# EXHIBIT B

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

1

1              UNITED STATES DISTRICT COURT

2              DISTRICT OF MINNESOTA

3    - - - - - - - - - - - - - - - - - - - - - - - - - -

4    In Re:

5    Bair Hugger Forced Air Warming

6    Products Liability Litigation

7

8    This Document Relates To:

9    All Actions           MDL No. 15-2666 (JNE/FLM)

10   - - - - - - - - - - - - - - - - - - - - - - - - - -

11

12          DEPOSITION OF JOHN P. ABRAHAM, Ph.D.

13                 VOLUME I, PAGES 1 - 396

14                 JULY 20, 2017

15

16

17          (The following is the deposition of JOHN P.

18   ABRAHAM, Ph.D., taken pursuant to Notice of Taking

19   Deposition, via videotape, at the offices of Ciresi

20   Conlin L.L.P., 225 South 6th Street, Suite 4600, in

21   the City of Minneapolis, State of Minnesota,

22   commencing at approximately 9:26 o'clock a.m., July

23   20, 2017.)

24

25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

2

 1  APPEARANCES:

 2       On Behalf of the Plaintiffs:

 3           Gabriel Assaad
             KENNEDY HODGES
 4           4409 Montrose Boulevard
             Suite 200
 5           Houston, Texas    77006

 6           Genevieve M. Zimmerman
             MESHBESHER & SPENCE, LTD.
 7           1616 Park Avenue
             Minneapolis, Minnesota    55404
 8
         On Behalf of the Defendants:
 9
             Peter J. Goss
10           Micah Hines
             BLACKWELL BURKE P.A.
11           431 South Seventh Street
             Suite 2500
12           Minneapolis, Minnesota    55415

13  ALSO PRESENT:

14       Ryan M. Stirewalt, Videographer
         Nathan Bushnell
15
                    EXAMINATION INDEX
16  WITNESS              EXAMINED BY          PAGE
    Dr. Abraham      Mr. Assaad            4,353
17                   Mr. Goss               340

18                     EXHIBIT INDEX
    EXHIBIT              DESCRIPTION         PAGE
19  Abraham
    1        Expert Report, John Abraham, Ph.D.   22
20  2        CV, John P. Abraham                  26
    3        Materials Considered                 27
21  4        Subpoena, John Abraham               34
    5        3M - University of St. Thomas        40
22           Research Proposal, Oct. 18, 2015
    6        Chart, "Job Information at Start of   84
23           Run," Abraham00000002
    7        3.1.4 CODE OF PROFESSIONAL CONDUCT,  104
24           Rev. 11/14, 6 pgs.
    8        Chart, "Summary of data 2010-011 vs  202
25           2010-026, 3M00075103 to 75104

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

3

1   9      Internal Correspondence 3M, From    303
            Eaton, Endle, Chen, Wagner00000013
2          to 0029
     10      email string, fowler to wagner,    329
3          10/13/2015, Wagner00000001 to 0003
     11      Article, Stochastic modeling of    345
4          atomizing spray in a complex swirl
            injector using large eddy
5          simulation, Apte, et al, 2009
     12      Article, Large-Eddy Simulation of    345
6          Realistic Gas Turbine Combustors,
            Moin and Apte, AIAA Journal, 2006
7    13      Article, Forced-air warming and    345
            ultra-clean ventilation do not mix,
8          McGovern, et al, The Journal of
            Bone & Joint Surgery, 2011
9    14      Article, Patient Warming Excess    345
            Heat: The Effects on Orthopedic
10         Operating Room Ventilation
           Performance, Belani, et al,
11        Anesthesia & Analgesia, 2013
     15     Exhibit B of Dr. Elghobashi's    349
12        errata sheet, with equation on back
           of one page

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

4

1                    P R O C E E D I N G S

09:26:46    2          (Witness sworn.)

3                    JOHN P. ABRAHAM, Ph.D.,

4               Called as a witness, being first

5               duly sworn, was examined and

6               testified as follows:

7                         EXAMINATION

8    BY MR. ASSAAD:

09:27:00    9          Q.    Please state your name for the record.

09:27:02   10          A.    John, J-O-H-N, Patrick, P-A-T-R-I-C-K,

09:27:09   11    Abraham, A-B-R-A-H-A-M.

09:27:12   12          Q.    Have you ever had your deposition taken

09:27:13   13    before?

09:27:14   14          A.    Yes.

09:27:15   15          Q.    Approximately how many times?

09:27:18   16          A.    Six or seven.

09:27:19   17          Q.    Were they all in the capacity of an expert

09:27:21   18    witness?

09:27:23   19          A.    Yes.

09:27:25   20          Q.    And we'll get to those in a little bit.  I'm

09:27:28   21    sure -- You've been through the drill before, but I

22    have to go over a few instructions --

23               (Interruption by the reporter.)

09:27:29   24          Q.    You've been through the drill before, but

09:27:33   25    I'm going to go over a few instructions.  Fair?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

5

09:27:36    1          First of all, I'm going to ask you numerous

09:27:38    2    questions today.  If you don't understand the question

09:27:40    3    I'm asking, please let me know and I'll do my best to

09:27:43    4    rephrase it.  Fair?

09:27:45    5       A.   Yes.

09:27:45    6       Q.   If you answer the question that I've asked,

09:27:46    7    I will assume that you understood the question.  Fair?

09:27:49    8       A.   Yes.

09:27:51    9       Q.   At any time you want to take a break just

09:27:53   10    please let me know.  I just ask that you request a

09:27:55   11    break after you answer a pending question.  Fair?

09:27:58   12       A.   Yes.

09:28:00   13       Q.   Okay.  We've met before; correct?

09:28:01   14       A.   Yes.

09:28:02   15       Q.   We've actually met at the deposition of Dr.

09:28:04   16    Elghobashi; correct?

09:28:05   17       A.   That is correct.

09:28:06   18       Q.   And actually we had a -- two brief

09:28:13   19    discussions at the hotel that we both stayed at in

09:28:15   20    Irvine, California.

09:28:16   21       A.   That is correct.

09:28:17   22       Q.   And you agree with me that none of the

09:28:20   23    conversations that we've had had any -- anything to do

09:28:20   24    with the substantive issues in this case.

09:28:22   25       A.   I agree.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

6

09:28:23   1      Q.   In fact, you commented on my demeanor during

09:28:26   2   the deposition; correct?

09:28:27   3      A.   That is correct.

09:28:28   4      Q.   And on my jacket that I'm actually wearing

09:28:31   5   today; correct?

09:28:32   6      A.   That is correct.

09:28:32   7      Q.   And then we had a brief discussion about

09:28:35   8   your work in global warming.

09:28:37   9      A.   That is correct.

09:28:38   10      Q.   Okay.

09:28:39   11           MR. GOSS:   Are you contributing to global

09:28:41   12   warming?

09:28:43   13           THE WITNESS:   Yes.   Right now.

09:28:46   14           (Laughter.)

09:28:46   15      Q.   And -- And actually we talked about my

09:28:49   16   appreciation for your work in the global warming area;

09:28:51   17   correct?

09:28:52   18      A.   That is true.

09:28:53   19      Q.   Okay.   And it's something you're passionate

09:28:54   20   about.

09:28:55   21      A.   That is true.

09:28:56   22      Q.   And you publish frequently in the area of

09:28:59   23   global warming or climate change.

09:29:00   24      A.   That is true.

09:29:02   25      Q.   In fact I was looking at your CV, and within

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

7

| | | |
|---|---|---|
| 09:29:06 | 1 | the first -- I only looked at the first 40 |
| 09:29:08 | 2 | publications, and about 25 percent of those are on the |
| 09:29:10 | 3 | issue of global warming or climate change. |
| 09:29:13 | 4 | A.  That sounds reasonable. |
| 09:29:17 | 5 | Q.  You give talks and presentations with |
| 09:29:20 | 6 | respect to climate change and global warming. |
| 09:29:22 | 7 | A.  That is true. |
| 09:29:24 | 8 | Q.  And you even have some high-profile debates |
| 09:29:27 | 9 | I've heard online regarding these issues. |
| 09:29:29 | 10 | A.  Correct. |
| 09:29:33 | 11 | Q.  And my understanding is the reason why you |
| 09:29:36 | 12 | are passionate is because of the impact that global |
| 09:29:40 | 13 | warming or climate change could have on the future of |
| 09:29:43 | 14 | our -- of our world. |
| 09:29:45 | 15 | A.  That is true. |
| 09:29:46 | 16 | Q.  Okay.  And you want to do whatever you can |
| 09:29:49 | 17 | make the world a better place for -- for you and for |
| 09:29:53 | 18 | your family and for the rest of the people in the |
| 09:29:54 | 19 | world. |
| 09:29:55 | 20 | A.  Yes. |
| 09:29:58 | 21 | Q.  However, I think we could agree, based on |
| 09:30:00 | 22 | the recent events in our country, that some people are |
| 09:30:05 | 23 | in disagreement in the scientific community over |
| 09:30:07 | 24 | whether climate change even exists. |
| 09:30:10 | 25 | A.  There is a very small minority of people in |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

8

09:30:15  1   the scientific community --

09:30:17  2         Actually I don't know of anyone who would

09:30:21  3   disagree that climate change exists.  Sitting here now

09:30:25  4   I cannot think of a single person in the scientific

09:30:28  5   community who doubts climate change.

09:30:30  6       Q.   But there's some high political figures that

09:30:32  7   disagree that climate change exists.

09:30:36  8       A.   I mean, we have to be a little bit careful

09:30:39  9   because I don't think any political figures disagree

09:30:42  10  climate change exists.  I think there are some people

09:30:45  11  who disagree that humans are causing current climate

09:30:50  12  change, or that humans are a significant cause of

09:30:53  13  current climate change, but I don't know of anyone who

09:30:56  14  would say climate change doesn't exist.

09:30:58  15      Q.   Okay.  I think that makes sense.

09:31:02  16         I guess the better question is some people

09:31:04  17  in the -- in the community believe that people don't

09:31:09  18  have a -- a significant impact on climate change.

09:31:13  19      A.   Yes.

09:31:14  20      Q.   Okay.  Would that include people in the

09:31:17  21  scientific community as well, even though it's a very

09:31:20  22  few minority?

09:31:23  23      A.   There is a small minority that thinks --

09:31:28  24         I mean, this is a difficult question and I'm

09:31:29  25  going to work to give you the best answer possible.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

9

09:31:33    1    There's a very small minority of people in the

09:31:37    2    scientific community who think that while climate

09:31:41    3    change may exist and it's due in part to humans, it

09:31:47    4    isn't going to be bad; or that the solutions may be

09:31:53    5    more costly than the problem.  So some of the most

09:31:58    6    high-profile contrarians of the mainstream view

09:32:04    7    acknowledge humans' affect on climate change, but it's

09:32:07    8    an issue of magnitude and severity.

09:32:11    9        Q.   Okay.  And I take it that you disagree with

09:32:17   10    respect to the people that the solutions would be more

09:32:19   11    costly than the problem.

09:32:26   12        A.   I'm not an economist, I'm a climate

09:32:30   13    scientist.  My understanding of climate change

09:32:34   14    economics, through reading the literature, tells me

09:32:38   15    that the most reputable climate-change economists are

09:32:43   16    reporting that there will be social and economic costs

09:32:49   17    with respect to future climate change, those costs

09:32:52   18    will get worse as climate change gets worse, and in

09:32:57   19    many cases the solutions are less expensive than the

09:33:01   20    costs.

09:33:02   21        Q.   Okay.  In any event, given the potential

09:33:05   22    impact of climate change, it is important to pursue

09:33:08   23    good science.

09:33:09   24        A.   I agree.

09:33:12   25        Q.   And to pursue good science you want a solid

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

10

09:33:16    1    methodology.

09:33:18    2         A.   Can you define what you mean by

09:33:20    3    "methodology"?

09:33:22    4         Q.   Let me ask you this.  I assume in your

09:33:27    5    research you use methodology to pursue answers to

09:33:31    6    problems.

09:33:32    7         A.   Yes.

09:33:33    8         Q.   So how would you define "methodology"?

09:33:37    9         A.   I would define methodology as -- as your

09:33:41    10   plan.

09:33:46    11        Q.   And to pursue good science you would need a

09:33:48    12   good plan.

09:33:50    13        A.   I would agree.

09:33:52    14        Q.   Okay.  And in reviewing a -- a methodology,

09:34:08    15   a methodology or plan should be repeatable; correct?

09:34:14    16   That's why you have a methodology.

09:34:17    17        A.   I would say the results should be

09:34:20    18   reproducible.

09:34:21    19        Q.   Okay.  So if you have a good methodology the

09:34:26    20   results should be reproducible.

09:34:31    21        A.   I want to be careful about not conflating

09:34:34    22   those two things.  I mean, you can reproduce results

09:34:37    23   using a different methodology.  The key is are the

09:34:43    24   results reproducible.

09:34:44    25        Q.   Okay.  So my understanding is you could have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

11

09:34:48    1    a different methodology but obtain repeatable results.

09:34:57    2        A.   Yes.

09:34:58    3        Q.   Okay.  But -- But the --

09:35:05    4             But whichever methodology you use, the

09:35:07    5    methodology has to be reasonable.

09:35:30    6        A.   I would agree the methodology has to be

09:35:33    7    reasonable.

09:35:40    8        Q.   And with respect to methodology there might

09:35:46    9    be multiple methodologies, but they should be

09:35:49   10    identified so someone in the community could determine

09:35:53   11    whether or not there's any potential biases in the

09:35:55   12    methodology.

09:35:57   13        A.   Yes.

09:36:08   14        Q.   And with respect to methodology, one of the

09:36:10   15    key is is that you need to communicate any assumptions

09:36:13   16    you make in the methodology.

09:36:17   17        A.   You need to communicate assumptions that are

09:36:19   18    relevant that you expect could affect the results.

09:36:22   19        Q.   Okay.  And you would identify those in the

09:36:25   20    methodology.

09:36:32   21        A.   I mean, it depends on how broad you're

09:36:36   22    interpreting the term "methodology."  If your

09:36:39   23    methodology, for example, is a test plan or a

09:36:43   24    simulation method --

09:36:48   25             Could you restate your question?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

12

09:36:49  1      Q.   Well you've written many scientific papers;

09:36:51  2  correct?

09:36:52  3      A.   Correct.

09:36:52  4      Q.   And usually there's a method -- a methods

09:36:56  5  section in the paper; correct?

09:36:57  6      A.   A methods or an equivalent of a methods

09:36:59  7  section.

09:36:59  8      Q.   Yes.  There's some -- There's some section

09:37:00  9  that says what you did and how you did it.

09:37:03  10     A.   Yes.

09:37:04  11     Q.   Okay.  And the reason why that's there is

09:37:06  12  for someone else that's reviewing the paper, it's

09:37:09  13  there to understand the methodology that you used in

09:37:13  14  performing your research.

09:37:14  15     A.   Correct.

09:37:15  16     Q.   Okay.  And to determine whether or not the

09:37:17  17  methodology you used is in fact correct?

09:37:20  18     A.   Yes.

09:37:21  19     Q.   Whether it is reasonable?

09:37:23  20     A.   Yes.

09:37:23  21     Q.   Whether it is a methodology used and well

09:37:28  22  respected in the scientific community.

09:37:29  23     A.   Yes.

09:37:30  24     Q.   Okay.  And in fact you've written papers on

09:37:50  25  biases and errors with respect to issues in research.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

13

09:37:58    1       A.    Yes.

09:38:13    2       Q.    And in fact you wrote an article in the

09:38:15    3    Bulletin of the American Meteorological Society titled

09:38:20    4    *XBT science: Assessment of XBT biases and errors*.

09:38:26    5       A.    I -- I wrote an article --

09:38:28    6             The title sounds correct.

09:38:30    7       Q.    Uh-huh.

09:38:30    8       A.    I'm assuming you read it correctly, but yes,

09:38:33    9    I wrote an article that is either that exact title or

09:38:37   10    something similar.

09:38:38   11       Q.    And it's important to communicate all your

09:38:40   12    assumptions in your methodology because until research

09:38:49   13    -- Strike that.

09:38:50   14             You mentioned you make -- you have to

09:39:03   15    identify assumptions that may affect the results of

09:39:07   16    your research; correct?

09:39:08   17       A.    Correct.

09:39:09   18       Q.    Okay.  And it's important to communicate all

09:39:11   19    -- it's important to communicate all your assumptions,

09:39:14   20    because until research is -- the research is complete,

09:39:16   21    you may not know whether the assumptions you make --

09:39:19   22    you made impact the outcome.

09:39:22   23       A.    I disagree.

09:39:24   24       Q.    Why?

09:39:26   25       A.    Because some assumptions you make are so

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

14

09:39:29    1    trivial you know they would not affect the results.

09:39:35    2    So I would -- I would amend your question, change your

09:39:39    3    question to not use the word "all" assumptions, but I

09:39:43    4    would say the important assumptions.

09:39:45    5        Q.    Okay.  So --

09:39:47    6             But you want to identify them and

09:39:50    7    communicate them in the methodology because for the

09:39:53    8    important assumptions, until the research is complete

09:39:58    9    you may not know whether those important assumptions

09:40:01   10    you made impact the outcome.

09:40:03   11        A.    Correct.

09:40:04   12        Q.    Okay.  And you agree with me that in any

09:40:11   13    type of research you do that you want to gather as

09:40:13   14    much information as possible regarding research that

09:40:18   15    has been done in the scientific community.

09:40:23   16        A.    I don't necessarily agree with that, and I

09:40:28   17    can explain.  You gather as much background

09:40:34   18    information as you need to understand what people have

09:40:38   19    done and what the current state of the art is and the

09:40:43   20    current state of the knowledge is.  Let's say that I'm

09:40:46   21    doing a paper on XBT biases, which is the title of the

09:40:51   22    paper you read.

09:40:53   23        Q.    I think I understand your answer, though.  I

09:40:55   24    mean, I don't need an example.  I think I understand

09:40:57   25    what you're saying.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

15

09:40:58　1　　　A.　But -- But if I give one it'll be clear for

09:41:01　2　the record.

09:41:01　3　　　Q.　I get it though, I don't need -- I'm fine.

09:41:04　4　　　A.　Okay.

09:41:05　5　　　Q.　So with respect to determining whether or

09:41:20　6　not a -- an important assumption is correct or not,

09:41:24　7　how do you determine that?

09:41:32　8　　　A.　Well you may look at someone else -- There's

09:41:36　9　a number of ways.

09:41:37　10　　　For example, you may find someone who has

09:41:40　11　done work in the past and they've articulated or shown

09:41:43　12　that a certain assumption matters or doesn't matter.

09:41:46　13　Maybe you've done work in the past and you've

09:41:48　14　quantified the effect of an assumption.  Maybe the

09:41:52　15　assumption is obvious on its face.  So there's a

09:41:58　16　number of ways where you might identify that an

09:42:01　17　assumption matters or doesn't matter.

09:42:03　18　　　Q.　Umm-hmm.  Well you agree with me that

09:42:10　19　certain assumptions can significantly affect the

09:42:13　20　results.

09:42:14　21　　　A.　I agree.

09:42:23　22　　　Q.　Now I forgot to give you this instruction,

09:42:25　23　but I'm going to ask you many questions today.  I

09:42:29　24　don't -- Unless I ask you to guess or give an

09:42:31　25　approximation, when it comes to your expert opinions I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

16

09:42:36  1   would not like any guessing, I'd like your -- your

09:42:39  2   opinions without guessing.  Fair enough?

09:42:41  3       A.   Fair.

09:42:42  4       Q.   And I don't think anyone here wants any

09:42:44  5   guessing.  But I might ask you to guess like guess how

09:42:47  6   many hours you spent on something, that might be a

09:42:49  7   guess.  But when it comes to your expert opinions we

09:42:52  8   don't want any guessing.  Fair enough?

09:42:53  9       A.   Fair.

09:42:54  10          MR. GOSS:  I think we would -- rather than

09:42:56  11  use the word "guess," I think approximation is the

09:42:58  12  better term to use.

09:42:59  13      A.   So if I could ask for a clarification.

09:43:01  14          Are you also asking me not to approximate,

09:43:04  15  or are you just asking me not to guess?

09:43:07  16          MR. GOSS:  He'll let -- He'll let --

09:43:07  17      Q.   If the approx -- That's why --

09:43:09  18          If the approximation isn't something you can

09:43:10  19  give as an expert opinion, for example, if I ask you a

09:43:15  20  temperature in this room, you know, you might say well

09:43:18  21  it's approximately between, you know, 70 and 75, you

09:43:21  22  know, that's within -- within your education, training

09:43:24  23  and expertise and just your experience.  But to make

09:43:28  24  an outlying guess about something when you don't know

09:43:30  25  the answer, just say you don't know the answer.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

17

```
09:43:32   1        A.   Thank you.

09:43:33   2        Q.   Okay?

09:43:33   3             You said you had six other depositions as an

09:43:40   4   expert witness; correct?

09:43:41   5        A.   Incorrect.  I think I said I had six or

09:43:43   6   seven.

09:43:44   7        Q.   Six or seven.

09:43:45   8        A.   Sorry.

09:43:46   9        Q.   Okay.  Any of them deal with forced-air

09:43:52  10   warming?

09:43:52  11        A.   No.

09:43:53  12        Q.   Any of them deal with patient-warming

09:43:55  13   devices?

09:43:55  14        A.   No.

09:43:56  15        Q.   Would most of them be with respect to burn

09:43:59  16   cases?

09:44:00  17        A.   No.

09:44:02  18        Q.   What were the six or seven?

09:44:06  19        A.   I've given a deposition related to a burn

09:44:09  20   case.  I've given a number of depositions related to

09:44:16  21   intellectual property litigation.  In fact I think, I

09:44:23  22   am quite certain, that the remaining depositions were

09:44:25  23   related to intellectual property cases.

09:44:28  24        Q.   Okay.  So one burn case and the rest dealing

09:44:31  25   with intellectual property cases.
```

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

18

| | | |
|---|---|---|
| 09:44:34 | 1 | A. Correct. |
| 09:44:35 | 2 | Q. And they would be patent litigation cases? |
| 09:44:39 | 3 | A. Correct, if -- if "patent litigation cases" |
| 09:44:42 | 4 | would include things like International Trade |
| 09:44:47 | 5 | Commission, Inter Partes Review. |
| 09:44:49 | 6 | Q. Okay. |
| 09:44:50 | 7 | A. But I would just say within the intellectual |
| 09:44:52 | 8 | property realm. |
| 09:44:55 | 9 | Q. Okay. |
| 09:44:55 | 10 | A. I don't know if they are technically |
| 09:44:57 | 11 | considered patent litigation cases. |
| 09:44:59 | 12 | Q. Fair enough. |
| 09:45:00 | 13 | Now as an expert in this case you agree with |
| 09:45:03 | 14 | me that you are supposed to be objective. |
| 09:45:05 | 15 | A. Yes. |
| 09:45:07 | 16 | Q. You're not supposed to be an advocate for |
| 09:45:10 | 17 | either side in this case; correct? |
| 09:45:11 | 18 | A. Correct. |
| 09:45:11 | 19 | Q. And as a professor, you agree that providing |
| 09:45:14 | 20 | false data or results would be fraudulent. |
| 09:45:16 | 21 | A. Correct. |
| 09:45:17 | 22 | Q. Okay. And if your research provided false |
| 09:45:23 | 23 | data or results that would be considered research |
| 09:45:25 | 24 | fraud; correct? |
| 09:45:28 | 25 | A. If it knowingly -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

19

09:45:29   1              I think if it's knowingly fraudulent, then

09:45:31   2    yes.

09:45:31   3        Q.    Okay.  And I take it you would never commit

09:45:33   4    research fraud or put your name on a court document

09:45:35   5    that you did not believe in.

09:45:37   6        A.    Correct.

09:45:39   7        Q.    You do understand that you are under oath

09:45:41   8    today; correct?

09:45:42   9        A.    Correct.

09:45:43   10       Q.    And that's under penalty of perjury;

09:45:45   11   correct?

09:45:45   12       A.    Correct.

09:45:45   13       Q.    And you understand what that means; correct?

09:45:48   14       A.    I think I do.

09:45:52   15       Q.    Did your lawyer not explain to you that

09:45:54   16   sitting here today is like sitting in a courtroom,

09:45:58   17   you're under oath and the same rules apply and the

09:46:00   18   same penalties apply?

09:46:02   19       A.    I understand that.

09:46:03   20       Q.    Okay.  And by the way, do you like to be

09:46:05   21   called Mr. Abraham, Dr. Abraham, John, what do you

09:46:09   22   like?

09:46:09   23       A.    For a deposition I'd prefer Dr. Abraham.

09:46:11   24       Q.    Okay.  So Dr. Abraham, do you agree, or can

09:46:15   25   we agree that if for any reason you discover that one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

20

09:46:19    1   of the opinions you put in your report is incorrect,

09:46:23    2   or not accurate, or if you even change your opinions

09:46:26    3   today, that -- that you will tell me today?

09:46:30    4        A.   Yes.

09:46:31    5        Q.   Okay.  This is the time for me to take your

09:46:34    6   deposition and ask you questions about your opinions

09:46:41    7   and all your opinions in this case.  You understand

09:46:43    8   that.

09:46:43    9        A.   Yes.

09:46:44   10        Q.   Okay.  And when I leave here today I expect

09:46:47   11   to have all your opinions outlined and understood that

09:46:54   12   I could go back through the deposition and read.  You

09:46:56   13   understand that?

09:46:57   14        A.   I understand that.

09:46:58   15        Q.   Okay.  You understand that I'm one of the

09:46:59   16   attorneys working on behalf of over 2700 people who

09:47:03   17   have filed lawsuits against 3M that they were harmed

09:47:06   18   by the Bair Hugger.

09:47:07   19        A.   I do not understand that.

09:47:08   20        Q.   Okay.  Do you understand that there's been

09:47:10   21   over 2700 lawsuits in this case, in this litigation in

09:47:14   22   Minnesota?

09:47:14   23        A.   I do not understand that.

09:47:15   24        Q.   Okay.  So you, sitting here today, you don't

09:47:21   25   know how many cases were fi -- have been filed.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

21

09:47:22    1        A.    Correct.

09:47:23    2        Q.    Okay.  Did you understand there were many

09:47:25    3   cases that were filed?

09:47:30    4        A.    I would say I know there are a number of

09:47:32    5   cases filed.  "Many" -- I don't know the number.

            6        Q.    Okay.

09:47:36    7        A.    Sitting here right now I do not know the

09:47:39    8   number of cases filed.

09:47:44    9        Q.    You also understand that the plaintiffs have

09:47:51   10   a right to determine all the methodologies you used to

09:47:56   11   reach your opinions.

09:47:57   12        A.    Correct.

09:47:58   13        Q.    Okay.  So that at the end we could test

09:48:03   14   whether or not your methodologies are reliable.

09:48:06   15        A.    Correct.

09:48:07   16        Q.    And do you understand what I mean by

09:48:08   17   "reliable"?

09:48:10   18        A.    Yes.

09:48:11   19        Q.    Like reproducible.

09:48:13   20        A.    Yes.

09:48:13   21        Q.    Okay.

09:48:24   22        A.    Actually that may not be quite right.  You

09:48:26   23   could have results which are reliable, but they may

09:48:35   24   not be reproducible.

09:48:38   25        Q.    Okay.  What do you mean by that in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

22

09:48:42   1   science -- with respect to research in the scientific

09:48:45   2   community?

09:48:45   3       A.   Let me give you an example.  I work on areas

09:48:50   4   of patient-specific medical interventions, and let's

09:49:00   5   say I did an experiment on someone, on a person, and

09:49:08   6   let's say that person died or was other -- otherwise

09:49:15   7   unavailable for a repeat experiment.  Someone could

09:49:20   8   not reproduce the experiment on that person, and

09:49:23   9   reproducing it on someone else would be slightly

09:49:26  10   different.

09:49:26  11       Q.   Let me define it, then.  I understand that

09:49:29  12   one outlier.

09:49:30  13           But with respect to your issues in this

09:49:35  14   case, computational fluid dynamics, heat transfer, the

09:49:40  15   laws of thermodynamics, you agree with me that if

09:49:44  16   something is reliable, it should be reproducible.

09:49:48  17       A.   Yes.

09:49:51  18       Q.   Okay.  So moving on.

09:50:15  19           (Discussion off the stenographic record.)

          20           (Abraham Exhibit 1 marked for

          21           identification.)

          22   BY MR. ASSAAD:

09:50:15  23       Q.   What's been marked as Exhibit 1 is a copy of

09:50:18  24   your report that is -- was submitted to the plaintiffs

09:50:22  25   on June 2nd, 2017.  I'll represent to you that this is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

23

09:50:27  1  a copy -- a true copy of your report.  If you want to

09:50:29  2  review it, you can review it at a break, but I don't

09:50:33  3  want to get into that issue right now.

09:50:36  4          Now my understanding is that this report

09:50:50  5  deals with the Bair Hugger Model 750 or 775; correct?

09:50:58  6      A.   The Bair Hugger model is listed, I think

09:51:01  7  it's the --

09:51:06  8          Is it listed in this report?  If it's not

09:51:18  9  listed, then I'll say yes to that.

09:51:21  10     Q.   Okay.

09:51:40  11     A.   Yes, it's listed on page 5, third paragraph

09:51:43  12 from the bottom.

09:51:45  13     Q.   Okay.  And this report you do not --

09:51:53  14         This report does not contain anything with

09:51:54  15 respect to any studies done on the Model 505; correct?

09:52:01  16     A.   This report does not.

09:52:03  17     Q.   Okay.

09:52:03  18     A.   However, since drafting this report I have

09:52:06  19 analyzed that blower system.

09:52:09  20     Q.   Okay.  When was this report drafted?

09:52:21  21     A.   I'm going to estimate.

09:52:23  22     Q.   Okay.

09:52:23  23     A.   I would estimate early 2016, but I don't

09:52:31  24 have an exact date.

09:52:39  25     Q.   And what was when you -- when you completed

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

24

09:52:41    1    the final draft was early 2016?

09:52:43    2        A.    No.

09:52:45    3        Q.    Okay.  When did you complete the final

09:52:47    4    draft?

09:52:49    5        A.    Well the final draft would have been

09:52:52    6    completed after I received the expert report from Dr.

09:52:57    7    Elghobashi, so that part was added, that section was

09:53:03    8    added after -- after that date.

09:53:05    9        Q.    Okay.  Could we -- Could we --

09:53:08    10        I'm going to just give you page numbers and

09:53:10    11   let me just see if we could go through this quickly.

09:53:13    12        Would you agree with me that pages 1 through

09:53:21    13   10, the first part, was completed by early 2016?

09:53:36    14        A.    You said "10, the first part"?

09:53:38    15        Q.    Page 10 and -- with paragraph subtitled B.

09:53:43    16        A.    Yes.  I -- To my best recollection, that

09:53:46    17   would have been completed early 2016.

09:53:48    18        Q.    Okay.  And then the part with respect to the

09:53:51    19   schlieren and -- and the criticisms of Elghobashi

09:53:58    20   would have been done probably this year, after you

09:54:01    21   received those reports.

09:54:02    22        A.    Correct.

09:54:03    23        Q.    Okay.  And you've kept detailed bills with

09:54:12    24   respect to all the work you've done in this case.

09:54:13    25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

25

09:54:14   1      Q.   Okay.  So would you agree with me that this

09:54:19   2   report was completed with respect to your CFD, not

09:54:23   3   your criticisms of the schlieren, prior to Science Day

09:54:27   4   where you testified in front of the Court in this

09:54:29   5   case?

09:54:30   6      A.   Yes.

09:54:46   7      Q.   And let me just correct one thing.  Go to

09:54:50   8   page 11 and the top of 12.  Was that -- part D,

09:54:59   9   section D.  Would that have been part of your report

09:55:02  10   in January of 2016, or was that added later on?

09:55:12  11      A.   That would have been part of the original,

          12   the early --

          13      Q.   Okay.

09:55:16  14      A.   -- the early report.

09:55:19  15      Q.   Okay.  So now we have, just to be clear and

09:55:21  16   for the record, pages 1 through 10 of -- section B of

09:55:28  17   10, and pages 11, section D, which completes on

09:55:31  18   section 12, was all completed in January of 2016.

09:55:34  19           MR. GOSS:  Object to form.

09:55:36  20           MR. ASSAAD:  Basis?

09:55:37  21           MR. GOSS:  I think he said "early" 2016.

09:55:39  22      Q.   Early 2016.

09:55:41  23      A.   That is the best of my recollection.

09:55:43  24      Q.   And definitely before Science Day in this

09:55:45  25   case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

26

09:55:46   1        A.    Yes.

09:55:47   2        Q.    Okay.  Now for today's deposition all my

09:56:00   3   questions will be with respect to the report that we

09:56:06   4   have as -- marked as Exhibit 1.  You understand that.

09:56:08   5        A.    I understand it because you've just told me.

09:56:10   6        Q.    Okay.  Any work that you did on the 505 is

09:56:13   7   not part of this report so we're not going to talk

09:56:15   8   about that today.  You understand that?

09:56:17   9        A.    I do.

09:56:17  10        Q.    Okay.

09:56:28  11             (Abraham Exhibit 2 marked for

          12             identification.)

          13   BY MR. ASSAAD:

09:56:39  14        Q.    What's been marked as Exhibit 2 is a copy of

09:56:41  15   your curriculum vitae that was provided to us with

09:56:44  16   your report.  Is this the most --

09:56:46  17             Is this an accurate copy of your CV?

09:57:03  18        A.    (Witness reviewing exhibit.)  This would be

09:57:12  19   an accurate copy of my CV at the time it was produced.

09:57:16  20        Q.    Okay.  I assume there might be a few new

09:57:18  21   publications?

09:57:19  22        A.    Correct.

09:57:20  23        Q.    Any publications dealing with

09:57:24  24   patient-warming devices?

09:57:25  25        A.    No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

27

09:57:28   1        Q.    Any publications dealing with the issues in

09:57:30   2   this case?

09:57:30   3        A.    No.

09:57:31   4        Q.    Okay.  And it seems like you've written

09:57:37   5   about 100, 102 publications since 2010.

09:57:42   6        A.    That sounds about right.

09:57:43   7        Q.    Okay.  About 15 publications per year; that

09:57:47   8   sound about right?

09:57:47   9        A.    Yes.

09:57:48   10        Q.    Okay.  And I take it these are publications

09:57:50   11   which you have worked with research students as their

09:57:56   12   advisor, or research that St. Thomas is doing that

09:57:59   13   you've coauthored with other people; correct?

09:58:02   14        A.    Oftentimes, yes.

09:58:03   15        Q.    Okay.  Are you the main writer in many of

09:58:06   16   these publications, or just the advisor overseeing the

09:58:12   17   research?

09:58:13   18        A.    I am usually the main writer.

09:58:15   19        Q.    Okay.  Now --

           20              (Abraham Exhibit 3 marked for

           21              identification.)

           22   BY MR. ASSAAD:

09:58:35   23        Q.    What's been marked as Exhibit 3 is a

09:58:38   24   document that was provided to us of all the materials

09:58:40   25   you considered with respect to your expert report of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

28

| | | |
|---|---|---|
| 09:58:45 | 1 | Exhibit 1.  Do you recall this document? |
| 09:58:49 | 2 | A.   No. |
| 09:58:50 | 3 | Q.   Have you ever seen this document before? |
| 09:58:54 | 4 | A.   I don't recall seeing this document. |
| 09:58:56 | 5 | Q.   Okay.  This was provided to us by defense |
| 09:58:58 | 6 | counsel discussing all the materials considered by you |
| 09:59:04 | 7 | in -- in -- and relied upon in formulating your |
| 09:59:10 | 8 | opinions in this case. |
| 09:59:10 | 9 | Do you agree with me that this is a complete |
| 09:59:13 | 10 | list of the materials you considered that formulated |
| 09:59:18 | 11 | your opinions in -- that are identified in Exhibit 1? |
| 09:59:25 | 12 | Let me rephrase that.  I'm going to go back |
| 09:59:28 | 13 | a little bit. |
| 09:59:29 | 14 | Exhibit 1 has references; correct? |
| 09:59:34 | 15 | A.   Correct. |
| 09:59:35 | 16 | Q.   Okay.  So if you take those references along |
| 09:59:37 | 17 | with this Exhibit 3, would that constitute all the |
| 09:59:40 | 18 | materials you considered and relied upon in |
| 09:59:43 | 19 | formulating your opinions? |
| 10:00:12 | 20 | A.   (Witness reviewing exhibits.)  We'd have to |
| 10:00:13 | 21 | include the -- the videos, which I -- which I mention |
| 10:00:19 | 22 | explicitly in the report.  They're not in the |
| 10:00:21 | 23 | reference list of the report.  I'm trying to think of |
| 10:00:29 | 24 | anything that would not be in these two groups. |
| 10:00:40 | 25 | Sitting here now I cannot think of anything |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

29

10:00:44  1  not in one of these two groups.

10:00:47  2      Q.   Okay.  And if you do later on, just say,

10:00:51  3  hey, I forgot to include this on Exhibit C.

10:00:54  4      A.   Thank you.

10:00:55  5      Q.   Okay?

10:00:57  6           Now have you had a chance to review your

10:01:12  7  report before today's deposition?

10:01:14  8      A.   I didn't quite hear that question.  Could

10:01:16  9  you --

10:01:16  10      Q.   Have you reviewed your report before today's

10:01:18  11  deposition?

10:01:19  12      A.   Yes.

10:01:19  13      Q.   Okay.  And I assume you met with counsel and

10:01:22  14  went over your report; correct?

10:01:28  15      A.   I met with counsel, but I don't recall going

10:01:30  16  over the report.

10:01:31  17      Q.   Okay.  But you recently reviewed your

10:01:33  18  report.

10:01:33  19      A.   Yes.

10:01:34  20      Q.   Any corrections you would like to make to

10:01:36  21  your report before we begin discussing your report?

10:01:40  22      A.   Not at this time.

10:01:41  23      Q.   Okay.  All the opinions you intend to offer

10:01:43  24  to the court and the jury in this matter are contained

10:01:45  25  in your report; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

30

| | | |
|---|---|---|
| 10:01:52 | 1 | A.   Well the only other opinion that I have |
| 10:01:55 | 2 | that's not in this report is that lower flow blankets |
| 10:02:00 | 3 | -- lower flow forced-air warming devices also do not |
| 10:02:03 | 4 | interrupt the airflow in an operating room, but aside |
| 10:02:05 | 5 | from that, yes. |
| 10:02:07 | 6 | Q.   When you say "lower flow," are you talking |
| 10:02:08 | 7 | about devices such as the Mistral? |
| 10:02:11 | 8 | A.   No. |
| 10:02:12 | 9 | Q.   What -- What's lower flow? |
| 10:02:14 | 10 | A.   505. |
| 10:02:14 | 11 | Q.   Okay.  You stand by your report? |
| 10:02:26 | 12 | A.   Yes. |
| 10:02:27 | 13 | Q.   You checked your report for any type of |
| 10:02:28 | 14 | error, mathematical or computational? |
| 10:02:31 | 15 | A.   Yes. |
| 10:02:32 | 16 | Q.   And you believe that all the numbers in your |
| 10:02:33 | 17 | report are correct. |
| 10:02:34 | 18 | A.   Yes. |
| 10:02:35 | 19 | Q.   Okay.  My understanding is, and I'll get |
| 10:02:38 | 20 | into more detail, but the main opinions I obtained |
| 10:02:41 | 21 | from your report is that the Bair Hugger does not |
| 10:02:43 | 22 | disrupt airflow; correct?  Over the surgical site. |
| 10:02:48 | 23 | A.   That is one opinion. |
| 10:02:49 | 24 | Q.   Okay.  That the Bair Hugger does not |
| 10:02:52 | 25 | increase the temperature around the surgical table. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

31

10:02:58  1      A.   That is another opinion.

10:03:00  2      Q.   Okay.  You also claim that you val -- you

10:03:03  3  validated your CFD by temperature measurements;

10:03:07  4  correct?

10:03:08  5      A.   Correct.

10:03:09  6      Q.   And you did that by doing measurements on

10:03:12  7  the floor and the edge of the bed; correct?

10:03:16  8      A.   Those were two locations, correct.

10:03:18  9      Q.   Were there any other locations that you

10:03:19  10  measured temperature?

10:03:20  11      A.   Yes.

10:03:20  12      Q.   Where else?

10:03:30  13      A.   I took a number of temperatures in the room.

10:03:33  14      Q.   And what page are you looking at?

10:03:34  15      A.   The bottom of page 5.

10:03:36  16      Q.   Okay.

10:03:37  17      A.   And had a room average temperature of 62

10:03:42  18  degrees Fahrenheit.  And I think you mentioned on the

10:03:50  19  -- near the floor, I think you mentioned that.

10:03:52  20      Q.   Yes.

10:03:53  21      A.   That's one location.  And yes, at the edge

10:03:55  22  of the bed.

10:03:56  23      Q.   I'm going to correct you for a little bit.

10:03:57  24  I believe you measured -- your experimental

10:03:59  25  measurements was 61 and your calculated measurements

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

32

10:04:02    1    were 62 for an 8.1 million-grid-cell calculation.

10:04:07    2        A.    Thank you for that correction.

10:04:09    3        Q.    Okay.  My understanding is besides those

10:04:31    4    temperature measurements that we've just identified,

10:04:33    5    you did not take any other temperature measurements in

10:04:36    6    the room during your experiment.

10:04:38    7        A.    Correct.

10:04:39    8        Q.    You did not take any measurements of the

10:04:42    9    drape temperature; correct?

10:04:44   10        A.    Correct.

10:04:44   11        Q.    You did not take any measurements of the

10:04:46   12    temperature above the surgical site.

10:04:50   13        A.    Correct.

10:04:53   14        Q.    And if you go to page 12 of your report, you

10:04:56   15    would agree with me that this is a -- a represent --

10:05:00   16    this is a view of the temperature represented in the

10:05:07   17    operating room with respect to your CFD analysis along

10:05:11   18    that plane.

10:05:12   19        A.    Yes.

10:05:12   20        Q.    Okay.  And my understanding is also

10:05:17   21    validated by smoke tests?

10:05:22   22        A.    I don't know if I used the word "smoke."

10:05:24   23    Did I use the word "smoke" in this?

10:05:26   24        Q.    I don't know.  Did --

10:05:27   25              I mean, did you use smoke tests?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

33

| | | | |
|---|---|---|---|
| 10:05:29 | 1 | A. | Well technically it's not smoke. |
| 10:05:31 | 2 | Q. | It's water vapor; correct? |
| 10:05:37 | 3 | A. | Visible -- |
| 10:05:38 | 4 | | Condensed water droplets. |
| | 5 | Q. | Okay. |
| 10:05:39 | 6 | A. | And maybe for -- for this deposition I'm |

10:05:42  7  going to use the term "visible water vapor," but --

8  Q.  Okay.

10:05:46  9  A.  -- but that's a -- that's not a technical

10:05:48  10  term.

10:05:49  11  Q.  So you used visible water vapor in your

10:05:52  12  validation; correct?

10:05:54  13  A.  Correct.

10:05:54  14  Q.  Okay.  And you did that yourself.

10:05:57  15  A.  Yes.

10:05:59  16  And let me go back to a question you asked,

10:06:01  17  did I measure any other temperatures?  I actually did

10:06:05  18  one that I had forgotten about.  I measured the

10:06:08  19  temperature of the water vapor emerging from the water

10:06:12  20  vapor machine.

10:06:13  21  Q.  What was that temperature?

10:06:15  22  A.  I recall it 62.5 Fahrenheit.

10:06:20  23  Q.  Do you have that written down somewhere?

10:06:22  24  A.  Yes.

10:06:22  25  Q.  Okay.  And what device did you use for the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

34

10:06:27    1    visible water -- visible water machine?

10:06:34    2         A.    I recall it's a megasonic fog generator.

10:06:40    3         Q.    Can we just call it fog, a fog generator?

10:06:43    4         A.    Perfect.

10:06:44    5         Q.    Okay.   That's much easier to say than the

10:06:46    6    "visible water."

10:06:47    7         A.    I agree.

10:07:00    8         Q.    Is a fog generator a generally accepted

10:07:05    9    method in the scientific community to validate CFD?

10:07:10   10         A.    Yes.

10:07:32   11              (Abraham Exhibit 4 marked for

           12              identification.)

           13    BY MR. ASSAAD:

10:07:44   14         Q.    What's been marked as Exhibit 4 is a

10:07:46   15    subpoena issued by myself to you dated June 7th, 2017

10:07:52   16    for you to provide documents by June 21st, 2017.

10:07:59   17              Have you seen this document before?

10:08:01   18         A.    Yes.

10:08:01   19         Q.    Okay.   And this was given to you by counsel

10:08:04   20    for 3M when they received it; correct?

10:08:06   21         A.    Yes.

10:08:07   22         Q.    Did you go through the subpoena and produce

10:08:09   23    documents to 3M's attorneys that are responsive to

10:08:13   24    this subpoena?

10:08:16   25         A.    No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

35

10:08:17    1      Q.    Why not?

10:08:19    2      A.    I don't believe --

10:08:20    3            Well I produced the documents to Blackwell

10:08:23    4    Burke attorneys, --

10:08:24    5      Q.    Yes.

10:08:24    6      A.    -- not to 3M attorneys.

10:08:26    7      Q.    They're 3M attorneys.

10:08:27    8      A.    Oh.

10:08:27    9            (Laughter.)

10:08:28   10      A.    My naivete on this whole matter, the legal

10:08:33   11    matters.

10:08:33   12      Q.    Okay.  Okay.

10:08:33   13      A.    But yes, I produced documents to Blackwell

10:08:39   14    Burke attorneys related to this subpoena.

10:08:40   15      Q.    Okay.  Let's go to page four.  Now you

10:08:47   16    mentioned -- I'm going to only go through a few of

10:08:49   17    them.  You just mentioned you had some notes that you

10:08:53   18    created during your whole -- the whole process of

10:08:56   19    preparing -- of taking data and preparing your report?

10:08:59   20      A.    No.  I did not say that.

10:09:01   21      Q.    So you said the 62.5 temperature for the fog

10:09:03   22    generator, you said that was written down someplace.

10:09:06   23      A.    That's correct.

10:09:07   24      Q.    Where is it written down?

10:09:08   25      A.    It's written down in a manuscript submitted

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

36

10:09:10  1  to a journal, but it's not a note.

10:09:14  2      Q.   Okay.  So you've submitted this -- the -- a

10:09:19  3  manuscript to a journal in this case --

10:09:20  4      A.   Yes.

10:09:20  5      Q.   -- regarding your testing?

10:09:22  6          Who are the authors of that journal, or that

10:09:24  7  manuscript?

10:09:27  8      A.   Well I -- I wrote the manuscript.

10:09:35  9      Q.   Is it listed in your resume?

10:09:36  10     A.   Yes, it is.

10:09:37  11     Q.   Okay.

10:09:38  12     A.   It is the number one listing under the

10:09:41  13  wor -- section "Publications."

10:09:58  14     Q.   So do you have a copy of this manuscript

10:10:04  15  with you today?

10:10:05  16     A.   No.

10:10:06  17     Q.   Has it been accepted?

10:10:08  18     A.   Yes.

10:10:09  19     Q.   Okay.  And in there it talks about the Bair

10:10:14  20  Hugger?

10:10:16  21     A.   I don't know if the name Bair Hugger is

10:10:19  22  used.

10:10:20  23     Q.   Does it talk about a forced-air warming

10:10:23  24  device?

10:10:23  25     A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

37

10:10:24  1    Q.    Okay.  And is it with the 505 or the 750

10:10:27  2    model?

10:10:28  3    A.    Both.

10:10:28  4    Q.    Okay.  And you wrote this with B. D.

10:10:35  5    Plourde; is that how you pronounce it?

10:10:37  6    A.    Plourde.

10:10:38  7    Q.    Plourde.  And Ms. Vallez?

10:10:40  8    A.    Correct.

10:10:41  9    Q.    Okay.  Did those two assist you with the CFD

10:10:44  10   analysis that is the subject of your report?

10:10:56  11   A.    No.

10:10:58  12   Q.    So it's my understanding that the report --

10:11:04  13   the -- the creation of the CFD and the results was all

10:11:08  14   created by you?

10:11:10  15   A.    All of the results contained in the document

10:11:13  16   and in my expert report were created by me.

10:11:17  17   Q.    What about the geometry?

10:11:19  18   A.    The geometry was not created by me.

10:11:21  19   Q.    Who was it created by?

10:11:23  20   A.    I don't know the answer to that.

10:11:29  21   Q.    Was it given to you?

10:11:30  22   A.    Yes.

10:11:31  23   Q.    By whom?

10:11:33  24   A.    If I recall, it was supplied by an attorney,

10:11:38  25   but it would have been two years ago.  I don't recall

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

38

10:11:41  1  the person.

10:11:43  2      Q.   Was it Lori Cohen?

10:11:45  3      A.   No.

10:11:46  4      Q.   Christiana Jacxsens?

10:11:49  5      A.   No.

10:11:49  6      Q.   Evan Holden?

10:11:50  7      A.   No.

10:11:51  8      Q.   Okay.  Was it someone from Greenberg

10:11:54  9  Traurig?

10:11:55  10      A.   I believe so.

10:11:58  11      Q.   And this was submitted to *Numerical Heat*

10:12:01  12  *Transfer*, your -- a journal, we're discussing?

10:12:03  13      A.   Yes.

10:12:03  14      Q.   Okay.  And when's it going to be published?

10:12:06  15      A.   I don't know.

10:12:06  16      Q.   Okay.  On the journal, did you inform the

10:12:17  17  journal that this research was funded by 3M?

10:12:20  18      A.   Yes.  It is listed in the supporting section

10:12:23  19  or the acknowledgment section.

10:12:25  20      Q.   Okay.  Did you inform the journal that the

10:12:38  21  geometry that was created was not created by you?

10:12:40  22      A.   No.

10:12:47  23      Q.   Where did you obtain the data that you --

10:12:50  24  the 62.5 degrees for the journal?  Did you have that

10:12:55  25  just memorized regarding the temperature of the fog

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

39

10:12:57    1    generator?

10:12:58    2        A.    Yes.

10:12:58    3        Q.    Okay.  So my understanding is you did not

10:13:03    4    create any notes.

10:13:07    5        A.    Incorrect.

10:13:08    6        Q.    So you did create notes.

10:13:09    7        A.    Yes.

10:13:11    8        Q.    Where are the notes?

10:13:12    9        A.    I had one note on a yellow sheet of paper

10:13:16   10    like this [indicating], a note to myself about whether

10:13:20   11    I had a reference, a certain reference.  And when I

10:13:25   12    confirmed that I had the reference, I discarded that

10:13:27   13    note.

10:13:28   14        Q.    Okay.  So sitting here today there are no

10:13:30   15    written notes in your possession regarding your

10:13:33   16    research or your analysis performed in your expert

10:13:38   17    report.

10:13:41   18        A.    Sitting here today there are no notes

10:13:44   19    regarding the analysis in my expert report.  The only

10:13:48   20    other notes that I would have would be annotations on

10:13:50   21    journal papers, as I read through journal papers and I

10:13:54   22    make notes.

10:13:54   23        Q.    On the journal papers?

10:13:56   24        A.    Correct.

10:13:58   25        Q.    Okay.  Did you provide those to 3M's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

40

10:13:59  1  counsel?

10:14:00  2      A.  No.

10:14:55  3      Q.  Did Mr. Plourde or Ms. Vallez provide any

10:15:04  4  work with respect to the CFD analysis you performed on

10:15:12  5  the 750?

10:15:14  6      A.  No.

10:15:15  7      Q.  So even though part of your agreement with

10:15:20  8  3M was to -- that the money was to be used for a staff

10:15:24  9  member and a student, you did not obtain a student or

10:15:27  10  a -- or a staff member to work on the project.

10:15:31  11      A.  Incorrect.

10:15:31  12      Q.  So you did obtain a student.

10:15:33  13      A.  Yes.

10:15:34  14      Q.  What student did the work?

10:15:38  15      A.  Lauren Vallez.

10:15:39  16      Q.  Okay.  So she did help you on the 750

10:15:41  17  analysis?

10:15:41  18      A.  Incorrect.

10:15:43  19      Q.  Okay.

10:15:53  20          (Discussion off the stenographic record.)

         21          (Abraham Exhibit 5 marked for

         22          identification.)

         23  BY MR. ASSAAD:

10:16:08  24      Q.  What's been marked as Exhibit 5 is a

10:16:10  25  document that the plaintiffs have received yesterday,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

41

10:16:13    1   June -- July 19th, 2017 in response to the subpoena.

10:16:17    2   Do you recog --

10:16:18    3          Do you recognize what's been marked as

10:16:19    4   Exhibit 15 -- or Exhibit 5?

10:16:22    5      A.   Yes.

10:16:23    6      Q.   Okay.  And this is the research proposal

10:16:26    7   written by you to 3M; correct?

10:16:28    8      A.   Yes.

10:16:29    9      Q.   Even though you were dealing with 3M's

10:16:31   10   attorneys at the time, which was Greenberg Traurig,

10:16:34   11   this proposal is directed to 3M; correct?

10:16:37   12      A.   Correct.

10:16:38   13      Q.   Okay.  And in the last paragraph it says:

10:16:40   14   "The duration and cost of this project is $12,000 and

10:16:43   15   one month.  This is a fixed cost grant and will

10:16:46   16   support the employment of one student, one staff

10:16:48   17   member, and all other university costs."

10:16:51   18          Did I read that correctly?

10:16:53   19      A.   Yes.

10:16:53   20      Q.   Was a student employed with respect to this

10:16:57   21   project?

10:16:57   22      A.   Yes.

10:16:58   23      Q.   Who?

10:16:59   24      A.   Lauren Vallez.

10:17:00   25      Q.   Okay.  What did she do on the project?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

42

10:17:03   1        A.    She actually didn't accomplish anything.

10:17:08   2    The -- It turns out the simulation was very

10:17:12   3    challenging and she wasn't able to contribute

10:17:16   4    meaningfully in any way.  She didn't contribute in any

10:17:21   5    way to the generation of the mesh, to the setting of

10:17:26   6    the boundary conditions, and to the analysis.

10:17:29   7        Q.    Okay.

10:17:30   8        A.    But she was still paid.

10:17:32   9        Q.    Okay.  And was there a staff member used?

10:17:35  10        A.    Yes.

10:17:35  11        Q.    Who?

10:17:36  12        A.    Brian Plourde.

10:17:38  13        Q.    Okay.  What was his role in -- with respect

10:17:40  14    to the CFD analysis?

10:17:43  15        A.    It was the same.  It turns out the

10:17:45  16    calculations -- All of the calculations in the report

10:17:48  17    and in the journal paper were done by me.  The problem

10:17:52  18    was too complex and the timeline was too short for him

10:17:56  19    to contribute meaningfully.

10:17:58  20        Q.    So you agree with me that the -- the model

10:18:01  21    is a complex model.

10:18:04  22        A.    Yes.

10:18:05  23        Q.    Okay.  All right.  Did the lawyers in this

10:18:37  24    case provide you any documents?

10:18:40  25        A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

43

| | | |
|---|---|---|
| 10:18:41 | 1 | Q.   Well they provided you the geometry; |
| 10:18:43 | 2 | correct? |
| 10:18:44 | 3 | A.   Yes. |
| 10:18:45 | 4 | Q.   But with respect to documents, what |
| 10:18:47 | 5 | documents did they provide you? |
| 10:18:54 | 6 | A.   I was provided a literature archive. |
| 10:18:58 | 7 | Q.   Is that listed in -- in any of your |
| 10:19:00 | 8 | references or Exhibit 3? |
| 10:19:04 | 9 | A.   Probably not because I did not use their |
| 10:19:06 | 10 | literature archive. |
| 10:19:08 | 11 | Q.   Okay. |
| 10:19:09 | 12 | A.   I was provided deposition transcripts. |
| 10:19:12 | 13 | Q.   Okay. |
| 10:19:19 | 14 | A.   I'm trying to -- I'm struggling to think of |
| 10:19:22 | 15 | oth -- |
| 10:19:22 | 16 | Other things may come to my mind, but those |
| 10:19:24 | 17 | were the two big things. |
| 10:19:26 | 18 | Q.   Did they provide any internal documents, |
| 10:19:27 | 19 | internal testing of the Bair Hugger? |
| 10:19:30 | 20 | A.   They -- There was a document of flow through |
| 10:19:37 | 21 | a Bair Hugger.  Yes, they did provide a document. |
| 10:19:39 | 22 | Q.   And what was that document? |
| 10:19:44 | 23 | A.   Oh, man.  It might have been called tech, |
| 10:19:49 | 24 | tech documents or something.  All I remember from the |
| 10:19:52 | 25 | document is there was some testing of the airflow |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

44

10:19:54  1   through a tube that fed a Bair Hugger.  And I think

10:19:59  2   that there was some schematics of an operating room,

10:20:04  3   if I recall correctly.

10:20:06  4       Q.   Did you use that document in any way with

10:20:07  5   respect to your CFD analysis?

10:20:10  6       A.   Yes.

10:20:10  7       Q.   How did you use the document?

10:20:12  8       A.   I confirmed my understanding of the airflow

10:20:18  9   going through a Bair Hugger.

10:20:19  10      Q.   And we're talking about determining the mass

10:20:21  11  flow through the Bair Hugger?

10:20:23  12      A.   Yes.

10:20:24  13      Q.   Okay.  Anything else you used in that

10:20:26  14  document?

10:20:33  15      A.   I don't believe so.

10:20:34  16      Q.   Did you provide that document to counsel in

10:20:36  17  response to our subpoena?

10:20:42  18      A.   I'm certain -- I'm certain I would have

10:20:45  19  provided that document.

10:20:46  20      Q.   Okay.

10:20:48  21           MR. ASSAAD:  Do you have that document?

10:20:50  22           MR. GOSS:  I believe it was produced

10:20:54  23  separately in response to an earlier subpoena, when

10:21:01  24  you subpoenaed Jennifer Wagner and John Abraham.

10:21:04  25           MR. ASSAAD:  Well that's different than

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

45

10:21:05   1   subpoenaing him.  I wanted to know what documents he

10:21:08   2   had.  And I don't want what document you're talking

10:21:10   3   about or he's talking about, so I'd like to know what

10:21:13   4   document you're referring to and get a copy of that.

10:21:16   5          If it's already been produced, then it

10:21:18   6   should have been produced with his production;

10:21:20   7   correct?

10:21:20   8          MR. GOSS:  I'm saying it's already -- to my

10:21:22   9   knowledge it's already been produced.  We can

10:21:23  10   identify it.  I think I know what he's talking about.

10:21:27  11          MR. ASSAAD:  So my understanding is 3M is

10:21:29  12   only going to produce documents that Abraham has that

10:21:33  13   was not produced previously according to the

10:21:36  14   subpoena, even though the subpoena's directed to

10:21:37  15   Abraham?

10:21:39  16          MR. GOSS:  I think we did our best to

10:21:41  17   comply with the subpoena.  If we missed something

10:21:43  18   we'll go back and look for it and supply it.

10:21:45  19          MR. ASSAAD:  Well can I get it at the next

10:21:47  20   break, please, if you know what you're talking about?

10:21:50  21          MR. GOSS:  We will do our best to locate

10:21:51  22   it.

10:21:51  23          MR. ASSAAD:  Well it seems like you know

10:21:53  24   what the document is, Peter Goss.

10:21:54  25          MR. GOSS:  I think I do know what the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

46

10:21:55  1  document is --

2          MR. ASSAAD:  Well let's get --

10:21:56  3          MR. GOSS:  -- Gabriel Assaad.

10:21:56  4          MR. ASSAAD:  -- it produced then.  Let's

10:21:57  5  get it produced then, please.

10:21:58  6          MR. GOSS:  I will do my best.

10:22:01  7          THE WITNESS:  And if I could continue?

10:22:03  8      Q.   Sure.

10:22:03  9      A.   Sitting here I remember, I think, some

10:22:10  10  communications with Augustine perhaps, or there may

10:22:15  11  have been some kind of communications, emails that I

10:22:21  12  received, but I don't recall what they were.  And

10:22:36  13  those were not used in the -- in these reports.

10:22:55  14      Q.   Did you produce all your files in this case?

10:23:04  15      A.   I believe I did.  I am pretty sure I did.  I

10:23:07  16  mean certainly every file that is necessary for --

10:23:10  17  that went into these reports.

10:23:13  18      Q.   What do you --

10:23:13  19          What do you mean, "every file that is

10:23:15  20  necessary"?

10:23:17  21      A.   Well, for example, I received a CAD file.  I

10:23:26  22  did not reproduce that CAD file because I produced a

10:23:28  23  file in which the CAD file is contained.

10:23:31  24      Q.   Okay.  Let me tell you what I've got -- been

10:23:34  25  produced regarding files, you tell me if that's all

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

47

10:23:37    1    the files.

10:23:38    2                I was produced a AGDBT file.  Is that the

10:23:42    3    CAD file?

10:23:43    4        A.   Actually that would be the CAD file.

10:23:45    5        Q.   Okay.  And I was provided a TRN file, one

10:23:49    6    TRN file --

10:23:50    7        A.   Yep.

10:23:52    8        Q.   -- previously from the original subpoena.

            9        A.   Umm-hmm.

10:23:55   10        Q.   Do you recall producing that?

10:23:56   11        A.   Yes.

10:23:56   12        Q.   And I received another TRN file that was

10:24:00   13    called the 2540 that is -- that was produced subject

10:24:07   14    to your -- the subpoena.  Does that sound correct?

10:24:10   15        A.   Yes.

10:24:10   16        Q.   Are there any other files that you have?

10:24:15   17        A.   I don't think there's any other files that I

10:24:16   18    have.  I don't recall any other files that I have

10:24:21   19    sitting here now.

10:24:22   20        Q.   Okay.  So the only --

10:24:25   21                And I don't know this for sure, and I was

10:24:27   22    guessing based on the pictures that I received, but

10:24:29   23    the 2540, is that your work on the 505?

10:24:33   24        A.   Yes, that's correct.

10:24:34   25        Q.   And the one that was titled "Abraham," which

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

48

10:24:38   1   you might have it titled something different, but it

10:24:41   2   was provided to us as Abraham 001, which was a Bates

10:24:43   3   number, was the TRN file on the 750; correct?

10:24:47   4        A.   I don't know if that's the Bates number.

10:24:49   5        Q.   Okay.

10:24:49   6        A.   But the twenty -- 264.TRN would have been

10:24:53   7   the results in CAD.

10:24:56   8        Q.   254.

10:24:57   9        A.   2540 is for the 505.

10:25:00   10       Q.   Okay.  And the other one is the 750.

10:25:01   11       A.   Correct.

10:25:01   12       Q.   Are there any other TRN files for runs that

10:25:04   13   you did that you changed later on?

10:25:07   14       A.   What do you mean by "changed"?

10:25:08   15       Q.   I mean, did you on -- did you only make one

10:25:10   16   run, or did you refine, you know, and get multiple

10:25:15   17   results and then came up with the final results?

10:25:19   18       A.   Yes, I did.

10:25:22   19       Q.   So are there other files showing those

10:25:24   20   results?

10:25:25   21       A.   Yes.

10:25:26   22       Q.   And where are those?

10:25:27   23       A.   Those would be on my computer.

10:25:28   24       Q.   Do you have your computer here today?

10:25:30   25       A.   No.  All of the results contained here are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

49

| | | |
|---|---|---|
| 10:25:35 | 1 | from the 264 TRN, and other results are the sa -- give |
| 10:25:42 | 2 | the same results as the ones shown here. |
| 10:25:45 | 3 | Q.  Just out of curiosity, what does "264" stand |
| 10:25:48 | 4 | for? |
| 10:25:49 | 5 | A.  It's the time -- |
| 10:25:52 | 6 | It's a number indicator from the software as |
| 10:25:55 | 7 | it saves results. |
| 10:25:58 | 8 | Q.  Okay.  And what's the number mean?  Does it |
| 10:26:01 | 9 | mean anything? |
| 10:26:04 | 10 | A.  Time step. |
| 10:26:05 | 11 | (Interruption by the reporter.) |
| 10:26:05 | 12 | A.  Time step. |
| 10:26:05 | 13 | Q.  Time step.  Okay. |
| 10:26:11 | 14 | Does it apply -- Is it a time -- |
| 10:26:13 | 15 | Does the value mean anything to you, 264? |
| 10:26:16 | 16 | A.  Yes. |
| 10:26:17 | 17 | Q.  What does it mean? |
| 10:26:18 | 18 | A.  It means it's the 264th calculation. |
| 10:26:28 | 19 | Q.  Calculation of what? |
| 10:26:29 | 20 | A.  Of the airflow in the room. |
| 10:26:31 | 21 | Q.  Okay.  I might be confused, but I thought |
| 10:26:42 | 22 | there was, like, thousands of calculations that the |
| 10:26:48 | 23 | computer does before it gets a single result. |
| 10:26:51 | 24 | A.  That's correct. |
| 10:26:51 | 25 | Q.  So how can this -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

50

10:26:54  1        So why would this only be such a small

10:26:57  2    number, like 264, or am I mis -- or am I

10:27:01  3    misunderstanding something?

10:27:02  4        A.   Yeah.  I think you're confused.

10:27:04  5        Q.   I know I'm confused because we just agreed

10:27:06  6    there's over a thousand calculations.

10:27:08  7        So what does -- Is the 264, is it 264

10:27:11  8    calculations, or 264 results?

10:27:19  9        A.   There are many millions of calculations, and

10:27:24  10   in a problem like this you have to do the calculations

10:27:27  11   in time, you march forward in time.  And so you have

10:27:32  12   to wait until what's called quasi-steady results

10:27:38  13   occur.  And I used the 264th step for my quasi-steady

10:27:44  14   calculation.

10:27:48  15       Q.   Okay.  So it's the 264th step, not the 264th

10:27:53  16   calculation.

10:27:57  17       A.   It's the 264th step, which is the 264th

10:28:02  18   calculation in time.

10:28:05  19       Q.   Okay.  I think I understand.  Let me see if

10:28:07  20   I get this.

10:28:08  21       Each step might have millions of

10:28:14  22   calculations for each step; correct?

10:28:15  23       A.   Correct.

10:28:16  24       Q.   Okay.  And each step represents a period of

10:28:21  25   time.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

51

10:28:21    1      A.   Correct.

10:28:22    2      Q.   And 264 is the 264th period of time that you

10:28:27    3   got a result.

10:28:29    4      A.   Yes.

10:28:30    5      Q.   So where are the other 263 results?

10:28:34    6      A.   I -- I didn't archive them because the

10:28:37    7   results are enormous and they fill up the hard drive.

10:28:41    8   I think I have two others, just to verify that I re --

10:28:45    9   that I achieved steady state.

10:28:48   10      Q.   Are they time steps before or after?

10:28:50   11      A.   Both.

10:28:51   12      Q.   How -- What's the -- the -- How far --

10:28:54   13           What number after?

10:28:56   14      A.   I think 300.

10:28:57   15      Q.   Okay.  And what about before; do you

10:29:03   16   remember the --

10:29:04   17      A.   I don't know.

10:29:05   18      Q.   Okay.  And I take it that 300, it actually

10:29:08   19   means something to you, the 300th time step?

10:29:12   20      A.   Correct.

10:29:13   21      Q.   Is a time step every second?

10:29:14   22      A.   No.

10:29:15   23      Q.   What's the time step, like in this case?

10:29:17   24      A.   I don't recall what my time step was in the

10:29:19   25   calculation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

52

10:29:20  1    Q.    Is that something that's in your report?

10:29:25  2    A.    I'll have to look.  (Witness reviewing

10:30:14  3  exhibit.)

10:30:14  4    Q.    We have a lot to cover and I'm going to go

10:30:17  5  page-by-page, so let's look for it when we start going

10:30:20  6  page-by-page through your report later on, okay?

10:30:23  7    A.    Great.

10:30:24  8    Q.    So did you do any runs --

10:30:31  9          Did you do any other runs before you came

10:30:33  10  with your final -- before you came up with your final

10:30:36  11  results?

10:30:39  12    A.    Yes.

10:30:40  13    Q.    Okay.  What were different about those runs?

10:30:45  14    A.    A calculation like this requires an initial

10:30:49  15  guess.  These are what are called iterative

10:30:54  16  calculations, so you're guessing and checking and

10:30:56  17  guessing and checking.  If you have a reasonable

10:31:00  18  initial guess, it speeds the -- what we call the

10:31:05  19  convergence.

10:31:06  20          So I did a calculation to get an initial

10:31:08  21  guess, which I then used as an input.  And the effect

10:31:14  22  of that was to speed the process.

10:31:16  23    Q.    Okay.  How many of those did you do?

10:31:19  24    A.    I think I would have done one.

10:31:20  25    Q.    Okay.  Do you have those results?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

53

10:31:22    1        A.    No.

10:31:23    2        Q.    So those have been destroyed.

10:31:25    3              MR. GOSS:  Object to form.

10:31:27    4        A.    Well, I mean I -- there's no reason to keep

10:31:30    5    them.

10:31:31    6        Q.    That wasn't my question.

10:31:32    7              My question is:  They're no longer -- They

10:31:34    8    no longer exist.

10:31:35    9        A.    I no longer --

10:31:36   10              That's correct, they no longer exist.

10:31:38   11        Q.    So you destroyed them.

10:31:39   12              MR. GOSS:  Object to form.

10:31:42   13        Q.    Let me -- Let me withdraw that question.

10:31:44   14              Do files --

10:31:46   15              Is this on your personal computer or a St.

10:31:49   16    Thomas computer?

10:31:50   17        A.    St. Thomas computer.

10:31:51   18        Q.    Okay.  And do you have to go physically

10:31:57   19    delete the file, or are they automatically deleted

10:32:00   20    over a certain period of time?

10:32:01   21        A.    I -- I actually do the deletion.

10:32:03   22        Q.    So you deleted those files.

10:32:04   23        A.    Correct.

10:32:06   24        Q.    When did you delete those files?

10:32:07   25        A.    Proba --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

54

10:32:08  1        I don't know.  I probably would have done it

10:32:12  2  once I had obtained them and then I used the -- then I

10:32:15  3  used them as the initial...

10:32:16  4        I don't -- I don't know when I did.

10:32:17  5    Q.    Okay.  Prior to writing this report?

10:32:24  6    A.    I would have to guess.  I don't know.

10:32:27  7    Q.    So just so I understand, the only files

10:32:30  8  available right now that you have on your computer are

10:32:37  9  three -- with respect to the 750, are three TRN files,

10:32:42  10  one which is the 264, one that's titled 300, and then

10:32:47  11  one that's earlier than 264.

10:32:49  12    A.    Correct.

10:32:50  13    Q.    Okay.  Any other files that you have

10:32:51  14  available to you?

10:32:52  15    A.    No.

10:32:54  16    Q.    Okay.  Are there any other files that you

10:32:59  17  could obtain from your --

10:33:01  18        Well let me ask you this:  Do you still have

10:33:03  19  the model?

10:33:04  20    A.    It's contained within the TRN.

10:33:06  21    Q.    Okay.  So if I want --

10:33:14  22        Can I reproduce your model through the TRN?

10:33:17  23    A.    Yes.

10:33:17  24    Q.    How would I do that?

10:33:18  25    A.    The TRN contains all of the information,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

55

10:33:22  1  including the geometry, the mesh, the boundary

10:33:26  2  conditions, the time stepping information.  The TRN

10:33:30  3  actually contains everything.

10:33:32  4      Q.   Okay.  But it's at a certain time; correct?

10:33:39  5      A.   That is correct.

10:33:39  6      Q.   So how do I know what occurred before 264?

10:33:43  7  Can I go backwards?

10:33:49  8      A.   You cannot go backwards.

10:33:51  9      Q.   So how do I know what your time zero was?

10:33:55  10     A.   Well the time zero's not relevant because

10:33:57  11 that's just your initial guess.  So the time -- The

10:34:01  12 time zero result has no physical meaning.

10:34:04  13     Q.   But in this TRN your initial guess was -- or

10:34:08  14 your initial -- your time zero wasn't an initial

10:34:12  15 guess, or it was an educated assumption based on a

10:34:16  16 previous file that you created.

10:34:17  17     A.   That's correct.

10:34:18  18     Q.   Okay.  And this was a steady-state model;

10:34:25  19 correct?

10:34:26  20     A.   No.

10:34:27  21     Q.   What was it then?

10:34:28  22     A.   It was an unsteady model.

10:34:31  23     Q.   Is that the same as transient?

10:34:32  24     A.   Yes.

10:34:33  25     Q.   Okay.  I might have misunderstood you, but I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

56

10:35:02    1    think you talked about converse or converge or

10:35:05    2    convergence.  Did you --

10:35:07    3              You said something about convergence?

10:35:09    4      A.    Yes, I did.

10:35:10    5      Q.    What is --

10:35:11    6              What is convergence?

10:35:15    7      A.    Convergence has two meanings.

10:35:18    8      Q.    In the CFD meaning.

10:35:20    9      A.    It has two CFD meanings.

10:35:22   10      Q.    Okay.

10:35:22   11      A.    Sorry.

10:35:26   12              At each time step you can converge your

10:35:29   13    solution to the correct solution.  And another meaning

10:35:34   14    is that over time you converge to a steady state, we

10:35:39   15    call it quasi-steady result.

10:35:43   16      Q.    Okay.  And is 264 a quasi-steady result?

10:35:50   17      A.    It was.

10:35:51   18      Q.    Okay.  And that means that you came close to

10:35:54   19    steady state?

10:35:56   20      A.    That means the results were no longer

10:35:58   21    changing meaningfully over time.

10:36:00   22      Q.    Okay.  Which is not true steady state, but

10:36:04   23    quasi-steady state.

10:36:05   24      A.    That's correct.

10:36:06   25      Q.    Okay.  I think I'm understanding this.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

57

10:36:08  1      And how do you determine whether or not you

10:36:22  2  have quasi-steady results?

10:36:29  3      A.   Well one way to determine that is to look at

10:36:31  4  the results and see if they meaningfully change from

10:36:33  5  one step to the next.

10:36:36  6      Q.   Okay.  Are you looking at the results while

10:36:38  7  you're running this?

10:36:41  8      A.   You can look at the results.  I don't recall

10:36:43  9  if I was, but you can look at them while you run.

10:36:46  10      Q.   Okay.  And just so I understand that you're

10:36:52  11  saying that if you looked at, I guess, time like 260,

10:36:57  12  262, 263 and then 264, you're not seeing much of a

10:37:02  13  change and therefore you could determine quasi-steady.

10:37:05  14      A.   That's correct.

10:37:06  15      Q.   Okay.  And that is a judgment call based on

10:37:08  16  the person doing the CFD.

10:37:10  17      A.   Yes.

10:37:11  18      Q.   Okay.  Was there any correspondence between

10:37:23  19  you and anyone besides attorneys for 3M regarding your

10:37:29  20  work on this case, or your research work regarding the

10:37:33  21  Bair Hugger?

10:37:33  22      A.   No.

10:37:34  23      Q.   What about with the journal?

10:37:38  24      A.   Oh, there would have been correspondence

10:37:40  25  with the journal.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

58

10:37:41    1       Q.    Did you provide those to counsel?

10:37:45    2       A.    I -- I don't recall if I did.

10:37:47    3             MR. GOSS:  We would invoke the Ingelfinger

10:37:52    4    rule with respect to that correspondence.

10:37:52    5             MR. ASSAAD:  That rule only applies during

10:37:54    6    the submission, but once it's accepted it no longer

10:37:58    7    applies.  And according to his -- his publications

10:38:02    8    it's already been accepted.

10:38:03    9             MR. GOSS:  All right.  Well it's a

10:38:06   10    sauce-for-the-goose situation with respect to

10:38:08   11    Elghobashi's correspondence with his journal.

10:38:10   12             MR. ASSAAD:  Well I'm telling you the

10:38:11   13    distinction here, sir.  The distinction is Elghobashi

10:38:14   14    is still being under review.  This has been accepted.

10:38:17   15             MR. GOSS:  I'm not aware that it isn't

10:38:20   16    still under review.

10:38:21   17             MR. ASSAAD:  It says right here,

10:38:22   18    "accepted."

10:38:22   19             MR. GOSS:  Okay.

10:38:23   20             MR. ASSAAD:  Exhibit 2, page 12, under the

10:38:28   21    number 1 publication, quote, accepted,

10:38:31   22    A-C-C-E-P-T-E-D, closed quote.  So it's -- we're in a

10:38:36   23    different situation here.

10:38:37   24             Are you saying you're not going to produce

10:38:39   25    that document under the -- under the law?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

59

10:38:40    1            MR. GOSS:  We are not producing it today.

10:38:42    2            MR. ASSAAD:  Okay.  Let's take a break.

10:38:58    3            THE REPORTER:  Off the record, please.

10:39:03    4            (Recess taken from 10:39 to 10:50 a.m.)

10:50:41    5    BY MR. ASSAAD:

10:50:56    6        Q.    To determine whether or not you had a

10:50:58    7    quasi-steady result, what do you look at, in this

10:51:04    8    case?

10:51:04    9        A.    The patterns of flow.

10:51:06   10        Q.    When you say "patterns," what do you mean by

10:51:09   11    "patterns"?

10:51:10   12        A.    In this case I looked at the streamlines,

10:51:13   13    which you can think of as an instantaneous pattern of

10:51:16   14    flow, and I compared streamlines.

10:51:19   15        Q.    And is the streamline based on velocity?

10:51:23   16        A.    Yes.

10:51:24   17        Q.    Okay.  Are you looking at the instantaneous

10:51:33   18    velocity or the average velocity?

10:51:34   19        A.    Instantaneous.

10:51:37   20        Q.    Okay.  Did you look at anything else besides

10:51:39   21    the streamlines?

10:51:43   22        A.    No.

10:51:47   23        Q.    As you can see from Exhibit 5, which is the

10:51:51   24    St. Thomas proposal, I understood that's probably the

10:51:55   25    engagement agreement between -- to perform the study

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

60

10:51:57    1    on the 750 between St. Thomas and 3M; correct?

10:52:06    2        A.    Yes.

10:52:06    3        Q.    Okay.  Are there any other engagement

10:52:08    4    agreements that exist with respect to your time on

10:52:11    5    this case as a consultant, an expert for 3M?

10:52:17    6        A.    Well I would say this isn't one of those.

10:52:21    7    This isn't a engagement agreement with me as an

10:52:25    8    expert.

10:52:25    9        Q.    I understand that.

10:52:26   10             I'm saying are there any engagement

10:52:28   11    agreements between you and 3M or the attorneys for 3M?

10:52:31   12        A.    I -- I'm quite certain there isn't.

10:52:33   13        Q.    Okay.  Is there a similar document with

10:52:37   14    respect to Exhibit 5 for your work on the 505?

10:52:44   15        A.    I think there was a working draft, but not a

10:52:46   16    final draft.  I think the -- if I recall, the final

10:52:51   17    proposal was by -- was verbal.

10:52:53   18        Q.    Okay.  And I know I wasn't going to ask much

10:52:57   19    about the 505, but did you use the same type of

10:53:00   20    methodology on your analysis of the 505 as you did

10:53:02   21    with the 750?

10:53:04   22        A.    Yes.

10:53:04   23        Q.    Okay.  And with respect to determining the

10:53:16   24    quasi-steady state by looking at the instantaneous

10:53:21   25    velocity, what did you consider a meaningful, I guess

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

61

10:53:26  1  the term was convergence, what change, like what would

10:53:29  2  be a non-meaningful change that you could say this is

10:53:32  3  quasi-steady state?

10:53:42  4      A.   It was by visual inspection, not

10:53:44  5  quantitative comparison.

10:53:47  6      Q.   Okay.  So if I asked you today to show me

10:53:59  7  the results that you looked at to determine

10:54:03  8  quasi-steady state that's something that you couldn't

10:54:05  9  put together because you don't have those files any

10:54:07  10  more; correct?

10:54:08  11      A.   I disagree.

10:54:09  12      Q.   Okay.  What would you look at?

10:54:12  13      A.   I could compare the results at two different

10:54:14  14  time steps to show that there's no meaningful

10:54:19  15  difference in the streamlines, and that's what I would

10:54:22  16  provide you.

10:54:22  17      Q.   Okay.  So you'd compare it to the two other

10:54:26  18  files that you have.

10:54:26  19      A.   That's one way.  Absolutely.

10:54:28  20      Q.   What would be the other way?

10:54:29  21      A.   It would be to compare two files.

10:54:32  22      Q.   Okay.  But the only files that you have are

10:54:34  23  the 264, the 300 and another file before 264.

10:54:40  24      A.   That -- Those are the two files related to

10:54:44  25  this expert report.  In my journal paper I made a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

62

| | | |
|---|---|---|
| 10:54:48 | 1 | further comparison where the two results differed by |
| 10:54:53 | 2 | maybe 2,000 time steps, and I did a side-by-side |
| 10:54:56 | 3 | comparison of those. |
| 10:54:57 | 4 | Q.  So you ran it again for your journal paper? |
| 10:55:01 | 5 | A.  No. |
| 10:55:03 | 6 | Q.  I'm really confused now.  So -- |
| 10:55:05 | 7 | A.  It was the same calculation. |
| 10:55:09 | 8 | Q.  What do you mean by the "same calculation"? |
| 10:55:13 | 9 | A.  I ran the simulation once. |
| 10:55:15 | 10 | Q.  And how far did you run it? |
| 10:55:17 | 11 | A.  At least to 2500 time steps. |
| 10:55:21 | 12 | Q.  Okay.  And do you have any of that data |
| 10:55:24 | 13 | available? |
| 10:55:24 | 14 | A.  I may have the data at 2500, I would have to |
| 10:55:30 | 15 | check.  But that data would show that over that entire |
| 10:55:33 | 16 | time period there's no meaningful difference.  And |
| 10:55:38 | 17 | that comparison was in -- is in the journal paper. |
| 10:55:49 | 18 | Q.  Why did you not put that information in your |
| 10:55:51 | 19 | expert report? |
| 10:55:55 | 20 | A.  What I put in the expert report is this, |
| 10:56:03 | 21 | images from figures 3 through 8 could be replicated -- |
| 10:56:06 | 22 | I'm on page 9 of Exhibit 1.  "Images from figures 3-8 |
| 10:56:12 | 23 | could be replicated at other time instances and the |
| 10:56:15 | 24 | same conclusions would be drawn." |
| 10:56:16 | 25 | So I assessed them and I state that the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

63

10:56:21  1   results are the same at other instances.

10:56:25  2        Q.   Okay.  I assume there is much more detail in

10:56:44  3   your publication which is -- which has been submitted

10:56:50  4   for publication than in your expert report.

10:56:54  5        A.   There's different detail.  I don't know if

10:56:56  6   I'd say "much more," but there's different detail.

10:57:00  7        Q.   What's the different detail?

10:57:01  8        A.   Well, for example, in a journal paper I

10:57:03  9   would have never included a critique of Said

10:57:08  10  Elghobashi.

10:57:08  11       Q.   I'm talking to the -- with respect to your

10:57:10  12  CFD analysis, not the critiques, but.

10:57:12  13       A.   Thanks for that clarification.

10:57:16  14            There is more detail related to the CFD in

10:57:19  15  my journal paper.

10:57:20  16       Q.   What detail is there in the journal paper?

10:57:22  17       A.   Some equations are included.

10:57:23  18       Q.   Okay.

10:57:25  19       A.   I ran the -- a comparison with the

10:57:32  20  forced-air warming and without, and I also -- if I

10:57:37  21  recall correctly, I ran a case where I had a even

10:57:39  22  higher temperature coming out of the Bair Hugger than

10:57:42  23  is reasonable.

10:57:43  24            So I ran other cases for the journal paper.

10:57:48  25       Q.   Okay.  When you say "a higher temperature,"

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

64

10:58:07  1   what temperature?

10:58:08  2        A.    For the journal paper I ran a calculation

10:58:12  3   where the temperature emerging from the Bair Hugger

10:58:14  4   was 43 Celsius.

10:58:16  5        Q.    Okay.  Now the opinions that you're going to

10:58:30  6   be giving in today's deposition, they're based on the

10:58:45  7   initial CFD analysis that was completed by January of

10:58:48  8   2016 with respect to the 750; correct?

10:58:52  9        A.    They're based on the initial CFD analysis.

10:58:54  10  I don't know if they were completed by January of

10:58:57  11  2016, but they are based on the initial CFD analysis.

10:59:00  12       Q.    Okay.  And you agree with me there's nothing

10:59:09  13  in your report that identifies the equations that you

10:59:12  14  used with respect to your analysis of the problem.

10:59:17  15       A.    I agree.

10:59:18  16       Q.    Okay.  Now I asked you what the time step

10:59:29  17  was, and I know you looked through your report

10:59:31  18  somewhere.  Did you see anything about the time step

10:59:33  19  that was used?

10:59:34  20       A.    The only thing I saw was the statement that

10:59:36  21  the results at other time steps lead to the same

10:59:39  22  conclusions.

10:59:40  23       Q.    Is -- Is a time step, is that a -- is it a

10:59:42  24  constant time between, like, 263 and 264?

10:59:48  25       A.    Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

65

10:59:50  1      Q.   And when you're talking about a time step

10:59:52  2  are you like running it every second, every two

10:59:55  3  seconds, every five seconds?

10:59:57  4      A.   You -- It's like that, but you use -- you

11:00:00  5  can use different time steps during your calculation.

11:00:06  6  So, for example, you might want to use small time

11:00:10  7  steps initially to get things going, and then you

11:00:14  8  might use larger time steps, let's say, once you get

11:00:18  9  to quasi steady and you want to go out further in time

11:00:21  10 just to verify.  So you can change the time step over

11:00:24  11 ti -- over -- over -- during the calculation.  But

11:00:26  12 unless you do that, the time step is the same between

11:00:29  13 each sequential time.

11:00:32  14     Q.   So is it a second, a fraction of a second?

11:00:35  15     A.   It would be a fraction of a second.

11:00:37  16     Q.   And did you ever change the time steps?

11:00:38  17     A.   Yes.

11:00:38  18     Q.   At what point?

11:00:42  19     A.   What do you mean by "at what point"?

11:00:44  20     Q.   Like when did --

11:00:45  21          Did you change the time step between 1 and

11:00:48  22 264?

11:00:49  23     A.   I don't recall.

11:00:51  24     Q.   Where would that information be?

11:00:59  25     A.   I don't know if I recorded that.  I don't

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

66

| | | |
|---|---|---|
| 11:01:02 | 1 | recall recording when I changed -- when or if I |
| 11:01:06 | 2 | changed time steps. |
| 11:01:07 | 3 | Q.   So you don't know even if you changed the |
| 11:01:09 | 4 | time step. |
| 11:01:17 | 5 | A.   I -- |
| 11:01:18 | 6 | You know, thinking back, I do recall |
| 11:01:20 | 7 | changing the time step, but I don't recall when. |
| 11:01:37 | 8 | Q.   You do understand that all the opinions you |
| 11:01:39 | 9 | intend to offer in this case had to be disclosed to |
| 11:01:42 | 10 | the plaintiff by June 2nd, 2017. |
| 11:01:45 | 11 | MR. GOSS:  Object to form, foundation. |
| 11:01:48 | 12 | Q.   Were you aware of a deadline for your expert |
| 11:01:50 | 13 | opinion in this case?  Your report? |
| 11:01:52 | 14 | A.   Yes, I was. |
| 11:01:53 | 15 | Q.   Okay.  And the deadline was June 2nd, 2017? |
| 11:01:57 | 16 | A.   That sounds -- |
| 11:01:58 | 17 | Q.   Okay. |
| 11:01:59 | 18 | A.   -- right. |
| 11:02:00 | 19 | Q.   And you prepared the report yourself? |
| 11:02:02 | 20 | A.   Yes. |
| 11:02:03 | 21 | Q.   Okay.  Did anyone provide any edits to the |
| 11:02:05 | 22 | report? |
| 11:02:05 | 23 | A.   Yes. |
| 11:02:06 | 24 | Q.   Who? |
| 11:02:08 | 25 | A.   Counsel would have provided typographical |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

67

11:02:11   1   edits; commas, periods.  Nothing substantive, nothing

11:02:17   2   that would change the conclusions or any substance of

11:02:21   3   the report.

11:02:22   4        Q.   Any of your colleagues look at it and offer

11:02:24   5   any edits?

11:02:27   6        A.   No.

11:02:27   7        Q.   Okay.  When was the journal article

11:02:34   8   submitted?

11:02:44   9        A.   I would estimate -- estimate April or May.

11:02:46  10        Q.   Of this year?

11:02:47  11        A.   Yes.

11:02:47  12        Q.   Okay.  Did you put the time step in the

11:03:02  13   journal?

11:03:05  14        A.   I would have to look.  I don't know.

11:03:07  15        Q.   Okay.  If you do change the time step during

11:03:13  16   a -- a run, is that something that you would disclose

11:03:17  17   in the methodology of a journal paper?

11:03:22  18        A.   The choice of time step is important to

11:03:24  19   disclose, and its bearing on accuracy, but whether or

11:03:28  20   not you change it may or may not be important.

11:03:32  21        Q.   So you definitely would have disclosed,

11:03:34  22   like, the -- that the -- Strike that.

11:03:36  23             The time step is an important piece of

11:03:46  24   information that is usually submitted as a part of a

11:03:51  25   CFD analysis in a scientifical -- scientific research

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

68

11:03:53    1    report for publication.

11:03:54    2        A.    Yes.

11:03:56    3        Q.    Okay.  Because you would need the time step

11:03:59    4    to reproduce the results.

11:04:02    5        A.    Correct.

11:04:03    6        Q.    Okay.  Do you agree with me that there is a

11:04:11    7    lot more information in your journal article than is

11:04:14    8    contained in your expert report?  Scientific

11:04:18    9    information?

11:04:25   10        A.    No.

11:04:26   11        Q.    "No"?

11:04:27   12        A.    No.

11:04:27   13        Q.    Okay.  Without the time step can I reproduce

11:04:40   14    your results?

11:04:41   15        A.    Yes.

11:04:42   16        Q.    But you just told me it was very important

11:04:43   17    to reproduce the results.

11:04:46   18        A.    Correct.

11:04:47   19        Q.    So without it and it's an important piece of

11:04:51   20    information to reproduce results, how would I

11:04:53   21    reproduce your results without a time step?

11:04:56   22        A.    And actually let me clarify my earlier

11:05:01   23    answer.

11:05:02   24            Provided that your time step is sufficiently

11:05:04   25    small and that it allows you to reach quasi-steady

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

69

11:05:08    1    results, you would be able to reproduce these results.

11:05:15    2        Q.    Okay.  But if I wanted to -- I guess for --

11:05:22    3    to create file 264 again, I would need the time step

11:05:27    4    that you used; correct?

11:05:30    5        A.    No.

11:05:32    6        Q.    Well how would I know that 264 correlates to

11:05:35    7    the time step you used without knowing your time step?

11:05:38    8        A.    Well first of all, the TRN file that I

11:05:41    9    provided has my time steps.  Okay?

11:05:44   10        Q.    Okay.

11:05:45   11        A.    Secondly, the number 264 isn't important by

11:05:49   12    itself.  What's important -- And this is the same with

11:05:53   13    Dr. Elghobashi's work.  What's important is that you

11:05:59   14    run the results long enough so that there's not

11:06:01   15    meaningful change.  And so you could repre --

11:06:03   16    reproduce the quasi-steady results without knowing the

11:06:07   17    time step that I used.

11:06:08   18        Q.    And I understand what you're saying, but my

11:06:10   19    question's a little bit more specific, okay?

11:06:12   20            I assume that every single time step, okay,

11:06:19   21    has numbers in it that -- that identify the results of

11:06:25   22    the calculations for a different part of the mesh;

11:06:30   23    correct?

11:06:30   24        A.    Correct.

11:06:31   25        Q.    Okay.  So if I wanted to run a CFD model and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

70

| | | |
|---|---|---|
| 11:06:38 | 1 | obtain the same numbers in the 264th time step, I |
| 11:06:47 | 2 | would need to know what time step you used; correct? |
| 11:06:54 | 3 | A.   That is correct, but that's not relevant. |
| 11:07:00 | 4 | Q.   I understand that.  It might not be |
| 11:07:02 | 5 | relevant, but my statement is correct. |
| 11:07:04 | 6 | A.   Yes. |
| 11:07:05 | 7 | Q.   Okay.  And I would have to know, like, where |
| 11:07:11 | 8 | you started kind of; right? |
| 11:07:15 | 9 | A.   Correct. |
| 11:07:18 | 10 | Q.   I mean, is that called the boundary |
| 11:07:19 | 11 | conditions or is it called something else where you |
| 11:07:21 | 12 | start? |
| 11:07:22 | 13 | A.   Where you start is called the initial |
| 11:07:24 | 14 | condition. |
| 11:07:24 | 15 | Q.   Okay.  Are the initial conditions anywhere |
| 11:07:27 | 16 | in your report? |
| 11:07:29 | 17 | A.   No. |
| 11:07:29 | 18 | Q.   Okay.  Do you have it in any type of your |
| 11:07:32 | 19 | notes? |
| 11:07:33 | 20 | A.   No. |
| 11:07:33 | 21 | Q.   Is it anywhere that I could obtain it |
| 11:07:35 | 22 | sitting here today? |
| 11:07:36 | 23 | A.   No.  And it's not relevant. |
| 11:07:38 | 24 | Q.   Okay.  I understand that you say it's not |
| 11:07:40 | 25 | relevant, but that's kind of a legal term.  So let's |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

71

11:07:46  1  stick the relevancy objections to your counsel and

11:07:49  2  just answer my questions for me.

11:07:50  3       MR. GOSS:  Well I think "relevance" has a

11:07:51  4  meaning outside of the law, and if that's the way

11:07:54  5  he's using it, then --

11:07:55  6       MR. ASSAAD:  Fair enough.

11:07:56  7       MR. GOSS:  -- let him use it.

11:08:03  8  BY MR. ASSAAD:

11:08:03  9     Q.  But I would need those initial conditions to

11:08:07  10  do the exact same thing that you did to get the

11:08:10  11  results that are obtained in the TRN file that you've

11:08:13  12  provided; correct?

11:08:15  13     A.  That is a correct statement.

11:08:17  14     Q.  Okay.  And I'd also have to know whether or

11:08:20  15  not you changed the time step between the initial

11:08:25  16  conditions and time step 264; correct?

11:08:29  17     A.  Correct.

11:08:30  18     Q.  Okay.  Otherwise, without those data -- that

11:08:38  19  data, it would be impossible for me to replicate the

11:08:44  20  results you found in your 264 TRN file; correct?

11:08:47  21     A.  I disagree.

11:08:48  22     Q.  How would I replicate and get the exact same

11:08:52  23  numbers -- I'm not talking about your judgment -- I'm

11:08:55  24  talking about the exact same calculated numbers in the

11:08:59  25  264 TRN file, if I don't have the initial conditions?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

72

11:09:05  1    A.    You're using the word "replicate" in a way

11:09:08  2   that's not the way it's used in our field.  To

11:09:14  3   replicate, and I mentioned this before, "replicate"

11:09:19  4   doesn't mean to do the exact same thing with the exact

11:09:22  5   same methodology, but it's to come up with the same

11:09:27  6   results and conclusions.  You are able -- Anyone is

11:09:32  7   able to replicate my work simply from that TRN file.

11:09:38  8   Now that doesn't mean that at the 264th time step they

11:09:43  9   will have the exact same numbers, but it means that if

11:09:47  10  they do the problem right they will come to the exact

11:09:49  11  same conclusions.

11:09:50  12    Q.    And I understand that, and I understand

11:09:52  13  exactly what you're saying, sir.  And I -- And I know

11:09:56  14  you think some of my questions don't mean anything or

11:09:59  15  are not relevant, but what I'm really just trying to

11:10:02  16  find out is this.  I cannot replicate the same numbers

11:10:05  17  in 264 unless I have the initial -- the initial

11:10:09  18  conditions; correct?

11:10:12  19    A.    That is correct.

11:10:13  20    Q.    Okay.

11:10:13  21    A.    And I just want to correct your

11:10:15  22  interpretation of my answer.

11:10:17  23          Can I ask for your answer to be -- your

11:10:21  24  response to be read back?

11:10:23  25    Q.    Well you can talk to your counsel and he

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

73

11:10:26  1  could ask -- he can correct anything later on when he

11:10:27  2  has a chance to ask.

11:10:28  3      A.   Okay.  Well then I'll do it from memory.

11:10:32  4          It's not that I disagree with your question,

11:10:43  5  it's that you're using the word "replicate" in a way

11:10:47  6  that is not used in this field.  You're -- Maybe

11:10:52  7  you're using "replicate" with a legal meaning, but

11:10:55  8  that's not -- when we talk about can you replicate

11:10:58  9  someone's study we are not talking -- we're not using

11:11:01  10  the word replicate as you've done.  That's my

11:11:03  11  clarification.

11:11:03  12      Q.   And I understand that, because there could

11:11:05  13  be a different methodology or a different initial

11:11:07  14  conditions; correct?

11:11:09  15      A.   Correct.

11:11:09  16      Q.   But my question is more just simple math.

11:11:12  17          To get the calculated numbers in the 264

11:11:16  18  TRN, I would need to know what the initial conditions

11:11:18  19  are; correct?

11:11:19  20      A.   That is correct.

11:11:20  21      Q.   Okay.  Now for the 254 TRN file did you use

11:11:38  22  RANS or LES?

11:11:40  23      A.   I used LES, which is Large-Eddy Simulation.

11:11:45  24      Q.   Okay.  Did you ever use RANS initially?

11:11:48  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

74

11:11:49    1        Q.   And was that to create your initial

11:11:51    2    conditions?

11:11:52    3        A.   Yes.

11:11:53    4        Q.   Okay.  What was showed in Science Day, was

11:12:00    5    that a RANS model or an LES model?

11:12:03    6        A.   LES.

11:12:03    7        Q.   Okay.  And you ran RANS once, correct, to

11:12:06    8    get your initial conditions?

11:12:07    9        A.   I believe that's true.

11:12:09   10        Q.   And RANS is steady state?

11:12:12   11        A.   RANS does not have to be steady state.

11:12:14   12        Q.   Did you run it steady state?

11:12:16   13        A.   I would have run it steady state.

11:12:18   14        Q.   Okay.  And my understanding is that you used

11:12:22   15    the, according to your report, the Boussinesq

11:12:27   16    approximation?

11:12:27   17        A.   That's right.  And I'm going to try to spell

11:12:29   18    that.

11:12:29   19        Q.   We can -- We can give the spellings later

11:12:31   20    on to her.  I don't want to waste time with spelling.

11:12:33   21        A.   Thank you.

11:12:34   22        Q.   Okay.  And on the --

11:12:35   23             And just so I understand, did you use RANS

11:12:37   24    or LES for the 2540?

11:12:40   25        A.   LES.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

75

11:12:40  1      Q.   Okay.  And you also used the Boussinesq for

11:12:44  2  the 2540?

11:12:45  3      A.   Correct.

11:12:50  4      Q.   And so you received a geometry, a CAD file

11:12:56  5  from the lawyers for 3M.

11:12:59  6      A.   Correct.

11:13:00  7      Q.   Okay.  And those are not the lawyers of

11:13:01  8  Blackwell Burke, but Greenberg Traurig; correct?

11:13:05  9      A.   Correct.

11:13:05  10     Q.   Were you aware why -- why Greenberg Traurig

11:13:08  11 was not -- no longer attorneys for 3M?

11:13:13  12     A.   No.

11:13:13  13     Q.   Okay.  And you don't know who created the

11:13:15  14 geometry; correct?

11:13:17  15     A.   Correct.

11:13:19  16     Q.   Do you know what software they used?

11:13:22  17     A.   No.

11:13:23  18     Q.   Okay.  And I take it you just imported it

11:13:26  19 into whatever system that you use.

11:13:28  20     A.   Correct.

11:13:29  21     Q.   And that would be ANSYS?

11:13:30  22     A.   Correct.

11:13:31  23     Q.   ANSYS CFX or ANSYS Fluent?

11:13:35  24     A.   We used ANSYS CFX.

11:13:38  25     Q.   Okay.  And did you change the geometry in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

76

11:13:52    1    any way?

11:13:53    2        A.    Yes.

11:13:54    3        Q.    How did you change the geometry?

11:13:57    4        A.    I omitted small and insignificant objects, I

11:14:03    5    don't recall which ones.  But as an example, let's say

11:14:07    6    I want to simulate the airflow in this room.  There

11:14:11    7    are many small features which may not matter, like the

11:14:15    8    doorknob, the handle on the cup -- the cupboard over

11:14:25    9    there.  Those features that are small that don't

11:14:28   10    affect the flow I would have -- I removed some of

11:14:31   11    them.

11:14:32   12        Q.    Okay.  And that'd just be a judgment call

11:14:35   13    what you believe would affect or not affect the

11:14:37   14    airflow.

11:14:38   15        A.    That is correct.

11:14:38   16        Q.    Okay.  Based on your education, training and

11:14:41   17    experience.

11:14:42   18        A.    That is correct.

11:14:43   19        Q.    Okay.  And did the geometry already contain

11:14:49   20    a grid or a mesh?

11:14:51   21        A.    No.

11:14:52   22        Q.    Okay.  Is a grid and mesh the same thing?

11:14:56   23        A.    Yes.

11:14:57   24        Q.    Okay.  Now what program was used to create

11:15:08   25    the mesh?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

77

11:15:11  1       A.    The ANSYS mesher.

11:15:18  2       Q.    And what shapes were used to create the

11:15:25  3    mesh?

11:15:27  4       A.    The vast majority, perhaps all of the shapes

11:15:30  5    were tetrahedral.

11:15:33  6       Q.    Okay.

11:15:33  7       A.    Pyramid -- Pyramid-like shapes.

11:15:35  8       Q.    Okay.  Four-sided trian --

11:15:37  9             Four sides of triangles; correct?

11:15:38  10      A.    Or five sides.

11:15:39  11      Q.    Or five sides.  I'm sorry.  You're right,

11:15:42  12   five sides.

11:15:43  13      A.    Well it's four or five, it's a combination.

11:15:46  14      Q.    Okay.

11:15:46  15      A.    Pyramids and tetrahedrons are two

11:15:49  16   complimentary shapes; one of them has five sides, one

11:15:52  17   has four sides.

11:15:53  18      Q.    Okay.  So tetrahedral could either be four

11:15:56  19   or five sides?

11:15:57  20      A.    No.  We use the term tetrahedral for four

11:16:00  21   sided, and that's what "tetra" comes from.  We use

11:16:05  22   pyramidal or pyramid elements in our field generally

11:16:10  23   refers to five-sided.

11:16:11  24      Q.    Okay.  So you believe that all the mesh

11:16:15  25   shapes were tetrahedral?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

78

| | | |
|---|---|---|
| 11:16:18 | 1 | A.   Or pyra -- |
| 11:16:21 | 2 | Or pyramids. |
| 11:16:24 | 3 | Q.   Okay.  Is that something that you've written |
| 11:16:26 | 4 | down? |
| 11:16:26 | 5 | A.   No. |
| 11:16:27 | 6 | Q.   How would I find that out? |
| 11:16:29 | 7 | A.   From the TRN file. |
| 11:16:30 | 8 | Q.   Okay.  And what -- |
| 11:16:43 | 9 | Do you know what CFX solves for; does it |
| 11:16:45 | 10 | solve for the different shapes, or does it kind of say |
| 11:16:48 | 11 | it's all one shape? |
| 11:16:50 | 12 | A.   I don't quite know how to interpret your |
| 11:16:52 | 13 | question. |
| 11:16:56 | 14 | Q.   Well did you use any -- |
| 11:16:57 | 15 | I guess what's the term polyhedra with |
| 11:17:01 | 16 | respect to CFX; does that mean anything? |
| 11:17:05 | 17 | A.   Polyhedra would refer to a multi-sided |
| 11:17:09 | 18 | element. |
| 11:17:09 | 19 | Q.   Okay.  Does CFX solve for polyhedras? |
| 11:17:18 | 20 | A.   Well polyhedra means a multi-sided object. |
| 11:17:21 | 21 | Q.   Okay. |
| 11:17:21 | 22 | A.   CFX will solve for brick-shaped elements, |
| 11:17:24 | 23 | which have eight sides; it will solve for hexahedras, |
| 11:17:30 | 24 | which have six sides.  They can have -- It'll solve |
| 11:17:33 | 25 | for wedge elements which have five; pyramid elements |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

79

| | | |
|---|---|---|
| 11:17:37 | 1 | which have five; and tetrahedras, which have five. |
| 11:17:40 | 2 | Q.  Okay. |
| 11:17:41 | 3 | A.  Or, I'm sorry, four. |
| 11:17:43 | 4 | Q.  Okay.  And I know you -- in your journal |
| 11:17:52 | 5 | article you looked at the 505 as well? |
| 11:17:54 | 6 | A.  Yes. |
| 11:17:55 | 7 | Q.  And did you use the same geometry in the 505 |
| 11:17:57 | 8 | as you did with the 750? |
| 11:17:59 | 9 | A.  Yes. |
| 11:18:00 | 10 | Q.  Okay.  So I assume you still have the |
| 11:18:03 | 11 | geometry someplace. |
| 11:18:05 | 12 | A.  That's correct. |
| 11:18:07 | 13 | Q.  Did you pull that geometry from the 505 -- |
| 11:18:10 | 14 | that you used in the 505 from the TRN file, the 264? |
| 11:18:14 | 15 | A.  Yes. |
| 11:18:15 | 16 | Q.  So you don't have the original geometry file |
| 11:18:18 | 17 | that was given to you by the lawyers for 3M. |
| 11:18:23 | 18 | A.  I don't know.  I may.  I would have to look. |
| 11:18:36 | 19 | Q.  Okay.  So you said something about ANSYS |
| 11:18:39 | 20 | mesher.  Is that the only meshing program that you |
| 11:18:44 | 21 | could use in ANSYS? |
| 11:18:45 | 22 | A.  No. |
| 11:18:45 | 23 | Q.  Why did you decide to use ANSYS mesher? |
| 11:18:48 | 24 | A.  Well the meshing program in ANSYS actually |
| 11:18:51 | 25 | has many different meshers. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

80

|          |    |    |                                              |
|----------|----|----|----------------------------------------------|
|          | 1  | Q. | Okay.                                        |
| 11:18:53 | 2  | A. | So I used the meshers contained in the ANSYS |
| 11:18:56 | 3  | software, but there are other meshers I could have |
| 11:18:58 | 4  | used. |                                         |
| 11:18:58 | 5  | Q. | Does it create its own file after it's done? |
| 11:19:01 | 6  | A. | Yes.                                         |
| 11:19:01 | 7  | Q. | Where is that file?                          |
| 11:19:02 | 8  | A. | It's --                                      |
| 11:19:03 | 9  |    | The mesh is contained within the TRN.        |
| 11:19:05 | 10 | Q. | But does it create a separate file after you |
| 11:19:07 | 11 | mesh? |                                         |
| 11:19:07 | 12 | A. | It would create a separate file after the    |
| 11:19:09 | 13 | mesh. |                                         |
| 11:19:10 | 14 | Q. | And where is that file?                      |
| 11:19:12 | 15 | A. | I don't think I have it because it's         |
| 11:19:13 | 16 | contained within the TRN. |                    |
| 11:19:15 | 17 | Q. | I understand that, but you run the mesh and  |
| 11:19:17 | 18 | I -- you just said it creates its own separate file; |
| 11:19:20 | 19 | correct? |                                      |
| 11:19:20 | 20 | A. | That's right.                                |
| 11:19:21 | 21 | Q. | That's before you probably run any of the    |
| 11:19:22 | 22 | calculations; correct? |                        |
| 11:19:23 | 23 | A. | That's correct.                              |
| 11:19:24 | 24 | Q. | Did you delete that meshing file?            |
| 11:19:25 | 25 | A. | I would have to look to see if I have it,    |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

81

11:19:27  1  but once you have the TRN file you don't nee -- you

11:19:30  2  don't need the mesh file, so there's no reason to keep

11:19:32  3  it.

11:19:33  4      Q.   Okay.  Okay.  So whether or not you kept it

11:19:35  5  or not is irrelevant because you have it in the TRN

11:19:38  6  file.

11:19:38  7      A.   That is correct.

11:19:39  8      Q.   Okay.  Does CFX put out any other files

11:19:44  9  besides a TRN file?

11:19:47  10     A.   Yes.

11:19:48  11     Q.   What files?

11:19:49  12     A.   It puts out an output file which is just a

11:19:52  13  script of what you've done, which is the same as --

11:19:55  14  it's all contained in the TRN.  And it puts out what's

11:19:58  15  called a RES file, which is the results, which is also

11:20:02  16  the same as the TRN.

11:20:05  17     Q.   Okay.  Do you have those files?

11:20:06  18     A.   No.  Well I may have the output file, which

11:20:09  19  is a script file, but the results file are the same as

11:20:12  20  the TRN.

11:20:13  21     Q.   Okay.  So what's the output file, does that

11:20:15  22  contain your initial conditions?

11:20:18  23     A.   It -- I don't know.

11:20:25  24     Q.   So it may?

11:20:26  25     A.   Well, I mean, it -- it does -- it --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

82

11:20:29    1        Well let me say this.  It does not contain

11:20:31    2   the initial conditions.  It's a script file.  It's

11:20:33    3   just writing of the setup of your problem.

11:20:36    4        Q.  But wouldn't the setup have the initial

11:20:38    5   conditions?

11:20:39    6        A.  No, because it's just the script.  So, for

11:20:43    7   example, it says you're using air, you're using the

11:20:47    8   LES method, your density is this, your velocity is

11:20:50    9   this.

11:20:51   10        Q.  Okay.

11:20:51   11        A.  So it's information written to a script, but

11:20:53   12   it's not data.

11:20:54   13        Q.  Okay.  And you said there was a results file

11:20:57   14   but you don't have that any more; correct?

11:20:59   15        A.  Correct, because it's contained within the

11:21:01   16   TRN.

11:21:01   17        Q.  Okay.  Any other files?

11:21:06   18        A.  Not that I can think of.

11:21:10   19        Q.  I mean, does CFX put a CFX file out?

11:21:14   20        A.  Yeah.  Actually there are two more files,

11:21:16   21   thanks for reminding me.

11:21:18   22        There could be a CFX file, and what's called

11:21:20   23   a DEF file, definition file.  Both of those are

11:21:23   24   contained within the TRN.

11:21:25   25        Q.  Okay.  But they're al -- they're also

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

83

11:21:26  1  separate files as well.

11:21:27  2      A.   That's correct.

11:21:28  3      Q.   Do you still have those files, or have they

11:21:30  4  been deleted?

11:21:31  5      A.   I don't believe I still have them because

11:21:33  6  they're contained within the TRN.

11:21:35  7      Q.   And are these files on your personal

11:21:37  8  computer, or on a server in St. Thomas?

11:21:40  9      A.   They would be on a computer at St. Thomas.

11:21:42  10      Q.   On the server?

11:21:44  11      A.   Well they're on a desktop.

11:21:46  12      Q.   Okay.  And what computer did you use to run

11:22:07  13  the CFX, or the -- the model?

11:22:10  14      A.   I used a multicore desktop machine.

11:22:13  15      Q.   How many cores?

11:22:15  16      A.   I recall 16.

11:22:17  17      Q.   Sixteen cores?

11:22:17  18      A.   Yep.

11:22:20  19      Q.   Did you consider using a supercomputer?

11:22:23  20      A.   No.

11:22:24  21      Q.   What about a computer at the University of

11:22:26  22  Minnesota?

11:22:27  23      A.   I did not consider that.

11:22:28  24      Q.   So you never used a computer at the

11:22:30  25  University of Minnesota?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

84

11:22:31   1       A.    The -- I have used computers at the

11:22:33   2   University of Minnesota.

11:22:34   3       Q.    I mean for this.  For this.

11:22:35   4       A.    For this I did not.

11:22:36   5       Q.    Okay.

11:22:49   6             (Abraham Exhibit 6 marked for

           7             identification.)

           8   BY MR. ASSAAD:

11:22:58   9       Q.    What's been marked as Exhibit 6 is a

11:22:59  10   document that was produced to us during the first

11:23:01  11   subpoena issued to you, titled Abraham 00002 regarding

11:23:10  12   your job information.

11:23:10  13             Do you recall this document?

11:23:11  14       A.    Yes.

11:23:12  15       Q.    What is this document?

11:23:15  16       A.    This document lists the -- it's information

11:23:20  17   about the run and the subdivision of elements or --

11:23:26  18   the subdivision of the problem to processors or to

11:23:29  19   cores.

11:23:31  20       Q.    Engineering Sparrow, what's that?

11:23:33  21       A.    It's a name of a computer.

11:23:35  22       Q.    That you use at St. Thomas?

11:23:36  23       A.    Correct.

11:23:37  24       Q.    And the reason why I'm confused is because

11:23:39  25   you trained under Sparrow; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

85

| | | |
|---|---|---|
| 11:23:41 | 1 | A.   That's correct. |
| 11:23:41 | 2 | Q.   Okay.  So this is not his computer? |
| 11:23:43 | 3 | A.   That is correct. |
| 11:23:43 | 4 | Q.   Okay.  So you used no resources from the |
| 11:23:46 | 5 | University of Minnesota. |
| 11:23:47 | 6 | A.   Correct. |
| 11:23:48 | 7 | Q.   Okay.  And where it says "mesh," are these |
| 11:23:51 | 8 | mesh or nodes?  Or do you know what that even is? |
| 11:23:58 | 9 | A.   I know what that is. |
| 11:23:59 | 10 | Q.   What is it? |
| 11:24:03 | 11 | A.   When you want to solve a problem, let's say |
| 11:24:06 | 12 | fluid flow in this room, the problem is very complex |
| 11:24:13 | 13 | and the mathematics is very difficult so what is done |
| 11:24:16 | 14 | is you subdivide the room into a number of -- |
| 11:24:21 | 15 | Q.   Parts? |
| 11:24:22 | 16 | A.   I'd say parts, and there are these |
| 11:24:24 | 17 | tetrahedra, pyramid, hexahedra, these elements that we |
| 11:24:29 | 18 | were talking about. |
| 11:24:29 | 19 | Q.   Umm-hmm? |
| 11:24:30 | 20 | A.   Those are cells.  We call that the mesh. |
| 11:24:34 | 21 | At the intersection of those cells where two |
| 11:24:36 | 22 | come together we call that a node.  And so cells and |
| 11:24:41 | 23 | nodes, or mesh and nodes are used together. |
| 11:24:46 | 24 | Q.   So this isn't the mesh size, this is |
| 11:24:48 | 25 | probably the nodes size? |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

86

11:24:50    1        A.    I don't know if these numbers refer to the

11:24:53    2    number of elements or the number of nodes.

11:24:56    3        Q.    Well I add these up and they're roughly

11:24:58    4    between 1.8 to 1.9 million.  I assume your mesh was

11:25:03    5    larger than 1.9 million.

11:25:05    6        A.    Correct.

11:25:06    7        Q.    Okay.  Do you know how many nodes you had?

11:25:10    8        A.    The re --

11:25:11    9              All the results contained here are about 8.1

11:25:14   10    million elements.  I don't know the number of nodes,

11:25:18   11    but it would be approximately that number.

11:25:20   12        Q.    The same --

11:25:21   13              The nodes equal elements?

11:25:23   14        A.    No.

11:25:24   15        Q.    Close to the elements?

11:25:25   16        A.    Close.

11:25:26   17        Q.    Okay.  Then how would I know this 8.1

11:25:32   18    million?

11:25:34   19        A.    From the TRN file.

11:25:41   20        Q.    Did you have another --

11:25:45   21              Do you have another one of these Job

11:25:47   22    Information tables for the RANS model that you ran?

11:25:55   23        A.    I don't believe so.  I can go look when I

11:25:57   24    get to my computer, but I don't recall.  I don't

11:25:59   25    believe so.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

87

11:26:08    1        Q.    And, I'm sorry, you said you had 16 cores?

11:26:10    2        A.    Correct.

11:26:12    3        Q.    Is it a double or single precision?

11:26:16    4        A.    Well the cores aren't double precision,

11:26:18    5    they're single precision.

11:26:22    6        Q.    Did you monitor the solutions as they

11:26:24    7    solved?

11:26:25    8        A.    Yes.

11:26:26    9        Q.    How long did it take to solve?

11:26:30   10        A.    I recall something like 40 days.

11:26:34   11        Q.    Forty days?

11:26:34   12        A.    Correct.

11:26:35   13        Q.    Nonstop running?

11:26:36   14        A.    Correct.

11:26:48   15        Q.    So when did you start the solution?  Would

11:26:51   16    it be this date, November 18th, 2015?

11:26:56   17        A.    Well certainly --

11:26:59   18              It appears that that is the date.

11:27:01   19        Q.    Okay.  So that's the start time.

11:27:03   20        A.    Yes.

11:27:04   21        Q.    Okay.  So you would have not gotten the

11:27:07   22    solution till the middle of December?

11:27:29   23        A.    You know, I think I -- I'm struggling with

11:27:31   24    memory.  I'm trying to remember the details of the

11:27:34   25    length.  If the run starting on November 18th was the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

88

11:27:46  1  beginning of the run, and I recall 40 days, then yes,

11:27:50  2  the result would have been obtained aft -- 40 days

11:27:54  3  later.

11:27:56  4        But I don't know where in the calculation

11:27:58  5  this run -- this start run corresponds to.  So it

11:28:03  6  could have been the initial start, it could have been

11:28:07  7  after a hundred time steps, it could have been after

11:28:11  8  200, so I -- I can't tell you, sitting here, what time

11:28:14  9  step this start run corresponds to.  I just don't

11:28:17  10  recall.

11:28:17  11        Q.   So this -- this is performed for every time

11:28:19  12  step?

11:28:21  13        A.   No.

11:28:24  14        Q.   Okay.  So sitting here today, you're not

11:28:26  15  sure of when you started the -- the run.

11:28:30  16        A.   Correct.

11:28:31  17        Q.   Okay.  The fact that the contract was

11:28:35  18  signed, or the proposal with St. Thomas and 3M was

11:28:38  19  October 17th, 2015, does that give you -- does that

11:28:43  20  refresh your recollection as how long it took you to,

11:28:46  21  I guess, import the geometry, do the mesh or do

11:28:51  22  whatever you had to do before you started the run?

11:28:53  23        A.   No.

11:28:54  24        Q.   How long did it take you to create the mesh?

11:28:58  25        A.   I don't recall.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

89

11:29:00  1      Q.   Was it a day, an hour?

11:29:02  2      A.   It would have been more than an hour, likely

11:29:04  3  more than a day.

11:29:06  4      Q.   Okay.  By the way, do you have authority to

11:29:15  5  sign contracts between St. Thomas and third parties?

11:29:22  6      A.   I am one of the signers.

11:29:25  7      Q.   And who is the other signer?

11:29:26  8      A.   There are other folks in the administration.

11:29:28  9  I think the Dean would sign, and then there may be

11:29:36  10  someone else.

11:29:37  11      Q.   Okay.  I take it that you've reviewed Dr.

11:30:10  12  Settles' report; correct?

11:30:11  13      A.   Yes.

11:30:12  14      Q.   And you reviewed Dr. Kuehn's report from

11:30:17  15  University of Minnesota.

11:30:18  16      A.   Yes.

11:30:18  17      Q.   Have you ever had any classes with Dr.

11:30:20  18  Kuehn?

11:30:21  19      A.   Yes.

11:30:22  20      Q.   When you were an undergrad?

11:30:25  21      A.   That's correct.

11:30:26  22      Q.   What class?

11:30:26  23      A.   It -- And I think I was an undergrad, it's

11:30:29  24  possible I was studying my mas -- getting my master's

11:30:32  25  degree.  But I recall taking a class from him related

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

90

| | | |
|---|---|---|
| 11:30:36 | 1 | to heating, ventilation and air conditioning. |
| 11:30:40 | 2 | Q.   Okay.  Did you rely on Dr. Settles' report |
| 11:30:49 | 3 | for any information? |
| 11:30:50 | 4 | A.   No. |
| 11:30:51 | 5 | Q.   Did you rely on Dr. Kuehn's report for any |
| 11:30:53 | 6 | information? |
| 11:30:53 | 7 | A.   I relied on Dr. Kuehn's report to confirm my |
| 11:30:56 | 8 | results. |
| 11:30:57 | 9 | Q.   And what did you look at Dr. Kuehn's report? |
| 11:31:02 | 10 | A.   His velocity and temperature measurements. |
| 11:31:04 | 11 | Q.   Okay.  Did you read his deposition? |
| 11:31:05 | 12 | A.   Yes. |
| 11:31:06 | 13 | Q.   Okay.  The entire dep -- |
| 11:31:08 | 14 | You read the entire deposition? |
| 11:31:09 | 15 | A.   Yes. |
| 11:31:10 | 16 | Q.   Did you read Dr. Settles' deposition? |
| 11:31:12 | 17 | A.   Yes. |
| 11:31:15 | 18 | Q.   Did you read any other depositions? |
| 11:31:17 | 19 | A.   Yes. |
| 11:31:17 | 20 | Q.   What other depositions did you read? |
| 11:31:20 | 21 | A.   I read all of the depositions from the |
| 11:31:24 | 22 | plaintiff's side. |
| 11:31:27 | 23 | Q.   Plaintiffs' experts, or plaintiff's side? |
| 11:31:29 | 24 | A.   Plaintiffs' experts. |
| 11:31:30 | 25 | Q.   Okay. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

91

11:31:30    1        A.    Okay.

11:31:31    2        Q.    So that would have been Dr. Elghobashi?

11:31:33    3        A.    That's right.  I read his.

11:31:34    4        Q.    Okay.  Doctor -- Or Dan Koenigshofer?

11:31:38    5        A.    Yes.

11:31:39    6        Q.    Michael Buck?

11:31:41    7        A.    I -- I'm struggling to go through -- to

11:31:44    8    remember the names, but there were perha -- maybe make

11:31:48    9    this easier.  There are maybe eight or nine or so

11:31:50   10    expert depositions that I was provided, and I read all

11:31:53   11    of them.  I recall -- I think I recall the name

11:31:56   12    Michael Buck.

11:31:57   13        Q.    Okay.

11:31:58   14        A.    Certainly Dan K.

11:32:00   15        Q.    Umm-hmm.

11:32:01   16        A.    Certainly Said Elghobashi.

11:32:04   17        Q.    Okay.  Well I will represent to you that the

11:32:05   18    plaintiffs only have seven experts, and not all of

11:32:08   19    them have been deposed.  So -- So are there -- are you

11:32:14   20    mixing expert reports and depositions?

11:32:22   21        A.    That's actually possible.  Maybe -- I think

11:32:24   22    I am mixing expert reports and depositions.

11:32:26   23        Q.    Okay.

11:32:27   24        A.    Thank you for correcting me.

11:32:28   25        Q.    So what depositions have you read?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

92

11:32:29  1          You read Dr. Settles and Dr. Kuehn; correct?

11:32:33  2     A.   That's correct.

11:32:34  3     Q.   You've read Dr. Elghobashi; correct?

11:32:35  4     A.   Correct.

11:32:36  5     Q.   Have you read Michael Buck?

11:32:38  6     A.   No.

11:32:39  7     Q.   Have you read Dr. -- or Dan Koenigshofer?

11:32:42  8     A.   The only deposition -- And thank you so much

11:32:45  9  for correcting me.

11:32:45  10          The only deposition on the plaintiff's side

11:32:47  11  that I've read is Elghobashi.

11:32:49  12     Q.   Okay.  So you've seen all the reports of

11:32:52  13  plaintiffs' experts, you just have only read the

11:32:54  14  Elghobashi deposition.

11:32:55  15     A.   That is correct.

11:32:56  16     Q.   Have you received any other depositions of

11:32:57  17  plaintiffs' experts?

11:33:02  18     A.   No.

11:33:03  19     Q.   Okay.  Have you read the depositions of

11:33:05  20  defense experts?

11:33:08  21     A.   Just the --

11:33:10  22          Just Settles and Kuehn.

11:33:15  23     Q.   Okay.  And Kuehn is K-U-E-H-N, that Kuehn;

11:33:27  24  correct?

11:33:27  25     A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

93

| | | |
|---|---|---|
| 11:33:28 | 1 | Q.   Okay.  Have you read Michael Keen's |
| 11:33:33 | 2 | deposition, Keen from Cali -- or from Canada? |
| 11:33:37 | 3 | A.   No. |
| 11:33:37 | 4 | Q.   Okay.  Have you reviewed any expert reports |
| 11:33:40 | 5 | by the defense? |
| 11:33:44 | 6 | A.   I don't think so. |
| 11:33:45 | 7 | Q.   Well you've seen Gary Settles' report; |
| 11:33:47 | 8 | correct? |
| 11:33:49 | 9 | A.   Correct. |
| 11:33:49 | 10 | Q.   Okay.  And you've -- you've seen Dr. Kuehn's |
| 11:33:51 | 11 | report. |
| 11:33:52 | 12 | A.   That is correct. |
| 11:33:54 | 13 | Q.   Okay. |
| 11:33:55 | 14 | MR. GOSS:  Do you mean American Kuehn? |
| 11:33:57 | 15 | MR. ASSAAD:  American Kuehn. |
| 11:33:58 | 16 | MR. GOSS:  Thank you. |
| 11:33:59 | 17 | Q.   Okay. |
| 11:34:00 | 18 | A.   Correct. |
| 11:34:00 | 19 | Q.   Have you seen any other of defense expert |
| 11:34:02 | 20 | reports? |
| 11:34:07 | 21 | A.   I have defense expert reports.  I have only |
| 11:34:11 | 22 | read the two that we just mentioned. |
| 11:34:14 | 23 | Q.   So you haven't read the report -- the expert |
| 11:34:16 | 24 | report of Jim Ho. |
| 11:34:18 | 25 | A.   Correct. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

94

11:34:19   1      Q.   You haven't read the report of Michael Keen

11:34:22   2   from Canada.

11:34:23   3      A.   Correct.

11:34:24   4      Q.   You haven't read the report of Dr. Mont.

11:34:26   5      A.   Correct.

11:34:27   6      Q.   You haven't read the report of Dr. Holford?

11:34:32   7   Holford.

11:34:32   8      A.   Correct.

11:34:33   9      Q.   You haven't read the report of Dr. Borak.

11:34:36  10      A.   Correct.

11:34:37  11      Q.   You haven't read the report of Dr. Wenzel;

11:34:39  12   correct?

11:34:39  13      A.   Correct.

11:34:40  14      Q.   And you haven't read the expert report of

11:34:49  15   Dr. Lampotang; correct?

11:34:52  16      A.   Correct.

11:34:52  17      Q.   You haven't read the report of Dr.

11:34:54  18   Hannenberg; correct?

11:34:57  19      A.   Correct.

11:35:04  20      Q.   Have you read the deposition of Al Van

11:35:07  21   Duren?

11:35:08  22      A.   I have read a deposition of Al Van Duren.

11:35:11  23      Q.   Which one; do you recall?

11:35:12  24      A.   It was in maybe September 2015.  So I have

11:35:20  25   read a deposition around that time.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

95

11:35:21   1      Q.   So you read the deposition that was done in

11:35:23   2   the Walton case, or the Johnson case.

11:35:25   3      A.   I don't know about the cases.

11:35:28   4      Q.   Okay.

11:35:28   5      A.   I read a deposition from Al Van Duren around

11:35:30   6   September 2015.

11:35:32   7      Q.   Okay.  Any other depositions you've read of

11:35:34   8   fact witnesses?

11:35:35   9      A.   Yes.

11:35:36  10      Q.   Who?

11:35:38  11      A.   Gary Hansen.

11:35:40  12      Q.   Okay.

11:35:40  13      A.   And Winston Tan.

11:35:42  14      Q.   Okay.  And was that back while Greenberg

11:35:47  15   Traurig was the representative of 3M?

11:35:49  16      A.   Yes.

11:35:50  17      Q.   Okay.  So would it be fair to say that if

11:35:53  18   this MDL started in January of 2 -- December of 2015

11:35:58  19   that you haven't read any fact depositions that were

11:36:01  20   conducted in the MDL?

11:36:02  21      A.   Sitting here now, I cannot think of any fact

11:36:06  22   dep -- witness depositions that I have read after the

11:36:08  23   MDL.

11:36:09  24      Q.   Okay.  After the beginning of the MDL.

11:36:11  25      A.   After the beginning of the MDL.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

96

11:36:14    1         Thank you for correcting me.

11:36:15    2    Q.    Okay.  Did you have any criticisms of Dr.

11:36:19    3    Kuehn's report?

11:36:24    4    A.    No.

11:36:25    5    Q.    Any criticism of Dr. Settles' report?

11:36:29    6    A.    No.

11:36:30    7    Q.    You have no criticism of -- of his

11:36:32    8    measurement of air coming out of the Bair Hugger

11:36:35    9    between 30 to 33 degrees Celsius?

11:36:37   10    A.    No.

11:36:38   11    Q.    Okay.  Now my understanding is is that the

11:37:07   12    invoices with respect to your expert work for 3M the

11:37:12   13    money goes directly to you; correct?

11:37:16   14    A.    Yes.

11:37:16   15    Q.    Okay.  And the two CFD studies for research,

11:37:21   16    which is for the 750 and the 505, is money that goes

11:37:25   17    to St. Thomas; correct?

11:37:26   18    A.    That's correct.

11:37:27   19    Q.    Okay.  So the $15,000 in your CV for

11:37:41   20    research in 2017 for 3M is for the 505; correct?

11:38:00   21    A.    Can you point to me where you're seeing

11:38:03   22    15,000?

11:38:13   23    Q.    I'm sorry.  Fourteen thousand.  My fault.

11:38:20   24    A.    That is correct.

11:38:21   25    Q.    Okay.  And you've kept invoices

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

97

11:38:33  1  contemporaneously with your work in this case;

11:38:35  2  correct?

11:38:36  3      A.  Correct.

11:38:37  4      Q.  Your invoices are complete; correct?

11:38:41  5      A.  I -- Yes.

11:38:42  6      Q.  And they're accurate; correct?

11:38:44  7      A.  To the best of my knowledge.

11:38:46  8      Q.  And they're so accurate that some months you

11:38:48  9  even submitted invoices that you had no time; correct?

11:38:50  10     A.  That is correct.

11:38:51  11     Q.  Okay.  And even for the cost of travel you

11:38:56  12  -- you put it to the exact penny; correct?

11:39:00  13     A.  I think I'm obligated to, but yes.

11:39:02  14     Q.  I mean, you're an engineer, you like to be

11:39:04  15  accurate; correct?

11:39:06  16     A.  I certainly don't want to overcharge someone

11:39:10  17  for work.

11:39:12  18     Q.  So with respect to your invoices, and --

11:39:37  19         Do you have a copy of your invoices today?

11:39:39  20     A.  No.

11:39:40  21     Q.  Okay.  Were you told to bring nothing to

11:39:42  22  this deposition?

11:39:42  23     A.  No.

11:39:43  24     Q.  You just decided to bring nothing to this

11:39:45  25  deposition?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

98

11:39:45    1       A.    That's not true.

11:39:46    2       Q.    Okay.  Well what did you bring to this

11:39:49    3   deposition?

11:39:49    4       A.    I have some files right here, some papers

11:39:51    5   right here.

11:39:52    6       Q.    Oh, I didn't see those.  I'm sorry.

11:39:56    7             MR. ASSAAD:  Let's take a break.

11:39:57    8             THE REPORTER:  Off the record, please.

11:39:59    9             (Recess taken from 11:39 to 11:45 a.m.)

11:45:49   10   BY MR. ASSAAD:

11:45:53   11       Q.    We were talking about your invoices.  Would

11:45:55   12   it be fair to say if I want to determine all the time

11:45:58   13   you worked on your report that was completed by early

11:46:01   14   January, I'd just have to look at your invoices?

11:46:08   15       A.    No.

11:46:11   16       Q.    Let me guess.  I'm assuming that's because

11:46:13   17   of the flat fee for the -- actually doing the CFD that

11:46:17   18   was paid to St. Thomas; correct?

11:46:20   19       A.    Well that's -- that is one reason, but also

11:46:23   20   I tend not to -- I tend to undercharge.  So, for

11:46:26   21   example, I don't charge for many phone calls, and for

11:46:29   22   travel, and so I tend to undercharge.  It would be the

11:46:33   23   lower bound of the work.  It's the charged amount.

11:46:37   24       Q.    Okay.  Because I looked at it, and by the

11:46:41   25   ti -- by the end of January you've only billed 30

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

99

11:46:44    1   hours.  Does that seem about roughly how much time you

11:46:46    2   spent, personal time that you charged directly to 3M

11:46:52    3   on the -- your research and the report writing?

11:46:56    4       A.    That seems reasonable.

11:46:57    5       Q.    Okay.  And I might have misspoke, but that

11:47:06    6   was the beginning of 2016, correct, that you completed

11:47:09    7   the report?

11:47:10    8       A.    That's how I in --

11:47:11    9       Q.    Okay.

11:47:11   10       A.    Well that's how I interpreted what your

11:47:13   11   question was.

11:47:14   12       Q.    Okay.  All right.

11:47:25   13       A.    But I think you said completed the report by

11:47:27   14   2 -- early 2016?

11:47:28   15       Q.    Just the CFD portion.

11:47:30   16       A.    Okay.

11:47:30   17       Q.    That's what I meant.

11:47:47   18             There's one thing I want to discuss if you

11:47:50   19   know off the top of your head, but you spent about six

11:47:53   20   hours to draft the protocol that's listed on your

11:47:57   21   invoices.  Do you know what that's referring to?

11:47:59   22       A.    Can you show me which invoice?

11:48:20   23       Q.    It was in December of 2016 and, I'm sorry, I

11:48:24   24   misquoted, it was three hours to draft -- discussion

11:48:27   25   of CFD and protocol and draft protocol.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

100

11:48:29  1        Do you recall, back in 2016, what protocol

11:48:31  2   that would be for?

11:48:32  3        A.   No, I don't recall.

11:48:33  4        Q.   Okay.  Did you speak with any of the defense

11:48:43  5   experts?

11:48:44  6        A.   No.

11:48:45  7        Q.   So you never spoke to Gary Settles or --

11:48:49  8        A.   And in fact --

11:48:50  9             Can I correct that?

11:48:51  10       Q.   Yes.

11:48:51  11       A.   At Science Day there were some defense

11:48:53  12  experts there along with myself.

11:48:57  13       Q.   Fair enough.

11:48:57  14       A.   Outside of that I have not spoken to any

11:49:00  15  defense experts.

11:49:01  16       Q.   Okay.  Oh, by the way, that protocol, if it

11:49:04  17  was in December of 2016, that would not -- that would

11:49:08  18  not apply to your CFD analysis in your report;

11:49:11  19  correct?

11:49:13  20       A.   Correct.

11:49:14  21       Q.   Okay.  Are you a member of the American

11:49:22  22  Society of Mechanical Engineers?

11:49:23  23       A.   No.

11:49:23  24       Q.   Were you ever a member?

11:49:25  25       A.   Yes.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

101

11:49:26   1        Q.    Why are you no longer a member?

11:49:29   2        A.    The American Society of Mechanical Engineers

11:49:31   3   is a professional society where my understanding is if

11:49:35   4   you pay your annual fee you become a member, and there

11:49:39   5   wasn't much value in it for me, so I dropped

11:49:42   6   membership.

11:49:43   7        Q.    Okay.  But at one time you were a member;

11:49:45   8   correct?

11:49:46   9        A.    I recall being a member.

11:49:48   10       Q.    And at one time, you agree with me that

11:49:51   11  while you went to the University of Minnesota you took

11:49:53   12  a course on engineering ethics; correct?

11:49:56   13       A.    I don't believe I did.

11:49:57   14       Q.    Was -- Did any of your course involve -- any

11:50:00   15  of your studies involve engineering ethics?

11:50:03   16       A.    I don't recall taking any course on

11:50:08   17  engineering ethics or a course that had a significant

11:50:11   18  part of engineering ethics.  I can't remember --

11:50:13   19  Sitting here right now I cannot remember any

11:50:16   20  engineering ethics content in a course.

11:50:18   21       Q.    Well do you agree that engineers uphold and

11:50:20   22  advance the integrity, honor and dignity of the

11:50:24   23  engineering profession?

11:50:26   24       A.    They should.

11:50:26   25       Q.    Do you agree that engineers should be

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

102

11:50:28   1   objective -- should be objective?

11:50:30   2       A.   Yes.

11:50:31   3       Q.   Should be honest?

11:50:32   4       A.   Yes.

11:50:32   5       Q.   And have integrity?

11:50:34   6       A.   Yes.

11:50:34   7       Q.   Do you agree that the engineers of 3M should

11:50:36   8   be held to the same standards?

11:50:38   9       A.   Yes.

11:50:42   10      Q.   Do you agree that engineers must use their

11:50:44   11  knowledge and skill for enhancement of human welfare?

11:50:49   12      A.   Yes.

11:50:49   13      Q.   Do you agree that safety should be

11:50:51   14  considered in the engineering profession, the safety

11:50:54   15  of humans?

11:50:55   16      A.   Yes.

11:50:55   17      Q.   And safety is paramount?

11:50:59   18      A.   Well safety should be considered, should be

11:51:02   19  highly considered.  I don't know about "paramount,"

11:51:05   20  but safety should be highly considered.

11:51:19   21      Q.   Do you believe that in the context of

11:51:24   22  designing a device to be used by the public that

11:51:27   23  safety is more important than profits?

11:51:31   24          MR. GOSS:  Object to form.

11:51:33   25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

103

11:51:35  1      Q.   Engineering's a profession; correct?  Not

11:51:37  2  just a job.

11:51:37  3      A.   Correct.

11:51:38  4      Q.   Okay.  And as a professor you have a duty to

11:51:42  5  teach ethical engineering behavior; correct?

11:51:47  6      A.   If we have a class where that fits, then

11:51:50  7  yes.  But we have a duty to convey ethical behavior to

11:51:54  8  our students.

11:51:55  9      Q.   Okay.  Engineers are to serve with the

11:51:59 10  fidelity -- with fidelity to the public; correct?

11:52:05 11      A.   Is "fidelity" truthfulness?  What is

11:52:07 12  "fidelity"?

11:52:08 13      Q.   It's the quality of being faithful or loyal.

11:52:11 14      A.   I don't know if engineers have to be loyal

11:52:13 15  to the public.

11:52:14 16      Q.   Okay.

11:52:14 17      A.   That's not a word I would use.

11:52:17 18      Q.   Are you familiar with the St. Thomas Code of

11:52:18 19  Ethics?

11:52:20 20      A.   I am familiar with it.

11:52:21 21      Q.   Have you read them recently?

11:52:22 22      A.   No.

11:52:26 23          MR. GOSS:  I'm just going to state my usual

11:52:28 24  objection to ethics as an improper subject matter.

11:52:34 25      Q.   Did the St. Thomas Code of Professional

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

104

11:52:36  1  Conduct apply to you?

11:52:40  2       A.   I don't know.

11:52:41  3       Q.   Okay.

11:52:47  4            (Abraham Exhibit 7 marked for

          5            identification.)

          6  BY MR. ASSAAD:

11:52:59  7       Q.   I'd like for you to turn to page 4 of 6.

11:53:05  8  Under Section VII it states:  "Members of the

11:53:07  9  University community must transact University business

11:53:11  10  in compliance with applicable laws, regulations, and

11:53:14  11  University" policy -- "policies and procedures."

11:53:17  12       A.   Can you tell me where you're reading?

11:53:19  13       Q.   Under Section VII, first sentence.

11:53:23  14       A.   I'm reading "All University financial

11:53:25  15  transactions and reports, including tax returns," and

11:53:28  16  so forth.

11:53:31  17       Q.   On page 4?

11:53:35  18       A.   Page 4 of 6?

11:53:37  19       Q.   Under Section VII, number --

11:53:40  20       A.   Oh, Section VII.  Sorry.  My -- My mistake.

11:53:43  21            (Witness reviewing exhibit.)  Yes.

11:53:50  22       Q.   Actually let's go to the first page, "POLICY

11:53:53  23  STATEMENT."  It states:  "The University of St. Thomas

11:53:56  24  is committed to upholding the highest ethical

11:53:59  25  standards in all that it does and expects those who

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

105

11:54:02  1   are part of the University community, including

11:54:05  2   trustees, officers, faculty, staff, and students to

11:54:07  3   adhere to such standards in their business dealings."

11:54:10  4           Did I read that correctly?

11:54:11  5       A.   Yes.

11:54:12  6       Q.   Would you agree with me that this Code of

11:54:13  7   Professional Conduct applies to you?

11:54:15  8       A.   Yes.

11:54:16  9       Q.   Okay.  And you would agree with me that even

11:54:19  10  in your work as a consultant, as a professor of

11:54:24  11  engineering at the University of St. Thomas the Codes

11:54:27  12  of Professional Conduct listed out here apply to you.

11:54:31  13      A.   I don't know if that's technically true, but

11:54:33  14  I would view them as applying to me.

11:54:35  15      Q.   Okay.  Under Section VI -- I'm sorry,

11:55:13  16  Section VII, the last sentence says:  "Therefore, only

11:55:20  17  individuals who have been delegated proper authority

11:55:25  18  by an appropriate University official are authorized

11:55:27  19  to enter into contractual agreements on behalf of the

11:55:30  20  University."

11:55:30  21          See where I read that?

11:55:32  22          MR. GOSS:  Are you under one of the subs?

11:55:34  23          MR. ASSAAD:  VII a., under "Contractual

11:55:36  24  Obligations."

11:55:37  25          MR. GOSS:  Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

106

11:55:38    1       A.    Yes.

11:55:38    2       Q.    Are you --

11:55:39    3             Have you been delegated proper authority to

11:55:42    4    contract -- or enter into contractual agreements on

11:55:49    5    behalf of the university?

11:55:53    6       A.    Well I'm one of a number of people that is

11:55:58    7    able to enter into contractual obligations.  I by -- I

11:56:04    8    don't believe I, by myself, can.

11:56:06    9       Q.    Okay.  So you yourself can't go out and

11:56:10   10    enter in a contract on behalf of the University

11:56:13   11    without someone else from the University involved.

11:56:15   12       A.    That's my understanding.

11:56:16   13       Q.    Okay.  Are any professors allowed to do

11:56:22   14    that?

11:56:23   15       A.    I don't know of any professors that are

11:56:24   16    allowed to do that.

11:56:29   17       Q.    Okay.  Who else at St. Thomas approved the

11:56:38   18    research with regard to the proposal with 3M?

11:56:45   19       A.    The proposals would run through the Dean and

11:56:49   20    then the grant's office.

11:56:51   21       Q.    So if I subpoena the University of St.

11:56:53   22    Thomas, I'll see documents signed by the Dean and the

11:56:57   23    grant office with respect to approving this contract?

11:57:00   24       A.    I expect you would.

11:57:01   25       Q.    Okay.  You agree that engineers should solve

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

107

| | | |
|---|---|---|
| 11:57:30 | 1 | a potential problem instead of ignoring it? |
| 11:57:35 | 2 | A.   Possibly. |
| 11:57:36 | 3 | Q.   Engineers that are working in the community, |
| 11:57:39 | 4 | not -- |
| 11:57:40 | 5 | A.   Possibly.  Not always. |
| 11:57:42 | 6 | Q.   Okay.  So it's okay if -- if you're an |
| 11:57:45 | 7 | engineer that has a product on the market and you |
| 11:57:47 | 8 | identify a potential problem, to ignore it? |
| 11:57:51 | 9 | MR. GOSS:  Object to form, |
| 11:57:53 | 10 | mischaracterizes. |
| 11:57:53 | 11 | A.   That's -- It -- It's -- |
| 11:57:57 | 12 | I would take it on a case-by-case basis. |
| 11:58:00 | 13 | There are some problems that are insignificant that |
| 11:58:03 | 14 | you can ignore, and there are some problems that may |
| 11:58:06 | 15 | be significant that you should not ignore. |
| 11:58:09 | 16 | Q.   Well to determine whether or not the problem |
| 11:58:10 | 17 | is significant or insignificant you have to identify |
| 11:58:15 | 18 | the problem and determine whether or not it is |
| 11:58:18 | 19 | significant or insignificant; correct? |
| 11:58:22 | 20 | A.   Correct. |
| 11:58:23 | 21 | Q.   So you might ignore moving on with respect |
| 11:58:27 | 22 | to a problem, but the identification of a problem you |
| 11:58:31 | 23 | would not ignore. |
| 11:58:36 | 24 | A.   Could you rephrase that question? |
| 11:58:38 | 25 | Q.   Well to determine whether -- the |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

108

| | | |
|---|---|---|
| 11:58:42 | 1 | significance of a problem, you can't ignore the |
| 11:58:44 | 2 | problem.  You have to identify the problem and look at |
| 11:58:46 | 3 | it. |
| 11:58:47 | 4 | A.    Identifying the problem is different from |
| 11:58:50 | 5 | acting on or ignoring a problem. |
| 11:58:51 | 6 | Q.    Okay. |
| 11:58:51 | 7 | A.    So I'm try -- I'm parsing your words. |
| 11:58:55 | 8 | Let me use this cup as an example. |
| 11:59:00 | 9 | Underneath this cup there is a small indentation, |
| 11:59:03 | 10 | which is by design.  Let's say that this cup comes off |
| 11:59:08 | 11 | of -- By the way, it's a very nice cup.  Let's say the |
| 11:59:11 | 12 | cup comes of the assembly line and there's a problem |
| 11:59:17 | 13 | with the manufacturing and the indentation is 10 |
| 11:59:19 | 14 | percent too large.  That's a problem that someone may |
| 11:59:21 | 15 | or may not identify and they may or may not act on it, |
| 11:59:25 | 16 | so -- because it may not matter. |
| 11:59:28 | 17 | So the point I'm trying to distinguish is |
| 11:59:31 | 18 | identifying a problem, and then making a decision to |
| 11:59:34 | 19 | act on it are two different things. |
| 11:59:36 | 20 | Q.    Okay.  You agree, in any event, that |
| 11:59:38 | 21 | problems involving patient risks should not be |
| 11:59:45 | 22 | ignored. |
| 11:59:47 | 23 | A.    It depends. |
| 11:59:49 | 24 | Q.    Okay. |
| 11:59:50 | 25 | A.    And let me -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

109

| | | |
|---|---|---|
| 11:59:51 | 1 | Q.   No.  That's fine.  I mean I -- |
| 11:59:52 | 2 | That's fine. |
| 11:59:52 | 3 | A.   Well by just saying -- by cutting me off I |
| 11:59:55 | 4 | am not able to fully qualify my answer, and I think |
| 11:59:58 | 5 | that the record won't be clear. |
| 12:00:00 | 6 | Q.   Well I'll withdraw my question then.  Let's |
| 12:00:02 | 7 | move on. |
| 12:00:06 | 8 | So you're familiar with the 35 bridge |
| 12:00:15 | 9 | collapse here in Minneapolis; correct? |
| 12:00:16 | 10 | A.   Yes. |
| 12:00:20 | 11 | Q.   Did you ever go over the bridge? |
| 12:00:21 | 12 | A.   Yes. |
| 12:00:23 | 13 | Q.   How often did you go over that bridge? |
| 12:00:29 | 14 | A.   One to three times per week. |
| 12:00:30 | 15 | Q.   Is it on your way home?  At that time. |
| 12:00:36 | 16 | A.   Can you remind me what year it was? |
| 12:00:38 | 17 | Q.   2007. |
| 12:00:40 | 18 | A.   It would not have been on my way home. |
| 12:00:42 | 19 | Q.   So why would you go over it one or two ti -- |
| 12:00:44 | 20 | three times a week? |
| 12:00:45 | 21 | A.   It's a major bridge in South St. Paul, and I |
| 12:00:48 | 22 | live in sou -- South Minneapolis, and I live in South |
| 12:00:51 | 23 | Minneapolis, so I'm estimating that I might go over it |
| 12:00:53 | 24 | one to three times a week. |
| 12:00:55 | 25 | MR. GOSS:  If you went to Home Depot you |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

110

12:00:58  1  probably went over it.

12:00:59  2       A.   There is a Home Depot, there's also a

12:01:03  3  Target.  Going downtown.

12:01:04  4       Q.   But you didn't go over it every day;

12:01:06  5  correct?

12:01:07  6       A.   Correct.  I did not go over it every day.

12:01:26  7       Q.   You understand that in the 3M -- or in the

12:01:32  8  Minnesota bridge collapse that engineers or the city

12:01:35  9  ignored problems identified by the engineer.

12:01:38  10       MR. GOSS:  Objection, lack of foundation.

12:01:40  11       Q.   Are you aware of that?

12:01:41  12       A.   That's not totally true.

12:01:43  13       Q.   Okay.  There weren't engineers that said

12:01:47  14  that we should replace the bridge and there's

12:01:51  15  structural problems with the bridge and just to

12:01:52  16  monit -- and the city said just to monitor it instead

12:01:55  17  of fixing it?

12:01:56  18       A.   So I have to break that apart.  First of

12:02:00  19  all, any warnings related to the bridge collapse I

12:02:03  20  think were associated with the questions about the

12:02:06  21  strength of the gusset plates.

12:02:07  22       Q.   Yes.

12:02:08  23       A.   There were other warnings about the bridge

12:02:10  24  that the city took action on.  In fact, as I recall,

12:02:13  25  they had annual remediation processes to maintain the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

111

12:02:18  1  structural integrity of the bridge.  So the city did

12:02:21  2  take action on warnings from engineers.

12:02:26  3        Now I don't recall if a specific warning

12:02:30  4  came about from the gusset-plate issue.  If the city

12:02:35  5  decided not to fix the problem but to monitor it, that

12:02:38  6  is still taking action.  It may not have been

12:02:41  7  appropriate action, but it still is taking action.

12:02:43  8        So it's not a simple yes-or-no answer that I

12:02:46  9  can give there.

12:02:47  10      Q.   Okay.  But at the end of the day the bridge

12:02:50  11  collapsed.

12:02:50  12      A.   At the end of the day, the bridge collapsed.

12:02:52  13      Q.   Okay.  Just by the way, did you receive any

        14  --

12:03:01  15       Well do you recall some of the engineers

12:03:03  16  stated, in the bridge collapse, that a catastrophic

12:03:08  17  collapse was possible?

12:03:14  18      A.   Boy, sitting here now I cannot recall.  That

12:03:18  19  may have occurred.

12:03:20  20      Q.   By the way, did you receive any -- did you

12:03:21  21  look at the Sessler study?

12:03:25  22      A.   Yes.

12:03:25  23      Q.   Were you provided the raw data regarding the

12:03:27  24  Sessler study?

12:03:28  25      A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

112

| | | |
|---|---|---|
| 12:03:29 | 1 | Q.   Okay.  Have you looked at any other |
| 12:03:32 | 2 | patient-warming devices manufactured by 3M or Arizant |
| 12:03:37 | 3 | prior to the 505 model or the 750 model? |
| 12:03:40 | 4 | A.   Yes. |
| 12:03:41 | 5 | Q.   What model? |
| 12:03:43 | 6 | A.   I don't recall.  I worked on patient warming |
| 12:03:46 | 7 | with Augustine Medical at the time, back in 2000.  I |
| 12:03:50 | 8 | don't recall the model numbers that we worked with. |
| 12:03:53 | 9 | Q.   Do you recall any model numbers that warned |
| 12:03:56 | 10 | about possible airborne contamination? |
| 12:03:57 | 11 | A.   No. |
| 12:03:58 | 12 | Q.   Would that be relevant to -- |
| 12:04:00 | 13 | Would that knowledge be relevant to your |
| 12:04:02 | 14 | report? |
| 12:04:04 | 15 | A.   I would need to see more.  I doubt it would |
| 12:04:06 | 16 | be relevant. |
| 12:04:07 | 17 | Q.   Okay.  When you worked with Augustine, what |
| 12:04:09 | 18 | did you do for Augustine? |
| 12:04:11 | 19 | A.   I worked on characterizing the rate of heat |
| 12:04:16 | 20 | transfer from the blanket to a patient and the flow |
| 12:04:19 | 21 | and temperatures within the blanket. |
| 12:04:23 | 22 | Q.   Okay.  Did you publish anything regarding |
| 12:04:25 | 23 | that work? |
| 12:04:25 | 24 | A.   No. |
| 12:04:26 | 25 | Q.   Do you still have the data or information |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

113

12:04:28  1  regarding that work?

12:04:29  2       A.   No.

12:04:32  3       Q.   So you've met Dr. Augustine before; correct?

12:04:34  4       A.   I have.

12:04:35  5       Q.   Okay.  When was the last time you spoke with

12:04:36  6  Dr. Augustine?

12:04:38  7       A.   To my best recollection, and mind you this

12:04:42  8  is years, I think I met him at Augustine Medical.

12:04:47  9  There was a social gathering or a party, and I believe

12:04:51  10  I met him there, and I also met him after he left

12:04:55  11  Augustine Medical.  He moved to a nearby location and

12:05:00  12  he had started a company, and I recall meeting him

12:05:03  13  there.

12:05:04  14       Q.   Did you do for --

12:05:05  15       Did you do any work for him after -- after

12:05:07  16  he started his -- after he left Augustine Medical or

12:05:10  17  Arizant?

12:05:11  18       A.   No.

12:05:11  19       Q.   Okay.  Have you spoken with him or anyone

12:05:14  20  from Augustine Medical since that time, since the last

12:05:19  21  conversation, by email or telephone?

12:05:21  22       A.   Well Augustine Medical is no longer around,

12:05:25  23  right?  Oh, oh.  You mean Augustine -- Augustine --

12:05:28  24       Q.   Biomedical or --

25       A.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

114

12:05:29    1        Q.    Any Augustine entity.

12:05:31    2        A.    No.

12:05:32    3        Q.    Okay.  So you haven't heard from Randy

12:05:34    4    Benham or anyone else in the past five years?

12:05:39    5        A.    I don't know Randy Benham.  I don't recall

12:05:42    6    ever hearing from him.  I did receive a subpoena,

12:05:46    7    which I don't think was from Randy Benham, but it's

12:05:50    8    possible it was.

12:05:51    9        Q.    Okay.

12:05:51   10        A.    But I have never spoken to him.  I don't

12:05:53   11    recall any speaking or emails.

12:05:55   12        Q.    Now Exhibit 2 is your CV; correct?  We

12:06:00   13    already went over that.

12:06:02   14        A.    Yes.

12:06:02   15        Q.    Okay.  Are you certified in any way by

12:06:04   16    ANSYS?  Like a certified ANSYS technician or anything

12:06:07   17    like that?

12:06:07   18        A.    No.

12:06:08   19        Q.    Okay.  What's your training in ANSYS?

12:06:12   20        A.    I've taken a number of courses with ANSYS at

12:06:17   21    the undergraduate and graduate level.  I've taken a

12:06:20   22    large number of short training seminars on ANSYS

12:06:25   23    premises, and I --

12:06:26   24        Q.    ANSYS what?

12:06:28   25        A.    Premises.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

115

| | | |
|---|---|---|
| 12:06:29 | 1 | Q.   Okay. |
| 12:06:29 | 2 | A.   Both in Minneapolis and in a place called |
| 12:06:33 | 3 | Canonsburg, Pennsylvania. |
| 12:06:35 | 4 | Q.   What's "ANSYS premises"? |
| 12:06:37 | 5 | A.   Their locations. |
| 12:06:38 | 6 | Q.   Oh, okay. |
| 12:06:39 | 7 | A.   Their buildings. |
| 12:06:40 | 8 | Q.   Okay. |
| 12:06:40 | 9 | MR. GOSS:  Another legal term. |
| 12:06:41 | 10 | MR. ASSAAD:  I thought it was a software |
| 12:06:43 | 11 | bundle, -- |
| 12:06:44 | 12 | THE WITNESS:  Sorry. |
| 12:06:45 | 13 | MR. ASSAAD:  -- you know, so -- |
| 12:06:46 | 14 | A.   Thank you for helping clarify that. |
| 12:06:48 | 15 | And I've used ANSYS as an instructor and a |
| 12:06:50 | 16 | researcher throughout my career. |
| 12:06:53 | 17 | Q.   Okay.  And is this ANSYS CFX or ANSYS |
| 12:06:57 | 18 | Fluent? |
| 12:06:57 | 19 | A.   We have both. |
| 12:07:00 | 20 | Q.   But which one do you use? |
| 12:07:02 | 21 | A.   I have used both.  I currently use CFX more |
| 12:07:04 | 22 | often. |
| 12:07:05 | 23 | Q.   And St. Thomas has both? |
| 12:07:06 | 24 | A.   Correct. |
| 12:07:06 | 25 | Q.   And what version does St. Thomas have |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

116

| | | |
|---|---|---|
| 12:07:08 | 1 | currently? |
| 12:07:09 | 2 | A.   Version 18. |
| 12:07:10 | 3 | Q.   Okay.  But what version was the CFD done for |
| 12:07:13 | 4 | the 750? |
| 12:07:15 | 5 | A.   17. |
| 12:07:16 | 6 | Q.   17, or 17.1? |
| 12:07:19 | 7 | A.   I don't know if it was 17.0 or .1. |
| 12:07:23 | 8 | Q.   Would there be a difference in the results |
| 12:07:24 | 9 | if it was 17 or 17.1? |
| 12:07:26 | 10 | A.   No. |
| 12:07:28 | 11 | Q.   Okay.  You're not an expert in medicine; |
| 12:07:30 | 12 | correct? |
| 12:07:31 | 13 | A.   Correct. |
| 12:07:31 | 14 | Q.   You're not an infectious disease expert; |
| 12:07:34 | 15 | correct? |
| 12:07:34 | 16 | A.   Correct. |
| 12:07:34 | 17 | Q.   So do you know how many CFUs it would take |
| 12:07:37 | 18 | to cause a periprosthetic joint infection? |
| 12:07:41 | 19 | A.   No. |
| 12:07:41 | 20 | Q.   You're not an expert in orthopedics; |
| 12:07:42 | 21 | correct? |
| 12:07:43 | 22 | A.   Correct. |
| 12:07:43 | 23 | Q.   You're not an expert in nursing; correct? |
| 12:07:46 | 24 | A.   Correct. |
| 12:07:46 | 25 | Q.   You're not an expert in filter |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

117

12:07:48    1    manufacturing; correct?

12:07:49    2        A.    Correct.

12:07:49    3        Q.    You're not an expert in medical device

12:07:51    4    design; correct?

12:07:53    5        A.    Well I've designed many medical devices and

12:07:56    6    I've worked for many medical companies.  I haven't

12:07:58    7    been asked, in this case, to serve as a medical device

12:08:02    8    design expert, so I'd have to give that some thought.

12:08:05    9        Q.    Okay.  But at this point you don't consider

12:08:07   10    yourself a medical device design expert for this case.

12:08:10   11        A.    Correct.

12:08:11   12        Q.    And would you hold yourself out as a patient

12:08:15   13    warmer medical device expert?

12:08:17   14        A.    Yes.

12:08:18   15        Q.    You would?

12:08:18   16        A.    Yes.

12:08:19   17        Q.    You have designed the patient-warming

12:08:21   18    devices?

12:08:21   19        A.    I have worked on the design of multiple

12:08:23   20    patient-warming devices.

12:08:25   21        Q.    Which ones?

12:08:27   22        A.    I've worked on a device from Smiths Medical.

12:08:30   23        Q.    Called?

12:08:33   24        A.    It's a -- I don't know.  It's EQ -- I think

12:08:36   25    the name is an EQ something, so it's numbers and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

118

12:08:39   1   letters.

12:08:40   2        Q.   Okay.

12:08:41   3        A.   I have published that work.

12:08:42   4        Q.   Okay.

12:08:42   5        A.   I have worked on the -- I think it's called

12:08:46   6   the Ranger fluid warming system.

12:08:49   7        Q.   Okay.

12:08:49   8        A.   I have worked on the forced-air warming

12:08:53   9   devices through Augustine Medical.

12:08:56   10       Q.   Okay.

12:08:56   11       A.   And I have analyzed multiple forced-air

12:09:00   12   warming devices.

12:09:02   13       Q.   Have you worked on any other patient-warming

12:09:04   14   devices besides forced-air warming?

12:09:05   15       A.   Yes.

12:09:05   16       Q.   Which ones?

12:09:06   17       A.   The Ranger.

12:09:07   18       Q.   Okay.  That's a fluid warmer; correct?

12:09:09   19       A.   Correct.

           20       Q.   Okay.

12:09:10   21       A.   But it warms fluids before they're inserted

12:09:12   22   into the body, so it's essentially a patient warmer.

12:09:16   23       Q.   Fair enough.

12:09:16   24            And have you used -- have you done any

12:09:19   25   research on conductive blankets or conductive devices?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

119

12:09:23  1       A.   Yes, I have done research on conductive

12:09:25  2   devices.

12:09:29  3       Q.   Okay.  What conductive devices?

12:09:32  4       A.   In my research, almost every heat transfer

12:09:35  5   situation has conduction.

12:09:36  6       Q.   I'm talking dealing with patient warming.

12:09:39  7       A.   Oh.  Thanks for the clarification.

12:09:40  8            No.  I have not done work on conductive

12:09:42  9   warming devices.

12:09:43  10      Q.   Okay.  You agree with me that the

12:09:45  11  patient-warming devices are either going to transfer

12:09:48  12  heat by either convection, conduction or radiation;

12:09:51  13  correct?

12:09:52  14      A.   I agree.

12:09:53  15      Q.   Those are the only three ways of heat

12:09:54  16  transfer that I'm aware of.  Is that --

12:09:56  17           Are there any other ways to do heat

12:09:59  18  transfer?

12:10:00  19      A.   You could have internal heat generation, but

12:10:02  20  that -- I can't imagine that being used for a

12:10:06  21  patient-warming device.

12:10:07  22      Q.   Okay.  So you agree there's multiple

12:10:11  23  patient-warming devices out there, but just a

12:10:16  24  different method of transferring heat.

12:10:17  25      A.   I agree.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

120

12:10:18  1      Q.   Okay.  Like some --

12:10:26  2           Like, for example, forced-air warming is

12:10:29  3  going to transfer heat by both convection and

12:10:31  4  conduction; correct?

12:10:33  5      A.   Well it's really convection.

12:10:36  6      Q.   Well would you agree with me that any part

12:10:37  7  that the blanket is touching the body it's going to

12:10:40  8  transfer heat by conduction?

12:10:42  9      A.   I would agree that there would be

12:10:45  10  conduction, but the vast majority of heat is

12:10:47  11  transferred by convection.

12:10:49  12      Q.   And -- And the -- the amount of heat I'm not

12:10:52  13  really going to get into, but there is some conductive

12:10:55  14  transfer when the Bair Hugger is used, Bair Hugger

12:10:56  15  blanket.

12:10:57  16      A.   There is no conduction heat transfer that

12:11:01  17  does not also involve convection.

12:11:05  18      Q.   Okay.

12:11:06  19      A.   Would you like me to explain?

12:11:08  20      Q.   I understand what you're saying, actually,

12:11:10  21  so that's fine.

12:11:10  22           Is there any radiation transfer of energy

12:11:15  23  using the Bair Hugger?

12:11:19  24      A.   There -- It's the same answer for

12:11:21  25  conduction.  There would be some radiation, but it's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

121

12:11:24    1  initially caused by convection.

12:11:26    2      Q.    Okay.  Well...  That's fine.

12:11:31    3            You're not an expert with respect to medical

12:11:35    4  device warnings; correct?

12:11:38    5      A.    Did you say "warnings" or --

12:11:39    6      Q.    Warnings.  Warnings.

12:11:40    7      A.    Correct.  I am not.

12:11:42    8      Q.    You're not an expert on operating room

12:11:44    9  design.

12:11:45   10      A.    That is correct.

12:11:48   11      Q.    Besides doing the operating-room airflow in

12:11:51   12  this case, and the 505 I guess, have you done any

12:11:55   13  other work on operating-room airflow?

12:11:58   14      A.    Yes.

12:11:59   15      Q.    Where?

12:12:00   16      A.    I worked for a company called Precision Air

12:12:04   17  I think is their name, it was not a formal -- there

12:12:07   18  was no formal grant, but I -- I have done work and

12:12:11   19  informal consulting with them, and they design

12:12:13   20  operating-room airflow systems.

12:12:16   21      Q.    Okay.  So besides Precision Air and this

12:12:20   22  case, you have not worked on any operating-room

12:12:24   23  airflow systems.

12:12:25   24      A.    That's correct.

12:12:26   25      Q.    Do you hold yourself out as an expert in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

122

12:12:28   1   designing HVAC systems for operating rooms?

12:12:31   2       A.   I do not.

12:12:34   3       Q.   Okay.  The airflow system that is used in an

12:12:43   4   operating room, would you consider that laminar or

12:12:46   5   turbulent?

12:12:52   6       A.   I consider all airflow in all operating

12:12:55   7   rooms turbulent because I'm using the fluid mechanics

12:12:57   8   definition of turbulence.

12:12:58   9       Q.   Which is the Reynolds number; correct?

12:13:00   10      A.   It's based in part on the Reynolds number.

12:13:02   11      Q.   Do you know what the Reynolds number is for

12:13:04   12   the operating room that you used with respect to your

12:13:08   13   CFD analysis?

12:13:11   14      A.   Can you clarify when you say "for the

12:13:13   15   operating room" used.

12:13:15   16      Q.   Like for the CFD model it has airflow;

12:13:18   17   correct?

12:13:18   18      A.   Correct.

12:13:19   19      Q.   And that is going to have a Reynolds number;

12:13:20   20   correct?

12:13:21   21      A.   No.

12:13:21   22      Q.   It's not going to have a Reynolds number?

12:13:23   23      A.   No.

12:13:23   24      Q.   What's the Reynolds number based off of?

12:13:26   25      A.   The Reynolds number is based off of flows

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

123

12:13:28   1   that have a defined velocity, a defined length of --

12:13:32   2   of an object they're flowing around or flowing

12:13:35   3   through, like a duct, and a viscosity.

12:13:39   4         Now for example in this room, if the camera

12:13:42   5   would pan up -- please don't pan up -- but if it did

12:13:46   6   pan up or pan around we would see ventilation.

12:13:49   7   Perhaps this screen in the ceiling's a ventilation.

12:13:53   8   We can define a Reynolds number up there within that

12:13:56   9   ventilation shaft.  But when the Reynolds number --

12:13:59   10  when the flow gets into this room there's really no

12:14:02   11  unique definition of the Reynolds number because

12:14:05   12  there's no unique length.  Do we use the length that's

12:14:08   13  the height of the ceiling?  Do we use the length

12:14:10   14  that's the width of this room, according to my

12:14:13   15  perspective?  Do we use what's called the depth?  Do

12:14:15   16  we use the length, let's say, the diameter or height

12:14:18   17  of this coffee cup?  There's no unique definition.

12:14:20   18       Q.   Okay.

12:14:20   19       A.   So we -- it is very unusual --

12:14:22   20            I have never heard of someone defining a

12:14:25   21  Reynolds number for a room.

12:14:26   22       Q.   What about the Reynolds number of the

12:14:28   23  ventilation right before it comes out of the vent, did

12:14:30   24  you calculate that?

12:14:31   25       A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

124

12:14:32   1      Q.   Okay.  So you don't know what it is sitting

12:14:34   2   today -- sitting here today?

12:14:37   3      A.   I don't know what it is, and it's not

12:14:39   4   material, and I could calculate it in a matter of a

12:14:44   5   few minutes.

12:14:44   6      Q.   Okay.  Do you consider your -- yourself an

12:14:51   7   expert in particle flow?

12:14:59   8      A.   Yes.

12:15:00   9      Q.   Do you consider yourself an expert in

12:15:05   10  particle movement in a turbulent flow?

12:15:08   11     A.   Well I've done multiple studies on movement

12:15:11   12  of objects and particles in a turbulent flow, so --

12:15:16   13  and multiple peer-reviewed studies.  Does that make me

12:15:19   14  an expert?  I don't know.  I'd have to think about

12:15:22   15  that.

12:15:23   16     Q.   Well sitting here today, I mean, I

12:15:26   17  understand you want to think about it, but I need a

12:15:27   18  answer.

12:15:27   19     A.   I consider myself an expert.

12:15:29   20     Q.   Okay.  Are you familiar with the

12:15:35   21  Navier-Stokes equations?

12:15:37   22     A.   Yes.

12:15:37   23     Q.   Are you familiar with the Boussinesq

12:15:41   24  approximation equations?

12:15:41   25     A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

125

12:15:43  1      Q.   You agree that turbulence does not follow

12:15:50  2  airstreams.

12:15:53  3      A.   Turbul -- Well turbulence is a description

12:15:57  4  of air motion.

12:15:57  5      Q.   Yes.

12:15:58  6      A.   So turbulence is not something that follows

12:16:00  7  anything.

12:16:01  8      Q.   Okay.  And that's my point, it doesn't

12:16:03  9  follow airstreams.

12:16:05  10          If it's not following anything, it's

12:16:07  11  definitely not following airstreams.

12:16:09  12     A.   Well, I mean, fluid that is turbulent that

12:16:14  13  moves would carry its turbulence with it, but it's not

12:16:19  14  -- someone wouldn't say turbulence follows an

12:16:20  15  airstream.

12:16:21  16     Q.   Okay.  Just out of curiosity, on all your --

12:16:27  17  I see a lot of consulting work here, and have you

12:16:30  18  always used ANSYS?

12:16:38  19     A.   No.

12:16:40  20     Q.   What did you use -- What other --

12:16:42  21          What other software device -- or software

12:16:44  22  programs do you use?

12:16:46  23     A.   I've written my own code, first of all.  And

12:16:49  24  I did use Fluent before they were part of ANSYS.

12:16:52  25     Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

126

12:16:53  1       A.    And now I strictly use ANSYS.

12:16:56  2       Q.    Do you ever use your own code?

12:16:57  3       A.    No.

12:16:57  4       Q.    Have you used your co --

12:16:59  5             Has your code been verified?

12:17:02  6       A.    I don't recall because it was years ago.

12:17:04  7       Q.    Okay.  And you know the difference between

12:17:08  8   verification and validation; correct?

12:17:11  9       A.    Yes, I do.

12:17:13  10      Q.    Okay.  Have you used your code in any of the

12:17:14  11  consulting work you've done that's listed in your CV?

12:17:28  12      A.    No, I don't believe I have.  No.

12:17:31  13      Q.    Okay.  Now all -- all this, like for --

12:17:39  14  would it be fair to say that going from page -- from

12:17:49  15  the "grants" section on page 5, all the way down for 6

12:17:52  16  and 7 and 8, 9, page 9, all those grants, did you

12:18:02  17  primarily use either ANSYS Fluent or ANSYS CFX?

12:18:07  18      A.    Well many of those grants didn't involve

12:18:10  19  CFD.

12:18:11  20      Q.    Okay.  But the ones that did?

12:18:12  21      A.    Yes.

12:18:13  22      Q.    Okay.  You didn't use any of your code for

12:18:15  23  any of those grants.

12:18:16  24      A.    That is correct.

12:18:17  25      Q.    Okay.  And the ANSYS that was used, if I

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

127

12:18:20  1   wanted to know the version that was used could I just

12:18:22  2   look at what version was being used by the University

12:18:25  3   at the time?

12:18:26  4        A.   Yes.

12:18:28  5        Q.   Have you ever used the ANSYS at the

12:18:32  6   University of Minnesota since you left The University

12:18:33  7   of Minnesota?

12:18:35  8        A.   Yes.

12:18:36  9        Q.   In what capacity?

12:18:38  10        A.   I was an Associate Fellow at the

12:18:41  11   Supercomputing Institute at the University of

12:18:44  12   Minnesota for a number of years, and my research group

12:18:49  13   would have used ANSYS stored there.

12:18:54  14        Q.   Okay.  Do you own ANSYS?

12:18:58  15        A.   No.

12:18:59  16        Q.   Okay.  So whatever you use is what the

12:19:04  17   University has.

12:19:05  18        A.   Correct.

12:19:06  19        Q.   Okay.  And is --

12:19:14  20             I mean, does the University have a full

12:19:16  21   version of ANSYS?

12:19:18  22        A.   We have a -- what's called a research

12:19:20  23   license.

12:19:21  24        Q.   Okay.

12:19:22  25        A.   We also have student licenses.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

128

12:19:24    1      Q.    Okay.  What's a research --

12:19:25    2            I mean, but does it have the same

12:19:27    3    capabilities of, like, what you could buy from ANSYS?

12:19:34    4      A.    I believe it does.

12:19:35    5      Q.    Does it have any limitations of how many --

12:19:40    6    like how big of a mesh it would calculate, or --

12:19:43    7      A.    I don't think the research license has any

12:19:45    8    limitations.  If that's important, I could check.

12:19:50    9            But sitting here now I think the research

12:19:53   10    license has all of the capabilities.

12:19:56   11      Q.    Okay.  With respect to the, say, for

12:20:05   12    example, the $12,000 given to St. Thomas, do you

12:20:08   13    receive any money from that?

12:20:09   14      A.    Yes.

12:20:10   15      Q.    What percentage?

12:20:12   16      A.    I probably received approximately half of

12:20:16   17    that.  I would have to check.

12:20:17   18      Q.    Okay.  And with respect to most of the

12:20:20   19    consulting work that you -- or grants that you have

12:20:25   20    listed in your CV, would it be about the same

12:20:28   21    percentage?

12:20:29   22      A.    No.

12:20:30   23      Q.    What would be the difference?  Is it a case

12:20:32   24    by case?

12:20:33   25      A.    It's case by case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

129

12:20:34   1      Q.   But would you agree with me that on some of

12:20:36   2   them you do receive compensation?

12:20:38   3      A.   Yes.

12:20:38   4      Q.   Okay.  Like, for example, you did something

12:20:41   5   in 2015 for Mador Technologies, M-A-D-O-R.  You got

12:20:47   6   $20,000.  Did you receive any personal, like,

12:20:51   7   compensation?

12:20:52   8      A.   I did not.

12:20:53   9      Q.   Okay.  What about Amphora Medical of

12:21:14  10   fifty-five thousand point five -- 55.5 thousand; did

12:21:18  11   you receive any compensation?

12:21:19  12      A.   Yes.

12:21:19  13      Q.   What percentage of that was direct

12:21:21  14   compensation to you?

12:21:24  15      A.   I would estimate I received 10 to 15,000.

12:21:29  16      Q.   Okay.  Windstrip, LLC.  Do you recall doing

12:21:39  17   work for them?

12:21:40  18      A.   Yes.

12:21:40  19      Q.   And it was 250,000 for development of

12:21:44  20   vertical axis wind turbines?

12:21:47  21      A.   Yes.

12:21:48  22      Q.   Did you receive any personal compensation

12:21:50  23   directly for you?

12:21:51  24      A.   Four thousand dollars.

12:21:52  25      Q.   Four thousand?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

130

12:21:53  1      A.   Correct.

12:21:53  2      Q.   And that's not an estimate?

12:21:55  3      A.   That is exact.

12:21:57  4      Q.   Okay.  Most of -- These -- Most -- Well,

12:22:03  5   strike that.

12:22:03  6           With respect to a lot of these grants, are

12:22:05  7   these grants that you've obtained while working at St.

12:22:08  8   Thomas or The University of Minnesota, or did you work

12:22:10  9   with somebody else that obtained the grants?

12:22:13  10          Do you understand the question?

12:22:14  11     A.   No.

12:22:15  12     Q.   For example, with 3M it was you that was the

12:22:19  13  person that worked with 3M and obtained the grant for

12:22:22  14  St. Thomas.  You understand that; correct?

12:22:25  15     A.   Yes.

12:22:25  16     Q.   With respect to these other grants, were you

12:22:28  17  the direct contact with The University of St. Thomas

12:22:31  18  or University of Minnesota, or was this -- you're just

12:22:36  19  itemizing grants that were received by St. Thomas or

12:22:39  20  The University of Minnesota that you worked on?

12:22:41  21     A.   For the vast majority of them I was the --

12:22:44  22     Q.   Okay.

12:22:44  23     A.   -- primary contact and recipient.

12:23:07  24     Q.   Are you familiar with the ANSYS User's

12:23:09  25  Guide?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

131

12:23:10    1      A.    Yes.

12:23:11    2      Q.    Do you agree with me that it's authoritative

12:23:14    3  on how to use ANSYS and its capabilities?

12:23:17    4      A.    I don't know -- I don't know if I'd use -- I

12:23:19    5  don't know if I'd ever use the word "authoritative."

12:23:23    6  I would agree that it describes how to use ANSYS, and

12:23:25    7  its capabilities.

12:23:26    8      Q.    Okay.  You agree with me that the

12:23:27    9  programmers of ANSYS would probably know more about

12:23:30   10  ANSYS's capabilities than you do.

12:23:33   11      A.    In general, yes.  I might know more about

12:23:36   12  some small feature.

12:23:38   13      Q.    Okay.  Now I assume that you are aware of

12:23:49   14  the basic laws of physics.

12:23:51   15      A.    Yes.

12:23:51   16      Q.    Okay.  You agree with me that in a case such

12:23:58   17  as this the law of thermodynamics applies.

12:24:01   18      A.    Yes.

12:24:01   19      Q.    Okay.  And with respect to a complex model,

12:24:05   20  which this is, as you described earlier, everything

12:24:09   21  needs to be accounted for; correct?

12:24:11   22      A.    I disagree.

12:24:12   23      Q.    Okay.  Why?

12:24:13   24      A.    Not everything matters.

12:24:15   25      Q.    Okay.  Would you agree with me that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

132

12:24:16    1    everything that matters needs to be accounted for?

12:24:18    2        A.    Everything that --

12:24:20    3              Things that can significantly affect the

12:24:22    4    results --

12:24:24    5        Q.    Okay.

12:24:24    6        A.    -- need to be accounted for.

12:24:26    7        Q.    All right.  So, for example, in your

12:24:31    8    assumptions you determined what you would consider

12:24:34    9    significant that could affect the results and not

12:24:36   10    affect the results; correct?

12:24:42   11        A.    Yes.

12:24:43   12        Q.    For example, you -- you removed some

12:24:48   13    geometry because when you were creating -- when you

12:24:51   14    were -- you assumed, based on your education, training

12:24:54   15    and experience, that that geometry would have no

12:24:57   16    effect on the results, or very little effect.

12:24:59   17        A.    Correct.

12:25:00   18        Q.    So your assumptions -- you make assumptions

12:25:04   19    about what would affect or not affect the model.

12:25:09   20        A.    Yes.

12:25:10   21        Q.    Okay.  So you'd agree with me that if a heat

12:25:16   22    source would affect the model significantly, that

12:25:18   23    needs to be included in a model.

12:25:20   24        A.    If it would affect the question you're

12:25:23   25    trying to answer, then yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

133

12:25:25  1     Q.    Okay.  And let's just agree that when I say

12:25:28  2     "the problem," or "the model," we're talking about the

12:25:31  3     ques -- you're creating a model to answer a question.

12:25:34  4     A.    Correct.

12:25:35  5     Q.    Okay.  So you agree with me that if people

12:25:39  6     would significantly affect the model, they should be

12:25:41  7     included.

12:25:43  8     A.    Yes.

12:25:44  9     Q.    Okay.  You agree with me that the inlets and

12:25:50  10    outlets of a room should be included if it would

12:25:54  11    significantly affect the model.

12:25:56  12    A.    Yes.

12:25:56  13    Q.    Okay.  And the goal is to be as accurate as

12:26:02  14    possible to put into a model things that may

12:26:07  15    significantly affect the results.

12:26:13  16    A.    Yes.

12:26:21  17    Q.    You agree with me that if the model is not

12:26:23  18    accurate, the model is not reliable.

12:26:39  19    A.    I would say this:  If the model does not

12:26:42  20    have the ingredients which are significant and may

12:26:46  21    affect the question being asked of the model, then it

12:26:50  22    is not reliable.

12:26:51  23    Q.    Okay.  You agree with me that if you use the

12:27:05  24    wrong mathematical equations, the model's not

12:27:10  25    reliable.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

134

12:27:11   1        A.   Yes.

12:27:13   2        Q.   By the way, you agree with me that particles

12:27:15   3   do not follow airstreams; correct?

12:27:18   4        A.   They may or may not follow airstreams.

12:27:21   5        Q.   Depending on the size; correct?

12:27:24   6        A.   Correct.

12:27:25   7        Q.   Okay.  Because particles have inertia.

12:27:28   8        A.   That is correct.

12:27:28   9        Q.   Okay.  What size particles follow airstreams

12:27:31   10  as compared to size particles that don't follow

12:27:34   11  airstreams?

12:27:36   12       A.   I cannot answer that question in the

12:27:38   13  abstract because it depends on the airstreams.

12:27:40   14       Q.   Okay.  In the airstreams in this case --

12:27:44   15  with the velocity of the airstreams in this case, do

12:27:46   16  you have any idea, sitting here today, what -- what

12:27:49   17  size particles would follow the airstreams as compared

12:27:51   18  to not follow the airstreams?

12:27:54   19       A.   No.

12:27:55   20       Q.   Okay.  The fact that we have eight people --

12:28:26   21  seven people sitting in this room, does that affect

12:28:28   22  the temperature of this room?

12:28:32   23       A.   It may.

12:28:33   24       Q.   Okay.  But you can't assume that it doesn't.

12:28:44   25       A.   The reason why I'm pausing is the answer

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

135

12:28:49   1   involves more than just the presence of eight people,

12:28:53   2   it involves the ventilation system and the control

12:28:55   3   system.  So it's possible, and I would say likely,

12:29:00   4   that when more people enter this room the control

12:29:03   5   system reacts so that more -- more air, ventilation

12:29:08   6   air is supplied.  So in that respect it's likely the

12:29:11   7   presence of people in this room does not affect the

12:29:13   8   temperature.

12:29:15   9       Q.   Well it's going to affect the temperature to

12:29:17   10   a point in which the system reacts to it.

12:29:20   11       A.   I would agree.

12:29:21   12       Q.   Okay.  So it has an effect on the

12:29:23   13   temperature.

12:29:24   14       A.   I agree, but it's unlikely to have a lasting

12:29:28   15   effect.

12:29:28   16       Q.   Okay.  Well we're not talking about -- I'm

12:29:30   17   just saying an effect, whether or not it's an

12:29:32   18   instantaneous effect.  I'm just saying it's going to

12:29:35   19   have an effect.

12:29:36   20       A.   I agree.

12:29:37   21       Q.   The laws of thermodynamics, we're all

12:29:38   22   putting off heat, energy, it's the conservation of

12:29:41   23   energy, it's going to have an effect.

12:29:43   24       A.   That is correct.

12:29:44   25       Q.   Okay.  And you yourself, I think what I'm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

136

12:29:50  1  understanding, is you made assumptions with respect to

12:29:54  2  your CFD analysis of what would have an effect and not

12:29:58  3  have an effect; correct?

12:30:00  4       A.   No.

12:30:01  5       Q.   Well there are no people in your CFD

12:30:04  6  geometry; correct?

12:30:05  7       A.   That is correct.

12:30:06  8       Q.   Except -- Except for the patient.

12:30:07  9       A.   That's correct.

12:30:07  10      Q.   So you assumed that the people are not going

12:30:10  11  to have effects on the airflow.

12:30:12  12      A.   No.

12:30:13  13      Q.   Are they going to have an effect?

12:30:14  14      A.   People in an OR will have an effect.

12:30:17  15      Q.   Okay.  But you did not put that in your CFD.

12:30:20  16      A.   That's correct, and there's a reason why.

12:30:22  17      Q.   Why?

12:30:24  18      A.   The question I was trying to ans -- ask in

12:30:29  19  my CFD model is does the Bair Hugger have the

12:30:32  20  potential of disrupting the normal airflow in the

12:30:36  21  operating room.  Now I could have put people in the

12:30:40  22  room, and in fact I could have put moving people in

12:30:45  23  the room, but the fact of the matter is, movement

12:30:50  24  would dominate any effect the Bair Hugger would have.

12:30:55  25  So if there was some kind of motion of air in the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

137

12:30:58　1　room, it would likely be from the humans.  What I

12:31:02　2　wanted to do was isolate the Bair Hugger, in a certain

12:31:05　3　sense it's a worst-case scenario.  Without any other

12:31:08　4　thing that will hide the effect of the Bair Hugger,

12:31:13　5　what is the effect of the Bair Hugger.

12:31:15　6　　　　　　Now what I also did, though, is did

12:31:20　7　experiments, and in those experiments there were

12:31:23　8　people, with heat, moving in a simulated surgery, and

12:31:27　9　the results corroborated my calculations.

12:31:30　10　　　Q.　When did you do the experiments; before or

12:31:32　11　after the CFD?

12:31:34　12　　　A.　The experiments would have been done be --

12:31:40　13　after.  I'm sorry.

12:31:40　14　　　　　　The experiments were done before the CFD

12:31:42　15　results.

12:31:43　16　　　Q.　Okay.  Now you agree with me that it's

12:32:03　17　normal to have people in the OR.

12:32:05　18　　　A.　I would agree.

12:32:06　19　　　Q.　And you agree that -- you've seen videos of

12:32:10　20　total hip and total knee surgeries; correct?

12:32:14　21　　　A.　I have not seen a complete video of a total

12:32:16　22　hip and total knee surgery.  I've seen -- So no.  The

12:32:20　23　answer is no.

12:32:20　24　　　Q.　I didn't ask for a complete video, but

12:32:22　25　you've seen some videos, at least portions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

138

12:32:25    1      A.    I've seen portions of videos of either hip

12:32:27    2    or knee re -- surgeries.

12:32:28    3      Q.    I mean, you were at Science Day.

12:32:30    4      A.    That's right.

12:32:30    5      Q.    Okay.  So I know you've seen it.

12:32:31    6      A.    Well, hold on.  But you asked two different

12:32:34    7    types of surgeries, and my recollection is it was just

12:32:36    8    one type.  I could be wrong.

12:32:37    9      Q.    Okay.

12:32:38   10      A.    So I didn't want to overrepresent my video

12:32:41   11    watching.

12:32:42   12      Q.    So are you assuming that -- Strike that.

12:32:48   13            You agree that even if you have non-moving

12:32:52   14    people in an operating room it's going to affect

12:32:56   15    airflow.

12:32:57   16      A.    Yes.

12:32:57   17      Q.    Okay.  Especially if the people are around

12:33:03   18    the operating room table it's going to affect the

12:33:05   19    airflow underneath the operating room table.

12:33:09   20      A.    I don't know if I agree with that.

12:33:11   21      Q.    Well you're -- you're causing -- you are

12:33:14   22    causing blockages underneath the operating room table

12:33:18   23    because you have people standing next to it, correct,

12:33:21   24    and that's going to affect the air underneath the

12:33:23   25    operating room table.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

139

12:33:23   1      A.   You are causing blockages, but the effect of

12:33:26   2   airflow underneath the operating room because of those

12:33:29   3   blockages would be negligible.

12:33:38   4      Q.   Okay.  In your CFD model did you -- I

12:33:43   5   remember this from college, because I did very little.

12:33:46   6   I wasn't big when I was in college.

12:33:49   7           Like I remember you could put in, like,

12:33:51   8   material properties, like, for heat transfer and

12:33:55   9   stuff.  Was that done in this CFD?

12:33:58   10     A.   You can put in material properties for the

12:34:01   11  materials.

12:34:01   12     Q.   Yes.

12:34:02   13     A.   We wouldn't say put in a material property

12:34:04   14  for heat transfer, because heat transfer doesn't have

12:34:06   15  a property.  But it's true, you put in material

12:34:09   16  properties.

12:34:09   17     Q.   Well heat transfer is for different objects

12:34:12   18  differently and different materials differently;

12:34:14   19  correct?

12:34:15   20     A.   That's correct.

12:34:15   21     Q.   And that -- like, for example, in your

12:34:17   22  research when -- because you do a lot of heat

12:34:18   23  transfer; correct?

12:34:20   24     A.   Correct.

12:34:20   25     Q.   And I -- I can't remem --

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

140

12:34:22  1          What's the term used for how much an object

12:34:24  2  absorbs heat, or -- Is it heat index or heat

12:34:28  3  coefficient?  Specific heat.

12:34:29  4      A.    Specific heat.

12:34:31  5      Q.    That's it, specific heat.

12:34:32  6          Was the specific heat ever -- did you use

12:34:34  7  that at all with respect to your CFD analysis?

12:34:36  8      A.    Yes.

12:34:37  9      Q.    What -- What did you apply specific heat to?

12:34:39  10     A.    The air.

12:34:40  11     Q.    Anything else?

12:34:42  12     A.    No.

12:34:44  13     Q.    What about the blanket, the -- the Bair

12:34:47  14  Hugger blanket?

12:34:51  15     A.    I did not apply a specific heat to the Bair

12:34:54  16  Hugger blanket.

12:34:55  17     Q.    Okay.

12:34:56  18     A.    It was not necessary.

12:34:59  19     Q.    What about the drapes?

12:35:03  20     A.    Same answer.

12:35:03  21     Q.    What about the patient?

12:35:06  22     A.    Same answer.

12:35:07  23     Q.    So you didn't put -- you didn't apply any

12:35:10  24  specific heat.

12:35:11  25     A.    Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

141

12:35:11    1        Q.    What about to the walls?

12:35:13    2        A.    I did not --

12:35:14    3              Same answer.

12:35:15    4        Q.    Okay.  So is it fair to say that the only

12:35:20    5    fluid you applied specific heat to was the air?

12:35:23    6        A.    That's the only fluid in the model, so yes.

12:35:26    7        Q.    Okay.  Well when I took fluid dynamics I was

12:35:31    8    told that everything's a fluid, even solids.

12:35:34    9        A.    You were told incorrectly.

12:35:35   10        Q.    Okay.  They're just different densities.

12:35:38   11        A.    You were still told incorrectly.

12:35:40   12        Q.    Okay.  It was Engineering 101 I guess.

12:35:46   13              MR. GOSS:  Kind of wish I'd taken that

12:35:47   14    class.

12:35:48   15              (Laughter.)

12:35:50   16              THE WITNESS:  You still can.

12:35:51   17        Q.    Were there any solids in your analysis?

12:35:55   18        A.    No.

12:35:57   19        Q.    So now I'm really confused, because I look

12:36:00   20    at the pictures and there is a operating room table.

12:36:03   21    Is that not a solid?

12:36:05   22        A.    No.  What you see is the interface between

12:36:08   23    the table and the fluid.  You're not seeing inside the

12:36:13   24    operating room table itself.

12:36:15   25              So if I use this table as an example, what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

142

12:36:20  1  you see is this top interface, but when you look at

12:36:24  2  the model you're not looking at the wood grains

12:36:27  3  inside, and that's the difference.

12:36:28  4       Q.   So is it like a void in the model?

12:36:33  5       A.   It is a void in the model, but that -- using

12:36:37  6  that term is misleading.

12:36:39  7       Q.   I know.  I don't know what...

12:36:40  8            Like, for example, I mean it -- there's the

12:36:44  9  table, but it's not really there, it's just telling

12:36:47 10  that, like, it's a barrier type thing.

12:36:50 11       A.   That's right.

12:36:51 12       Q.   Okay.  So -- So you would agree with me that

         13  --

12:37:01 14            What's the word?  Is it adiabatic?

12:37:07 15       A.   Adiabatic is the word meaning insulated, and

12:37:11 16  I -- I used adiabatic surfaces to represent solids.

12:37:16 17       Q.   Okay.  Which means that there's no heat

12:37:17 18  transfer among the solids.

12:37:19 19       A.   Correct.

12:37:19 20       Q.   So you had no heat transfer between the Bair

12:37:23 21  Hugger blanket and the drapes.

12:37:27 22       A.   Correct.

12:37:29 23       Q.   But we know in the real world that's not

12:37:31 24  accurate.

12:37:35 25       A.   In the real world you have cool air on one

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

143

12:37:46  1  side which would cool off the drape.  I didn't account

12:37:50  2  for that cool air heat transfer to the drape, nor did

12:37:55  3  I account for heat from any Bair Hugger air to the

12:37:59  4  drape because it wasn't material to my analysis.

12:38:03  5      Q.   Okay.  Would you agree with me that what was

12:38:13  6  material to your analysis -- Strike that.

12:38:16  7           Did you do the measurements in the OR that

12:38:46  8  account for your geometry?

12:38:49  9      A.   No.  The measurements were sent to me.  I

12:38:53  10  double-checked the width and length of the room, but I

12:38:56  11  did not do other measurements.

12:38:58  12      Q.   How many times did you go visit the OR that

12:39:00  13  you modeled?

12:39:01  14      A.   Once.

12:39:02  15      Q.   And that would have been in 2015?

12:39:04  16      A.   Yes.

12:39:05  17      Q.   Who was there with you?

12:39:09  18      A.   Attorneys, or maybe it was one attorney, I

12:39:11  19  can't recall, from the initial law firm.  There were I

12:39:20  20  believe hired surgeons and nurses who replicated a

12:39:24  21  surgery.  An attorney from 3M, Janell.  Two engineers

12:39:31  22  from 3M.  And Jennifer Wagner and Brian Plourde.  And

12:39:41  23  I think two lighting people.

12:39:44  24      Q.   "Lighting"?

12:39:44  25      A.   Or cam -- camera people.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

144

12:39:45    1      Q.    Oh, was this filmed?

12:39:48    2      A.    The --

12:39:49    3      Q.    The experiments?

12:39:50    4      A.    The visualization in the OR?

12:39:52    5      Q.    Yeah.

12:39:52    6      A.    Yes.

12:39:56    7      Q.    Okay.  Do you know how much film was taken?

12:39:58    8      A.    I have no idea.

12:39:59    9      Q.    Okay.  The two engineers from 3M, do you

12:40:02   10   know who they are?

12:40:02   11      A.    I know one of them.

12:40:04   12      Q.    Who?

12:40:04   13      A.    Andy Chen.

12:40:06   14      Q.    Who's Andy Chen?

12:40:07   15      A.    An engineer from 3M.

12:40:09   16      Q.    Is that how you know him?  Did you know him

12:40:11   17   before that day?

12:40:12   18      A.    I did know him --

           19      Q.    Okay.

12:40:13   20      A.    -- before that day.

12:40:15   21      Q.    How?

12:40:15   22      A.    I think he got his Ph.D. under Sparrow, who

12:40:19   23   was my doctoral advisor.

12:40:20   24      Q.    Before or after you?

12:40:21   25      A.    After me.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

145

12:40:23    1        Q.   Okay.  So he's a Ph.D.?

12:40:29    2        A.   Yes.

12:40:30    3        Q.   And in what, mechanical engineering?

12:40:31    4        A.   In mechanical engineering with a specialty

12:40:33    5   in the thermal sciences.

12:40:34    6        Q.   Okay.

12:40:34    7        A.   Which is heat and fluid flow.

12:40:36    8        Q.   Does he do CFD?

12:40:38    9        A.   I -- Yes, he does.

12:40:40   10        Q.   Okay.  Does 3M have the capability of doing

12:40:47   11   their own CFD analysis?

12:40:49   12        A.   I believe they do.

12:40:50   13        Q.   So why'd they hire you?

12:40:52   14        A.   I don't know.

12:40:53   15        Q.   They could have done this internally?

12:40:56   16        A.   It's possible.

12:40:56   17        Q.   Okay.  Do you know what soft --

12:40:58   18             Do they have their own proprietary software,

12:41:00   19   or do they use a commercial product like you?

12:41:03   20        A.   I don't --

12:41:04   21             Sitting here, I don't know the answer to

12:41:05   22   that.

12:41:06   23        Q.   Okay.  Maybe I should ask this question:

12:41:09   24   Have you seen any CFD models done by 3M?

12:41:13   25        A.   No, I have not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

146

12:41:30   1      Q.   Is there a geometry created for the Bair

12:41:38   2   Hugger blower, or outlet, where the air blows?

12:41:43   3      A.   Oh, you have to be more specific.  I'm

12:41:44   4   confused.

12:41:45   5      Q.   Well, for example, there's geometry for the

12:41:48   6   ventilation of the ducts or the vents; correct?

12:41:51   7      A.   Yes.

12:41:51   8      Q.   And there's geometry for the intake vents.

12:41:54   9      A.   Yes.

12:41:56  10      Q.   Now I've seen mixed terms of people calling

12:42:01  11   air coming in as an inlet.  I've heard people calling

12:42:07  12   it as an outlet because it's coming out.  What term do

12:42:10  13   you use?

12:42:11  14      A.   It's an inlet to the room.

12:42:12  15      Q.   Okay.  Is there a geometry for the Bair

12:42:14  16   Hugger inlet?

12:42:15  17      A.   There is a geometry for the Bair Hugger

12:42:20  18   inlet to the room in the sense that the room -- the

12:42:23  19   Bair Hugger air enters into the room.

12:42:26  20      Q.   Okay.  Is that --

12:42:27  21           Does it have an area for the geometry?

12:42:29  22      A.   Yes.

12:42:30  23      Q.   What is the area?

12:42:30  24      A.   Sitting here now, I don't know.

12:42:32  25      Q.   Could it be --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

147

12:42:33  1            Could you get it from the TRN file?

12:42:35  2     A.    Yes.

12:42:36  3     Q.    Okay.  And how'd you calculate that area?

12:42:39  4     A.    It was part of the initial CAD file.

12:42:44  5     Q.    Okay.  And where is that geometry where the

12:42:51  6  air is coming out?

12:42:55  7     A.    Do you mean where in the model is it?

12:42:57  8     Q.    Yes.

12:42:58  9     A.    It's near the head and neck --

          10     Q.    So if we --

12:42:59  11     A.    -- it shows.

12:43:01  12     Q.    -- go to your report.  Let's go to Exhibit

12:43:04  13  1.  What picture would best show me where the air is

12:43:23  14  coming out?

12:43:25  15            And please don't give me the one with all

12:43:26  16  the dot -- dotted lines in it.

12:43:31  17     A.    Figure 1(a).

12:43:32  18     Q.    Okay.  And where is the air coming out?

12:43:34  19     A.    Can I mark it up?

12:43:35  20     Q.    Yes.  Why don't you mark it with a --

12:43:39  21            Do you have a pen on you?

12:43:40  22     A.    No.

12:43:42  23     Q.    Use --

          24            [Red pen provided by the court reporter.)

12:43:43  25            MR. ASSAAD:  Can we film that, please?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

148

12:43:44    1    There's a camera above you, so.

            2              THE WITNESS:  Oh, great.  Is it centered?

12:43:49    3    Is it good?

12:43:49    4              (Discussion off the stenographic record.)

12:43:54    5              THE WITNESS:  Can you see that?

12:43:57    6        Q.   Can I see it, please?

12:43:59    7        A.   Yes.  (Handing.)

12:44:04    8        Q.   Okay.  Is it coming from --

12:44:06    9              Do you know whether or not it's coming from

12:44:08   10    the front of the body or the back of the body?

12:44:10   11        A.   Both.

12:44:10   12        Q.   Both?  Okay.

12:44:12   13              And so if I looked at the TRN file you're

12:44:15   14    absolutely certain it comes out of both?

12:44:17   15        A.   Yes.

12:44:17   16        Q.   Okay.  And what's the --

12:44:20   17              And you assumed that all the air comes out

12:44:24   18    of the head and neck; correct?

12:44:25   19        A.   That is correct.

12:44:26   20        Q.   Why did you make that assumption?

12:44:31   21        A.   Well there's a number of reasons.  First of

12:44:38   22    all, I saw the draping that was done and I saw that

12:44:42   23    the draping channels the airflow so that once it

12:44:46   24    touches the body, once it touches the body the air

12:44:50   25    will migrate vertically upwards and it will exhaust

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

149

12:44:54  1  near the drape -- near the head and neck.

12:44:57  2         There is also prior literature that's been

12:45:00  3  cited in this case that confirms my understanding that

12:45:03  4  the air enters the room through the head or neck area.

12:45:09  5         In addition, the Bair Hugger has tape on it

12:45:12  6  which adheres the Bair Hugger to the body so in those

12:45:15  7  portions the air can't go elsewhere.  And in this case

12:45:19  8  on one side the Bair Hugger was wrapped around the

12:45:22  9  back of the patient so there was no other alternative

12:45:25  10  for it to go.

12:45:27  11         These views were confirmed by Dr. Kuehn's

12:45:32  12  measurements when he took measurements of airflow near

12:45:34  13  the Bair Hugger.

12:45:35  14     Q.    Okay.  And you're talking about Dr. Kuehn's

12:45:42  15  measurements that when he raised the -- when he turned

12:45:44  16  the Bair Hugger on, the temperature of the room went

12:45:46  17  down?

12:45:47  18         MR. GOSS:  Object to form.

12:45:48  19     A.    I am not --

12:45:49  20         I'm not talking about that measurement, and

12:45:52  21  I don't believe that that's a correct characterization

12:45:53  22  of what he did.

12:45:55  23     Q.    Have you ever heard the term "junk science"?

12:45:59  24     A.    Yes.

12:46:00  25     Q.    Okay.  Is that a signif -- Is that a --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

150

12:46:12    1        You made the assumption, based on your

12:46:12    2   analysis, that all the air comes out of the head and

12:46:16    3   neck area; correct?

12:46:18    4        MR. GOSS:  Object to form, mischaracterizes

12:46:20    5   the testimony.

12:46:23    6        A.    You said "made the assumption based" -- I

12:46:25    7   think you said "based on the analysis."  I actually

12:46:29    8   made the determination based on multiple, mutually

12:46:32    9   reinforcing lines of evidence.

12:46:34   10        Q.    Okay.  But that's an assumption that you

12:46:35   11   made in your CFD analysis; correct?

12:46:37   12        A.    That is correct.

12:46:38   13        Q.    Okay.  If that assumption is incorrect,

12:46:42   14   would you agree with me that your model is incorrect?

12:46:45   15        A.    No.

12:46:45   16        Q.    Why?

12:46:46   17        A.    My model may or may not be incorrect if that

12:46:50   18   boundary condition is incorrect.

12:46:52   19        Q.    Okay.  If you've made that -- Let's take it

12:46:54   20   this way.

12:46:55   21        You can't sit here today and say your model

12:46:58   22   is correct if that assumption is incorrect that all

12:47:01   23   the air comes out of the head and neck.

12:47:03   24        MR. GOSS:  Object as calling for

12:47:05   25   speculation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

151

12:47:05  1       A.    I disagree.

12:47:07  2       Q.    Well you just said it may or may not be

12:47:09  3   correct.

12:47:09  4       A.    You used the word "all."  Let's say, for

12:47:14  5   example, 99 percent of --

12:47:15  6             Let's say we find out tomorrow 99 percent of

12:47:17  7   the air comes out by the head and 1 percent comes out

12:47:22  8   somewhere else.  There's no reason to think that my

12:47:25  9   results wouldn't be accurate.

12:47:29  10      Q.    What if it was 50/50?

12:47:31  11      A.    I don't --

12:47:32  12            Sitting here, I don't know the answer to

12:47:33  13  that.

12:47:34  14      Q.    Okay.  So let's assume that half the air

12:47:36  15  comes out of the hair and neck and half -- half the

12:47:39  16  air goes down below the drape.  Would you agree with

12:47:42  17  me that the model that you have submitted as part of

12:47:46  18  Exhibit 1 cannot be confirmed as correct?

12:47:53  19            MR. GOSS:  Object to form.

12:47:54  20      A.    I disagree.

12:47:56  21      Q.    Okay.  Why?

12:47:59  22      A.    Well first of all I disagree with the

12:48:01  23  hypothetical, but let's assume your hypothetical's

12:48:03  24  correct.

12:48:04  25      Q.    You don't have to agree with my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

152

12:48:06   1   hypothetical.

12:48:06   2         A.   I know.  But I'm getting on the record that

12:48:08   3   I -- there's no basis for the hypothetical, and I want

12:48:10   4   -- I want that clear.

12:48:11   5         But let's say that it is correct and air

12:48:16   6   exhausts somewhere else.  The fact of the matter is,

12:48:21   7   the easiest pathway -- buoyant air wants to rise, hot

12:48:25   8   air wants to rise, and the easiest pathway would --

12:48:28   9   would be for it to rise up through the location which

12:48:32   10  I've articulated on this diagram.  So even if air came

12:48:36   11  out somewhere else, it's my opinion it would

12:48:40   12  ultimately enter the -- enter -- it would likely enter

12:48:42   13  the room through the place I've just annotated.

12:48:45   14        Q.   Okay.  Assuming that 50 percent of the air

12:48:49   15  was exhausted to below the operating room table, and

12:48:54   16  50 percent of the air came out of the head and neck,

12:48:58   17  would you agree with me that you can't confirm that

12:49:00   18  the model is correct?

12:49:02   19        MR. GOSS:  Same objection.

12:49:04   20        A.   Sitting here now --

12:49:06   21        I mean the word "confirm" to a scientist has

12:49:11   22  a very high bar.  Sitting here now, if -- I would like

12:49:19   23  to know more about the hypothetical.  If -- If hot air

12:49:22   24  is vented beneath the table, it's my opinion, sitting

12:49:26   25  here now, it is -- would most likely rise and still

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

153

12:49:31  1   exit through the head and neck, so I would have no

12:49:33  2   reason to doubt my results.

12:49:35  3       Q.   So your assumption is that no matter where

12:49:37  4   the hot air goes, at the end of the day all of it's

12:49:41  5   going to come out of the head and neck.

12:49:42  6       A.   That is not my assumption, and I didn't

12:49:45  7   state that.

12:49:46  8       Q.   Well you said if the hot air rises, the hot

12:49:48  9   air is going to rise no matter where it goes, and then

12:49:51 10   it's going to come out of the head and neck area.

12:49:53 11          Do I need to read your answer again?

12:49:55 12       A.   No.  I know the answer.

12:49:56 13          What you said is if 50 percent of the hot

12:49:59 14   air goes beneath the table and 50 percent dir -- is

12:50:02 15   vented directly from the head and neck, would that

12:50:03 16   invalidate my results.  And in that case it's my

12:50:07 17   opinion the air would most likely still leave by the

12:50:10 18   head and neck.

12:50:11 19          But let's say 50 percent of the hot air

12:50:13 20   exited by the foot of the patient.  Well then I would

12:50:17 21   change my answer because that air would not rise by

12:50:20 22   the head and neck, so -- so I am not -- so I think you

12:50:24 23   mischaracterized my testimony.

12:50:25 24       Q.   Okay.

12:50:38 25          MR. GOSS:  Gabe, if you get to a good spot

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

154

12:50:40    1    for a lunch break, let us know.

12:50:43    2              MR. ASSAAD:   Okay.

12:51:07    3         Q.   Do you believe it's possible that based on

12:51:09    4    the geometry that air -- hot air could escape to the

12:51:15    5    side of the drape?

12:51:18    6         A.   Can you define what you mean by "the side of

12:51:20    7    the drape"?

12:51:20    8         Q.   Like you have a head, the feet, and then the

12:51:24    9    two sides.  Do you think, based on your geometry, that

12:51:30   10    air could escape the sides, hot air, below the drape

12:51:32   11    to the side?

12:51:33   12         A.   No.

12:51:33   13         Q.   Okay.  And what's your basis behind that?

12:51:37   14    Scientific basis.

12:51:39   15         A.   Well let's take this case as an example.  On

12:51:44   16    the one side the Bair Hugger was wrapped around the

12:51:46   17    back of the patient so that air cannot escape, and --

12:51:50   18         Q.   Was it wrapped around the back or was it

12:51:52   19    tucked in --

           20         A.   Both.

12:51:53   21         Q.   -- underneath the pad?

           22         A.   Both.

12:51:55   23         Q.   Well it can't be both.  It's either one

12:51:58   24    side's tucked under the pad, or it's wrapped

12:52:00   25    underneath the patient.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

155

12:52:01   1      A.   Oh, no.   I said wrapped around the back.

12:52:03   2      Q.   When you say "wrapped around the back," what

12:52:05   3  do you mean?

12:52:06   4      A.   It -- It was wrapped around the back of the

12:52:08   5  patient and then tucked in.

12:52:09   6      Q.   Tucked in underneath the pad.

12:52:12   7      A.   It was tucked in somewhere -- some part of

12:52:13   8  the bed.

12:52:13   9      Q.   Okay.

12:52:14  10      A.   I did not --

12:52:15  11           If I said it was tucked underneath the

12:52:17  12  patient, then that's a mistake.

12:52:19  13      Q.   Okay.   Fair enough.

12:52:20  14      A.   That air clearly cannot vent beneath the

12:52:23  15  room -- or beneath the table.   I'm sorry.

12:52:26  16           But let's talk about the other air.   This

12:52:29  17  Bair Hugger blanket is a blanket with tubes, air

12:52:33  18  tubes, and when you inflate it and you put on the

12:52:37  19  cotton layer -- the cotton blanket and the drapes it

12:52:40  20  wraps around the arm.   And the way it works is you

12:52:44  21  have very small jets of air that shoot out of those

12:52:47  22  tubes and they impact the skin right away.   In fact

12:52:51  23  there's a connection between those tubes and the skin.

12:52:55  24  So what happens is you have a warm, almost stagnant

12:53:00  25  air space.   Now we know hot air rises.   Colloquially,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

156

12:53:07   1   heat rises.  So that stationary air now has to escape,

12:53:11   2   and what it wants to do is it wants to rise.  There is

12:53:14   3   no reason to expect that that air would go down,

12:53:22   4   vertically downwards, go underneath the drape and then

12:53:25   5   come back up.

12:53:26   6           Here is an analogy I'd like to use.  Let's

12:53:28   7   -- Let's pretend that this is a match.  [Demonstrating

12:53:31   8   with the red pen.]  And let's pretend this red part is

12:53:35   9   the flame.  If I hold the match like this, hot air

12:53:37   10  rises.  You see the flame go up, you see the soot, et

12:53:42   11  cetera.  If I -- Even if the air was to be vented

12:53:47   12  downwards, which it's not, because it's vented against

12:53:50   13  the skin, what happens when I do this?

12:53:54   14  [Demonstrating.]  The flame still rises, the smoke

12:53:57   15  still rises.

12:53:58   16          I cannot get a match to have a flame that

12:54:03   17  will go down vertically, somehow travel underneath the

12:54:07   18  drape and then come back up, and that's the basis.

12:54:12   19      Q.   Do you really believe that?

12:54:14   20      A.   I am certain of it.

12:54:15   21      Q.   You're certain of it.

12:54:16   22      A.   Absolutely.

12:54:17   23      Q.   Hundred percent.

12:54:18   24      A.   Scientists never say 100 percent.  I would

12:54:21   25  say within a reasonable degree of engineering

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

157

12:54:25   1   certainty, yes.

12:54:27   2       Q.   So if I put a -- 10 space heaters facing up

12:54:36   3   five feet from the ceiling, okay, I turn them all on,

12:54:40   4   are you telling me I'm not going to feel heat down

12:54:42   5   here?

12:54:42   6       A.   That's not what I said.

12:54:43   7       Q.   Okay.  So heat can actually go down;

12:54:46   8   correct?  Depending on if there's any insulation

12:54:49   9   above, conservation of energy; correct?  It's going to

12:54:52   10  -- The hot air is going to start warming the air below

12:54:55   11  and below and it's going to keep on going down until

12:54:58   12  it reaches us, correct, in my -- in my hypothetical,

12:55:00   13  in my example.  "Yes" or "no"?

12:55:02   14      A.   I cannot answer that --

           15      Q.   Okay.

12:55:03   16      A.   -- with a "yes" or "no."

12:55:04   17      Q.   If you can't answer "yes" or "no," that's

12:55:06   18  fine.  We'll move on.

12:55:07   19      A.   No.  I can answer it.  I can't answer it

12:55:09   20  with a "yes" or "no."

12:55:10   21      Q.   Okay.  Let's move on.

12:55:15   22           (Interruption by the videographer.)

12:55:16   23           MR. ASSAAD:  Two minutes?  One more

12:55:17   24  question.

12:55:20   25  BY MR. ASSAAD:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

158

12:55:21  1      Q.   If hot air does get below the operating room

12:55:26  2   table, you agree with me if the heat fills up

12:55:32  3   underneath the operating room table, when it escapes

12:55:34  4   the drape on the sides it's going to start rising;

12:55:37  5   correct?

12:55:39  6      A.   Your question --

12:55:40  7           MR. GOSS:  Object to form.

12:55:41  8      A.   -- is based on a faulty premise.

12:55:43  9      Q.   Forget about the premise.

12:55:44  10          Just say if there's -- if there's heat

12:55:46  11  underneath the operating room table to the point where

12:55:48  12  when it escapes the drape it's -- the air is warmer

12:55:51  13  than the ambient temperature, that air is going to

12:55:54  14  rise; correct?

12:55:55  15          MR. GOSS:  Same objection.

12:55:56  16     A.   So if you had a perfectly insulated table --

12:56:00  17  I mean, to have your hypothetical work you would have

12:56:04  18  to have it perfectly insulated, you would have to

12:56:07  19  allow the heat to build up, and that's not what

12:56:09  20  happens.

12:56:09  21     Q.   Okay.  But if it does happen and it escapes

12:56:12  22  out the side the air is going to rise; correct?

12:56:14  23     A.   If you had a perfectly insulated space under

12:56:18  24  the table and you didn't let any heat leave, and you

12:56:22  25  put heat into that space until the entire air space

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

159

12:56:26   1   was warm, then yes.

12:56:28   2                  MR. ASSAAD:  Okay.  We can take a lunch

12:56:31   3   break.

12:56:32   4                  THE REPORTER:  Off the record, please.

12:56:33   5                  (Luncheon recess taken at

           6                  approximately 12:56 p.m.)

           7

           8

           9

          10

          11

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

160

1                    AFTERNOON SESSION

2            (Deposition reconvened at

3            approximately 1:49 p.m.)

4            (Mr. Bushnell joined the

13:29:26    5            proceedings.)

13:55:43    6    BY MR. ASSAAD:

13:55:47    7        Q.    You ready to continue, Dr. Abraham?

13:55:49    8        A.    Yes.  Thank you.

13:55:51    9        Q.    You understand the allegations by the

13:55:52   10    plaintiffs in this case; correct?

13:55:56   11        A.    I understand generally that there is an

13:55:59   12    allegation that for -- the Bair Hugger may cause

13:56:03   13    infections.

13:56:04   14        Q.    Or significantly increase the risk of

13:56:06   15    infection.

13:56:08   16        A.    I -- I don't know the specific allegation

13:56:11   17    made in this case, so I -- so no.

13:56:15   18        Q.    But you understand that for hip and knee

13:56:20   19    implant surgery, infections are a serious thing.

13:56:22   20        A.    That's my understanding.

13:56:24   21        Q.    And they could be deadly; correct?

13:56:25   22        A.    That is my understanding.

13:56:28   23        Q.    And you agree with me no matter what side

13:56:32   24    you're on, plaintiffs' side or the defense side, if --

13:56:35   25    if the Bair Hugger does cause an increase in hip and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

161

13:56:39  1   knee implant infections that that's not a good thing.

13:56:47  2           MR. GOSS:  Object to form.

13:56:49  3       A.   I would agree.

13:56:50  4       Q.   Okay.  Because, you know, people -- if that

13:56:57  5   is the case, people's lives are at stake.

13:57:00  6           MR. GOSS:  Same objection.

13:57:01  7       A.   I agree.

13:57:02  8       Q.   Okay.  And in fact you once were quoted for

13:57:06  9   saying:  In my research, people's lives are literally

13:57:09  10  at stake.  There is very little room for error when

13:57:13  11  you're designing devices that will be implemented into

13:57:15  12  bodies or trying to remove pathogens from dirty water

13:57:18  13  that a village relies upon.  I need the very best

13:57:21  14  students who I can depend on to recognize that while

13:57:24  15  engineering is fun, it is also deadly serious.  Lauren

13:57:27  16  is such a student.

13:57:28  17           Do you remember making that quote?

13:57:30  18      A.   Yes.

13:57:30  19      Q.   Okay.  So although engineering is fun, it

13:57:32  20  can be deadly serious; correct?

13:57:34  21      A.   Yes.

13:57:35  22      Q.   Okay.  And we want to be for sure, we want

13:57:37  23  to be certain, when we formulate opinions, that

13:57:42  24  because the effect of these opinions could be -- have

13:57:47  25  detrimental effects on people, we need to be serious

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

162

13:57:51    1    about it; correct?

13:57:52    2              MR. GOSS:  Object to form.

13:57:53    3         A.    I agree.

13:57:54    4         Q.    Okay.

13:57:56    5              MR. ASSAAD:  Basis?

13:57:57    6              MR. GOSS:  Effects of opinions could be

13:57:59    7    deadly?

13:58:00    8              MR. ASSAAD:  Yeah.

13:58:01    9         Q.    I mean, if your opinion in this case is, to

13:58:04   10    3M, that the Bair Hugger doesn't increase the risk of

13:58:08   11    surgical-site infections and it actually does, but 3M

13:58:12   12    relies upon it to keep it in the market or not make

13:58:16   13    any changes to the product, that could be a -- an

13:58:18   14    opinion that could cause serious harm; correct?

13:58:21   15              MR. GOSS:  Object to form.  You can answer

13:58:22   16    if you understand the question.

13:58:27   17         A.    I'm --

13:58:28   18              Yes.

13:58:29   19         Q.    Okay.  Now -- And the --

13:58:35   20              And Lauren Vallez is the person you were

13:58:40   21    talking about earlier that is a -- is a co-author on

13:58:44   22    the article that was submitted and accepted for

13:58:46   23    publication regarding the 505 and 750; correct?

13:58:51   24         A.    Yes.

13:58:52   25         Q.    And you've published a lot with her;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

163

13:58:53   1   correct?

13:58:54   2        A.   Yes.

13:58:56   3        Q.   Okay.  And if I recall correctly, isn't she

13:58:58   4   off to California?

13:59:00   5        A.   I believe that's true.

13:59:01   6        Q.   Is she still in town, or has she left for

13:59:04   7   California?

13:59:05   8        A.   I don't know.

13:59:05   9        Q.   Okay.  But she took a -- she's doing a Ph.D.

13:59:10  10   program, is it at Stanford?

13:59:12  11        A.   That sounds correct.

13:59:13  12        Q.   Okay.  Speaking about Stanford, are you --

13:59:21  13   do you know, personally, Dr. Krishnan Mahesh?

13:59:32  14        A.   No.

13:59:33  15        Q.   You understand that he's a professor at the

13:59:34  16   University of Minnesota; correct?

13:59:37  17        A.   If you present that, I have no reason to

13:59:40  18   doubt that.

13:59:41  19        Q.   Okay.  So you don't know that he came from

13:59:43  20   Stanford and was part of the Ph.D. students that

13:59:50  21   worked on the code that was used by Elghobashi?

13:59:53  22        A.   I don't know that.

13:59:53  23        Q.   Okay.  Now we -- you mentioned before we

14:00:13  24   took up the lunch break that if air is coming on the

14:00:19  25   arm it's going to migrate up and come out the head and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

164

14:00:22   1   neck.  Do you recall that testimony?

14:00:24   2        A.   Yes.

14:00:25   3        Q.   Do you have any calculations that you

14:00:27   4   performed to support that assumption?

14:00:33   5        A.   Are you asking me do I have calculations to

14:00:36   6   support the idea that the air will rise?

14:00:40   7        Q.   No.  That the air will come from the arm --

14:00:43   8   the air that's being blown on the end of the hand is

14:00:46   9   going to migrate up the arm and out the head and neck

14:00:50   10  of the patient.

14:00:52   11       A.   I have no calculations.

14:00:53   12       Q.   Okay.

14:00:54   13       A.   I have my experience in buoyant flow motion.

14:00:57   14       Q.   Okay.  But you have no calculations;

14:00:59   15  correct?

14:00:59   16       A.   Correct.

14:01:00   17       Q.   Do you have any experimental testing to

14:01:03   18  indicate of such?

14:01:06   19       A.   There is experimental testing.  Well that's

14:01:12   20  a complex answer, I'm going to give it a few ways.

14:01:15   21  I'm going to give the answer in a few ways.

14:01:18   22            I have experimental testing that shows the

14:01:21   23  air does not exhaust beneath the table.

14:01:23   24       Q.   And what testing was that?

14:01:25   25       A.   That was testing --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

165

14:01:26   1        That was flow visualization testing done in

14:01:29   2   the OR with the draping as used in a hip or knee

14:01:35   3   replacement.

14:01:35   4        Q.   When you say "flow visualization testing,"

14:01:38   5   what device did you use?

14:01:39   6        A.   The device we mentioned earlier in this

14:01:41   7   deposition.  I believe it's called a megasonic fog

14:01:45   8   device.

14:01:46   9        Q.   Okay.

14:01:46  10        A.   Okay?

          11        Q.   So --

14:01:47  12        A.   In addition to that my findings are

14:01:51  13   corroborated by testing from Tom Kuehn, and by

14:01:54  14   literature that the plaintiffs rely upon.

14:01:57  15        Q.   Okay.  But I'm talking about you yourself.

14:02:00  16        Have you done any experimental testing,

14:02:02  17   besides using the fog generator, to support your

14:02:08  18   assumption that all the air, even the air coming --

14:02:11  19   hitting the end of the hand, is going to migrate up

14:02:14  20   out of the head and neck?

14:02:15  21        A.   No.

14:02:16  22        Q.   Okay.  In your analysis does the temperature

14:02:37  23   underneath the operating room table increase in

14:02:40  24   temperature?

14:02:40  25        A.   Temperature does not increase temperature.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

166

14:02:44    1       Q.   I'm saying does the temperature in -- I'm

14:02:46    2   sorry.

14:02:46    3            Does the air underneath the operating room

14:02:48    4   table increase in temperature?

14:02:53    5       A.   I don't know -- I don't recall extracting

14:02:56    6   that data point.  I would presume it does.  I would

14:03:02    7   presume that the air underneath the operating table

14:03:06    8   may increase, but I don't believe I presented that in

14:03:08    9   this document, and I don't think I extracted that

14:03:10   10   data.

14:03:10   11       Q.   Can --

14:03:11   12            If I go to your TRN file, can I extract that

14:03:15   13   data?

14:03:15   14       A.   Yes.

14:03:17   15       Q.   Okay.  If it does increase in temperature,

14:03:21   16   would that not indicate that hot air is blowing down?

14:03:25   17       A.   Not necessarily.

14:03:26   18       Q.   What would cause the increase in

14:03:28   19   temperature?

14:03:29   20       A.   Before I answer that can you tell me the

14:03:30   21   increase in temperature of what?

14:03:32   22       Q.   The air underneath the operating room table.

14:03:34   23       A.   Okay.  Thank you.

14:03:36   24       Q.   Let's say two inches below the operating

14:03:38   25   room table.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

167

14:03:42    1        A.    Air temperature --

14:03:46    2              Heat can get below the operating table a

14:03:48    3    number of different ways, in fact we mentioned this

14:03:51    4    earlier in this deposition.  There are three modes of

14:03:54    5    heat transfer; conduction, convection and radiation.

14:03:59    6    So if I were to measure, let's say, the temperature

14:04:01    7    directly underneath the operating table, and if I were

14:04:05    8    to measure a temperature increase it could be by one

14:04:08    9    of those three mechanisms.  It may be that air has

14:04:13    10   migrated under the table, it may be that that region

14:04:17    11   has been heated by conduction, or it may be that it's

14:04:21    12   been heated by radiation.

14:04:23    13       Q.    Well we could agree in your model, since all

14:04:25    14   the solids or all the geometry's adiabatic, that area

14:04:30    15   cannot be created -- be heated up by conduction;

14:04:32    16   correct?

14:04:33    17       A.    That is correct.

14:04:33    18       Q.    And since it's adiabatic it can't be --

14:04:37    19   there's no convective heat that's being transferred to

14:04:39    20   that, correct, through the table.

14:04:41    21       A.    Convection would not refer to heat transfers

14:04:44    22   through the table.

14:04:45    23       Q.    Okay.  And there's no radiative heat that

14:04:47    24   would warm up underneath the operating room table

14:04:50    25   because the table is adiabatic.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

168

14:04:52  1      A.   That is correct.

14:04:53  2      Q.   Okay.  So let's go --

14:04:58  3           So how long did your model run to get to 264

14:05:06  4  step -- time step?

14:05:11  5      A.   Sitting here now I don't know the answer to

14:05:12  6  that.

14:05:13  7      Q.   But if we go to the TRN file that's

14:05:15  8  something we could determine?

14:05:16  9      A.   Yes.

14:05:16  10     Q.   Okay.  And we could do that based on the

14:05:18  11  time step; correct?

14:05:20  12     A.   It would be information contained within the

14:05:22  13  TRN file.

14:05:22  14     Q.   If you did change the time step between time

14:05:26  15  zero and time step 264, would you have increased or

14:05:31  16  decreased the time step?

14:05:33  17     A.   I don't know.

14:05:35  18     Q.   So sitting here today we will never be able

14:05:38  19  to know that answer; correct?

14:05:49  20     A.   Sitting here today, I don't know if or

14:05:52  21  whether I increased or decreased the time step.

14:05:56  22     Q.   And if you did increase the time step you

14:06:00  23  wouldn't know if you increased it or decreased it.

14:06:02  24     A.   That is correct.

14:06:02  25     Q.   Okay.  So sitting here today we could not

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

169

14:06:04    1   replicate that in ANSYS.

14:06:09    2        A.   That is incorrect.

14:06:11    3        Q.   Well how am I supposed to know the time step

14:06:13    4   if you don't know the time step?

14:06:15    5        A.   When we use the word "replicate" in CFD,

14:06:18    6   what we mean is can you reproduce the results.  Anyone

14:06:23    7   with my TRN file could reproduce my results, whether

14:06:27    8   or not they used the same time step or a different

14:06:30    9   time step, provided it was sufficiently small.  So the

14:06:34   10   TRN file is all that you need to reproduce the

14:06:37   11   results.

14:06:37   12        Q.   When you say "sufficiently small," what do

14:06:40   13   you mean by "sufficiently small"?

14:06:42   14        A.   It has to be small enough so that the size

14:06:45   15   of the time step does not affect the results.

14:06:47   16        Q.   Okay.  In the beginning of running a model

14:06:49   17   do you want a large time step or a small time step for

14:06:52   18   a model such as this?

14:06:54   19        A.   I prefer a small time step.

14:06:55   20        Q.   Okay.  And what would you consider small?

14:07:02   21        A.   Less than a second.

14:07:04   22        Q.   What about less than a tenth of a second?

14:07:08   23        A.   Likely less than a tenth of a second.

14:07:11   24        Q.   So if I represent to you that your TRN files

14:07:14   25   says .01 seconds, would you disagree with that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

170

14:07:18  1       A.   I would not disagree with that.

14:07:19  2       Q.   Is that something that you would likely do

14:07:21  3  for a time step in a situa -- in a model such as this?

14:07:25  4       A.   It seems reasonable.

14:07:26  5       Q.   Okay.  Having the fact that it was .01 --

14:07:36  6            Well let me ask you this:  How would you

14:07:39  7  know that the time step you used didn't affect the

14:07:41  8  model?

14:07:43  9       A.   You'd run the calculation, as I said before,

14:07:46  10  and obtain quasi-steady results, and once your results

14:07:50  11  were quasi steady and you abide by certain rules of

14:07:54  12  the numerics, such as the Courant number has to be low

14:07:58  13  enough, you would assume that the results are

14:08:01  14  time-step independent.

14:08:02  15       Q.   You used the word "Courant number"; correct?

14:08:06  16       A.   Correct.

14:08:06  17       Q.   And have you heard the term "CFL" number?

14:08:11  18  Are you familiar with that?

14:08:13  19       A.   "CFL number"?

14:08:14  20       Q.   Yes.

14:08:19  21       A.   It doesn't --

14:08:24  22            I've heard "CFL."  I can't place it right

14:08:26  23  now.

14:08:26  24       Q.   So you've never heard of the

14:08:29  25  Courant-Friedrichs-Lewy number?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

171

14:08:33   1      A.   That's probably the same thing as the

14:08:34   2   Courant number I was mentioning.

14:08:36   3      Q.   Well do you think it's the same number, or

14:08:37   4   is it something similar to that number?

14:08:39   5      A.   I think it's the same number, --

           6      Q.   Okay.

14:08:41   7      A.   -- but I would have to check the --

           8      Q.   Okay.

14:08:44   9      A.   -- whatever resource to verify.

14:08:46  10      Q.   Now you mentioned earlier that --

14:08:50  11           Well let me ask you this question:  Is the

14:08:52  12   mesh that you used in the TRN file the mesh you put in

14:08:55  13   Figure 2 on page 4?

14:09:07  14      A.   I think it is.

14:09:08  15      Q.   Okay.  Well do you know one way or the

14:09:11  16   other?

14:09:11  17      A.   No.

14:09:11  18      Q.   Okay.  Well how would you formulate this

14:09:13  19   mesh for your report if it did not come from the TRN

14:09:18  20   file?

14:09:18  21      A.   It is likely it is from the TRN file.

14:09:21  22      Q.   Okay.  So you believe that your mesh in the

14:09:24  23   TRN file is as fine as it's in this -- depicted in

14:09:28  24   Figure 2.

14:09:33  25      A.   I don't recall if this image was taken from

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

172

14:09:36   1   the TRN file, so I can't answer that "yes" or "no."

14:09:39   2        Q.   Well where would this image be taken from?

14:09:44   3        A.   As noted in this report, calculations were

14:09:48   4   done for an 8.1 million-element mesh, and a mesh that

14:09:54   5   was approximately 60 million.

14:09:55   6        Q.   So you did calculations for a 60 million

14:09:58   7   mesh?

14:09:59   8        A.   That's correct.

14:09:59   9        Q.   And are the results in this report?

14:10:01   10        A.   No.

14:10:01   11        Q.   Why not?  Did it --

14:10:03   12             Did it converge?

14:10:04   13        A.   Yes.

14:10:05   14        Q.   And you've gotten results?

14:10:07   15        A.   Correct.

14:10:07   16        Q.   Why didn't you produce those results?

14:10:09   17        A.   Because the results were the same, and it's

14:10:12   18   our practice in computational fluid dynamics to show

14:10:16   19   that your results are independent of mesh and then to

14:10:18   20   show one set of results.

14:10:20   21        Q.   So my understanding is the calculations for

14:10:25   22   the six -- the 60-million-grid mesh no longer exist.

14:10:32   23        A.   I don't know if they exist.

14:10:34   24        Q.   Okay.  How long did it take you to calculate

14:10:37   25   the 60-million-grid mesh?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

173

| | | |
|---|---|---|
| 14:10:41 | 1 | A.   I don't know. |
| 14:10:42 | 2 | Q.   Was it done -- |
| 14:10:45 | 3 | When was it done? |
| 14:10:46 | 4 | A.   It would have been done about the same time |
| 14:10:49 | 5 | that the initial calculations were done.  We have that |
| 14:10:52 | 6 | list of the time stamp, which I think was November |
| 14:10:56 | 7 | 2015, so approximately then. |
| 14:10:58 | 8 | Q.   Okay.  Was it done in LES or RANS? |
| 14:11:01 | 9 | A.   I believe it was LES. |
| 14:11:03 | 10 | Q.   Okay.  So -- And what was the time step -- |
| 14:11:08 | 11 | step? |
| 14:11:08 | 12 | A.   I don't recall. |
| 14:11:10 | 13 | Q.   Would it have been less than a second? |
| 14:11:12 | 14 | A.   I'm pretty sure it would have been less than |
| 14:11:13 | 15 | a second, but I don't recall. |
| 14:11:14 | 16 | Q.   Okay.  So it's your testimony today that -- |
| 14:11:19 | 17 | Well how long did it take to run? |
| 14:11:20 | 18 | A.   I don't recall. |
| 14:11:21 | 19 | Q.   A month, two months, five months? |
| 14:11:24 | 20 | A.   Well not five months, but I don't recall how |
| 14:11:26 | 21 | long it took. |
| 14:11:26 | 22 | Q.   Can you give me an approximation? |
| 14:11:28 | 23 | A.   No. |
| 14:11:29 | 24 | Q.   Less than three months? |
| 14:11:31 | 25 | A.   I don't know. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

174

14:11:32  1     Q.   Okay.  So it's your --

14:11:36  2          Well, so less than five; correct?

14:11:38  3     A.   Yes.

14:11:39  4     Q.   Greater than a month?

14:11:40  5     A.   I can't say.

14:11:41  6     Q.   Okay.  And what computer did you do it on?

14:11:44  7     A.   A St. Thomas computer.

14:11:46  8     Q.   A 16-core computer?

14:11:47  9     A.   Yes.

14:11:48  10    Q.   How long do you think it would take for a

14:11:50  11    16-core computer to run an LES mesh with 60 million

14:11:54  12    cells?

14:11:55  13    A.   Depends on how long you run it.  It depends

14:11:56  14    on how many time steps.

14:11:58  15    Q.   Well how long did --

14:11:59  16    A.   What we -- Hold on.

14:12:00  17         Sorry.  That was inappropriate for me to say

14:12:02  18    "hold on."  I apologize.

14:12:03  19         In computational fluid mechanics what a

14:12:11  20    standard practice is to run code on more than one mesh

14:12:17  21    to show that the results -- the conclusions don't

14:12:20  22    depend on the mesh.

14:12:22  23    Q.   Called mesh independence; correct?

14:12:24  24    A.   That's correct.

14:12:25  25    Q.   How'd you perform your mesh independence?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

175

14:12:28    1        A.    Visualization of streamlines.

14:12:30    2        Q.    Okay.  So you'd done a mesh for eight

14:12:33    3    thousand one hundred or whatever it -- eight million

14:12:35    4    one -- eight million one hundred thousand; correct?

14:12:36    5        A.    Correct.

14:12:36    6        Q.    And you did one for approximately 60

14:12:38    7    million.

14:12:38    8        A.    Correct.

14:12:39    9        Q.    Exactly how many cells were used?

14:12:43   10        A.    I don't recall the exact number, sitting

14:12:45   11    here.

14:12:46   12        Q.    Okay.  And do you know what shapes were used

14:12:52   13    in the approximate 60-million-cell mesh?

14:12:59   14        A.    Yes.

14:13:00   15        Q.    What?

14:13:01   16        A.    The same shapes that were used in the

14:13:03   17    8.1-million-cell mesh.

14:13:05   18        Q.    So the tetrahedras.

14:13:06   19        A.    And pyramid.

14:13:07   20        Q.    Okay.  Well if I show you your ANSYS program

14:13:10   21    today and there's no mention of any pyramid shapes,

14:13:12   22    would you disagree with that?

14:13:14   23        A.    No.

14:13:14   24        Q.    Okay.  So you're not absolutely certain that

14:13:17   25    there are pyramid shapes in your mesh.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

176

14:13:20  1      A.   I believe there are.  It would not surprise

14:13:22  2   me if the entire mesh was tetrahedral.

14:13:26  3      Q.   Okay.  So would you agree with me that the

14:13:41  4   mesh that's used in Figure 2 is most likely the mesh

14:13:46  5   used for your 60-million-cell mesh?

14:13:50  6      A.   I would say I don't recall which one it is.

14:13:53  7      Q.   Okay.  And your mesh independence was solely

14:14:07  8   based on the streamlines.

14:14:11  9      A.   Correct.

14:14:13  10      Q.   Okay.

14:14:13  11      A.   It was based on the trajectory of the fluid

14:14:15  12   flow in the room.

14:14:16  13      Q.   Which create the streamlines.

14:14:17  14      A.   Correct.

14:14:18  15      Q.   Okay.  Did you do path lines?

14:14:20  16      A.   I did not.

14:14:21  17      Q.   Okay.  And we could agree that you did not

14:14:23  18   add particles to the flow; correct?

14:14:25  19      A.   Correct.  It was unnecessary.

14:14:27  20      Q.   Well I understand you believe it's

14:14:28  21   unnecessary, but you don't have to -- I'm just asking

14:14:31  22   you correct or not.  I don't need -- If I want a

14:14:33  23   reason, I'll ask you for a reason.

14:14:34  24         So you agree with me you didn't add

14:14:36  25   particles to the flow; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

177

14:14:37    1        A.    I did not.

14:14:38    2        Q.    Did you change the geometry between the

14:14:40    3   8-million-cell mesh and the 60-million-cell mesh?

14:14:47    4        A.    Yes.

14:14:47    5        Q.    How did you change the geometry?

14:14:53    6        A.    In the 60-million-cell mesh we actually

14:14:56    7   extended the geometry into the vents, the outlet

14:15:03    8   vents.  And in the 8-million-cell mesh we did not.

14:15:07    9        Q.    So in the 8-million-cell mesh you removed

14:15:09   10   the vents; correct?

14:15:11   11        A.    In the 8-million-cell mesh we represented

14:15:13   12   the vents on the wall, and in the 60-million-cell mesh

14:15:18   13   we actually extended the solution up into the exhaust

14:15:22   14   vents --

           15        Q.    Okay.

14:15:22   16        A.    -- so that would be into the wall.

14:15:23   17        Q.    Okay.  In your meshing, what algorithm did

14:15:38   18   you use?

14:15:42   19        A.    I think I used a tetrahedral-based

14:15:50   20   algorithm, but I don't recall.

14:16:01   21        Q.    Was it patch conformal or patch

14:16:03   22   non-conformal?

14:16:05   23        A.    I don't recall.

14:16:06   24        Q.    Is there any way to determine that today?

14:16:08   25        A.    Not today.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

178

14:16:09  1      Q.   How?  How would I determine that?

14:16:12  2      A.   You -- From the TRN.

14:16:12  3      Q.   So that would be in the TRN file?

14:16:14  4      A.   Correct.

14:16:14  5      Q.   Okay.  Were any mesh controls used?

14:16:31  6      A.   Sizing controls were used.

14:16:34  7      Q.   Anything else?

14:16:36  8      A.   Curvature controls were probably used,

14:16:40  9  sitting here now I don't know for sure; and proximity

14:16:43  10  controls were probably used, sitting here now, I don't

14:16:46  11  know for sure.

14:16:50  12      Q.   So mesh controls would have curvature and

14:16:53  13  proximity values you could add to it?

14:16:57  14      A.   That is correct.

14:17:02  15      Q.   Did you use any defeaturing tools?

14:17:06  16      A.   I defeatured manually.  When we talked

14:17:09  17  earlier today about removing small features, that was

14:17:12  18  a manual defeaturing.

14:17:14  19      Q.   Did you make --

14:17:15  20           Did you change any features of the drape?

14:17:17  21      A.   No.

14:17:18  22      Q.   Did you change any features of the patient?

14:17:21  23      A.   No.

14:17:22  24      Q.   Okay.  And how'd you determine the quality

14:17:28  25  of your mesh?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

179

14:17:33  1      A.   I determined the quality of the mesh by the

14:17:36  2  fact that the solution -- the results were independent

14:17:40  3  of the mesh, and that's the ultimate arbiter of

14:17:43  4  whether the mesh is a good quality.

14:17:44  5      Q.   Now was the only thing that was changed

14:17:46  6  between -- Well, strike that.

14:17:47  7           We agree that we changed -- you changed the

14:17:50  8  geometry between the 8.1-million-cell mesh and the

14:17:53  9  60-million-cell mesh; correct?

14:17:55  10     A.   Correct.

14:17:55  11     Q.   Okay.  Was the only geometry changed the

14:18:04  12  vents, exhaust vents?

14:18:06  13     A.   That's the only thing I can recall now.

14:18:08  14     Q.   Okay.  Everything else was kept the same?

14:18:10  15     A.   To my recollection, yes.

14:18:12  16     Q.   Okay.  Is it the same equations, used

14:18:17  17  Boussinesq?

14:18:18  18     A.   I believe that's true, yes.  Same equations.

14:18:21  19     Q.   Okay.  So just so I understand, your

14:19:05  20  determination of the mesh quality was solely based on

14:19:09  21  doing the mesh-independence test between the 8.1

14:19:16  22  million cells and the 60 million cells.

14:19:19  23     A.   That is the gold standard for determining

14:19:23  24  mesh quality, and yes, that's the method I used.

14:19:27  25     Q.   Okay.  Is the standard practice with respect

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

180

14:19:30   1    to mesh independence to change the geometry?

14:19:39   2         A.   The geometry --

14:19:40   3              If the geometry materially impacts the

14:19:43   4    results, then no.

14:19:45   5         Q.   So why did you change the geometry?

14:19:47   6         A.   Because it was a defeaturing, as we

14:19:49   7    mentioned.  I defeatured the presence or absence of

14:19:55   8    these vents.  The ducts extended into the wall doesn't

14:19:58   9    matter.  So in my judgment there was no reason to

14:20:02   10   calculate the flow up into the wall, so they were

14:20:04   11   removed.

14:20:05   12        Q.   And that was for the 8.1 million cells.

14:20:07   13        A.   Correct.

14:20:08   14        Q.   Okay.  But you thought it was necessary for

14:20:10   15   the 60 million cells?

14:20:13   16        A.   No.  It was probably not necessary for the

14:20:14   17   60 million cells.

14:20:15   18        Q.   Which one did you run first, the 60 million

14:20:18   19   or the 8.1 million?

14:20:19   20        A.   I don't recall.

14:20:28   21        Q.   What metrics did you use to check the mesh,

14:20:31   22   besides grid independence?

14:20:34   23        A.   I may have looked at --

14:20:37   24              I may have looked at shape quality, such as

14:20:41   25   skewness or orthogonality, but in my experience those

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

181

14:20:45   1   are not important for determining the mesh quality for

14:20:48   2   a solution, so I relied upon a comparison of the

14:20:51   3   results, mesh independence.

14:20:53   4       Q.   Okay.  So sitting here today if I asked you

14:20:55   5   what the aspect ratio was, or the skewness, or the

14:20:58   6   expansion ratio, you wouldn't know.

14:20:59   7       A.   I would not know, and it's immaterial.

14:21:02   8       Q.   I understand you think it's immaterial.

14:21:03   9   That's your opinion.

14:21:04   10       So the answer to the question is you would

14:21:06   11   not know sitting here today.

14:21:07   12       MR. GOSS:  All right.  Wait for him to ask

14:21:08   13   a question.

14:21:09   14       Q.   You don't know the answers to the skewness,

14:21:12   15   aspect ratio or expansion ratio sitting here today;

14:21:15   16   correct?

14:21:15   17       A.   Correct.

14:21:21   18       Q.   Okay.  So do you know if your aspect

14:21:23   19   ratio -- it could have been anywhere from .1 to 15,

14:21:26   20   you wouldn't know.

14:21:27   21       A.   I don't know the aspect ratio.

14:21:29   22       Q.   Okay.  Do you know whether or not the Bair

14:22:01   23   Hugger created any areas of turbulence in the

14:22:04   24   operating room when you ran it?

14:22:12   25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

182

| | | |
|---|---|---|
| 14:22:13 | 1 | Q.   Where? |
| 14:22:17 | 2 | A.   Whenever you have rising buoyant flow into a |
| 14:22:22 | 3 | larger space you almost always have turbulence. |
| 14:22:26 | 4 | Q.   I understand that. |
| 14:22:26 | 5 | My question was where in the operating room. |
| 14:22:29 | 6 | A.   So places where we have rising heated flow |
| 14:22:34 | 7 | in this simulation are places where you would have |
| 14:22:38 | 8 | turbulence, and that would clearly be shown on Figure |
| 14:22:50 | 9 | 11. |
| 14:22:53 | 10 | Q.   Okay.  Is Figure 11 the temperature |
| 14:22:57 | 11 | distribution of the room? |
| 14:22:59 | 12 | A.   Yes. |
| 14:23:00 | 13 | Q.   Okay.  At a -- At time step 264; correct? |
| 14:23:06 | 14 | A.   Correct. |
| 14:23:07 | 15 | Q.   Okay.  Now -- |
| 14:24:21 | 16 | Going back to time step.  If you ra -- If |
| 14:24:30 | 17 | there is only 264 time steps, would that -- would I be |
| 14:24:34 | 18 | able to calculate how long you let the model run? |
| 14:24:39 | 19 | A.   Do you mean the computer time? |
| 14:24:40 | 20 | Q.   No.  Like how long it took from the initial |
| 14:24:45 | 21 | conditions to time step 264. |
| 14:24:50 | 22 | A.   I believe you would be able to determine |
| 14:24:52 | 23 | that from the TRN. |
| 14:24:53 | 24 | Q.   Okay.  So if the TRN for 264 -- And I'm |
| 14:24:58 | 25 | talking about simulation time.  You understand when I |

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

183

14:25:00  1   say "simulation time"?

14:25:01  2        A.   Yes.

14:25:02  3        Q.   I mean, a one-second simulation could take a

14:25:04  4   week on the computer.

14:25:05  5        A.   Correct.

14:25:06  6        Q.   Okay.  So if the time step that you used was

14:25:11  7   .01, then I would multiply that by 264 to get the

14:25:16  8   actual time of simulation?

14:25:19  9        A.   If the time steps for those first 264

14:25:23  10  calculations was the same, then correct.

14:25:26  11       Q.   Okay.  Do you have any reason to believe

14:25:33  12  that you changed the time step between time step zero

14:25:36  13  and time step 264?

14:25:40  14       A.   Sitting here now, no.

14:25:42  15       Q.   Okay.  So if the time step is 264, then the

14:26:06  16  model would have ran for 2 -- the simulation would

14:26:09  17  have ran for 2.64 seconds; correct?

14:26:12  18       A.   Correct.

14:26:13  19       Q.   And at that point you determined that, based

14:26:16  20  on the instantaneous velocity measurements of the

14:26:21  21  model, that you had quasi-static results.

14:26:27  22       A.   Correct.

14:26:28  23       Q.   Okay.  Did you start the model at time zero?

14:26:41  24       A.   Yes.

14:26:50  25       Q.   Is it possible that you used a time step

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

184

14:26:53  1  before 264 of .001 seconds?

14:27:00  2      A.   It is possible.

14:27:00  3      Q.   And if that's the case, then it would be

14:27:02  4  less than 2.64 seconds for the simulation; correct?

14:27:05  5      A.   Correct.

14:27:06  6      Q.   Okay.  Do you --

14:27:11  7           Do you set the time step change prior to

14:27:17  8  starting the model run, or can you change it in the

14:27:20  9  middle of a run?

14:27:21  10     A.   You can change it in the middle of a run.

14:27:23  11     Q.   Okay.  And you said the run for the -- for

14:27:25  12  the 8.1 million model took 40 days.

14:27:29  13     A.   Yes.

14:27:30  14     Q.   Okay.  And it took 40 days to get 264 time

14:27:35  15  steps?

14:27:37  16     A.   Well remember I have a file at 300, --

14:27:41  17     Q.   Okay.

14:27:42  18     A.   -- so I went beyond 264.  I don't recall how

14:27:45  19  far I went, but it took 40 days to do the calculation.

14:27:51  20     Q.   I understand that.  And you think -- It

14:27:53  21  could be 300, it could be 264, you don't know.

14:27:56  22     A.   Correct.

14:27:56  23     Q.   Okay.  And you said this report was done by

14:28:11  24  Science Day; correct?

14:28:12  25           MR. GOSS:  Object to form.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

185

14:28:13  1      Q.   All the pictures and the meshes and

14:28:15  2  everything.

14:28:16  3      A.   Boy, I think it was.  I think all of these

14:28:18  4  were done by Science Day.

14:28:44  5      Q.   You said previously today that you ran

14:28:47  6  through 2500 time steps; correct?

14:28:51  7      A.   The 505 results include the 2540 time step

14:28:57  8  result.

14:28:58  9      Q.   Okay.  How many time steps did you run for

14:28:59  10  the 750?

14:29:01  11      A.   I don't know.

14:29:02  12      Q.   Okay.  But it wasn't 2500.

14:29:04  13      A.   Correct.

14:29:05  14      Q.   Okay.  Then I misunderstood you.

14:29:06  15           I thought we were talking about the 750.

14:29:11  16      A.   The 2500 pertained to the --

14:29:15  17      Q.   505.

14:29:16  18      A.   -- 505.

14:29:17  19      Q.   And that's why we have a file named 2540

14:29:20  20  TRN.

14:29:20  21      A.   Correct.

14:29:21  22      Q.   Okay.  And you believe that there is a time

14:29:34  23  step 300 that was --

14:29:35  24           Well let me ask you this:  Can you preset

14:29:38  25  the amount of time steps you want in a model?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

186

| | | |
|---|---|---|
| 14:29:42 | 1 | A.   Yes. |
| 14:29:43 | 2 | Q.   Did you do that in this -- in the 750 case? |
| 14:29:46 | 3 | A.   No. |
| 14:29:47 | 4 | Q.   So you just ran it till you believed you had |
| 14:29:49 | 5 | a solution. |
| 14:29:49 | 6 | A.   Correct. |
| 14:29:51 | 7 | Q.   Till you had convergence. |
| 14:29:52 | 8 | A.   Till I had a quasi-steady solution. |
| 14:29:55 | 9 | Q.   Okay.  Now you'll agree with me that if your |
| 14:30:01 | 10 | boundary conditions are not correct, the model's not |
| 14:30:03 | 11 | correct. |
| 14:30:06 | 12 | A.   If your boundary conditions differ in a way |
| 14:30:10 | 13 | that's substantive -- |
| 14:30:13 | 14 | Let me put it this way:  The software solves |
| 14:30:16 | 15 | the problem for the boundary conditions.  If the |
| 14:30:18 | 16 | boundary conditions that you put into the software |
| 14:30:23 | 17 | differ significantly from the actual boundary |
| 14:30:25 | 18 | conditions then I agree, the solution will not reflect |
| 14:30:28 | 19 | reality. |
| 14:30:28 | 20 | Q.   So if your boundary condition's different |
| 14:30:30 | 21 | from the actual, real-life conditions, then the model |
| 14:30:35 | 22 | will not be accurate. |
| 14:30:36 | 23 | A.   If the difference is significant. |
| 14:30:39 | 24 | Q.   Okay.  And you criticize Elghobashi on a |
| 14:30:48 | 25 | number of things, but one of them is his boundary |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

187

14:30:50   1   conditions; correct?

14:30:51   2        A.    That is correct.

14:30:51   3        Q.    And that's why you say he's incorrect;

14:30:54   4   right?

14:30:54   5        A.    That is one of the reasons.

14:30:55   6        Q.    Okay.  And so therefore if your boundary

14:30:58   7   conditions are incorrect, then your analysis would be

14:31:01   8   incorrect; correct?

14:31:03   9        A.    If the difference between my boundary

14:31:05   10  conditions and the correct boundary conditions is

14:31:07   11  significant, then yes, I agree with you.

14:31:10   12       Q.    For example, if none of the air comes out

14:31:12   13  the head and neck but goes below the operating room

14:31:16   14  table, then -- and that -- and you are incorrect in

14:31:19   15  that assumption, then your model would be incorrect.

14:31:21   16  True?

14:31:22   17            MR. GOSS:  Object to form, improper

14:31:23   18  hypothetical.

14:31:23   19       A.    I would say this.  My model has a boundary

14:31:29   20  condition where the air leaves through the head and

14:31:32   21  neck area into the room.  I do not have a boundary

14:31:36   22  condition like Elghobashi where the air leaves at the

14:31:38   23  bottom of the drape and then into a room.  I would

14:31:40   24  call that a significant difference.

14:31:42   25       Q.    Okay.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

188

14:31:42   1      A.   If his boundary conditions are correct and

14:31:45   2   if mine are incorrect, then that would cause me

14:31:51   3   concern that my results are not correct.

14:31:53   4      Q.   Well from an experienced computational fluid

14:31:59   5   dynamics engineer, you would agree with me that the

14:32:02   6   results of the TRN file that we're looking at in this

14:32:05   7   case would not depict what would occur if the air was

14:32:10   8   going underneath the operating room table and not out

14:32:13   9   the head and neck; correct?

14:32:15   10     A.   We have to be very careful and exact in our

14:32:17   11  words.

14:32:17   12          If the air left the bottom of the drape and

14:32:25   13  oozed uniformly from the drape into the room, as Dr.

14:32:29   14  Elghobashi assumed, that would be a very different

14:32:32   15  boundary condition than the one I used.  And if he is

14:32:38   16  correct, then I have great concern about my

14:32:41   17  calculations.

14:32:41   18          Now if the air is exhausted, let's say along

14:32:47   19  the arm, maybe under the table, but then still exits

14:32:51   20  by the head and neck, then I am much less concerned.

14:32:54   21     Q.   Okay.  Well when you say "greatly

14:32:58   22  concerned," it would question your reliability in your

14:33:02   23  results; correct?

14:33:02   24     A.   Yes.

14:33:03   25     Q.   And you couldn't sit here today and say that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

189

14:33:05    1    my results are correct and reliable because of these

14:33:08    2    great concerns.

14:33:09    3         A.   Correct.

14:33:10    4         Q.   Okay.  How do you determine if a difference

14:33:15    5    is significant?

14:33:19    6         A.   One way to determine it is to run both cases

14:33:23    7    and to compare the results.  That's probably the most

14:33:26    8    direct way.

14:33:28    9         Q.   Okay.  And it's quite clear that your

14:33:31   10    results are much different than Elghobashi's results;

14:33:33   11    correct?

14:33:36   12         A.   Correct.

14:33:37   13         Q.   But with respect to your analysis, you did

14:33:44   14    not -- you did not analyze particle flow; correct?

14:33:49   15         A.   It was unnecessary.

14:33:50   16         Q.   That wasn't my answer -- my question.

14:33:52   17              You did not analyze particle flow; correct?

14:33:55   18         A.   Correct.

14:33:57   19         Q.   Okay.  Now you formulated your assumptions

14:34:14   20    back in 2015; correct?

14:34:20   21         A.   Yes.

14:34:21   22         Q.   That was before any of the depositions in

14:34:23   23    this MDL; correct?

14:34:26   24         A.   Correct.

14:34:27   25         Q.   Before any of these expert witnesses were

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

190

14:34:30  1    identified in written reports.

14:34:33  2         A.   Correct.

14:34:34  3         Q.   Okay.  Before any --

14:34:44  4              Let me ask you this.  Did anyone at 3M

14:34:48  5    indicate to you that all the air comes from the head

14:34:50  6    and neck?

14:34:51  7         A.   No.

14:34:52  8         Q.   Okay.  Did you see any 3M testing that

14:34:54  9    stated the opposite?

14:34:56  10        A.   No.

14:34:57  11        Q.   If they had actual testing done that

14:35:00  12   indicated that -- that not all the air comes out of

14:35:05  13   the head and neck, but most of it goes down -- from

14:35:09  14   the arm section down below, would that change your

14:35:11  15   opinions in this case?

14:35:12  16        A.   I would need to see the --

14:35:13  17             MR. GOSS:  Object to form.

14:35:14  18        A.   -- details of the tests.

14:35:15  19        Q.   Okay.

14:35:16  20        A.   It's possible.

14:35:45  21        Q.   You would agree with me that if you only ran

14:35:49  22   your model for 2.5 seconds, roughly, that although you

14:35:59  23   may be able to get changes -- determine quasi-static

14:36:06  24   solution for a velocity, you could not apply that to a

14:36:12  25   change in temperature in the operating room.  True?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

191

14:36:15   1      A.    I disagree.

14:36:16   2      Q.    You disagree.   Why?

14:36:22   3      A.    Remember you have to have initial conditions

14:36:26   4   to start, and if your initial conditions are very good

14:36:31   5   you can be very close to a quasi-steady result from

14:36:35   6   time zero, and that's the whole point of setting good

14:36:38   7   initial conditions.

14:36:39   8      Q.    But you don't know what your initial

14:36:40   9   conditions are.

14:36:42   10     A.    I -- Well I had reasonable initial -- I had

14:36:46   11  very good initial conditions.

14:36:47   12     Q.    But sitting here today you do not know what

14:36:49   13  your initial conditions are; correct?

14:36:53   14     A.    My initial conditions were almost identical

14:36:56   15  to the flow patterns that we see here, here

14:37:02   16  [indicating].

14:37:03   17     Q.    Are you guessing?

14:37:04   18     A.    No.

14:37:04   19     Q.    So how do I -- how do I --

14:37:06   20           How do you prove that to me, by just stating

14:37:09   21  off the top of your head that your initial conditions

14:37:11   22  are here, equivalent to here, here, here, here and

14:37:16   23  here [indicating]?

14:37:16   24           MR. GOSS:   Objection, move to strike,

14:37:19   25  mischaracterizes his testimony.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

192

14:37:23  1      A.   Well I'm under oath and I'm obligated to

14:37:26  2   tell the truth, and so I'm presenting to you that

14:37:31  3   these results were very similar to the initial

14:37:34  4   conditions.

14:37:42  5      Q.   So you believe the initial conditions in an

14:37:45  6   operating room would show very little temperature

14:37:55  7   gradient between the ceiling and the floor?

14:38:05  8           "Yes" or "no," or you don't know.

14:38:08  9           MR. GOSS:  Take your time and give the

14:38:09  10  answer to the best of your ability.

14:38:11  11     A.   Can you re-ask the question?

14:38:13  12     Q.   Based on Figure 11 the temperature gradient

14:38:16  13  between the ceiling and the floor is constant.  Do you

14:38:22  14  believe that your initial conditions --

14:38:24  15          Do you believe that the temperature gradient

14:38:25  16  in an operating room would be constant from the

14:38:29  17  ceiling, where the air is coming out of, to the floor?

14:38:33  18     A.   Figure 11 does not show that.

14:38:40  19     Q.   You're saying it's a different color from

14:38:42  20  the ceiling and the floor?

14:38:44  21     A.   Yes.

14:38:46  22     Q.   How much of a difference?

14:38:48  23     A.   Let me explain.

14:38:49  24     Q.   I'm asking you a question.  How much of a

14:38:51  25  difference?  You can look at the picture.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

193

14:38:55    1          If you know.  If you don't know, that's

14:38:56    2    fine.

14:38:58    3       A.    You have in your possession, I believe, an

14:39:04    4    image which shows the temperature gradient vertically

14:39:06    5    in the room for the 505.  This image --

14:39:11    6       Q.    750, you mean.

14:39:14    7       A.    For the 505.

14:39:19    8          Do you have any of the 505 results?

14:39:22    9       Q.    I'm not talking about the 505, I'm talking

14:39:24   10    about the 750 here.

14:39:25   11       A.    I -- I know you are.

14:39:29   12       Q.    I did not look at the 505 results because

14:39:32   13    they don't apply to this report.

14:39:33   14       A.    Okay.  But had you looked at them, they

14:39:35   15    showed the temperature variation vertically in a room

14:39:38   16    and they -- the image that I used there was more

14:39:40   17    appropriate to detect the temperature difference be --

14:39:43   18    than this image, because this image is called what's

14:39:46   19    -- what's called scaled globally.  That means the

14:39:50   20    hottest value in the entire room is red, the coldest

14:39:54   21    value in the entire room is dark blue.  I scaled it

14:40:00   22    this way so that you could see the hot -- hot spots,

14:40:03   23    any hot spots in the room.

14:40:06   24          If I wanted to show the image that you've

14:40:09   25    articulated -- by the way, which I have created -- I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

194

14:40:13   1   would have scaled it differently.  I would have scaled

14:40:15   2   it, for example, from 59 to maybe 70, and then the 70

14:40:19   3   degree areas would be red.

14:40:22   4        So this image does not show that there is no

14:40:25   5   temperature variation in a room.  It is scaled to show

14:40:28   6   the min and max range.

14:40:32   7        Q.   Okay.

14:40:33   8        A.   Okay?

14:40:34   9        Q.   What other images --

14:40:35   10       Do you have images that you've scaled it to

14:40:39   11   a different range?

14:40:40   12       A.   Yes.

14:40:41   13       Q.   Have you provided that to counsel?

14:40:42   14       A.   Yes.

14:40:45   15       Q.   And that has not been provided to me.

14:40:47   16       So what other images have you created that

14:40:48   17   you provided to counsel that's not in your report?

14:40:52   18       A.   Image --

14:40:52   19            MR. GOSS:  I would just state for the

14:40:53   20   record I'm not sure that it hasn't been provided.

14:41:00   21       But you can answer the question, if you

14:41:03   22   can.

14:41:05   23       A.   I don't know what images have been provided

14:41:06   24   by counsel, but I've done calculations with the 505.

14:41:12   25       Q.   I'm not talking about the 505, I'm talking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

195

14:41:14  1  about the 750.  I don't care about the 505, that's not

14:41:17  2  part of your report.  Do you understand that, sir?

14:41:19  3      A.   Yes.

14:41:20  4      Q.   Okay.  So with the 750 are there other

14:41:24  5  images that show temperature gradients?

14:41:26  6      A.   Not that I'm aware of.

14:41:28  7      Q.   Okay.  Did you use a sub-grid model for your

14:42:05  8  -- for the LES?

14:42:06  9      A.   Yes.

14:42:07  10     Q.   What was the sub-grid model?

14:42:09  11     A.   The wall-adapted large-eddy model.

14:42:12  12     Q.   So W-A-L-E?

14:42:14  13     A.   Yes.

14:42:16  14     Q.   And any --

14:42:17  15          And that was constant throughout your whole

14:42:20  16  model; you didn't make any changes to that?

14:42:23  17     A.   Correct.

14:42:23  18     Q.   Okay.  And you used Boussinesq?

14:42:27  19     A.   Yes.

14:42:28  20     Q.   Okay.  And you agree with me that the

14:42:35  21  temperature gradient on Figure 11 is from 105.9

14:42:40  22  degrees to 59 degrees; correct?

14:42:42  23     A.   I disagree.

14:42:50  24     Q.   You have air coming out of the Bair Hugger

14:42:52  25  at 105.9 degrees; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

196

14:42:54  1      A.   Correct.

14:42:55  2      Q.   Okay.  So the temperature gradient in the

14:42:57  3  room is 105.9 to 59 -- 59 to 105.9; correct?

14:43:02  4      A.   No, it is not.

14:43:03  5      Q.   Why not?

14:43:04  6      A.   Because the term "gradient" means a change

14:43:06  7  of something over a distance.  Gradient is like

14:43:09  8  velocity.

14:43:11  9           What you're talking about is a temperature

14:43:13  10  difference, not a gradient.

14:43:15  11     Q.   Okay.  Lack of term.

14:43:16  12          Temperature difference is between 59 degrees

14:43:18  13  and 105.9 degrees.

14:43:20  14     A.   Correct.

14:43:21  15     Q.   Okay.  And since --

14:43:41  16          You have the choice of using ideal gas in

14:43:44  17  ANSYS, or Boussinesq; correct?

14:43:46  18     A.   That is correct.

14:43:47  19     Q.   And you chose Boussinesq because it's

14:43:49  20  quicker computation; correct?

14:43:51  21     A.   Incorrect.

14:43:52  22     Q.   It's not?

14:43:52  23          Why did you use Boussinesq?

14:43:54  24     A.   It is quicker, but I chose it because it

14:43:57  25  makes it a worst-case scenario.  It stacks the cards

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

197

14:44:00  1  against 3M and so it's a worst-case scenario.

14:44:04  2       Q.    How does it stack the cards against --

14:44:06  3            I mean, isn't the whole point of doing CFD

14:44:08  4  is to be as accurate as possible and to show exactly

14:44:12  5  what happens in a model that would happen in real

14:44:16  6  life?

14:44:16  7       A.    Not necessarily.

14:44:17  8       Q.    So is that not what you did here?  Is this

14:44:20  9  -- Is what you did in your -- in your modeling what

14:44:23  10  happens in real life?

14:44:25  11       A.    Let me explain.

14:44:26  12       Q.    "Yes" or "no," then you could explain.

14:44:30  13       A.    Yes.

14:44:31  14       Q.    Okay.

14:44:33  15       A.    When we do a calculation we have to make

14:44:38  16  choices, and we can make choices that are judgements,

14:44:43  17  and sometimes those judgements may affect the results

14:44:45  18  in small ways.  What I like to do is do what's called

14:44:49  19  a bounding calculation.  I like to assume worst-case

14:44:53  20  scenarios.  If I assume a worst-case scenario against

14:44:59  21  the manufacturers of the Bair Hugger, and if I -- if

14:45:02  22  my results show that the air does not intrude to the

14:45:05  23  surgical site then I have added confidence that under

14:45:09  24  a more exact calculation the results would hold.

14:45:13  25       Q.    Worst-case scenario you performed?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

198

14:45:15   1        A.    The Boussinesq --

14:45:17   2        Q.    No.  I'm saying you -- in all the

14:45:20   3   assumptions you made you determined the worst-case

14:45:22   4   scenario.

14:45:22   5        A.    For the buoyancy model I did.

14:45:24   6        Q.    Okay.  You didn't --

14:45:26   7              You didn't assume it for where the air goes;

14:45:28   8   correct?  The hot air.

14:45:33   9        A.    Well that --

14:45:33  10              (Interruption by the reporter.)

14:45:34  11        A.    When we make assumptions, we make

14:45:40  12   assumptions on things that we're uncertain about.

14:45:44  13   Things that -- Let me give you an example.  The air

14:45:48  14   coming out of the blanket.  It could be 41 Celsius, it

14:45:55  15   might be 33 Celsius.  We don't know for sure.  And in

14:45:59  16   fact you might have some air that's 33 and some air

14:46:02  17   that's 41, so there's a judgment that has to be made.

14:46:06  18   In those cases I tend to prefer judgements that stack

14:46:11  19   the cards against the case so that if my results come

14:46:16  20   out to show no intrusion, I have more confidence.

14:46:24  21        Q.    By the way, in your report you said the war

14:46:29  22   -- on page 6 [5]:  "The warm air from the Bair Hugger

14:46:32  23   blanket was treated as a second inlet to the room near

14:46:35  24   the patient's head and the temperature of the air

14:46:37  25   leaving the blower and entering the blanket was set to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

199

| Time | # | Text |
|---|---|---|
| 14:46:40 | 1 | the highest value of 43 degrees Celsius.  This assumes |
| 14:46:45 | 2 | a worst-case scenario; the temperature of the air |
| 14:46:48 | 3 | exiting near the patient's head should be |
| 14:46:50 | 4 | significantly less than 43 degrees Celsius -" the |
| 14:46:53 | 5 | value used in these -- "the value used in these |
| 14:46:55 | 6 | calculations was 43 degrees Celsius." |
| 14:46:58 | 7 | Correct? |
| 14:47:02 | 8 | A.   You have read that correctly. |
| 14:47:04 | 9 | Q.   Is that what you used, you used 43 or 41? |
| 14:47:07 | 10 | A.   It's a typo.  It should have been 41. |
| 14:47:09 | 11 | Q.   Okay.  Because 41 degrees is 106, not 43. |
| 14:47:12 | 12 | A.   That's -- That's right. |
| 14:47:14 | 13 | Q.   Okay.  So that's a typo. |
| 14:47:16 | 14 | Any other typos I should be aware of? |
| 14:47:18 | 15 | A.   Not that I know of. |
| 14:47:19 | 16 | Q.   Okay.  And now do you know what the |
| 14:47:26 | 17 | temperature of a human body is?  I'm sure you do |
| 14:47:28 | 18 | because you've done studies on it. |
| 14:47:29 | 19 | A.   Yes, I do. |
| 14:47:30 | 20 | Q.   What's the skin temperature of a human body? |
| 14:47:32 | 21 | A.   It depends on the environment that they're |
| 14:47:34 | 22 | in.  If you're out here in Minnesota in the winter |
| 14:47:38 | 23 | your skin temperature is going to be colder than in |
| 14:47:41 | 24 | the summer.  It also depends on the part of the body, |
| 14:47:43 | 25 | the face and nose and ears tend to be colder, but |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

200

14:47:47   1   generally it's a few degrees colder than body core

14:47:50   2   temperature.  So in metric units maybe 34 degrees

14:47:54   3   Celsius.

14:47:54   4        Q.   What about the core?

14:47:55   5        A.   The core is approximately 37.

14:47:59   6        Q.   Okay.  Skin temperature, around the chest.

14:48:01   7        A.   No.

14:48:02   8        Q.   What about the skin around the -- like the

14:48:04   9   chest and everything?

14:48:05   10       A.   It depends on the clothing that peoples wear

14:48:08   11   -- people are wearing.  I would estimate, sitting

14:48:10   12   here, with a reasonable degree of certainty, between

14:48:14   13   35 and 36.

14:48:15   14       Q.   Okay.  So I'm a little bit confused, because

14:48:20   15   heat transfer goes from something that's hot to

14:48:26   16   something that's cold; correct?

14:48:28   17       A.   That is correct.

14:48:28   18       Q.   Okay.  And I think that's --

14:48:30   19            Is that the second law of thermodynamics?

14:48:32   20       A.   No.

14:48:32   21       Q.   Okay.  Maybe I'm wrong.

14:48:33   22            So are you aware of internal studies of 3M

14:48:40   23   that actually measured the temperature underneath the

14:48:45   24   blanket when it's being used?

14:48:46   25       A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

201

14:48:47  1      Q.   Why'd you come up with 41 degrees then?

14:48:50  2      A.   I've studied these blankets for years.  I've

14:48:54  3  studied 3M's blankets and other blankets.   Through my

14:48:59  4  study know that when the air -- let's say the air

14:49:03  5  enters the blankets at 43 Celsius, it transfers heat

14:49:08  6  to the body and loses heat.  It loses -- lowers its

14:49:12  7  temperature.  As the air exit -- exits out the holes

14:49:16  8  it will be somewhat less than 43.  Now in some parts

14:49:21  9  of the -- The blanket's not a uniform temperature.  If

14:49:25  10  we were to lay a blanket out on this table and let's

14:49:28  11  say the hose entered here and the end of the blanket

14:49:33  12  was here, you would actually show a temperature

14:49:36  13  decrease as you went from one end to the other.

14:49:40  14     Q.   Did you ask for 3M whether or not they have

14:49:42  15  measured the uniformity of their temperature under the

14:49:45  16  blankets?

14:49:45  17     A.   I did not.

14:49:46  18     Q.   Wouldn't that be something that would be

14:49:47  19  good to know?

14:49:48  20     A.   Not necessary for my calculations.

14:49:50  21     Q.   Okay.  Well --

14:49:51  22     A.   So what I did --

14:49:52  23     Q.   You're making the assumption, sir, that the

14:49:54  24  air might be different at one part of the blanket or

14:49:56  25  the other.  Is that based on any experiments done on

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

202

14:49:58    1  the Bair Hugger, or just an educated guess?

14:50:02    2      A.   It's based on experiments done on the Bair

14:50:04    3  Hugger.

14:50:04    4      Q.   What studies?

14:50:05    5      A.   I cannot tell you.

14:50:06    6      Q.   Well I'm sitting here today and I need to

14:50:09    7  know, so I can go back and check your credibility,

14:50:11    8  what studies you're referring to.

14:50:12    9           Is it listed in -- in any -- in your CV?

14:50:16   10      A.   No.

14:50:17   11      Q.   Okay.  Is it studies you've done for 3M or

14:50:20   12  Arizant?

14:50:21   13      A.   No.

14:50:21   14      Q.   So what studies are they?

14:50:22   15      A.   Actually, let me take that back.

14:50:24   16           We did do studies in the 2000, 2002 period

14:50:31   17  where we measured temperature of air inside the Bair

14:50:33   18  Hugger, and there is clearly a temperature variation

14:50:36   19  as you move along the blanket.

14:50:41   20           So I made an engineering decision.  I

14:50:44   21  decided to use the hottest reasonable temperature at

14:50:49   22  the exhaust because that would promote buoyant mixing.

14:51:02   23           (Abraham Exhibit 8 marked for

           24           identification.)

           25  BY MR. ASSAAD:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

203

14:51:11    1       Q.   Was assuming 41 degrees in 3M's favor --

14:51:23    2            Was assuming 41 degrees in favor of 3M, or

14:51:26    3  -- or an assumption made in favor of 3M, worst-case

14:51:31    4  scenario?

14:51:33    5       A.   You've handed me a document --

14:51:35    6       Q.   That's a different question.  I'm asking you

14:51:36    7  a different question.  I haven't got to this document

14:51:38    8  yet.

14:51:39    9       A.   Okay.

14:51:39   10       Q.   Your assumption that 41 degrees is coming

14:51:41   11  out of the blanket, was that in 3M's favor of creating

14:51:45   12  a worst-case scenario?

14:51:47   13       A.   It was a worst-case scenario against 3M.

14:51:50   14       Q.   "Against 3M."  Okay.  All right.

14:51:52   15            What's been marked as Exhibit Number 8 is a

14:51:57   16  document produced during the litigation which is a

14:52:00   17  data of measurements taken by the Bair Hugger 505, as

14:52:04   18  well as the 750, used with different blankets -- with

14:52:10   19  a upper body blanket, a new body blanket and an older

14:52:13   20  body 522 blanket.

14:52:15   21            Have you seen this document before?

14:52:16   22       A.   I do not recall seeing this document.

14:52:17   23       Q.   Okay.  Do you see where it talks about MCST,

14:52:20   24  the average of temperature across the blanket?

14:52:23   25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

204

14:52:24   1       Q.   And I'm going to tell you and I'm going to

14:52:25   2   represent to you that what they do at 3 -- at Arizant

14:52:28   3   at this time is they have a -- a bed with many

14:52:31   4   thermocouples on it and they place the Bair Hugger and

14:52:33   5   they check how much of the -- how much heat is coming

14:52:36   6   out of the -- out of the holes onto the test bed.

14:52:39   7           Have you ever heard of them doing that?

14:52:41   8           MR. GOSS:  The Bair Hugger blanket.

14:52:42   9           MR. ASSAAD:  Bair Hugger blanket.

14:52:44  10       Q.   Have you --

14:52:44  11           Have you seen that test before?

14:52:46  12       A.   No.

14:52:46  13       Q.   Okay.  Do you have any reason to believe

14:52:48  14   that 3M or Arizant would incorrectly provide data in

14:52:57  15   this case to the plaintiffs?

14:52:59  16           MR. GOSS:  Object to the lack of

14:53:01  17   foundation.

14:53:01  18       A.   Could you repeat the question?

14:53:02  19       Q.   Withdraw that question, it was a bad

14:53:03  20   question.

14:53:04  21           Do you see here, under "Model 750 warming

14:53:08  22   unit" that under "New (M9) 522," and I represent

14:53:12  23   that's a new change in the Bair Hugger blanket, that

14:53:15  24   the average temperature across the blanket is 41.1

14:53:18  25   degrees?

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

205

14:53:19    1        A.    I see it says that, and I don't know what it

14:53:22    2    -- what me -- what the meaning of "average temperature

14:53:24    3    across the blanket" is.

14:53:25    4        Q.    Okay.  Do you see where it says the standard

14:53:28    5    deviation is .7?

14:53:30    6        A.    I see that.

14:53:31    7        Q.    Okay.  So sitting here today you've never

14:53:34    8    seen this document.

14:53:35    9        A.    I don't recall ever seeing this document.

14:53:38    10        Q.    Okay.  Wouldn't it be --

14:53:38    11            I mean, why recreate the wheel?  Wouldn't it

14:53:44    12    be just proper to ask 3M, hey, do you have any data on

14:53:46    13    what the temperature is coming out of the blanket?

14:53:50    14        A.    Not necessary.  I've got a lot of experience

14:53:54    15    with these devices, so I trust my own judgment.

14:53:56    16        Q.    Do you have experience with the Bair Hugger

14:53:57    17    blower 750 and the Model 522 blanket?

14:54:05    18        A.    I don't know.

14:54:05    19        Q.    Okay.  Do you have any experience with the

14:54:07    20    750 prior to this study?

14:54:10    21        A.    I don't --

14:54:11    22            I would have to look to see what models I've

14:54:13    23    studied.

14:54:14    24        Q.    Okay.  So if you can't remember what you

14:54:17    25    even studied, how do you have experience on what the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

206

14:54:19  1  heat output and the airflow and the -- and what the

14:54:23  2  temperature is coming out of the blanket if you can't

14:54:26  3  even remember if you've even seen the device before?

14:54:29  4       A.   Because I've studied many of these blankets

14:54:31  5  and they all have a very similar behavior.  The flow

14:54:35  6  enters into the blanket through a tube, typically the

14:54:39  7  temperature at entry is 43 or 44 Celsius, there is a

14:54:43  8  temperature drop as you move from one end to the other

14:54:46  9  of the blanket.  Regardless of which blanket you're

14:54:49  10 studying, regardless of the manufacturer, regardless

14:54:51  11 of the brand, there are those temperature variations.

14:54:55  12       Q.   But you don't know in this case.

          13       A.   What's that?

14:54:58  14       Q.   You don't know in the 522 what the

14:55:01  15 temperature difference is; do you?

14:55:03  16       A.   Which temperature difference are you talking

14:55:05  17 about?

14:55:05  18       Q.   Across the blanket.

14:55:07  19       A.   But where across the blanket?

14:55:08  20       Q.   From -- From the hose where it's coming in

14:55:11  21 at 43 degrees, and what's coming out of the

14:55:14  22 perforations at the opposite end.  You don't know what

14:55:16  23 the change in -- the Delta T is; do you?

14:55:18  24       A.   No, but I can estimate it within a

14:55:20  25 reasonable degree of certainty.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

207

14:55:21  1      Q.    What would you estimate it as, how many

14:55:23  2  degrees difference?

14:55:26  3      A.    A couple degrees.

14:55:27  4      Q.    Okay.  So 43 to about 41 degrees Celsius;

14:55:31  5  correct?

14:55:31  6      A.    Correct.

14:55:32  7      Q.    So the average temperature coming out of the

14:55:33  8  Bair Hugger at about 41.1 seems reasonable.

14:55:39  9      A.    It's not clear to me that this is the

14:55:41  10  average temperature coming out of the Bair Hugger.

14:55:44  11  What this says is "across the blanket."  Now I would

14:55:46  12  need to more -- know more information; for example,

14:55:48  13  did they measure inside the channels of the -- of the

14:55:51  14  Bair Hugger, or are they measuring outside or are they

14:55:53  15  measuring the wall?

14:55:54  16      Q.    I just told you.  I told you.

14:55:56  17          I said they have a thermal bed -- a

14:55:57  18  thermocouple -- a table with many thermocouples, they

14:55:59  19  placed the Bair Hugger on top, turn it on, of course

14:56:02  20  the Bair Hugger's going to rise a little bit because

14:56:04  21  of the -- because that's what it does, and the

14:56:06  22  convective currents are hitting the thermocouples and

14:56:08  23  this is the measurement.  If that --

14:56:10  24          Assuming that is the way they tested it,

14:56:11  25  would you agree with me that the air coming out of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

208

14:56:13   1   blanket, on average, is 41.1 degrees Celsius?

14:56:17   2        MR. GOSS:  Objection, lack of foundation.

14:56:19   3   This document does not contain any of those

14:56:21   4   experimental details.

14:56:23   5        Q.   Assuming that's what -- that's what they

14:56:26   6   did, would you agree with me that the temperature

14:56:28   7   coming out is 41.1 degrees; "yes" or "no"?  "Yes" or

14:56:31   8   "no"?

14:56:32   9        A.   You take --

14:56:32  10        Q.   If you don't agree, you don't agree.

14:56:34  11        A.   It's not that I agree or disagree, but I

14:56:38  12   would, for example, want to know the room temperature,

14:56:40  13   and I would want to know the constitution of the table

14:56:43  14   upon which they sit this.  If they put it on a table

14:56:45  15   that's an insulator you're going to get a higher

14:56:48  16   temperature.  If it's in a room -- If it's covered by

14:56:51  17   draping and blankets you'll get a higher temperature.

14:56:53  18   There are many factors that go into these

14:56:55  19   temperatures, and from this document I cannot assess

14:56:57  20   them.

14:56:57  21        Q.   Okay.  But you agree that the 41 degrees

14:57:00  22   that you used is consistent with the 41 degrees that

14:57:03  23   is coming out of the blanket according to this

14:57:05  24   document, Exhibit Number 8; correct?

14:57:08  25        A.   I am not in agreement that -- If --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

209

14:57:12    1          If this MCST is the temperature coming out

14:57:15    2    of the blanket, if it is, then yes, the value I used

14:57:19    3    is consistent with it.

14:57:20    4          Q.    Okay.  Which would be inconsistent with what

14:57:26    5    Dr. Settles measured less than one millimeter coming

14:57:27    6    out of the hole; correct?

14:57:28    7              MR. GOSS:  Object to form.

14:57:29    8          A.    I don't believe they are inconsistent.

14:57:32    9          Q.    Okay.  Are you aware that Dr. Settles

14:57:39    10   criticized your boundary conditions?

14:57:41    11         A.    Yes.

14:57:41    12         Q.    Okay.  So you believe that you could get a

14:57:46    13   measurement less than one millimeter out of a heated

14:57:49    14   air jet that dropped the temperature from 41 degrees

14:57:52    15   to 32 to 33 degrees?

14:57:57    16         A.    That's not necessarily the case.  In my

14:58:00    17   experience with these blankets every blanket that I've

14:58:03    18   seen has a temperature variation across the blanket.

14:58:07    19   It would go from maybe 43 down to 37 or 35.

14:58:13    20         Q.    You just testified a Delta of two degrees

14:58:15    21   from one end to the other.

14:58:17    22         A.    I don't know if I did, and if I did, that

14:58:19    23   was not --

14:58:20    24         Q.    So it's incorrect testimony back then?

14:58:22    25         A.    Well I'd have to see the question.  It may

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

210

14:58:24   1   be.  You may be misrepresenting the question that you

14:58:26   2   asked.

14:58:27   3       Q.   Oh no.  I said to you:  The hose here, 43

14:58:29   4   degrees, what would be the temperature drop at the

14:58:31   5   other end of the Bair Hugger blanket, and you said

14:58:33   6   about two degrees.

14:58:34   7            Do you remember me putting my arms like

14:58:36   8   this?

14:58:36   9       A.   Yeah.  I would not agree with that.

14:58:38   10      Q.   Okay.

14:58:38   11      A.   What I would say is -- and I remember the

14:58:40   12  context of this where you posed a hypothetical to me,

14:58:44   13  or you -- you presented to me an experiment, and the

14:58:47   14  experiment that you presented was, assume that the

14:58:51   15  average air temperature coming out of the blanket's

14:58:53   16  41; is that consistent with your work?  And I agreed

14:58:57   17  to that.

14:58:58   18      Q.   Okay.

14:58:58   19      A.   But that is not the same as saying it's a

14:59:02   20  Delta T of two degrees across the blanket.

14:59:08   21      Q.   And your mass flow rate coming out of the

14:59:14   22  Bair Hugger device is .025 kilograms per second;

14:59:18   23  correct?  Page 5.

14:59:26   24      A.   No.  I used .023.

14:59:30   25      Q.   Okay.  For a partially obstructed blanket

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

211

14:59:33   1   because the blanket was tucked underneath the table;

14:59:36   2   correct?

14:59:36   3        A.   Correct.

14:59:37   4        Q.   Okay.  Where'd you obtain these numbers?

14:59:40   5        A.   These are numbers that are consistent with

14:59:43   6   my experience working on blankets like this measuring

14:59:46   7   airflow, and they were confirmed by a tech document

14:59:48   8   from 3M.

14:59:49   9        Q.   Okay.  Is it the tech document that has not

14:59:55   10  been produced by you in this case, but it was produced

14:59:58   11  in another production?  If you know.

15:00:04   12       A.   I produced the tech document.

15:00:07   13       Q.   Okay.

15:00:07   14       A.   I did not create it.

15:00:10   15       Q.   Who created it?

15:00:11   16       A.   I don't know the answer.

15:00:13   17       Q.   Okay.

15:00:59   18            MR. ASSAAD:  Let's take a break.

15:01:00   19            THE REPORTER:  Off the record, please.

15:01:03   20            (Recess taken from 3:01 to 3:11 p.m.)

15:11:55   21  BY MR. ASSAAD:

15:11:58   22       Q.   In your manuscript that you submitted for

15:12:05   23  publication you put equations down; correct?

15:12:07   24       A.   Correct.

15:12:08   25       Q.   Why'd you put equations down in that report

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

212

15:12:10   1   and not in the expert report of Exhibit 1?

15:12:15   2        A.   It's a different audience, it would be read

15:12:17   3   by scientists who would want the equations.

15:12:20   4        Q.   Do you not think that Dr. Elghobashi would

15:12:23   5   want to know the equations that you used for your

15:12:25   6   model?

15:12:26   7        A.   Dr. Elghobashi, when he sees that I used the

15:12:29   8   LES model, would know what the equations are.

15:12:31   9        Q.   Well wouldn't people that are reviewing

15:12:34   10  numerical heat transfer know what the equations are in

15:12:39   11  the use of the LES model?

15:12:40   12       A.   They would.

15:12:41   13       Q.   So why would you put the equations down if

15:12:43   14  they already know the equations, like Dr. Elghobashi?

15:12:47   15       A.   Overthoroughness.

15:12:48   16       Q.   Okay.  So you were thorough in your

15:12:50   17  manuscript, but you were not thorough with respect to

15:12:53   18  identifying the equations you used in your expert

15:12:55   19  report.

15:12:56   20            MR. GOSS:  Object to form.

15:12:58   21       A.   I identified the equations in the expert

15:13:01   22  report by indicating the model that was used.

15:13:05   23       Q.   Okay.  Do you know what --

15:13:06   24            You said LES; correct?

15:13:07   25       A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

213

15:13:08   1        Q.   Okay.  And are you sitting here --

15:13:11   2             Are you sitting here today and telling me

15:13:14   3   that you know the equations that were used by ANSYS

15:13:18   4   when you clicked -- when you used the LES model in

15:13:22   5   ANSYS?

15:13:23   6        A.   There are thousands of equations.  I know

15:13:27   7   the key equations.

15:13:28   8        Q.   But you don't know the code; do you?

15:13:31   9        A.   I mean, I -- I know how to do compu --

15:13:35   10        Q.   You do not know the ANSYS code --

           11             MR. GOSS:  Well, hold on.

15:13:36   12        Q.   -- sitting here today; correct?

15:13:38   13             MR. GOSS:  Let him finish -- Let him finish

15:13:40   14   his answer, then you can ask another question.

15:13:42   15        A.   CFX is based on something called

15:13:45   16   control-volume analysis for fluid mechanics.  I've

15:13:47   17   taken a number of courses at the graduate and

15:13:49   18   undergraduate level on that topic.  I could write the

15:13:52   19   equations if I had to.  Fortunately, they're contained

15:13:55   20   within the software.

15:13:56   21        Q.   Okay.  But for the manuscript you decided to

15:14:02   22   put the equations, but you did not decide to put them

15:14:05   23   in your expert report; correct?

15:14:06   24        A.   For the manuscript I put a brief summary of

15:14:09   25   the equations, and I did not put them in the expert

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

214

15:14:11    1    report.

15:14:12    2        Q.    Did you put the Navier-Stokes equations?

15:14:15    3        A.    Yes.

15:14:17    4        Q.    Did you put the Boussinesq equations?

15:14:18    5        A.    No.

15:14:19    6        Q.    Okay.  So you would agree with me that --

15:14:39    7              I mean, you saw Dr. Elgho's report before

15:14:44    8    you submitted your final report in this case; correct?

15:14:46    9        A.    That is correct.

15:14:47   10        Q.    And you had the opportunity, if you so

15:14:50   11    choose, to add the equations; correct?

15:14:53   12        A.    That is correct.

15:14:53   13        Q.    And in fact the only thing you pretty much

15:14:55   14    had to do was copy and paste from your manuscript,

15:14:58   15    because your manuscript's already submitted by that

15:15:00   16    point in time; correct?

15:15:02   17        A.    Yes.

15:15:02   18        Q.    But you decided not to do that; correct?

15:15:04   19        A.    Correct.

15:15:05   20        Q.    Okay.  And you assumed that the lawyers, or

15:15:10   21    our consultants, or even Judge Ericksen is a different

15:15:14   22    audience than the peer reviewers for the -- for the

15:15:17   23    journal; correct?

15:15:19   24        A.    Yes.

15:15:20   25        Q.    Okay.  You do understand that Judge Ericksen

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

215

15:15:22    1    is the judge in this case.

15:15:25    2         A.    No.  You're telling me that now.

15:15:27    3         Q.    Well the -- the female judge that you were

15:15:29    4    in front of on Science Day was Judge Ericksen.

            5         A.    Okay.

15:15:32    6         Q.    You understand that; correct?

15:15:34    7               And she is the judge of this MDL.  You

15:15:36    8    understand that.

15:15:36    9         A.    Yes.

15:15:37   10         Q.    And she decides whether or not expert

15:15:40   11    opinions will eventually come in or not come in during

15:15:44   12    trial.  Do you understand that?

15:15:45   13         A.    That is my understanding.

15:15:46   14         Q.    Okay.  Have you ever had your expert

15:15:48   15    opinions limited in any way?

15:15:50   16         A.    Yes.

15:15:51   17         Q.    When?

15:15:55   18         A.    Very recently in an intellectual property

15:15:57   19    case.

15:15:59   20         Q.    In what court?

15:16:02   21         A.    I don't know.

15:16:03   22         Q.    What state?

15:16:06   23         A.    May I go to my --

15:16:07   24         Q.    Sure.

15:16:08   25         A.    -- CV?  (Witness reviewing exhibit.)

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

216

15:16:31    1          Select Comfort versus Tempur Sealy, Eighth

15:16:35    2    District Court, Minnesota.

15:16:36    3         Q.    Okay.  Is it --

15:16:40    4               Was it state court?

15:16:42    5         A.    Well it's U.S. Eighth District Court.

15:16:46    6         Q.    What page were you looking at?

15:16:47    7         A.    Page 4.

15:16:52    8         Q.    Of your CV, of Exhibit 2?

15:16:56    9         A.    Yes.

15:17:06   10         Q.    And was your entire expert opinion excluded?

15:17:09   11         A.    No.

15:17:09   12         Q.    What part of it was?

15:17:11   13         A.    A very small fraction.

15:17:12   14         Q.    Okay.

15:17:12   15         A.    One opinion.

15:17:13   16         Q.    Was there an opinion issued by the court as

15:17:16   17    to why it was excluded?

15:17:17   18         A.    Yes.

15:17:17   19         Q.    Okay.  What was the reasoning; do you

15:17:19   20    recall?

15:17:19   21         A.    No.

15:17:20   22         Q.    Okay.  And this was back in 2014?

15:17:24   23         A.    The decision came out perhaps a month ago.

15:17:27   24         Q.    Okay.  And you said United States Eighth

15:17:31   25    District Court?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

217

15:17:38   1      A.   I'm an engineer, so perhaps I got the court

15:17:40   2   wrong.

15:17:41   3      Q.   Okay.

15:17:41   4      A.   But that's the best of my --

15:17:44   5      Q.   Was the case originally in Minnesota, like

15:17:49   6   -- or was it in a different state?

15:17:51   7           MR. GOSS:  I think he gave you a file

15:17:52   8   number.

15:17:55   9           MR. ASSAAD:  Page 4?

15:17:57  10           MR. GOSS:  I think it's -- the file number

15:17:58  11   is listed right below where it says "United States

15:18:03  12   8th District Court, Minnesota."

15:18:10  13           MR. ASSAAD:  Okay.

15:18:16  14      Q.   Was that also in front of Judge Ericksen?

15:18:19  15      A.   Well the -- I don't know who it's in front

15:18:22  16   of.

15:18:32  17           MR. GOSS:  That's Janie S. Mayeron.

15:18:37  18           MR. ASSAAD:  Huh?

15:18:37  19           MS. ZIMMERMAN:  That's a Magistrate.  Janie

15:18:39  20   S. Mayeron.

15:18:39  21           MR. GOSS:  "JSM" is Janie S. Mayeron.

15:18:41  22           MR. ASSAAD:  Okay.

15:18:43  23   BY MR. ASSAAD:

15:18:43  24      Q.   So Judge Ericksen limited your expert

15:18:46  25   opinion?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

218

15:18:47   1          MR. GOSS:  Objection, lack of foundation.

15:18:50   2      A.   What I know is -- I don't know which judge

15:18:53   3   or which court limited it.  The extent of my knowledge

15:18:58   4   is indicated by this court file number.  I don't know

15:19:00   5   who it was.

15:19:01   6      Q.   Okay.  Now 3M's a pretty big company;

15:19:07   7   correct?

15:19:09   8      A.   I believe that's true.

15:19:10   9      Q.   Worth more than a billion dollars?

15:19:13  10      A.   I believe that's true.

15:19:15  11      Q.   So if they wanted to they could have spent

15:19:21  12   more money and created a very detailed model, CFD

15:19:27  13   model if they wanted to, and paid you for it; correct?

15:19:30  14          MR. GOSS:  Object to form.

15:19:31  15      A.   Yes.

15:19:38  16      Q.   Okay.  I mean, for example, there was

15:19:40  17   nothing preventing you from adding surgeons and staff

15:19:45  18   in your model; correct?

15:19:47  19      A.   Correct.

15:19:48  20      Q.   Except time and money; correct?

15:19:51  21      A.   Incorrect.

15:19:53  22      Q.   Okay.  So you could have added people;

15:19:55  23   correct?

15:19:56  24      A.   Correct.

15:19:57  25      Q.   You could have given properties to the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

219

15:19:59    1    materials; correct?

15:20:01    2         A.    That is correct.

15:20:02    3         Q.    Okay.  You could have had a --

15:20:04    4               You could have done particle testing, or

15:20:08    5    added particles; correct?

15:20:09    6         A.    Correct.

15:20:10    7         Q.    You could have put skin squames like Dr.

15:20:12    8    Elghobashi and Farhad Memarzadeh did in their studies?

15:20:18    9         A.    They did not put skin squames in, --

            10         Q.    They --

15:20:20   11         A.    -- but I could have done particle tracking.

15:20:22   12         Q.    You're right, they did not put skin squames.

15:20:24   13    They calculated the aerodynamic diameter of the skin

15:20:28   14    squames and placed those in their studies; correct?

15:20:33   15         A.    Incorrect.

15:20:33   16         Q.    They didn't calculate the aerodynamic

15:20:34   17    diameter?

15:20:34   18         A.    They related skin squa -- skin squames to

15:20:38   19    spheres whose diameter gave the same settling

15:20:43   20    velocity.  That's not the same as aerodynamics.

15:20:46   21         Q.    Okay.  But they both did the same thing.

15:20:48   22         A.    I know that's what Said Elghobashi did.  I

15:20:52   23    don't recall, sitting here, what Memarzadeh did.

15:20:54   24         Q.    Did you read Farhad Memarzadeh's report on

15:20:58   25    the use of a Bair Hugger in a operating room?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

220

15:21:02  1       A.   I read multiple papers of his, so I'm

15:21:06  2  certain I read...

15:21:08  3            He's done more than one.

15:21:10  4       Q.   Okay.  Did you read the one that dealt with

15:21:13  5  the Bair Hugger 505 and its effect on the laminar

15:21:16  6  system and where skin squames that were represented as

15:21:20  7  spheres would go?

15:21:22  8       A.   I believe I did read that.

15:21:23  9       Q.   Okay.  And do you recall reading that he

15:21:27 10  indicated that the Bair Hugger 505 slightly disrupted

15:21:34 11  the laminar flow?

15:21:36 12       A.   I do not recall reading that.

15:21:38 13       Q.   Would you agree with that if he said that?

15:21:42 14       A.   It depends on what you mean by "disrupt."  I

15:21:45 15  know that Memarzadeh's work has shown that for -- that

15:21:50 16  warming devices create a thermal plume, and in fact I

15:21:56 17  think the body heat of the patient create a thermal

15:21:59 18  plume that protects the surgical site, so I recall

15:22:02 19  that.

15:22:04 20            Anyone who's done an analysis has to admit

15:22:07 21  that everything in the room affects the flow.  So no

15:22:11 22  one can say it has no effect.

15:22:12 23       Q.   So everything in the room affects the flow.

15:22:15 24  Is that what you're saying?

15:22:17 25       A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

221

15:22:17  1      Q.   So people affect the flow; correct?

15:22:18  2      A.   That is correct.

15:22:19  3      Q.   Okay.  Actually a -- a Bair Hugger device

15:22:26  4  that's sitting on the floor that sucks up air is going

15:22:29  5  to affect the flow; correct?

15:22:31  6      A.   That is correct.

15:22:31  7      Q.   Okay.  And in fact you did not even put the

15:22:33  8  Bair Hugger device in your model; correct?

15:22:35  9      A.   That is correct.

15:22:36  10     Q.   Okay.  The fact that heat might be causing

15:22:41  11  thermal plumes through, you know, the Bair Hugger

15:22:44  12  heating the blankets through conduction which create a

15:22:47  13  thermal plume is going to affect the flow; correct?

15:22:51  14     A.   Correct.

15:22:51  15     Q.   Okay.  But none of those things you decide

15:22:54  16  to put into your model because you thought they would

15:22:57  17  be insignificant; correct?  With what you're trying to

15:23:00  18  determine.

15:23:02  19     A.   Correct.

15:23:03  20     Q.   And that was your judgment call; correct?

15:23:05  21     A.   Yes.

15:23:06  22     Q.   And other people in the scientific community

15:23:08  23  may disagree with you on that; correct?

15:23:10  24     A.   Yes.

15:23:43  25     Q.   Sitting here today I cannot determine, or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

222

15:23:46   1   anyone on my team, or my consultants, whether or not

15:23:49   2   the equations that you used are the appropriate

15:23:53   3   equations for the model because you did not inform me

15:23:57   4   what the equations are; correct?

15:23:58   5        MR. GOSS:  Well objection, lack of

15:24:01   6   foundation as to what you would know or be able to

15:24:02   7   do.

15:24:05   8        A.   You know that I used the LES method.  The

15:24:09   9   equations -- If you need to see the equations written

15:24:12  10   down they would be contained within the ANSYS theory

15:24:15  11   manual.  So yes, sitting here today you could.

15:24:20  12        Q.   Okay.  You agree with that ANSYS is not

15:24:24  13   verified for every single type of physics; correct?

15:24:30  14        A.   I don't understand your question.

15:24:32  15        Q.   Well "verified" applies to the mathematics

15:24:35  16   and "validation" applies to the physics.  Do you

15:24:38  17   understand that?

15:24:39  18        Have you ever heard that before?

15:24:40  19        A.   I've heard it in a different -- slightly

15:24:42  20   different phrasing, but essentially yes.

15:24:47  21        Q.   Okay.  Let me ask you this.  Well, strike

15:24:59  22   that.

15:25:00  23        Did you -- I might have asked this.  Did you

15:25:01  24   put the initial conditions in your manuscript?

15:25:04  25        A.   No.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

223

15:25:04   1        Q.   Okay.  For either the 505 or the 750?

15:25:10   2        A.   Correct.

15:25:12   3        Q.   Is that common practice with respect to

15:25:15   4   people in the CFD community when submitting a

15:25:19   5   peer-review paper on a model not to put the input

15:25:25   6   conditions?

15:25:27   7        A.   When you say "manuscript," are you talking

15:25:29   8   about the manuscript that's my expert report?

15:25:34   9        Q.   No.  Your expert report's your expert

15:25:36  10   report.  Your manuscript is what's been submitted for

15:25:38  11   publication.

15:25:39  12        A.   Thank you for clarifying.

15:25:41  13             In the manuscript for publication I show --

15:25:44  14   I show quasi-steady results have been achieved by

15:25:47  15   comparing two results at different times, and that is

15:25:51  16   sufficient, in my mind, for a peer-reviewed

15:25:57  17   publication.

15:26:05  18        Q.   Okay.  Would you consider the Reynolds

15:26:19  19   number --

15:26:19  20             Let me ask you this.  Is the Reynolds number

15:26:22  21   related to computational time in LES?

15:26:42  22        A.   Yes.

15:26:43  23        Q.   Okay.  So the higher the Reynolds number is,

15:26:46  24   the longer the computational time may be; correct?

15:26:52  25   It's Reynolds cubed is the -- the -- CFD that you guys

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

224

15:26:59   1   use to determine the relative compu --

15:27:01   2          (Interruption by the reporter.)

15:27:02   3      Q.   -- Reynolds cubed to determine the relative

15:27:03   4   computational time it takes -- or how much

15:27:05   5   computational time is needed to solve an LES problem.

15:27:08   6   Do you agree?

15:27:09   7      A.   I don't know that.

15:27:10   8      Q.   Okay.  Do you agree that the most difficult

15:27:22   9   calculations in computational fluid dynamics is the

15:27:31   10  area where there's a transition between laminar and

15:27:35   11  turbulent?

15:27:40   12     A.   I would agree that that is a very difficult

15:27:42   13  calculation in computational fluid dynamics.

15:27:44   14     Q.   Do you know whether or not ANSYS is able to

15:27:46   15  calculate those transition -- those -- those

15:27:48   16  transition areas?

15:27:49   17     A.   Yes.

15:27:50   18     Q.   It can?

15:27:50   19     A.   Yes.

15:27:51   20     Q.   Okay.  The Boussinesq approximation, what is

15:27:58   21  its -- what is its underlying assumption?

15:28:02   22     A.   The underlying assumption behind the

15:28:05   23  Boussinesq approximation is that you relate density

15:28:09   24  changes, which are the cause of buoyancy, to

15:28:12   25  temperature changes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

225

15:28:16   1      Q.   So you would agree with me that in the

15:28:19   2   Boussinesq approximation it disregards density for

15:28:22   3   every variable except for gravity; correct?

15:28:25   4      A.   Incorrect.

15:28:28   5      Q.   So what's your definition again?

15:28:30   6      A.   The Boussinesq model represents density

15:28:34   7   variations through variations in temperature.

15:28:52   8      Q.   You sure about that?

15:28:54   9      A.   Yes.

15:30:06   10      Q.   So what variables does density affect in the

15:30:12   11   Boussinesq model?

15:30:15   12      A.   Your question is not well posed.

15:30:18   13           Let me say this.  When people use the

15:30:21   14   Boussinesq model they're relating density variation in

15:30:24   15   a fluid in the buoyancy term, to temperature

15:30:30   16   variation.

15:30:38   17      Q.   Do you agree that the Boussinesq

15:30:46   18   approximation, which came out in 1903, suggested that

15:30:49   19   density changes in the fluid can be neglected except

15:30:52   20   where mu is multiplied by G, which is gravity, or

15:30:57   21   density is multiplied by G, which is gravity.

15:30:59   22      A.   Can you say that again?

15:31:01   23      Q.   Do you agree that Boussinesq came out in

15:31:05   24   1903.  Are you -- Are you familiar with that?

15:31:07   25      A.   I don't know the year it came out.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

226

15:31:09    1        Q.    Okay.   Suggested that density changes in the

15:31:11    2    fluid can be neglected except where density is re --

15:31:15    3    is multiplied by gravity.   So it only applies to the

15:31:19    4    gravity term.

15:31:21    5        A.    That's what I said in my answer.

15:31:23    6        Q.    Okay.   So you agree with me that density is

15:31:25    7    a constant except for with relation to gravity.

15:31:31    8        A.    In the model that I used density was treated

15:31:33    9    as a constant with the exception of the term for

15:31:37   10    buoyancy, the density variations in buoyancy.

15:31:41   11        Q.    Okay.

15:31:41   12        A.    I would agree with that.

15:31:46   13        Q.    And you agree with me that the most common

15:31:49   14    areas that Boussinesq has been used is in natural

15:31:53   15    convection equations.

15:31:55   16        A.    I don't know if that's a fact, but that

15:31:58   17    would not surprise me.   I believe that's true.

15:32:00   18        Q.    And when you have a high Delta T temperature

15:32:05   19    difference, that the Boussinesq approximation may

15:32:07   20    fail.

15:32:08   21        A.    That is correct.

15:32:09   22        Q.    What would you consider a high temperature

15:32:11   23    difference?

15:32:12   24        A.    That's a very good question.

15:32:14   25             In 2003 I did a study on the applicability

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

227

15:32:18   1   of the Boussinesq model and we compared it to the

15:32:21   2   ideal gas model, and we used a situation where the

15:32:24   3   temperature difference was 150 degrees Celsius.  We

15:32:28   4   found that in that case the Boussinesq model did an

15:32:31   5   excellent job of calculating the flow in an enclosure

15:32:35   6   in a room.

15:32:36   7       Q.    Airflow or particle flow?

15:32:38   8       A.    Airflow.

15:32:38   9       Q.    What about with respect to particle flow?

15:32:42   10      A.    In my simulations I used airflow as a

15:32:46   11  surrogate for particles because it's a worst-case

15:32:49   12  scenario.  I did not -- As I stated already, I did not

15:32:53   13  model particles.

15:32:54   14      Q.    So you assumed that airflow was the

15:32:56   15  worst-case scenario as compared to particle flow?

15:32:59   16      A.    Yes.

15:33:00   17      Q.    And your basis behind that assumption?

15:33:03   18      A.    Simple.  Particles have a mass that is

15:33:08   19  higher than their surrounding air, so particles like

15:33:11   20  to settle out of the air.  And in fact Said Elghobashi

15:33:15   21  found his equivalent diameter by using the settling

15:33:19   22  diameter.  Particles like to fall out of the flow.

15:33:22   23  Furthermore, particles have inertia.  Multiple experts

15:33:25   24  have already testified to this fact.  Particles have

15:33:28   25  inertia, and they find it hard to follow curved

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

228

15:33:32  1  streamlines, and that tends to bring particles out of

15:33:35  2  the flow.

15:33:35  3        So for those two reasons I decided to use

15:33:39  4  the worst-case scenario, which is air.  I tracked air

15:33:42  5  particles which have no gravity term and no inertia

15:33:46  6  term.  So in that respect it's a worst-case

15:33:49  7  calculation.

15:33:52  8     Q.  Well, I disagree with you mathematically and

15:33:55  9  as a worst-case scenario, and I'm going to tell you

15:33:58  10 why.

15:33:58  11       You don't think turbulence causes the spread

15:34:00  12 of particles?

15:34:03  13    A.  I think turbulence does cause the spread of

15:34:04  14 particles.

15:34:05  15    Q.  And don't you think that temperature

15:34:06  16 differences affect the turbulence intensity?

15:34:10  17    A.  And in fact I included that in my analysis.

15:34:13  18    Q.  So you agree with me they do; correct?

15:34:15  19    A.  I agree that temperature affects turbulence.

15:34:18  20    Q.  Okay.  And the fact that particles don't

15:34:20  21 follow streamlines is that they may -- they may act

15:34:25  22 with -- they may follow velocity vectors caused by

15:34:30  23 turbulence; correct?

15:34:41  24    A.  I'm not struggling because I can't answer

15:34:43  25 it, I'm struggling to interpret your question and to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

229

15:34:45   1   figure out a way to artfully answer.

15:34:48   2              Turbulence affects particles, and in fact

15:34:54   3   particles can affect turbulence.  Particles have

15:34:58   4   inertia, and when a particle gets caught in an eddy it

15:35:02   5   likes -- it has a tendency to leave that eddy.

15:35:06   6              So if you look at the simulations that I

15:35:07   7   have where the flow goes down, curves against the

15:35:11   8   ground and then curves against the wall, particles

15:35:14   9   would have a tendency to leave the flow at that

15:35:16   10  instant and land on the ground and the wall and

15:35:19   11  surfaces, and in fact that's why we dust.  We dust, if

15:35:24   12  we're cleaning our house, because particles collect on

15:35:27   13  a table.  But there's not air particles collecting on

15:35:30   14  this table, there's particles in -- in the air.

15:35:34   15             By giving -- I essentially gave my particles

15:35:36   16  a zero mass so they had no weight, and zero inertia so

15:35:43   17  that they would perfectly follow the flow.  And

15:35:46   18  whether that flow was turbulent or not they follow the

15:35:49   19  flow.  That's why it's a worst-case scenario.

15:35:51   20       Q.   Well I think you just misspoke, sir, because

15:35:53   21  you didn't use particles in your analysis; correct?

15:35:55   22       A.   I did not misspeak.

15:35:57   23       Q.   Well you did, because you said I gave my

15:35:59   24  particles no inertia and no mass, but you did not use

15:36:02   25  particles in your CFD; isn't that correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

230

15:36:05   1       A.   Actually the particles I used were air

15:36:07   2    particles.  I tracked air.  So we can talk about

15:36:10   3    particles, essentially I used oxygen and nitrogen

15:36:14   4    molecules.  I followed the air, not a solid,

15:36:19   5    inertia-filled particle through the air.

15:36:21   6       Q.   So you do not insert particles that have a

15:36:23   7    mass into your system; correct?

15:36:25   8       A.   That is correct.

15:36:26   9       Q.   Okay.  And you agree that the reason why

15:36:32  10    there are particle models is because people in the

15:36:36  11    scientific community understand that particles do --

15:36:41  12    always don't react or follow airstreams; correct?

15:36:44  13       A.   That's correct.

15:36:45  14       Q.   Okay.

15:36:46  15       A.   In fact I've done particle modeling in the

15:36:48  16    peer review --

15:36:51  17       Q.   I know what you've done.  I'm -- Just answer

15:36:51  18    my questions, please.

15:36:52  19       A.   Okay.

15:36:52  20       Q.   So the fact that --

15:36:53  21            I mean, turbulence has a significant effect

15:36:57  22    on particle flow; don't you agree?

15:36:59  23            MR. GOSS:  That's asked and answered, but

15:37:00  24    if you have more to say, please go ahead.

15:37:04  25       A.   They may, and they may not.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

231

15:37:08    1        Q.    But you don't know until you model it;

15:37:10    2    correct?

15:37:12    3        A.    That is not true.

15:37:14    4        Q.    Okay.  Are there any turbulent areas in the

15:37:19    5    operating room that would be significant with respect

15:37:21    6    to whether or not particles could actually cause harm

15:37:29    7    to a patient?

15:37:33    8        A.    Could you restate that question?

15:37:34    9        Q.    That's a bad question.

15:37:35   10              Are there -- Are there any areas that there

15:37:38   11    exist significant turbulence in the operating room

15:37:43   12    model that would have an effect on particles that

15:37:47   13    would indicate to you that the particles would not

15:37:49   14    follow streamlines?

15:37:56   15        A.    That's still a confusing question, but I'm

15:37:58   16    going to give an answer.  I modeled turbulence.  I

15:38:05   17    modeled particles that had the characteristics of air.

15:38:11   18    Insofar as there's turbulent motion in the air, those

15:38:16   19    carry the air.  So whether we're talking about a

15:38:20   20    particle or not, turbulence -- whether we're talking

15:38:23   21    about a solid particle or whether we're talking about

15:38:25   22    air, the motion is affected by the turbulence and I

15:38:29   23    included that in my model.

15:38:36   24        Q.    What was the turbulent intensity --

15:38:39   25              If I ask you what the turbulent intensity

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

232

15:38:41   1   was underneath the operating room table could you tell

15:38:44   2   me what that is in your model?

15:38:45   3        A.   I could, and I don't have that information

15:38:47   4   here with me.

15:38:47   5        Q.   Okay.  How would you do it?  What would you

15:38:50   6   look at?

15:38:51   7        A.   I would either calc -- I would either have

15:38:57   8   the software extract the turbulence intensity, or I

15:39:00   9   would look at a surrogate like the eddy viscosity.

15:39:04   10        Q.   Can ANSYS CFX determine turbulence

15:39:08   11   intensity?  Is there actually a function to do that?

15:39:11   12        A.   I believe there is, and if not you can do it

15:39:13   13   through other -- other parameters that it calculates.

15:39:16   14        Q.   The eddy viscosity.

15:39:18   15        A.   Yes.

15:39:19   16        Q.   Okay.

15:39:20   17        A.   In fact all you need is the fluctuating

15:39:24   18   component of the velocities and the average

15:39:27   19   velocities.

15:39:27   20        Q.   Okay.  In your manuscript did you indicate,

15:39:45   21   with respect to the 750, why -- or what data that you

15:39:49   22   used to show that it was a quasi-steady solution?

15:39:54   23        A.   In my manuscript I compared two sets of

15:39:56   24   results that differed substantially in time step and

15:40:00   25   showed that they were immaterially different.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

233

15:40:03    1        Q.    For the 750 or the 505?

15:40:05    2        A.    750.

15:40:06    3        Q.    Okay.  And that would be the 264 and the 300

15:40:10    4    something?

15:40:12    5        A.    No.  I think they were further apart than

15:40:14    6    that.

15:40:25    7        Q.    All right.  Did you provide those data files

15:40:30    8    to counsel?

15:40:34    9        A.    I don't know if I did.  The data files for

15:40:37   10    the journal paper?  I don't recall.

15:41:02   11        Q.    And you didn't cite your reasoning or your

15:41:07   12    data to support that you reviewed the results to get a

15:41:14   13    quasi-steady solution with respect to the expert

15:41:18   14    report; correct?

15:41:22   15        A.    Could you ask that again?

15:41:23   16        Q.    In your expert report you did not provide

15:41:24   17    that information of the data points that you looked at

15:41:28   18    for you -- for your determination that the solution

15:41:32   19    that you provided was a quasi-steady solution.

15:41:40   20        A.    No, that's not quite true.  On page 9 I

15:41:44   21    actually say that images from Figures 3 through 8

15:41:47   22    could be replicated at other instan -- time instances

15:41:51   23    and the same conclusions would be drawn.

15:41:53   24        Q.    I understand that.

15:41:54   25              But it's a judgment call by you whether or

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

234

15:41:56    1   not you had a quasi-steady solution; correct?

15:41:58    2       A.   Correct.

15:41:59    3       Q.   And I might look at it, or my expert might

15:42:02    4   look at it and disagree with you; correct?

15:42:04    5       A.   That's -- That's possible.

15:42:05    6       Q.   Okay.  And they can't do that because you

15:42:08    7   did not provide that data in your expert report;

15:42:09    8   correct?

15:42:11    9            MR. GOSS:  Object to form, --

           10       A.   They --

15:42:11   11            MR. GOSS:  -- calls for speculation.

15:42:19   12       Q.   The only way I could determine whether or

15:42:21   13   not you have a quasi-steady solution is to look at two

15:42:25   14   -- at least two TRN files; correct?

15:42:27   15       A.   Correct.

15:42:28   16       Q.   I only have one TRN file.  You understand

15:42:30   17   that; correct?

15:42:31   18       A.   Yes.

15:42:31   19       Q.   And you did not -- you only plotted

15:42:34   20   solutions for one TRN file in your -- in your expert

15:42:37   21   report; correct?

15:42:37   22       A.   That is correct.

15:42:38   23       Q.   Okay.  So sitting here today I don't have --

15:42:42   24   no one in the world has any information to make their

15:42:47   25   own judgment call whether or not the two solutions are

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

235

15:42:51   1   close enough to make the judgment -- judgment that

15:42:54   2   it's a quasi-steady solution; correct?

15:42:58   3        A.   From the data --

15:42:59   4             From the single TRN file that I provided,

15:43:01   5   correct.

15:43:02   6        Q.   Okay.  And nothing in the report.

15:43:04   7        A.   Well I stated it in the report.

15:43:06   8        Q.   That's your opinion.

15:43:07   9             But I'm saying for someone to ascertain and

15:43:10  10   make a determination of whether or not your judgment

15:43:13  11   is correct, no one could do that right now based on

15:43:16  12   the expert report; correct?

15:43:18  13             MR. GOSS:  Argumentative, asked and

15:43:19  14   answered.

15:43:19  15        A.   Correct.

15:43:20  16        Q.   Okay.  Just out of curiosity, when you ran

15:44:26  17   the model with 8.1 million cells that you said took

15:44:30  18   roughly 40 days, was that the only program that was

15:44:36  19   running on that machine?

15:44:38  20        A.   I don't know.

15:44:39  21        Q.   Okay.  Does anyone else have access to that

15:44:43  22   machine that you used?

15:44:44  23        A.   Yes.

15:44:45  24        Q.   Okay.  Is it a single desktop computer or

15:44:50  25   does it use, like, a combination of computers to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

236

15:44:53  1  solve?

15:44:54  2       A.   Single desktop.

15:44:57  3       Q.   Why didn't you use the Minnesota

15:44:58  4  supercomputer?

15:45:01  5       A.   I have enough computer power with me, and

15:45:05  6  there was no reason to use the Minnesota

15:45:09  7  supercomputer.

15:45:09  8       Q.   Well you could have --

15:45:09  9            I mean that supercomputer has I think 16,000

15:45:12  10 cores.  Does that sound about right?

15:45:15  11      A.   I don't know how many cores it has, but

15:45:18  12 there is an inconvenience of queuing your jobs, and

15:45:22  13 I'm not -- and I wasn't willing to be subject to that

15:45:26  14 inconvenience.

15:45:27  15      Q.   So you'd rather wait 40 days?

15:45:29  16      A.   Yeah.

15:45:53  17      Q.   Do you know who Lagrange is?

15:45:55  18      A.   Yes.

15:45:56  19      Q.   Do you know who Euler is?

15:45:56  20      A.   Yes.

15:45:57  21      Q.   Their equations were not used in your CFD

15:46:00  22 analysis; correct?

15:46:01  23      A.   Incorrect.

15:46:02  24      Q.   In what way were they used?

15:46:05  25      A.   Well the Euler method, E-U-L-E-R, is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

237

15:46:09   1   generally re -- Let me back up.

15:46:11   2           In an overview, Lagrange means you follow

15:46:18   3   the fluid or particle.  The Euler method means that

15:46:23   4   you calculate the flow by sitting in a single place in

15:46:26   5   time and watching things go by you.  So one has a

15:46:30   6   moving perspective reference frame and the other one

15:46:33   7   doesn't.

15:46:35   8           The CFD used to calculate the airflow is

15:46:38   9   Eulerian, E-U-L-E-R-I-A-N.  Now it turns out that

15:46:44   10  these two ideas can be applied to particle tracking;

15:46:48   11  Lagrange particle tracking and Euler particle

15:46:53   12  tracking.  And with respect to particle tracking I did

15:46:56   13  not -- not use either of them.

15:47:00   14      Q.   Do you agree that current -- that ANSYS CFX

15:47:04   15  has limited capabilities for Lagrangian simulation?

15:47:11   16      A.   I don't know that to be true.

15:47:13   17      Q.   So you don't know one way or the other;

15:47:15   18  correct?

15:47:16   19      A.   Well, I mean, every software has limited

15:47:19   20  capabilities, so I don't know the context of what

15:47:22   21  you're --

15:47:23   22      Q.   And you don't know the code that's used

15:47:26   23  behind the black box of ANSYS; correct?

15:47:28   24      A.   That's incorrect.

15:47:29   25      Q.   Do you know the code?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

238

15:47:29  1      A.   I could actually write the code.

15:47:31  2      Q.   Okay.  But do you know the code?

15:47:36  3      A.   What do you mean by "know the code"?

15:47:38  4      Q.   Do you know the software or the code behind

15:47:40  5  ANSYS?

15:47:42  6      A.   I would say this.

15:47:42  7           MR. GOSS:  Asked and answered.  Go ahead.

15:47:44  8      A.   I would say this.  I know the equations that

15:47:46  9  go in.  I know the equations that ANSYS relies upon.

15:47:52  10      Q.   I understand that.  But everyone knows the

15:47:54  11  equations.  Everyone knows Navier-Stokes; correct?

15:47:58  12           MR. GOSS:  I don't.

15:48:00  13      A.   Incorrect.

15:48:00  14      Q.   Well people that are doing CFD, like

15:48:03  15  professors such as yourself should know the

15:48:05  16  Navier-Stokes equations; correct?

15:48:08  17      A.   That is correct.

15:48:08  18      Q.   Okay.  And the people that are writing the

15:48:10  19  programs should know the Navier-Stokes equation;

15:48:13  20  correct?

15:48:14  21      A.   Correct.

15:48:15  22      Q.   But some codes are verified because the

15:48:19  23  mathematics work out, and other codes that use -- that

15:48:22  24  try to solve for the Navier-Stokes equation are not

15:48:25  25  verified.  Do you agree with that?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

239

15:48:31  1      A.   I disagree.

15:48:33  2      Q.   Okay.

15:48:33  3      A.   I would have to understand more about the

15:48:35  4  hypothetical that you're --

          5      Q.   Well --

15:48:37  6      A.   -- suggesting.

15:48:40  7      Q.   -- I could write a code that solves for the

15:48:42  8  Navier-Stokes equations and I get wrong mathematical

15:48:47  9  results and therefore my code is not verified even

15:48:49  10 though I could write down the Navier-Stokes equations;

15:48:51  11 correct?

15:48:52  12     A.   I agree.

15:48:53  13     Q.   Okay.  So a code needs to be verified;

15:48:55  14 correct?

15:48:56  15     A.   I agree.

15:48:57  16     Q.   Okay.  So the code is more than just the

15:49:03  17 equation, it's actually the code is what they use --

15:49:06  18 do to solve the equation; correct?

15:49:10  19     A.   In this context "code" usually refers to the

15:49:15  20 numerical algorithm that's used to solve the

15:49:18  21 Navier-Stokes equations.

15:49:19  22     Q.   So the mere fact that I know the equation

15:49:21  23 doesn't mean I have the correct algorithm to solve the

15:49:24  24 equation accurately; correct?

15:49:26  25     A.   I agree --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

240

| | | |
|---|---|---|
| 15:49:26 | 1 | Q.   Okay. |
| 15:49:27 | 2 | A.   -- with that statement. |
| 15:49:28 | 3 | Q.   So the mere fact that you know the equations |
| 15:49:31 | 4 | that ANSYS used, you don't know the code or the |
| 15:49:34 | 5 | algorithm they used to solve the equation. |
| 15:49:37 | 6 | A.   Incorrect. |
| 15:49:38 | 7 | Q.   You do? |
| 15:49:39 | 8 | A.   Well you have to be careful here because |
| 15:49:42 | 9 | there's many equations and many algorithms.  It's not |
| 15:49:45 | 10 | as though there's a single algorithm for ANSYS. |
| 15:49:47 | 11 |      For example, there is an algorithm on how to |
| 15:49:49 | 12 | solve the mass equation over each element.  There's an |
| 15:49:53 | 13 | algorithm on how to solve the momentum equation. |
| 15:49:56 | 14 | There's an algorithm on how to evaluate the density |
| 15:50:00 | 15 | variation in a -- in a natural convection flow. |
| 15:50:02 | 16 |      So there are many, many algorithms.  It's |
| 15:50:04 | 17 | not as though there's a single algorithm for a code. |
| 15:50:14 | 18 | Q.   Have you actually looked behind the software |
| 15:50:19 | 19 | and -- and the actual code that the programmers use |
| 15:50:23 | 20 | for ANSYS CFX? |
| 15:50:25 | 21 | A.   In fact -- |
| 15:50:25 | 22 | Q.   It's a simple yes-or-no answer. |
| 15:50:28 | 23 |      Have you looked at it?  That's all I need to |
| 15:50:30 | 24 | know. |
| 15:50:31 | 25 |      MR. GOSS:  You can go ahead and answer. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

241

| | | |
|---|---|---|
| 15:50:32 | 1 | A.   In fact I've modified the code that they |
| 15:50:34 | 2 | use. |
| 15:50:34 | 3 | Q.   So you looked at it. |
| 15:50:35 | 4 | A.   I have looked at the code. |
| 15:50:37 | 5 | Q.   Okay.  That's all I need to know. |
| 15:50:45 | 6 | How would you define "natural convection"? |
| 15:50:48 | 7 | A.   Natural convection is the process -- |
| 15:50:51 | 8 | Well colloquially hot air rises or heat |
| 15:50:57 | 9 | rises, but more exactly it's the process of fluid, |
| 15:51:00 | 10 | when it warms up -- and when I say "fluid" I mean a |
| 15:51:03 | 11 | gas or a liquid -- when it warms up it wants to |
| 15:51:06 | 12 | expand, and when it expands it's less dense so it |
| 15:51:09 | 13 | wants to rise.  Think of a hot air balloon would be |
| 15:51:12 | 14 | natural convection. |
| 15:51:12 | 15 | Q.   Do you agree with me that the density |
| 15:51:15 | 16 | between 41 degrees Celsius and the density of 59 |
| 15:51:21 | 17 | degrees Celsius of air is different? |
| 15:51:22 | 18 | A.   I would agree. |
| 15:51:23 | 19 | Q.   Okay.  And you agree with me that the |
| 15:51:32 | 20 | Boussinesq approximation does not take that difference |
| 15:51:34 | 21 | in density except for the gravity term; correct? |
| 15:51:40 | 22 | A.   Incorrect.  The Bou -- The dens -- The |
| 15:51:43 | 23 | buoyancy term is also in the turbulence production, |
| 15:51:46 | 24 | but it does not -- the density variation does not |
| 15:51:50 | 25 | appear in the other terms of the Navier-Stokes |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

242

15:51:53    1   equations.  I think that's what you're trying to get

15:51:55    2   at.

15:51:55    3        Q.   So you think it's part of the turbulence

15:51:58    4   equations?

15:51:59    5        A.   The Boussinesq model, my recollection is

15:52:04    6   that it includes density variations -- I'd have to go

15:52:08    7   back and look.

15:52:09    8            The Boussinesq model relates density

15:52:12    9   variations in the buoyancy term to temperature

15:52:15   10   variations, period.

15:52:20   11        Q.   Do you recall what your -- Does ANSYS CFX --

15:52:29   12   Strike that.

15:52:29   13            Does ANSYS CFX require you to give a

15:52:38   14   temperature for -- a reference temperature for

15:52:41   15   Boussinesq?

15:52:42   16        A.   Yes.

15:52:42   17        Q.   So what did you use?

15:52:44   18        A.   25 Celsius.

15:52:46   19        Q.   "25 Celsius"?

15:52:47   20            Why'd you use 25 Celsius?

15:52:49   21        A.   It's a good midpoint between 15 and 43.

15:52:54   22        Q.   So 25 Celsius, what's that in Fahrenheit?

15:53:10   23            MR. GOSS:  I'm going to guess 74 degrees.

           24            [Calculating.]

15:53:18   25        Q.   77 degrees.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

243

15:53:20   1            So that's what you used is 77?

15:53:22   2       A.   That's what I recall.

15:53:25   3       Q.   Okay.  You know, why'd you use seven --

15:53:27   4            As a midpoint, you said?

15:53:29   5       A.   Well it's not the exact midpoint, but it's

15:53:31   6    between the two.

15:53:32   7       Q.   And why would you use -- why would you want

15:53:34   8    to use the midpoint?

15:53:37   9       A.   I've done work on -- peer-reviewed published

15:53:40  10    work on the Boussinesq model, and what we showed is

15:53:43  11    that when -- even for temperature variations in a room

15:53:46  12    of 150 Celsius, that if you use a temperature at or

15:53:52  13    near the midpoint you'll get very accurate results.

15:53:55  14       Q.   Would it --

15:53:56  15            Just so I understand, is -- is the

15:54:00  16    temperature used in the Boussinesq, would that be

15:54:02  17    equivalent to the buoyancy reference temperature?

15:54:05  18       A.   It is my --

15:54:06  19            I believe it is, --

15:54:06  20       Q.   Okay.

15:54:07  21       A.   -- but I'd have to check the manual.

15:54:09  22       Q.   Okay.  And how would that affect the

15:54:10  23    calculations?

15:54:14  24       A.   It affects the calculations in a couple

15:54:16  25    ways.  First of all, it mean -- as you pointed out

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

244

15:54:21   1    earlier, warmer air is less dense than cooler air.  So

15:54:28   2    the air coming out of the Bair Hugger blanket, which I

15:54:33   3    used as 41, is less dense than air coming out of the

15:54:38   4    ceiling.  By using a reference temperature that is

15:54:43   5    between the two what I did is I made a worst-case

15:54:48   6    scenario in that the density of air coming out of the

15:54:50   7    Bair Hugger was higher than it actually is in real

15:54:53   8    life and the density of the air coming out of the

15:54:57   9    ceiling is lower.  And what that means is I gave the

15:55:01   10   Bair Hugger air more momentum.

15:55:03   11           So, for example, let's think of this as a

15:55:07   12   car and a train having a collision.  The momentum

15:55:11   13   coming out of the ceiling is 60 times that of the Bair

15:55:17   14   Hugger, so it's like a train hitting a car, train

15:55:20   15   hitting a sedan, let's say.  By using the Boussinesq

15:55:24   16   model I made my sedan a little heavier, I made it an

15:55:28   17   SUV, just to make it a worst-case scenario.

15:55:32   18           Q.   So say you lowered the buoyancy reference

15:55:35   19   temperature to 50, how would that affect your model?

15:55:42   20           MR. GOSS:  50 Fahrenheit?

15:55:43   21           MR. ASSAAD:  50 Fahrenheit.

15:55:47   22           A.   It would make the density of the air in the

15:55:48   23   room higher.

15:55:52   24           Q.   Okay.  You could have used ideal gas instead

15:56:22   25   of Boussinesq; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

245

15:56:23    1        A.    That is correct.

15:56:25    2        Q.    Okay.  And just so I'm absolutely sure, you

15:56:37    3   ran one run as RANS on the 750 and one run as LES;

15:56:43    4   correct?

15:56:44    5        A.    No.

15:56:47    6        Q.    On the 750.

15:56:49    7        A.    All the results here, all the unsteady

15:56:51    8   results were LES.

15:56:53    9        Q.    I understand that, but you ran one run of

15:56:56   10   RANS to get your initial conditions, and then you ran

15:56:59   11   one run of LES.

15:57:01   12        A.    I believe that's true.  I don't recall

15:57:03   13   exactly, but I'm pretty confident that is correct.

15:57:16   14        Q.    Do you agree with me that the ideal gas is

15:57:19   15   more accurate than the Boussinesq?

15:57:23   16        A.    It is more accurate, but it's not a

15:57:25   17   worst-case calculation, which is why I chose

15:57:28   18   Boussinesq.

15:57:37   19        Q.    But it's more accurate; correct?

15:57:40   20        A.    Correct.

15:58:04   21        Q.    Do you agree that Dr. Elghobashi is an

15:58:06   22   expert in particle flow in turbulent air?

15:58:12   23        A.    I would agree he's an expert on spherical

15:58:16   24   particles in perhaps high-speed flows for sure.  I

15:58:21   25   don't know if I'd generally agree he's an expert in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

246

15:58:24  1  particle flow in air.

15:58:26  2       Q.   Would you -- Would you --

15:58:28  3            Would you consider yourself a particle

15:58:29  4  expert in high-speed flows?

15:58:32  5       A.   No.

15:58:33  6       Q.   Would you consider yourself an expert in low

15:58:35  7  -- with particles in low-speed flows?

15:58:38  8       A.   Probably not.

15:58:40  9       Q.   Okay.  Have you ever done any work for the

15:58:46  10  Department of Defense?

15:58:48  11       A.   Via a subcontractor, yes.

15:58:52  12       Q.   What about directly with the Department of

15:58:54  13  Defense?

15:58:54  14       A.   No.

15:58:55  15       Q.   Have you done any work with the -- with any

15:58:58  16  part of the military?

15:59:01  17       A.   No.

15:59:02  18       Q.   Do you have access to the military

15:59:03  19  supercomputer?

15:59:04  20       A.   No.

15:59:05  21       Q.   Do you have access to a computer that could

15:59:07  22  do DNS modeling?

15:59:09  23       A.   Yes.

15:59:10  24       Q.   What computer?

15:59:12  25       A.   The ANSYS model, the ANSYS software has the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

247

15:59:15  1  capability of doing D -- DNS if you set a term in the

15:59:20  2  LES model to zero.  I wouldn't use DNS for this case.

15:59:26  3      Q.  No one could use DNS for this case.

15:59:29  4      A.  I don't know --

15:59:30  5          MR. GOSS:  Wait for a question.

15:59:32  6      Q.  Do you agree with that?

15:59:33  7          Can anyone do DNS for this case?

15:59:36  8      A.  I would have to calculate how many elements

15:59:39  9  would be needed to recor -- to do the calculation, but

15:59:43  10  sitting here now I think it's unlikely someone would

15:59:46  11  do DNS for this.

15:59:48  12     Q.  Do you know --

15:59:51  13         Have you ever done DNS?

15:59:52  14     A.  No.

16:00:03  15     Q.  Do you know what type of computing is

16:00:05  16  required to run DNS?

16:00:09  17     A.  What do you mean by "computing"?

16:00:11  18     Q.  What size computer, how many cores?

16:00:13  19     A.  It depends on the size of the problem and

16:00:16  20  the number of elements.

16:00:19  21     Q.  You agree that DNS is the most accurate form

16:00:23  22  -- method of computational fluid dynamics.

16:00:26  23     A.  It is generally considered the most

16:00:28  24  accurate.

16:00:29  25     Q.  And in fact it's probably more accurate than

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

248

16:00:31    1   experimental measurements.

16:00:33    2       A.   I would disagree with that.

16:00:35    3       Q.   You'd disagree with that?

16:00:36    4       A.   Yes.

16:00:37    5       Q.   Okay.

16:00:54    6            MR. ASSAAD:  Let's take a break.

16:00:55    7            THE REPORTER:  Off the record, please.

16:00:57    8            (Recess taken from 4:00 to 4:13 p.m.)

16:13:42    9   BY MR. ASSAAD:

16:13:59   10       Q.   Are you aware of any peer-reviewed

16:14:04   11   literature that has modeled an operating room?

16:14:11   12       A.   Yes.

16:14:12   13       Q.   Is that the Farhad Memarzadeh literature?

16:14:15   14       A.   That is one.  There may be others that I

16:14:18   15   can't think of, but that's one of them.

16:14:20   16       Q.   And you agree with me that Farhad Memarzadeh

16:14:22   17   used the RANS model; correct?

16:14:24   18       A.   Yes.

16:14:24   19       Q.   Okay.  He didn't use LES; correct?

16:14:26   20       A.   Correct.

16:14:26   21       Q.   And are you aware of any peer-review

16:14:29   22   literature that gave -- that included no solids in

16:14:34   23   their CFD model?

16:14:38   24            MR. GOSS:  Of an operating room, or more

16:14:40   25   generally?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

249

| | | |
|---|---|---|
| 16:14:41 | 1 | Q.   In the operating room. |
| 16:14:41 | 2 | A.   Sitting here now, no. |
| 16:14:44 | 3 | Q.   Well you had no solids; correct? |
| 16:14:45 | 4 | A.   That is correct. |
| 16:14:46 | 5 | Q.   Okay.  Now you agree with me that I could |
| 16:15:31 | 6 | try to run a model and get the same results as you can |
| 16:15:38 | 7 | without having your initial conditions; correct? |
| 16:15:41 | 8 | A.   Yes. |
| 16:15:42 | 9 | Q.   Your opinion is that you don't believe that |
| 16:15:44 | 10 | I need the initial conditions to obtain reproducible |
| 16:15:49 | 11 | results in this model; correct? |
| 16:15:51 | 12 | A.   Correct. |
| 16:15:51 | 13 | Q.   Okay.  However, you would agree with me that |
| 16:15:56 | 14 | for me to verify that you had used the proper initial |
| 16:16:07 | 15 | conditions I would need to know what the initial |
| 16:16:09 | 16 | conditions are; correct? |
| 16:16:12 | 17 | A.   I would disagree that there is such a thing |
| 16:16:14 | 18 | as "proper initial conditions." |
| 16:16:16 | 19 | Q.   For me to verify your initial conditions I |
| 16:16:19 | 20 | would need to know the initial conditions; correct? |
| 16:16:22 | 21 | A.   I would a --  I would agree for you to know |
| 16:16:23 | 22 | my initial conditions you would have to know the |
| 16:16:25 | 23 | initial conditions. |
| 16:16:26 | 24 | Q.   Okay.  And for me to determine whether or |
| 16:16:29 | 25 | not there is quasi-steady solution with respect to |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

250

16:16:36    1    your CFD model, I would have to know the initial

16:16:39    2    conditions.

16:16:44    3         A.    I don't know if that's true.

16:16:50    4         Q.    Well do you know that it's not true?

16:16:53    5         A.    Well let's say you ran your own code and

16:16:55    6    let's say you obtained initial -- quasi-steady results

16:16:59    7    and compared them with mine.  If yours were the same

16:17:03    8    then you had reached quasi-steady results.

16:17:05    9         Q.    What if mine were different?

16:17:08    10        A.    Then you may not have quasi-steady results.

16:17:12    11        Q.    Or you might not have quasi-steady results;

16:17:14    12    correct?

16:17:15    13        A.    That could be.

16:17:16    14        Q.    And for me to determine that I would need

16:17:18    15    the initial conditions to determine whether I had

16:17:23    16    quasi -- you had quasi-steady results or I had

16:17:25    17    quasi-steady results, and if we both came to different

16:17:29    18    results then we might have to look further at the

16:17:32    19    problem; correct?

16:17:33    20        A.    I would agree.  If we came to different

16:17:35    21    results we'd have to look further.

16:17:37    22        Q.    Okay.  So there is a possibility, without

16:17:39    23    the initial conditions, that I may never be able to

16:17:43    24    determine whether or not your results show a

16:17:51    25    quasi-steady solution if I cannot come to a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

251

16:17:54  1  quasi-steady solution in my results; correct?

16:17:57  2          MR. GOSS:  Calls for speculation.

16:17:59  3      A.    That's a complex --

16:18:00  4          Could you re -- rephrase it, re-ask it?

16:18:02  5      Q.    Well just assume that I -- I run your model

16:18:04  6  and I cannot come to a quasi-steady solution, okay?  I

16:18:09  7  could determine whether or not you came to a

16:18:11  8  quasi-steady solution if I had your initial -- your

16:18:15  9  initial conditions and your final result; correct?

16:18:27  10     A.    It's a --

16:18:29  11         That was a very cumbersome question.  Could

16:18:31  12 you just --

16:18:31  13     Q.    Let's make it:  I cannot independently

16:18:33  14 verify that you have -- your solution is a

16:18:37  15 quasi-steady solution without another TRN file or even

16:18:42  16 -- or the initial conditions; correct?

16:18:44  17     A.    You could not verify that my results were

16:18:47  18 quasi-steady without another TRN file.

16:18:50  19     Q.    And, I mean, these are transient results,

16:18:53  20 TRN files; correct?

16:18:54  21     A.    Correct.

16:18:55  22     Q.    And all transient results are dependent on

16:18:59  23 the initial conditions.

16:18:59  24     A.    That is correct.

16:19:00  25     Q.    Okay.  So your failure to provide the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

252

16:19:10   1   initial conditions prevents my independent

16:19:15   2   verification of your CFD.  You agree?

16:19:17   3        A.   I disa --

16:19:18   4             MR. GOSS:  Object to form.

16:19:19   5        A.   I disagree.

16:19:21   6        Q.   I can't verify your CFD to determine whether

16:19:22   7   or not you have quasi-steady solution based on your

16:19:26   8   one TRN value.

16:19:27   9             MR. GOSS:  Asked and answered.

16:19:28   10       A.   I disagree.

16:19:29   11       Q.   You disagree to that now?

16:19:31   12       A.   Yes.

16:19:32   13       Q.   Okay.  You told me before I need at least

16:19:35   14   two TRNs to determine whether or not a solution is --

16:19:38   15   is a quasi-steady solution.

16:19:43   16       A.   You need two --

16:19:46   17            Let's take a step back and make sure it's

16:19:48   18   totally clear, and I want to make sure that I'm not

16:19:50   19   confused.

16:19:51   20            If you want to know whether your results are

16:19:59   21   quasi-steady you can do it a number of different ways.

16:20:04   22   You can compare the results to an experiment that's

16:20:08   23   quasi-steady, you could compare two sets of TRN files,

16:20:13   24   which is what you mentioned, or you could compare

16:20:18   25   someone else's calculations that are quasi-steady.  So

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

253

16:20:23   1   there's different ways of doing it.  But -- But I

16:20:26   2   would agree with you to know if this set of results

16:20:28   3   right here is quasi-steady [indicating Exhibit 1] you

16:20:32   4   would want to compare two different TRN files.

16:20:34   5        Q.   Okay.  Because you didn't compare your

16:20:36   6   results to anyone else's results; correct?

16:20:38   7        A.   I did not --

16:20:39   8             Well I compared my results to an experiment.

16:20:42   9        Q.   Okay.  But I'm talking about your

16:20:43  10   computational fluid -- your mathematical results.

16:20:47  11        A.   Correct.

16:20:48  12        Q.   Okay.  For example, if I wanted someone on

16:21:27  13   my team to -- Well, strike that.

16:21:41  14             Part of the methodology in doing CFD is to

16:22:21  15   have a proper model; correct?

16:22:25  16        A.   Yes.

16:22:26  17        Q.   Proper boundary conditions; correct?

16:22:28  18        A.   Yes.

16:22:28  19        Q.   And you need to put in initial conditions;

16:22:31  20   correct?

16:22:32  21        A.   That is correct.

16:22:33  22        Q.   Okay.  Without the initial --

16:22:36  23             That is mandatory in a CFD analysis is

16:22:40  24   having initial conditions; correct?

16:22:42  25        A.   That is correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

254

16:22:43    1       Q.   And you have not provided the initial

16:22:44    2   conditions to the plaintiff in this case; correct?

16:22:48    3            MR. GOSS:  Asked and answered multiple,

16:22:49    4   multiple times.

16:22:52    5       A.   That is correct.

16:22:53    6            Now you can get the same results by having

16:22:57    7   different initial conditions.

16:22:59    8       Q.   But the methodology requires initial

16:23:01    9   conditions; correct?

16:23:01   10       A.   The methodology requires initial conditions,

16:23:04   11   it doesn't require the same ones.

16:23:05   12       Q.   Let's go to your CFD model.

16:23:21   13            (Discussion off the stenographic record.)

16:23:31   14            (Files brought up on a projector.)

16:23:31   15   BY MR. ASSAAD:

16:23:31   16       Q.   Now I'm going to represent to you that the

16:23:34   17   name of this file is Abraham 0000001, which is a Bates

16:23:40   18   number that -- your TRN file that is TRN 264.

16:23:50   19            MR. GOSS:  Can you -- I'm not suggesting

16:23:51   20   that it isn't that, but can you give us, at the end

16:23:54   21   of the deposition, a thumb-drive copy?

16:23:55   22            MR. ASSAAD:  Is there any way we can go to

16:23:57   23   the 264 TRN -- dot TRN number?

16:24:02   24            (Screen being manipulated.)

16:24:02   25            MR. GOSS:  And I don't -- I don't question

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

255

16:24:04   1   that it is, it's just can we get a copy of the file

16:24:07   2   after the deposition?

16:24:08   3             MR. ASSAAD:  It's your file.  So yeah, I

16:24:10   4   can give it back to you.

16:24:11   5             MR. GOSS:  That's fine.  Just so I can

16:24:13   6   verify.

16:24:15   7   BY MR. ASSAAD:

16:24:15   8       Q.   Okay.  Up there --

16:24:17   9             And if you want to stand up and look closer,

16:24:20  10   feel free, but it says 264.  And I represent that this

16:24:26  11   is your TRN file loaded into ANSYS software.

16:24:32  12             Does this look like ANSYS software to you?

16:24:35  13       A.   Yes.

16:24:39  14       Q.   And what I have here is the temperature

16:24:42  15   difference between --

16:24:57  16             MR. ASSAAD:  Let's go off the record real

16:24:59  17   quick.

16:25:37  18             (Discussion off the record.)

          19   BY MR. ASSAAD:

16:26:14  20       Q.   I'm sorry about that.  I needed to get a

16:26:16  21   mobile microphone so I can move.

16:26:19  22             So this is your TRN file for time step 264.

16:26:28  23   And what I've put up on the screen is the temperature

16:26:33  24   distribution in the room with a -- a scale range of 58

16:26:38  25   degrees Celsius to 62.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

256

16:26:40   1          Do you see that?

16:26:40   2     A.    Yes.

16:26:41   3     Q.    Okay.  Does that look about right?

16:26:43   4     A.    I never provided a plot or looked at a plot

16:26:46   5   with this temperature range, so I can't co -- I can't

16:26:48   6   confirm.

16:26:49   7     Q.    Okay.  But you agree with me that with the

16:26:51   8   TRN file that you provided that you could go in and

16:26:54   9   get temperature ranges such as this.

16:26:56   10    A.    Yes.

16:26:57   11    Q.    Okay.  And I represent to you that this is

16:26:59   12   the temperature range along a certain plane along the

16:27:02   13   middle -- going down the middle of the body roughly of

16:27:05   14   the temperature differences in the room.

16:27:07   15          Do you see --

16:27:07   16          MR. GOSS:  I'm sorry.  Is this something

16:27:09   17   that you did, or are you saying that she did it?

16:27:11   18          MS. ZIMMERMAN:  This is off his --

16:27:13   19          MR. GOSS:  What's that?

16:27:14   20          MR. ASSAAD:  Well let me --

16:27:16   21    Q.    You could produce many images off your TRN

16:27:18   22   file depending on what you're looking for; correct?

16:27:21   23    A.    Correct.

16:27:21   24    Q.    And this is the type of image that you could

16:27:23   25   pull off your TRN file; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

257

16:27:25    1        A.    That is correct.

16:27:25    2        Q.    You just do a couple clicks in ANSYS, you

16:27:28    3    tell them what you need, you draw a plane where you're

16:27:32    4    looking and you could produce this image; correct?

16:27:34    5        A.    Correct.

16:27:34    6        Q.    Okay.  And you agree with me that when you

16:27:39    7    put the temperature max of 62, the red area is all

16:27:45    8    temperatures 62 degrees and above; correct?

16:27:47    9        A.    Yes.

16:27:47   10        Q.    And you agree with me that based on your

16:27:49   11    initial conditions and that the air coming from the

16:27:54   12    ceiling inlet of being 59 degrees, that the low

16:27:58   13    temperature would probably be 59 degrees in the

16:28:00   14    operating room; correct?

16:28:02   15        A.    Correct.

16:28:02   16        Q.    Okay.  And this would be the temperature

16:28:04   17    difference between the ceiling and the floor; correct?

16:28:10   18        A.    Well you're showing the temperature

16:28:11   19    distribution on a cross-section.

16:28:13   20        Q.    Yes.

16:28:14   21        A.    And that temperature distribution goes from

16:28:16   22    the ceiling to the floor.

16:28:17   23        Q.    Okay.  And you agree with me that there's

16:28:19   24    very little difference between the temperature of the

16:28:24   25    ceiling and the temperature of the floor.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

258

16:28:30   1       A.   There is a few degrees difference.

16:28:32   2       Q.   Okay.  And we could actually go in and pick

16:28:36   3   points and determine the temperature difference;

16:28:39   4   correct?

16:28:39   5       A.   Yes.

16:28:40   6       Q.   Okay.  I could go pick a point up at the

16:28:41   7   ceiling and I could go pick a point up at the bottom

16:28:44   8   and it'll give me the temperature difference; correct?

16:28:46   9       A.   Correct.

16:28:47  10       Q.   Do you know what the temperature difference

16:28:48  11   in an operating room is between the ceiling and the

16:28:50  12   height of the operating room table?

16:28:53  13       A.   No.  It would depend on where you are in the

16:28:57  14   room, because the temperature difference would not be

16:29:00  15   constant.  It would not be the same depending on where

16:29:04  16   you took the measurements.

16:29:05  17            But no, I do not know, as a general rule,

16:29:08  18   the temperature difference between the ceiling in the

16:29:11  19   OR.

16:29:11  20       Q.   By the way, have you looked at any studies

16:29:14  21   that did temperature monitoring of an operating room

16:29:17  22   when the Bair Hugger was on as compared to the Bair

16:29:19  23   Hugger was off?

16:29:19  24       A.   Yes.

16:29:20  25       Q.   Would that be the Dasari study?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

259

16:29:23  1       A.    That was one.

16:29:24  2       Q.    What was the other one?

16:29:26  3       A.    (Witness reviewing exhibit.)  If I recall

16:30:03  4  correctly, it was the Legg papers.

16:30:07  5       Q.    Okay.  Would you agree with me that a study

16:30:14  6  that was identical with the number of people in an

16:30:17  7  operating room, same flow, same operating room, and

16:30:20  8  the only thing that changed was whether or not the

16:30:23  9  Bair Hugger was used or not used and measured

16:30:29  10  temperature difference would indicate the temperature

16:30:31  11  rise in the operating room solely because of the Bair

16:30:32  12  Hugger?

16:30:34  13      A.    Boy, that was complex.

16:30:35  14            Could you rephrase it in a shorter, tighter

16:30:37  15  --

16:30:37  16      Q.    If there's a study which everything is

16:30:39  17  identical; the number of people in the room, the

16:30:42  18  airflow, the devices, the equipment, but the only

16:30:47  19  thing that changed was the Bair Hugger was on as

16:30:50  20  compared to the Bair Hugger was off, would you agree

16:30:53  21  with me that any change in the temperature in that

16:30:55  22  room would be a result of the Bair Hugger?

16:30:59  23      A.    Yes.

16:30:59  24            MR. GOSS:  Object to the incomplete

16:31:01  25  hypothetical.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

260

16:31:01   1      A.   Yes.

16:31:02   2      Q.   Okay.  And say if they were comparing two

16:31:06   3   devices.  Say, for example, the difference between the

16:31:10   4   Bair Hugger and the HotDog, okay?  Everything's

16:31:14   5   identical except one was the Bair Hugger was on, and

16:31:17   6   one was that the HotDog was on, would you agree with

16:31:22   7   me that if there was a Delta T between the temperature

16:31:25   8   measurements you could say that was as a result of the

16:31:27   9   differences in the devices?

16:31:29   10         MR. GOSS:  Same objection.

16:31:30   11     A.   I would agree to this and the prior question

16:31:34   12  with the caveat that the -- any heat generated in an

16:31:39   13  OR may create a change in the control system of the

16:31:41   14  HVAC.  So the HVAC may turn on or off or turn higher

16:31:45   15  or lower depending on heat, but aside from that

16:31:47   16  caveat, I agree.

16:31:49   17     Q.   Okay.  And have you looked at any studies

16:31:52   18  that show the difference in the temperature increase

16:31:55   19  around the surgical table between the Bair Hugger and

16:31:58   20  the HotDog?

16:32:02   21     A.   Yes.

16:32:04   22     Q.   What study?

16:32:09   23     A.   It may -- I -- I know this isn't a memory

16:32:12   24  test and you're not making me do a memory test.  It

16:32:16   25  could be the two I mentioned, the Legg studies.  It

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

261

16:32:20    1    could be Dasari.  I just don't remember which one.  I

16:32:23    2    remember that there were -- there are two studies in

16:32:27    3    my memory that looked at temperature changes over the

16:32:30    4    surgical site, and I believe one of them did a

16:32:33    5    comparison of the HotDog and Bair Hugger.

16:32:39    6         Q.   And do you recall that study showing that

16:32:44    7    when the Bair Hugger was used the temperature around

16:32:46    8    the surgical table was higher than when the HotDog was

16:32:49    9    used?

16:32:50   10         A.   Can you show me the study?

16:32:52   11         Q.   I'm asking if you recall that?

16:32:53   12         A.   I don't recall.

16:32:54   13         Q.   Okay.  Assuming that when the Bair Hugger's

16:32:56   14    used that the temperature around the surgical site is

16:33:01   15    higher -- or the surgical table is higher than when

16:33:04   16    the HotDog is used and everything else stayed

16:33:07   17    constant, what would that indicate to you as a

16:33:09   18    scientist?

16:33:10   19              MR. GOSS:  Objection, incomplete

16:33:12   20    hypothetical.

16:33:15   21         A.   I mean you're asking me to comment on a

16:33:19   22    study that I don't have in front of me so I'd have to

16:33:22   23    read the study.

16:33:24   24         Q.   I'm just saying -- Forget about the study.

16:33:27   25              In a hypothetical situation that you have a

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

262

16:33:30   1   HotDog --

16:33:31   2          You know what the HotDog is?

16:33:32   3      A.   Yes.

16:33:32   4      Q.   And you have a Bair Hugger.  You know what a

16:33:34   5   Bair Hugger is; correct?

16:33:35   6      A.   Yes.

16:33:35   7      Q.   Okay.  And everything else is constant

16:33:37   8   except in one -- in certain tests the HotDog is used,

16:33:41   9   and in other certain tests the Bair Hugger is used,

16:33:46   10  and when you compare the results it shows a statis --

16:33:52   11  statistic -- signi -- a statistic --

16:33:53   12          MR. GOSS:  Ly [lee].

16:33:55   13     Q.   -- statistically significant change between

16:34:01   14  the Bair Hugger and the HotDog showing that the Bair

16:34:04   15  Hugger warms the air around the operating room table

16:34:06   16  more than the HotDog.

16:34:08   17          Assuming those facts, what does that mean to

16:34:11   18  you as a scientist as to the effect of the Bair Hugger

16:34:13   19  compared to the HotDog on the temperature around the

16:34:17   20  surgical table?

16:34:18   21          MR. GOSS:  Same objection, assumes facts

16:34:19   22  not in evidence.

16:34:20   23     A.   If that is correct, and part of the reason

16:34:23   24  why I'm tentatively answering this is there have been

16:34:28   25  multiple studies that I've read that actually show

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

263

16:34:31   1   conflicting measurements of temperature above the

16:34:33   2   table, they show different values, so I wouldn't

16:34:38   3   assume that that study is correct.  But if it is

16:34:41   4   correct, one interpretation may be that there is heat

16:34:46   5   from the Bair Hugger that is entering the air.  That's

16:34:49   6   one possibility.

16:34:50   7        Q.   What's the other possibility?

16:34:54   8        A.   There is -- could be draping, it could be

16:34:56   9   the measurement method is different.  I would have to

16:34:58  10   look at the study.  You're asking me to comment --

16:35:00  11        Q.   Well when you compare --

16:35:01  12             MR. GOSS:  Hold on.  Let him finish his

16:35:03  13   answer.

16:35:04  14        A.   You're asking me to comment on a study that

16:35:06  15   I don't see, and I know that there are multiple

16:35:08  16   studies that are conflicting on these very types of

16:35:11  17   measurements that you've made.

16:35:12  18        Q.   With respect to temperature measurements?

16:35:13  19        A.   Yes.

16:35:14  20        Q.   Okay.  We'll get to that in a second.

16:35:17  21             But if everything is constant; where the

16:35:25  22   temperature measurements are taken, the airflow, the

16:35:29  23   number of people, okay?  There's no change.  The only

16:35:32  24   thing that's changed is the HotDog and the Bair

16:35:34  25   Hugger, and the Bair Hugger shows an increase in

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

264

16:35:36  1   temperature around the operating room table more than

16:35:39  2   the HotDog, you would agree with me that the increase

16:35:42  3   in temperature over the operating room table is most

16:35:46  4   likely due to the heat coming from the Bair Hugger.

16:35:49  5         MR. GOSS:  Objection, incomplete

16:35:50  6   hypothetical.

16:35:51  7         A.   It's possible, but there are other

16:35:53  8   alternative explanations.

16:35:55  9         Q.   Are there other heat sources that -- that --

16:35:58  10        A.   Yes.

16:35:58  11        Q.   -- are different if I say everything else is

16:36:00  12  constant besides the Bair Hugger and the HotDog?

16:36:03  13        MR. GOSS:  Same objection.

16:36:04  14        A.   Let me give you two options.  Let me give

16:36:08  15  you just two alternatives to show that it's not a

16:36:10  16  simple question without seeing the study in front of

16:36:12  17  me.

16:36:13  18        Let's say the Bair Hugger initiated less of

16:36:20  19  a temperature response in the HVAC system and that

16:36:26  20  lesser response meant that there was less airflow

16:36:29  21  coming out of the vents.  That could be a reason.

16:36:31  22        Q.   Is it your understanding that the mass flow

16:36:35  23  out of the vents in an operating room can change?

16:36:39  24        A.   It may.  I would have to see the H -- the

16:36:41  25  control system, but it could.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

265

16:36:43    1      Q.   Do you know the entire purpose of the

16:36:46    2   unidirectional airflow is a constant velocity of air

16:36:50    3   being -- coming out of the inlets over the surgical --

16:36:55    4   over the surgical table.  You understand that;

16:36:57    5   correct?

16:36:57    6      A.   I do not under --

16:36:58    7           MR. GOSS:  Object to form.

16:37:00    8      A.   I do not understand that.

16:37:01    9      Q.   You're not aware of that fact?

16:37:03   10           MR. GOSS:  Object to form.

16:37:04   11      A.   What I understand --

16:37:05   12      Q.   Are you not aware of that fact?

16:37:06   13           MR. GOSS:  Same objection.

16:37:06   14      A.   Are you saying constant in time or constant

16:37:08   15   in space?

16:37:09   16      Q.   Well you -- you take the face velocity of I

16:37:21   17   believe 39 feet per sec -- feet cubed per second.  Do

16:37:24   18   you recall that?

16:37:24   19      A.   Yes.  That is not a face velocity, but yes,

16:37:26   20   I recall that number.

16:37:29   21      Q.   You're right, it's not.  It's a volumetric

16:37:31   22   velocity.

16:37:32   23           Do you believe that number changes over time

16:37:36   24   in an operating room?

16:37:40   25      A.   Certainly it would.  There is no perfect

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

266

16:37:46  1  ventilation system where the flow is always the exact

16:37:49  2  same value.

16:37:50  3       Q.   I understand that it's a tolerance and

16:37:53  4  there's going to be a deviation, but do you -- do you

16:37:57  5  believe that the controls of the HVAC system in an

16:38:00  6  operating room may change the volumetric flow?

16:38:03  7       A.   I don't know the answer to that --

16:38:05  8       Q.   Okay.

16:38:05  9       A.   -- but it -- they may.

16:38:06  10      Q.   But you don't know sitting here today.

16:38:08  11      A.   Correct.

16:38:09  12      Q.   So again I don't want you to guess, so you

16:38:10  13  could say "I don't know"; right?  You can say those --

16:38:13  14  You know how to say "I don't know."  If you don't

16:38:16  15  know, you don't know; correct?

16:38:16  16      A.   I do know how to say I don't know.

16:38:19  17      Q.   Okay.  Now let's look at your 3D model, and

16:38:31  18  --

16:38:31  19           MR. ASSAAD:  Can you put up the boundary

16:38:33  20  condition for the outlet...

16:38:57  21           (Discussion off the stenographic record.)

16:39:17  22           (Change in projected image.)

16:39:17  23           MR. GOSS:  Are we in ANSYS right now?

16:39:20  24           MR. ASSAAD:  Let me ask the doctor.

16:39:22  25  BY MR. ASSAAD:

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

267

16:39:22    1        Q.    Doctor, does this look like ANSYS?

16:39:24    2        A.    Yes.

16:39:25    3        Q.    Do you have any dispute that this is not

16:39:27    4    ANSYS?

16:39:27    5        A.    No.

16:39:28    6              MR. GOSS:   I'm not disputing it, I just

16:39:30    7    wanted to know.

16:39:31    8        Q.    Do you agree that --

16:39:34    9              MR. ASSAAD:   Turn it so I can see --

16:39:36   10        Q.    Do you agree that the red area is the

16:39:38   11    boundary condition for the Bair Hugger inlet?

16:39:46   12        A.    I do.

16:39:47   13        Q.    Okay.  And you agree that's mostly coming

16:39:50   14    from the back -- underneath the drape and the back of

16:39:55   15    the patient.

16:39:56   16        A.    I do, which reminds me that I gave an

16:39:59   17    incorrect answer earlier today where I had recalled it

16:40:02   18    came from both.  But seeing it re -- seeing it here,

16:40:07   19    it's clearly predominantly the back.

16:40:10   20              Thank you.

16:40:10   21        Q.    Now we could agree that the -- the -- I

16:40:20   22    mean, you might remember and not remember stuff, we

16:40:23   23    always can go back to the TRN file to get the geometry

16:40:25   24    and the mesh and everything; correct?  And the

16:40:28   25    boundary conditions.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

268

16:40:28   1      A.   Yes.

16:40:29   2      Q.   Okay.  So even though you might be

16:40:31   3   incorrect, I could rely on your TRN file for the

16:40:34   4   boundary conditions, the time step, the material

16:40:38   5   properties, the airflow, et cetera.

16:40:40   6      A.   Yes.

16:40:41   7      Q.   Okay.  Now my understanding is that the

16:40:47   8   entire mass flow -- the entire mass flow of the Bair

16:40:57   9   Hugger unit is coming out of that area that looks --

16:41:00   10   that's red.

16:41:02   11      A.   Yes.

16:41:03   12      Q.   Okay.  And on top of it is a drape; correct?

16:41:08   13      A.   Correct.

16:41:09   14      Q.   And the drape -- the drape is adiabatic;

16:41:13   15   correct?  You set it as adiabatic.

16:41:16   16      A.   Correct.

16:41:17   17      Q.   Therefore there's no heat transfer from that

16:41:20   18   Bair Hugger inlet to the drape; correct?

16:41:23   19      A.   Correct.

16:41:24   20      Q.   And that's not what happens in real life;

16:41:26   21   correct?

16:41:26   22      A.   That is different from real life.

16:41:28   23      Q.   So -- Okay.  Real life there'll be some heat

16:41:32   24   transfer and actually convective -- or plumes above

16:41:38   25   the drape; correct?  There'll be convective currents

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

269

16:41:44  1  above the drape as a result of the change in

16:41:46  2  temperature of the drape.

16:41:46  3      A.   I disagree.

16:41:47  4      Q.   You disagree?

16:41:48  5      A.   Yes.

16:41:49  6      Q.   Okay.  So you disagree with Gary Settles,

16:41:54  7  who did schlieren testing that showed that there was

16:41:58  8  thermal convection above the drape.

16:42:01  9      A.   Well there's thermal convection everywhere

16:42:03  10  in the room.

16:42:04  11      Q.   Okay.  But you disagree that the Bair Hugger

16:42:07  12  caused thermal convection above the drape as Gary

16:42:11  13  Settles has testified.

16:42:12  14          MR. GOSS:  Objection, lack of foundation.

16:42:14  15      A.   When you --

16:42:15  16          MR. GOSS:  If you know, you can answer.

16:42:16  17      A.   When you use the words "thermal convection"

16:42:19  18  and "above the drape," what do you mean by "above the

16:42:22  19  drape"?

16:42:22  20      Q.   Okay.  The Bair Hugger is going to heat the

16:42:24  21  drape, correct, in real life.

16:42:26  22      A.   It may.

16:42:27  23      Q.   Okay.  The Bair Hugger air is coming out at

16:42:31  24  41 degrees Celsius according to what you've put down;

16:42:34  25  correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

270

16:42:35    1        A.   Correct.

16:42:35    2        Q.   And the drape is a cloth drape, a surgical

16:42:40    3   drape; correct?

16:42:41    4        A.   Correct.

16:42:42    5        Q.   You would agree by the law of thermodynamics

16:42:45    6   that there'll be -- and heat transfer that there's

16:42:48    7   going to be some heat transfer to the drape; correct?

16:42:57    8        A.   Pardon me.   (Witness reviewing exhibit.)

16:42:59    9        Q.   I'm not talking about your report here.

16:43:01   10   Let's just talk about engineering principles.

16:43:04   11            MR. GOSS:   Okay.   But if he needs to refer

16:43:06   12   to his report to answer --

16:43:07   13            MR. ASSAAD:   I am not talking about his

16:43:08   14   report, sir.   I'm talking about this picture up here

16:43:10   15   and common heat transfer.

16:43:12   16            MR. GOSS:   You have plenty of time left on

16:43:14   17   the tape to get an answer.   You can answer when

16:43:16   18   you're ready.

16:43:16   19            MR. ASSAAD:   Okay.

16:43:17   20        A.   If sufficient amount of warm air presses

16:43:22   21   against -- touches that drape, then I agree there

16:43:26   22   would be heat transfer between the air and the drape.

16:43:31   23        Q.   Did you look at the drapes actually?   Did

16:43:34   24   you touch the drapes?

16:43:36   25        A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

271

16:43:37  1      Q.   The drapes are -- they have no form to them,

16:43:39  2  they're just like a drape, like a blanket; correct?

16:43:42  3      A.   Correct.

16:43:42  4      Q.   Okay.  And when you put the drape on a

16:43:46  5  patient do you get that same type of nice curvature

16:43:50  6  shape that has an open area to the back of the

16:43:53  7  patient?

16:43:55  8      A.   No.

16:43:56  9      Q.   Okay.

16:43:56  10     A.   It is not exactly that shape.

16:43:58  11     Q.   Okay.  Because gravity is going to be

16:44:00  12  pulling that drape down; correct?  Unless something's

16:44:03  13  holding it up.

16:44:05  14     A.   Well the drape is held up by clips.

16:44:09  15     Q.   Not that drape.  That drape -- I don't see

16:44:13  16  any clips here on this drape.  This drape, the white

16:44:17  17  line is held up by clips; correct?

16:44:19  18     A.   I agree.  I thought that's the drape we were

16:44:21  19  talking about.

16:44:22  20     Q.   This drape I'm talking about here.

16:44:23  21  [Indicating.]  This drape is not being held up by

16:44:25  22  anything; correct?

16:44:27  23     A.   It's hard for me to identify a different

16:44:30  24  drape than that drape in this image.  I mean, I would

16:44:40  25  -- look, I would agree with you that the exact shape

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

272

16:44:42   1   of that inlet --

2                   (Screen image modified.)

16:44:44   3                   THE WITNESS:   Thank you.

16:44:46   4       A.   I would agree with you that the exact shape

16:44:48   5   of that inlet shown in red would differ slightly from

16:44:53   6   in actual practice.   I agree.

16:44:55   7       Q.   "Slightly"?   Or --

16:44:56   8           Do you know, sitting here today?

16:44:58   9       A.   Well I will say this.   I don't think the cha

16:45:01   10  -- the difference would have a material impact on the

16:45:03   11  results.

16:45:04   12      Q.   I understand that's your opinion, sir.   But

16:45:05   13  let's just not make --

16:45:07   14          I don't want to know about what your

16:45:08   15  opinions on the results.   I just want to know, do you

16:45:10   16  know whether or not that drape shape is accurate,

16:45:13   17  sitting here today?

16:45:14   18      A.   That drape shape would not be perfectly

16:45:16   19  accurate.

16:45:16   20      Q.   Okay.   Did you take any measurements of the

16:45:19   21  shape, or pictures?

16:45:21   22      A.   No.

16:45:22   23      Q.   And in fact you did not even create this;

16:45:25   24  did you?

16:45:26   25      A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

273

16:45:27  1      Q.    Okay.

16:45:27  2      A.    I did not create it.

16:45:28  3      Q.    3M created this; correct?

16:45:30  4      A.    3M created the geometry.

16:45:32  5      Q.    Which is the shape of the -- of the Bair

16:45:34  6  Hugger inlet.

16:45:34  7      A.    Yes.

16:45:35  8      Q.    Okay.  You never did any measurements, you

16:45:39  9  yourself or anyone on your team, to determine the

16:45:41  10  shape of the Bair Hugger inlet; correct?

16:45:43  11      A.    That is correct.

16:45:44  12      Q.    Okay.  So sitting here today, you cannot

16:45:51  13  independently verify the shape of that Bair Hugger

16:45:56  14  inlet, you're relying on what 3M has provided to you.

16:46:00  15      A.    I relied, for the three dimensional object

16:46:06  16  -- all the three dimensional objects, on what 3M

16:46:08  17  provided to me.

16:46:09  18      Q.    So you, sitting here today, cannot

16:46:11  19  independently verify that shape, you are relying on

16:46:13  20  what 3M has provided to you.

16:46:14  21          MR. GOSS:  Asked and answered.

16:46:15  22      A.    Correct.

16:46:15  23      Q.    Okay.  Now based on this geometry it was 3M

16:46:28  24  that came up with the assumption of the Bair Hugger

16:46:31  25  inlet; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

274

16:46:32  1      A.    No.

16:46:35  2      Q.    "No"?

16:46:36  3      A.    That was my decision.

16:46:39  4      Q.    If you look at the geometry file provided by

16:46:42  5  3M, that red area is titled "Bair Hugger inlet";

16:46:45  6  correct?

16:46:48  7      A.    I don't know if it is.  But the decision to

16:46:51  8  have the hot air enter into the room from that surface

16:46:56  9  was my decision regardless of the name on the file.

16:47:00  10      Q.    Okay.  But did you change the Bair Hugger

16:47:04  11  inlet if 3M created it?

16:47:06  12      A.    I did not change the Bair Hugger inlet.

16:47:08  13      Q.    So you accepted their --

16:47:09  14          You looked at what they did and you

16:47:12  15  determined that that assumption is correct.

16:47:14  16      A.    I determined that that assumption is

16:47:16  17  reasonable, yes.

16:47:17  18      Q.    Okay.  And by "reasonable" you mean correct.

16:47:20  19      A.    Correct enough to --

16:47:21  20      Q.    Okay.

16:47:22  21      A.    -- answer the question I was trying to

16:47:24  22  answer.

16:47:24  23      Q.    Okay.

24          (Discussion off the stenographic record.)

16:47:49  25      Q.    You agree with me that this is -- what's

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

275

16:47:52  1  shown up on the screen is a depiction of a patient in

16:47:55  2  a hip arthroplasty surgery.

16:47:58  3       A.   Yes.

16:47:59  4       Q.   Okay.  And that is when he's on the side and

16:48:02  5  both of his hands are pointed, and in this case to the

16:48:05  6  left direction.

16:48:07  7       A.   Correct.  Or her hands.  Correct.

16:48:08  8       Q.   Her hands.  I apologize.

16:48:12  9            To play it safe I'll use "the patient's

16:48:17  10 hands."

16:48:17  11            And the Bair Hugger blanket is going over

16:48:24  12 the entire -- Rephrase that.

16:48:27  13            On the right-hand side the Bair Hugger

16:48:29  14 blanket, we can agree, is being tucked in underneath

16:48:32  15 the table, or the pad.

16:48:35  16      A.   Correct.

16:48:35  17      Q.   And on the left-hand side we agree that the

16:48:37  18 Bair Hugger blanket is being -- is going over the --

16:48:39  19 the arms of the patient; correct?

16:48:41  20      A.   Correct.

16:48:42  21      Q.   And it's being tied down; correct?

16:48:44  22      A.   Correct.

16:48:45  23      Q.   Okay.  And just so I understand, it is your

16:48:51  24 assumption that no matter where the air comes out of

16:48:54  25 the Bair Hugger that it ends up coming out of the area

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

276

16:48:58   1   that's red.

16:48:59   2        A.   Yes.

16:49:00   3        Q.   Okay.  So if I could look from underneath

16:49:07   4   this table and I see an opening to where the arms are,

16:49:11   5   you're saying that no air is -- no hot air is going to

16:49:14   6   come down the side of this drape over here

16:49:17   7   [indicating].

16:49:18   8        A.   It is highly unlikely.

16:49:20   9        Q.   What's your scientific basis behind that?

16:49:24   10        A.   As I've explained earlier in this

16:49:26   11   deposition, the way this device works in a setup like

16:49:30   12   this is the arms are out, could be two arms or it

16:49:35   13   could be one arm.  The Bair Hugger is in a blanket

16:49:38   14   that is inflated with warm air and there are tubes

16:49:42   15   that run along the arm.  Those tubes wrap around the

16:49:47   16   arm, and that wrapping is facilitated by the covering,

16:49:52   17   the cotton blanket and the other draping.  Out of that

16:49:57   18   Bair Hugger blanket small jets of air hit the skin and

16:50:01   19   then essentially stop, so you have a stagnant zone of

16:50:07   20   warm air.  It is my professional opinion -- Well it's

16:50:14   21   more than my professional opinion that that stagnant

16:50:18   22   air wants to rise.  It is my professional opinion that

16:50:20   23   it takes, as one of the other experts said, the path

16:50:22   24   of least resistance and it will want to go along a

16:50:25   25   vertical channel, and that would be along the arm

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

277

16:50:29    1    because there are channels, there are spaces, and then

16:50:32    2    out through the head and neck area.  Now --

16:50:35    3         Q.   Do you take into --

16:50:36    4              While you answer this question do you take

16:50:38    5    into account that it's -- there's still jets of air

16:50:42    6    pushing down at all times?

16:50:43    7         A.   Yes.

16:50:44    8         Q.   Okay.

16:50:48    9              MR. GOSS:  Were you finished with your

16:50:50   10    earlier answer?

16:50:51   11              THE WITNESS:  What I was going to add is

16:50:53   12    that it is likely, and I would say certain, that the

16:50:59   13    warm air would emerge from an area which may not be

16:51:03   14    identical to that red area exactly, but it would be

16:51:07   15    close enough so that the calculations are valid.

16:51:34   16         Q.   And that is the assumption that there is an

16:51:39   17    opening where that red is for the air to escape;

16:51:41   18    correct?

16:51:42   19         A.   Incorrect.  What I said in my statement was

16:51:46   20    that the air would travel up the natural channels that

16:51:49   21    exist between the blanket and the body and it would

16:51:52   22    emerge by the head or neck area.  I concede, and I

16:51:55   23    conceded in my last answer, that the area through

16:51:59   24    which the air ultimately enters the room would likely

16:52:03   25    not be exactly that red area.  In fact some of that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

278

16:52:07  1  air would emerge by the chest and neck, by the chin.

16:52:12  2  So there would be some differences, but they would be

16:52:14  3  immaterial to the results of the analysis.

16:52:16  4      Q.   Would you agree with me, though -- I mean

16:52:18  5  you've seen Gary Settles' measurements; correct?

16:52:21  6      A.   Yes.

16:52:21  7      Q.   And when the Bair Hugger was turned on, and

16:52:25  8  this was in a warehouse with no people around, that

16:52:29  9  the temperature underneath the operating room table

16:52:31  10  increased.

16:52:32  11          MR. GOSS:  Objection to form, lack of

16:52:34  12  foundation, misstates the evidence.

16:52:37  13      A.   I think what he said is the temperature

16:52:39  14  underneath the drapes and perhaps underneath the

16:52:42  15  arm-boards, but I would a -- with that caveat, I would

16:52:45  16  agree.

16:52:46  17      Q.   So if the temperature under the arm-boards

16:52:47  18  increased, that means the heat is -- not all the

16:52:52  19  heat's going up through the channels and out the area

16:52:55  20  that you say it goes out; correct?

16:52:57  21      A.   It is correct that not all the heat, but

16:53:00  22  let's not confuse "heat" with "air."

16:53:02  23      Q.   Okay.  Well maybe that's where our issue is

16:53:05  24  here, and maybe we're coming to the final, like, area

16:53:08  25  we disagree.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

279

16:53:09   1           Just because air travels up doesn't mean all

16:53:14   2   of the heat is transferring with the air to -- to the

16:53:18   3   -- not all the heat's being exited out of the red area

16:53:21   4   here on the diagram; correct?

16:53:22   5       A.   I agree.

16:53:23   6       Q.   Okay.  In fact, in real life heat's going to

16:53:26   7   be transferred to the drapes around it; correct?

16:53:30   8       A.   Could be.

16:53:31   9       Q.   It's going to be transferred definitely to

16:53:32   10  the patient, because that's the purpose of the Bair

16:53:34   11  Hugger.

16:53:35   12      A.   Yes.

16:53:35   13      Q.   Okay.  It's going to be transferred to

16:53:37   14  probably the arm-boards a little bit; correct?

16:53:40   15      A.   Yes.

16:53:40   16      Q.   Okay.  And if the flow is not fast enough,

16:53:44   17  it's going to be -- it's going to start transferring

16:53:46   18  hot air -- the air below the -- the arm-board is going

16:53:51   19  to increase over time until it reaches steady state

16:53:55   20  based on the flow of air escaping and the amount of

16:53:58   21  heat that's being transferred.  Correct?

16:54:01   22      A.   No.

16:54:01   23      Q.   Well --

16:54:02   24      A.   That's not the only explanation.

16:54:04   25      Q.   What's the other explanation?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

280

16:54:06    1         A.    What Gary Settles showed --

16:54:09    2              Well first of all, he said he did not know

16:54:11    3    whether there is air that actually went beneath the

16:54:14    4    arm-boards.  That's my best reco --

16:54:16    5         Q.    I'm not talking heat --

16:54:16    6              I'm not talking air, we're talking about

16:54:18    7    heat.

16:54:18    8         A.    Okay.

16:54:19    9         Q.    Heat.

16:54:20   10         A.    Okay.  If temperatures are higher below the

16:54:23   11    arm-board, if temperature measurements are higher,

16:54:28   12    what are the possible explanations?  One explanation

16:54:32   13    is what you've just articulated, that hot air may get

16:54:36   14    below the arm-boards.  That's an explanation.  Another

16:54:38   15    explanation is that heat, as you pointed out, and I

16:54:44   16    neglected this in my model, heat conducts through

16:54:46   17    solids.  Heat would conduct through the arm-board and

16:54:50   18    that heat would end up on the undersurface of the

16:54:55   19    arm-board.  A third explanation is that he reported he

16:54:59   20    put the -- a thermocouple or a thermal sensor under

16:55:04   21    the drape and underneath the arm-board somewhere.  If

16:55:08   22    his thermal sensor was between the drape and the

16:55:10   23    arm-board, or if it was in visible sight of the drape,

16:55:13   24    the sensor was warmed by infrared radiation.  And

16:55:17   25    remember, sensors sense the temperature around them,

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

281

16:55:20   1   they don't sense their own temperature.

16:55:22   2          So there's other explanations, --

16:55:25   3      Q.   Okay.

16:55:26   4      A.   -- including the one you've given, about how

16:55:28   5   the undersurface of the arm-board could warm.

16:55:30   6      Q.   Okay.  And if you gave material properties

16:55:33   7   to the patient, and to the arm-board, and to the

16:55:36   8   drapes, your model would be able to show where the

16:55:40   9   heat is going to; correct?

16:55:43   10     A.   My model would be able to show heat

16:55:46   11  conduction through solids, if that's what you mean.

16:55:50   12     Q.   And heat conduction through air.

16:55:53   13     A.   My model does show heat conduction through

16:55:55   14  air.

16:55:56   15     Q.   Okay.  Okay.  I understand that.

16:55:57   16          But you agree with me --

16:55:59   17          But -- But since you made the board

16:56:02   18  adiabatic, the drape adiabatic, and all the -- and

16:56:05   19  everything in that room adiabatic except for air, we

16:56:09   20  can't see the transfer of heat to the arm-board, to

16:56:15   21  the drapes, and then its effect on the air below the

16:56:18   22  operating room table; correct?

16:56:20   23     A.   We cannot see conductive heat transfer.

16:56:22   24  However, you have to recognize that this model was a

16:56:26   25  replication of an actual OR, and in an actual OR what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

282

16:56:30    1    I recall from the setup was there was an arm, there

16:56:34    2    was a pillow, then there was another arm and the

16:56:37    3    blanket wrapped around.

16:56:39    4        I made a judgment that the heat would not

16:56:42    5    transfer through the pillow.  I don't know if Gary

16:56:46    6    Settles had an insulating pillow in his experiment.  I

16:56:50    7    don't know if he provided that detail or perhaps my

16:56:52    8    memory's faulty.

16:56:53    9        Q.   Well you've read his report; correct?

16:56:55    10       A.   Yes.

16:56:55    11       Q.   And I asked you if his data in his report's

16:56:58    12   reliable, and you said "yes."  And now you're sitting

16:57:01    13   here telling me that you don't know how he took

16:57:03    14   temperature measurements?

16:57:03    15       MR. GOSS:  Object to form.

16:57:04    16       A.   No, that's not what I'm telling you.

16:57:06    17       Q.   Well do you know where he took the

16:57:07    18   temperature measurements?  Did he take them between

16:57:09    19   the arm and the -- and the board -- and the arm-board?

16:57:12    20       MR. GOSS:  Lack of foundation.  If you have

16:57:14    21   a --

16:57:15    22       Q.   If you don't know, remember you can just say

16:57:17    23   the words "I don't know."

16:57:18    24       A.   What Gar --

16:57:19    25       What I recall Gary Settles saying, Dr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

283

16:57:22  1  Settles saying, is that the temperature measurement

16:57:24  2  was made under the drape, so clearly under the drape.

16:57:28  3  What I recall him saying was that the temperature

16:57:31  4  underneath the arm-board was warmer.

16:57:34  5      Q.   28 degrees Celsius; correct?  At one point.

16:57:38  6      A.   I believe that was the maximum.

16:57:40  7      Q.   Okay.  26 to 28 degrees Celsius depending on

16:57:43  8  where he took it; correct?

16:57:44  9      A.   That is what I recall.

16:57:45  10     Q.   Okay.  So --

16:57:45  11     A.   What Gary Settles --

16:57:46  12     Q.   -- it definitely shows that heat is getting

16:57:48  13 underneath the arm-board; correct?

16:57:50  14         MR. GOSS:  Hold on.

16:57:50  15     A.   What Gary Settles was trying to do was to

16:57:54  16 explore the veracity of Elghobashi's boundary

16:57:58  17 conditions by looking at temperatures.  As I

16:57:59  18 understand it, and if I'm wrong I'm happy to admit I'm

16:58:03  19 wrong.  As I understand it, he was looking to see if

16:58:05  20 he could find temperatures of 41 degrees Celsius under

16:58:09  21 the table as reported by Elghobashi, and that was the

16:58:12  22 intent of his study.  In that respect it is reliable.

16:58:17  23     Q.   You agree with me that if you put a heat

16:58:20  24 source in a room, its change in the temperature in the

16:58:25  25 room is relative to time; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

284

16:58:29   1        A.    Yes.

16:58:29   2        Q.    Okay.  So if I put a 1600 BTU heater in this

16:58:37   3   corner and turn it on, it might take time until you

16:58:40   4   feel its effects where you're sitting in the

16:58:42   5   deposition chair; correct?

16:58:44   6        A.    I agree.

16:58:44   7        Q.    Okay.  So time is definitely a factor with

16:58:49   8   respect to heat flow.

16:58:51   9        A.    It can be.

16:58:52  10        Q.    Okay.  Well again, with heat flow it would

16:58:56  11   take time for this room with a 1600 BTU heater,

16:59:01  12   powered heater, to come to a steady state in this

16:59:03  13   room; correct?

16:59:04  14        A.    I agree.

16:59:06  15        Q.    Okay.  And you agree with me that when you

16:59:08  16   turn the Bair Hugger on it's going to take some time

16:59:12  17   for the area -- if the area under the floor board is

16:59:17  18   heated, to reach steady state; correct?

16:59:18  19             MR. GOSS:  "Under the floor board"?

16:59:20  20             MR. ASSAAD:  Or under the arm-board.

16:59:21  21        A.    I would agree.

16:59:23  22        Q.    Okay.  And depending on when you take that

16:59:26  23   measurement, unless you're absolutely certain you're

16:59:30  24   at steady state it might not be the max temperature

16:59:33  25   underneath the arm-board; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

285

16:59:35   1      A.    Correct.

16:59:35   2      Q.    Okay.  And do you recall his deposition in

16:59:39   3   which he could not identify any of the times that he

16:59:42   4   took the temperature measurements?

16:59:44   5           MR. GOSS:  Object to form, lack of

16:59:46   6   foundation.  If you remember from reading the

16:59:49   7   transcript, you can indicate as much.

16:59:51   8      A.    I don't recall that.

16:59:52   9      Q.    Okay.  And the fact that --

17:00:20  10           MR. ASSAAD:  Let's turn this upside down so

17:00:22  11   I can see looking straight down.

          12           (Image manipulated.)

17:00:25  13           MR. ASSAAD:  Okay.  Right there is perfect.

17:00:27  14      Q.    You agree with me that there is an opening

17:00:29  15   to the arm-board in your model right underneath right

17:00:32  16   here; correct?

17:00:33  17           MR. GOSS:  Can you tell me what we're

17:00:35  18   looking at right now?  I'm sorry.

17:00:35  19      Q.    Do you know what we're looking at, Dr.

17:00:39  20   Abraham?

17:00:39  21      A.    It's hard for me to see from this side of

17:00:40  22   the room.

17:00:42  23      Q.    All right.  Feel free to get closer.

17:00:43  24           MR. GOSS:  I don't -- I can't tell how you

17:00:45  25   oriented it.  I could understand what we were looking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

286

17:00:48    1   at and then you tilted it, and now are we looking at

17:00:51    2   from the ceiling down?

17:00:52    3          MR. ASSAAD:  From the floor up.

17:00:53    4          MR. GOSS:  From the floor up.  Thank you.

17:00:55    5          MR. ASSAAD:  And you could notice by the

17:00:56    6   X/Y coordinates here.

17:00:58    7          MR. GOSS:  If I knew anything about that I

17:00:59    8   could, that's true.

17:01:00    9      Q.   You agree with me you're looking from the

17:01:02   10   floor up; correct?

17:01:03   11      A.   I agree.

           12          MR. GOSS:  Thank you.

17:01:04   13      Q.   Okay.  And if you are looking from the floor

17:01:06   14   up, you see that there's a pathway to that arm-board

17:01:09   15   that's in that little area here.  Do you agree?

17:01:13   16      A.   Could you color the body so that I can --

17:01:17   17   Everything is blue now and I can't distinguish between

17:01:20   18   different features.

17:01:27   19          Okay.  So we're not looking at the body.

17:01:30   20      Q.   I said the arm-board.

17:01:34   21          MR. ASSAAD:  Can you get a better view of

17:01:39   22   the...

17:01:45   23          (Image manipulated.)

17:01:45   24   BY MR. ASSAAD:

17:01:45   25      Q.   I mean, based on the geometry do you agree

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

287

17:01:47  1  that that's the arm-board?

17:01:49  2      A.   I would agree.

17:01:50  3      Q.   Okay.  And you agree with me that it looks

17:01:52  4  like you could see into where the drape is there's an

17:01:55  5  open area there; correct?

17:01:57  6      A.   We can visually see that on the screen.

17:01:59  7      Q.   Okay.

17:02:00  8      A.   But it's not necessary that there's a flow

17:02:02  9  path.

17:02:03  10     Q.   Well the reason why there's --

17:02:05  11          You can sit down.

17:02:06  12          The reason why --

17:02:07  13          MR. ASSAAD:  Let's go back to the boundary

17:02:12  14  condition.

17:02:14  15          (Discussion off the stenographic record.)

17:02:20  16          (Image manipulated.)

17:02:20  17     Q.   You agree with me that --

17:02:22  18          MR. ASSAAD:  A little more to the right so

17:02:24  19  I can see some red.  To the right.  Other way.  Okay.

         20          (Image manipulated.)

17:02:28  21     Q.   You agree with me that the boundary

17:02:31  22  condition set for the Bair Hugger inlet is for a mass

17:02:36  23  flow of heat going out of the inlet, correct,

17:02:41  24  perpendicular?

17:02:44  25     A.   A mass flow --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

288

17:02:45  1          There's no such thing as a mass flow of

17:02:47  2    heat.

17:02:47  3          Q.   Well there's a mass flow of air; correct?

17:02:50  4          A.   Correct.

17:02:50  5          Q.   And there's heat --

17:02:51  6               And that air's heated to 41 degrees Celsius;

17:02:53  7    correct?

17:02:54  8          A.   Correct.

17:02:54  9          Q.   And it's coming out perpendicular to that

17:02:56  10   boundary; correct?

17:02:59  11         A.   I don't recall if I set the velocity to be

17:03:02  12   perpendicular, but I would agree it comes out of the

17:03:04  13   boundary.

17:03:05  14         Q.   Okay.  It comes out of the boundary.

17:03:07  15               There is no -- There's nothing in your model

17:03:10  16   of hot air around the arms; correct?

17:03:14  17         A.   Correct.

17:03:15  18         Q.   There's no flow of hot air on the arms;

17:03:17  19   correct?

17:03:18  20         A.   I did not model the flow of the jets hitting

17:03:21  21   the arm, that is correct.

17:03:22  22         Q.   You agree with me that if you did model

17:03:24  23   that, of hot air around the arms, that when we looked

17:03:28  24   at the underside, the view going from the floor to the

17:03:30  25   ceiling, that you'd see a change of temperature in

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

289

17:03:32    1   that area.

17:03:33    2        A.   Not necessary.

17:03:34    3        Q.   Not necessarily?  Okay.

17:03:36    4             MR. GOSS:  Well wait.  Did you say "not

17:03:37    5   necessarily" or "not necessary"?

17:03:39    6             THE WITNESS:  Not necessarily.

17:03:40    7             MR. GOSS:  Okay.  Thanks.

17:03:43    8        Q.   So you're telling me if I have hot air

17:03:45    9   blowing at 41 degrees Celsius on my hand, okay, and

17:03:50   10   I'm looking at it and it's coming --

17:03:52   11             Air is fluid; correct?

17:03:54   12        A.   Air is a fluid.

17:03:55   13        Q.   -- and if I'm looking at it from the bottom

17:03:57   14   I'm not going to see a change in temperature in this

17:04:00   15   area [indicating]?

17:04:01   16        A.   That's not what I'm saying.

17:04:02   17        Q.   What are you saying, then?

17:04:05   18        A.   Remember -- and I believe this is true with

17:04:06   19   Dr. Elghobashi's model as well -- I did not model the

17:04:10   20   solids, which means if you look up from the bottom

17:04:15   21   you're not going to see the temperature of the air.

17:04:20   22             So I am not saying -- I will agree with you

17:04:23   23   that if I modeled the air jets impinging on the skin,

17:04:27   24   if I modeled that air region you would see it.

17:04:30   25        Q.   But you did model the air; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

290

17:04:33    1      A.    Yes.

17:04:34    2      Q.    Well there's air around the board; correct?

17:04:37    3      A.    There is air in the blanket, and between the

17:04:40    4   blanket and the skin.

17:04:42    5      Q.    Okay.  And some of the air goes around the

17:04:47    6   board; correct?

17:04:50    7      A.    I disagree.

17:04:51    8      Q.    You disagree.  Okay.

17:04:54    9            Is there any basis, scientific basis why you

17:04:56   10   disagree except that based on your experience --

           11      A.    Yes.

17:05:00   12      Q.    -- with forced-air warming blankets?

17:05:01   13      A.    Yes.

17:05:02   14      Q.    What's your basis?

17:05:06   15      A.    I'll try to do a better job of explaining

17:05:08   16   it, because I think it's -- multiple times.  I'm going

17:05:11   17   to use my arm and --

17:05:12   18            THE WITNESS:  If you can't catch this on

17:05:14   19   the screen, I apologize.

17:05:17   20      A.    The way the person is sitting they're laying

17:05:19   21   like this.  [Demonstrating.]

17:05:20   22      Q.    Is that how he's laying?

17:05:21   23      A.    Well it's essentially this.  They've got two

17:05:24   24   arms out to the side and is --

17:05:25   25      Q.    Is there anything between the arms?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

291

17:05:26  1        A.   As I recall, there's a pillow.

17:05:28  2        Q.   Okay.

17:05:28  3        A.   Okay.  There are blank --

17:05:30  4             There is a hot warming blanket which wraps

17:05:34  5   around the arm, and in fact I think a cartoon version

17:05:39  6   of this was provided in Said Elghobashi's, maybe it

17:05:44  7   was his supplemental report or something that I saw

17:05:47  8   yesterday where he had these tubes around the arm.

17:05:49  9   Okay?  And that's -- that cartoon outlines this quite

17:05:53  10  well, okay?  So you have these tubes around the arm.

17:05:56  11  The tubes have these little jets of air that are one

17:06:00  12  millimeter in diameter, approximately.  They hit the

17:06:03  13  skin, they stop.  We call that stagnation.  So now you

17:06:08  14  have a warm stagnant body of air.

17:06:11  15            Now the question is, where does it go?  If I

17:06:15  16  have warm air near my hands, is that warm air going to

17:06:19  17  travel up my arms and then out the open space by my

17:06:23  18  head?  And mind you there is air jets all along the

17:06:28  19  way.  So there's some air being -- hitting the arm

17:06:30  20  here, and stagnating.  There's other air hitting the

17:06:34  21  arm here.  There's other air hitting the arm here.  A

17:06:37  22  tiny amount is at the hands, but there's air all the

17:06:41  23  way along, and in fact in the center part of the --

17:06:43  24  the blanket.  So you have air oozing out of this

17:06:46  25  blanket very slowly, it hits the arms, it's stagnant.

292

17:06:49  1  Then what does it do?  If you're hot air right here

17:06:54  2  are you going to be able to go down to the bottom of

17:06:59  3  the drapes and then emerge out into the room?  That's

17:07:02  4  possible.  Or are you going to just migrate upwards

17:07:05  5  along with buoyant forces?  That is actually what

17:07:08  6  happens.  There is no physical mechanism that would

17:07:12  7  force that stagnant warm air to go downwards to the

17:07:18  8  floor and then come back up.  It's the analogy that I

17:07:21  9  used before; the match, or incense, or a cigarette.

17:07:26  10  If you hold those things upside down, the smoke or the

17:07:29  11  flame still rise.

17:07:34  12      Q.  Are you done?

17:07:34  13      A.  Yes.

17:07:35  14      Q.  Okay.  Let's talk about heat, though.  Are

17:07:39  15  you saying all the heat's going to go out the head and

17:07:41  16  neck?

17:07:43  17      A.  In my model all the hot air emerged by the

17:07:47  18  head and neck.  I did not allow heat to transfer by

17:07:51  19  conduction, for example, through the arm-board.

17:07:54  20      Q.  Okay.  And we know through Settles' results

17:07:58  21  that heat does travel by conduction and heats up the

17:08:02  22  -- the -- underneath the operating room table.

17:08:05  23      A.  We do --

17:08:05  24          MR. GOSS:  Object to form.

17:08:05  25      A.  -- not know that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

293

| | | |
|---|---|---|
| 17:08:06 | 1 | Q.   Okay.  So you disagree with Settles. |
| 17:08:12 | 2 | A.   No. |
| 17:08:12 | 3 | Q.   Okay. |
| 17:08:13 | 4 | A.   I gave two explanations of how temperature |
| 17:08:15 | 5 | measurements in the place he made them could be |
| 17:08:16 | 6 | elevated, not -- one of them was not by conduction. |
| 17:08:21 | 7 | Q.   Okay.  But regardless of what method it was |
| 17:08:23 | 8 | heated, it was done by the Bair Hugger. |
| 17:08:28 | 9 | A.   I would agree. |
| 17:08:30 | 10 | MR. GOSS:  Lack of foundation.  You can |
| 17:08:30 | 11 | answer if you know. |
| 17:08:31 | 12 | A.   I would agree. |
| 17:08:33 | 13 | Q.   I mean, conservation of energy, you need a |
| 17:08:36 | 14 | heat source to increase temperature; correct? |
| 17:08:39 | 15 | A.   I agree. |
| 17:08:39 | 16 | Q.   Okay. |
| 17:08:42 | 17 | MR. GOSS:  I'm sorry, Gabriel, can I take a |
| 17:08:44 | 18 | bathroom break when you have a chance?  Too much |
| 17:08:48 | 19 | coffee. |
| 17:08:51 | 20 | MR. ASSAAD:  If I said "no," would you be |
| 17:08:53 | 21 | upset? |
| 17:08:54 | 22 | MR. GOSS:  I'd be uncomfortable. |
| 17:08:55 | 23 | MR. ASSAAD:  You can take a break. |
| 17:08:58 | 24 | MR. GOSS:  Thanks. |
| 17:08:59 | 25 | MR. ASSAAD:  Off the record. |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

294

17:08:59    1            THE REPORTER:  Off the record, please.

17:09:01    2            (Recess taken from 5:09 to 5:16 p.m.)

17:16:12    3   BY MR. ASSAAD:

17:16:16    4       Q.   So real quick a couple of things.  Looking

17:16:19    5   at that picture up there if you look on the left side

17:16:22    6   it says -- it states, time, 1.2 seconds.  Would you

17:16:30    7   agree with me that the file that you provided to us

17:16:35    8   was at a simulation time of 1.2 seconds?

17:16:38    9       A.   No.  I don't know if it was.  That looks to

17:16:41   10   be an expression that was made, and I can't recall if

17:16:43   11   I made a time expression.  Oh, I'm sorry.  I thought

17:16:47   12   you were looking at the bottom.

17:16:48   13       Q.   No.  The right -- left-hand side --

17:16:50   14       A.   Yes.

17:16:50   15       Q.   -- where it says "time."

17:16:51   16       A.   I agree.

17:16:52   17       Q.   Okay.  So your model is basically a

17:16:54   18   simulation of 1.2 seconds; correct?

           19            MR. GOSS:  Object to form.

17:16:57   20       A.   The results shown here --

17:16:58   21       Q.   Yes.

17:17:00   22       A.   -- are the results after 1.2 seconds.

17:17:02   23       Q.   Of simulation time.

17:17:03   24       A.   Correct.

17:17:03   25       Q.   Okay.  Which is 1.2 seconds real time;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

295

17:17:06    1    correct?

17:17:06    2        A.    Correct.

17:17:07    3        Q.    And as I understand it, the streamlines is a

17:17:11    4    line based on the instantaneous velocity at a

17:17:14    5    particular cell; correct?

17:17:18    6        A.    Yes.

17:17:18    7        Q.    Okay.  It's not that you're following the

17:17:22    8    air around the operating room and seeing where that

17:17:29    9    particular air goes; correct?

17:17:33   10        A.    It is an instant --

17:17:34   11             What the streamline is is an instantaneous

           12    --

17:17:39   13             Let me tell you how streamlines are made.

17:17:42   14    The vectors which describe the flow direction and

17:17:46   15    speed are all obtained at a time instant and then they

17:17:50   16    are connected by their tangents, and that gives us

17:17:53   17    streamlines.  So it's an instantaneous trajectory of

17:17:56   18    air.

17:17:57   19        Q.    So one of the videos I believe lasted about

17:17:59   20    three minutes, or three and a half minutes long that

17:18:01   21    you provided in this case; correct?

17:18:03   22        A.    I don't know that.

17:18:05   23        Q.    Okay.  Well the video is on YouTube.  You've

17:18:07   24    seen your videos on YouTube that 3M has put on with

17:18:10   25    respect to your -- this CFD analysis.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

296

17:18:12  1     A.   I have seen the CFD analysis on YouTube.

17:18:15  2     Q.   And you've created the YouTube videos which

17:18:17  3  are about -- more than 1.2 seconds long; correct?

17:18:21  4     A.   Correct.

17:18:23  5     Q.   Okay.  The fact that the video is -- say,

17:18:26  6  for example, is three minutes long of streamlines, or

17:18:29  7  two minutes, doesn't mean that you ran the model for

17:18:32  8  two minutes; correct?

17:18:34  9     A.   That is correct.

17:18:34  10     Q.   Okay.  And so it's your opinion today that

17:18:40  11  you got quasi-steady state by running the model in 1.2

17:18:45  12  seconds.

17:18:46  13     A.   Yes.

17:18:47  14     Q.   Okay.  Is it possible to run the model

17:19:05  15  forward based on the TRN file?

17:19:07  16     A.   Yes.

17:19:07  17     Q.   Without the initial conditions?

17:19:09  18     A.   Correct.

17:19:18  19     Q.   Now the fact that this is the 264th time

17:19:25  20  step, does that indicate to you what your time step

17:19:27  21  was?

17:19:31  22     A.   No.  I don't -- Looking at this here, I

17:19:36  23  don't see -- it doesn't tell me the time step and I

17:19:38  24  don't recall, sitting here.

17:19:40  25     Q.   Can you determine the time step by looking

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

297

17:19:42    1    at the ANSYS file?

17:19:47    2         A.    Could you determine it?  Yes, you could.

17:19:50    3         Q.    How would you do that?

17:19:52    4         A.    Well remember this file, the TRN file

17:19:55    5    contains everything, in the sense that it contains the

17:19:58    6    mesh, the geometry and the setup.  So you could pull

17:20:01    7    it into the setup.

17:20:02    8         Q.    So if I told you you could take over this

17:20:04    9    ANSYS program right now and determine the time step,

17:20:06   10    that's something you could do?

17:20:08   11         A.    I may be able to.

17:20:09   12         Q.    How long would it take you?

17:20:13   13         A.    Boy, I don't know how long it would take me.

17:20:17   14         Q.    Well where would you look?

17:20:21   15         A.    I would load this thing into the CFX, what's

17:20:25   16    called the setup file, and I would look there.

17:20:28   17         Q.    Okay.  You used ANSYS Academic; correct?

17:20:43   18         A.    Incorrect.

17:20:44   19         Q.    "Incorrect"?

17:20:44   20         A.    Incorrect.

17:20:46   21         Q.    What did you use?

17:20:47   22         A.    ANSYS Research.

17:20:48   23         Q.    That's part of the Academics soft --

17:20:51   24    package; correct?

17:20:55   25         A.    I recall them being separate.  I mean, if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

298

17:20:58  1  you show me documentation that they are part of a

17:21:00  2  single suite, then I would defer.  But I recall ANSYS

17:21:05  3  Academic and Research as separate licenses and

17:21:11  4  separate software capabilities.

17:21:59  5       Q.  So to determine the time step you would load

17:22:01  6  the TRN file into a CF -- CFX file --

17:22:03  7       A.  Correct.

17:22:06  8       Q.  -- to the CFX setup program?

17:22:07  9       A.  Yes.

17:22:08  10      Q.  Okay.  Now in some of your images it shows

17:22:15  11  "ANSYS 17.1 Academic," not on here but on the files

17:22:20  12  that you sent.  Does that sound familiar?

17:22:22  13      A.  No.  I don't recall that.

17:22:32  14      Q.  I'm going to show you on my computer, and we

17:22:35  15  could -- I'm just going to show it to you.  This is

17:22:37  16  what's been provided to me, and it says "ANSYS R17.1

17:22:42  17  Academic;" is that correct?  [Showing computer screen

        18  to witness.]

17:22:43  19      A.  Yes.

17:22:44  20      Q.  Okay.  Does that mean Academic that was

17:22:48  21  used?

17:22:50  22      A.  Well it's my understanding, looking at that,

17:22:53  23  that it's the Research license that's -- I believe

17:22:56  24  that's what the "R" stands for, and as you pointed out

17:23:01  25  earlier, that may be part of the Academic suite, and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

299

17:23:03   1   so I would concur.  It appears as though it's the

17:23:07   2   Research portion of the Academic license.

17:23:09   3        Q.   And you agree with me that the ANSYS

17:23:12   4   Research license is not allowed to be used for

17:23:15   5   consulting; correct?

17:23:18   6        A.   I believe that is true.

17:23:19   7        Q.   Okay.  And you actually use it for

17:23:22   8   consulting; correct?

17:23:23   9        A.   I disagree.

17:23:24   10        Q.   So the fact that 3M was in litigation and

17:23:26   11   hired you as an expert to do the CFD study, you don't

17:23:32   12   -- that wasn't in your -- in a consulting role to 3M?

17:23:36   13        A.   I was hired in an academic capacity to do

17:23:40   14   the CFD.

17:23:41   15        Q.   You were hired by Lori Cohen and Greenberg

17:23:44   16   Traurig; correct?

17:23:45   17             MR. GOSS:  Object to form.

17:23:46   18        A.   I don't know who officially hired.

           19        Q.   Okay.

17:23:49   20        A.   But my understanding is I was hired to do an

17:23:51   21   academic study, which is totally appropriate using the

17:23:55   22   Research license that I used.  The expert witness work

17:23:59   23   is a separate issue, separate payment, and there's no

17:24:03   24   formal proposal.

17:24:05   25        Q.   Okay.  You were hired by the attorneys of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

300

17:24:07   1   Greenberg Traurig to do your CFD; correct?

17:24:10   2        A.   I don't know that.

17:24:10   3        Q.   Who contacted you first?

17:24:12   4        A.   I don't recall.

17:24:13   5        Q.   Okay.  But you have no disagreement that --

17:24:25   6   that ANSYS Research is not allowed to be used for

17:24:28   7   consulting purposes.

17:24:30   8        A.   I don't believe it is allowed to be used for

17:24:32   9   consulting purposes.

17:25:18   10        Q.   You understand that you were contacted in

17:25:20   11   this case to do research with respect to a litigation

17:25:24   12   that was ongoing in 2015.

17:25:27   13             MR. GOSS:  Object to form, mischaracterizes

17:25:29   14   his testimony.

17:25:31   15        A.   I understand that I was contacted to

17:25:35   16   determine whether a device like the Bair Hugger would

17:25:38   17   interrupt operating-room airflow.  I did understand

17:25:41   18   that it was part of a litigation.

17:25:43   19        Q.   And in fact when you got -- you did your

17:25:46   20   experimental measures at -- at the OR, there were

17:25:49   21   lawyers there; correct?

17:25:51   22        A.   That is correct.

17:25:51   23        Q.   Okay.  Are you aware of law firms contacting

17:25:57   24   universities to do research?

17:25:59   25             MR. GOSS:  Just going to object to what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

301

17:26:02  1   this may -- I don't see what this has to do with his

17:26:05  2   scientific opinions in this case, --

17:26:07  3          MR. ASSAAD:  Well it goes to his --

17:26:08  4          MR. GOSS:  -- but if you can answer the

17:26:09  5   question, then you may.

17:26:13  6       A.   My understanding is 3M wanted to understand

17:26:18  7   the airflow in an operating room, and that's an

17:26:21  8   academic question with real academic significance.

17:26:27  9   That study was performed as we normally perform

17:26:30  10  studies where a fixed-cost grant proposal was given.

17:26:34  11  That study was the basis for the computational fluid

17:26:38  12  dynamics and for the journal paper publication.

17:26:40  13       Q.   And all the consulting fees you were

17:26:44  14  receiving on behalf -- from 3M directly is from you

17:26:51  15  offering opinions based on that study done at St.

17:26:55  16  Thomas; correct?

17:26:58  17       A.   No.

17:26:59  18       Q.   Well all that we discussed about today and

17:27:03  19  all your opinions in this case is -- is with respect

17:27:07  20  to your CFD analysis of the problem.

17:27:11  21       A.   That is incorrect.

17:27:14  22       Q.   Okay.  What else?

17:27:17  23       A.   For example, I read a lot of literature, I

17:27:22  24  read depositions, I read expert reports, I performed

17:27:31  25  experiments.  So to say that all of my opinions -- I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

302

17:27:37  1   -- To say, for example, my opinions about Said

17:27:40  2   Elghobashi's work, that was not based on my CFD, so --

17:27:42  3   so it's incorrect to say that all of my opinions are

17:27:44  4   based on the CFD.

17:27:46  5        Q.   Many of your opinions are based on the CFD

17:27:48  6   that you've given today; correct?

17:27:49  7        A.   Some of my opinions are based on the CFD

17:27:51  8   work that we have discussed today.

17:27:53  9        Q.   Well we've barely -- we rarely talked about

17:27:57  10  Elghobashi's report so far; correct?

17:27:59  11       A.   That is correct.

17:27:59  12       Q.   Okay.  And you're using the results of your

17:28:27  13  CFD analysis in formulating your opinions regarding --

17:28:36  14  some of your opinions in this case; correct?

17:28:38  15       A.   I agree.

17:28:38  16       Q.   Okay.  And in fact you plan on testifying in

17:28:41  17  trial regarding the CFD analysis you performed in this

17:28:44  18  case; correct?

17:28:48  19       A.   I am prepared to testify in trial based on

17:28:52  20  these CFD results.

17:28:53  21       Q.   And that's not research, that's consulting;

17:28:54  22  correct?

17:28:56  23       A.   Well that would be unpaid consulting, but

17:28:58  24  yes.

17:28:58  25       Q.   Okay.  Because you're not getting paid for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

303

17:29:01   1   trial testimony; correct?

17:29:02   2       A.   Correct.

17:29:18   3       Q.   Now --

17:29:18   4            MR. ASSAAD:  Let's mark this.

17:29:29   5            (Abraham Exhibit 9 marked for

           6            identification.)

           7   BY MR. ASSAAD:

17:29:30   8       Q.   Exhibit 9 is a document titled -- with the

17:29:34   9   Bates number Wagner 0000013.  Have you received this

17:29:38  10   document before?

17:29:49  11       A.   Yes.

17:29:50  12       Q.   Okay.  And this was authored by Andrew Chen,

17:29:54  13   correct?  If you look at the bottom left-hand corner?

17:29:58  14       A.   Yes.

17:29:59  15       Q.   Okay.  And is this the document where -- in

17:30:02  16   which you obtained your initial boundary conditions

17:30:08  17   with respect to mass flow?

17:30:10  18       A.   "Initial" and "boundary conditions" don't go

17:30:12  19   together.

17:30:12  20       Q.   I'm sorry.  Your boundary conditions.

17:30:14  21       A.   This is the document which confirmed my

17:30:16  22   understanding of the boundary condition for the Bair

17:30:18  23   Hugger.  So I would say it confirmed my boundary

17:30:21  24   conditions.

17:30:22  25       Q.   Okay.  And if you look at pages 23, 24, 25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

304

17:30:42  1   and 26, and 27 and 28, those are the diagrams and

17:30:47  2   pictures of the OR that's represented in your CFD

17:30:49  3   model; correct?

17:30:58  4        A.   I believe that's true.

17:30:59  5        Q.   Okay.  And the geometry which is on page

17:31:03  6   Wagner 28 is the geometry that was most likely

17:31:07  7   provided to you by 3M; correct?

17:31:18  8             MR. GOSS:  Lack of foundation, but you can

17:31:19  9   answer if you know.

17:31:21  10       A.   I don't know if that is the geometry.

17:31:23  11       Q.   Okay.  But it's very similar; correct?

17:31:31  12       A.   (Witness reviewing exhibit.)

17:31:35  13            MR. GOSS:  You're on page 28?

17:31:37  14            MR. ASSAAD:  Yes.

17:31:37  15       A.   Yeah, it is --

17:31:39  16            Yes.  I would agree.

17:31:41  17       Q.   Okay.  And in fact the -- Never mind.

17:31:55  18            Do you agree that it seems like a study was

17:31:58  19   done by 3M that was memorialized in this memo on

17:32:01  20   October 15, 2015?

17:32:06  21       A.   Yes.

17:32:07  22       Q.   Okay.  And they did schlieren testing at 3M.

17:32:16  23            MR. GOSS:  Wait for a question.

17:32:18  24       Q.   Correct?

17:32:19  25            MR. GOSS:  Objection, lack of foundation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

305

17:32:25   1        MR. ASSAAD:  I'll withdraw that ques --

17:32:26   2        Q.  Do you agree that this model contains

17:32:28   3   schlieren photography?

17:32:30   4        MR. GOSS:  The memo.

17:32:30   5        MR. ASSAAD:  Yes.

17:32:31   6        MR. GOSS:  You said "model."

17:32:32   7        MR. ASSAAD:  Huh?

17:32:33   8        MR. GOSS:  Sorry.  You said "model."  You

17:32:35   9   meant "memo."

17:32:36   10       A.  Yes.

17:32:37   11       Q.  Okay.  And if you look at page Wagner 19,

17:32:51   12   you agree with me that the bottom image shows a

17:32:54   13   schlieren photography of air from a rolled-up Bair

17:33:01   14   Hugger blanket; correct?  Figure 8.

17:33:09   15            (Interruption by the reporter.)

17:33:10   16       A.  What's your question again?

17:33:18   17       Q.  According to Figure 8 it's a schlieren

17:33:21   18   picture of air emitted from the end of a rolled-up

17:33:23   19   Bair Hugger blanket; correct?

17:33:28   20       A.  That's what this figure shows.

17:33:30   21       Q.  Okay.  And you have no reason to disagree

17:33:31   22   with that; correct?

17:33:33   23       A.  Correct.

17:33:34   24       Q.  Okay.  And in fact the schlieren mirror is

17:33:38   25   26 inches in length; correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

306

17:33:42   1        MR. GOSS:  Object to the lack of

17:33:45   2   foundation.  If that's what the document shows, you

17:33:47   3   can testify to that.

17:33:48   4        A.   26 inches is stated in the document.

17:33:51   5        Q.   Okay.  Let's look at Figure 9 on the

17:33:57   6   following page, Wagner 20.  Figure 9 says, "Air

17:34:02   7   departing the region around the blanket representing

17:34:04   8   the neck region of the blanket."  Do you see that?

17:34:07   9        A.   Yes.

17:34:08  10        Q.   And you see a schlieren photography and

17:34:11  11   something there that says 6 inches; correct?

17:34:16  12        A.   Yes.

17:34:17  13        Q.   Okay.  So you would agree with me that the

17:34:21  14   -- the disruption or the -- the refractiveness of the

17:34:29  15   -- the light or the imaging, which is what schlieren

17:34:32  16   shows --

17:34:33  17             You understand that; correct?

17:34:34  18        A.   Yes.

17:34:34  19        Q.   -- is when the air is coming out of the neck

17:34:36  20   region of the blanket it's a little over 6 inches;

17:34:39  21   correct?

17:34:40  22        MR. GOSS:  Object to the lack of

17:34:41  23   foundation, lack of expertise in schlieren imaging.

17:34:44  24   You can testify to what the document shows if you

17:34:46  25   understand it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

307

17:34:48   1        A.   Can you restate your question?

17:34:50   2        Q.   Let me ask.  Do you --

17:34:51   3             Have you ever used schlieren photography

17:34:53   4   before?

17:34:53   5        A.   No.

17:34:54   6        Q.   Okay.  Do you understand schlieren

17:34:55   7   photography?

17:34:56   8        A.   I understand the basics of it.

17:34:59   9        Q.   Okay.  So the fact that if you look at the

17:35:03  10   -- the -- Strike that.

17:35:08  11             Now with respect to -- Let's go to page 15.

17:35:51  12   Figure 2 says a "System of Bair Hugger Model 750

17:35:54  13   blower and Upper Body Model 522 blanket integrated

17:35:59  14   with flow measurement system pitot tube in a flow

17:36:05  15   development pipe and" --

17:36:05  16             (Interruption by the reporter.)

17:36:05  17        Q.   -- with flow measurement system pitot tube,

17:36:08  18   P-I-T-O-T, in a flow development pipe and "Magnehlic

17:36:14  19   manometer."

17:36:14  20        A.   It's "Magnehlic," but yes.

17:36:17  21        Q.   Okay.  And in fact if you look, you agree

17:36:22  22   with me that 3M did testing to determine the initial

17:36:29  23   conditions to be used in a CFD analysis.

17:36:33  24        A.   I'm not clear in this document where it says

17:36:35  25   that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

308

17:36:36    1        Q.    Okay.   If you look at page Wagner 14, under

17:36:49    2    **"Bair Hugger Product Testing"** it states:   Testing the

17:36:53    3    Bair Hugger product for volumetric flow was necessary

17:36:57    4    to determine the boundary condition for a CFD model of

17:37:00    5    a blanket with an actual operating room.

17:37:03    6            Did I read that correctly?

17:37:04    7        A.    Yes.

17:37:04    8        Q.    So you agree with me that they did product

17:37:06    9    testing to determine the -- a boundary condition for

17:37:10   10    the -- for a CFD model; correct?

17:37:13   11        A.    Yes.

17:37:14   12        Q.    And it says:   A mass flowrate inlet

17:37:16   13    condition was used in the operating room CFD model as

17:37:18   14    the operating room supply air inlet boundary condition

17:37:22   15    as well as the Bair Hugger air inlet using faces at

17:37:25   16    the inlet boundary.

17:37:27   17            Did I read that correctly?

17:37:28   18        A.    With the exception of you said "at," I

17:37:31   19    think, or -- yeah -- yes, you read that correctly.

17:37:35   20            MR. GOSS:   I'm just going to insert an

17:37:36   21    objection that 3M may have done some testing

17:37:39   22    internally for attorney-client purposes, we would

17:37:44   23    assert work-product protection over that and reserve

17:37:47   24    the right to claw back any portions of this memo that

17:37:50   25    relate to that and do not have any relevance to Dr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

309

17:37:56  1    Abraham's work or his use of the document.

17:38:00  2         MR. ASSAAD:  Okay.

17:38:01  3    Q.    So it states here under the last paragraph:

17:38:03  4    "For the Upper Body (Model 522) with one side rolled

17:38:07  5    up," -- And that's the case that you used in your CFD

17:38:10  6    modeling; correct?

17:38:11  7    A.    Correct.

17:38:12  8    Q.    Okay.

17:38:12  9         -- "a mass flow rate of 0.237 kilograms per

17:38:17  10   second was calculated and used as an inlet condition

17:38:20  11   for the area around the arms in the OR CFD model."

17:38:24  12        Did I read that correctly?

17:38:26  13   A.    Yes.

17:38:26  14   Q.    You did not have an inlet condition around

17:38:29  15   the arms of an OR CFD model; correct?

17:38:31  16   A.    Correct.

17:38:32  17   Q.    Okay.  For a fully open blanket and draping

17:38:35  18   arrangement, 0.0255 kilograms per second, open

17:38:41  19   parentheses, half on arms and half on the other side

17:38:44  20   of the -- of head, closed parentheses, was used in the

17:38:47  21   second OR CFD model as a Bair Hugger inlet condition.

17:38:51  22        Did I read that correctly?

17:38:52  23   A.    Yes.

17:38:53  24   Q.    So according to what 3M did, it's my

17:38:56  25   understanding that based on the Bair Hugger product

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

310

17:38:59   1   testing that when the Bair Hugger is folded over, the

17:39:03   2   mass flow rate of .0237 kilograms per second was going

17:39:08   3   over the arms; correct?

17:39:09   4          MR. GOSS:  I will object again that any

17:39:12   5   internal testing --

17:39:13   6          MR. ASSAAD:  I got your objection.

           7          MR. GOSS:  -- described in this document --

17:39:14   8          MR. ASSAAD:  Don't waste my time, please.

17:39:15   9   Stop the clock, then.  I don't want to waste my time.

17:39:17  10   I got your objection, it's already been said, we

17:39:20  11   don't need to reiterate the record.

17:39:21  12          MR. GOSS:  And this witness has no

17:39:23  13   foundation.  I think he's already said he has no

17:39:26  14   foundation with respect to any internal CFD testing

17:39:28  15   that 3M did.

17:39:31  16      Q.   Go on.

17:39:31  17          Did I read that correctly?

17:39:33  18      A.   I don't recall what you read, actually.

17:39:35  19      Q.   The question was:  Do you agree with me that

17:39:36  20   according to what 3M's product testing did, when the

17:39:40  21   Bair Hugger blanket is folded over, similar to what

17:39:43  22   you did in your CFD, that they calculated that there

17:39:46  23   is a mass flow over -- or on the area around the arms

17:39:53  24   and that was used in the OR CFD model; correct?

17:39:57  25      A.   That is what it says.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

311

17:39:57    1            MR. GOSS:  Same objection.

17:39:59    2       Q.    Okay.  And when the blanket was open, that

17:40:03    3    based on testing they calculated a mass flow of .0255

17:40:09    4    kilograms per second, which was half on the arms and

17:40:12    5    half on the other side of the head; correct?

17:40:23    6       A.    That's what the document says.

17:40:24    7       Q.    And in fact you used this document, sir, if

17:40:29    8    you look at page 5 of your report where you took the

17:40:32    9    measurements from this document and applied it in your

17:40:36   10    report.  Right above where it says **Step 5.**"

17:40:47   11            MR. GOSS:  You can --

17:40:47   12       Q.    I'll read it to you.  Page 5, above where it

17:40:51   13    says "Step 5 of the Analysis..."  "Measurements were

17:40:53   14    made using a Bair Hugger Blower model 750 and an Upper

17:40:58   15    Body Blanket Model 522 to determine the flowrate

17:41:00   16    through the system.  The experiments" -- I'd like to

17:41:03   17    say that word again, "experiments" --

17:41:05   18            MR. GOSS:  Okay.

           19       Q.    -- "found a flow rate" --

17:41:06   20            MR. GOSS:  You don't have to make faces at

17:41:08   21    me, Gabriel.

17:41:09   22       Q.    -- of .023 kilograms per second for a

17:41:12   23    partially obstructed blanket and .025 kilograms per

17:41:16   24    second for a fully open blanket."

17:41:18   25            Is that correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

312

17:41:19    1        A.    Correct.

17:41:19    2        Q.    And you're basing it off the experiments

17:41:22    3   that 3M did which is marked as Exhibit Number 9;

17:41:25    4   correct?

17:41:25    5             MR. GOSS:   Object to form, mischaracterizes

17:41:27    6   his testimony.   He has already answered this.

17:41:28    7             If you have a different answer, you may

17:41:30    8   offer it.

17:41:32    9        A.    My flow rate was based on my own experience

17:41:35   10   of years working with these types of blankets.   As --

17:41:38   11   As I said earlier -- As I said earlier in this

17:41:42   12   deposition, this -- these results confirmed my

17:41:47   13   knowledge of the airflow.

17:41:48   14        Q.    I mean, we're talking about a flow rate

17:41:50   15   going out to three decimal places.   Correct?   Am I

17:41:55   16   correct?   Three decimal places; correct?

17:41:59   17        A.    Two significant figures.

17:42:00   18        Q.    Okay.   But three decimal places; correct?

17:42:02   19   "Two significant figures."   You want to use two --

17:42:03   20   That's fine.

17:42:04   21             Two significant figures of a difference of

17:42:06   22   .002; correct?

17:42:09   23        A.    Are you talking about the 3M document or my

17:42:11   24   document?   Because the 3M document uses different

17:42:13   25   numbers.   I actually didn't use their numbers.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

313

17:42:17    1       Q.    For the flow rate of a Bair Hugger blanket

17:42:22    2    which is folded, you have -- or partially

17:42:25    3    obstructed -- Would you say that's equivalent to being

17:42:27    4    folded?

17:42:28    5       A.    Yes.

17:42:28    6       Q.    -- you have .023, and in the Bair Hugger

17:42:31    7    testing they have 0.237; correct?

17:42:35    8       A.    Correct.

17:42:36    9       Q.    Okay.  And for a open blanket you have .025

17:42:40   10    and they have .0255; correct?

17:42:43   11       A.    That is correct.

17:42:43   12       Q.    Okay.  So you're telling me that based on

17:42:46   13    your experience with forced-air warming blankets that

17:42:50   14    you predicted these numbers that were that similar to

17:42:54   15    3M?  Is that what you're saying here today, sir?

17:42:58   16            MR. GOSS:  There's no -- You asked him the

17:42:59   17    question, there's no need for you to raise your

17:43:01   18    voice, and I will --

17:43:01   19       Q.    Well there's nothing in these papers --

17:43:03   20            MR. GOSS:  -- and I will try to keep mine

17:43:05   21    down, too.

17:43:05   22       Q.    There's nothing in the papers to answer that

17:43:07   23    question.  So I'm saying because this is off of your

17:43:08   24    memory that you got these numbers; correct?

17:43:10   25       A.    No.  That's not what I'm saying.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

314

17:43:13    1       Q.    So where'd you get your numbers from?

17:43:16    2       A.    In fact I didn't use their numbers.  These

17:43:17    3   numbers are different.

17:43:21    4           What I'm saying, I've done many experiments

17:43:23    5   on Bair Hugger and similar blankets.  My recollection

17:43:28    6   was that the -- the -- I recalled the flow rate

17:43:33    7   through the Bair Hugger, it was very close, not the

17:43:36    8   same as the Technical Data Sheet that we've got here,

17:43:38    9   that confirmed that my answers -- my recollection was

17:43:41   10   correct.  But you notice I didn't take their numbers.

17:43:45   11   I did not use their numbers as inputs.

17:43:48   12       Q.    You just took it out to two significant

17:43:50   13   places.

17:43:51   14       A.    Well had I used their numbers, I -- and had

17:43:54   15   I rounded, I would have had .024, and I have .023.

17:43:59   16   They're close, but they're not the same.  I did not

17:44:03   17   solely rely on this.  This confirmed my understanding.

17:44:07   18       Q.    Where are the calculations or the documents

17:44:08   19   that you got your numbers from?

17:44:11   20       A.    It's from past work that I've done on Bair

17:44:14   21   Huggers.

17:44:14   22       Q.    Okay.  So you have done work on a Bair

17:44:16   23   Hugger 750 blower and a 522 blanket.

17:44:21   24       A.    I didn't say that.

17:44:23   25       Q.    Do you agree with me that every blanket will

17:44:26 have a different mass flow rate because of the
17:44:28 resistance to the motor?
17:44:30 A. That is correct.
17:44:30 Q. Okay. And you agree with me that the 750
17:44:35 has a different volumetric flow without a blanket than
17:44:39 the 505 or the Smiths Medical or any other non-750
17:44:44 blower out there.
17:44:46 A. I agree --
17:44:47 Q. Okay.
17:44:48 A. -- that blowers have a different flow rate.
17:44:55 Q. So sitting here today you're going to
17:44:57 testify to a jury in Minnesota that you've obtained
17:45:03 these very similar numbers to the Bair Hugger
17:45:05 experiments that -- of Exhibit 9 based on your memory
17:45:10 and experience of working with different forced-air
17:45:14 warming devices.
17:45:17 A. What I can tell you is I had the number in
17:45:21 my mind of what the flow rate through these systems
17:45:23 were. I used this -- [Exhibit 9} I received this
17:45:27 datasheet and it verified, hey, this is very close,
17:45:32 and so I used my numbers.
17:45:35 Q. But your -- you can't reproduce your numbers
17:45:38 from some physical document or even notes.
17:45:40 A. That is correct. I cannot.
17:45:42 Q. Okay. And in fact -- Strike that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

316

17:46:07    1        And based -- If you look at the last page of

17:46:15    2   this document, you agree with me that they used -- if

17:46:29    3   you look at the second-to-last sentence, they used

17:46:32    4   Star CCM+ as the commercial CFD code.

17:46:36    5        MR. GOSS:  Objection, lack of foundation.

17:46:37    6        You can testify as to whether he read that

17:46:41    7   correctly.

17:46:43    8   A.   It says here:  "In all scenarios Star CCM+,

17:46:47    9   (a commercial CFD code) was used to model the air

17:46:49   10   flows."

17:46:55   11   Q.   I'm sorry.  I missed what you said.

17:46:58   12   A.   I read the sentence.  I confirmed what the

17:47:01   13   sentence said.

17:47:01   14   Q.   Okay.  And they actually used a polyhedral

17:47:05   15   mesh of 12 million and some cells; correct?

17:47:09   16   A.   That is --

17:47:10   17        MR. GOSS:  Again, lack of foundation, and

17:47:11   18   I'm going to actually stop any more questions about

17:47:14   19   the CFD which was done internally which again we are

17:47:17   20   asserting work-product protection over.  He has not

17:47:21   21   testified that he has seen any of it or relied on

17:47:25   22   any -- any CFD imaging that may have been done

17:47:27   23   internally by 3M.

17:47:28   24        MR. ASSAAD:  Well first of all, you

17:47:31   25   referenced this document early on in this deposition

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

317

17:47:33  1  about a document produced by Jennifer Wagner;

17:47:35  2  correct?  And this was --

17:47:36  3        MR. GOSS:  I'm not being deposed, Gabriel.

17:47:38  4  You can ask him the question.

17:47:39  5        MR. ASSAAD:  Well we've had the records

17:47:40  6  indicate it, and you've had this document -- you

17:47:42  7  provided this document way back in January and now

17:47:44  8  you're claiming attorney work product?

17:47:46  9        MR. GOSS:  You've had this document a long

17:47:49  10  time.  I'm saying that the references to CFD that

17:47:51  11  were done internally, that is attorney work product

17:47:53  12  and we reserve the right to claw it back.

17:47:55  13        And you can ask him about what he

17:47:58  14  considered from this document with respect to his

17:48:00  15  opinions, but other than that I'm going to instruct

17:48:03  16  him not to speculate about anything in here that he

17:48:06  17  doesn't know anything about.

         18  BY MR. ASSAAD:

17:48:07  19        Q.   You understand CFD modeling; correct?

17:48:10  20        A.   Yes.

17:48:11  21        Q.   Okay.  You understand that if you look at

17:48:12  22  here they used a RANS model, item number 7; correct?

17:48:17  23        MR. GOSS:  I'm going to instruct you not to

17:48:19  24  answer anything based on lack of foundation and no

17:48:22  25  relevance to your opinions in this case.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

318

17:48:25  1       Q.    Correct?

17:48:27  2             MR. ASSAAD:   Are you instructing him not to

17:48:28  3    answer?

17:48:29  4             MR. GOSS:   Right.

17:48:29  5             MR. ASSAAD:   Okay.

17:48:30  6       Q.    You agree with me that 3M used an ideal gas

17:48:35  7    and did not use the Boussinesq according to their --

17:48:38  8    their -- the air physics that were followed; correct?

17:48:42  9             MR. GOSS:   Is that something that you

17:48:43  10   considered for your opinions in this case?

17:48:45  11            THE WITNESS:   No.

17:48:46  12            MR. GOSS:   Then I instruct you not to

17:48:47  13   answer.

17:48:47  14      Q.    Okay.   You agree with me that they used a

17:48:51  15   K-epsilon two-layer buoyancy driven XU option;

17:48:55  16   correct?

17:48:56  17            MR. GOSS:   Is that something that you

17:48:57  18   considered for your work in this case?

17:48:59  19            THE WITNESS:   No.

17:48:59  20            MR. GOSS:   Then I instruct you not to

17:49:01  21   answer.

17:49:01  22      Q.    This document was provided to you; correct?

17:49:04  23      A.    Correct.

17:49:05  24      Q.    You received this document previously;

17:49:06  25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

319

17:49:08    1              MR. GOSS:  That's been well established,

17:49:09    2    but --

17:49:09    3              MR. ASSAAD:  I'm asking him.

17:49:10    4              MR. GOSS:  -- you can answer again.

17:49:11    5              MR. ASSAAD:  Let me set up my case for the

17:49:14    6    motion.

17:49:14    7        A.   Yes.

17:49:14    8        Q.   Okay.  And actually, Jennifer Wagner, who

17:49:16    9    assisted you in this case in some of the -- when you

17:49:19   10    went to the OR, has also been provided a copy of this

17:49:23   11    document.

17:49:24   12        A.   I don't know if that's true.

17:49:25   13        Q.   Okay.  Well the fact that it says "Wagner

17:49:31   14    0000013," I represent to you that she's the one that

17:49:35   15    produced this document.

17:49:36   16              MR. GOSS:  You can wait for a question.

17:49:45   17        Q.   And you reviewed this document and

17:49:47   18    considered it with respect to your opinions; correct?

17:49:51   19              MR. GOSS:  You can testify to what you

17:49:53   20    considered out of this document with respect to your

17:49:56   21    opinions.

17:49:57   22        Q.   You were provided this document before you

17:49:59   23    did your CFD analysis.

17:50:02   24        A.   I don't know the answer to that.  I don't

17:50:04   25    know if I was.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

320

17:50:05  1      Q.   Well it's dated October 15th, 2015; correct?

17:50:09  2      A.   Yes.

17:50:10  3      Q.   Okay.  And you said you compared your

17:50:13  4  numbers to the numbers that were in this document

17:50:15  5  regarding mass flow; correct?

17:50:17  6      A.   What I said was that --

17:50:22  7      Q.   Let me rephrase.  Your numbers --

17:50:24  8           Your memory and your experience confir --

17:50:27  9  was confirmed by the numbers in this document.

17:50:30  10     A.   My memory was confirmed by the flow numbers

17:50:34  11  in Table 1 of this document.

17:50:50  12          MR. ASSAAD:  Let's take a break.

17:50:52  13          THE REPORTER:  Off the record, please.

17:50:55  14          (Recess taken from 5:50 to 5:58 p.m.)

17:58:08  15  BY MR. ASSAAD:

17:58:11  16     Q.   I'd like to turn to page 5 of your report.

17:58:13  17  Are you there?  I want to talk about validation, the

17:58:18  18  validated method; correct?  That's what step 5 is;

17:58:21  19  correct?

17:58:21  20     A.   Yes.

17:58:22  21     Q.   Okay.  It states here that you took

17:58:24  22  measurements of the room and you find it -- you found

17:58:27  23  it to be 61 degrees Fahrenheit during the procedure;

17:58:30  24  is that correct?

17:58:30  25     A.   Correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

321

17:58:31    1      Q.   Where'd you take the measurements?

17:58:32    2      A.   Multiple locations.

17:58:33    3      Q.   Where?

17:58:34    4      A.   All -- I walked all the way around the

17:58:37    5  perimeter of the OR table multiple times and I took

17:58:40    6  measurements at different heights.

17:58:41    7      Q.   You agree the image that we put up regarding

17:58:43    8  the temperature differences in the room, that many of

17:58:47    9  the temperatures around the OR table were less than 61

17:58:50   10  degrees; correct?

17:58:51   11      A.   Some temperatures were slightly less than

17:58:53   12  61.

17:58:54   13      Q.   Okay.  And by the way, do you believe that

17:58:56   14  your CFD showed -- only has 8.1 million cells?

17:59:02   15      A.   I believe that's true.

17:59:03   16      Q.   If the CFD showed that there was over 9

17:59:06   17  million, would you disagree with that, the TRN file?

17:59:09   18      A.   No.

17:59:09   19      Q.   Okay.  So this would be incorrect about 8.1

17:59:12   20  million cells then; correct?  That you've testified

17:59:14   21  earlier and that's in your validation.

17:59:18   22      A.   Well would -- if -- if my TRN file shows

17:59:20   23  that I have 9 million cells, it means that, if

17:59:23   24  anything, it's more accurate.

17:59:26   25      Q.   It just means that there's more cells.  It

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

322

17:59:28   1   doesn't mean it's more accurate unless you do a

17:59:31   2   quasi-steady solution judgment; correct?

17:59:36   3        A.   That --

17:59:36   4        Q.   I mean more cells don't mean it's more

17:59:38   5   accurate; correct?

17:59:41   6        A.   That's not true.  Most -- More cells, in

17:59:45   7   almost every case, means more accurate.  And in fact

17:59:48   8   Elghobashi agreed with that.

17:59:49   9        Q.   Well if you have --

17:59:50   10            You did 60 million cells.  Are you telling

17:59:52   11   me the 60-million-cell solution is more accurate than

17:59:55   12   the one provided in your report?

17:59:58   13       A.   Adding more cells always has the potential

18:00:01   14   to make your results more accurate.

18:00:04   15       Q.   "Potential."

18:00:05   16       A.   That's right.

18:00:06   17       Q.   It doesn't mean it's more accurate.  You

18:00:07   18   might get the same solution whether you have 60

18:00:11   19   million cells or 5 million cells.

18:00:13   20       A.   Yes, you're right.

18:00:15   21       Q.   Okay.  So the -- So that statement is

18:00:18   22   incorrect that the more cells automatically means it's

18:00:21   23   more accurate.  It may be more accurate, but it might

18:00:23   24   not be.

18:00:24   25       A.   Correct.  And I don't think I used the word

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

323

18:00:26   1   "automatically."

18:00:26   2        Q.   Okay.  So sitting here today I cannot

18:00:29   3   replicate where you took temperature measurements in

18:00:32   4   the room; correct?

18:00:35   5        A.   I -- Well what you can --

18:00:38   6             What this document says and what's implied

18:00:41   7   by this document is multiple temperature measurements

18:00:43   8   were made, and the average was 61 Fahrenheit.

18:00:47   9        Q.   I understand that.  But if I want to

18:00:48   10  replicate exactly what you did, I have no way of

18:00:52   11  knowing exactly where you took the measurements;

18:00:54   12  correct?

18:00:54   13       A.   That is correct.

18:00:54   14       Q.   Okay.  And also you took measurements three

18:00:57   15  inches off the floor and you measured that to be 60

18:01:00   16  degrees Fahrenheit; correct?

18:01:02   17       A.   That is correct.

18:01:02   18       Q.   And where were those measurements taken?

18:01:08   19       A.   Those measurements were directly underneath

18:01:10   20  the head.

18:01:12   21       Q.   Okay.  Was it one measurement or two

18:01:14   22  measurements, or three?

18:01:16   23       A.   It would have been multiple measurements.

18:01:20   24       Q.   Sitting here today, do you know how many?

18:01:22   25       A.   It would have been enough measurements so

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

324

18:01:24    1    that I could get an average temperature that -- that

18:01:28    2    -- I mean there's obviously some short-term time-wise

18:01:33    3    fluctuations.  This -- This number represents enough

18:01:36    4    measurements that I got a steady temperature variable.

18:01:39    5        Q.   But you can't tell me how many; can you?

18:01:42    6    Sitting here today.

18:01:44    7        A.   Correct.

18:01:45    8        Q.   And you have no notes to indicate actual --

18:01:47    9    the numbers that you took down or the measurements;

18:01:49   10    correct?

18:01:51   11        A.   Well the numbers that I took down are the

18:01:52   12    numbers that we see here.

18:01:54   13        Q.   But to do an average you have multiple

18:01:55   14    numbers; correct?

18:01:58   15        A.   You can have the --

18:02:00   16             And I don't know if I did this.  You can

18:02:02   17    have the software do the averaging for you.  And in

18:02:05   18    that case you wouldn't extract the individual numbers.

18:02:07   19        Q.   Okay.  But you need individual measurements

18:02:09   20    to have an average; correct?

18:02:11   21        A.   That is correct.

18:02:12   22        Q.   Okay.  And either the software did it or you

18:02:13   23    did it to --

18:02:15   24        A.   Correct.

18:02:16   25        Q.   Okay.  And sitting here today we don't have

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

325

18:02:17   1   what those individual numbers are, and we will never

18:02:20   2   be able to find out what those individual numbers are

18:02:24   3   exactly; correct?

18:02:24   4        A.   Based on this document what you would know

18:02:26   5   is that the temperature, the average temperature at

18:02:29   6   that location is 60 or 60.5.  You would not have the

18:02:33   7   individual measurements that went into that number.

18:02:36   8        Q.   So you agree with me.  Sitting here today, I

18:02:38   9   cannot calculate what the average is based on

18:02:41  10   individual measurements because we do not have those

18:02:43  11   individual measurements; correct?

18:02:44  12        A.   I disagree.

18:02:45  13        Q.   How would I calculate an average unless I

18:02:47  14   have the numbers?

18:02:49  15        A.   Well there are two sets of numbers here.

18:02:51  16   One of them is calculated, and that means from the CFD

18:02:56  17   model, so you could get that directly.

18:02:58  18        Q.   But validation is based --

18:03:01  19             Your validation is based on experimental

18:03:03  20   results; correct?

18:03:03  21        A.   Yes.

18:03:04  22        Q.   So if I want to test whether or not your

18:03:07  23   experiments indicate that the temperature three inches

18:03:11  24   above the floor -- the average temperature above the

18:03:13  25   floor was 60.5 degrees, I would need the individual

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

326

18:03:18    1    numbers so I could calculate that average; correct?

18:03:21    2        A.   If you wondered whether I know how to do an

18:03:24    3    average and you doubted that, then yes, you would need

18:03:27    4    the individual numbers.

18:03:28    5        Q.   Okay.  Because to calculate an average I

18:03:32    6    need actual numbers to calculate an average from;

18:03:34    7    correct?

18:03:34    8        A.   That is correct.

18:03:35    9        Q.   Okay.  And that's not even college

18:03:40    10   mathematics, that's like middle school maybe, or

18:03:45    11   elementary?  I don't know, but.

18:03:45    12            MR. GOSS:  That's my level mathematics.

18:03:49    13       Q.   So --

18:03:50    14            And you agree with me that as an engineer --

18:03:54    15   as -- it's good to, when you take measurements, to

18:04:01    16   document them contemporaneously when you take the

18:04:04    17   measurements; correct?

18:04:05    18       A.   If it's needed.  If that documentation's

18:04:07    19   necessary.

18:04:08    20       Q.   Or if you're writing a report -- an expert

18:04:13    21   report in litigation and someone might want to

18:04:15    22   reproduce how you calculated the average that would be

18:04:19    23   something important to do; correct?

18:04:21    24       A.   Calculating the average is so trivial I

18:04:24    25   wouldn't have even thought of doing that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

327

18:04:34    1      Q.    Okay.  Now you also did -- you used a fog

18:04:37    2  generator to do fog -- to do tests on the airflow;

18:04:38    3  correct?

18:04:39    4      A.    Correct.

18:04:39    5      Q.    Okay.  And the fog generator was provided by

18:04:42    6  3M; correct?

18:04:43    7      A.    Correct.

18:04:44    8      Q.    Okay.  Have you ever used a fog generator

18:04:46    9  before?

18:04:51   10      A.    Yes.

18:04:53   11      Q.    Do you recall --

18:04:54   12            Do you know how long the -- you'd be able to

18:04:57   13  see the fog in a high velocity or turbulent flow?

18:05:02   14      A.    It depends.

18:05:03   15      Q.    Depends on what?

18:05:04   16      A.    Depends on the speed, depends on whether the

18:05:08   17  flow is disbursing, so the patterns of airflow,

18:05:13   18  depends on the level of turbulence.

18:05:20   19      Q.    And did you calculate or determine how long

18:05:26   20  you would be able to see the fog in the test that you

18:05:29   21  conducted?

18:05:29   22      A.    No.  It was not necessary.

18:05:31   23      Q.    I understand that you believe it's not

18:05:33   24  necessary.  But sitting here today, if I want to

18:05:36   25  replicate something I need to know all the facts and

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

328

18:05:40    1    how things are done.  So I understand you don't think

18:05:42    2    it's necessary, but you never calculated those

18:05:44    3    numbers; correct?

18:05:47    4        A.    Well I'm struggling to understa --

18:05:49    5        Q.    I'll withdraw that question.

18:05:50    6              Did you ever talk to the manufacturer to see

18:05:53    7    whether or not they recommended using this fog

18:05:55    8    generator to determine whether or not it was a proper

18:06:00    9    device to observe the airflow in an operating room?

18:06:07   10        A.    That was complex.  Could you re-ask the

18:06:09   11    question?

18:06:10   12        Q.    Did you talk to the manufacturer of this

18:06:11   13    device, the fog generator, to determine whether or not

18:06:13   14    this device would be a -- a device that could produce

18:06:19   15    results that you could see in an operating room?

18:06:22   16        A.    No.  It was not necessary.

18:06:42   17        Q.    Are you aware that the -- the person that

18:06:43   18    provided the device to 3M stated that in turbulent or

18:06:48   19    fast-moving air the fog generator would dissipiate in

18:06:52   20    two feet due to mixing?

18:06:54   21              MR. GOSS:  Object to form, lack of

18:06:55   22    foundation.

18:06:56   23        A.    I've never heard the word "dissipiate."

18:07:00   24        Q.    Or dissipate.  I'm sorry.

18:07:03   25        A.    Could you read the sentence again?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

329

18:07:04   1        Q.   Are you aware that the person -- the company

18:07:06   2    that provided the fog generator to 3M indicated to 3M

18:07:11   3    that, in fast-moving air or turbulence it dissipiates

18:07:15   4    in a foot or two due to mixing with the air?

18:07:20   5             MR. GOSS:  Object -- Same objection.

18:07:22   6             MS. ZIMMERMAN:  Dissipates.

18:07:24   7        Q.   Dissipates.

18:07:27   8        A.   I'm not aware that they said that.  I would

18:07:27   9    say it begins to di -- that it dissipates all the

18:07:30   10   time, but.  So I don't know what the word "dissipates

18:07:34   11   in two feet," I don't know what that phrase means.

18:07:36   12       Q.   Which means that in turbulent air you might

18:07:39   13   not be able to see the fog because it dissipates in a

18:07:42   14   foot or two -- a foot or two.

18:07:45   15            MR. GOSS:  Objection, lack of foundation

18:07:45   16   with respect to this document, and misstatement.

18:07:48   17            You can testify to it if you know the

18:07:50   18   answer.

18:08:02   19            (Abraham Exhibit 10 marked for

           20            identification.)

           21   BY MR. ASSAAD:

18:08:05   22       Q.   What's been marked as Exhibit 10 is Wagner

18:08:08   23   0000001 that was produced in this case, and if you

18:08:14   24   look, it's an email from Mr. Campbell from

18:08:19   25   cleanroomfogger.com, or Clean Room Fogger, to Mr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

330

| | |
|---|---|
| 18:08:25 | 1   Fowler at GT Law.  Do you know Mr. Fowler? |
| 18:08:29 | 2       A.   That name sounds familiar. |
| 18:08:31 | 3       Q.   If you look at paragraph two, it states: |
| 18:08:38 | 4   "At the other end of the scale in fast moving air or |
| 18:08:41 | 5   turbulence it dissipates in a foot or 2 due to mixing |
| 18:08:45 | 6   with the air." |
| 18:08:46 | 7           Were you told that information regarding |
| 18:08:48 | 8   this fog generator that you used? |
| 18:08:51 | 9       A.   I was not, and it wasn't relevant. |
| 18:08:54 | 10      Q.   Okay.  Well you saw the intensity model done |
| 18:09:05 | 11  by Dr. Elghobashi; correct?  In his report. |
| 18:09:08 | 12      A.   I recall turbulence intensity calculations. |
| 18:09:11 | 13      Q.   Okay.  If Elghobashi is correct in his |
| 18:09:14 | 14  report, you would agree with me that there is a -- |
| 18:09:19 | 15  there is -- there's more than two feet distance |
| 18:09:22 | 16  between underneath the drape and the surgical site; |
| 18:09:26 | 17  correct? |
| 18:09:26 | 18          MR. GOSS:  Object to form. |
| 18:09:28 | 19      A.   I don't understand that question. |
| 18:09:29 | 20      Q.   Well there's more than two feet of distance |
| 18:09:32 | 21  that air would have to travel between underneath the |
| 18:09:37 | 22  operating room table where the drape is, where the |
| 18:09:39 | 23  drape -- the end of the drape, and where the knee was |
| 18:09:42 | 24  in Dr. Elghobashi's model.  You agree? |
| 18:09:45 | 25      A.   Are you asking -- |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

331

18:09:47  1      I think you're asking is the physical

18:09:49  2  distance between the bottom of the drape in his model

18:09:53  3  and a knee more than two feet.

18:09:55  4      Q.   Yes.

18:09:55  5      A.   Is that what you're asking?

18:09:57  6      I believe it is more than two feet.

18:09:58  7      Q.   Okay.  So if the fog generator dissipates

18:10:02  8  within one or two feet according to what Mr. Campbell

18:10:11  9  states in this email, it's possible that you could use

18:10:14  10  the fog generator and you're not going to see anything

18:10:18  11  occur two feet away from where you insert the fog in a

18:10:21  12  turbulent -- in turbulence.

18:10:23  13      MR. GOSS:  Objection to form, calls for

18:10:25  14  speculation.

18:10:26  15      A.   I disagree.  This document, when I read this

18:10:30  16  document I see the words "fast-moving air" or

18:10:33  17  "turbulence."  What that means is high turbulence.

18:10:35  18  What this person is saying is, look, this may not be

18:10:39  19  the right device to use in those situations.  Okay?

18:10:45  20  They talk in other places in the email about the fog

18:10:48  21  lasting a long time.  For example, they say in the

18:10:52  22  very same paragraph:  "A few feet from the filter it

18:10:55  23  can last up to 10 feet."  So what this person appears

18:10:58  24  to be warning Mr. Fowler of is, this device may not

18:11:03  25  provide good visualization of airflow.  That's what

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

332

18:11:07   1   they're saying.  So then the question is, does it?

18:11:10   2   Does it adequately visualize airflow?  And the fact

18:11:14   3   is, it does, and we showed that in our operating room

18:11:17   4   FloViz experiments.

18:11:21   5          THE VIDEOGRAPHER:  Ten minutes.

18:11:37   6       Q.   What test did you do to state that it would

18:11:39   7   show -- it would have enough life in it, I guess, for

18:11:45   8   lack of a better term, that you could see the fog

18:11:50   9   within more than two feet in a turbulent flow in the

18:11:52   10  operating room?

18:11:54   11      A.   Well first of all we have visual evidence.

18:11:57   12  But secondly, the distance -- whether it can display

18:12:03   13  fog in a visual manner for two feet or not is

18:12:06   14  immaterial.  What matters is does it display the fog

18:12:10   15  long enough for long enough distances so that you can

18:12:14   16  ascertain whether the Bair Hugger has an effect on

18:12:16   17  flow.  And it was --

18:12:17   18      Q.   And you would agree --

18:12:18   19          MR. GOSS:  Let him finish.

18:12:20   20          MR. ASSAAD:  I thought he was done.

18:12:22   21          MR. GOSS:  Thank you.

18:12:22   22          THE WITNESS:  Thank you.

18:12:23   23      A.   And this fog device, in my professional

18:12:27   24  opinion, was able to show fog that extended long

18:12:30   25  enough to provide that conclusion.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

333

18:12:36    1        Q.    But sitting here today you do not know how

18:12:39    2    long the -- the fog generator will last in a -- in

18:12:44    3    turbulence that may be found in an operating room.

18:12:48    4              MR. GOSS:   Object to form.

18:12:50    5        A.    No one can say that because there's -- I

18:12:53    6    mean, what this -- what this person is doing is

18:12:56    7    they're warning you.   They're saying, look, this

18:12:59    8    device, which they appear to be selling, sometimes has

18:13:04    9    fog that lasts a long time and sometimes it doesn't,

18:13:08   10    so if you have fast-moving air or turbulence you might

18:13:11   11    want to be careful.

18:13:12   12              Now the fact is we saw it last longer than

18:13:14   13    two feet, and that tells me that we don't have much

18:13:18   14    turbulence.

18:13:18   15        Q.    Did you take any measurements?

18:13:23   16        A.    Measure --

18:13:23   17        Q.    Did you take any measurements to say, look,

18:13:25   18    we consider this lasting four feet or five feet?

18:13:30   19    Visual measurements.

18:13:31   20        A.    There are visual measurements of how far it

18:13:33   21    lasted in the videos.

18:14:28   22        Q.    With respect to --

18:14:44   23              Are you familiar with the publication titled

18:14:47   24    Resistive-Polymer Versus Forced-Air Warming:

18:14:50   25    Comparable Efficiency in Orthopedic Patients, authored

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

334

18:14:53   1   by Sebastian Brandt?

18:14:56   2       A.   I don't recall if I've read that one.  It's

18:14:59   3   possible, but I don't recall.

18:15:03   4       Q.   By the way, are you aware that every single

18:15:05   5   study that looked at either particles or neutrally

18:15:13   6   buoyant bubbles showed an increase in bubbles or

18:15:16   7   particles over the surgical site when the Bair Hugger

18:15:18   8   was on?

18:15:19   9           MR. GOSS:  Object to form.

18:15:21   10      A.   I don't know about "every single study."

18:15:23   11   I'm aware of some that report to show that, and many

18:15:26   12   of them I'm not impressed with.  I believe that there

18:15:30   13   are flaws in the papers.

18:15:31   14      Q.   What about the study that was funded and

18:15:33   15   done by 3M?

18:15:35   16      A.   There was a study funded and done by 3M, and

18:15:38   17   that study, if I recall correctly, had particle

18:15:44   18   differences within the uncertainty of the

18:15:47   19   observations, so essentially the same.  And also if I

18:15:51   20   recall -- and I'm doing this from memory, and I

18:15:53   21   shouldn't be doing this -- but if I recall, when heat

18:15:55   22   was turned on in some cases the particles went down.

18:16:00   23   So -- And then finally, as I recall, every scenario

18:16:04   24   that they looked at met the protective standard.

18:16:10   25      Q.   The protective effect.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

335

18:16:12   1        A.   They may have called --

18:16:14   2        Q.   The DIN standard.  The DIN standard.

18:16:17   3        A.   I believe they used the DIN standard, but I

18:16:18   4   can't confirm.

18:16:18   5        Q.   Hypothetically speaking if you were to find

18:16:20   6   out that the particles in the 3M-funded study

18:16:25   7   increased by a hundred-fold, would that affect whether

18:16:30   8   or not, in your opinion, the Bair Hugger had an effect

18:16:34   9   on the downward flow -- the unidirectional downward

18:16:40   10   flow?

18:16:41   11        MR. GOSS:  Object to form,

18:16:42   12   incomplete/improper hypothetical, calls for

18:16:43   13   speculation.

18:16:44   14        A.   I would need to see the study to assess its

18:16:47   15   quality.

18:16:47   16        Q.   Well you've seen the study, correct, and you

18:16:49   17   said it was within the margin of error.

18:16:51   18        A.   Wait.  Are you talking about a hypo --

18:16:52   19        Q.   I'm talking about the --

           20        A.   Oh.

18:16:53   21        Q.   I'm talking about the Sessler study.

18:16:55   22        A.   I'm sorry.  I thought you were talking about

18:16:56   23   a hypothetical study.

18:16:57   24        Q.   Well I'm saying if that same study indicated

18:17:00   25   that the particle counts increased by a hundred times

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

336

18:17:01   1   with the same methodology, the same measurements,

18:17:04   2   would that change your -- would that have an effect on

18:17:07   3   your opinions in this case of whether or not the Bair

18:17:11   4   Hugger had an effect on the unidirectional downward

18:17:14   5   flow?

18:17:14   6          MR. GOSS:  Same objections as before.

18:17:17   7      A.   My recollection of that paper is that the

18:17:20   8   results were within the uncertainty bounds, which

18:17:23   9   means you could not say which scenario had more

18:17:27   10  particles.

18:17:29   11         My other recollection is that that study --

18:17:34   12         Did that study ever test the composition of

18:17:38   13  the particles?  I -- I don't recall that they did.

18:17:43   14  And I don't believe that that study had humans

18:17:48   15  involved.  So there's a number of questions that I

18:17:51   16  would have about the study, I would need to see it.

18:17:53   17  But what I recall is that they were -- the results

18:17:55   18  were within uncertainty.

18:17:57   19      Q.   By the way, what do you mean by

18:17:58   20  "significant"?

18:18:00   21      A.   It depends on the context.

18:18:05   22      Q.   So the term "significant" depends on the

18:18:08   23  context with you?

18:18:13   24      A.   Yes.  For instance, it could mean

18:18:16   25  statistically significant, and it could mean

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

337

18:18:19     1    qualitatively significant.

18:18:21     2        Q.    Your opinion in your conclusion says:   "My

18:18:23     3    opinion is that forced-air patient warming does not

18:18:26     4    disrupt airflow in a way that would present a

18:18:28     5    significant risk of infection."

18:18:31     6             What do you mean by "significant" in that

18:18:34     7    statement?

18:18:35     8        A.    I mean that in the --

18:18:39     9             Oh, I was just waiting till you --

18:18:40    10        Q.    No.  Go ahead.

18:18:43    11        A.    That statement does not refer to statistical

18:18:46    12    significance.  In that sense it means meaningful, or

18:18:50    13    non-negligible.

18:18:52    14        Q.    Okay.  It doesn't mean any clinical

18:18:55    15    significance; correct?

18:18:56    16        A.    Correct.

18:18:56    17        Q.    Okay.  It just means to you meaningful

18:18:58    18    significance.

18:18:59    19        A.    That's right.

18:18:59    20        Q.    Okay.  And what the is the basis for this

18:19:03    21    opinion?

18:19:04    22        A.    I have a lot of opinions.

18:19:05    23             Could you read this one again so you can

18:19:07    24    refresh my memory?  It's late in the day.

18:19:07    25        Q.    "My opinion is that forced-air patient

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

338

18:19:10  1  warming does not disrupt airflow in a way that would

18:19:12  2  present a significant risk of infection."

18:19:14  3      A.   It means what it says, that airflow from a

18:19:16  4  device like the Bair Hugger does not stop the downward

18:19:21  5  airflow from the ventilation system from washing over

18:19:24  6  the surgical site.

18:19:25  7          MR. GOSS:  He asked for the basis of that.

18:19:27  8          THE WITNESS:  Oh, the basis?

18:19:28  9      Q.   Yeah.  Is it your CFD study?

18:19:30  10     A.   That would be one of the bases.

18:19:33  11          And I apologize for not listening carefully

18:19:35  12  to your question.

18:19:38  13     Q.   Does the use of your term "significant" in

18:19:40  14  that context, in that opinion, mean you recognize

18:19:45  15  there may be some risk of infection?

18:19:48  16     A.   No.

18:19:51  17     Q.   Because you used the term "significant"

18:19:53  18  risk, not "any" risk.

18:19:58  19     A.   Correct.  I used that term.

18:20:05  20     Q.   And you're not a neurobiologist; correct?

18:20:10  21     A.   Correct.

18:20:10  22     Q.   And you don't -- you don't hold yourself out

18:20:13  23  as an expert in microbiology; correct?

18:20:15  24     A.   Correct.

18:20:15  25     Q.   So sitting here today you don't know how

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

339

18:20:17    1    many bacteria or CFUs could cause a -- could be a

18:20:21    2    significant risk of infection to a person that's

18:20:23    3    having an implant surgery; correct?

18:20:25    4         A.   That is correct.

18:20:26    5         Q.   Okay.  And -- Does the fact that Memarzadeh,

18:20:58    6    that showed a slight disruption in laminar flow using

18:21:02    7    the 505, did not use the 750 in his study and that

18:21:06    8    might show a more increased disruption of laminar

18:21:08    9    flow?  If you recall?

18:21:10    10        A.   Is this the Memarzadeh study where he had

18:21:12    11   the air jets just emerging from the top of the

18:21:16    12   patient?

18:21:17    13        Q.   Yeah.

18:21:17    14        A.   So there was no draping on it?

18:21:19    15        Q.   Yes.

18:21:20    16        A.   Boy, that's so different from this case.

18:21:23    17        Q.   I think we can agree on something.

18:21:25    18             That's a flaw by not having the patient

18:21:26    19   being draped because the drape would affect airflow;

18:21:28    20   correct?

18:21:33    21        A.   If your model --

18:21:35    22             So he may have been modeling a different

18:21:37    23   surgery.  I don't -- I don't recall what he was

18:21:39    24   modeling.

18:21:39    25        Q.   Okay.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

340

18:21:40  1      A.   And I don't recall the in -- the question --

18:21:42  2  the scientific question he was trying to ask.  So

18:21:44  3  without looking at the paper I'm not prepared to say

18:21:46  4  it was a -- it's a flaw in his model or not.

18:21:49  5      Q.   But if you didn't use drapes in your model,

18:21:51  6  that would be a flaw; correct?  Because you want a

18:21:59  7  model as accurate as possible.

18:22:00  8      A.   No.  I've never said that.  You need to

18:22:02  9  model the things that matter.

18:22:04  10     Q.   Okay.

18:22:04  11     A.   And some things matter.

18:22:05  12          So, for example, the anesthesia screen

18:22:07  13  matters.  I mean, look, if I had the air oozing

18:22:15  14  vertically outwards without a drape I think that that

18:22:18  15  would matter, but that's not how I understand these

18:22:20  16  surgeries are done.

18:22:21  17          MR. ASSAAD:  That's all I have.

18:22:24  18          MR. GOSS:  All right.  A couple questions

18:22:28  19  for you, Dr. Abraham.

18:22:30  20          Should we -- I guess should we trade

18:22:32  21  places, or does it matter?

18:22:38  22          (Discussion off the stenographic record.)

23                          EXAMINATION

24  BY MR. GOSS:

18:22:40  25     Q.   You brought some papers with you here today;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

341

18:22:42    1   correct, Dr. Abraham?

18:22:43    2        A.   That is correct.

18:22:44    3        Q.   All right.  And within that group there were

18:22:49    4   a couple of publications by Apte.  You recall those?

18:22:54    5        A.   Yes.

18:22:55    6        Q.   All right.  And you can refer to them if you

18:22:57    7   need to.

18:22:58    8             Why did you bring those papers?

18:23:11    9        A.   It's my understanding that Apte is the

18:23:14   10   person who actually did the calculations, or perhaps

18:23:17   11   more accurate to say his graduate students.  It's my

18:23:21   12   understanding Dr. Elghobashi did not do the

18:23:24   13   calculations himself.  It's my understanding, based on

18:23:29   14   sitting in the deposition, that it wasn't Elghobashi's

18:23:32   15   software.

18:23:34   16             It is clear from Elghobashi's report that he

18:23:36   17   relied upon the Apte work and he relied upon citations

18:23:40   18   to Apte's code that reportedly showed validation.  And

18:23:47   19   I would argue that when you look at these papers cited

18:23:49   20   by Elghobashi, they do not show validation.

18:23:52   21        Q.   Why not?

18:23:56   22        A.   Validation is best demonstrated by comparing

18:24:00   23   your results against an experiment.  That's the

18:24:03   24   classic form of validation.  And I can look at -- I am

18:24:08   25   citing Apte, Mahesh, Gorokhovski and Moin, 2009.  And

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

342

18:24:14  1   I believe this was cited in the Elghobashi report as

18:24:19  2   validation.  In Figure 4 there's a comparison of

18:24:25  3   simulations to experiments, and there is an "a" and a

18:24:29  4   "b" part.  And what we see is that there is a

18:24:33  5   experimental error bar which is listed in the caption,

18:24:36  6   and in some cases the simulation is outside of the

18:24:39  7   error bar.

18:24:42  8        Q.   By how much?

18:24:43  9        A.   Well in -- in Figure 4 a it's hard to

18:24:47  10  determine, maybe a hundred percent in some cases.  But

18:24:51  11  then there's Figure 5, the very next figure, and the

18:24:55  12  caption says, "Comparison of normalized droplet

18:25:00  13  mass-distribution at different axial locations."  By

18:25:03  14  the way, that's particle tracking.  And there are

18:25:08  15  experiments, and then there is the so-called LES

18:25:11  16  calculation which I understand Elghobashi used in this

18:25:14  17  case.  And the errors there are approximately 400

18:25:17  18  percent.

18:25:21  19            There was another Moin and Apte paper which

18:25:28  20  shows the same experimental work.  So this isn't just

18:25:31  21  in one paper, it's in multiple ones.

18:25:33  22        Q.   Is that paper cited by Dr. Elghobashi?

18:25:35  23        A.   Yes, it is.  And it is Moin and Apte 2006.

18:25:41  24  And what's interesting about this second paper is we

18:25:43  25  see something very interesting about the software.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

343

18:25:47  1  Dr. Elghobashi mentioned in his deposition, once you

18:25:50  2  validate for one case that's more complex and has all

18:25:53  3  the ingredients, he said, you don't need to revalidate

18:25:56  4  it.  And I would argue strongly against that.

18:26:00  5          This is a case, it's a simulation that

18:26:03  6  appears to be performed over a few centimeters' fluid

18:26:08  7  domain, so a very small object, and the simulations

18:26:12  8  were carried out to three milliseconds, and we see

18:26:15  9  that in Figure 6.

18:26:18  10         It's my understanding that these papers do

18:26:24  11  not, do not have buoyancy.  So to say that a very

18:26:28  12  small, very short-term simulation which is not well

18:26:35  13  compared with experiments provides validation is, in

18:26:39  14  my mind, an error.

18:26:41  15         I brought two other papers.

18:26:43  16     Q.   What are those papers about?

18:26:47  17     A.   These are papers that have been referenced

18:26:52  18  in the course of this litigation.  One is Belani, the

18:26:58  19  year is 2012.  And another one is McGovern, et al.,

18:27:02  20  year 2011.

18:27:03  21     Q.   Why did you bring those papers?

18:27:09  22         THE VIDEOGRAPHER:  Two minutes left on the

18:27:11  23  tape.

18:27:11  24         THE WITNESS:  This'll be fast.

18:27:17  25     A.   In a section called "Total Knee Replacement

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

344

18:27:20    1   Experiment Setup" from the Belani paper it says:

18:27:24    2   Bubbles were introduced at the head and neck of the

18:27:27    3   mannequin to track under drape resident air movements

18:27:30    4   in the region where...excess patient warming heat was

18:27:33    5   being released."  In --

18:27:36    6       Q.   Why is that statement significant to you?

18:27:39    7       A.   Well, it agrees with where I had the Bair

18:27:42    8   Hugger air enter the room.  And in fact that's

18:27:44    9   confirmed by the other paper, which is McGovern.

18:27:47   10       Now they're working on hip replacement.  So

18:27:49   11   this is knee and hip.  And they say -- I've got to

18:27:57   12   find it.  Ahh.  Bubbles were introduced at the floor

18:28:00   13   level between the surgeon's body and the operating ta

18:28:05   14   -- Let's see.  Hold on.  That may not be the right

18:28:08   15   one.  I have to find it.  Oh, here.

18:28:09   16       I'm in the section called **"Experimental

18:28:11   17   Setup: Hip Replacement**."  Bubbles were introduced at

18:28:14   18   the head and neck region of the mannequin to track

18:28:16   19   under-drape resident air movements in the region where

18:28:19   20   the excess heat from the patient warming was being

18:28:22   21   released.

18:28:23   22       So the documents relied upon by the

18:28:26   23   plaintiffs agree with my supposition of where the heat

18:28:30   24   enters the room.

18:28:33   25       MR. ASSAAD:  I have a couple follow-up, if

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

345

18:28:35   1   you're not done.

18:28:36   2               MR. GOSS:  Okay.  So we better change the

18:28:37   3   tape.

18:28:40   4               (Recess taken from 6:28 to 6:30 p.m.)

           5               (Abraham Exhibits 11 - 14 marked

           6               for identification.)

           7   BY MR. GOSS:

18:30:57   8        Q.   All right, Dr. Abraham.  Showing you Exhibit

18:31:00   9   11, "Stochastic modeling of atomizing spray in a

18:31:04   10  complex swirl injector using large eddy simulation."

18:31:10   11  Is that one of the Apte papers that you were

18:31:13   12  discussing earlier?

18:31:14   13       A.   Yes, it is.

18:31:15   14       Q.   Okay.  And this is one of the papers that

18:31:18   15  was referred to -- or was this one of the papers

18:31:21   16  referred to by Dr. Elghobashi as validating his CFD?

18:31:26   17       A.   Yes.

18:31:27   18       Q.   In your opinion, does it validate his CFD?

18:31:29   19       A.   No.

18:31:31   20       Q.   Exhibit 12 is a reference "Large-Eddy

18:31:35   21  Simulation of Realistic Gas Turbine Combustors," by

18:31:40   22  Moin and Apte.  Is that an article or publication

18:31:46   23  cited by Dr. Elghobashi as validation of his CFD?

18:31:49   24       A.   Yes, it is.

18:31:51   25       Q.   In your opinion does that validate his CFD?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

346

18:31:53    1        A.    It does not.

18:31:57    2        Q.    Exhibit 13 is McGovern, et al. "Forced-air

18:32:05    3   warming and ultra-clean ventilation do not mix."

18:32:07    4             And this is the paper from which you were

18:32:11    5   reading about the -- the location of the helium --

18:32:18    6   neutrally buoyant helium bubbles being released around

18:32:23    7   the head and neck of the mannequin; is that correct?

18:32:25    8        A.    Yes.

18:32:26    9        Q.    All right.  And finally, Exhibit 14 is

18:32:30   10   Belani, et al., "Patient Warming Excess Heat: The

18:32:34   11   Effects of Orthopedic Operating Room Ventilation

18:32:37   12   Performance," and is that another paper where the

18:32:43   13   experiment released the flow tracer from the head and

18:32:47   14   neck area of a mannequin?

18:32:49   15        A.    Yes, it is.

18:32:51   16        Q.    And in that paper there was a statement that

18:32:56   17   -- that that is where the excess heat from the Bair

18:32:58   18   Hugger was released; is that correct?

18:33:00   19        A.    Correct.

18:33:01   20        Q.    You attended Dr. Elghobashi's deposition;

18:33:05   21   correct?

18:33:06   22        A.    Correct.

18:33:06   23        Q.    And that was after you submitted your report

18:33:10   24   in this case on January -- I'm sorry -- June 2nd;

18:33:14   25   correct?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

347

18:33:14    1        A.    Correct.

18:33:16    2        Q.    Did you form opinions as a result of --

18:33:23    3              Well first of all, let me ask you:  Why did

18:33:25    4    you attend Dr. Elghobashi's deposition?

18:33:30    5        A.    His report was not written in a clear way

18:33:33    6    and I had questions about how his analysis was done.

18:33:36    7        Q.    And what did you learn from that analysis?

18:33:39    8        A.    I learned that my initial critiques still

18:33:43    9    held, and in fact I -- are strengthened.

18:33:52   10        Q.    Okay.

18:33:52   11              (Interruption by the reporter.)

18:33:53   12        Q.    And are you prepared to offer opinions at

18:33:55   13    trial based on the information you obtained during Dr.

18:33:59   14    Elghobashi's deposition?

18:34:00   15        A.    Yes, I am.

18:34:03   16        Q.    Now yesterday you saw a document from Dr.

18:34:09   17    Elghobashi called Exhibit B to his errata sheet.  Do

18:34:15   18    you recall that?

18:34:15   19        A.    Yes.

18:34:16   20        Q.    Did you have an opportunity to review that?

18:34:18   21        A.    Yes.

18:34:19   22        Q.    And are you prepared to offer --

18:34:22   23              Well first of all, what did you determine

18:34:24   24    from your review of that document?

18:34:26   25        A.    His analysis is in error.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

348

18:34:29    1        Q.    Okay.  And are you prepared to offer

18:34:31    2    opinions at trial with respect to that analysis?

18:34:35    3        A.    Yes, I am.

18:34:37    4        Q.    What errors specifically did you identify in

18:34:42    5    -- in that Exhibit B to the errata sheet?

18:34:46    6        A.    Do you have it?  Could I look at it?

18:34:48    7        Q.    Yes.

18:34:48    8        A.    Or I could do it by memory.

18:34:52    9             MR. ASSAAD:  Just for the record, I'm going

18:34:53   10    to need at least another half -- you're bringing up

18:34:56   11    new issues that are not raised in his report, stuff

18:34:58   12    that's not cited in his report, and if we're going

18:35:01   13    along this path of new opinions I'm going to request

18:35:03   14    another 30 minutes to an hour to go over these

18:35:05   15    documents that I haven't had a chance to go over till

18:35:09   16    today, or his opinions.

18:35:12   17             MR. GOSS:  Well it's his errata sheet.

18:35:14   18    It's --

           19             MR. ASSAAD:  And he did not --

18:35:15   20             MR. GOSS:  -- Dr. Elghobashi's errata

18:35:16   21    sheet.

18:35:16   22             MR. ASSAAD:  He did not cite any of these

18:35:18   23    documents or any of this rebuttal opinions in his

18:35:21   24    report.

18:35:21   25             MR. GOSS:  Well of course he didn't.  This

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

349

18:35:23    1    all happened after the report.

18:35:23    2              MR. ASSAAD:  He's had those documents that

18:35:25    3    were cited by Abraham -- or by Elghobashi prior to

18:35:29    4    the deposition and prior to the submission of his

18:35:30    5    report.  He did not put any of those critiques

18:35:34    6    regarding Apte's papers --

18:35:38    7              MR. GOSS:  We can go as long as you need.

18:35:39    8              MR. ASSAAD:  Okay.

18:35:40    9              MR. GOSS:  That's fine.

18:35:42   10              MR. ASSAAD:  Fair enough.

18:35:43   11              MR. GOSS:  All right.  I need to take a

18:36:09   12    break to copy this real quick.

18:36:11   13              THE REPORTER:  Off the record, please.

18:37:34   14              (Recess taken from 6:37 to 6:39 p.m.)

           15              (Abraham Exhibit 15 marked for

           16              identification.)

           17    BY MR. GOSS:

18:39:04   18         Q.   All right.  So Exhibit 15 is, I will

18:39:09   19    represent to you, even though it doesn't say "Exhibit

18:39:12   20    B" on top of it, this is a copy of Exhibit B to Dr.

18:39:16   21    Elghobashi's errata sheet.

18:39:18   22              MR. GOSS:  I will say for the record that

18:39:19   23    we consider it to be an improper submission,

18:39:22   24    nevertheless, since Dr. Abraham is here and has

18:39:26   25    reviewed it, I will present it to him and ask him to

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

350

18:39:31  1  testify as to --

18:39:33  2      Q.  Well, let me just ask you:

18:39:35  3          What errors did you identify in this Exhibit

18:39:38  4  B?  Or Exhibit 15.  Sorry.

18:39:42  5      A.  There were a number of errors.  For

18:39:45  6  instance, his Figure 3 is incorrect.  His Figure 3

18:39:51  7  shows an arm with a heated-air gap and then inflated

18:39:58  8  tube, so the blanket is actually elevated over the

18:40:01  9  arm.  And that's not how these devices operate.  These

18:40:05  10  devices operate where the ar -- the blanket wraps

18:40:10  11  around the arm and touches the arm.  So there is not

18:40:16  12  a, the word is coaxial arm and blanket.  That doesn't

18:40:21  13  occur.

18:40:22  14      Q.  Okay.  Did you identify other errors in this

18:40:26  15  Exhibit 15?

18:40:28  16      A.  I did.

18:40:30  17      Q.  Okay.

18:40:30  18      A.  Another error that I identified is with his

18:40:35  19  convective heat transfer coefficient which he used,

18:40:38  20  and that is seen in equation 3.  He's used a value of

18:40:44  21  the convective heat transfer coefficient which is

18:40:47  22  artificially low, his value is 5.  My own research

18:40:51  23  shows a value of about 11.  So that's a error of a

18:40:56  24  factor of two.

18:40:58  25      Q.  Okay.  And I realize you only saw this for

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

351

18:41:03   1   the first time yesterday, but did you formulate any

18:41:06   2   other impressions of potential errors in this

18:41:10   3   submission?

18:41:10   4        A.   Yes.

18:41:11   5        Q.   Okay.

18:41:12   6        A.   He describes air supposedly moving around

18:41:17   7   the arm from the blanket, and then he says -- he

18:41:23   8   calculates an air velocity of .514 meters per second.

18:41:29   9   Sitting here right now I don't recall if he ever used

18:41:31  10   that number in his report.  But what he says next is

18:41:37  11   important.  He says:  "It should be noted that this is

18:41:40  12   the velocity before the air reaches the drape that

18:41:42  13   covers the blanket.  The air will then leave the drape

18:41:47  14   edges" at a lower velo -- "at a lower velocity as

18:41:51  15   shown in Figure 4."  And then he has arrows pointing

18:41:56  16   to a red outline of the lower edge of the drape, and I

18:42:02  17   believe that that is physically impossible.  It is

18:42:05  18   impossible for hot air to travel to the arrowed

18:42:10  19   locations as he describes.

18:42:13  20        Q.   And what's the length of the arrow

18:42:16  21   locations; does he indicate?

18:42:22  22        A.   I -- He --

18:42:23  23             There's no indication that I see --

18:42:25  24        Q.   Okay.

18:42:26  25        A.   -- of the length.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

352

| | | |
|---|---|---|
| 18:42:27 | 1 | Q. Okay. Any other issues with Exhibit 15 that |
| 18:42:31 | 2 | you've been able to identify in the last 24 hours? |
| 18:42:48 | 3 | A. Yes. |
| 18:42:49 | 4 | Q. Okay. |
| 18:42:51 | 5 | A. In Figure 5 he has a schematic for heat |
| 18:42:55 | 6 | transfer from the air to the body, and he has two |
| 18:42:58 | 7 | temperatures listed there which are both in error. He |
| 18:43:02 | 8 | lists the body temperature of 37 degrees Celsius; it |
| 18:43:06 | 9 | is not, that is too high. He lists the blower air |
| 18:43:09 | 10 | temperature at the inlet of 41. And while I recognize |
| 18:43:15 | 11 | that these devices operate with different blower |
| 18:43:18 | 12 | temperatures, in my opinion this should be the inlet |
| 18:43:23 | 13 | temperature to the blanket of 43 Celsius. |
| 18:43:30 | 14 | Q. Okay. |
| 18:43:31 | 15 | A. And those are the key issues. |
| 18:43:34 | 16 | Q. All right. Now on the back of one of those |
| 18:43:37 | 17 | pages there are some notations? |
| 18:43:39 | 18 | A. Yes. |
| 18:43:40 | 19 | Q. All right. Did you make those notations? |
| 18:43:42 | 20 | A. Yes, I did. |
| 18:43:43 | 21 | Q. And what are those? |
| 18:43:45 | 22 | A. Those are written equations called the |
| 18:43:50 | 23 | Navier-Stokes equations. |
| 18:43:51 | 24 | Q. All right. And why did you write those out? |
| 18:43:53 | 25 | A. Because I was anticipating that I would be |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

353

18:43:56   1   asked to write them in the deposition, and out of an

18:44:00   2   abundance of caution I reminded myse -- they're very

18:44:04   3   complex, so I had to remind myself of all the terms.

18:44:07   4       Q.   All right.

18:44:08   5            MR. GOSS:   That's all I have for you, sir.

           6                      EXAMINATION

           7   BY MR. ASSAAD:

18:44:10   8       Q.   How did you remind yourself?

18:44:14   9       A.   I wrote them a number of times over and

18:44:17  10   over.

18:44:18  11       Q.   Were you looking at a book?

18:44:19  12       A.   No.

18:44:20  13       Q.   You did it off your memory.

18:44:22  14       A.   No.   I actually put the equations in my

18:44:24  15   journal paper, and so I just transcribed them from the

18:44:27  16   journal paper.

18:44:28  17       Q.   Okay.   So you didn't just write them off

18:44:30  18   your memory, you actually looked at another document

18:44:32  19   to write them down.

18:44:34  20       A.   That is correct.

18:44:35  21       Q.   And you practiced them because you thought I

18:44:37  22   was going to ask you that question today.

18:44:39  23       A.   I would say I memorized them.   There's many

18:44:41  24   terms, and I wanted to make sure I had every term

18:44:47  25   correct.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

354

18:44:48  1      Q.   Okay.  All right.

18:44:49  2           Let's first talk about validation.  You

18:44:51  3   listed two papers, Exhibits Number 12 and 11, written

18:44:59  4   by one of the authors of Apte; correct?

18:45:03  5      A.   Correct.

18:45:04  6      Q.   And you're using this to prove that -- to

18:45:07  7   show that the code is not validated; correct?

18:45:12  8           MR. GOSS:  Object to form.

18:45:13  9      Q.   That's what my under --

18:45:14  10          I could be incorrect, but that's what my

18:45:16  11  understanding was.

18:45:17  12     A.   Dr. Elghobashi cited a number of references

18:45:20  13  of Elghobashi that he says demonstrated validation.

18:45:23  14  In my mind those articles do not demonstrate

18:45:26  15  validation.

18:45:27  16     Q.   So they demonstrate --

18:45:28  17          So they don't demonstrate validation, in

18:45:30  18  your mind, with regard to Elghobashi's validation;

18:45:33  19  correct?

18:45:34  20     A.   Correct.

18:45:35  21     Q.   And just -- just to clarify, you've had Dr.

18:45:39  22  Elghobashi's report since March; correct?

18:45:43  23     A.   I don't know --

18:45:44  24          That seems a little early.  I don't know

18:45:46  25  when I received it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

355

18:45:47  1      Q.   But you had the -- you had his report that

18:45:49  2  -- report that these two articles are cited prior to

18:45:52  3  submitting your expert report on June 2nd; correct?

18:45:56  4      A.   That is correct.

18:45:56  5      Q.   And these critiques of validation are being

18:45:59  6  raised for the first time by you today; correct?   To

18:46:05  7  at least -- To at least the plaintiffs.

18:46:06  8      A.   No.  I critiqued him in validation in my

18:46:09  9  expert report.

18:46:09  10     Q.   But you did not use these two documents in

18:46:11  11  your critique; correct?

18:46:12  12     A.   That is correct.

18:46:13  13     Q.   The first time you've raised to the

18:46:14  14  plaintiffs the -- the critique of Elghobashi's

18:46:18  15  validation with respect to these two articles, Exhibit

18:46:22  16  11 and 12, is today; correct?

18:46:24  17     A.   Correct.

18:46:24  18     Q.   Okay.  And you understand that the deadline

18:46:53  19  of June 2nd, 2017 was for the defense to provide

18:46:57  20  rebuttal reports to plaintiffs' expert reports.

18:47:01  21          MR. GOSS:  Object to form.  He's not a

18:47:02  22  lawyer.

18:47:03  23          You can testify if you have an

18:47:04  24  understanding about that.

18:47:09  25     A.   When I went to Elghobashi's deposition I

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

356

18:47:11  1  heard something that I disagreed with.  What I heard

18:47:16  2  was that if a code is validated for one case, it could

18:47:20  3  automatically be used for another case provided the

18:47:24  4  ingredients were the same.  Now he said that in his

18:47:26  5  deposition.  That was not in his expert report.

18:47:30  6  Following that deposition I inquired, was his

18:47:35  7  statement at his deposition correct.

18:47:39  8          So you've asked me a question about a

18:47:42  9  deadline?  I'm not aware of the legal deadlines in

18:47:46  10  this case.

18:47:46  11     Q.   Okay.  You agree that with respect to codes

18:47:56  12  that are written for CFD, such as the one that

18:47:58  13  Elghobashi used, it's always an ongoing process;

18:48:00  14  correct?

18:48:02  15     A.   Not necessarily.

18:48:03  16     Q.   Well you agree that the Stanford code that

18:48:07  17  was used is maintained and run by Ph.D. students that

18:48:10  18  keep on updating it on a yearly basis, providing new

18:48:14  19  code to solve problems.

18:48:16  20          MR. GOSS:  Object to lack of foundation.

18:48:17  21     A.   I have no basis to know that.

18:48:19  22     Q.   Okay.  So you don't know what the current

18:48:20  23  code is -- the current state of the code as of 2017 is

18:48:25  24  of the code that Elghobashi used; correct?

18:48:28  25     A.   Correct.  The only thing --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

357

18:48:29    1       Q.    Okay.  And --

            2       A.    -- I know is --

18:48:30    3       Q.    -- And -- And --

18:48:30    4             MR. GOSS:  Let him finish.  We're --

18:48:32    5       Q.    And moving forward, you agree that --

18:48:33    6             MR. GOSS:  Now we're off the clock.  He can

18:48:35    7   give a full answer.

18:48:36    8             MR. ASSAAD:  Okay.  That's fine.

18:48:37    9       A.    The only thing that I know is based on the

18:48:39   10   technical information in his report.

18:48:40   11       Q.    Okay.  And -- And the technical information

18:48:43   12   you look at Exhibit 12, which is dated 2006; correct?

18:48:48   13       A.    Say that again.

18:48:49   14       Q.    The article's written in 2006; correct?

18:48:53   15       A.    It was published in 2006.

18:48:55   16       Q.    So it could have been written in 2005.

18:48:56   17       A.    That's correct.

18:48:57   18       Q.    Okay.  So that is approximately 11 years

18:49:01   19   ago; correct?

18:49:02   20       A.    Yes.

18:49:02   21       Q.    So you don't know what, if any, change in

18:49:05   22   the code occurred between the publication of this

18:49:06   23   paper and the code that Elghobashi used; correct?

18:49:09   24       A.    What I know --

18:49:10   25       Q.    "Yes" or "no," sir?  "Yes" or "no"?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

358

| | |
|---|---|
| 18:49:12 | 1   MR. GOSS:  No -- |
| 18:49:13 | 2   Q.  You don't know what has occurred between |
| 18:49:15 | 3   2006 and 2017 with respect to the code that Dr. |
| 18:49:19 | 4   Elghobashi used; correct? |
| 18:49:21 | 5   MR. GOSS:  Time is no longer an issue. |
| 18:49:22 | 6   MR. ASSAAD:  I want him to answer my |
| 18:49:24 | 7   question. |
| 18:49:24 | 8   MR. GOSS:  You can answer it, and you can |
| 18:49:26 | 9   provide your explanation. |
| 18:49:27 | 10   MR. ASSAAD:  That's fine.  As long as I get |
| 18:49:29 | 11   a "yes" or a "no," then he could... |
| 18:49:30 | 12   A.  Can you ask the question again? |
| 18:49:32 | 13   Q.  You don't know what has changed in the code |
| 18:49:35 | 14   between April of 2006, the date of this publication, |
| 18:49:37 | 15   and 2017; isn't that correct? |
| 18:49:41 | 16   A.  That is correct. |
| 18:49:41 | 17   Q.  Okay. |
| 18:49:42 | 18   A.  What I do know is that that's a paper he |
| 18:49:44 | 19   cited as supporting the validation of the code he used |
| 18:49:48 | 20   in this case. |
| 18:49:49 | 21   Q.  Okay.  And you agree with me that Exhibit |
| 18:49:53 | 22   Number 11, it was published in 2009. |
| 18:49:56 | 23   A.  I agree. |
| 18:49:58 | 24   Q.  Okay.  And you agree with me that you don't |
| 18:50:01 | 25   know any changes in the code that was use -- that was |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

359

18:50:02  1  made between 2009 and 2017 if any changes were made;

18:50:06  2  correct?

18:50:07  3      A.   I have the same answer as the prior question

18:50:10  4  you asked, which is, yes, I do not know.

18:50:13  5      Q.   Okay.

18:50:13  6      A.   But that was a document cited in his expert

18:50:16  7  report.

18:50:16  8      Q.   But --

18:50:17  9           And you agree that you could -- you could

18:50:19 10  validate CFD analysis based on the code being

18:50:31 11  validated in prior experiments.

18:50:38 12      A.   Can you ask that -- That's a cumber --

18:50:41 13           I'm struggling to understand your question.

18:50:42 14      Q.   Well you cited to Exhibit 11 and 12 saying

18:50:46 15  that you disagree with Dr. Elghobashi validating his

18:50:49 16  code on articles 11 and 12; correct?

18:50:52 17      A.   Correct.

18:50:52 18      Q.   Okay.  Which means that you could validate

18:50:55 19  your CFD analysis based on more complex experiments

18:50:59 20  made with the same code; correct?

18:51:04 21      A.   That is possible, but not necessarily true.

18:51:07 22      Q.   Okay.  And you cited a paper written by

18:51:10 23  Oberkampf and Trucano.  You recall that; correct?

18:51:13 24      A.   Yes.

18:51:13 25      Q.   And you would agree with me that in that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

360

18:51:17  1  paper it states, because of the infeasibility and

18:51:19  2  impractibility of conducting true validation

18:51:23  3  experiments on most complex systems, the recommended

18:51:26  4  method is to use a building-block approach.

18:51:28  5      Do you agree with that?

18:51:29  6  A.   Yes.

18:51:29  7  Q.   Okay.  And you testified earlier that the

18:51:33  8  CFD modeling that was done in this by you and by

18:51:36  9  Elghobashi was a complex system; correct?

18:51:38  10  A.   Yes.

18:51:39  11  Q.   Okay.  And you're an alumnus of the

18:51:51  12  University of Minnesota; correct?

18:51:52  13  A.   Yes.

18:51:52  14  Q.   You could have went and talked to Krishnan

18:51:55  15  Mahesh and got what actually the Stanford code is

18:51:58  16  validated for or not; correct?

18:52:00  17      MR. GOSS:  I'll object to form.

18:52:02  18  A.   I don't know.  I mean, I -- I think

18:52:06  19  Elghobashi said it was a proprietary code.

18:52:09  20  Q.   You understand that the people that work on

18:52:11  21  the code from Stanford take it with them and they're

18:52:13  22  allowed to use it, just like Elghobashi was allowed to

18:52:17  23  use it, as well as other people.

18:52:18  24      MR. GOSS:  Lack of foundation.

18:52:21  25  A.   I do not understand that.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

361

18:52:22   1      Q.   Okay.

18:52:22   2           (Interruption by the reporter.)

18:52:22   3      Q.   Well you understand there's codes out there

18:52:26   4   written by universities that are proprietary; correct?

18:52:29   5      A.   Yes.

18:52:29   6      Q.   And that many students or Ph.D.s work on

18:52:34   7   that code and refine that code over time.

18:52:36   8      A.   Yes.

18:52:37   9      Q.   Okay.  And the Stanford code is an example;

18:52:39   10  correct?

18:52:40   11     A.   Yes.

18:52:40   12     Q.   And actually The University of Minnesota has

18:52:42   13  its own code; correct?

18:52:44   14     A.   Possibly.  I don't know.

18:52:45   15     Q.   You don't know.

18:52:46   16     A.   Correct.

18:52:47   17     Q.   Okay.  And you still have ties to the

18:52:54   18  University of Minnesota; correct?

18:52:56   19     A.   Define "ties."

18:52:57   20     Q.   You still have relationships with your --

18:52:58   21  with Sparrow; correct?

18:53:00   22     A.   Yes.

18:53:01   23     Q.   Okay.  St. Thomas doesn't have its own code;

18:53:05   24  correct?

18:53:06   25     A.   St. Thomas uses ANSYS.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

362

18:53:08   1      Q.   Okay.  You agree with me that if the code

18:53:45   2   Elghobashi used was validated for more complex systems

18:53:49   3   used in this case, the same type of math -- for the

18:53:52   4   same type of physics and mathematics, that

18:53:56   5   Elghobashi's CFD is validated.

18:53:59   6           MR. GOSS:  Object to form.

18:54:01   7      A.   I would agree that if it was validated for

18:54:03   8   as complex or more complex of a case of the same

18:54:07   9   nature, then...

18:54:13   10          No, I would not agree.

18:54:14   11     Q.   You wouldn't.

18:54:15   12     A.   No.

18:54:15   13     Q.   Okay.  So you disagree with the article that

18:54:17   14   you wrote that I just read to you.

18:54:20   15     A.   Say --

18:54:21   16          Read that statement again.

18:54:25   17     Q.   You recall citing this article in your -- in

18:54:27   18   your report.

18:54:27   19     A.   Yes.

18:54:28   20     Q.   Okay.  Have you read this article?

18:54:30   21     A.   Yes.

18:54:30   22          MR. GOSS:  This is an article that he

18:54:31   23   wrote?

18:54:32   24          MR. ASSAAD:  He cited.

18:54:32   25          MR. GOSS:  You said he wrote it.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

363

18:54:34  1          MR. ASSAAD:  I said he cited in his report.

18:54:36  2          MR. GOSS:  Okay.  I thought you said he

18:54:38  3  wrote it.  I'm sorry.

18:54:40  4     Q.   You've read this entire article?

18:54:42  5     A.   Yes.

18:54:43  6     Q.   Okay.  When's the last time you read this

18:54:44  7  article?

18:54:45  8     A.   Awhile ago.  I can't --

          9     Q.   Okay.

18:54:47  10    A.   I can't recall.

18:54:47  11    Q.   It's a large article; correct?

18:54:49  12    A.   It was heavy reading.

18:54:51  13    Q.   Okay.  And in the article which you said you

18:54:53  14  agreed with...  No.  I withdraw that question.

18:55:01  15         Let me go to a different part, if I can find

18:55:05  16  it.

18:55:08  17         By the way, do you agree that this article's

18:55:11  18  authoritative on verification and validation in

18:55:14  19  computational fluid dynamics?

18:55:17  20    A.   I don't know what the word "authoritative"

18:55:19  21  means in this context.

18:55:20  22    Q.   But you cited it; correct?

18:55:22  23    A.   I cited it as a representation of how these

18:55:26  24  issues are viewed in the community.

18:55:28  25    Q.   Okay.  So this is --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

364

18:55:30   1          You agree with me this is how -- these are

18:55:32   2   how -- these are how verification and validation --

18:55:35   3   validation issues are viewed in the fluid dynamics

18:55:38   4   community; correct?

18:55:39   5       A.   Yes.

18:55:40   6       Q.   Okay.  Definitely not my community.  You

18:55:42   7   agree with that.

18:55:44   8       A.   Possibly.

18:55:45   9       Q.   Definitely not Peter Goss's community.

18:55:47  10          MR. GOSS:  Well that we can stipulate to.

18:55:56  11       Q.   Now you agree with me that Elghobashi put

18:56:00  12   down calculations and computations that you were able

18:56:03  13   to observe and critique; correct?  For example,

18:56:08  14   Exhibit Number 15.  He wrote down his calculations;

18:56:14  15   correct?

18:56:15  16       A.   I believe that is from him, and yes, it does

18:56:18  17   show a calculation.

18:56:19  18       Q.   So someone such as yourself could look at

18:56:21  19   what he did to calculate what he did and either agree

18:56:23  20   with it or critique it; correct?

18:56:25  21       A.   Correct.

18:56:25  22       Q.   Okay.  And you did not do such a thing with

18:56:30  23   respect to your initial boundaries; correct?

18:56:33  24       A.   Incorrect.

18:56:35  25       Q.   Please show me the calculations.  Please

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

365

18:56:37  1  show me one addition that you've provided that has a

18:56:43  2  mathematical equation to the plaintiff in this case.

18:56:48  3      A.   Well I think that the question's become

18:56:50  4  confused.

18:56:51  5      Q.   No, it hasn't become --

18:56:53  6           If it's confused, I'll re-ask it.

18:56:54  7           MR. GOSS:  He may not --

          8           MR. ASSAAD:  I'll re-ask it.

18:56:55  9           MR. GOSS:  -- understand what you're

18:56:56  10  asking.

18:56:56  11     Q.   I'll re-ask it.

18:56:58  12          Elghobashi provided you calculations of how

18:57:01  13  he did things; correct?

18:57:02  14     A.   Correct.

18:57:03  15     Q.   And there are actual equations; correct?

18:57:05  16     A.   Correct.

18:57:06  17     Q.   With numbers.

18:57:06  18     A.   Correct.

18:57:07  19     Q.   With solutions.

18:57:08  20     A.   Correct.

18:57:09  21     Q.   With heat value coefficients; correct?

18:57:15  22     A.   Correct.

18:57:16  23     Q.   That you as a -- a -- a person in the field

18:57:20  24  of mechanical engineering can look at it and critique

18:57:24  25  it and determine whether or not it's correct or not;

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

366

| | | |
|---|---|---|
| 18:57:27 | 1 | correct? |
| 18:57:28 | 2 | A.   Correct. |
| 18:57:28 | 3 | Q.   And that's what you did in this case.  You |
| 18:57:30 | 4 | saw what he did and you say, I disagree. |
| 18:57:32 | 5 | A.   That's right. |
| 18:57:33 | 6 | Q.   Correct? |
| 18:57:33 | 7 | And you did not provide one equation to the |
| 18:57:41 | 8 | plaintiffs that we could do the same type of critique |
| 18:57:44 | 9 | that you did to Elghobashi; correct? |
| 18:57:46 | 10 | MR. GOSS:  You mean other than the TRN |
| 18:57:47 | 11 | file? |
| 18:57:49 | 12 | Q.   There's no equations in the TRN file; are |
| 18:57:52 | 13 | there? |
| 18:57:53 | 14 | A.   Well, I mean, the equations are built into |
| 18:57:55 | 15 | the software so you can't really separate the |
| 18:57:57 | 16 | equations from the software.  But here is -- here is |
| 18:58:00 | 17 | the issue -- |
| 18:58:00 | 18 | Q.   My question -- |
| 18:58:02 | 19 | Let me ask it simple, simple.  In Exhibit 1, |
| 18:58:04 | 20 | 2 or any of the exhibits we saw today that were |
| 18:58:07 | 21 | produced by you, okay, except for the Elghobashi |
| 18:58:11 | 22 | exhibits or any of the citings -- |
| 18:58:13 | 23 | Let's go back.  Exhibit 1 and 2 of your |
| 18:58:18 | 24 | report, your CV, as well as your expert report, you |
| 18:58:22 | 25 | agree with me that there is not one mathematical |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

367

18:58:27  1  equation that was provided to the plaintiffs in this

18:58:31  2  case.

18:58:32  3      A.   There is no equation.

18:58:34  4      Q.   So you agree with me.  "Yes" or "no"?

18:58:36  5      A.   I agree with you, --

18:58:37  6      Q.   Okay.

18:58:38  7      A.   -- but the information is listed there that

18:58:41  8  would allow someone to reproduce the results.

18:58:44  9      Q.   Okay.  You agree with me that there's not

18:58:46  10  one mathematical equation in your expert report;

18:58:49  11  correct?

18:58:49  12          MR. GOSS:  I think he -- I think he

18:58:50  13  answered that.

18:58:52  14      A.   I agree, --

         15      Q.   Okay.

18:58:53  16      A.   - and it's not necessary.

18:58:54  17      Q.   And you agree with me there's not one number

18:58:56  18  or -- like equation that uses numbers to show what you

18:58:59  19  did to make any of your assumptions in your expert

18:59:03  20  report; correct?

18:59:04  21          MR. GOSS:  Asked and answered.

18:59:06  22      A.   I agree, I think I've answered that.

18:59:44  23      Q.   Okay.  You disagree with Figure 3 of Exhibit

18:59:49  24  15; correct?

18:59:51  25      A.   Yes.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

368

18:59:52    1        Q.   Okay.  Do you have any experimental or

18:59:55    2    scientific equations, besides the fact that you just

18:59:58    3    sit here today and say you disagree, to support your

19:00:01    4    -- your -- your critique of Figure 3?

19:00:05    5             MR. GOSS:  Do you have the exhibit in front

19:00:07    6    of you?

19:00:07    7             MR. ASSAAD:  I showed it to him already.

19:00:09    8             MR. GOSS:  Oh.

19:00:12    9        A.   Figure 3 shows --

19:00:14   10        Q.   That wasn't my question.  I know what Figure

19:00:16   11    3 shows.

19:00:16   12             I'm asking you, do you have any mathematical

19:00:19   13    equations or calculations or anything to support your

19:00:22   14    critique of Figure 3?

19:00:23   15        A.   Yes.

19:00:23   16        Q.   Where?

19:00:24   17        A.   I have direct observation.  I have worked on

19:00:26   18    these devices for years.  The blanket touches the

19:00:29   19    skin.  There -- The arm is not in a concentric space

19:00:34   20    within the blanket.  That is not how these devices

19:00:37   21    work.

19:00:38   22        Q.   So your opinion is that the blanket touches

19:00:43   23    the skin?

19:00:45   24        A.   Yes.

19:00:46   25        Q.   So the blanket would have a significant heat

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

369

19:00:50   1   transfer by conduction from the blanket to the skin;

19:00:53   2   correct?

19:00:54   3        MR. GOSS:  Object to form.

19:00:55   4   A.   All of the heat is transferred via -- via

19:00:57   5   convection.

19:00:58   6   Q.   Really?

19:00:59   7   A.   Yes.

19:01:01   8   Q.   Would you -- I mean, your critique is that

19:01:10   9   -- Strike that.

19:01:10   10       Do you not think that the -- the blanket

19:01:14   11   itself, the -- that's not the pores heats up?

19:01:18   12   A.   I do believe the pores heat up.

19:01:20   13   Q.   So if it's touching the skin, you don't

19:01:22   14   think it transfers heat by conduction?

19:01:24   15   A.   How did the heat get there in the first

19:01:26   16   place?  All of the heat that is transferred from the

19:01:29   17   heater to the patient is by convection.  Absolutely.

19:01:33   18   Q.   You'd bet your career on that, that all the

19:01:35   19   heat is transferred from the Bair Hugger by convection

19:01:38   20   to the patient?  You willing to bet your career on

19:01:41   21   that?

19:01:41   22       MR. GOSS:  I think you're talking about two

19:01:43   23   different things.

19:01:43   24       MR. ASSAAD:  No.  He knows exactly what I'm

19:01:45   25   talking about.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

370

19:01:45    1          MR. GOSS:  That's argumentative.

19:01:46    2          I think we covered this earlier, but if you

19:01:48    3   have a different answer, you can provide it.

            4          A.   I would --

19:01:51    5          MR. GOSS:  If you don't, you can stand by

19:01:52    6   your testimony.

19:01:53    7          A.   I would never bet my career on the word

19:01:56    8   "all."  But here's what I'll say.  This device is

19:02:00    9   designed and operated in a way where air is heated up,

19:02:04   10   that air is blown into an inflatable blanket, and that

19:02:09   11   air oozes out of the pores against the skin.  That

19:02:14   12   transfer of heat from the heater within the Bair

19:02:17   13   Hugger base to the body is convection.

19:02:22   14          Q.   You sure about that?

19:02:23   15          A.   Yes.

19:02:24   16          Q.   So you're telling me engineering principles

19:02:26   17   of heat transfer that --

19:02:28   18          I mean you agree with me that you could heat

19:02:30   19   something by convection -- I could heat this paper

19:02:39   20   with a hot air blower by convection; correct?

           21   [Demonstrating.]

19:02:41   22          A.   Correct.

19:02:42   23          Q.   And this paper is going to warm up; correct?

19:02:45   24          A.   Yes.

19:02:46   25          Q.   Okay.  And if I take this paper and put this

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

371

19:02:49   1   pen to it, okay, how's the paper warming up the pen;

19:02:53   2   by convection or by conduction?

19:02:55   3       A.   In that case it's a two-step process.  The

19:02:59   4   ultimate heat transfer is by convection, and it passes

19:03:02   5   through the paper by conduction.

19:03:04   6       Q.   And then it passes to the pen by conduction;

19:03:07   7   correct?

19:03:08   8       A.   Well once it's into the pen there's no issue

19:03:10   9   of conduction.

19:03:11  10       Q.   You said it passes into the paper by

19:03:13  11   conduction; correct?

19:03:14  12       A.   No.  No.  It pa -- If I said that, it was a

19:03:16  13   mistake.

19:03:17  14       Q.   Okay.  It passes --

19:03:18  15            It heats up the paper by convection;

19:03:20  16   correct?

19:03:21  17       A.   Yes.

19:03:21  18       Q.   And then the paper passes heat -- or

19:03:25  19   transfers heat to the pen that's touching it by

19:03:29  20   conduction; correct?

19:03:30  21       A.   If there is contact, the heat is transferred

19:03:32  22   through a wall by conduction.

19:03:35  23       Q.   Okay.  Okay.  So the transfer of heat from

19:03:38  24   the piece of paper to the pen in this example -- I'm

19:03:42  25   going to put it in front of the camera -- is by

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

372

19:03:46   1   conduction.

19:03:47   2        A.   Through an impermeable surface, the transfer

19:03:51   3   across the surface is by conduction.   The transfer to

19:03:55   4   the object initially is convection.

19:03:57   5        Q.   Okay.  You agree with me that the -- the

19:04:03   6   only way air escapes out of the Bair Hugger is through

19:04:07   7   the pores.

19:04:09   8        A.   No.

19:04:10   9        Q.   How else would it escape?

19:04:12   10        A.   Because when the hose connects with the

19:04:16   11   blanket there may be imperfections in that connection,

19:04:21   12   but I would say this.   The majority of the air escapes

19:04:23   13   through the holes.

19:04:24   14        Q.   Okay.

19:04:26   15        A.   And that air impinges on the skin, and that

19:04:28   16   is a convective heat transfer process.

19:04:30   17        Q.   Okay.  What about the part where the plastic

19:04:34   18   -- or the Bair Hugger bottom layer is heated?  Not

19:04:37   19   where the pores are, but the space in between the

19:04:40   20   pores, okay?  If that touches the patient, you agree

19:04:44   21   that the heat transfer from that plastic Bair Hugger

19:04:49   22   layer to the patient where there's contact is

19:04:52   23   conduction.

19:04:53   24        A.   I would agree that the heat transfer across

19:04:55   25   the plastic is conduction, but the origination of the

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

373

19:04:58    1   heat is by convection.

19:05:00    2        Q.   I understand that.

19:05:01    3             I think you and I are speaking two different

19:05:03    4   things, because you could heat by convection, but then

19:05:06    5   it's going to warm objects that might transfer heat by

19:05:09    6   conduction; correct?

19:05:12    7             Even though the initial source --

19:05:14    8        A.   The convective heat is transferred through

19:05:16    9   -- could be transferred through the wall by

19:05:18   10   conduction.

           11        Q.   Okay.

19:05:18   12        A.   I would say that.

19:05:19   13        Q.   So if the Bair Hugger is -- the plastic, not

19:05:22   14   the -- where the jets are, but the non-jet areas or

19:05:25   15   perforations are touching the patient, there is going

19:05:28   16   to be heat transfer from that solid Bair Hugger wall

19:05:34   17   to the patient.

19:05:36   18             MR. GOSS:  Objection, I think it

19:05:38   19   mischaracterizes the Bair Hugger.

19:05:39   20             But if you understand it, you can testify

19:05:41   21   to it.

19:05:42   22        A.   Can you ask the question again?

19:05:48   23             (Discussion off the stenographic record.)

19:05:48   24             MR. GOSS:  It's not a solid wall.

19:05:49   25        Q.   You're assuming that the Bair Hugger is

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

374

19:05:51   1   touching the patient; correct?  And that's why you

19:05:54   2   critique Figure 3.

19:05:55   3      A.   The critique I have of Figure 3 is that it

19:05:58   4   describes a situation which doesn't exist.  That is,

19:06:02   5   it's got a solid arm centrally located, and I think I

19:06:07   6   may have used the word, like, axisymmetrically

19:06:11   7   something located within a circle that is the blanket.

19:06:17   8   And that's not how this thing works, and that's not

19:06:21   9   how it operates.

19:06:24   10        So what he's done here is he's imagined

19:06:28   11   long, straight, rectangular slots through which the

19:06:32   12   air ejects downwards, and that is not how these

19:06:35   13   devices operate.

19:06:36   14      Q.   Well you agree that the air is ejected

19:06:38   15   downwards; correct?

19:06:39   16      A.   No.

19:06:41   17      Q.   Where is the Bair Hugger air blowing?

19:06:43   18      A.   Against the skin.

19:06:46   19      Q.   Okay.  Hypothetically speaking I am four

19:06:50   20   feet tall and I stretch out my hands and the Bair

19:06:53   21   Hugger goes past the end of my hand, the air over --

19:06:58   22   in that area that goes past my hand, is that ejecting

19:07:00   23   down?

19:07:02   24      A.   That --

19:07:04   25        I mean, that's a hypothetical.  From my

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

375

19:07:07  1  understanding of operating room tables, that air would

19:07:10  2  be ejected against...  I don't know.  I'd have to see

19:07:16  3  it.  I'd have -- I don't know.

19:07:18  4      Q.   So sitting here today, you don't know.

19:07:19  5      A.   Correct.

19:07:19  6      Q.   Okay.  And how wide is the -- is the arm

19:07:24  7  where the -- where the arm extension is, like the arm

19:07:27  8  pad and board; do you know?

19:07:29  9      A.   I do not know.

19:07:30  10     Q.   Okay.  And what's the -- the dimensions of

19:07:39  11  the Bair Hugger Blanket 522?

19:07:41  12     A.   I don't know the numbers off the top of my

19:07:42  13  head.

19:07:43  14     Q.   Have you seen one?

19:07:44  15     A.   Yes.

19:07:44  16     Q.   Have you measured one?

19:07:47  17     A.   I don't recall measuring the physical

19:07:49  18  dimensions of one.

19:07:50  19     Q.   Have you received the schematics of one?

19:07:52  20     A.   Not that I recall.

19:07:53  21     Q.   Do you disagree with the measurements that

19:07:55  22  Elghobashi put in Figure -- Figure 1 with respect to

19:08:00  23  the dimensions?

19:08:03  24     A.   I have no reason to disagree.

19:08:04  25     Q.   Okay.  You disagree with the body

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

376

19:08:31  1  temperature of 37 degrees Celsius; correct?

19:08:33  2       A.   I disagree that that's the skin temperature.

19:08:35  3       Q.   Okay.  What would you put here as the skin

19:08:37  4  temperature?

19:08:40  5       A.   The skin temperature depends on the

19:08:41  6  environment, but a good estimate would be about 35

19:08:44  7  degrees.

19:08:45  8       Q.   So you're saying that --

19:08:46  9       A.   Maybe 36.

19:08:48  10      Q.   36 degrees?  Okay.

19:08:49  11      A.   35 or 36.

19:08:50  12      Q.   Okay.  Let's just assume it's 35 degrees.

19:08:53  13           How much would that change his calculations

19:08:55  14  by?

19:08:56  15      A.   I did not put corrected numbers in to test

19:08:59  16  that.

19:09:00  17      Q.   Okay.  So it might only change it

19:09:03  18  insignificantly; correct?

19:09:06  19      A.   No.

19:09:06  20           MR. GOSS:  Calls for speculation.

19:09:08  21      Q.   Well we've talked that --

19:09:08  22           You don't know how much it would change?

19:09:10  23      A.   No.  Let me see this.  Let me --

19:09:12  24      Q.   Why don't you calculate for me how much it

19:09:14  25  would change?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

377

19:09:15    1              MR. GOSS:  He's had this for a day.  I

19:09:18    2    don't think --

19:09:18    3              MR. ASSAAD:  If he's going to critique it

19:09:20    4    and every little bit, I want to know --

19:09:22    5              MR. GOSS:  He's going to offer additional

19:09:24    6    critiques, because he's only had this for a day, but

19:09:27    7    he can -- he can -- he can do his best to respond to

19:09:30    8    your questions.

19:09:31    9              MR. ASSAAD:  Would you agree --

19:09:32    10             Would you want to just reconvene this

19:09:34    11   deposition, then, so he has time to critique it?

19:09:37    12        A.   No.  I can critique it now.

19:09:39    13        Q.   Okay.

19:09:39    14        A.   So let's take the air temperature which he

19:09:42    15   has as 41, and I think a more appropriate number would

19:09:46    16   be 43.

19:09:46    17             (Witness starting to mark an exhibit.)

19:09:49    18        A.   Actually let me just -- Let's put forty --

19:09:54    19             (Interruption by the reporter.)

19:09:54    20             (Discussion off the stenographic record.)

19:09:54    21        A.   Let me just do it in my mind.

19:09:58    22             So he's using 41 minus 37, that's a

19:10:00    23   temperature difference of four degrees.  I think a

19:10:02    24   more accurate set of numbers would be 43 to 35, which

19:10:09    25   is eight degrees, so that's a factor of two.  He also

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

378

19:10:14  1  is off by --

19:10:14  2      Q.    Before I finish.  When -- Is "T" in the

19:10:17  3  equations Celsius or Kelvin?

19:10:21  4      A.    Celsius.

5      Q.    Okay.

19:10:21  6      A.    He's off by a factor of two in his "h"

19:10:24  7  value, so that's --

19:10:24  8      Q.    I'm just talking about the temperature now.

19:10:26  9      A.    You just want me to --

19:10:29  10     Q.    If you changed the temperature to what you

19:10:30  11  thought it would be, how much would it affect the

19:10:32  12  results of his -- of his tem --

19:10:35  13     A.    One hundred percent.

19:10:37  14     Q.    One hundred --

19:10:37  15     A.    He would be off by a hundred percent.

19:10:39  16     Q.    Okay.  And you -- you think the temperature

19:10:41  17  coming out of the Bair Hugger, the air is 43 degrees

19:10:44  18  Celsius?

19:10:45  19     A.    Well that would be the maximum temperature.

19:10:48  20  It's my understanding that's the maximum temperature

19:10:50  21  of the air entering the Bair Hugger.

19:10:52  22          MR. GOSS:  Blanket; correct?

19:10:55  23          THE WITNESS:  Blanket.

19:10:55  24     Q.    Well he's talking about the Bair -- air

19:10:58  25  coming out of the Bair Hugger, and in the gap between

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

379

19:11:00  1  the Bair Hugger blanket and the surface of the body.

19:11:02  2      So your testimony today is that air coming

19:11:05  3  out of the Bair Hugger is 43 degrees Celsius?

19:11:07  4      A.   No.

19:11:09  5      Q.   You used 41 degrees; correct?

19:11:11  6      A.   I did, but you're mixing what he's done and

19:11:15  7  -- You're mixing things up.

19:11:16  8      Q.   He put down the blower air, then the gap

19:11:20  9  between the blanket surface and the body, and then the

19:11:24  10  exit temperature; correct?

19:11:28  11      A.   Yes.  He put that down.

19:11:30  12      Q.   Okay.  So if he's referring to the air

19:11:33  13  coming out of the blanket, you would have no critique

19:11:35  14  of the 41 degrees Celsius temperature.

19:11:40  15      That's what you used.

19:11:43  16      A.   Well it's hard to answer because...

19:11:47  17      I mean, you might be right.  You might be

19:11:49  18  right.  Let me think about this.

19:11:54  19      The air entering the blanket is 43, so some

19:11:58  20  of the air comes out at forty -- some of the air is

19:12:02  21  coming out hotter, some of it's coming out colder.

19:12:05  22  Okay.  So if what he has done is assume that all the

19:12:09  23  air comes out at 41, then I take that criticism back.

19:12:14  24  That would be an average.  That would be an

19:12:16  25  appropriate upper bound average.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

380

19:12:19    1        Q.    Okay.

19:12:19    2        A.    But that still doesn't correct his

19:12:22    3    temperature-drop calculations.

19:12:24    4        Q.    Okay.  Well the other critique is he put 37,

19:12:27    5    and you might think it's 35 or 36; correct?

19:12:31    6        A.    Correct.  And the "h" value.

19:12:32    7        Q.    Okay.  Not there yet.

19:12:34    8              You said he had an "h" value of 5; correct?

19:12:42    9        A.    Correct.

19:13:32   10        Q.    Do you disagree with the reference he used

19:13:34   11    to determine his "h" value?

19:13:36   12        A.    Can you remind me that reference?

19:13:37   13        Q.    R. J. De Dear, E. Arens, titled -- a couple

19:13:43   14    of authors -- titled "Convective and Radiative Heat

19:13:48   15    Transfer Coefficents For Individual Human Body

19:13:50   16    Segments."

19:13:52   17        A.    That paper --

19:13:55   18              So I've actually done research on convective

19:13:57   19    coefficients between forced-air warming blankets and

19:14:01   20    bodies, and the values that we calculated were 10 to

19:14:06   21    11.  Now that reference I don't believe pertains to

19:14:12   22    forced-air warming blankets.

19:14:16   23              If I read that document -- See it doesn't

19:14:19   24    mention anything in the title about forced-air warming

19:14:21   25    blankets.  If I read that document and I find that it

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

381

19:14:26     1    is related to forced-air warming blankets then I would

19:14:28     2    revise my criticism, but I don't believe it is.  I

19:14:31     3    think he used an inappropriate value that's off by a

19:14:34     4    hundred percent.

19:14:35     5         Q.   Okay.  And where would I find your value of

19:14:38     6    11?

19:14:39     7         A.   In my CV.  I've got a journal paper

19:14:42     8    published -- I think it's called Whole Body Warming

19:14:46     9    Hypothermia something, but it's there.

19:14:49    10         Q.   Is that the one with Vallez and Plourde,

19:14:51    11    Plourde?

19:14:51    12         A.   I --

19:14:53    13              No, it's not that one that we're talking

19:14:55    14    about.  It's a different paper.

19:14:56    15         Q.   Okay.  Who funded that research?

19:14:59    16         A.   That was funded by Smiths Medical.

19:15:03    17         Q.   Okay.  Now go to Belani, and...

19:15:38    18              You're not critiquing Dr. Elghobashi for the

19:15:40    19    fact that he wrote down all his equations and

19:15:43    20    assumptions; are you?

19:15:44    21         A.   No.

19:15:44    22         Q.   Okay.  I mean, you agree that significant

19:15:51    23    assumptions should be provided in a expert report or

19:16:00    24    publication; correct?

19:16:01    25              MR GOSS:  We're getting beyond the scope of

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

382

19:16:02  1  my redirect, but you can answer that.

19:16:07  2       A.   I do agree significant assumptions --

          3       Q.   Okay.

19:16:09  4       A.   -- should be listed.

19:16:47  5       Q.   So you cite to McGovern with respect to

19:16:50  6  their bubble tests; correct?  That they put the bubble

19:16:53  7  testing at the -- at the front of the anesthesia drape

          8  --

19:16:59  9            THE REPORTER:  They put the bubble testing?

19:16:59 10       Q.   -- at the head, at the -- in the front of

19:17:02 11  the anesthesia drape where the head is; correct?

19:17:04 12       A.   Correct.

19:17:05 13       Q.   Okay.  And you believe that's the correct

19:17:08 14  way of --

19:17:12 15            You believe they did that because you think

19:17:14 16  they felt that that's where the excess air was coming;

19:17:19 17  correct?

19:17:20 18            MR. GOSS:  Lack of foundation.

19:17:20 19       A.   I can only --

19:17:21 20            I mean, I don't know what they were

19:17:22 21  thinking, I only know what's in their report, and

19:17:25 22  what's in their report contradicts Dr. Elghobashi.

19:17:28 23       Q.   Are you aware that Dr. McGovern, Albrecht,

19:17:33 24  Dr. Belani, Nachtsheim and Reed were all deposed in

19:17:38 25  this case?

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

383

19:17:40   1        A.    I am aware McGovern and Albrecht were

19:17:43   2   deposed.  I don't know if any others.

19:17:44   3        Q.    Have you read their depositions?

19:17:46   4        A.    Yes.

19:17:52   5        Q.    I asked you before whether or not you read

19:17:54   6   any fact witness depositions and you said you haven't

19:17:57   7   read any since December of 2015.  Do you recall that?

19:18:04   8        A.    Yeah.  Maybe I thought they were expert

19:18:07   9   witnesses.  I don't -- I may have -- I may have made

19:18:10  10   an error, but I certainly read them.  I thought I told

19:18:12  11   you that.  And if I didn't, I apologize.

19:18:15  12        Q.    And I've also asked you what expert

19:18:17  13   depositions you've read and you did not mention these

19:18:19  14   people at all either; did you?

19:18:21  15        A.    I don't know if that's true.

19:18:22  16        Q.    Well you --

19:18:23  17              MR. GOSS:  So if you want to ask him about

19:18:25  18   that testimony, you have an opportunity to.

19:18:27  19        Q.    Did you have that testimony prior to

19:18:28  20   providing -- doing your report in this case?

19:18:31  21        A.    No.

19:18:31  22        Q.    So you got it after you submitted your

19:18:33  23   report?

19:18:35  24        A.    Correct.

19:18:40  25        Q.    And you didn't cite to any of their

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

384

| | | |
|---|---|---|
| 19:18:42 | 1 | testimony or their depositions in your expert report; |
| 19:18:45 | 2 | correct? |
| 19:18:46 | 3 | A.    That is correct. |
| 19:18:46 | 4 | Q.    Or in Exhibit C, which was documents you |
| 19:18:49 | 5 | considered that were outside of your expert report; |
| 19:18:50 | 6 | correct? |
| 19:18:52 | 7 | A.    Boy, I'd have to check.  Do we have Exhibit |
| 19:19:04 | 8 | 3? |
| 19:19:04 | 9 | Q.    Right there.  Exhibit 3. |
| 19:19:09 | 10 | A.    Those depositions are not cited here. |
| 19:19:12 | 11 | Q.    Okay.  Do you consider the report by Dr. |
| 19:19:26 | 12 | McGovern, which is Exhibit 13, reliable? |
| 19:19:29 | 13 | A.    No. |
| 19:19:37 | 14 | Q.    Were you -- |
| 19:19:38 | 15 | Did you find this report independently, or |
| 19:19:40 | 16 | was it given to you by counsel? |
| 19:19:43 | 17 | A.    I don't recall.  I was given a number of |
| 19:19:46 | 18 | documents and then I performed my own literature |
| 19:19:49 | 19 | search.  I don't recall using any of the documents |
| 19:19:51 | 20 | given to me by counsel. |
| 19:19:52 | 21 | Q.    So you found this document on your own then; |
| 19:19:56 | 22 | correct? |
| 19:19:56 | 23 | A.    I believe I did, but I don't know for sure. |
| 19:19:58 | 24 | Q.    What search terms did you use? |
| 19:20:01 | 25 | A.    Oh man.  I may have used laminar flow, |

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

385

19:20:10   1   operating room, forced-air warming.  I don't recall

19:20:12   2   the search terms I used.

19:20:16   3        Q.    Would the same apply to the Belani article

19:20:19   4   marked Exhibit 14?

19:20:20   5        A.    Same answer.

19:20:22   6        Q.    So I assume you pulled up more than these

19:20:24   7   two articles; correct?

19:20:26   8        A.    What do you mean by "pulled up"?

19:20:27   9        Q.    Like you did some independent research and

19:20:30  10   provided -- you found articles on the Bair Hugger

19:20:31  11   which you cited in your references, and Exhibit C, if

19:20:36  12   there are any -- or Exhibit 3, I'm sorry, and these

19:20:40  13   two articles; correct?

19:20:42  14        A.    Well there's many articles, but I think

19:20:44  15   those articles are actually in my expert report.

19:20:46  16        Q.    Okay.  Okay.  Do you agree with me that,

19:22:15  17   with respect to Exhibit 15, that the equations that

19:22:23  18   Dr. Elghobashi used are the correct equations?

19:22:28  19        A.    Can you point out which equations you're

19:22:30  20   referring to?

19:22:35  21        Q.    The equations on top of page 2 where he

19:22:43  22   calculates the volumetric flow rate over the gap area?

19:22:53  23        A.    The mathematics is done correctly, but this

19:22:57  24   equation represents something that doesn't happen

19:23:00  25   physically, so it's a meaningless equation.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

386

19:23:02  1      Q.   Okay.  But the equation is a correct equa --

19:23:04  2   the mathematics are correct, you don't think the

19:23:08  3   equation itself is correct.

19:23:11  4      A.   Just doing it in my head it appears the

19:23:14  5   numbers work out.  So the left -- the right-hand side

19:23:17  6   is obtained when you put the left-hand side numbers

19:23:20  7   in.

19:23:20  8      Q.   Okay.  Maybe the better question is this:

19:23:33  9   Assuming that Figure 3 is correct, okay, and based off

19:23:38  10  Figure 3 you want to calculate the velocity of the

19:23:42  11  flow coming out, is the equation correct to use that

19:23:45  12  veloci -- to calculate that velocity, if Figure 3 is

19:23:48  13  correct?

19:23:48  14            MR. GOSS:  Object to form.

19:23:51  15     A.   No.

19:23:52  16     Q.   What's wrong with it?

19:23:53  17            How would you calculate the velocity of the

19:23:56  18  air coming out of the Bair Hugger over that area?

19:24:00  19     A.   What he has ignored, eve --

19:24:02  20     Q.   I'm asking how you would calculate it.

19:24:06  21     A.   I would calculate it differently.

19:24:08  22     Q.   How would you calculate it?

19:24:09  23     A.   I'm going to tell you.

19:24:11  24     Q.   Please do.

19:24:12  25     A.   I would cal -- I do not believe --

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

387

19:24:14    1      Q.    Actually, let's write it down.

19:24:15    2         MR. GOSS: Hold on.

         3      Q.    Let's -- Write it down.

19:24:16    4         MR. GOSS: Hold on. Let him answer.

19:24:17    5         MR. ASSAAD: Okay.

19:24:17    6         MR. GOSS: He's not going to obey your

19:24:19    7   command to write anything. Let him answer the

19:24:22    8   question.

19:24:23    9      Q.    Feel free to write it down if you know how.

19:24:26   10         MR. GOSS: Object. Move to strike.

19:24:29   11      A.    And can you tell me the question again, the

19:24:31   12   specific --

19:24:32   13      Q.    What equation would you use to calculate the

19:24:34   14   velocity of the air coming out of the Bair Hugger

19:24:37   15   assuming that Figure 3 is correct?

19:24:46   16        Do you need a pen?

19:24:47   17      A.    Hold on. The velocity of the air coming out

19:24:49   18   of the Bair Hugger?

19:24:50   19      Q.    Yes. Blanket. Blanket.

19:24:51   20      A.    The equation that I would use is I would

19:24:54   21   take the number of holes, multiplied by the area of

19:24:58   22   the holes, and that would be the total jet area, and

19:25:07   23   then I would take the flow rate divided by that area.

19:25:12   24   That's how I'd get the velocity of the air emerging

19:25:15   25   from the Bair Hugger.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

388

19:25:15  1       Q.    Do you think the number of holes in a Bair

19:25:17  2  Hugger is a constant from blanket to blanket?

19:25:20  3       A.    No.

19:25:21  4       Q.    Okay.  So you'd have to physically cou --

19:25:26  5  you'd have to physically take a Bair Hugger blanket

19:25:28  6  and count how many holes to get the correct velocity

19:25:31  7  for that particular blanket; correct?

19:25:36  8       A.    If you want to know the jet velocity coming

19:25:39  9  out of the Bair Hugger then that is certainly one way.

19:25:42 10  That's how I would do it.

19:25:43 11       Q.    Okay.  Do you agree with the equation of 1.2

19:25:55 12  with respect to the exit air temperature?  The m in, h

19:26:15 13  in?

19:26:15 14       A.    I have no argument about --

19:26:17 15            I have no disagreement with that equation.

19:26:20 16       Q.    What about with the equation below it with

19:26:22 17  the h in equals h exit plus q body, divided by m?

19:26:32 18       A.    I have no disagreement with that equation.

19:26:35 19       Q.    Okay.  So basically on those two equations

19:26:38 20  you would agree with me that Elghobashi understands

19:26:40 21  the basic laws of physics; correct?

19:26:44 22            MR. GOSS:  Object to form.  I also think in

19:26:47 23  redirect he made clear what his criticisms are.  Now

19:26:50 24  you're asking him beyond -- questions beyond that.

19:26:53 25            If you can answer the question, you may.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

389

19:26:55   1      A.    Those two equations are the first law of

19:26:58   2   thermodynamics, which governs energy conservation.  I

19:27:02   3   believe he has written those correctly.

19:27:05   4      Q.    I mean, but you stated in your report that

19:27:08   5   he didn't understand the basic laws of physics.  Well

19:27:11   6   with respect to these equations do they indicate or

19:27:16   7   not indicate that he knows the basic laws of physics?

19:27:16   8            MR. GOSS:  Objection to form.  This is

19:27:18   9   becoming counterproductive.

19:27:19   10            I don't think you have to answer that.  I

19:27:21   11   think you already have.

           12      Q.    Did you put in --

19:27:21   13            MR. GOSS:  And you said --

19:27:22   14      Q.    Did you put in your report that Elghobashi

19:27:25   15   doesn't understand the basic laws of physics?

19:27:27   16      A.    I may have, and I believe he --

19:27:29   17            I think you're confusing two things.  I --

19:27:32   18   What we're talking about here is a simple

19:27:35   19   conservation-of-energy equation which I think he's

19:27:37   20   written correctly, but that -- my arguments in his

19:27:41   21   expert report go beyond a simple

19:27:44   22   conservation-of-energy equation.

19:27:46   23      Q.    Okay.  So you agree with me here that except

19:27:49   24   for the one equation that you think you do different,

19:27:52   25   which is the velocity -- the velocity of the air

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

390

19:27:56   1   coming out of the Bair Hugger, that all the other

19:27:58   2   equations he used to calculate whatever he was

19:28:01   3   calculating are correct?

19:28:04   4        A.   Well I would argue the entire premise of his

19:28:06   5   calculation is incorrect.

19:28:08   6        Q.   Assuming Figure 3 is correct.  The equations

19:28:11   7   are correct.  You're not disagreeing with the

19:28:13   8   equations that he used.

19:28:15   9             MR. GOSS:  Objection, mischaracterizes his

19:28:16   10  testimony with respect to one of the equations.

19:28:27   11       A.   I think equation 4 is incorrect.

19:28:31   12       Q.   "Incorrect"?

19:28:32   13       A.   Right.

19:28:33   14       Q.   Okay.

19:28:33   15       A.   I think he's used the wrong value of the

19:28:36   16  convective coefficient.

19:28:37   17       Q.   Well forget about the values used.  I'm

19:28:39   18  talking about the actual mathematical equation.

19:28:48   19       A.   Actually he's got another maybe more serious

19:28:51   20  error.  In equation 3 he has the heat transfer to the

19:28:56   21  body and he's got an "h" value times an area of the

19:29:01   22  blanket surface.  That's not correct.  That should be

19:29:04   23  the area of the body.  So he's got the wrong area --

19:29:07   24       Q.   Okay.

19:29:07   25       A.   -- in equation 3.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

391

19:29:12  1     I did not look up his enthalpy values, so I

19:29:16  2  can't comment on whether they're correct or not.

19:29:25  3     Q.   Okay.

19:29:25  4        (Interruption by the reporter.)

19:29:35  5     Q.   Do you believe it is professional to call a

19:29:39  6  professor or a scientist in the community that has

19:29:42  7  been working 30 to 40 years doing engineering research

19:29:46  8  and has published probably more than you, that that

19:29:49  9  person doesn't understand the basic laws of physics?

19:29:52  10        MR. GOSS:  All right.  You had the

19:29:53  11  opportunity to ask that question during seven hours

19:29:55  12  of direct exam.  This does not relate to my redirect.

19:30:01  13        MR. ASSAAD:  It goes to him doing these

19:30:03  14  calculations and criticizing his calculations.

19:30:06  15        MR. GOSS:  Okay.  I'm going to object to

19:30:10  16  form on multiple grounds.

          17        MR. ASSAAD:  That's fine.

19:30:13  18        MR. GOSS:  If you understand the question,

19:30:14  19  then you can provide an answer.

19:30:16  20     A.   I -- I'm not sure he has published more than

19:30:19  21  me, but that's immaterial.

19:30:22  22        I think he has made some serious errors.  I

19:30:27  23  think he does not -- did not account for the buoyancy

19:30:30  24  of the air in the OR, and I think that's a serious

19:30:35  25  error.  And so critici -- Look, scientists criticize

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

392

19:30:39    1    each other all the time.

19:31:01    2         Q.    Would you expect someone such as your

19:31:04    3    professor, Dr. Sparrow, to criticize someone of the

19:31:08    4    stature of Elghobashi the way you did by saying he

19:31:11    5    doesn't know the basic laws of physics?

19:31:13    6              MR. GOSS:  Same objection.  I'm also going

19:31:16    7    to object that this doesn't have anything to do with

19:31:17    8    the actual scientific opinions rendered in his report

19:31:20    9    or the scientific issues subject to expert testimony

19:31:22   10    in this case.  I also think it was asked and

19:31:25   11    answered.

19:31:28   12              MR. ASSAAD:  What Dr. Sparrow would do?

19:31:30   13              MR. GOSS:  All right.  You can answer if

19:31:31   14    you have an understanding of what Dr. Sparrow thinks

19:31:35   15    and what he would do.

19:31:36   16         A.    I don't know what Dr. Sparrow would do.

19:31:39   17              MR. ASSAAD:  Well first of all I'm going to

19:31:41   18    object to his -- any of his opinions that he gives

19:31:45   19    outside his expert report as rebuttal under Rule 16

19:31:49   20    and Rule 26 and the Court's PTO order that governs

19:31:55   21    discovery in this case.  This is untimely, especially

19:31:58   22    with some of the documents that he had in his

19:32:00   23    possession.  I think he had everything in his

19:32:04   24    possession prior to the deposition of Dr. Elghobashi.

19:32:09   25              Furthermore, these are new opinions that

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

393

19:32:11  1  the court has specifically refused and that the

19:32:15  2  defense had a time to offer rebuttal.  Well the Court

19:32:19  3  definitely has refused surrebuttal.  The expert

19:32:22  4  time -- deadline to provide rebuttal opinions was

19:32:25  5  June 2nd, and this should have been disclosed prior

19:32:27  6  to then.

19:32:29  7            MR. GOSS:  And we will stipulate that Dr.

19:32:31  8  Elghobashi's supplemental report is untimely.

19:32:38  9            Subject to that, I disagree with what you said,

       10  --

       11            MR. ASSAAD:  I haven't --

19:32:40 12            MR. GOSS:  -- respectfully.

19:32:41 13            MR. ASSAAD:  I haven't finished yet.

19:32:43 14            MR. GOSS:  You may finish.  You may finish.

19:32:46 15            MR. ASSAAD:  And just for the record, this

19:32:47 16  is not a supplemental report, this was added to his

19:32:50 17  errata sheet in response to a question.

19:32:52 18            MR. GOSS:  You call it what you will.

19:32:58 19            MR. ASSAAD:  Okay.  I lost my track or

19:33:01 20  line, Peter.  It's been a long day.

19:33:03 21            Anyway, we're just going to object, a

19:33:05 22  formal objection, and we're going to leave this

19:33:07 23  deposition open for me to seek more documents

19:33:11 24  possibly, and files that were clearly not produced

19:33:14 25  today that were clearly in the possession of Dr.

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

394

19:33:22   1   Abraham and may have been in the possession of 3M,

19:33:25   2   and we will address the other issues -- these issues

19:33:30   3   with the court.

19:33:30   4              MR. GOSS:  And I'll just state that we

19:33:32   5   believe we have complied, but we understand your

19:33:34   6   position.

19:33:37   7              MR. ASSAAD:  That's it.

19:33:37   8              MR. GOSS:  I don't have any further

19:33:38   9   questions.

19:33:40  10              THE REPORTER:  Off the record.

19:33:43  11              (Deposition adjourned at 7:33 p.m.)

          12

          13

          14

          15

          16

          17

          18

          19

          20

          21

          22

          23

          24

          25

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

395

1                    C E R T I F I C A T E

2               I, Debby J. Campeau, hereby certify that I

3    am qualified as a verbatim shorthand reporter; that I

4    took in stenographic shorthand the testimony of JOHN

5    P. ABRAHAM, Ph.D. at the time and place aforesaid;

6    and that the foregoing transcript consisting of 394

7    pages is a true and correct, full and complete

8    transcription of said shorthand notes, to the best of

9    my ability.

10              Dated at Lino Lakes, Minnesota, this 24th

11   day of July, 2017.

12

13

14

15                              DEBBY J. CAMPEAU

16                              Notary Public

17

18

19

20

21

22

23

24

25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

396

1                S I G N A T U R E   P A G E

2         I, JOHN P. ABRAHAM, Ph.D., the deponent, hereby

3    certify that I have read the foregoing transcript,

4    consisting of 394 pages, and that said transcript is

5    a true and correct, full and complete transcription

6    of my deposition, except per the attached

7    corrections, if any.

8    PAGE   LINE      CHANGE/REASON FOR CHANGE

9    _____  _____    _____

10   _____  _____    _____

11   _____  _____    _____

12   _____  _____    _____

13   _____  _____    _____

14   _____  _____    _____

15   _____  _____    _____

16   _____  _____    _____

17   _____  _____    _____

18

19   _____    _____

20     Date              Signature of Witness

21

22                  WITNESS MY HAND AND SEAL this _____

23                  day of _____, 2017.

24

25   (DJC)          _____