```
1                    UNITED STATES DISTRICT COURT
                         DISTRICT OF MINNESOTA
2
      ------------------------------------------------------------
3                                    )
      In Re: Bair Hugger Forced Air  )  File No. 15-MD-2666
4     Warming Devices Products       )         (JNE/FLN)
      Liability Litigation           )
5                                    )
                                     )  Minneapolis, Minnesota
6                                    )  March 12, 2018
                                     )  10:37 a.m.
7                                    )
                                     )  DIGITAL RECORDING
8                                    )
      ------------------------------------------------------------
9
                BEFORE THE HONORABLE FRANKLIN L. NOEL
10          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                         (MOTION HEARING)
11
      APPEARANCES
12     For the Plaintiffs:        MESHBESHER & SPENCE
                                  Genevieve M. Zimmerman, ESQ.
13                                1616 Park Avenue
                                  Minneapolis, MN 55404
14
       For the Defendant:         BLACKWELL BURKE P.A.
15                                Mary S. Young, ESQ.
                                  Benjamin Hulse, ESQ.
16                                Peter J. Goss, ESQ.
                                  431 South Seventh Street
17                                Suite 2500
                                  Minneapolis, MN 55415
18
       Court Reporter:            STACI A. HEICHERT
19                                RDR, CRR, CRC
                                  1005 U.S. Courthouse
20                                300 South Fourth Street
                                  Minneapolis, Minnesota 55415
21
22        Proceedings recorded by mechanical stenography;
      transcript produced by computer.
23

24

25
```

1                    **P R O C E E D I N G S**

2                      **IN OPEN COURT**

3          THE COURT:  Okay.  This is In Re. Bair Hugger

4    Forced Air Warming Device Product Liability Litigation.

5    Let's get everybody's appearance on the record.  For the

6    plaintiff.

7          MS. ZIMMERMAN:  Good morning, Your Honor.

8    Genevieve Zimmerman for plaintiffs.

9          MS. YOUNG:  Good morning, Your Honor.  Mary Young

10   for defendants.

11         MR. GOSS:  Good morning, Your Honor.  Peter Goss

12   for defendants.

13         THE COURT:  Okay.  We are here for a hearing on

14   plaintiffs' motion to compel and the defendant's motion for

15   a protective order, correct?

16         MS. ZIMMERMAN:  Yes, Your Honor.

17         THE COURT:  Okay.  Let's start with the

18   plaintiffs' motion to compel, Ms. Zimmerman.

19         MS. ZIMMERMAN:  Thank you, Your Honor.  May I

20   please the Court.  We're here with respect to, as the Court

21   has indicated, plaintiffs' motion to compel additional

22   information necessary for completion of our duties under

23   Pretrial Order No. 24, which is repopulation of the

24   bellwether pool.  We have been obligated to provide proof of

25   Bair Hugger use to defendants, and I believe that we

1    completed that on February 9th.  In response, PTO No. 24

2    required 3M to essentially let us know if there were cases

3    where they were challenging the proof of product claims and

4    then also to produce relevant documents that the defendants

5    may have with respect to those challenges.

6         And we outlined in our papers some of the issues

7    that we have with respect to defendants many challenges.

8    The defendants have challenged more than half of the

9    100 cases randomly selected by the Court for potential

10   inclusion in the second bellwether pool.

11        And I would start by directing Your Honor to the

12   challenge that was made with respect to Carol Griffin, and

13   her case is 17-CV-1520.  And so, for example, the challenge

14   made here, plaintiffs have produced records that show the

15   Bair Hugger was used during the surgery.  And in connection

16   with their response to the PTO 24, defendants say that they

17   agree that they were selling blankets in the 12 months

18   leading up to the surgery but that there's no records that

19   they have that the warming devices themselves were ever

20   placed at that hospital, and that's at least in the

21   spreadsheet that they provided to us.

22        And I'm sure we could -- I haven't -- I have two

23   copies of the spreadsheets if the Court would like to look

24   at.  We have one that we could e-mail the Court as well.

25   But these are defendant's spreadsheets kind of indicating as

1      to the 100, here's what we know.  Here's if the actual

2      warming unit itself was placed and then also a separate

3      spreadsheet that says we show that we've sold Bair Hugger

4      blankets themselves in the 12 months ahead of time.  So they

5      say yeah, we were selling Bair Hugger blankets but we don't

6      see that we ever supplied a warming unit.

7             To contrast with that, though, plaintiffs looked

8      through some of the documents that have been produced, and

9      in 2010 the FDA requested a customer list from 3M, and we

10     have that information in the documents that were produced to

11     plaintiffs.  And at the Bates range BMBH572250, 3M indicated

12     to the FDA that, in fact, they had placed 27 Bair Hugger

13     warming units at the particular hospital in Alabama where

14     Ms. Griffin's surgery took place by the year 2010.  Her

15     surgery was in 2015.  So what they've told the FDA is not

16     consistent with what they've told the plaintiffs in

17     connection with this bellwether identification process.  And

18     that is just one example that I can point the Court to

19     specifically with respect to Bates numbers where we see what

20     they're telling us now is inconsistent with what they've

21     told the FDA in the past.

22             Some of the other challenges that we see, Dale

23     Anderson, for example, he's case 17-CV-1928, the anesthesia

24     record clearly actually preprints Bair Hugger on the medical

25     record itself but they've misspelled Bair Hugger, it's

1    B-A-E-R, on the medical record, and the challenge is

2    essentially there's unspecific Bair Hugger confirmation.  So

3    not that there isn't a check mark but it doesn't say Bair

4    Hugger, but from what we can see, it was misspelled.

5            THE COURT:  But as I understand it, part of the

6    defendant's objections here are that the plaintiff is

7    supposed to do more than look to see that there's a check

8    mark that says Bair Hugger was used, that you're supposed to

9    have some evidence before they even have to go back and

10   produce evidence to show that the Bair Hugger was or wasn't

11   used in the particular case, and they're saying that you've

12   not done that, you've just come up with another check the

13   box thing.

14           MS. ZIMMERMAN:  Well, respectfully, Your Honor, I

15   think that, from the plaintiffs' perspective, in vetting a

16   case prior to filing it for Rule 11 purposes, once a

17   plaintiff -- or the plaintiffs' attorney sees on the medical

18   record that a Bair Hugger box is checked, between that

19   medical record confirmation and also what we know about the

20   merit -- the Bair Hugger market share , we certainly think

21   that there has been a due diligence that supports that Bair

22   Hugger was used in the particular surgery.

23           So, for example, if Mr. Anderson were my client

24   and I saw Bair Hugger checked on his anesthesia record

25   B-A-E-R, I would think that was a Bair Hugger use.  The fact

1    that it was misspelled on the anesthesia record would not

2    suggest to me that I needed, for example, an affidavit from

3    the anesthesiologist that performed the surgery that day.  I

4    think that that is putting the plaintiffs to a burden beyond

5    what is required by the rules, and certainly whether or not

6    a Bair Hugger was used during that surgery, we think, given

7    the records that were involved, given the sales records that

8    the defendants have, we think would be an issue of fact that

9    should be properly decided by the trier of fact.

10           I -- I certainly understand that the Court has

11   directed that to the extent that there are some questions

12   about whether or not Bair Hugger was properly documented,

13   that plaintiff should attempt to get additional records.

14   Plaintiffs have produced records on the 100 bellwether

15   candidates randomly selected by the Court.  I think that the

16   defendant's point that there was at least one letter that

17   confirmed that Bair Hugger was not used, and to my knowledge

18   that case was dismissed with prejudice by the firm that

19   represented that particular plaintiff, so I think that

20   that's not an issue at least before the Court today.

21           With respect to other cases where there is, in

22   fact, documents in the medical records, that sometimes the

23   challenges that defendants make seem to be that the -- that

24   the serial number that the plaintiffs have provided does not

25   comport with the serial number that the defendants show as

1    being placed in that particular hospital.  So, for example,

2    Edna Washington, she's 17-CV-3763, the challenges made by 3M

3    about whether or not Bair Hugger was properly used,

4    underneath the entry on the medical record where it says

5    warming device dash Bair Hugger, they actually enter the

6    equipment 81005, but from what we can tell, that's actually

7    likely a number that's assigned by the hospital.  It's not

8    necessarily the serial number that was provided by the

9    defendants on their particular product, but it's clear from

10   the records that Bair Hugger was used and that the hospital

11   was even tracking the type of machine that was used during

12   that particular surgery.

