```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
 2
      ------------------------------------------------------------
 3                                 )
      In Re: Bair Hugger Forced Air )  File No. 15-MD-2666
 4    Warming Devices Products      )          (JNE/)
      Liability Litigation          )
 5                                  )
                                    )  Minneapolis, Minnesota
 6                                  )  March 19, 2018
                                    )  10:00 a.m.
 7                                  )
                                    )
 8                                  )
      ------------------------------------------------------------
 9
              BEFORE THE HONORABLE FRANKLIN L. NOEL
10         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                        (MOTION HEARING)
11
      APPEARANCES
12      For the Plaintiffs:       SCHLICHTER BOGARD & DENTON, LLP
                                  Kristine Kraft, ESQ.
13                                100 South Fourth Street
                                  Suite 1200
14                                St. Louis, MO 63102

15      For the Defendant:        BLACKWELL BURKE P.A.
                                  Deborah Lewis, ESQ.
16                                Charmaine Harris, ESQ.
                                  Peter J. Goss, ESQ.
17                                431 South Seventh Street
                                  Suite 2500
18                                Minneapolis, MN 55415

19      Court Reporter:           STACI A. HEICHERT
                                  RDR, CRR, CRC
20                                1005 U.S. Courthouse
                                  300 South Fourth Street
21                                Minneapolis, Minnesota 55415

22

23         Proceedings recorded by mechanical stenography;
      transcript produced by computer.
24

25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1      THE COURT:  Okay.  This is In Re. Bair Hugger

2 Forced Air Warming Devices Products Liability Litigation.

3 We're here for a hearing on the plaintiffs' motion for an in

4 camera review and some motions to substitute parties.

5 Excuse me.  Let's get everybody's appearance on the record.

6 Where are we, who is who, for the plaintiff?

7      MS. KRAFT:  Your Honor, Kristine Kraft

8 representing the plaintiffs.

9      MS. LEWIS:  Good morning, Your Honor.  Debra Lewis

10 representing defendant 3M and Arizant.

11      MS. HARRIS:  Good morning, Your Honor.  Charmaine

12 Harris representing defendant.

13      MR. GOSS:  Good morning, Your Honor.  Peter Goss

14 for defense.

15      THE COURT:  Okay.  You're up.

16      MS. KRAFT:  Thank you, Your Honor.  Again, good

17 morning.  My name is Kristine Kraft.  The -- I'm going to

18 address the motion for in-camera inspection.  This motion

19 concerns ten documents that involve communications between

20 3M's attorneys and 3M's employee, Andrew Chen.  Mr. Chen has

21 been employed by 3M since 1993 as a mechanical engineer

22 specializing in thermoscience.  His involvement in this case

23 relates solely to conducting internal testing on the very

1     Bair Hugger system that's at issue in this litigation.  His

2     involvement concerned conducting testing on the safety of

3     the Bair Hugger system, as well as evaluating the increased

4     risk of infection associated with the Bair Hugger system.

5     These ten documents that are referenced in our motion all

6     concern that topic because that was his only involvement in

7     this litigation, and they consist of the underlying facts

8     and data, apparently so based on the description, but the

9     underlying facts and data that were, in fact, used by

10    Mr. Chen and two of his colleagues to generate a report

11    addressing their experimental assessment of the Bair Hugger

12    model 750.

13          Because the documents on the privilege log that

14    are at issue, these ten documents, involve underlying facts

15    and scientific information, they are discoverable.  And

16    there is not a basis for the defendants to selectively

17    produce the report that Mr. Chen and his colleagues prepared

18    in October 2015, which, in fact, was disclosed and provided

19    to their testifying expert, Dr. John Abraham, on the

20    analysis, but yet not produce these other documents that

21    apparently relate to the internal testing of work and

22    evaluation of the increased risk of infection that Mr. Chen

23    was asked to do.

24          These documents are discoverable for a multitude

25    of reasons.  Again, they involve factual information,

1     scientific-related work which, in fact, is the subject of

2     one of your prior orders entered in this case which you

3     addressed this issue that pertains to whether or not

4     internal testing documents involving either material or data

5     related to the Bair Hugger were, in fact, discoverable.

6     And, in fact, you addressed both the application of the work

7     product privileges and the attorney-client privilege, and

8     I'll go through that in a moment, but neither privilege was

9     determined to have applied.

10          Here, simply because 3M's lawyer asked Mr. Chen to

11     become involved in this regard doesn't shield the documents

12     from disclosure.  Neither the attorney-client privilege or

13     the work product doctrines apply to preclude production of

14     underlying factual internal testing or related materials,

15     particularly when those documents are related to a report

16     that he prepared and, in fact, has been used by defendant's

17     testifying expert and, in fact, relied upon in issuing his

