# EXHIBIT A

```
 1                    UNITED STATES DISTRICT COURT

 2                      DISTRICT OF MINNESOTA

 3   ------------------------------------------------------------
                                    )
 4                                  )
       In Re:  Bair Hugger Forced Air  )  File No. 15-MD-2666
 5     Warming Devices Products     )  (JNE/DTS)
       Liability Litigation         )
 6                                  )  September 6, 2018
                                    )  Minneapolis, Minnesota
 7                                  )  Courtroom 9E
                                    )  9:00 a.m.
 8                                  )
                                    )
 9   ------------------------------------------------------------

10             BEFORE THE HONORABLE DAVID T. SCHULTZ
                 UNITED STATES MAGISTRATE JUDGE
11

12                      (MOTIONS HEARING)

13   APPEARANCES

14   FOR THE PLAINTIFFS:          MESHBESHER & SPENCE LTD.
                                  Genevieve M. Zimmerman
15                                1616 Park Avenue
                                  Minneapolis, MN  55404
16
     FOR THE DEFENDANT:           BLACKWELL BURKE P.A.
17                                Mary Young
                                  Peter Goss
18                                Ben Hulse
                                  431 South Seventh Street
19                                Suite 2500
                                  Minneapolis, MN  55415
20

21   COURT REPORTER:              Maria V. Weinbeck, RMR, FCRR
                                  U.S. Courthouse
22                                300 South Fourth Street
                                  Suite 1005
23                                Minneapolis, MN  55415

24
             Proceedings recorded by mechanical stenography;
25   transcript produced by computer.
```

```
 1                    P R O C E E D I N G S
 2                       (9:06 a.m.)
 3              THE COURT:  Good morning, everyone.  Please be
 4     seated.
 5              All right.  We are on the record in the Bair
 6     Hugger Forced Air Warming Devices, MDL Number 15-2666.  Will
 7     counsel for the plaintiff note your appearance for the
 8     record, please?
 9              MS. ZIMMERMAN:  Yes, Good morning, Your Honor.
10     Genevieve Zimmerman for plaintiffs, and a number of my
11     colleagues are in trial right now and they send their
12     regrets that they're not able to be here this morning.
13              THE COURT:  Good morning, Ms. Zimmerman.  For the
14     defendants?
15              MS. YOUNG:  Good morning, Your Honor.  Mary Young
16     for the defendant.
17              THE COURT:  Good morning, Ms. Young.
18              MR. GOSS:  Good morning, Your Honor.  Peter Goss
19     for the defense.
20              THE COURT:  Good morning, Mr. Goss.
21              MR. HULSE:  And good morning, Your Honor.  Ben
22     Hulse.
23              THE COURT:  Good morning, Mr. Hulse.  I hope you
24     don't mind sitting on the bench.
25              MR. HULSE:  Not at all.
```

1            THE COURT:  All right.  So I take it, Ms. Young,

2    you'll be arguing the motion?

3            MS. YOUNG:  Yes, Your Honor.

4            THE COURT:  Go ahead.  Beware or be aware I have

5    read everything, so go ahead when you're ready.

6            MS. YOUNG:  Thank you, Your Honor.  So as Your

7    Honor knows then at issue today is defendant's motion to

8    strike two of the three case specific experts that

9    plaintiffs have disclosed for the Axline trial on

10   December 3rd.  Neither of these experts have offered case

11   specific opinions related to the plaintiff, and defendants

12   move to exclude their testimony as untimely and improper.

13           Before discussing the specific experts, I just

14   wanted to highlight two over-arching points.  First, as Your

15   Honor knows, discovery in this MDL is bifurcated by the

16   Judge and that what that bifurcation means has become a

17   point of contention really for the first time on this

18   motion.

19           Defendant's position, a position we believe was

20   shared by the Court or is shared by the Court and was shared

21   by the plaintiffs up until now, is that general causation

22   discovery covered issues related to all of the cases that

23   cross cut the cases in the MDL.  General causation certainly

24   is one of those issues, but it also applies to other issues

25   that would apply equally to other plaintiffs in this case.

1          On the other hand, we have case specific expert

2     disclosures.  And those case specific experts were intended

3     to be bellwether case specific and to offer opinions

4     specific to a plaintiff's case.  The Court had an exchange

5     with plaintiff's counsel on this very issue where the

6     distinction was clear the Court asked plaintiff's counsel,

7     "who do you foresee being a case specific expert?"  And in

8     response, plaintiffs essentially said it would be an

9     anesthesiologist or an orthopedic surgeon who would be

10     offering a case specific opinion.

11          So that distinction, Your Honor, general

12     causation, general issues versus the case specific issues,

13     that bifurcation has been made in the case and has been

14     clear.  Plaintiffs now on this motion argue for the first

15     time that the general causation discovery meant something

16     different.  That it was a floor for the experts and that

17     once their experts cleared that hurdle in the Daubert

18     motions, they could now go ahead and offer new non case

19     specific expert opinions at the bellwether stage.  We

20     fundamentally disagree with that distinction.  And it would

21     be contrary not only to bifurcation of discovery, but it

22     would undermine the streamlining that the Court has done so

23     that this MDL can move forward.  The Court allowed general

24     causation, general issues to proceed first so that the

25     Daubert issues could be addressed and resolved and then we

1    are at a point now where bellwether cases need to be worked

2    up efficiently and effectively.  Allowing this new

3    definition and to undermine the bifurcation would create a

4    never ending cycle of expert discovery where you have non

5    case specific issues being introduced and having to be dealt

6    with in a specific bellwether case.  And so at the outset,

7    we think that is a fundamental issue that brings this

8    motion.

9            While that is a distinction that's the backdrop,

10   Your Honor, it really just is the backdrop here.  The Court

11   does not need to for the issues before Your Honor today, the

12   Court doesn't need to grapple with the broader issues that

13   plaintiffs are trying to interject here.  Issues like what

14   if we get to a point where a general causation expert can no

15   longer participate?  Inevitably, in an MDL we'll probably

16   get there, we're not there today.  So this isn't about this

17   must be the case that we can never have new general

18   causation experts.  That is not what we are talking about

19   here today.  At this stage, we're only looking at the

20   specific opinions offered by Dr. Bushnell and Dr. David and

21   whether those two experts have offered proper opinions in

22   the Axline case under the federal rules and under the

23   Court's schedule.

24           THE COURT:  Okay.  Keep going.

25           MS. YOUNG:  Thank you, Your Honor.  Turning then

1     to Dr. Bushnell.  Dr. Bushnell is a computational fluid

2     dynamics expert offered to rebut defendant's rebuttal

3     computational fluid dynamics expert Dr. John Abraham.  There

4     is nothing in his report that relates to Ms. Axline, and he

5     says nothing about causation.  His entire report is an

6     improper sur-rebuttal report that provides hyper technical

7     critiques of Dr. Abraham's CFD.  It's really, Your Honor,

8     just a rehash of the extensive cross-examination that

9     plaintiffs have already done of Dr. Abraham.  And no doubt a

10     cross that's been informed by Dr. Bushnell because he sat

11     through 14 hours of Dr. Abraham's deposition and certainly

12     informed plaintiff's cross-examination of him, and they also

13     cross examined him at trial.

14          So, Your Honor, this report violates the Court's

15     Scheduling Order, which does not provide for sur-rebuttal

16     reports, and Judge Noel made that very clear when he

17     expressly denied plaintiff's prior request for likely this

18     very sur-rebuttal report from Dr. Bushnell.  Therefore, the

19     report violates both Rule 16 and Rule 37, and it should be

20     excluded here at trial as a sanction.

21          Plaintiffs have tried to recharacterize

22     Dr. Bushnell as an impeachment expert.  Defendants are not

23     aware of any support for the notion that there is such a

24     thing as an impeachment expert.  The expert is clearly

25     rebutting our rebuttal expert, and Judge Noel unequivocally

1    said there will be no replies to rebuttal experts.  What you

2    get are reports on issues where you prepare the burden of

3    proof, a rebuttal, and deposition, and that has all happened

4    here with respect to the CFD experts.

5         THE COURT:  Let me ask you this, in general, as I

6    understand the sort of dialogue that went on between the

7    Court and counsel, the sequence was initial report, rebuttal

8    report, depositions.  And if the initial reporting expert

9    had a response or a rebuttal to the rebuttal expert's

10   report, that that was permitted to be offered and explored

11   in the context of their deposition but that that -- so to

12   the extent that there is any sort of sur-rebuttal, if you

13   will, that was the mechanism and scope, mechanism for it and

14   scope of it.  Am I right?

15        MS. YOUNG:  Absolutely, Your Honor.  And to that

16   point, the points that Dr. Bushnell seeks to rebut of

17   Dr. Abraham's were in fact explored.  The CFD that

18   Dr. Abraham, while plaintiffs are arguing some sort of

19   impeachment expert, the CFD was presented for the first time

20   in May of 2016 at science day.  It was posted on the

21   Internet.  So there's simply nothing that either wasn't

22   explored previously in cross exam or could not have been

23   explored.  So there is a mechanism by which this information

24   can come into the case and is in the case.