13           We have other examples like that, for Kent

14   Griffin, for example.  He's 17-CV-1286.  He's challenged by

15   3M, again, saying that the Bair Hugger system doesn't have

16   the same serial number that they reflected that they have

17   placed at that facility.  Now, they agree that they put Bair

18   Huggers in that particular hospital.  And the records on

19   page 26 show that a Bair Hugger model 505 was used, and this

20   one, again, provides a serial number, or a number anyways,

21   for the hospital 75853.  It looks, to us, that that's an

22   internal hospital tracking number, not the serial number,

23   but certainly there's confirmation that Bair Hugger was used

24   and that the hospital was tracking it.  And while 3M

25   certainly agrees that they placed these warming units there

1    and that they sold the disposable blankets themselves, they

2    are still challenging proof of product in that particular

3    case.

4              We know from the exchanges that happened in

5    Gareis, the case that we're getting ready to try before Your

6    Honors in May, in December they were able to provide a

7    number of non-Bates-labeled e-mail exchanges between

8    defendants and the hospital at issue there, Providence

9    Hospital, that was essentially a communication about whether

10   or not the hospital was going to continue to use Bair

11   Hugger.  I think that we have now ultimately resolved any

12   question the parties had with respect to the use of Bair

13   Hugger in that particular hospital, but we know that there

14   were e-mails that were exchanged between the defendant and

15   the hospital in question and that they hadn't previously

16   been produced, and they related to this issue of product

17   placement.

18             So while we have outlined a number of different

19   challenges in the actual motion papers we have provided to

20   the Court and we have other examples of additional

21   information that we think are just inappropriate given that

22   we are on the verge of needing to recommend to the Court the

23   list of 16 cases that we think ought to be included in the

24   bellwether repopulation pool, we simply ask to be on an

25   equal footing, because at this point, the defendants are

1    essentially saying about half of the cases have to be

2    removed from potential consideration based on their proof of

3    product challenges, and we think many of those challenges

4    were not --

5              THE COURT:  As I understand your argument, all

6    they've given you for their challenges are these

7    spreadsheets.

8              MS. ZIMMERMAN:  That's exactly right, Your Honor.

9              THE COURT:  There's no documentation underlying

10   them or backing them up?

11             MS. ZIMMERMAN:  Correct.  And to my knowledge, in

12   the interest of full disclosure, they have withdrawn a

13   single challenge to the 53 challenges that they made, but

14   only one.  So we what we have are the spreadsheets that

15   they've provided and their objections and that's it at this

16   point.  And I'll reserve any additional time.

17             THE COURT:  Okay.

18             MS. ZIMMERMAN:  And I do have a copy of each of

19   the Bair Hugger, the blanket sales, and the warming unit

20   spreadsheet provided by defendants if the Court would like

21   them.

22             THE COURT:  Sure.

23             MR. GOSS:  Does that include all of the backup

24   dates that we've provided or just --

25             MS. ZIMMERMAN:  I think it's just the cover page.

1           MR. GOSS:  Not the full stack with the backup

2     data?

3           MS. ZIMMERMAN:  It does not have each one of the

4     tabs.  This is a summary page.

5           MR. GOSS:  Okay.  As long as that's clear on the

6     record.

7           THE COURT:  Except now I'm confused again.  I

8     thought there was just the spreadsheet.  What is the backup

9     stuff that we're talking about?

10          MS. YOUNG:  May I approach too, Your Honor?

11          THE COURT:  I don't want a lot of stuff, but

12    what --

13          MS. ZIMMERMAN:  So there's essentially, if you

14    have Excel spreadsheet, there are different tabs.  So this

15    one is a summary sheet of their challenges, and as I

16    understand it, they have a additional tab for each one of

17    the hospitals in the 100 cases where they would say, you

18    know, we show that we shipped, you know --

19          MS. YOUNG:  This is my --

20          MS. ZIMMERMAN:  -- blankets to the hospital on

21    these different occasions.  And if an electronic copy would

22    be useful to the Court or to the clerk, I'm happy to e-mail

23    that as well.  We have it right here.

24          THE COURT:  All right.  Well, I'm still confused,

25    but I will wait to hear from the defendant when we get

1   there.

2            MS. ZIMMERMAN:  That's right.

3            THE COURT:  Are you done?

4            MS. ZIMMERMAN:  For now, on this.  I will wait and

5   address any additional questions the Court may have after

6   defense presents.

7            THE COURT:  All right.  Thank you.  Ms. Young.

8            MS. YOUNG:  Thank you, Your Honor.  So to try to

9   clarify what you have in front of you, so 3M exported from

10  the sales system data for each of the hospitals at issue

11  where the plaintiffs in the 100 cases had their surgeries

12  performed.  And the one sheet that I provided for you was

13  just an example of a facility address, and then if you look

14  across, you can see the serial number of the Bair Hugger

15  warming unit, the model type, and the manufacturing ship

16  date, the install date.  And so we provided this.  We

17  searched and in some cases we had to try to reconcile where

18  an address didn't match a facility name or vice versa, so 3M

19  searched the database, put together this information, and it

20  provides, for each facility at issue, our records with

21  respect to what warming units are placed there.

22            And then, in addition, we went through for those

23  same facilities and looked at the 12 months prior to the

24  surgery date at issue and provided blanket sale information.

25  So you have the two summary charts, I believe, from

1    Ms. Zimmerman, but wanted you to be aware that there is

2    backup for each of those.

3            THE COURT:  But the backup is data that you've

4    extracted from a database, not -- and presumably there is --

5    is there a document that would correspond to, for example,

6    I'm looking at customer No. H0013219, Cartersville Medical

7    Center, are there -- is there a document that this database

8    would generate?

9            MS. YOUNG:  Your Honor, I don't know that.  I can

10   confer with Mr. Hulse who might know that, but I do know

11   that this is the exact information.  In the prior bellwether

12   selection process the parties did some limited discovery on

13   31 cases before making our selections in response to those

14   interrogatories served by plaintiffs, and this is identical

15   to the information that we've provided for those 31 cases.

16           THE COURT:  Okay.

17           MS. YOUNG:  Thank you, Your Honor.  At issue in

18   plaintiffs' motion is what is sufficient proof of product

19   use to get us over this threshold requirement, and that is

20   what plaintiffs now contend they need additional information

21   from 3M.  And, Your Honor, it's our position that this is

22   simply an attempt to shift the burden to 3M in cases where

23   plaintiffs have not come forward with sufficient product

24   use.  Pre-trial Order 24 requires the plaintiffs to submit

25   and, as the order says, to confirm use, and so at issue here

1    is what is sufficient to confirm use.

2            And as we know from the Skaar case, that's an

3    example where there appeared to be a notation to the Bair

4    Hugger circled on the plaintiffs' medical records and it

5    wasn't until the parties got to Idaho, were taking treating

6    physician depositions, that it became to light that the Bair

7    Hugger was not used in that procedure.  And so the Court in

8    open court on December 21st at the status conference, the

9    Court said that that check the box just simply wasn't enough

10    based on the experience that the parties have had in

11    selecting bellwether cases.  We also had the Kamke case

12    where it came to light that the Bair Hugger was turned off.

13    And so what we're trying to determine here is what is

14    sufficient proof?

15            Plaintiffs have pointed out a couple of instances.

16    And our chart on page 3 of our brief sets forward our

17    challenges fall into I think it's six or seven categories,

18    and we tried to do that so that the Court could see what it

19    is, is at issue here.  As Ms. Zimmerman pointed out, there

20    was a case that there was actually a letter saying Bair

21    Hugger wasn't used.  And when we got the 100 cases,

22    plaintiffs represented to us, they represented to the Court

23    at the next status conference that proof of product use had

24    been provided in every case.  That's just simply not the

25    case.  There's a number of cases where there's no reference

1      of warming of any kind, and plaintiffs continue to maintain

2      that it's our records that they need to further evaluate

3      these challenges.  So what I think they're really saying,

4      Your Honor, is in those cases where there is a reference to

5      a Bair Hugger, that should be sufficient, the Court should

6      take that at face value and should require us to come

7      forward with additional information.