18     opinions in this case that will be rendered at trial.

19          Additionally, these materials are discoverable

20     because none of the cases cited by 3M substantiate

21     protecting these types of documents.

22          Even if Mr. Chen were categorized as an internal

23     consulting expert in this case, that does not end the

24     inquiry.  Instead, the inquiry goes on to evaluate whether

25     or not exceptional circumstances exist for the production of

1    these internal testing documents and related materials, and

2    here, that same standard, an exception to the work product

3    doctrine which has previously been determined to have been

4    met by plaintiffs and therefore requiring production of

5    other internal testing materials.

6         THE COURT:  So compare that to -- refresh my

7    recollection as to what the circumstances were.  As I

8    understand it, it related to something that either

9    Mr. Benham or Mr. -- Dr. Augustine had done.

10        MS. KRAFT:  The prior documents that you ordered

11   to be disclosed were documents dated in the early 2000s that

12   Dr. Augustine -- that Mr. Augustine and/or his counsel

13   requested be done, and you determined that those documents

14   fell within the ordinary work product doctrine but that the

15   plaintiffs had met their burden of demonstrating substantial

16   need for the documents as well as undue hardship associated

17   with generating a substantial equivalence of those

18   documents.

19        And for your -- and these documents are, in fact,

20   similar and even more compelling for production here

21   because, again, what we know is Mr. Chen's involvement was

22   limited.  It was limited to doing internal testing on the

23   Bair Hugger products.  And the -- we're only talking about

24   ten documents.  These documents, as described on the log,

25   all relate to the forced air warming system, the safety of

1    the Bair Hugger system, and nine of the ten documents at

2    issue were either authored by or sent by Mr. Chen or one of

3    his colleagues who are authors of the very report dated

4    October 15, 2015, that was supplied by 3M's counsel to

5    Dr. Abraham and, in fact, used in his review and --

6              THE COURT:  Hold on.  Let me stop you there

7    because I'm confused by the convoluted nature of that

8    sentence.  Are you saying that Dr. Abraham relied on

9    Dr. Chen's report?

10             MS. KRAFT:  He relied and used the information in

11   the report in connection with rendering his opinions.

12             THE COURT:  Is that different than relying on the

13   report?

14             MS. KRAFT:  It -- using the information and

15   relying on the report are two different things, and --

16             THE COURT:  By information, are you referring to

17   just objective data that Dr. Chen generated or things he

18   wrote down in a narrative report?

19             MS. KRAFT:  Okay.  I'll direct the Court's

20   attention to some of the deposition testimony of Dr. Abraham

21   in this regard and let you know what I'm referring to.  So

22   first of all, just by way of further background, at pages

23   143 and 144 of Dr. Abraham's deposition, he testified that

24   Andy Chen was one of three engineers who was with him at the

25   time he did the modeling of the operating room, so he was

1     there from the outset.

2           Then at pages 43 and 44 of his deposition, we

3     learned that Dr. Abraham had been provided with a copy of

4     this very extensive report prepared by Mr. Chen and his two

5     colleagues regarding the Bair Hugger system.

6           Then on pages 303 and 304 of his deposition,

7     Dr. Abraham testified that he used the report in the

8     following ways.  At page 303, quote, he says, this is the

9     document which confirmed my understanding of the boundary

10    conditions of the Bair Hugger, so I would say it confirmed

11    my boundary conditions.

12          He then goes on to testify that many of diagrams

13    and photographs contained in Chen's report represented the

14    same CFD model used by Dr. Abraham.  He goes on at those

15    pages in the range of 303 and 304 to talk about the geometry

16    from Chen's report that's referenced on page 28 of his

17    report and states that is the same one or similar to the one

18    that 3M provided to Dr. Abraham to do his analysis.

19          And then, finally, he discusses diagrams and

20    photographs of the OR contained in Chen's October 2015

21    report that, in fact, represent the same CFD model used by

22    Dr. Abraham.

23          So what seems to be the case here is we have ten

24    documents on the privilege logs identified by 3M.  These

25    documents are, with the exception of one dated in 2016, but

1    none of the ten documents are all dated right at the time of

2    the preparation of this report.  And we know there's a short

3    window.  Mr. Chen was asked to get involved in August of

4    2015.  His report was prepared by October of 2015.  Four of

5    the documents were prepared -- excuse me, five of the

6    documents were prepared the day before he issued the report,

7    one after the date of the report.  Again, most of these

8    documents are authored by Mr. Chen or his colleagues.  The

9    defendants here have --

10              THE COURT:  And this is right around the time of

11   Walton and Johnson, correct, that we're --

12              MS. KRAFT:  Yes.

13              THE COURT:  And do you dispute that these are

14   ordinary work product and are simply arguing that you've met

15   your burden to get them or do you dispute that they're even

16   work product at all?