25        So, Your Honor, for the plaintiff's failure to

1    obey, first, the scheduling order, and then Judge Noel's

2    subsequent and very clear statement that we will not have

3    sur-rebuttals here, plaintiff's report of Dr. Bushnell

4    should be stricken.

5           On a broader note, Your Honor, if sur-rebuttals

6    are allowed, that certainly does set a very different

7    precedent for this case, for expert discovery in this case.

8    It would make meaningless the scheduling order, the Court's

9    statements about the scheduling order and really there would

10   be an opening of a flood gate in every bellwether case.  Is

11   it now open season?  The plaintiffs get a sur-rebuttal, and

12   how do we deal with that mechanism?

13          THE COURT:  If this were allowed, this report, the

14   Bushnell report were allowed, what would defendant's plan be

15   for responding to it, if you know?

16          MS. YOUNG:  Well, Your Honor, I do know because

17   we've had to comply with other deadlines in the case

18   schedule, so we have submitted a stand alone

19   sur-sur-rebuttal report from Dr. John Abraham and that was

20   provided to the plaintiffs on Tuesday.  And so we have

21   already incurred, we believe, you know, harm by needing to

22   actually engage in discovery that was clearly in violation

23   of a Court Order.  We would need to depose Dr. Bushnell.  If

24   he weren't brought here, I understand he's in Seattle and

25   then, of course, prepare for trial with respect to his

1    testimony.

2            THE COURT:   Okay.

3            MS. YOUNG:   So, Your Honor, I think that's an

4    appropriate segueway to talking about Dr. David.   That too

5    allowing his supplemental opinions, albeit for different

6    reasons, would be also an opening of the flood gates here

7    and would undermine the Court's bifurcation of discovery.

8            As courts have recognized, if you allow improper

9    supplementation of expert reports, what you essentially have

10   is no finality, and you have a back and forth on experts

11   whether that be in an MDL or in a specific case.   So under

12   Rule 26(e), while experts do have a duty and often have

13   proper means to supplement their reports, that is not what

14   Dr. David has done here because he has offered new expansive

15   opinions on alternative design.   They're not proper under

16   Rule 26(e) and should be excluded under Rule 37(c)(1).   That

17   exclusion for improper supplementation is mandatory absent a

18   showing by plaintiffs and a demonstration of the failure is

19   harmless or substantially justified.

20           So to set the framework for that discussion, just

21   wanted to highlight what it is that Dr. David has done.   He

22   does not purport to offer any Axline case specific opinions.

23   He calls it a supplemental general causation report, so on

24   its face, we believe it's clearly outside of the context of

25   the rules.   And then what he's done is offered seven what he

1    contends to be feasible safer alternative designs for the

2    Bair Hugger, which run the gamut from a cotton blanket to

3    other -- to conductive warming systems.  And so these were

4    all available, I think, very significantly.

5           This isn't the type of supplementation where

6    there's been research published in the intervening time

7    period or information that he couldn't have known about

8    prior.  These devices were all available at the time of his

9    prior report.  And at the time of his deposition, all of the

10   research that he relies on in claiming that they're

11   alternative designs were available.  So --

12          THE COURT:  Let me stop you there for a second.

13   It's really of, I don't think, I think it's of no sequence

14   but you made that statement in the brief as well.  And from

15   what was submitted, I couldn't quite see that those dates

16   lined up.  You said that everything but one study was

17   available at the time the report was issued and that the

18   additional study that wasn't available at the time of the

19   report was available at the time of the deposition.

20          MS. YOUNG:  Right.

21          THE COURT:  But in your brief, those dates don't

22   seem to track, so what am I missing?

23          MS. YOUNG:  Your Honor, so are you looking at the

24   page 8?  We talk about the disclosure of its original report

25   on March 31, 2017, and then the availability of all articles

1      by August 1, 2017.  And I see here I believe the confusion

2      would be about the likely the latest study would be

3      July 2016.  None of them appear to be in the -- I agree with

4      you actually, Your Honor.  I see that none of them --

5                  THE COURT:  That's before the disclosure, right?

6                  MS. YOUNG:  Right, are in the intervening time

7      period.  So I will have to confirm from that, but I think

8      the point there is, Your Honor, that he was asked in his

9      deposition about the four alternative designs included in

10     his initial report, and he asked do you have any other

11     proposed alternative designs?  And he said no.  And so to

12     the extent these were proposed alternative designs, they

13     would have been known to him, available to him, and it is

14     now improper to add them into the case where, obviously,

15     safer alternative design has been an element of plaintiff's

16     claims and something they bear the burden of proving since

17     that time of his deposition.

18                 THE COURT:  They make the argument that honestly

19     I'm not sure I quite understand it, so I want you to explain

20     it to me faithfully and certainly Ms. Zimmerman gets an

21     opportunity to explain it as well.  But the argument, as I

22     understand it, is essentially something about the Gareis

23     trial and the pretrial motion in limine made a difference in

24     the disclosure for Dr. David, but I'm not quite sure I'm

25     tracking that.

1          MS. YOUNG:  Your Honor, we don't agree with that

2     statement.

3          THE COURT:  I figured that.

4          MS. YOUNG:  Right.  So the reason is that

5     plaintiff's now have disclosed a number of electric

6     conductive warming blankets, and they had also disclosed an

7     electric conductive warming blanket, the VitaHEAT UB3 in the

8     first report.  So to the extent they're claiming that

9     knowledge about that type of device somehow changed in the

10    intervening time period.  Frankly, it didn't.  The VitaHEAT

11    order stood, and it wasn't admissible, and they've now

12    augmented that.

13          The TableGard was part of their initial report.

14    It was also the only alternative design presented at trial,

15    and they have now the warm cloud alternative design that

16    would have a similar inflatable mattress, and so the idea

17    that that new device came in somehow because of how the

18    Gareis trial shaped up, we're not following that argument

19    either.  And there was no evidence about then they have not

20    even devices but they have cotton blankets, the reflective

21    blankets, and the prewarming.  None of those are devices,

22    none of those are modifications to the Bair Hugger system,

23    and we don't see what happened at the Gareis trial that

24    would change their view that those somehow are proper

25    alternative designs under the law.  So our view is that

1    argument is unavailing, and we're not following what the

2    rationale would be for it.

3         So, Your Honor, as I mentioned, the sanction

4    should be mandatory absent a showing that it was

5    substantially justified, and I think Your Honor's question

6    just went to that point of whether that in fact is

7    substantial justification.  It's our view that it is not.

8    Also, in terms of whether this is harmless.

9         If the Court were to allow an expansion of the

10   alternative design opinions in this case, defendants would

11   be seeking leave to reopen discovery on those issues for

12   whatever devices would be in play and don't see that the

13   current case schedule and a December 3rd trial date would be

14   viable in that scenario.  So those are factors that the

15   courts do consider in looking at harmlessness.

16        THE COURT:  Did the defendants in the period of

17   time after Dr. David's report was initially issued, did you,

18   in fact, take discovery on the alleged alternative feasible

19   designs?

20        MS. YOUNG:  So there were the four.  The Court had

21   already ruled that the VitaHEAT was not a feasible

22   alternative design because the Bair Hugger could not be

23   modified.

24        THE COURT:  Right.

25        MS. YOUNG:  Plaintiffs themselves took discovery

1    of the two forced air warming devices, the Cincinnati Sub-0

2    and the Stryker mistral.  In that intervening time period,

3    we were satisfied with those responses so that obviated the

4    need for defendants to seek any discovery.  And then the

5    TableGard, Dr. David was solely relying on a marketing

6    brochure, and we made that decision at the time not to seek

7    any additional discovery.

8              THE COURT:  Okay.

9              MS. YOUNG:  And so but in this case, given the

10   breadth of these new opinions we would be seeking to reopen

11   discovery.  So we don't believe this is the type of

12   supplementation, one, not proper to begin with; but, two,

13   that would be considered to be harmless under the rules,

14   which is the showing that plaintiffs are required to make in

15   order to proceed with this design.

16             And then, Your Honor, just getting to the point of

17   other factors that the courts look at the importance of the

18   evidence.  In our view if you propounded evidence that is

19   not actually alternative designs that is legally viable, so

20   you have products that have already been rejected as

21   alternative designs, you have things that aren't devices

22   certainly aren't modifications, that is evidence that we

23   believe won't be coming into the trial, and we shouldn't be

24   forced not only to spend resources developing responses to

25   it, but then also potentially losing our trial date and

1    losing, you know, the schedule that we have here, so.

2            THE COURT:  Regardless of the outcome, I think the

3    chance of losing that trial date is virtually nil but

4    understood.

5            MS. YOUNG:  Thank you.  Then we'll be very busy if

6    we head in one direction here.  So, Your Honor, it's our

7    position that the Dr. David's improper supplemental report

8    should be stricken and that no further discovery should be

9    taken on it, and no evidence of those alternative designs

10   should be allowed at trial.  So unless the Court has further

11   questions, I will rest.

12           THE COURT:  Thank you.

13           MS. YOUNG:  Thank you, Your Honor.

14           THE COURT:  Ms. Zimmerman, I have a number of

15   questions for you before you begin, so let me just jump to

16   them.  Regarding the Bushnell report, when was it prepared

17   in its current form?  And was that in fact the report that

18   was the subject of the discussion with Judge Noel?  I

19   believe it was in June 15 of '17 status conference.