8              We believe there is no basis to shift the burden

9      to 3M to provide these unspecified types of documents when

10     what plaintiffs could do and what they should do is go to

11     the facility and provide proof of product use, and they have

12     done that in some cases, even cases where there's references

13     to a Bair Hugger in the documents, some of the plaintiffs

14     firms have gone ahead and gotten that letter from the

15     facility to confirm product use.  And it's our position that

16     that is what the Court had envisioned here.  The whole

17     purpose of this is to get to cases that can be prepared for

18     bellwether trials so that the parties and the Court aren't

19     expending resources trying to figure out if a case is, in

20     fact, an appropriate bellwether case.

21              So plaintiffs moved immediately to both strike all

22     of our challenges, which we submit there's no support, that

23     is not an issue that could possibly be before the Court on a

24     motion to compel in this context, nor would there be any

25     basis to strike it.  The Court has said we just -- this is

1    Judge Ericksen, said we can't do this again, we can't be in

2    a position where we don't have proof of product use as the

3    parties move forward through the bellwether process.

4         So, Your Honor, if you looked at the records that

5    are submitted, if you looked at our charts, there is

6    probably 100 variations in how these come to pass.  Again,

7    we've tried to organize them by category, but you have to

8    dig into the records.  There are competing references at

9    times.  There are what look to be serial numbers that don't

10   match our serial numbers.  So in those cases where there's

11   ambiguity, that's where we take issue with plaintiffs'

12   product use.  So you may have a reference to a Bair Hugger

13   on a form but then there also, there is nothing else to

14   establish product use.  Some have references simply to

15   forced air forming, and as we know, there are other forced

16   air warming manufacturers, and a hospital or facility system

17   might have more than one.  So it is plaintiffs burden to

18   come forward with the evidence required to satisfy product

19   use so that we can move forward and select cases.

20        And Ms. Zimmerman is right, the parties today have

21   to each submit 16 cases to the Court.  It's our position if

22   cases have product use challenges that are on those lists,

23   we should come up with a mechanism to address that right

24   up-front should those make it to the list of eight that the

25   Court is going to have move forward to working up.

1          Defendant's -- or excuse me, plaintiffs' motion

2     also doesn't address what kind of information they purport

3     to be looking for.  And I do know Your Honor's question

4     about what additional document might be generated from that

5     list, but I don't believe they're saying that there's any

6     problem with the product placement information that we've

7     provided.  What I believe plaintiffs' position is, is that

8     they want us to go search for ESI to try to identify what

9     sales people at 3M may have spoken to salespersons at the

10    facilities at issue and that it's not that they're looking

11    for additional supporting documentation related to the

12    information we've provided.  And at best --

13          THE COURT:  Wait a minute.  Say that again.  I

14    guess my understanding was they were -- my understanding is

15    the plaintiffs' vision of this process is they produce

16    whatever they produce and then it -- the burden shifts to

17    you to show that there was no Bair Hugger used and that what

18    you have produced, these spreadsheets and apparently some

19    backup data, they say is insufficient to establish that.

20    And they give me the example of the misspelled Bair ,

21    B-A-E-R, and the internal control numbers that a hospital

22    might use for their devices as opposed to your serial

23    numbers and that those are not -- those two things, for

24    example, don't prove that a Bair Hugger was not used.

25    You're saying that they want discovery about sales people?

1          MS. YOUNG:  Well, Your Honor, I think what there

2     may be a sort of two ships passing in the might in terms of

3     what we're talking about.  I think what plaintiffs

4     are -- what we have said with respect to our challenges is

5     that we don't believe the evidence provided is sufficient to

6     prove product use and that it's plaintiffs' burden to do

7     that.  So where there's ambiguity in the records, even if

8     there is a Bair Hugger form checked, we heard the Court to

9     be saying that simply is not enough.  And so at the December

10    status conference, I think, Your Honor, it relates to the

11    fact, perhaps, that PTO24 is very broad and general and it

12    simply says that the plaintiffs have to confirm use and that

13    defendants may challenge --

14         THE COURT:  Technically it says that plaintiffs

15    must ascertain that a Bair Hugger was used in the surgery at

16    issue to the best of their ability.  Have I got that right?

17    I'm reading from PTO No. 24.  I think.  If plaintiffs have

18    evidence of Bair Hugger use, they must produce it to

19    defendants.  Plaintiffs must serve a complete verified

20    plaintiff fact sheet.  That's not at issue here, correct?

21    Then paragraph 3 is, by February 16th, defendants must

22    challenge plaintiff as to any disputes about Bair Hugger use

23    in the cases.  These challenges must include any relevant

24    documents defendants have.  And then by March 12th you need

25    to come up with your 16 cases.  Go ahead.

1              MS. YOUNG:  So with respect to the ascertaining

2     use, plaintiffs have represented that they submitted proof

3     of product use in all 100 cases.  And it's our view that

4     where they have either cases with no indication of warming

5     at all, cases where they have reference to forced air

6     warming but not the Bair Hugger, and even cases where they

7     have just a form reference to Bair Hugger, that that alone

8     would not be sufficient to meet their threshold requirement

9     of proving product use.  And so that's the basis for our

10    challenges.  And when we looked at what evidence we have

11    that relates to those challenges, it is the product

12    placement information that we provided, as well as the

13    blanket sales information.

14              And so the specific cases that I believe

15    plaintiffs highlighted, all of them in their motion, and

16    I'm -- I wouldn't represent this here today, but are the

17    cases that fall into the category if there was a medical

18    records with a checkmark and but the plaintiffs have not

19    provided then any additional information from the facility

20    to show that that was a Bair Hugger unit.

21              And so, Your Honor, if we want to go through

22    product use challenges, I think that actually would be more

23    on a case-by-case basis.  Our issue with this is that that

24    was not sufficient proof in the cases that we challenged

25    based on what we heard the Court to say in the December

1   status conference and then back in chambers and, again, with

2   the objective in mind that we are simply trying to get to a

3   set of cases where the resources are expended in working up

4   the bellwether case, not trying to figure out if the Bair

5   Hugger was used which is plaintiffs' initial and threshold

6   requirement to filing suit here.

7          And so I didn't understand plaintiffs to be asking

8   for more documentation related to the charts we've already

9   provided, but we had a very general discussion between our

10  meet and confer.  And the motion also doesn't specify what

11  specific information they're seeking that would shed light

12  on what we believe is their burden to establish.  And so we

13  ask that the Court deny the motion to strike.  We don't

14  think that's a proper issue before the Court, and it

15  certainly doesn't take into account the broad range of proof

16  that we have in all of these cases.  And then also that the

17  Court deny the motion to compel because there's no

18  specificity to it and it would be an improper attempt to

19  shift the burden to 3M on an issue that is plaintiffs.

20         If the parties, if, again, any of these cases make

21  their way into that group of -- final group of eight, I

22  think the parties can address how to deal with any

23  ambiguities that remain on proof of product use.

24         THE COURT:  So how many -- so as I understand it,

25  I'm looking at the chart on page 3 of your memo, there are

1  53 cases where you challenge the adequacy of the plaintiffs'

2  evidence of Bair Hugger use.  Is that a correct statement?

3          MS. YOUNG:  There were, Your Honor, and then after

4  the lexicon waivers came in, that number is now 37.  So

5  plaintiff submitted lexicon waivers in 70 cases and did not

6  waive lexicon in 30 cases and then 16 of our challenged

7  cases dropped out.  And I know which categories they fall

8  into.  They were the majority of those lexicon nonwaiver

9  cases were in the two categories where there was either a

10  reference to forced air warming generally or the Bair Hugger

11  what we call kind of the check the box form document.  But

12  there were some cases that fell out of the other categories

13  as well.

14          THE COURT:  So it's the two categories that are

15  both 15 cases?  Do we know?

16          MS. YOUNG:  Yes, Your Honor, by my math, nine

17  remain in the forced air warming and ten remain in the check

18  the box Bair Hugger category.  And then a couple fell out of

19  the other categories.