17              MS. KRAFT:  Well, I certainly dispute that they

18   are ordinary work product and that we meet our exception.  I

19   don't think that they're work product at all.  And the

20   reason is because these logically appear to be the

21   underlying facts or information pertaining to the October

22   report that Mr. Chen prepared, and, again, that basis alone

23   would require their production.  He, Mr. Chen, is a fact

24   witness here.  He's not a consulting expert witness by which

25   the defendants should be able to, you know, shield

1    production of these documents.

2            And certainly defendants have made arguments based

3    on every front, one of which is opinion work product.  They

4    claim that these documents are opinion work product.

5    However, in looking at the description of the documents on

6    the log, we see that none of the documents are even authored

7    by an attorney or sent by an attorney.  None of the

8    descriptions used on the log use terms such as strategy,

9    impressions, legal conclusions, legal -- or internal

10   thoughts of counsel.  Instead, the log reveals that all the

11   documents are sent by 3M employees and that relate to,

12   again, internal testing which is very, very critical to the

13   plaintiffs here to be able to have the effective right to

14   cross-examine Dr. Abraham and others about internal testing

15   done by 3M on the products at issue, regardless of the

16   timeframe of whether this occurred during the pendency of

17   the Walton Johnson litigation or not, because that

18   information is exclusively within the control of the

19   defendants.

20           And in your order issued on August 9th of 2017,

21   document --

22           THE COURT:  Do you have the docket number of that

23   order, by the way?

24           MS. KRAFT:  Yes, I do.  It's document No. 645.

25           THE COURT:  Okay.

1          MS. KRAFT:  And in reference to -- referring to

2     that order on page 4, you addressed sort of the timing of

3     litigation versus the timing of the document, the testing

4     documents at issue, and you indicated on page 4, quote,

5     assuming, without deciding, that some litigation was pending

6     at the time of the challenged documents requesting testing

7     or performing testing were created, any testing performed on

8     the Bair Hugger is material and relevant to the issue in

9     this case and plaintiffs have the substantial need for these

10    materials.  Additionally, because these materials are

11    exclusively in the possession of the defendants, the

12    plaintiffs have no other way of obtaining this material

13    other than through discovery.

14          And that same situation applies here.  As

15    discovery currently stands, we have a summary report

16    prepared by Mr. Chen and, again, his two colleagues, whose

17    names are referenced throughout the privilege log, but we

18    have a summary document prepared by Mr. Chen but yet we are

19    not in receipt of access of the underlying -- of what

20    appears to be the underlying documents or other information

21    related to his purpose in this litigation which is to do

22    internal testing.

23          And for all of these reasons, Your Honor, we would

24    request the Court to be the one to conduct the in-camera

25    review to assess the validity of these claims.  Again,

1    there's no basis to determine if the, based on the

2    description that these documents involved, opinion work

3    product, I -- they -- it's our position they do not involve

4    ordinary work product for two reasons:  One, not work

5    product at all because Mr. Chen is a fact witness who has

6    conducted internal testing on which their expert has relied.

7    That's a real distinguishing factor here.  Or at least

8    considered or used.  Whatever terminology, I do not believe

9    that it's dispositive, whether he used it or belies on it or

10   whatnot, but he was provided that information, and he

11   testifies very clearly about that in his deposition.

12           And then, third, the application of the

13   attorney-client privilege here in our position is not

14   applicable, as you so found in your order at pages 6 and 7,

15   because the context of the information is factual in nature.

16   It does not involve providing or seeking legal advice.  Each

17   description is providing information in connection with the

18   work that Mr. Chen has done on testing the Bair Hugger

19   products.

20           THE COURT:  Okay.  Thank you.

21           MS. KRAFT:  Thank you, Your Honor.

22           THE COURT:  Who's up over here, Ms. Lewis?

23           MS. LEWIS:  Good morning again, Your Honor,

24   Deborah Lewis.  It's defendant's position that no

25   camera -- in camera review is necessary, Your Honor, for

1    several reasons.  Number one, as is evident from our

2    responsive motion and the log itself, the documents that

3    plaintiffs challenge are protected by the attorney-client

4    privilege.  How do we know that?  The log identifies clearly

5    the attorneys' names on the log on all the entries.  It

6    shows the name of outside counsel, it shows the name of

7    in-house attorney, it shows the name of those who were

8    involved in the assignment by in-house attorneys.  It is

9    clear what the attorney-client privilege protects.  It

10   protects attorney-client privileged communications for the

11   client.

12            As Your Honor pointed out, the timing of these

13   communications is October 2015.  According to the Walton and

14   Johnson cases, they were set for trial in March of 2016.  So

15   these communications occurred five months before an actual