20           MS. ZIMMERMAN:  Yes, Your Honor.  The Bushnell

21   report was prepared this summer of 2018 after the conclusion

22   of the Gareis trial, and the defendants are certainly

23   welcome to explore that if they choose to take his

24   deposition.

25           THE COURT:  Okay.  So was it the contemplation in

1    2017 when you had this, as I understand it, a request, I

2    don't know if it was a formal motion or not to offer or

3    propound a sur-rebuttal report that was denied by Judge

4    Noel, was it in fact the contemplation that it would be

5    whether it was Bushnell or someone else a response to

6    Dr. Abraham's?

7            MS. ZIMMERMAN:  To be candid, Your Honor, I don't

8    remember.  I know that as we went through that process, so

9    that if I can take a quick step back.

10            THE COURT:  Sure.

11            MS. ZIMMERMAN:  We talked about the science day

12   and what was known about Dr. Abraham's opinions.  First of

13   all, science day was completely off the record.  And there

14   were videos, in fact, that were produced and shown to the

15   Court in I think it was May of 2016.  There were some of

16   those videos available on You Tube, but none of the written

17   report that Abraham has offered as supportive of his

18   opinions in this case and also connected with the videos

19   that are available on You Tube were produced to us until

20   June of 2017 as a part of his rebuttal to Dr. Elghobashi.

21            So just to the extent that the Court is thinking

22   that we had Abraham's report starting in 2016, we just

23   didn't.  We didn't have it until June of 2017.

24            THE COURT:  Okay, but I'm not sure that ultimately

25   helps the plaintiffs.  If you had the report in June of 2017

```
 1    or whenever it was, July of 2017, we're now over a year

 2    later, so I guess I'm not sure where that leaves you.  I

 3    don't think it leaves you in a good spot.

 4              MS. ZIMMERMAN:  Well, yes, Your Honor.  I mean I

 5    think a number of things have happened since that time

 6    primarily, and I wouldn't expect Your Honor to have read

 7    every single brief that has been submitted to the Court, but

 8    plaintiffs believed and continue to believe to this day that

 9    Dr. Abraham is not qualified to offer the opinions that he

10    offered and that he did not follow an appropriate

11    methodology.  And so we moved --

12              THE COURT:  But that ship sailed.

13              MS. ZIMMERMAN:  It did with respect to general

14    causation.  The Court has allowed all of the experts that

15    were disclosed to come in and offer testimony with respect

16    to general causation issues.

17              And so fast forward to what happened in the Gareis

18    trial, in the Gareis trial there were separate reports

19    because it was a different machine.  It was a Model 505 at

20    issue in that case, so both Dr. Elghobashi and Dr. Abraham

21    produced new reports for Gareis.  And during the course of

22    the trial, there were some limitations on our ability to

23    impeach Dr. Abraham.

24              One of those limitations on our ability to impeach

25    him actually was with respect to an order from Judge Noel
```

1      about whether or not his article was subject to the peer

2      review process.  That our attempt to impeach him with a

3      Court Order was denied on hearsay grounds.  So there's a

4      number of different things that we need to do in our view in

5      terms of impeaching Dr. Abraham.

6              What Dr. Elghobashi did with his general causation

7      report on the Model 750 was to explain what the impact is of

8      this particular machine on an operating room in a general

9      way.  He did not do a case, you know, he did not model each

10     and every operating room for the 5,000 plaintiffs that are

11     before the Court right now.  So he has a report on the 750,

12     and he has a report then on the Model 505.

13             And so with respect to what plaintiffs intend to

14     use Dr. Bushnell for, and I will make a representation as an

15     officer of the court, Dr. Bushnell will not be called unless

16     and until Dr. Abraham is called to the stand again.

17             THE COURT:  But, again, I mean I get that, but

18     that just makes Dr. Bushnell's report a response to

19     Dr. Abraham, right?

20             MS. ZIMMERMAN:  That's correct.

21             THE COURT:  But it doesn't make it specific to the

22     Axline trial except for the fact that Dr. Abraham like other

23     general causation witnesses are going to testify at that

24     trial.

25             MS. ZIMMERMAN:  Yes.

```
 1              THE COURT:  So I don't think it gets you to, and

 2      maybe you agree with this, but that's not a case specific

 3      report.

 4              MS. ZIMMERMAN:  Yes, Your Honor, correct.

 5      Plaintiffs concede that.  So we do think that, and I think

 6      that we conceded this in our papers, that Dr. Bushnell's

 7      report is indeed a rebuttal to Abraham, but it is an

 8      impeachment rebuttal.

 9              THE COURT:  Let me stop you there.  Impeachment it

10      strikes me for lack of a better way of characterizing it,

11      impeaching a witness is of course going after their

12      credibility.  Typical forms of that are you impeach them

13      with a prior inconsistent statement, right?  That's not

14      this.

15              MS. ZIMMERMAN:  Correct.

16              THE COURT:  You can impeach them in essence by

17      putting in evidence of prior criminal convictions, things of

18      that nature.  But, honestly, I've never done it as a

19      practicing lawyer, and I haven't heard of an expert's

20      opinion in this case, Dr. Bushnell being an -- it's not

21      impeachment.  How is it impeachment other than I just

22      disagree with you?  You're wrong.

23              MS. ZIMMERMAN:  I hear the Court to say that we're

24      wrong, and I believe that --

25              THE COURT:  No, I mean that was my
```

1    characterization of Bushnell saying to Abraham, "you're

2    wrong," but that's not impeachment.

3             MS. ZIMMERMAN:  Right.  Well, in our view, Your

4    Honor it is impeachment.  And we cite this *Peels v. Terra*

5    *Haute Police Department* case.  It's in the Seventh Circuit

6    2001, but we thought it was helpful because it talks about

7    how the proper function of rebuttal evidence is to

8    contradict, impeach, or defuse the impact of the evidence

9    offered by the adverse party.

10            And with respect to Dr. Abraham, it's not simply

11   -- certainly what he's going to be offering is his

12   testimony, and some of his testimony, his opinions are based

13   on his use of a computer program to conduct various, perform

14   equations and solve them to understand what he believes the

15   impact is of this machine on an operating room.

16            And what Dr. Bushnell did in the 70-some pages of

17   his surrebuttal report was to say that's not what happened.

18   If you use this particular computer program, here are all

19   the different ways that Dr. Abraham's opinions are wrong

20   because the equations were not solved the way that he said

21   that they were.

22            So I guess I understand the Court's distinction

23   that normally you would think about impeachment as

24   somebody's, you know, you think that they said something

25   different somewhere else, but here I think the reason that

1    Bushnell would come in is to say, look, if you use the

2    computer that Dr. Bushnell said he used, these results, the

3    results he claims are not correct.

4           And so the point of Bushnell's report is to

5    demonstrate that Abraham's opinions, they're not based on an

6    appropriate use of the ANSYS model of the CFD.  If you plug

7    the numbers in to that particular machine, that program, the

8    numbers don't come out the way that Abraham claims that they

9    did.

10          And so we need to have the opportunity to

11   demonstrate to this Court and particularly to the trier of

12   fact, who is not in this courtroom, that what Abraham claims

13   to have done he didn't do correctly and that is to impeach

14   the witness.  It's to impeach the witness with math and with

15   engineering.  There's other impeachment of Dr. Abraham as

16   well, but with respect to Bushnell, that's the point of

17   that.

18          THE COURT:  Okay, let me interrupt you for a

19   second.  A couple of observations.  Part of this is the

20   imprecision of language, right?  I mean the word

21   "impeachment" has both a precise meaning that's understood

22   if you're impeaching the credibility of a witness, but it

23   also has a broader meaning to undermine or to whatever.

24          First of all, I read the *Terra Haute* case.  To me,

25   I think the Court was using the phrase "impeach" in a

1    broader sense.  But even without that, and you just called

2    Bushnell's report a sur-rebuttal.

3              MS. ZIMMERMAN:  It's a rebuttal.  I'm sorry if I

4    misspoke.

5              THE COURT:  Okay, and I don't want to, again, I'm

6    not trying to get hung up on precise words, but I think they

7    do matter here because I think it is fairly characterized as

8    a sur-rebuttal, which would take it outside what is

9    permissible in the Court.  And the notion of impeaching an

10   expert with another expert's report really I think the Court

11   in its prior order said if you're going to do that, you have

12   two paths for doing it.  Either you have to anticipate or if

13   it's really something that comes up in their rebuttal

14   report, in this case Abraham's rebuttal report, you have to

15   be prepared for that and offer it in the deposition.

16             But what is not, I don't think, proper under the

17   Court's order is to say we're going to put in a whole new

18   report, call a whole new expert to call it impeach, call it

19   rebut, call it what you want, it's hard for me to see how

20   you squeeze that into what the Court already said was the

21   proper order of things.

22             And, frankly, if Dr. Abraham got the math wrong,

23   it seems to me that consistent with the Court's order, you

24   can do that one of two ways.  You can cross examine him.

25   Obviously, that puts the burden on counsel to be able to use

1   the computer program or show in some other way, but I don't

2   think consistent with the Court's order you get to bring in

3   an expert to do that.  But, I mean, you tell me, why am I

4   wrong on that?