20          THE COURT:  And the bottom category of other,

21  there's four cases, what -- is there any --

22          MS. YOUNG:  You know, Your Honor, I'd have to --

23          THE COURT:  One by one because each one is

24  different?

25          MS. YOUNG:  Yeah, they had just different

21

1    anomalies to them, and I could go back through my notes

2    and --

3            THE COURT:  Okay.

4            MS. YOUNG:  -- get them.  And with respect to the

5    serial numbers, again, there was a reference to a number.

6    It didn't reflect a Bair Hugger serial number, and when we

7    have a number, we can make that -- we can check that.

8            THE COURT:  Right.  But that's not really -- I

9    guess how many of that are we talking about?

10           MS. YOUNG:  There are three left in that category.

11           THE COURT:  And that doesn't strike me as being a

12   particularly valid argument.  I mean, it's clear there's a

13   Bair Hugger there, there's a number assigned to it, it might

14   not be your number, but the hospital has given it a number,

15   and apparently you don't have records like you do in on your

16   sheets to show that you never sold them a warming unit or

17   you never sold blankets in the year before the surgery.  Why

18   are they even on this list?

19           MS. YOUNG:  Well, Your Honor, I think, though,

20   there are records that show ambiguity, and that's what we

21   are trying to have some way of dealing with this.  I mean,

22   they moved categorically --

23           THE COURT:  What's ambiguous?  What's ambiguity?

24   There's no ambiguity.  You don't have records or you do have

25   records showing the sale of a warming unit or the placement

1     of a warming unit at that hospital.  You've showed that in

2     the 12 months before the surgery you sold them blankets.

3     And the fact that they wrote down a number that's different

4     than the number that's on your device, how does that call

5     into question whether a Bair Hugger was used in that surgery

6     if the records the plaintiff has looked at has a check box

7     that says yes, Bair Hugger used?

8               MS. YOUNG:  Well, Your Honor, that would be I

9     believe the exact situation we had in the Scar case where

10    you had the notations, you know, the units are there, but

11    what we have learned through the process is that isn't

12    necessarily sufficient.  And we are certainly happy to meet

13    and confer on the very --

14              THE COURT:  Which was the Skaar again?  That's the

15    one where they said --

16              MS. YOUNG:  Idaho.

17              THE COURT:  -- turned off?

18              MS. YOUNG:  No that's the one that looked to be a

19    circle on the box and it wasn't until the depositions of the

20    treating physicians in Idaho that I believe it was the CRNA

21    said I don't use this, this -- this wouldn't be how we'd

22    note it.  And so we're just trying to figure out where there

23    is ambiguity in the records what will give us sufficient

24    proof, and that would be an affidavit, a verification from

25    the treating physician.

1          And, again, there are varying levels here of in

2     some of these if you look, Your Honor, and I'd have to look

3     at, again, there's a specific example for each case, some of

4     these show unit placement from the late 90s, from the early

5     2000s, and maybe those do or don't have blanket sales, but

6     there are tremendous variation in --

7          THE COURT:  Do they still work?  Do you have a

8     product that you placed in the 90s and the early 2000s that

9     they're still buying blankets?

10          MS. YOUNG:  Yes, Your Honor.

11          THE COURT:  So what difference does it make, so

12     what if they bought it in 1998 as opposed to 2017?

13          MS. YOUNG:  Well, and, Your Honor, if that is

14     sufficient to move forward, and we can certainly get into

15     discovery and determine like we have done in the other cases

16     whether it was, in fact, there and turned on and used, but

17     we don't believe going back through 3M records to try to

18     figure out any more information about product use is an

19     efficient way.  It would be unduly burdensome at this

20     juncture to require that type of discovery when what we're

21     trying to drive here towards are eight cases that can be

22     worked up for trial and that simply we're trying to take the

23     Court's guidance from the last go around and understand what

24     plaintiffs have submitted and whether it's sufficient to

25     resolve ambiguity about use.  Our whole objective here is to

1    figure out if Bair Hugger was used so that we can make those

2    nominations.

3               THE COURT:  Right.  And I guess the point is that

4    you're introducing a new phrase, the ambiguity of use.

5    That's not what this is about.  This is about Pretrial Order

6    No. 24.  Plaintiffs have to come up -- have to ascertain

7    that a Bair Hugger was used.  If you say that it wasn't,

8    you've got to produce evidence that shows that it wasn't.

9    Not that there's ambiguity.  Your standard isn't whether

10   there's ambiguity.  Your standard is it wasn't used.  Once

11   they -- they have a prima facie case.  They've got to show

12   that it was used.  Once they've met their prima facie case,

13   if you want to kick this case out of the bellwether pool,

14   you've got to say and show it wasn't used, not just create

15   some ambiguity that it might not have been used.  Am I

16   missing something?

17              MS. YOUNG:  Well, but, Your Honor --

18              THE COURT:  Am I missing something?

19              MS. YOUNG:  Well, I think the issue is have they

20   met their prima facie case, where for example --

21              THE COURT:  I get that.  And I understand that's

22   the thing, but that's different than you saying all you've

23   got to do is show some ambiguity about whether it was used

24   because the serial numbers don't match.

25              MS. YOUNG:  Well, Your Honor, I think our

1     challenges relate to what is required to meet a prima facie

2     case, and what we're doing is going off what we learned in

3     the Skaar case, the Kamke case and what the Court has said

4     about a simple checkmark on a box not being sufficient, and

5     that is where I think the discrepancy or the dispute is here

6     as to what is the prima facie case.  And then whether we

7     should be talking about challenges on a case by case basis

8     and what could be done to resolve those disputes I think is

9     a different issue than moving to strike all of our

10    challenges or asking for additional discovery on cases where

11    there's not even a reference to warming at all.

12         THE COURT:  Okay.  Do you agree or disagree,

13    Ms. Zimmerman, that the 53 number has now been reduced to 37

14    by reason of the failure to waive lexicon?

15         MS. ZIMMERMAN:  I will take counsel at her

16    representation on that.  I believe that there are, in fact,

17    30 cases that refused to waive lexicon, so it's still a

18    little over half.

19         THE COURT:  So why don't -- what would be wrong

20    with just simply saying, okay, they challenged these 37,

21    kick them out, let's now from you've got 63 cases left?

22         MS. ZIMMERMAN:  Because we've --

23         THE COURT:  You started with a hundred, right?

24         MS. ZIMMERMAN:  Sure.  So we started with a

25    hundred.  30 don't waive lexicon so we're down to 70, and of

1    that 70, 37 they challenge at this time, so we're down to a

2    little less than half of the remaining 70.  You know, I

3    think that we've got some real questions about whether

4    that's appropriate representative.

5           But kind of getting back to some of the questions

6    that were posed by Your Honor, another way of looking at

7    these spreadsheets is that, you know, if you look at the

8    gray kind of summary spreadsheet 3M prepared, out of the

9    100 cases randomly selected by the Court, all but four have

10   Bair Hugger heaters placed in those facilities.  So and of

11   those four where there are challenges saying we don't see

12   that we ever placed a heater, one is this Carol Griffin case

13   that I mentioned at the beginning where they told -- they

14   told the FDA something different than what they're telling

15   the Court today.

16          So my question really gets to or the plaintiffs'

17   motion is really intended to drive to, look, if 3M has

18   evidence that nothing was ever sold to this particular

19   facility and it's not a case, there's no fact dispute for a

20   trier of fact to figure out, please tell me and I will get

21   on the phone to whomever the plaintiffs attorney is, as I

22   did last week when I saw this letter that said Bair Hugger

23   wasn't used in this facility, that's one case.  That case

24   does not exist and is not pending before this Court anymore.

25   If there is additional evidence about cases like that where

1    their records show we didn't ever sell anything here, this

2    is not a real case, let's work on that.

3           But I think that Your Honor's question really

4    drives towards the kind of dispute between the parties, and

5    that is whether or not essentially what needs to happen here

6    is identifying ambiguities and what plaintiffs need to do to

7    respond to that.  And I think, unfortunately, while we did

8    learn things in the Scar deposition -- the Skaar, by the

9    way, was a defendant nomination so it was presumably they

10   thought that was a Bair Hugger use as well or they would

11   have either moved to dismiss it or wouldn't have nominated

12   it as a potentially representative bellwether.