16   trial setting.  These communications reflect the attorney's

17   opinions and defense strategy for those particular cases.

18   Communications between an attorney and client are absolutely

19   immune from disclosure.  That should end the inquiry on that

20   alone.  These are attorney-client privileged communications.

21            For the second reason, these documents on the log

22   are opinion product, meaning they are reflective of the

23   attorney's opinion, strategy, again, prior to trial.  They

24   were asked, this team was asked at the direction of legal

25   counsel to form and perform some work that was relevant to

1   the defense of the case, and that's -- and so the work that

2   was done was done under the direction and control of legal

3   counsel.

4           Plaintiffs do not argue that there are some

5   extraordinary circumstances.  And as we know, case law is

6   pretty clear that opinion work product is more absolutely

7   immune from discovery.  There has to be some sort of

8   extraordinary circumstance in order for that privilege to be

9   passed aside.

10          Plaintiffs don't have any evidence if this were to

11  be assumed to be opinion -- if this were assumed to be

12  ordinary work product, which it is not, but let's assume for

13  purposes of ordinary work product, if this were ordinary

14  work product, plaintiffs don't have evidence that they can't

15  do -- can't get substantially the same amount of information

16  from their own testing.

17          As we have pointed out --

18          THE COURT:  Except that's the point, we don't know

19  what Chen did, right, or do we?

20          MS. LEWIS:  Plaintiffs have that information.

21          THE COURT:  Do they know what tests he performed?

22          MS. LEWIS:  They have the data, and that's the

23  point that you were making, do they have the data, which

24  they have.  They had more than 14 hours of deposition time

25  with Dr. Abraham to question him about the data.

1    Dr. Abraham did not rely on the Chen Eaton memo.  He said

2    he -- the -- the data in the memo confirmed his

3    understanding of the Bair Hugger flow rate and temperature,

4    but that doesn't mean because that confirmed -- that memo

5    confirmed what he understood that he relied on it.  He did

6    not rely on it.  He tested --

7             THE COURT:  Did he use it?  What words, I guess,

8    words do we use to get the ship confused?  What word, if he

9    relied on it, do you concede that it would then be

10   discoverable?

11            MS. LEWIS:  I don't know that I would concede if

12   he relied on it, it would be discoverable.  It -- my

13   understanding from Dr. Abraham's testimony is he came up

14   with figures on his own.  When he saw the Chen report, he

15   said the Chen report data confirmed what he already knew and

16   understood.

17            THE COURT:  And does that constitute using the

18   data in some way?

19            MS. LEWIS:  I think he used his own data.  What

20   was in the Chen data confirmed what he already knew.

21            THE COURT:  And but the data you're telling me the

22   plaintiffs have already anyway?

23            MS. LEWIS:  The data that they have --

24            THE COURT:  I'm sorry, the data that Chen

25   generated, not Abraham's data.  Do they have Chen's data?

1              MS. LEWIS:  They have Chen's data.

2              THE COURT:  Okay.

3              MS. LEWIS:  And so they already have the data.

4     And so there's no substantial need for these documents on

5     this log because they already have the data.  I think -- I

6     mean, their argument is simply we don't have your testing,

7     and they're claiming that constitutes substantial need.  And

8     we have cited numerous cases have said just the opposite,

9     that have given examples of when someone asked for someone

10    else's testing, the courts have ruled that just because they

11    have testing doesn't mean you're entitled to it, especially

12    when you can do your own testing.

13              And the case from Northern District of Illinois is

14    pretty instructive, which we cite, in which that Court ruled

15    that it -- the Court can easily conclude that

16    attorney-initiated tests were reflective of the attorneys

17    opinions and strategy and thus protected as opinion work

18    product.  Even if the tests were non opinion work product,

19    they were still protected because nothing prevented the

20    plaintiff from running tests of its own.  And although

21    plaintiffs might not have the same tests as defendants, it

22    would have tests nonetheless, reflecting the

23    same -- relating to the same ultimate issue.

24              Plaintiffs' issue in this case is they -- their

25    contention that the Bair Hugger is defective.  Well, go get

1    your own testing to --

2              THE COURT:  Which I'm sure they've done.  And I

3    remember sitting through three days of testimony.

4              MS. LEWIS:  That's absolutely right.

5              THE COURT:  Or argument.

6              MS. LEWIS:  They've done their own testing, so

7    they have, you know, the substantial equivalent of data that

8    they're trying to get.  So just saying we don't have it is

9    not a showing a substantial need or that you can't get the

10   substantial equivalent.

11             We've cited our cases as well.  But the courts are

12   coming to the conclusion that if you're wanting someone

13   else's tests and if you already have that data, in some

14   circumstances you don't need to go after someone else's

15   privileged communications.  And so these documents are

16   different from your prior order.