5          MS. ZIMMERMAN:  Well, so, Your Honor, I think

6   that, respectfully, that it can be a difficult task to kind

7   of understand and articulate.  I think that how you and

8   particularly because the kind of science that we're talking

9   about is very complicated.  I mean I put Dr. Elghobashi on

10   the stand during the trial.  I understand enough of what he

11   did to try to make it accessible for a jury and explain what

12   his model did to show the impact of this machine on an

13   operating room.

14          Dr. Elghobashi and Dr. Abraham used completely

15   different methods.  And I think that the case law that Your

16   Honor would look to and, frankly, the case law that

17   defendants cite to with respect to sanctions and talking

18   about sur-rebuttal and improper bolstering and that sort of

19   thing, those are all really in what I would call one-off

20   cases where it's only one trial.  There's only one set of

21   reports, and you're not going to be dealing with as we are

22   here thousands of cases down the road.

23          So with respect to what plaintiffs are supposed to

24   anticipate from defendant's expert report.  So this isn't

25   the case where plaintiffs thought that we lay in the weeds

1    so to speak and came back around and said, oh, geez, we

2    didn't have a qualified enough expert to anticipate or to,

3    you know, defeat, I guess, the other side's computational

4    fluid dynamics expert.  I mean we hired a world renowned

5    computational fluid dynamics expert in Dr. Elghobashi, and

6    he performed what is now a peer reviewed internationally

7    published paper on this particular subject.  And so it's

8    certainly not that we lay back and didn't understand what

9    the issues were.  We hired a qualified expert to handle

10    these issues.

11            The challenge becomes then how are plaintiffs

12    afforded an opportunity to appropriately examine the

13    opinions of the defendant's expert when we don't get

14    obviously a detailed report with what the equations are,

15    what the assumptions are, what the real basis of the

16    conclusions are, and the methodology by which the experts

17    arrived at those conclusions.  We didn't get that, of

18    course, until after we disclosed ours, and that's the nature

19    of litigation.  And I appreciate that there does need to be

20    at some point a spot where the Court says, okay, there's no

21    more reports, but it can't be to deny the plaintiffs the

22    ability to show that the opinions that Dr. Abraham intends

23    to offer to the jury are not based on appropriate

24    methodology.  They're not based on a reliable use of the

25    ANSYS model.

1          THE COURT:  Well, I think, two reactions to that.

2     One, that gets then back to what they say, which is

3     Dr. Abraham's study was available on science day and has

4     been posted on the website.  Go ahead.

5          MS. ZIMMERMAN:  Well, his videos were, yes, the

6     detailed reports.

7          THE COURT:  Okay.  And the difference being you

8     didn't have the computer program or you didn't know what

9     computer programming he was using?

10         MS. ZIMMERMAN:  Correct.  I mean we do from the

11    first time we saw it, we thought that it was incorrect, but

12    until we know what the inputs are, what the boundary

13    conditions are, what the different assumptions are that he

14    makes in generating a video.  I mean I could probably go on

15    my iPad and generate some sort of a video and say that this

16    is what the impact is of the Bair Hugger in the room, but

17    until somebody really has the opportunity to explore, well,

18    you know, Ms. Zimmerman what's that based on?  There's not

19    really an ability, I mean I can put up all kinds of videos

20    and that doesn't mean that I understand or anybody has the

21    ability to understand what the kind of underlying basis is

22    of the opinions of the videos I would make.

23         THE COURT:  But that then leads to the second

24    observation, which is the plaintiffs have had Dr. Abraham's

25    reports since July of 2017?

1          MS. ZIMMERMAN:  Yes, sir.

2          THE COURT:  And took his deposition by August 16th

3    of 2017?

4          MS. ZIMMERMAN:  Yes.

5          THE COURT:  Had an intervening trial, the Gareis

6    trial?

7          MS. ZIMMERMAN:  Then we had another round of

8    reports and then a trial, yes.

9          THE COURT:  And another round of reports is what?

10         MS. ZIMMERMAN:  So the first report that we

11   received from Dr. Abraham was limited to the Model 750,

12   which was not at issue in Gareis, so that was produced in

13   June of 2017.  And we took his deposition I believe in July

14   of '17.

15         THE COURT:  Right.

16         MS. ZIMMERMAN:  Then we had the Daubert motions

17   and briefing in September and October.  There were new

18   reports produced on general causation issues with respect to

19   Gareis on the Model 505.

20         THE COURT:  That was allowed by Court Order,

21   right?

22         MS. ZIMMERMAN:  It was.

23         THE COURT:  Okay.

24         MS. ZIMMERMAN:  And those were produced in

25   December of 2017.  Depositions took place in January and

```
 1    February and then the trial in May.

 2              THE COURT:  Okay.  So why wasn't this all done a

 3    year ago or a half a year ago?

 4              MS. ZIMMERMAN:  Respectfully, Your Honor, because

 5    we believe that Dr. Abraham would and should be excluded on

 6    Daubert based on his testimony at deposition.

 7              THE COURT:  But that testimony in deposition that

 8    you're relying on to be the basis, hopefully, of a Daubert

 9    motion is stuff that took place in early '18 or in the

10    summer of '17?

11              MS. ZIMMERMAN:  Summer of '17.

12              THE COURT:  So, but, I mean you do see the issue,

13    right?

14              MS. ZIMMERMAN:  I do see some of it, yes.

15              THE COURT:  Okay.  So you had this problem you

16    thought existed.  You think the Court got it wrong,

17    shouldn't have allowed the opinion in, but I mean that's

18    literally over a year ago.  So I mean to me that seems like

19    another hurdle you're facing even if the Court were inclined

20    to allow it, we're essentially on the eve of the Axline

21    trial.

22              MS. ZIMMERMAN:  Absolutely, Your Honor.  And so I

23    think that maybe this is one of the reasons that it's

24    important and why we included, you know, probably a very

25    basic recitation of what is an MDL and why are we here and
```

28

1       where are we headed?  So if these trials are to be useful to

2       the Court and to the parties in understanding where we head

3       and when we head there, we need to be able to try a complete

4       case, a complete case involving warnings and conduct and

5       negligence and all of those things, and that's going to be

6       subject to motions that are I believe coming down the river

7       I guess.

8             But we shouldn't be doomed to do the same exact

9       trial again because, and that I guess is one of the reasons

10      to have a rebuttal report from Dr. Bushnell.  You know, in

11      addition as we read various case law, we were concerned that

12      we wouldn't be allowed to call Dr. Bushnell in rebuttal at

13      trial of the Axline matter if we haven't disclosed a report

14      from him.  Although, under the Court's scheduling order

15      we're not allowed to disclose a rebuttal report.

16            So we thought particularly because he's not going

17      to be -- he would be providing, we think, real substantive

18      evidence if he's asked to come to rebut and impeach

19      Dr. Abraham, it's going to be based on math and science and

20      the application of the engineering software to the facts as

21      Dr. Abraham claims to have used them, that that's going to

22      be a real piece of evidence that's important in Axline and

23      should we have called, you know, Dr. Bushnell without an

24      expert report or attempted to do so in Gareis?  Perhaps.

25      Perhaps we should have.

1              THE COURT:  Okay, but yeah, in response to the

2    general comments about MDLs, I agree with you, obviously,

3    that one of the whether it's the desired function or the

4    reality of bellwether trials is, you know, obviously, you

5    try and assess your likelihood of success and the value of

6    your cases, that, obviously, has its place.  But there's

7    also the function you mention, which is you go through one

8    trial and both sides figure out what lessons they've learned

9    and how to better present the evidence in the next trial.

10             And I agree with you, maybe there's additional

11   evidence that should be considered by either side to present

12   in the next trial, but there's a gap between that, which is,

13   at least in my view, the function of case specific expert

14   testimony and case specific discovery, and we're going to go

15   back, and we're going to reconfigure the playing field by

16   reinvestigating, if you will, sort of the general issues

17   that are common to all cases.  That can't be the function of

18   a bellwether trial in an MDL because then it is purely

19   chaotic, and we don't achieve efficiencies.

20             And the argument I'm hearing is, essentially,

21   well, now we have, we've come up with a better, in our view,

22   a better way of attacking Abraham and that may well be true,

23   and that may well be sort of hard reality that you're

24   limited in how you go about that, but I don't know that the

25   cure for that issue is to just throw out the Court's very

1    clear in my mind distinction between general causation and

2    case specific causation, and its admonition that there are

3    no sur-rebuttal reports.

4         And so I mean I understand your argument, but I

5    think the logical extension of that is that none of this

6    stuff that was done in advance to be across the board has

7    any force and effect to it.

8         MS. ZIMMERMAN:  So, Your Honor, if I may, I'll

9    offer just a couple of reactions and observations.  I agree

10   with you that there have been discussions between the party

11   and the courts about this use of sur-rebuttal reports and is

12   that appropriate?  But one thing that is we, obviously, have

13   a difference of opinion as to what is general causation?

14   And I bring that up because as we think about what are we

15   going to do with this next trial and, you know, case

16   specific issues and that sort of thing?  What there is

17   certainly not that I'm aware of anywhere in any of the case

18   management orders is some sort of edict or proclamation or

19   limitation that plaintiffs will be limited in all ways for

20   all experts in each of the individual cases to both the

21   experts and the opinions that were offered in the general

22   causation phase.