13          THE COURT:  Sort of, except their whole point is,

14   as I understand, this is all your burden.  You have to

15   establish that a Bair Hugger was used.

16          MS. ZIMMERMAN:  Agreed.

17          THE COURT:  And that checking a box on a form

18   isn't enough.  You've got to do something more than that.

19          MS. ZIMMERMAN:  That's their position.

20          THE COURT:  And does that require a affidavit from

21   a doctor or anesthesiologist or something, I don't know, I'm

22   not -- I'm not going say right now, but that's their

23   position, that you've got to do more than just look at a

24   record and see if there's a box checked or a circle around a

25   box.

1          MS. ZIMMERMAN:  Yes, Your Honor.  I understand

2     that to be defendant's position.  I think that that imposes

3     a burden on the plaintiffs that is not imposed by the

4     Federal Rules of Civil Procedure.  The plaintiffs have a

5     good faith when they see that the record is indeed checked.

6     There's certainly people that are going above and beyond

7     that whenever they can to get an affidavit or declaration

8     either from the risk manager or a facilities manager or

9     sometimes the treating physicians, but these cases have been

10    going on, and the treatment, in many instances, are -- is

11    many years ago.  Some of the hospitals just don't have the

12    time or the staff or the willingness to submit to legal, you

13    know, form filling out, at this point, and/or the people

14    just aren't there anymore.  I mean, the case we're getting

15    ready to try, that surgery was, you know, almost eight years

16    ago now; it was in 2010.  So the issue is that going back to

17    figure out what was actually used in the kind of way that I

18    think the defendants are contemplating or hearing the Court

19    to require to resolve any and all ambiguity is really

20    imposing a burden above and beyond the burden that the

21    plaintiffs accept.

22          THE COURT:  But it's the burden that is

23    established by our experience with this case, right?  I

24    mean, clearly you've -- you can't sue somebody and hold them

25    liable for something they had nothing to do with.  So if it

1     was an ABC machine that was used, not a Bair Hugger.

2              MS. ZIMMERMAN:  Absolutely.

3              THE COURT:  3M is not responsible for that.

4              MS. ZIMMERMAN:  Absolutely.

5              THE COURT:  And you can't sue them for it and you

6     can't haul them into court and make them go to trial.

7              MS. ZIMMERMAN:  Absolutely, Your Honor.

8     Plaintiffs agree.  But I think that the issue, though, is

9     that the way that the proof of product issue has been

10    painted in this court is different than what we believe the

11    facts really reflect of the six bellwether nominations that

12    we started to work up.  There was only one where there was a

13    real proof of product issue and that was the Scar case that

14    nobody knew until we got to a deposition.  So and given the

15    timeframe that's outlined in Pre-trial Order 24, we

16    can't -- we don't believe that the Court assumed that the

17    parties were going to go depose every one of the treating

18    facilities to figure out and resolve any and all ambiguity.

19    That just wouldn't have been feasible.

20             THE COURT:  No, but I do think what the Court

21    anticipated that the plaintiffs' lawyers, and it's the whole

22    panoply of lawyers, not just and your committee but whoever

23    has got these cases, was going to do more than just look at

24    the record that you already got and see if there's a

25    checkbox, that you're going to do something to ascertain

1     that a Bair Hugger was actually used.  Maybe it's just a

2     call to the hospital.  Maybe it's looking at more records

3     than what's in your possession at the moment.  I don't know

4     what it would be.  But I think the Court anticipated it

5     would be more than what you did for the first go round

6     because the first go round resulted in one bellwether that

7     actually can go to trial.

8              MS. ZIMMERMAN:  So, Your Honor, I think that from

9     the plaintiffs' perspective, Pretrial Order No. 24 outlines

10    what we're required to do, and what we heard the Court to

11    say was that plaintiffs had to say, are you -- are we

12    prepared to try this case?  It -- do we have evidence that

13    confirms Bair Hugger use such that I will walk into this

14    courtroom and say, you know, Judge Noel and Judge Ericksen,

15    may I please the Court, I'm here to present my trial, my

16    case for trial.

17             THE COURT:  Let me just make sure you're clear.

18    I'm not going to be there for the trial.  That's Judge

19    Ericksen's problem.  But go ahead.  I appreciate the --

20             MS. ZIMMERMAN:  So we heard the Court to instruct

21    that what the plaintiffs were required to do was get

22    evidence such that we felt confident that we were going to

23    be able to come in here and say to a court and to a jury, we

24    believe that the Bair Hugger was used in Mr. Anderson's

25    case, for example, and records we think support that, and to

1    the extent that defendants then think that we're wrong about

2    that, that is part of what happens in a adversarial process.

3             There is a mutual discovery obligation in these,

4    and when we come forward and we say, okay, Mr. Anderson,

5    head of surgery at this particular place, or, for example,

6    Ms. Griffin, you say that couldn't be possible, well, we say

7    that, you know, your records suggest otherwise and we say

8    that Ms. Griffin's medical records, she was exposed to this

9    and we know you were selling blankets.

10            So we think that there is, you know, to the extent

11   that there is ambiguity or a lack of meeting of the minds as

12   to what was sold when and who was exposed to it, we think

13   that it's inappropriate for the defendants to use this

14   process of challenging proof of product to unfairly filter

15   the potential bellwether pool.  And we certainly see

16   examples that they have more information about what was

17   placed where, and we think that some of these challenges

18   were not made in good faith.

19            THE COURT:  So let me make sure I'm following

20   because I'm still a little confused about what that there is

21   and what there isn't.  So you've given me these

22   spreadsheets.

23            MS. ZIMMERMAN:  Mm-hmm.  Yes.

24            THE COURT:  And then the defendant says, but,

25   wait, you also got to have the backup and the backup they

1    say this is the documentation that's the subject of your

2    motion to compel, as I understand it, this is their

3    database, whatever it is, that shows when they placed a

4    warming unit at a given hospital and how -- whether they

5    sold blankets in the 12 months before the surgery.

6              MS. ZIMMERMAN:  Yes.

7              THE COURT:  Is it your contention that there's

8    more than that that you want or that they just haven't given

9    you this for all of the items on the -- that they challenge?

10             MS. ZIMMERMAN:  We think that we have -- we think

11   that we have a summary spreadsheet, so it's an Excel

12   spreadsheet.  The documents I printed for Your Honor, there

13   are tabs on the bottom, if you're familiar with Excel where

14   you can flip from one tab to the next, so they have a

15   summary sheet which is in front of you presently and then

16   there are tabs for each of the different hospital, at least

17   for the warming unit.  The heater, that is not printed

18   because it would be a voluminous production per hospital.

19   And the vast majority of those comport with the kind of all

20   gray spreadsheet that I've showed to Your Honor where all

21   but four of the 100 hospitals are shown to be Bair Hugger

22   warming unit customers.

23             So I think that at least with respect to, I mean,

24   if we can assume that 94 -- 96, I'm sorry, 96 of the hundred

25   we know have heaters, then we can look at the blue and white

1    sheet that's in front of you and that talks about whether or

2    not blankets were placed in the facility in the 12 months

3    prior to the plaintiffs' surgery.  I think that Your Honor's

4    question was to opposing counsel was really kind of getting

5    at the issue which is if there is a case where defendants

6    are sure based on their own internal information that, you

7    know, maybe it's Carol Griffin, that we didn't sell

8    anything, I mean, they show blankets but they don't show a

9    heater, they don't show blanket sales, they don't show any

10   of that, then if they can tell us that, we can try and

11   figure out where the kind of -- where we're missing each

12   other.  But what we're seeing in these challenges instead

13   are, well, your serial numbers don't match our serial

14   numbers so that can't be part of the pool.  And that's

15   imposing a burden on the plaintiffs and, frankly, excluding

16   a number of cases that ought to be considered as potentially

17   representative bellwether nominations simply because they've

18   created an ambiguity in the record about proof of use.