17             THE COURT:  In what way?

18             MS. LEWIS:  These tests are, number one, these are

19   tests done in during the pending litigation in Walton and

20   Johnson.  These tests are --

21             THE COURT:  But I assumed in the other case, in

22   the other order, assumed without deciding, that the stuff I

23   was referring to was generated in connection with

24   litigation.

25             MS. LEWIS:  That's what we were trying to

1    establish in the prior priv log challenges.  The evidence

2    was not as clear-cut then as it is now.  But in this case it

3    is clear that these were done, again, during pending

4    litigation, done at the direction of legal counsel, done in

5    order to facilitate the defense of the case.  They

6    involved -- these involve opinion work product which means

7    it's more than just facts.

8              THE COURT:  But I guess so how does -- how is it

9    opinion work product?  So opinion work product, as I

10   understand it, relates solely to the lawyer's opinion,

11   right?

12             MS. LEWIS:  That's correct.

13             THE COURT:  What's relevant, what evidence should

14   we look at, what evidence should we generate, what evidence

15   should we discover, how do we analyze these claims.

16             MS. LEWIS:  That's correct.

17             THE COURT:  It's the lawyer's opinion, not some

18   scientist's opinion, correct?

19             MS. LEWIS:  That's correct.  And plaintiffs are

20   assuming that these particular documents at issue are not

21   met and that's not the case.

22             THE COURT:  But I guess that's my question, as I

23   understand it, yeah, every one of these documents is an

24   e-mail string, correct?

25             MS. LEWIS:  That's correct.

1          THE COURT:  And you're telling me that if I were

2     to look at them in camera, what I would see is a lawyer

3     saying something that is exposing her thought processes?

4          MS. LEWIS:  Yes.

5          THE COURT:  Not Dr. Chen's thought processes or

6     analyses or interpretations of data?

7          MS. LEWIS:  Correct on interpretation of data.

8     And these e-mail strings, the way they are placed on the

9     log, by necessity, because it is an e-mail string, the

10     defendants only listed the names of those at the top of that

11     chain, but within that e-mail chain are communications

12     generated by outside counsel.  So contrary to Ms. Kraft's

13     thoughts, all e-mails were not generated by a nonlawyer.

14          THE COURT:  Okay.

15          MS. LEWIS:  That was her argument was these could

16     not be either work product or communications because they

17     were all generated by, again, a nonlawyer, but, again,

18     that's because that may be top e-mail string, e-mail string,

19     that was the last communication, but, again, within that

20     string were communications generated by one of the lawyers.

21          So although, again, it's our position that these

22     are opinion work product and, again, similar to the

23     attorney-client privilege, there has to be some

24     extraordinary circumstance why plaintiffs should be entitled

25     to have those in which the work product would not apply.

1   These, again, are different from the other ones that you

2   ordered produced because these more reflect thought

3   processes of the lawyers getting ready for trial.  It was

4   not that clear on the previous orders and the documents that

5   were at issue.  So these documents are not similar to the

6   documents in the other case.

7          And so, finally, I guess, Your Honor, our argument

8   is, again, we don't believe an in camera review is even

9   necessary because the attorney-client privilege attaches to

10   each and every single document that is challenged today.  In

11   addition to the attorney-client privilege that applies,

12   opinion work product also applies.

13          THE COURT:  Okay.  Thank you.  Anything else,

14   Ms. Kraft?

15          MS. KRAFT:  Yes, Your Honor.  If I may, please.

16          THE COURT:  Before you go, let me ask, do you have

17   the Chen data?

18          MS. KRAFT:  Well, that's exactly one of the points

19   that I was going to address.  We do not have the underlying

20   data.  We have the report.  We have Mr. Chen's October 15,

21   2015, report.  We do not have the underlying data.  And, in

22   fact, I can provide certain examples of information

23   contained in this report, although --

24          THE COURT:  But the data is not going to be

25   found -- now I'm even more confused.  The ten documents at

1      issue are e-mail strings, correct?

2              MS. KRAFT:  Yes, that's how they are described out

3      there.  The attachments or additional information, I don't

4      know, or they could be just discussions about the report and

5      the testing that he did.  And in either case, it's our

6      position it would be discoverable.

7              THE COURT:  But -- but you've got the report.  So

8      let's assume for a moment the strings are something like

9      holy crap, look at this, we're going to lose this case, is

10     that relevant -- is that discoverable if that's between a

11     lawyer and Dr. Chen in response --

12             MS. KRAFT:  Yes.

13             THE COURT:  -- to the lawyer's request to do this

14     testing stuff?

15             MS. KRAFT:  Yes, that communication would not

16     involve rendering legal advice or providing legal advice, it

17     would be I guess a factual opinion by Mr. Chen in that

18     scenario.

19             THE COURT:  But the requests at issue aren't going

20     to necessarily give you the data underlying Chen's report,