23        And in our responsive briefing we cited to a

24   number of different courts that really talk about the

25   definition of general causation and that's really is this

1    particular device capable of causing the harm the plaintiffs

2    claim?  Is there reliable evidence of that?  Because if

3    there isn't, we should stop right now, and we shouldn't put

4    the Court through the trouble and the defendants through the

5    trouble.  We should stop; and that's really what the point

6    is of general causation.  We're past that.

7         And, frankly, jumping ahead, but Dr. David's

8    report really probably doesn't touch on general causation at

9    all, right?

10         THE COURT:  Right.

11         MS. ZIMMERMAN:  Because it doesn't address the

12    issue about whether the machine --

13         THE COURT:  Right, I want to stay on Bushnell

14    because to me they present different issues, and they are

15    different types of reports.  But whether the Court used the

16    phrase "general causation" in its strictest sense or not, I

17    don't think it did, but I think it was also very clear that

18    expert testimony that would be cross cutting a wide swath of

19    cases.  In other words, something that's not, well, let me

20    ask it this way:

21         I am assuming that if this report were allowed,

22    you're not, the plaintiffs aren't taking the position that,

23    oh, we're only going to call Dr. Bushnell in the Axline

24    trial, right?  I mean you're not going to concede that it's

25    only relevant to the Axline trial?

1          MS. ZIMMERMAN:  I think that that's correct, Your

2     Honor.  I mean, if, and we said this in our papers, if

3     Dr. Abraham comes, Dr. Bushnell is what we're going to use

4     to show that he just -- he's not telling the truth about

5     what he did.

6          THE COURT:  But that wasn't my question,

7     respectfully.  My question is, you know, the plaintiffs,

8     there's no question that Dr. Abraham, whether or not his

9     report is any good or it's just pure junk and whether or not

10    it should be allowed into evidence at any trial on down the

11    road, there's no question that it was timely disclosed.

12          And if he's allowed to testify, the defendants are

13    saying we're going to put him on the stand in this next

14    bellwether and the one after that and the one after that,

15    and I'm not hearing the plaintiffs say, well, we're going to

16    call Bushnell but only in Axline because it's not Axline

17    specific.

18          MS. ZIMMERMAN:  Yes, Your Honor.  However, so we

19    have reports, and I brought copies if you'd like them.

20    Ms. Young alluded to them, at least two of the reports that

21    we've got from defense counsel this week, both from Abraham

22    and from Dr. Mont, are repeat with general causation

23    opinions.  And we highlighted for Your Honor the general

24    causation opinions that are in Abraham's report.  These are

25    all rebuttals to Elghobashi, again, and Elghobashi didn't

1    write a report for Axline.

2            Abraham has submitted an additional report on

3    Axline that tries to rebut Elghobashi and also touches on

4    some Axline specific issues, and then a second

5    sur-sur-rebuttal report to Dr. Bushnell, which I would note

6    for the Court I think points out that there really isn't

7    prejudice.  They've had the opportunity to explore his

8    opinions and rebut them, and he's been offered for

9    deposition.  And the same thing is happening with respect to

10   Dr. Mont.

11           So I guess the question the plaintiffs would have

12   then is if general causation is both the floor and the

13   ceiling for both plaintiffs and defendants, will Dr. Wenzel

14   be called to the stand?  He's the infectious disease doctor

15   that the defendants disclose in the general causation phase.

16   He hasn't provided a report in Axline.  Can we compel him to

17   come to testify to the trial in Axline and any subsequent

18   plaintiff?  We'd like to.

19           But so I guess this is the reason that I think

20   that the words really do make a difference.  You know, what

21   is general causation?  What was intended as we went through

22   that phase?  From the plaintiff's perspective, that general

23   causation phase was really to do some permitted discovery

24   about general causation issues and then, and because there's

25   a number of things that we wanted to get into that we were

```
1    not allowed to get into, and then to get into the case

2    specific workup.

3            So if we had changed the caption, if we had

4    changed the caption and instead of saying for Dr. Bushnell,

5    say that this is Axline specific, and say that he's going to

6    offer the following as impeachment if he's called during

7    Axline, would that be permitted?

8            THE COURT:  No, that wouldn't change it.  I agree

9    with you, but the point is his opinions are, the plaintiff

10   isn't saying this is only relevant to the Axline case, which

11   I think you've conceded, and I get that.  I understand

12   you're really making a different argument.

13           What I'm saying is that as I understand the

14   Court's prior orders, if you want to have Dr. Bushnell

15   testify in the Axline trial, what you would have to do is

16   have Dr. Bushnell or Dr. Elghobashi, or however you

17   pronounce it --

18           MS. ZIMMERMAN:  Well done, Your Honor.

19           THE COURT:  -- actually model the Axline surgery

20   suite and run computational fluid dynamics computational

21   fluid dynamics in that suite, and then say given the

22   particulars of that surgery suite X follows or Y follows or

23   what have you.  And so I mean I think the issue just simply

24   comes down to this is a rebuttal to nothing that is newly

25   disclosed.  It's beyond the time period for general
```

1       causation reports, and the gist of the argument is but we

2       regret not having or we think this is a better way to

3       approach it, but it still seems to me to run afoul of the

4       Court's order.

5               MS. ZIMMERMAN:  So I think that from the

6       plaintiff's perspective, we disclosed this report in an

7       abundance of caution anticipating we will have a rebuttal

8       case in Axline and potentially in other cases and that that

9       rebuttal case after the close of defendant's, you know,

10      evidence, assuming that they have called Dr. Abraham, then

11      we would call Dr. Bushnell to explain why it is that

12      Dr. Abraham's testimony is not reliable and should be

13      discarded by the jury.

14              We have now taken an extra step ahead of time to

15      explain in great detail what his specific criticism will be

16      of Abraham.  If the Court wants to set aside the report and,

17      you know, and they don't want to take his deposition in

18      advance of the trial in December.  And, you know, I don't

19      see any reason, I understand that they complained about

20      whether or not the Court should have to consider a Daubert

21      motion on Dr. Bushnell, we could set all of that aside.  The

22      plaintiffs still have the opportunity under the rules to

23      have a rebuttal case.  And what we have tried to do in

24      disclosing this particular report is identify for the Court

25      and for defendants this is what our rebuttal case will look

1    like.  And, respectfully, we don't see anything in the

2    Court's order even where it says there's not rebuttal

3    reports that denies the plaintiffs a rebuttal case.  And in

4    fact, we don't think that that would be permitted under the

5    rules.

6              So it's fine with us if we all want to say that,

7    oh, this wasn't disclosed or you don't want to depose him,

8    that's fine.  But in December, when they rest, we're going

9    to call him if Abraham came.  And we want to make sure that

10   there's not an argument made at that time that this is a

11   surprise to them for the first time or that they haven't

12   been able to explore his testimony.

13             THE COURT:  Right.  No, my comments earlier about,

14   you know, you've had the reports since 2017 notwithstanding.

15   I agree with you that certainly if your intention is to

16   attempt to call Dr. Bushnell to testify, it was prudent to

17   disclose a report.

18             Where you and I part company, I think, is in two

19   places.  One, I don't think this is impeachment, at least

20   not in the form that one doesn't have to disclose it,

21   because I agree with you that impeachment, real impeachment,

22   true impeachment doesn't have to be disclosed, and it's not

23   in the form of an expert opinion, number one.

24             Number two, I think that, you know, the ultimate

25   extension of your argument is that Judge Ericksen and Judge

1   Noel, the Court, just got it wrong and has denied you

2   somehow due process by allowing for an initial report and a

3   rebuttal report and no sur-rebuttal reports.  That's the

4   ultimate extension of your argument, and I for one am not

5   going there, so but...

6            MS. ZIMMERMAN:  Certainly understood.  I think

7   that from the plaintiff's perspective, respectfully, where

8   we think that the Court got it wrong was on Daubert.  And I

9   understand that that ship with respect to Gareis is awaiting

10  the Court's decision with respect to our motion for a new

11  trial.  And, you know, at some point, we'll maybe go to the

12  Eighth Circuit, and we'll find out, you know, we got the law

13  wrong.  That's certainly a possibility, maybe even a

14  probability.

15            But I think that the plaintiffs really do think

16  that this is -- it is closer to a normal impeachment.  And I

17  know that it gets complicated because it's not the same as,

18  you know, you claim to have been somewhere you weren't, and

19  we're going to bring in someone who says they saw you there

20  that day in a criminal case.  It's much more complicated

21  than that.

22            This is really impeachment to say you say your

23  calculator did, you know, one times two, and it came up with

24  this answer, but we have your calculator.  We have the same

25  program, and we know if we put those numbers in, it doesn't

1   come up with the number you claim.

2           So I know that it's more complicated, and I

3   appreciate that the plaintiffs may have a different

4   position, and the Court may see it differently, but that's

5   why we see this as a real impeachment witness, that we would

6   bring Dr. Bushnell to show that Dr. Abraham's calculator is

7   wrong.

8           THE COURT:  That would limit his opinions if

9   allowed to a very narrow, right?  A very narrow scope?