19            THE COURT:  Okay.  Thank you.

20            MR. HULSE:  Your Honor, Ben Hulse for --

21            THE COURT:  Who are you?  I don't believe you

22   entered an appearance .

23            MR. HULSE:  I was just going to say, I do defer to

24   Ms. Young.  As the discovery guy and the person --

25            THE COURT:  Just for the record, this is Mr. Hulse

1     speaking.  Go ahead.

2              MR. HULSE:  Good morning, everybody.  Ben Hulse

3     for defense.  I can speak to the data, where it comes from,

4     what was provided to plaintiffs, if it would be helpful

5     to --

6              THE COURT:  Well, that was my last question I was

7     going to ask Ms. Young, but if you want to answer it, I

8     suppose that would be fine.  So this?

9              MR. HULSE:  Yes.

10             THE COURT:  And the court record should reflect

11    I'm holding up a single sheet which was given to me as an

12    example by Ms. Young of a backup piece, correct?

13             MR. HULSE:  Yes, Your Honor.

14             THE COURT:  Okay.  Is this a printout from a

15    database kept in the ordinary course of business by 3M or is

16    this something that was created along with the databases

17    that what Ms. Zimmerman handed me as an attachment by that

18    some human was looking at information and then entered the

19    data anew into an Excel spreadsheet?

20             MR. HULSE:  The item that you're holding right

21    now, Your Honor, is generated in the ordinary course of

22    business from 3M's sales systems.  Basically the way it

23    comes to be is that there is a paper invoice.  It is in a

24    box somewhere in the bowels of 3M.  That was all keyed in at

25    the time of the sale or the placement into 3M's system or

1    Arizant's predecessor system.  A report is then generated

2    which provides the information in the system about the

3    placement of the unit.

4          We also for simply explanatory purposes and for a

5    quicker reference created these additional cover sheets that

6    summarize all of the underlying data that we provide.  For

7    example, sometimes we had cases where the -- we did not show

8    blanket sales to a hospital or facility at the particular

9    address that had been provided to us at the plaintiffs but

10   we had a -- blankets provided to a facility at a very

11   similar address and a facility with a similar name, and

12   we've provided that data.  So that's the kind of thing

13   that's notated on these cover sheets that we prepared.  But

14   there were close to, it wasn't 200 because we didn't show

15   sales and placement to all hospitals because we didn't have

16   any, but there's still somewhere around 185, 190 individual

17   spreadsheets that were provided to plaintiffs, individual

18   spreadsheets for both the blanket sales and for the warming

19   unit placement generated from 3M systems in their ordinary

20   course of business, business data.

21         THE COURT:  Is Ms. Zimmerman correct that for 96

22   of the 100 there was warming units placed?

23         MR. HULSE:  I think that is correct.  At some

24   point in time there was, for 96 facilities, and again, this

25   also includes ones where we didn't have a perfect match but

1    we saw something that looked like a facility with a similar

2    address and we provided warming unit information for all of

3    those.

4           So maybe just to sort of clarify one point, our

5    challenges are overwhelmingly based on the medical records

6    that have been produced.  We provided the warming unit and

7    sales information because it's -- it is, we concede,

8    relevant to all of this.  And we would agree that if there

9    is a warming unit placed at the facility, it makes it more

10   likely that the Bair Hugger was used.  If there were blanket

11   sales for the 12 months prior, it makes it more likely.  But

12   as we know from our first round of bellwethers, it's still

13   not ultimately determinative.  It's only --

14          THE COURT:  Well, let's put aside which is which.

15   This one the -- the -- the spreadsheet that's all white and

16   gray is the placement of warming units?

17          MS. ZIMMERMAN:  That's the warming unit.  You can

18   see it.

19          MR. HULSE:  Yeah, actually, it's hard for me to

20   see from there, Your Honor, but it sounds like it's the

21   warming unit.

22          MS. ZIMMERMAN:  And when you say this one --

23          THE COURT:  So I'm going to assume that 96 out of

24   100 is good enough for warming units.

25          MR. HULSE:  For warming unit.  But, again, all

```
 1    this means is that we show that a warming unit was placed.

 2    It doesn't mean that warming unit was still in use at the

 3    time of the --

 4              THE COURT:  I understand all of that.  And then so

 5    the only, what I'm -- it appears to me the only evidence

 6    that really relates to this issue of whether a case should

 7    be in the bellwether because a Bair Hugger was or wasn't

 8    used is the one showing when you sold them -- last sold them

 9    blankets?

10              MR. HULSE:  I think that -- that's probably more

11    helpful evidence.

12              THE COURT:  And it's the defendant's contention

13    that in now 37 out of the 100 cases -- or 37 out of the

14    70 --

15              MS. YOUNG:  53.  It was 37 out of the 53

16    challenges.

17              THE COURT:  Okay.  37 out of the 53 challenges,

18    but still, it's -- there's now 37 challenges.

19              MS. YOUNG:  Correct.

20              THE COURT:  Out of the -- when you take the

21    lexicon waivers out of the 100, you're down to.

22              MS. YOUNG:  70, yes.

23              THE COURT:  70.  So 57 -- or 37 out of the 70 are

24    now being challenged.  By the way, is there anything in this

25    spreadsheet that will tell me who hasn't waived lexicon?
```

1           MR. HULSE:  No, Your Honor.  Unless that's

2      something that either side has created.

3           MS. ZIMMERMAN:  I have a spreadsheet with that.  I

4      could certainly provide it to the Court, but --

5           MR. HULSE:  If that's useful information, I'm sure

6      the parties could collaborate on it and provide it.

7           THE COURT:  Yes, let's do that.  So before the day

8      is out, get together and submit to me a revised page 3 of

9      your memo so that will show which of the 53 are no longer

10     being challenged, so it shows the 37 that are being

11     challenged, and then a revised, this includes all 100 cases,

12     and then it's either you've produced stuff and everybody

13     agrees or you haven't.  And have I got that right?

14          MR. HULSE:  If we didn't produce, it's because we

15     couldn't find a matching or a similar address so we reached

16     the conclusion that they weren't a customer.  And we

17     searched both for similar facility names and similar

18     addresses, recognizing that in the healthcare world, the

19     hospitals change names all the time.

20          THE COURT:  Okay.  I guess my question is, are

21     there a hundred things listed on this spreadsheet?

22          MS. ZIMMERMAN:  Yes.

23          THE COURT:  Okay.  And so if it's just an X in the

24     box in the column called disposable sales found for

25     12 months before surgery, that means yes?

1           MR. HULSE:  Yes.

2           THE COURT:  Okay.  So then just somebody tell me

3     which of these 100 are out for lexicon reasons as opposed to

4     Bair Hugger use reasons.

5           What about, Ms. Young, the argument that FDA was

6     told one thing and the response on this spreadsheet is

7     another with regard to blanket sales on one of the

8     hospitals?

9           MS. YOUNG:  You know, we didn't have any

10    information about that before today.  I will have to check

11    into it and get back to the Court.

12          THE COURT:  Okay.

13          MS. YOUNG:  I wasn't aware of that.  But, Your

14    Honor, I think this is obviously coming to a head today

15    because the parties 16 nominations are due.  3M is certainly

16    willing to allow cases to be nominated with a notation as to

17    where there's product use challenges and then to move

18    forward with whatever seems to be the best way to address

19    those, and the parties -- the Court then is going to pick 12

20    and each party is going to strike two.

21          I'm wondering if we may be able to just agree that

22    parties can list cases and then note the nature of the

23    product use challenge.  I think the Court certainly has an

24    understanding now of the different categories that we've

25    challenged.  I would suggest perhaps that we could do it in

1    that manner and then this issue may actually not come to a

2    head in any way that applies across all of the 70 cases.  So

3    I think we could likely resolve this.

4              THE COURT:  So I can kick the can down the road.

5              MS. YOUNG:  Pardon me?

6              THE COURT:  That I can kick the can down the road.

7              MS. YOUNG:  Yes, since by probably 5 o'clock today

8    we're submitting our lists, and that would be the approach

9    that we would think makes sense.

10             THE COURT:  Ms. Zimmerman, any thoughts on that?

11             MS. ZIMMERMAN:  Well, we're happy to work with

12   defense counsel on that.  I mean, I'm a little worried that

13   the defendant's nominations of 16 are going to be from just

14   this, what's left, 37.