21     will it?

22             MS. KRAFT:  I don't know.  And that's

23     particularly -- and, frankly, we think that information is

24     discoverable.  We don't know where that -- where those

25     documents may be.  We did not find descriptions on the log

1    that would seem to, per se, state this is the underlying

2    data.

3              THE COURT:  Well, where did the report say the

4    data is?

5              MS. KRAFT:  It doesn't indicate.  It makes -- this

6    is a confidential document so I hesitate to make reference

7    to certain aspects of it, but there are references in the

8    report to certain types of testing being done.  And we do

9    not have the data.  Certain CFD, computational fluid

10   dynamic, analysis and experimental flow digitalization were

11   used.  We don't have that underlying data.  There is

12   information in the report describing a geometry for the CFD

13   model, a 3D geometric model was created and generated by

14   visiting site and certain dimensions were taken of the room

15   and the equipment.  We don't have that background

16   information.

17             There's other underlying --

18             THE COURT:  Okay.  I got it.

19             MS. KRAFT:  So I think counsel may be defining the

20   term data differently than we do.  We have the report, but

21   the underlying data we do not have.

22             A couple of other issues that I didn't point out

23   before that I think are important here after hearing

24   counsel's argument is that the portion -- in the event there

25   are opinions and legal conclusions or strategies of legal

1    counsel in these documents, which is not apparent at all

2    from the descriptions, but let's assume that's the case,

3    only that portion of the document would be protected, not

4    the remainder of the e-mail string.  And certainly based on

5    the descriptions that have been provided, it seems very

6    reasonable that the communications are from Mr. Chen or his

7    colleagues and relate to providing information about the

8    safety of the Bair Hugger system.  So we would -- this

9    is -- this only heightens the basis for our request to

10   conduct an in-camera review of these documents to make the

11   Court's own determination as to the applicability of the

12   privilege here.

13            With respect to our substantial need for this

14   information, whether it's e-mail communication commenting

15   about the tests that were done or the underlying data, which

16   we think is likewise discoverable, but we have a -- what

17   we're talking about here are -- is the testing and comments

18   of the testing or information related to the testing that is

19   exclusively in the defendant's control.  We're not talking

20   about -- I mean, an inventory of Bair Hugger systems that we

21   could conduct our own tests.  You know, we've done that.

22   That's not at issue here.  It's the, similar to what you

23   found before, it's the internal work of the -- of the

24   defendants that is exclusively within their control is

25   relevant here.  We cannot be in a position to replicate it

1    or duplicate it in any way if we don't know -- if we don't

2    have it, and we certainly are not -- or we would be placed

3    in an unfair position of not being able to effectively use

4    the information or cross-examine defendants' witnesses about

5    the information, you know, if applicable.

6              I would also state that the attorney-client

7    privilege is applied narrowly in order to ensure that the

8    truth and information, you know, pertaining to a subject

9    matter is disclosed and that the case citation I believe was

10   referenced in your order.

11             And those are all the issues that I wanted to

12   address, unless Your Honor has some questions.

13             THE COURT:  Okay.  Thank you.

14             I have a question for Ms. Lewis first.  When you

15   say the plaintiffs have the Chen data, are you referring to

16   the narrative report that Ms. Kraft refers to?  Or is there

17   somewhere where there's actual objective data generated by

18   Dr. Chen's testing?

19             MS. LEWIS:  That's why Mr. Goss was standing up.

20   He can probably better explain the data.  But it's my

21   understanding that plaintiffs do have and, in fact,

22   questioned Dr. Abraham for, again, 14 hours, on the data.

23             THE COURT:  That Chen generated?

24             MS. LEWIS:  Yeah, it's called the geometry.  I

25   think that means the calculations --

24

1          THE COURT:  Okay.

2          MS. LEWIS:  -- of a particular --

3          THE COURT:  Well, if your answer to my question is

4     Mr. Goss knows, I'll let Mr. Goss speak.

5          MS. LEWIS:  I believe I'm right, but I think he

6     can define that better.

7          THE COURT:  Okay.  Thank you.

8          MR. GOSS:  All right.  Ms. Lewis brought me along

9     because I have suffered through more of this than she has

10    and I am probably more familiar with the documents than

11    either counsel here.  They do have the data.  If Your Honor

12    recalls from Mr. Assad's presentation, various

13    presentations, regarding computational fluid dynamics, you

14    basically need three inputs: you need the temperature, you

15    need the flow rate, and then you need -- you do need some

16    specifics about the room, including the geometry of the

17    room, okay, and that is simply what we call a CAD file or

18    computer-aided design.

19          And the CAD file that Dr. Abraham used in his CFD

20    is the same one that Mr. Chen developed based on an

21    operating room at Fairview Southdale Hospital.  And that