10          MS. ZIMMERMAN:  Yes.  I mean Dr. Bushnell, if he

11  were allowed, would come to speak only about what it is that

12  Dr. Abraham claims to have done with his ANSYS program and

13  what those results would show if the same numbers were put

14  into the actual calculator and what is generated from there.

15  That's the only purpose of Dr. Bushnell.

16          THE COURT:  Okay.  So, let's talk about Dr. David

17  for a second.

18          MS. ZIMMERMAN:  Sure.

19          THE COURT:  So this isn't a question of whether

20  it's an improper sur-rebuttal.  It's really -- it's a

21  question of whether this is a proper supplementation of his

22  original report.

23          MS. ZIMMERMAN:  Yes, Your Honor.

24          THE COURT:  Right?  And at least as I hear the

25  defendants, maybe you disagree, but it seems to me all of

1    these devices existed at the time of the initial report, all

2    of the studies on which Dr. David relies either existed at

3    the time of his original report or at the time of his

4    deposition.  So in terms of at least as I understand the

5    supplementation rule, there's nothing new here, and so,

6    again, I'm struggling to see why this is proper

7    supplementation?

8             MS. ZIMMERMAN:  Thank you, Your Honor.  I

9    appreciate the opportunity to present to the Court on this.

10            I think that this supplement of Dr. David is

11   particularly important as we think about it in context of

12   this broader MDL.  And the reason that I say that is that

13   there are different requirements for what a plaintiff needs

14   to prove from a reasonable alternative design perspective,

15   whether you're applying Minnesota law, Wisconsin law, Iowa

16   law, which is maybe what's going to apply to Axline.  South

17   Carolina law, which is what did apply in Gareis or any

18   number of the other states.

19            So while the plaintiffs certainly disclosed

20   Dr. David's report in the general causation phase to

21   demonstrate, look, there are a bunch of alternatives.  There

22   are other products on the market that have warnings,

23   warnings just like the Bair Hugger used to have, and for

24   some reason, this product doesn't have anymore.

25            You can use cotton blankets.  You can use all

1    manner of different products, all of which are known to the

2    defendants and have been for a long time.  I've attached, I

3    think, as Exhibit 6 just a color coded sheet that

4    demonstrates what the defendants have thought in terms of

5    who is out there?  What's safe?  What's effective?  They've

6    got it pretty easily figured out here in a green, blue, red

7    schematic.

8           But, and I did want to make one point with respect

9    to counsel's comments that these are totally different

10   products.  Certainly, the prewarming with the Bair Paws,

11   that is defendant's product.  It is the exact same

12   application of the exact same technology.  The only thing

13   that happens there is that it's done before an operation and

14   that the warming therapy has stopped prior to an incision.

15   And according to the defendant's own documents, and I think

16   it's at Exhibit 1 of our motion, and I think I got that

17   wrong.

18          Pardon me, Your Honor.  It's Exhibit 3,

19   demonstrates that the defendants have known this for quite

20   some time, certainly well before Axline, certainly well

21   before the vast majority of cases have been filed in this

22   MDL.

23          So that is certainly not a different technology.

24   It is the defendant's own technology, and they're own

25   documents say that that is an effective way to warm patients

1    and that it avoids the kind of risks we're talking about

2    here.  And that you can see in the chart where they

3    summarize the pros and cons of using the Bair Paws

4    prewarming versus the Bair Hugger during an operation.  And

5    they say contraindicated in orthopedic surgery, they say the

6    Bair Paws avoids things like nosocomial infections and

7    contamination of the sterile field.  These are the most

8    critical issues before this Court.

9           So it's not that they didn't understand about

10   pre-warming as an alternative therapy.  And with respect to

11   different kinds of technologies like cotton blankets, for

12   example, those have been around for a very, very long time,

13   and according to their own chart, that's the safest way to

14   go, and it's the most effective, and it's the most widely

15   used.

16          So I think that the issue is not which

17   technologies were known and when because these technologies

18   were certainly well-known to defendants, but there have

19   been, and I think Your Honor had -- it looks like maybe you

20   have another question --

21          THE COURT:  Go ahead.

22          MS. ZIMMERMAN:  I was going to talk a little bit

23   about what happened with what I call the VitaHEAT motion.

24   So VitaHEAT is now also owned or exclusively distributed by

25   defendants, and it is essentially an electric blanket.

1    Plaintiffs sought to do discovery during the course of when

2    discovery was still open, and they refused.  They said it

3    wasn't relevant because it was a different product.

4              Now, the reason that this is important is that,

5    you know, a lot of different states, West Virginia, for

6    example, I'm involved in the transvaginal mesh litigation

7    out there.  Illinois, certainly, and many other states when

8    you have a device, you can look at the predicate product,

9    the product that they say is the predicate product for

10   getting through the 510(k) process and that that is always,

11   always going to be an alternative design.  So, and that's

12   case law in various MDLs.

13             THE COURT:  Right.

14             MS. ZIMMERMAN:  But in this Court, when we sought

15   to do discovery on VitaHEAT, and VitaHEAT, of course, claims

16   as its 510(k) predicate device the Bair Hugger, we weren't

17   allowed to do it.  It was denied on a relevancy objection,

18   which was, you know, granted -- it was ordered by the Court

19   and sustained by Judge Ericksen, and we understand that, but

20   it does impact what the plaintiffs were able to do from a

21   discovery standpoint.  And it really has, it has impacted

22   throughout during the entire litigation.

23             Now, something changed a little bit in pretrial

24   proceedings right before the Gareis trial this spring.  And

25   there the Court said, look, you know, you might -- this

1      whole idea that reflective technology or VitaHEAT is

2      completely not relevant, that might not really be the case

3      anymore.  And we think that that's correct.  Of course, we

4      don't have a written order to that effect, but counsel was

5      present when the comment was made.  And it's changed kind of

6      how we approach Gareis, and it changes how we approach

7      Axline.  And I think that what is required and allowable in

8      all these different states really makes a difference as we

9      think about Dr. David's report.

10             So, for example, and I won't relitigate this, but

11     in South Carolina, you can have a reasonable alternative

12     design even if it's a completely different product.  That

13     may not be the law in every state.  And we still don't know

14     right now whether Minnesota law is going to apply to the

15     Axline case or is it going to be Ohio law?  But there are

16     variations throughout --

17             THE COURT:  Yeah, but, again, the line you're

18     drawing or the ultimate implication of the argument then is

19     there's no -- there's really no such thing as a general

20     causation or a general feasible alternative design because

21     not, I mean that's not -- feasible alternative design isn't

22     case specific.  There's a difference between case specific,

23     which are what are the facts of your case, and did this

24     cause your injury in this case?  That's case specific.

25             What you're positing is an argument that we only

1     have to disclose just a baseline.  Here's some feasible

2     alternative designs, and then down the road given the law in

3     jurisdiction A, we can do a whole new opinion that discloses

4     other feasible alternative designs.  And I guess where I

5     struggle with that is while I understand the conundrum it

6     puts you in, it doesn't seem to be consonant again with the

7     Court's Order, which is everything you're going to do that

8     cross cuts cases, that is not dependent on the facts of this

9     person's particular experience really has to be done now.

10           And so it does put a burden on the plaintiff to

11    say, all right, some states allow a very broad definition of

12    feasible alternative designs.  Some states allow predicate

13    devices in the 510(k) process to be alternative designs.

14    Other states take a more narrow view, so we're going to

15    disclose all of these alternatives, and the Court will

16    decide in any individual case whether in the law of that

17    jurisdiction that would be admissible or not.  That seems to

18    me to be the burden that the plaintiffs carry under the

19    structure that this Court's put in place.

20           MS. ZIMMERMAN:  So, respectfully, I don't think

21    that that burden was clear to the plaintiffs at any point

22    during this litigation.  And it's not the same kind of

23    burden that's placed on plaintiffs in every other MDL that

24    I've been involved in or that I've researched where general

25    causation reports are then applicable to the universe of

1    cases both on file at the time that they're disclosed and

2    that ultimately join the MDL.

3              So, for example, in Minnesota there are some -- I

4    think it's the *Kulio* case, where if a product is

5    unreasonably dangerous or essentially there's no benefit to

6    it, you don't even need to show that there's a reasonable

7    alternative design.  You can just say, look, this is too

8    dangerous.  We're not going to have, you know, three

9    wheelers I think are one of the things people talk about a

10   lot.

11             But if there is to be such an edict from the Court

12   that the four corners of any of these reports are both the

13   floor and the ceiling as we refer to in our motion papers,

14   that needed to be clear, and it certainly shouldn't be held

15   against Ms. Axline or subsequent plaintiffs down the road

16   because if Ms. Axline could have, and I'll note by the way

17   that this whole motion of course is styled in the MDL

18   generally, and we keep talking about Axline because that's

19   where we're headed next.  But Ms. Axline could have had

20   either Dr. David or I suppose a completely different

21   engineer or specialist of some kind prepare a case specific

22   report saying that all this is here.

23             THE COURT:  I don't think so.  I think by

24   definition feasible alternative design is not case specific.

25   I think that's where we're sort of talking past each other.

1          MS. ZIMMERMAN:  Okay.

2          THE COURT:  And I think the other problem you have

3     is to the extent that the law varies from jurisdiction to

4     jurisdiction, Dr. David's initial report took account of

5     that because he included conductive patient warming devices.