15             MS. YOUNG:  They are not.  They are not, Your

16   Honor.  They would not be.

17             MS. ZIMMERMAN:  Then we should just submit our

18   lists to the Court and not bother him with additional --

19             MS. YOUNG:  There will be some, obviously, because

20   of, as Ms. Zimmerman has said, we whittle, whittle, whittle

21   and we're left with -- we -- we will have some likely that

22   have product use challenges, we would identify those for the

23   Court.  We certainly aren't making an effort -- we want to

24   get through this process and have cases that can be worked

25   up.  That's -- that is our objection in all of this.  Our

1    objective.

2                   THE COURT:  Objective.

3                   MS. YOUNG:  Excuse me.  Slip there.

4                   THE COURT:  Okay.

5                   MS. ZIMMERMAN:  And we'll be back before Your

6    Honor again on Thursday, I think, for the status conference.

7                   THE COURT:  Right.

8                   MS. ZIMMERMAN:  And I certainly, if it's something

9    we can work out, that's fantastic and I'd prefer not to

10   bother the Court with it.  What we were worried about was

11   that these nominations, A, that we might be limited, and, B,

12   that defendants wouldn't be -- would be nominating a case

13   they thought didn't have Bair Hugger proof because that

14   doesn't seem to be appropriate.

15                  THE COURT:  Okay.

16                  MS. ZIMMERMAN:  Perhaps we can get past that.

17                  THE COURT:  So let's, as I understand it, keep

18   doing what I suggested so I got a full thing as to and have

19   this lexicon, because that seems, to me, to be as at least

20   as big an issue or bigger than this issue; in other words,

21   that you've now whittled the 100 down to 70 because 30 folks

22   want to try their cases at home, so get me that information.

23   And in the meantime go forth and select your cases without

24   regard to the product placement challenges, and we'll deal

25   with those, and it may be that nobody picks a case that has

1    a challenge.  But we can deal with it.  We'll have a fewer

2    number that we need to know that do need to be dealt with.

3              MS. YOUNG:  Thank you, Your Honor.

4              THE COURT:  Okay.  All right.  So then the next

5    thing is the defendant's motion for a protective order

6    Mr. Goss, is that you?

7              MR. GOSS:  Yes, thank you, Your Honor.

8              THE COURT:  Okay.

9              MR. GOSS:  So the defendants are moving for a

10   protective order for a subpoena that was served on

11   Dr. Walter Minkowycz.  And Dr. Minkowycz is a professor of

12   mechanical engineering at the University of Illinois-Chicago

13   and he's also the editor in chief of a journal called the

14   *Journal of Numerical Heat Transfer*.  Defendants

15   computational fluid dynamics expert, Dr. John Abraham,

16   published an article in the *Journal of Numerical Heat*

17   *Transfer* back in August.  And the subpoena appears to be

18   directed towards Dr. Minkowycz to get discovery into the

19   pre-publication processing of the article before it was

20   selected for publication.  The subpoena was served on

21   February 15th.

22              During -- actually during Dr. Abraham's deposition

23   specific to the Gareis case, he was questioned about the

24   publication, about the article , and he actually produced an

25   acceptance letter which is Exhibit 5 to Ms. Zimmerman's

1     affidavit in support of her opposition.  And the letter

2     says, from Dr. Minkowycz to Dr. Abraham, it says, I have

3     reviewed the paper carefully and find it to be of good

4     quality.  Indeed, the quality standard of the paper merits

5     acceptance for publication without further review.  And

6     Dr. Abraham was asked, did you ever get any comments from

7     any outside reviewers?  And he said no, I didn't.  As far as

8     I know, the paper was reviewed by Dr. Minkowycz only, and he

9     didn't have any information about whether Dr. Minkowycz had

10    sent the paper to outside reviewers.

11          Plaintiffs have said in their papers that and they

12    confronted Dr. Abraham at his deposition with the idea that,

13    look, this doesn't comply with the written procedures for

14    Taylor and Francis which is the publisher for many

15    scientific journals, including this one, and Dr. Abraham's

16    answer to that was that the editor in chief has the

17    prerogative to publish things without sending them out for

18    review.

19          So this subpoena was served, again, on

20    February 15th.  Expert general cause discovery closed last

21    August.  And, in fact, I think when plaintiffs moved for

22    leave to seek additional discovery from Dr. Augustine,

23    plaintiffs' counsel mentioned that they were interested in

24    perhaps pursuing some additional discovery surrounding

25    Dr. Abraham's article.  So it's not a new issue.  The Gareis

1    case specific discovery closed in December.  So our position

2    is that this subpoena was served out of time and that

3    plaintiffs ought to have first moved for leave to seek --

4              THE COURT:  Is it clear or is it my understanding,

5    then, that what you're telling me the state of the record is

6    that this article was described as being peer-reviewed when

7    it wasn't?

8              MR. GOSS:  I think that's plaintiffs' position,

9    although --

10             THE COURT:  What's your position?

11             MR. GOSS:  Well, our position is that it was

12   reviewed by the editor in chief.  So in that sense, it was

13   peer reviewed.

14             THE COURT:  Okay.  But everybody agrees -- I guess

15   that's the question.

16             MR. GOSS:  Right.

17             THE COURT:  All of it is spin or interpretation.

18   You're -- but it -- everybody agrees the facts are it was

19   submitted for publication, the editor in chief reviewed it,

20   the editor in chief accepted it, and there were no other

21   comments from other people skilled in the art?

22             MR. GOSS:  That's right, Your Honor.  That's

23   absolutely right.

24             THE COURT:  There's no dispute about any of those

25   facts ?

1       MR. GOSS:  There's no evidence in the record that

2   it was ever sent out for review or any reviewers provided

3   Dr. Abraham any comments, which raises the question, why do

4   we need to go to Chicago two months before trial and take

5   the deposition of Dr. Minkowycz when plaintiffs already have

6   in the record what they need to impeach Dr. Abraham if he

7   says on the stand, well, yes, this was peer reviewed?

8   Plaintiffs have said that there are 3M marketing materials

9   that describe the article as peer reviewed.  They didn't

10  identify the -- I'm not saying that these statements haven't

11  been made.  They didn't identify them.  And I would submit

12  that there's no -- none of the witnesses at trial are going

13  to say that relied on a 3M statements about peer reviewed

14  status about Dr. Abraham's article.  And Dr. Abraham himself

15  is going to rely on his report which is substantially the

16  same as the article.

17      So the question is why do we need this discovery,

18  and our position is that it's not only late, it's just not

19  needed.  They have what they need to impeach Dr. Abraham on

20  this issue.  Dr. Minkowycz is 81 years old and probably

21  wondering what all of this is about.  And I -- defendants

22  just don't see the need to bother him, you know, in this

23  short window before trial.  But if we're going to reopen

24  discovery to discuss issues surrounding publications,

25  plaintiffs have refused to provide the same type of

1    information on Dr. Elghobashi's article which wasn't

2    published until after the Gareis discovery period closed.

3    We're concerned, I asked Dr. Elghobashi about the conflict

4    of interest disclosure in his article which says the authors

5    have no conflicts to disclose.  In his view, there was no

6    conflict.  Our position is that, well, if we're going to

7    reopen discovery, we would like to know from the journal

8    whether they would consider funding from plaintiffs' counsel

9    to be a potential conflict given the litigation.  So we

10   think all of this is too late, but if we're going to reopen

11   discovery, then defendants will likewise move for leave to

12   pursue discovery on Dr. Elghobashi's article.

13              THE COURT:  Okay.  Ms. Zimmerman.

14              MS. ZIMMERMAN:  Yes, thank you, Your Honor.  I

15   think that Your Honor has understood the salient facts at

16   issue here.

17              THE COURT:  So I guess then my ultimate question

18   is, why do we need to go to Chicago to depose this guy?

19   Everybody agrees there -- nobody else reviewed this article

20   but the editor in chief, period, end of sentence.  Why do we

21   need to -- - what more do you need?  The record is clear,

22   that's what you want it to show, right?