22    just tells you the configuration of the room and the patient

23    and the draping.  That CAD file was produced more than a

24    year ago.  So plaintiffs have that same CAD file.  The only

25    remaining questions are do they have the temperature of the

1    air coming out of the Bair Hugger and the flow rate of the

2    air coming out of the Bair Hugger.  Both of those are

3    disclosed in Mr. Chen's memo.  There's nothing else that you

4    need to do a CFD, according to Dr. Elghobashi's own

5    testimony.  So and, in fact, they relied on similar

6    documents to make their CFD to what's described in the Chen

7    report.  So that's what we mean we say they have the

8    underlying data.

9         What they seem to be asking for is actual CFD

10   files, after you plug the information into the computer,

11   what does the computer produce, okay, that's a different

12   thing.  Now, they've spent a lot of time and money with

13   Dr. Elghobashi using those same inputs to develop their own

14   CFDs.

15        THE COURT:  All right.  I get that.  But I guess

16   my question is, so does Dr. Chen run those things?  Does he

17   run the CAD file, the temperature, and the flow rate through

18   the computer and get something back from the computer saying

19   here's what happens at this temperature with this flow rate

20   in this room?

21        MR. GOSS:  Yeah, so it would be the same as

22   Dr. Elghobashi's CFD and Dr. Abraham's CFD.

23        THE COURT:  Well, if they were all the same, we

24   wouldn't be here, I'm guessing.

25        MR. GOSS:  No, that's right.  But you put it into

 1   the computer and you get a output.  Now, Dr. Abraham is not

 2   relying on -- he's never seen the internal 3M CFD.  He's

 3   seen the memo that Chen prepared that gave certain input.

 4            THE COURT:  But do the plaintiffs have Dr. -- is

 5   it Dr. Chen or Mr. Chen?  I've heard both.  Is he a doctor?

 6            MR. GOSS:  You know, I think he is a Ph.D. so.

 7            THE COURT:  Okay.

 8            MR. GOSS:  He's a very humble guy, though, so.

 9            THE COURT:  Does -- do the plaintiffs have

10   whatever he generated with his CAD file, his flow rate, his

11   temperature?

12            MR. GOSS:  No, they only have the inputs, and the

13   reason for that is this was done under direction of counsel

14   to assess whether the CFD project would be worth pursuing at

15   all with an outside lawyer -- with an outside expert, okay,

16   and that's why Dr. Abraham has never seen any of these

17   results.  And at trial in May he is not going to testify

18   about them, he's not going to rely on them, he's only going

19   to rely on his own work.

20            THE COURT:  So what does he mean when he

21   testifies, as I understand it, that Dr. Chen's data is

22   consistent with his own data?

23            MR. GOSS:  Right.  So counsel is trying to get him

24   to admit that he relied on the memo, and he said, no, I have

25   my own experience with these blankets from doing my own

1    research before I was retained for this litigation.  When I

2    saw the Chen memo, it was consistent with the inputs that I

3    used for air temperature and flow rate out of the Bair

4    Hugger.  I didn't rely on it.  It confirmed that the inputs

5    I used were correct.

6              And so by plaintiffs' argument, they're saying we

7    need the CFD files.  They haven't produced Elghobashi's CFD

8    files.  All we have is videos from it.  They've said the CFD

9    files are locked up in a super computer down in Austin,

10   Texas.  So it's hardly fair for them to say we need 3M's

11   internal CFD file which are not going to be shown in trial

12   which our expert has never seen when their expert has not

13   even produced the software he used to generate his CFD.

14             THE COURT:  All right.  All right.  I'll take the

15   matter under advisement.

16             There's also then an issue regarding substitute of

17   parties, correct?  Who's got that issue?

18             MS. HARRIS:  Good morning, Your Honor.  Charmaine

19   Harris for defendant.

20             THE COURT:  Ms. Harris.

21             MS. HARRIS:  As a preliminary matter, I should

22   mention that defendants noticed both hearings and so I'm not

23   sure even if plaintiffs are going to call in or what they're

24   going to do.  I don't know.

25             Are you representing plaintiffs in this matter?

1              MS. KRAFT:  Your Honor, for on behalf of the

2      plaintiffs, I would ask the Court to consider the briefing

3      solely in connection with this issue and would rely on

4      the --

5              THE COURT:  We haven't heard from anybody?

6              THE CLERK:  We have not.

7              THE COURT:  These all -- there's three of them.

8      Is that right?

9              MS. HARRIS:  Two.

10             THE COURT:  Two.  I'm sorry, what are the two?

11     I've got three things in front of me to so I'm confused.

12     This is Summers Price -- I'm sorry.

13             MS. HARRIS:  Yeah, she -- Ms. Price is connected

14     with the Andrews case.

15             MS. KRAFT:  Oh, okay.

16             MS. HARRIS:  And then we have.

17             THE COURT:  Sandra Vann.

18             MS. HARRIS:  Sandra Vann, correct.

19             THE COURT:  Okay.

20             MS. KRAFT:  Yes, Your Honor, I would say I do not

21     represent any of those plaintiffs so I guess I would retract

22     my statement and say I -- I'm not here appearing in those

23     cases and so I do not know, frankly, if they have submitted

24     a brief in this regard.

25             THE COURT:  Okay.  Let me --