6     He included the VitaHEAT.  But the position that you're in

7     is the plaintiffs are saying, geez, we could have put a lot

8     more examples into the bucket.

9          And so I don't think it's a notice problem that

10    you didn't have notice that somehow you should identify

11    everything that might be a feasible alternative design in

12    the first instance, and that's what you're essentially

13    arguing that you didn't have notice that you should have

14    done that.

15         MS. ZIMMERMAN:  Okay.  Well, I think from the

16    plaintiff's perspective, and this gets again back to the

17    definition of general causation versus something case

18    specific, and I think we're in agreement that for the most

19    part a reasonable alternative design probably isn't going to

20    be a case specific issue.

21         I do think that we have a little bit of a

22    difference of opinion I guess on when it may be case

23    specific and that is so for Axline, for example, she's in

24    Ohio.  I don't know if Minnesota law is going to apply or

25    Ohio law.  She's 2009.  There may be some technologies that

1    are available in 2009 that aren't available before that

2    where somebody from 2015, you know, in Wisconsin would have

3    different alternatives.

4         I hear the Court to be saying it's the Court's

5    understanding that the plaintiffs should have had every

6    single conceivable alternative design disclosed in

7    Dr. David's report.  You know, I guess that, and that's

8    certainly the Court's sense.  So, you know, I respectfully

9    disagree with that, but I certainly hear the Court, and I

10   won't belabor the point.

11        THE COURT:  No, you know, and I'm not picking on

12   you.  I'm trying to really understand where we are and the

13   basis of the argument, but, again, the last point about, you

14   know, Ms. Axline's surgery was in 2009, so, you know, some

15   of these alternatives weren't available.  That's certainly

16   true or it could be true.  But that's, you know, that's a

17   question of when it comes down to actually decide what

18   evidence gets in at trial.  That gets managed in motions in

19   limine it seems to me.

20        MS. ZIMMERMAN:  Absolutely.  And, you know, I mean

21   in some states a prototype or, frankly, an idea is

22   sufficient for reasonable alternative designs.  And so we

23   certainly I mean we can have maybe some ideas about certain

24   prototypes, but we don't know every single idea that was out

25   there.  We know some that were in some of the documents that

1    were produced to us, and those were included in Dr. David's

2    report.  And, you know, plaintiffs may well just have to

3    explore the alternatives that the defendants were aware of

4    through the defendant's own witnesses, and we'll certainly

5    take the opportunity to do that if afforded that.

6            THE COURT:  Right.  And that's the other issue

7    sort of under-coursing this whole discussion is what we're

8    really arguing about is the form of the evidence at the

9    trial, which is to say you may not be allowed to call an

10   expert to say this was out there.  In my opinion, it was a

11   good feasible alternative.  It should have been used.

12           MS. ZIMMERMAN:  Absolutely.

13           THE COURT:  But at least today it certainly isn't

14   my place to decide this, and it won't be, but today nobody

15   is saying, well, you don't get to ask the defendants if they

16   knew that cotton blankets existed, right?  I mean that comes

17   down to a difference in form.  You want to be able to have

18   an expert with the fancy credentials say all of this.

19           MS. ZIMMERMAN:  Right.

20           THE COURT:  But that's different from saying you

21   don't get to cross examine the defendants about their

22   knowledge.

23           MS. ZIMMERMAN:  Right.  And without, again,

24   relitigating what we're going to do, we had some issues

25   where we were precluded from doing that because the

1    witnesses were not experts so, again, a reason to supplement

2    Dr. David's report.  But I think we'll fight that fight down

3    the road.

4         THE COURT:  Right.  And, of course, you know, I

5    mean obviously I don't have as deep and broad a knowledge of

6    all the proceedings that went on before this, so motions in

7    limine that may have played in here, you know, some of it

8    may be as something I'm unaware of now, but I don't think it

9    really matters to the decision that I'm being asked to make

10   but.

11        MS. ZIMMERMAN:  And I did bring extra copies if

12   the Court would like them of some of the defendant's expert

13   report that really touch on general causation issues.  And

14   so to the extent that the Court is issuing or considering

15   issuing an order that's going to strike general causation

16   supplements from Dr. David and/or Dr. Nathan, we certainly

17   would request as I'm standing here, we move the Court that

18   the same rule be applied to the defendant's experts as well.

19        THE COURT:  Well, I think you can rely on -- I

20   think you can take comfort in the notion that the rule will

21   be applied, whatever the rule is, it will be applied even-

22   handedly and to both parties.  I can't make any kind of

23   statement about what the defendants have produced without a

24   formal motion and without study of what's produced.  So if

25   you think they're over the line, and if in response to

1    whatever we rule on this motion, you think that line clearly

2    plays in your favor, then I encourage you to bring the

3    motion.  Okay?

4              MS. ZIMMERMAN:  Thank you, Your Honor.

5              THE COURT:  Okay, thank you, Ms. Zimmerman.

6              Ms. Young?  So I have a question for you.  Come on

7    up.  Why isn't Dr. Bushnell's report impeachment?

8              MS. YOUNG:  So, Your Honor, listening to that

9    exchange, in my view, every answer took us right back into

10   cross-examination of an expert.  And so if we were to

11   suddenly open the door and have this new found impeachment

12   expert, this would be a never ending, frankly, a lot of sand

13   bagging.  The whole point of expert discovery is you have a

14   full and fair opportunity to understand the opinions of the

15   expert.

16             And to Ms. Zimmerman's point that Dr. Bushnell is

17   now somehow needed to allow them to better cross examine

18   Dr. Abraham or discredit him, she talks about only having

19   access to the video on You Tube.  Well, after science day,

20   plaintiffs subpoenaed Dr. Abraham and his CFD file was

21   produced to them in the fall of 2016, which was before any

22   CFD expert was in the case.

23             So to the extent they want to run software, figure

24   out what calculations were done, that was available to Dr.

25   Elghobashi in the first instance or to Dr. Bushnell if they

1    wanted to engage him prior to that.  And also Dr. Bushnell

2    was at Dr. Abraham's deposition.  To the extent that lawyers

3    need expertise that is beyond what most of us understand, it

4    was our understanding he was actually helping manipulate the

5    software to assist in their cross-examination.

6            So we think that is just, one, admonished by the

7    Court as Your Honor pointed out by Judge Noel no

8    sur-rebuttals, and it just opens the flood gate here.  MDL

9    or not, there is just simply nothing in the federal rules in

10   this Court's scheduling order that would allow for this type

11   of sur-rebuttal, which is just cross examine under a

12   different name.

13           Your Honor, very briefly, then, just on the point

14   as to what general causation is and isn't here.  I think

15   based on the Court's comments, there is -- we're on the same

16   page on that.  I do want to just point out that as

17   plaintiff's know, fact discovery was much broader than

18   issues of general causation.  They delved into regulatory

19   issues, alternative design, deposed I think it was 20

20   witnesses of 3M's.  There was nothing about that whole phase

21   of the case that would have suggested to either party that

22   we were simply talking about whether Bair Hugger was capable

23   of causing an infection, and so that I don't think more

24   needs to be said on that.

25           And then just one final point, Your Honor, again,

1    where I think I started the argument is that what's before

2    the Court today are two specific experts at this procedural

3    posture in the case. What I hear plaintiff saying is we

4    want relief potentially from the earlier scheduling order.

5    There may come a time where we need to do more on general

6    causation. These experts report in the Axline bellwether

7    case 90 days or so before trial simply could not be that

8    mechanism to visit that issue, and so we believe that these

9    experts should be excluded at this juncture, and that would

10   be all I have to say.

11              THE COURT: Thank you.

12              MS. YOUNG: Thank you.

13              THE COURT: Okay. It is 10:21. I'm going to take

14   a brief recess. I think, you know, obviously, you're three

15   months from trial. You have a lot of things going on. It

16   strikes me that it would be wise to get this ruling out as

17   quickly as possible so everyone knows the playing field.

18   And I want to go review my notes, and I'll decide whether

19   I'm going to rule today from the bench, so that you know

20   that, or whether I think it really needs to wait for a more

21   fulsome written order. But if I do rule from the bench, I

22   will follow it up with at least a written order that lays

23   some of this out. And I will articulate a rationale as well

24   on the record if I do that. Okay?

25              All right. So why don't we reconvene at 10:35.

1    Okay, thank you.  Court is in recess.

2                    (Short recess at 10:22 a.m.)

3                    (In open court at 10:37 a.m.)

4              THE COURT:  Please be seated.

5              All right.  Good morning again, everyone.  We're

6    on the record in the Bair Hugger Forced Air Warming Devices

7    Products Liability Litigation MDL 15-2666.  I will give you

8    the benefit or the detriment as the case may be of what I

9    think is the proper ruling here.

10             Let me say to both sides, I appreciate the

11   arguments.  They were well conceived.  I appreciate the

12   briefing.  I think the issues are interesting and well

13   prepared, and I felt like the Court was well informed on

14   everything.  So thank you to all of you on that.

15             And, you know, without further ado, I will grant

16   the defendant's motion and exclude both the Bushnell report

17   and Dr. David's supplemental report.  And I will give you my

18   rationale for doing that.  The rationale is slightly

19   different as to each or maybe not slightly but different as

20   to each.