23              MS. ZIMMERMAN:  Your Honor, I think that's correct

24   .  We did need to know because during his deposition,

25   Dr. Abraham testified under oath that this was a peer

1   reviewed publication.  And once he testified that, given the

2   documents that he produced to us, we had some questions

3   about whether or not he was telling us the truth.  That's

4   the reason that the subpoena wasn't timely prior to that.

5   It wasn't until he averred under oath that this was peer

6   reviewed that we served the subpoena.  We do have additional

7   information now that -- that, I mean, from counsel even on

8   the record today saying, yeah, this wasn't peer reviewed

9   because Dr. Abraham didn't go quite that far.

10          THE COURT:  Just to be clear, he didn't say it

11   wasn't peer reviewed; he said editor in chief alone

12   constitutes peer review and therefore it's peer reviewed.

13          MS. ZIMMERMAN:  That's correct.

14          THE COURT:  Go ahead.

15          MS. ZIMMERMAN:  And the papers that we submitted

16   along with our motion, as I can tell Your Honor read,

17   detailed what the peer-reviewed process ought to be in this

18   particular journal.  Dr. Minkowycz is, in fact, an

19   81-year-old former frequent colleague of Dr. Abraham's and

20   Dr. Sparrow's, both of whom have published a number of

21   different articles together, some of which relate to issues

22   here.  We're not sure yet which articles different experts

23   are intending to rely upon when we get to trial and so we

24   want to get to the heart of what really was done here and

25   whether or not this was an appropriately submitted and

1    peer-reviewed publication.

2              Now, plaintiffs submitted subpoena to Dr. Abraham

3    that mirrored really the subpoenas defendants served on our

4    experts last spring in the general causation phase.  It

5    would have contemplated production of these documents back

6    then, but these were not produced to us in advance of his

7    deposition in July.  We did finally get them this February

8    just before his deposition, and that's where we said oh,

9    something doesn't seem quite right here, and that's the

10   reason that we asked the questions and we served the

11   subpoena.

12             We do think that there's a departure from the

13   peer-reviewed standards in the journal, and we do think that

14   that will be appropriate cross-examination.  But we think

15   that we need more information about exactly what happened

16   here and what's been represented, because this paper is not

17   disclaimed by the journal, it is not being subjected to the

18   peer-review process that they typically hold themselves to.

19   And the person who is going to have the information about

20   that are essentially twofold, Dr. Abraham, the corresponding

21   author, and Dr. Minkowycz, the editor in chief who decided

22   on his own to publish this article.

23             Now, I can tell the Court Dr. Minkowycz called me

24   because he received the subpoena.  He told me on the phone

25   that he doesn't have a lawyer on this, that he doesn't know

1    anything about this particular subject area, and he doesn't

2    want to be involved.  I think that we need that information

3    under oath so that we can really properly investigate

4    whether or not this article ought to have been published and

5    what impact it has on the litigation here and on the

6    opinions that I don't know if the FDA was provided copies of

7    Dr. Abraham's published work.  Counsel has represented here

8    that both the published work and the report disclosed in

9    this litigation are, you know, substantially similar, if not

10   nearly identical.  So these things really do get to the

11   heart of what Dr. Abraham intends to testify about in this

12   Court before a jury, whether it's upstairs or where, about

13   matters that are really going to the key of this particular

14   case.

15          Now, I feel obligated to respond briefly that

16   counsel has noted Dr. Elghobashi did not disclose that the

17   plaintiffs had provided funding for the research that his

18   group did.  What was not cited to the Court is the section

19   of his deposition where he was asked, why did you think that

20   it might not be a conflict?  And Dr. Elghobashi said, I told

21   the plaintiffs at the beginning when they commissioned me to

22   do this work I was going to publish it no matter what the

23   results showed.  And that's why, under his under oath

24   testimony, he felt it wasn't a conflict because he was going

25   to publish it whether it supported the plaintiffs or not.

1    And we can provide that deposition testimony if the Court

2    would like it.

3              So we think that the information that

4    Dr. Minkowycz has is relevant to a key witness that the

5    defendants intend to call.  And the Court is certainly aware

6    of how important the CFD experts have been throughout the

7    heart of this litigation, and we ought to be entitled to

8    discover that information.

9              I will also say, it is my expectation that there

10   are going to be lawyers that look for this.  There's a state

11   court litigation that's pending in Illinois right now, and

12   the lawyers that have not been particularly active thus far

13   are quite interested in these kinds of issues.  So I think

14   that Dr. Minkowycz, whether in the Gareis case or in a

15   different case, is going to be providing discovery with

16   respect to these issues.  So we would like to go forward

17   with the discovery because we think it's important for

18   Gareis and for other matters, and we appreciate the Court's

19   attention.

20             THE COURT:  Okay.  Anything else, Mr. Goss?

21             MR. GOSS:  I would just say, Your Honor,

22   Dr. Abraham tends to rely on his report, which he was

23   cross-examined quite extensively about the peer review and

24   publication, is not really --

25             THE COURT:  Is Dr. Abraham going to be testifying

1    at trial or his --

2              MR. GOSS:  That's --

3              THE COURT:  -- deposition going to be offered?

4              MR. GOSS:  Well, if Dr. Elghobashi doesn't

5    testify, then maybe not, but if Dr. Elghobashi will be

6    present, then Dr. Abraham as a rebuttal witness will be

7    testifying in response.

8              THE COURT:  Is Dr. Elghobashi going to be --

9              MS. ZIMMERMAN:  Dr. Elghobashi will certainly be

10   here live.

11             THE COURT:  Okay.  Give me two seconds.

12             All right.  So with regard to both of these

13   motions, here's what's going to happen.  First, as I

14   understand it, the parties have agreed with respect to the

15   recalculation of the bellwether pool that irrespective of

16   challenges to the product placement or product use issue,

17   all of those cases are available to both sides to designate

18   as potential bellwethers, and if in fact, at the end of your

19   respective nominations cases remain which are subject to

20   product use challenges, the Court will address that at that

21   time.

22             With regard to this motion for a protective order,

23   as I understand it, the motion is for an order essentially

24   quashing the deposition subpoena for Dr. Minkowycz.  And

25   that motion will be granted, and the basis for it is the

1    Court concludes that the time for the discovery has closed,

2    and the state of the record is clear regarding the facts,

3    although apparently the parties disagree about the meaning

4    of peer review.  The facts are clear the article was

5    published at the direction of the editor in chief without

6    further review or comment by others in the field or others

7    skilled in the art of the field, and the field we're talking

8    about is computational fluid dynamics.

9            MR. GOSS:  Yes, Your Honor.

10           THE COURT:  I just had to say that out loud

11   because I've been working on the expression.

12           So anything else with regard to either of these

13   motions, Ms. Zimmerman?

14           MS. ZIMMERMAN:  No, Your Honor.

15           THE COURT:  Ms. Young.

16           MS. YOUNG:  No, Your Honor.  Thank you.

17           THE COURT:  Mr. Goss.

18           MR. GOSS:  No, Your Honor.

19           THE COURT:  Mr. Hulse.

20           MR. HULSE:  No, Your Honor.  Any -- anything

21   that's on the Court's mind for Thursday that we should be

22   prepared to address?

23           THE COURT:  I am chatting with both Patrick who is

24   here and Chad when we're done here, so the answer is not

25   right now.

1          MS. YOUNG:  Okay.  Then we'll be submitting a

2     agenda.

3          THE COURT:  And just so the record is clear, just

4     to round things out, Ms. Ahmann, do you have anything?

5          MS. AHMANN:  I have nothing further, Your Honor.

6     Thank you.

7          THE COURT:  Thank you for being here.  And we are

8     in recess.

9          MS. ZIMMERMAN:  Thank you, Your Honor.

10          THE COURT:  And we'll see you on Thursday but

11     we're going to be up in Judge Ericksen's courtroom even

12     though she's not here.

13          (Court adjourned.)

14                          *      *      *

15

16

17          I, Staci A. Heichert, certify that the foregoing is

18     a correct transcript to the best of my ability from the

19     digital recording in the above-entitled matter.

20

21          Certified by:   *s/ Staci A. Heichert*

22                          Staci A. Heichert,
                           RDR, CRR, CRC
23

24

25