```
 1                    MS. KRAFT:  So I'm sorry.

 2                    THE COURT:  -- start all over again.  So I've got

 3        before me two matters, civil No. 17-3276 which relates to

 4        Summer Price individually and on behalf of the estate of

 5        Larry Andrews, and in that matter plaintiff

 6        seeks -- plaintiff Summer Price seeks to be substituted for

 7        the deceased, Larry Andrews, and defendant objects, correct,

 8        correct, Ms. Harris?

 9                    MS. HARRIS:  Correct, Your Honor.

10                    THE COURT:  And then it appears to me based on the

11        documents I have that Ms. -- or Summers Price and Larry

12        Andrews estate are represented by Seth Webb of Seth Sharrock

13        Webb -- I'm sorry, Seth Sharrock Webb of Brown & Crouppen in

14        St. Louis, Missouri.

15                    MS. HARRIS:  Correct.

16                    THE COURT:  And the next matter then is the case

17        involving Sandra Vann which is civil No. 16-841.  And,

18        again, that's a situation of substitution the defendants

19        oppose, correct?

20                    MS. HARRIS:  Correct, Your Honor.

21                    THE COURT:  And it appears, to me, that Ms. Vann

22        and her estate are represented by Kirk Goza, G-O-Z-A, of

23        Goza and Honnold in Leawood, Kansas.

24                    MS. HARRIS:  Correct, Your Honor.

25                    THE COURT:  Okay.  So let me just confer with my
```

 1    clerk for one moment.

 2        (The Court conferred with his clerk.)

 3            THE COURT:  Counsel, it's my understanding, then,

 4    though, Ms. Harris, that the notice of this motion and this

 5    hearing were served on those through ECF.

 6            MS. HARRIS:  Correct.

 7            THE COURT:  Were served on the individual

 8    plaintiff's lawyers.

 9            MS. HARRIS:  Correct, Your Honor.

10            THE COURT:  Okay.  And you have no other

11    information?

12            MS. KRAFT:  I do not, Your Honor.

13            THE COURT:  All right.  Then I have the papers.

14    Ms. Harris, go.

15            MS. HARRIS:  Do you -- do you want --

16            THE COURT:  If there's any argument you want to

17    make in addition to what's in the papers.

18            MS. HARRIS:  I'll make it quick then.  For the

19    Larry Andrews case, Summer Price has asked to be the proper

20    party to be subsisted, but under Georgia law, a substituted

21    party requires legal appointment and she has not produced

22    any documentation evidencing that she is the administrator

23    or executor of the estate of Larry Andrews.  Additionally,

24    no PFS sheet has been submitted.  And so therefore, we ask

25    that the motion be denied.

1          THE COURT:  Okay.

2          MS. HARRIS:  For Sandra Vann, again, we ask that

3     his motion be denied as well.  Under Colorado law, the

4     personal representative stands in place of the decedent's

5     shoes in a survival action.  However, by counsel's own

6     admission, Jesse Cooper has initiated proceedings to be the

7     legal representative but, again, has not produced any papers

8     actually evidencing that he is the legal representative.  So

9     while he might be the heir, he is not the legal

10    representative.  And so we ask that his motion as well be

11    denied.

12         THE COURT:  Okay.  Thank you.  I will take those

13    under advisement and issue an order shortly.

14         Anything else for anybody on any of these issues?

15    Plaintiff?

16         MS. KRAFT:  If I may just one point, to

17    the -- our -- our argument with respect to these documents

18    and why we believe they do not fall within the scope of

19    either privilege, I just want to emphasize is not

20    dispositive or does not hinge on whether or not these same

21    documents were provided to Dr. Abraham.  We need to look at

22    the documents based on the description of the log which is

23    why an in-camera review is so important here to evaluate

24    whether or not any of these privilege claims we discussed

25    earlier apply.

1         And then secondly, on the underlying data issue,

2    if I may ask leave of court for five days to provide any

3    other information responding to Mr. Goss's argument, I will

4    acknowledge that I do not have the details associated with

5    that type of information to be able to address the Court in

6    that regard.

7         The reason we discussed underlying data was, you

8    know, in part because if these -- these documents do involve

9    underlying data, that, again, I think heightens the

10   reasoning that we have for producing these documents and

11   that they're not privileged because, again, as the status

12   would be, we have the expert report that was provided and

13   not underlying data.  But even if this information does not

14   involve underlying data in our terminology and as I

15   understand it when I appeared here, the information, to the

16   extent it's not involving attorney impressions and

17   strategies fall outside of the privilege because of the

18   internal testing that Mr. Chen's sole role was here.  So

19   thank you, Your Honor.

20        THE COURT:  Okay.  Thank you.  Ms. Lewis, anything

21   else?  You're thinking of something to say.  Don't feel

22   compelled.  But I just want to give you the opportunity.

23        MS. LEWIS:  I only want to say this, Your Honor,

24   and that is, as we said in our papers, there are ten

25   documents they challenge, nine of them, their focus seems to

1    be on the CFD.  None of the documents have anything to do

2    with the CFD.

3              THE COURT:  Okay.

4              MS. LEWIS:  And that's what we've told plaintiffs.

5              THE COURT:  Okay.  Ms. Harris, anything else you

6    want to say?

7              MS. HARRIS:  No, Your Honor.

8              THE COURT:  Mr. Goss.

9              MR. GOSS:  No, sir.

10             THE COURT:  Okay.  Thank you all, very much.  I

11   will take these advisement.  I'll issue an order shortly,

12   and we are in recess.

13        (Proceedings concluded at 10:51 a.m.)

14

15                          *      *      *

16

17

18             I, Staci A. Heichert, certify that the foregoing is

19   a correct transcript from the record of proceedings in the

20   above-entitled matter.

21

22             Certified by:  *s/ Staci A. Heichert*

23                            Staci A. Heichert,
                              RDR, CRR, CRC

24

25