21             By way of general background, I do generally agree

22   with the defendant's characterization of sort of the

23   backdrop against which these motions get played out.  The

24   Court did set deadlines for disclosure of general causation

25   experts.  They set those deadlines first in pretrial order

1   number 4, and then that was amended in pretrial orders 13,

2   17, 20, 21, 22, and 26, but the operative date for purposes

3   of these motions was the initial disclosure date, which did

4   not change after I believe pretrial order 17, and that date

5   was March 31 of 2017.  So and, you know, obviously, there's

6   no question that the reports at issue today were served

7   after that date.

8        The Court in its scheduling orders and as

9   clarified, I think, or amplified in its status conferences

10   really distinguished between reports on general causation

11   was the phrase that was used and case specific causation,

12   but as reflected not only in the pretrial orders, but also

13   in the status conferences of September 8th of 2016 and

14   June 15th of 2017.  What the Court really distinguished was

15   between expert reports that were general in nature, that is

16   cross cutting on a wide variety of, if not the majority of,

17   cases in the MDL, so general issues as distinct from

18   opinions that would be specific to a particular case.  And

19   the example that was used both by I think Judge Noel, but

20   also in response to Judge Noel and in correspondence with

21   the Court is that an example of the case specific expert

22   opinion would be an orthopedic surgeon or a treating

23   physician who would come in and say something about in this

24   example Ms. Axline's surgery or Ms. Axline's infection.

25   There's no question that general causation experts can also

1    issue case specific opinions, but they have to be case

2    specific opinions.  And I think it was very clear what

3    distinction the Court was making as well as very clear that

4    in its orders, the Court would not allow sur-rebuttal

5    reports.

6            So with that sort of background in mind, I turn to

7    these two reports.  Dr. Bushnell's report, I think the

8    plaintiff's wisely concede that it is obviously a direct

9    response to the report of the defendant's expert

10   Dr. Abraham, and it's unabashedly a rebuttal to that report.

11   Dr. Abraham's report was, of course, a rebuttal to the

12   initial report by Dr. Said Elghobashi.

13           So by definition, Dr. Bushnell's report is a

14   sur-rebuttal, and it's not permitted by the Court's pretrial

15   orders, and it's, in fact, prohibited by the Court's

16   pretrial order.  And I'll note that it doesn't reference

17   Nancy Axline or the specifics of her case or attempt to do

18   any computational fluid dynamics with respect to her surgery

19   suite or her operation.

20           It could have been done earlier.  I am persuaded,

21   first of all, by the defendants that the information which

22   Dr. Bushnell wants to critique Dr. Abraham on was available

23   to the plaintiffs in advance of the initial report.

24   Certainly, it's been available for over a year now.  To the

25   extent that the plaintiffs argue that it really ought to

1   come in as impeachment, I understand the argument.  I would

2   say that in my view it's not really classic impeachment

3   certainly, and even if it's characterized as impeachment, if

4   reports by experts and testimony by experts were allowed to

5   come in under the guise of I'm impeaching the credibility of

6   the other expert, than it really would eviscerate the limit

7   that the Court placed on an initial round and then a

8   rebuttal round and no sur-rebuttals.

9       So the conclusion from all that is that

10  Dr. Bushnell's report, I think, violates the pretrial

11  scheduling order and is excludable both under Rule 37B2A2,

12  and under Rule 16F1C.

13      You know, all of that is not to say I'm not

14  suggesting that Dr. Bushnell's critique or the impeachment

15  that counsel wants to make of Dr. Abraham is somehow not

16  available to them on cross-examination or somehow is not a

17  fair subject for examination of Dr. Abraham.  But I don't

18  think it's not available to them in the form of an expert

19  who takes the stand and puts their imprimatur of their

20  credentials and opinions on top of the impeachment.  The

21  evidence itself may or may not come in, but it's not going

22  to come in in the form of Dr. Abraham or Dr. Bushnell's

23  report.  I appreciate the dilemma that counsel faced, and I

24  think certainly plaintiff's counsel is to be complimented

25  for making the disclosure but that doesn't change the

 1    result.

 2              As to Dr. David's report, it's not, I guess I

 3    would not see it as an impermissible sur-rebuttal, though I

 4    suppose one could characterize it that way.  It's really a

 5    question of supplementation because it really amplifies and

 6    expands on his initial report as to feasible alternative

 7    designs by adding I think it's six or so other alternative

 8    designs.  But those feasible alternative designs were

 9    properly the subject of the plaintiff's initial expert

10    reports, and so the question really turns on whether this is

11    a proper supplementation, and I find under the rules that

12    it's not for the following reasons:

13              The newly disclosed designs did exist at the time

14    of the initial report.  The studies that Dr. David

15    references in support of those alternative designs were all

16    published prior to his report with the exception of the one

17    that was published after his report but prior to the

18    deposition.  So it's not a supplementation based on new

19    information, new studies, new things that could not have

20    been disclosed initially.

21              As to the rationale that the plaintiffs argue that

22    the Court's ruling on the motion in limine in Gareis and

23    then as described, it's retrenchment of that ruling, somehow

24    opened the gate to additional feasible alternative designs

25    is unpersuasive for a couple of reasons.

1          First of all, before the initial order, at least

2     as I understand the facts, Dr. David had in fact disclosed

3     the device or the alternative designs that were later

4     excluded.  So certainly additional such designs or I think

5     they were described as patient conductive warming devices

6     could have been disclosed at the time of his initial report.

7          As to the argument that it's premature to disclose

8     the full range of potential feasible alternative designs

9     because the law that will be applied to each individual case

10    may be different, again, I find that unpersuasive because

11    the law was certainly known, and there's no argument that

12    there's been a sea change in the law since the time of

13    Dr. David's initial report.  So I think the upshot is it's

14    really incumbent on the plaintiff, and I understand it may

15    seem an undue burden, but I don't think it is, and I think

16    it's certainly a burden that is imposed by the Court's, the

17    structure of its scheduling orders, that it's incumbent on

18    the plaintiff with respect to an issue such as feasible

19    alternative design to give us fulsome an opinion as they can

20    at the time about what alternative designs exist, what are

21    out there, and what could be alternatives.

22         So going back to my earlier point about Gareis

23    though, I think it can't be said that the relevance of these

24    after disclosed devices, the ones that are now in

25    Dr. David's newest report, that the relevance or the need or

1    desirability to disclose those only came to plaintiff's

2    attention as a result of the Gareis order or trial.

3            I do find -- so I don't think there's a

4    justification, a substantial justification for the

5    supplementation.  And I do find that plaintiff is prejudiced

6    by the disclosure, either they can't take additional

7    discovery, or if they can, it is requiring them to do so on

8    the eve of trial and to undertake substantial investigation

9    as the case careens toward trial.

10           And by way of legal support for this ruling, I

11   would rely on, I do rely upon the *3M v. Dow* case reported at

12   2005 Westlaw, 6007042.  The *Medtronic* case that's reported

13   at 2008 Westlaw, 4601038.  The *Cook* case reported at 580 F.

14   Supp. 2d 1071, and there are others, so I rely on those, but

15   the gist of it is under Rule 37(c)(1), I do think that

16   Dr. David's report needs to be excluded.

17           One last comment on his report and that is

18   regarding the nature of MDLs, I understand that, yes, as the

19   case, as a particular case gets ready for trial, the fact

20   that it is governed by the law of a particular state will in

21   fact govern how, you know, what precisely is admissible and

22   what precisely the parties decide to utilize in their trial

23   and that the function of bellwethers is in fact among other

24   things to educate the parties on what was persuasive and

25   what wasn't and to change or amend their presentation and

```
 1    their evidence.

 2            But that argument goes too far if it is a

 3    justification for saying that an expert can disclose a few

 4    feasible alternative designs and then disclose as many

 5    feasible alternative designs when a particular case gets

 6    ready for trial.  I think that would essentially undermine

 7    the efficiency of an MDL and the purpose of staggering

 8    discovery as between general issues and case specific

 9    issues.

10            So I hope that gives you some guidance.  I hope

11    that you understand the Court's rationale.  I will follow

12    this up with some level of written order, but you should

13    understand the rationale as I've given it here.  The order

14    will not perhaps be as long as it would in the ordinary

15    course because I want to make sure that you can get on up to

16    Judge Ericksen if you choose to do that.  And if you don't

17    choose to do that at least, then you have a guide post for

18    what's going on in the future.  Okay?

19            So anything further for the plaintiffs,

20    Ms. Zimmerman?

21            MS. ZIMMERMAN:  No, Your Honor.

22            THE COURT:  All right.  Thank you.

23            Ms. Young, anything further for the defendants?

24            MS. YOUNG:  No, thank you, Your Honor.

25            THE COURT:  Okay.  Thank you all.  Court is in
```

1     recess.

2                          (Court adjourned at 10:55 a.m.)

3

4                              *      *      *

5

6                          REPORTER'S CERTIFICATE

7

8          I, Maria V. Weinbeck, certify that the foregoing is

9     a correct transcript from the record of proceedings in the

10    above-entitled matter.

11

12              Certified by:   *s/ Maria V. Weinbeck*

13                              Maria V. Weinbeck, RMR-FCRR

14

15

16

17

18

19

20

21

22

23

24

25