```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MINNESOTA

 3      -----------------------------------------------------------
                                    )
 4                                  )
        In Re: Bair Hugger Forced Air   )   File No. 15-MD-2666
 5      Warming Devices Products     )   (JNE/FLN)
        Liability Litigation         )
 6                                  )   October 18, 2018
                                    )   Minneapolis, Minnesota
 7                                  )   Courtroom 12W
                                    )   9:45 a.m.
 8                                  )
                                    )
 9      -----------------------------------------------------------

10              BEFORE THE HONORABLE JOAN N. ERICKSEN
                UNITED STATES DISTRICT COURT JUDGE
11
                And THE HONORABLE DAVID T. SCHULTZ
12              UNITED STATES MAGISTRATE JUDGE

13                       (STATUS CONFERENCE)

14      APPEARANCES

15      FOR THE PLAINTIFFS:
                                    MESHBESHER & SPENCE
16                                  Genevieve M. Zimmerman
                                    1616 Park Avenue
17                                  Minneapolis, MN  55404

18                                  CIRESI CONLIN
                                    Jan Conlin
19                                  225 South 6th Street
                                    Suite 4600
20                                  Minneapolis, MN

21                                  KENNEDY HODGES, LLP
                                    Gabriel Assaad
22                                  4409 Montrose Blvd
                                    Suite 200
23                                  Houston, TX 77006

24                                  KASTER LYNCH FARRAR & BALL, LLP
                                    Kyle Farrar
25                                  1010 Lamar, Suite 1600
                                    Houston, TX  77002
```

```
 1     FOR THE PLAINTIFFS:          GOLDENBERG LAW, PLLC
                                    Noah Lauricella
 2                                  800 LaSalle Avenue
                                    Suite 2150
 3                                  Minneapolis, MN  55402

 4                                  JOHNSON BECKER PLLC
                                    Lisa Gorshe
 5                                  444 Cedar Street
                                    Suite 1800
 6                                  Saint Paul, MN  55101

 7     FOR THE PLAINTIFFS APPEARING BY PHONE:

 8                                  PRITZKER HAGEMAN, P.A.
                                    David J. Szerlag
 9                                  Wendy Thayer
                                    45 South 7th Street, #2950
10                                  Minneapolis, MN  55402-1652

11                                  LEVIN PAPANTONIO
                                    Ashley Woodard
12                                  Daniel A. Nigh
                                    316 S. Baylen Street
13                                  Suite 600
                                    Pensacola, FL 32502
14
                                    MESHBESHER & SPENCE
15                                  Ashleigh R. Raso
                                    Melanie Frenz
16                                  1616 Park Avenue
                                    Minneapolis, MN  55404
17
                                    PETERSON & ASSOCIATES, P.C.
18                                  Brian Emerson Tadtman
                                    801 W. 47th Street, Suite 107
19                                  Kansas City, MO  64112

20                                  THE OLINDE FIRM, LLC
                                    Alfred Olinde
21                                  400 Poydras Street
                                    Suite 1980
22                                  New Orleans, LA  70130

23                                  MORGAN & MORGAN, PA
                                    Heather Cullen
24                                  Michael S. Goetz
                                    Joseph T. Waechter
25                                  201 N. Franklin St 7th Floor
                                    Tampa, FL  33602
```

```
 1      FOR THE PLAINTIFFS APPEARING BY PHONE:

 2                                RAIZNER SLANIA, LLP
                                  Jeffrey Raizner
 3                                Rica Rinosa
                                  Erin Stracerner
 4                                Kristen Gorombol
                                  2402 Dunlavy Street
 5                                Houston, TX  77006

 6                                LONCAR & ASSOCIATES
                                  William Hymes
 7                                John L. Coveney
                                  424 S. Cesar Chavez Blvd
 8                                Dallas, TX  75201

 9                                CAPRETZ & ASSOCIATES
                                  Don K. Ledgard
10                                5000 Birch St, Suite 2500
                                  Newport Beach, ca  92660
11
                                  MICHAEL HINGLE & ASSOCIATES
12                                Julie Jochum
                                  Bryan Pfleeger
13                                220 Gause Blvd
                                  Slidell, LA  70005
14
                                  HOUSSIERE DURANT & HOUSSIERE
15                                Randall A. Kauffman
                                  Monica Vaughan
16                                Shirley Strom-Blanchard
                                  1990 Post Oak Blvd Suite 800
17                                Houston, TX  77056

18                                DAVIS & CRUMP, PC
                                  Martin D. Crump
19                                Wes Stevenson
                                  Robert Cain, Jr.
20                                2601 Fourteenth Street
                                  Gulfport, MS 39507
21
                                  SKIKOS CRAWFORD SKIKOS&
22                                   JOSEPH, LLP
                                  Darilyn Simon
23                                Julie Tucci
                                  Matt Skikos
24                                One Sansome Street, Suite 2830
                                  San Francisco, CA  94104
25      Telephone Appearances cont'd next page:
```

```
 1      FOR THE PLAINTIFFS APPEARING BY PHONE:

 2                              THE RUTH TEAM
                                Steven C. Ruth
 3                              842 Ramond Avenue
                                Suite 200
 4                              Saint Paul, MN  33733-5157

 5                              LAW OFFICE OF TRAVIS R. WALKER
                                Travis R. Walker
 6                              Valerie Marshall
                                1235 SE Indian Street
 7                              Suite 101
                                Stuart, FL  34997
 8
                                ANDREWS & THORNTON
 9                              Anne Andrews
                                Marco Galindez
10                              John Thornton
                                Lauren Davis
11                              Anthony
                                2 Corporate Park, Suite 110
12                              Irvine, CA 92606

13                              LORD & ASSOCIATES
                                Melissa Marie Heinlein
14                              Priscilla Lord
                                Sonja Mathiesen
15                              309 Clifton Avenue
                                Minneapolis, MN 55403
16
                                MURRAY LAW FIRM
17                              Caroline Whitney Thomas
                                650 Poydras Street
18                              Suite 2150
                                New Orleans, LA  70130
19
                                BROWN & CROUPPEN, PC
20                              Liz Liberatore
                                Seth S. Webb
21                              Abby Cordray
                                Meghan Ellis
22                              211 North Broadway, Suite 1600
                                St. Louis, MO  63102
23
                                BEASLEY ALLEN
24                              Renee Lindsey, Matthew Munson
                                Megan Robinson
25                              218 Commerce Street
                                Montgomery, AL  36104
```

```
 1
        FOR THE PLAINTIFFS APPEARING BY PHONE:
 2
                             HOLLIS LEGAL SOLUTIONS, PLLC
 3                           Natasha Ingram Hollis
                             Scott Hollis
 4                           6814 Crumpler Boulevard,
                             Suite 101
 5                           Olive Branch, MS  38654

 6                           PARKER WAICHMAN, LLP
                             Michael S. Werner
 7                           59 Maiden Lane
                             6th Floor
 8                           New York, NY  10038

 9                           FITZGERALD LAW GROUP, LLC
                             Kevin Fitzgerald
10                           120 Exchange Street
                             Suite 200
11                           Portland, ME  04101

12                           LANGDON & EMISON
                             Rachel Ahmann
13                           Lauren Niendick
                             Tricia Campbell
14                           911 Main Street
                             Lexington, MO  64067
15
                             LEWIS & CAPLAN
16                           Pete Lewis
                             Amy Webster
17                           Sarah Delahoussaye Call
                             Rebecca Robinson
18                           3631 Canal Street
                             New Orleans, LA  70119
19
20                           THE WEBSTER LAW FIRM
                             Chelsie Garza
21                           6200 Savoy Suite 150
                             Houston, TX  77036
22
                             MARTIN HARDING & MAZZOTI, LLP
23                           Rosemarie Bogdan
                             1222 Troy-Schenectady Road
24                           P.O. Box 15141
                             Albany, NY  12212-5141
25      Telephone Appearances cont'd next page:
```

```
 1      FOR THE PLAINTIFFS APPEARING BY PHONE:

 2                              SHELTON LAW GROUP
                                Rob Shelton
 3                              Crystal Whitaker
                                9300 Shelbyville Road
 4                              Suite 215
                                Louisville, KY  40222
 5
                                SHOWARD LAW FIRM PC
 6                              Elizabeth Orr
                                Elizabeth Whitley
 7                              Sarah J. Showard
                                4703 E Camp Lowell Drive
 8                              Suite 253
                                Tucson, AZ  85712
 9
                                BACHUS & SCHANKER, LLC
10                              Alexandra Franklin
                                Allison Brown
11                              Darin Schanker
                                J. Kyle Bachus
12                              Krysta Hand
                                Kyle Bachus
13                              J. Christopher Elliott
                                Noelle Collins
14                              1899 Wynkoop Street, Suite 700
                                Denver, CO  80202
15
                                DEGARIS LAW GROUP, LLC
16                              Wayne Rogers, Jr.
                                3179 Green Valley Road 235
17                              Birmingham, AL  35243

18                              MORRIS LAW FIRM
                                Jim Morris
19                              Shane Greenberg
                                Rochelle Burris
20                              411 W. Alameda Avenue
                                Suite 611
21                              Burbank, CA  91505

22                              THE AHEARNE LAW FIRM, PLLC
                                Allan J. Ahearne
23                              Jessica Pauley
                                Abigail Spurney
24                              24 Main Street
                                Warwick, NY  10990
25                  Telephone Appearances cont'd next page:
```

```
 1    FOR THE PLAINTIFFS APPEARING BY PHONE:

 2                              THE REARDON LAW FIRM, PC
                               John Nazzaro
 3                              Casandra Haggett
                               Elisa Cassino
 4                              160 Hempstead Street
                               New London, CT  06320
 5
                               NEAL R. ELLIOTT, JR.
 6                              P.O. Box 80136
                               Baton Rouge, LA  70898
 7
                               HARE WYNN NEWELL & NEWTON
 8                              Don McKenna
                               Peggy Little
 9                              Lynne Reed
                               Massey Building
10                              2025 Third Avenue North
                               Suite 800
11                              Birmingham, AL  35203

12                              MCEWEN LAW FIRM, LTD
                               Emily Robinson
13                              Gregory N. McEwen
                               5850 Blackshire Path
14                              Inver Grove Heights, MN  55076

15                              THE MILLER FIRM, LLC
                               Tayjes M. Shah
16                              The Sherman Building
                               108 Railroad Avenue
17                              Orange, VA  22960

18                              WALTERS LAW FIRM, LLC
                               Lon Walters
19                              23A East 3rd St
                               Kansas City, MO  64106
20
                               BERNSTEIN LIEBHARD LLP
21                              Dae Lee
                               10 East 40th Street
22                              New York, NY  10016

23                              KIRTLAND AND PACKARD LLP
                               Behram V. Parekh
24                              2041 Rosecreans Avenue
                               Third Floor, Suite 300
25                              El Segundo, CA  90245
        Telephone Appearances cont'd next page:
```

```
 1     FOR THE PLAINTIFFS APPEARING BY PHONE:
                         THE LANIER LAW FIRM, PLLC
 2                       Jason Goldstein
                         Erika Mohabir
 3                       126 East 56th Street, 6th Floor
                         New York, NY 10022
 4
                         GROSSMAN & MOORE, PLLC
 5                       Emily A. DeVuono
                         Jennifer Moore
 6                       Ashton R. Smith
                         Elizabeth Coulter
 7                       Kara Lane
                         401 W. Main Street
 8                       Suite 1810
                         Louisville, KY  40202
 9
                         JOHNSON JOHNSON & SCHALLER PC
10                       Leslie O'Leary
                         Brenda Steinle
11                       975 Oak Street
                         Citizens Building, Suite 1050
12                       Eugene, OR  97401

13                       JOHNSTON LAW GROUP PLLC
                         Joaquin Figueroa
14                       1472 White Oak Drive
                         Chaska, MN  55318
15
                         CARR & CARR ATTORNEYS
16                       Patrick E. Carr
                         4416 S. Harvard Avenue
17                       Tulsa, OK  74135

18                       CHAPPELL SMITH & ARDEN PA
                         Mark Chappell
19                       Graham Newman
                         Bonnie Sluce
20                       2801 Devine Street
                         Suite 300
21                       Columbia, SC  29205

22                       LOCKRIDGE GRINDAL NAUEN, PLLP
                         Elizabeth Peterson
23                       100 South Washington Ave #2200
                         Minneapolis, MM  55401
24
             Telephone Appearances cont'd next page:
25
```

```
 1      FOR THE PLAINTIFFS APPEARING BY PHONE:
                                    LAW OFFICES OF PETER ANGELOS,
 2                                  P.C.
                                    Craig Silverman
 3                                  100 North Charles Street
                                    Baltimore, MD  21201
 4
                                    LAW OFFICE OF MICHAEL PATRICK
 5                                  Michael W. Patrick
                                    100 Timberhill Pl, Suite 127
 6                                  Chapel Hill, NC  27514

 7                                  CHARLES H. JOHNSON LAW
                                    Charles H. Johnson
 8                                  2599 Mississippi Street
                                    New Brighton, MN  55112
 9
                                    SCHNEIDER SCHNEIDER
10                                    and SCHNEIDER
                                    Scott Haider
11                                  815 3rd Avenue South
                                    Fargo, ND  58103
12
                                    POGUST BRASLOW & MILLROOD, LLC
13                                  Jessica Lowe
                                    Matt Leekman
14                                  8 Tower Brg
                                    161 Washington
15                                  Conshohocken, PA 19428

16      FOR THE DEFENDANTS:         BLACKWELL BURKE P.A.
                                    Jerry Blackwell
17                                  Ben Hulse
                                    Mary Young
18                                  431 South Seventh Street
                                    Suite 2500
19                                  Minneapolis, MN  55415

20                                  FAEGRE BAKER DANIELS
                                    Bridget M. Ahmann
21                                  90 South Seventh Street
                                    Suite 2200
22                                  Minneapolis, MN  55402

23      COURT REPORTER:             Maria V. Weinbeck, RMR, FCRR
                                    U.S. Courthouse
24                                  300 South Fourth Street, #1005
                                    Minneapolis, MN  55415
25              Proceedings recorded by mechanical stenography;
        transcript produced by computer.
```

```
 1                    P R O C E E D I N G S

 2                       (9:42 a.m.)

 3            THE COURT:  Good morning.  Please be seated.  Nice

 4    to see everybody again after quite a while.  You've given

 5    the court reporter your appearances.  Let me just check and

 6    make sure that people on the phone can hear me.

 7            Okay, people on the phone, I've got a list of who

 8    you all are, but would someone say something just so I know

 9    you can hear what's going on?

10            COUNSEL:  Yes, we can hear, Your Honor.

11            THE COURT:  All right.  I'm muting you now.  And,

12    Ms. Zimmerman, do the people on the phone know who is in the

13    courtroom?

14            MS. ZIMMERMAN:  We have not introduced ourselves.

15            THE COURT:  On the plaintiffs' side, we have

16    Gabriel Assaad, Kyle Farrar, Jan Conlin, and Genevieve

17    Zimmerman.  Correct?

18            PLAINTIFFS' COUNSEL:  Yes.

19            THE COURT:  And on the defense side, we have

20    Jerry -- is it Blackwell?  And Ben Hulse and Mary Young and

21    Bridget Ahmann?

22            MR. BLACKWELL:  Correct, Your Honor.

23            THE COURT:  I've got a note that there are some

24    plaintiffs in the audience but that's not part of the

25    record.
```

```
 1              All right.  Shall we just go through the joint
 2    agenda?  And, first, let me make sure I've got the right
 3    one.  Also, Judge Schultz is here on the bench for the
 4    benefit of the folks on the phone.  And that's it.  There's
 5    just the two of us on the bench today.
 6              I was getting updated joint agendas in pretty
 7    rapid succession there for a while, so I have what I think
 8    is the most recent one.
 9              MR. HULSE:  Yes, Your Honor.  That's on me.  I'm
10    responsible for the typo.  The one that's entitled,
11    "Corrected Joint Agenda Report" is the correct one.  The
12    only difference was the date.
13              THE COURT:  All right.  And I do have that one in
14    front of me.
15              MR. HULSE:  Thank you, Your Honor.
16              THE COURT:  The joint agenda starts with pretrial
17    orders and case schedule.  Before we get to that, why don't
18    we cover the motions to dismiss.  That's you, Mr. Hulse?
19              MR. HULSE:  Yes, Your Honor.  Would you like to
20    take PTO23 or the PFS motions first?
21              THE COURT:  Well, let's take them in the order I
22    have them, which would be the PTO23.  Oh, let's do it in
23    your order.  We'll do the PFS ones.  Let me find that here.
24              We have one bucket.  I understand we're now using
25    the word "buckets."  One bucket of cases as to which there
```

1     has been no response, and I don't see any reason not to

2     grant the motion.  And that would be:  *Johnson*, 17-2426;

3     *Hanks*, 17-5052; *Lykes-Traver* 17-5327; *Meyers*, 17-5426;

4     *Shoaf*, 18-167; *Brabham*, 18-262; *Hughes*, 18-665; *Brown*,

5     18-802; *Stidham*, 18-840; *Wiggins* 18-842.  Those will be

6     dismissed.

7          MR. HULSE:  A note on *Wiggins*, just for the

8     record, Your Honor, we did receive a PFS on the 8th.

9     However, it did not include an authorization or

10    verification, and about half of the core areas were

11    deficient too.  So we think that should still be dismissed.

12         THE COURT:  Those will all be dismissed, the ones

13    that I listed.

14         There was a response in *Bresnock*, *Potter*, *Swales*,

15    *Weaver*, *Moore*, *Edwards*, *Johnston*, *Billings*, *Collins*, and

16    *Winegar*.

17         *Bresnock*, *Potter* and *Swales*, we'll take those

18    three first.  *Bresnock*, the deficiency is that he indicated

19    a claim for loss of future wages or income but then put not

20    applicable for the approximate amount lost and offered no

21    basis for calculating the losses.  Is that the objection to

22    the -- is that the --

23         MR. HULSE:  Your Honor, beyond that, there was a

24    group of three cases that were subject to the Court's Order

25    that said they had to be cured, fully cured by August 31st.

```
 1    The parties are in agreement, as I understand it, that they
 2    were not cured by August 31st.  And if the Court wants to
 3    see it, we have an e-mail exchange that confirms that.
 4    So --
 5              THE COURT:  Okay, so that's Bresnock, Potter and
 6    Swales?
 7              MR. HULSE:  That's Bresnock, Potter and Swales,
 8    correct, Your Honor.
 9              THE COURT:  Is it true that there was not anybody
10    disagree on the plaintiffs' side?  All right.  Bresnock,
11    Potter and Swales are dismissed.  And those are, so Bresnock
12    is 17-5371.  Potter is 17-4881.  And Swales is 18-00045.
13              Weaver then, 17-4754, no --
14              MR. HULSE:  Your Honor, this is like many cases we
15    had before where the plaintiffs' counsel isn't challenging
16    the motion on the merits but indicates that they've been
17    unable to reach their client.
18              THE COURT:  And does anybody, let me unmute -- the
19    phone people are unmuted.  Does anyone either in court or on
20    the phone disagree with what --
21              MR. LEE:  Your Honor?
22              THE COURT:  -- with what Mr. Hulse just said?
23              MR. LEE:  Your Honor, can you hear me?
24              THE COURT:  Mr. Assaad is standing.  That's not
25    you talking, is it?
```

 1                    MR. ASSAAD:  No, Your Honor.

 2                    MR. LEE:  Your Honor, this is Dae Lee for

 3      Bernstein Liebhard.  I was trying to call in, but I don't

 4      think you could have heard me, but on *Potter*, *Edwards* and

 5      *Johnston*, yes, I wish to be heard.

 6                    THE COURT:  It's *Potter*, *Swales* and *Bresnock*.

 7                    MR. LEE:  Okay.  So *Potter*, *Swales* and *Bresnock*.

 8                    THE COURT:  Right.  Do you want me to give you the

 9      case numbers again?

10                    MR. LEE:  No, no, I have it in front of me.  So

11      for plaintiff Potter, as per the Court's ruling on

12      August 16th, we served the amended PFS on August 23rd.  And

13      defendant waited until August 31st to notify us that there

14      was some missing information.  As soon as we learned that,

15      we served another PFS curing the deficiency, and I don't

16      think there's any deficiency pending right now.

17                    MR. HULSE:  Your Honor, we disagree with that.

18      Two things:  One, I think as Mr. Lee has indicated, there

19      were deficiencies as of the deadline.  We notified

20      plaintiffs' counsel of those deficiencies.  They didn't

21      contest them.  They did serve new PFS's afterwards.

22      However, they didn't meet the deadline.

23                    Further, if we're going to go into the details.

24      They also served photocopies verifications with the dates of

25      the original signatures whited out and new dates written in,

1    which is not a proper practice.

2              THE COURT:  They can't have done that.  Let me

3    make sure that that didn't happen.  So let me ask the is it

4    Mr. Lee on the phone?

5              MR. LEE:  Yes.

6              THE COURT:  Is Mr. Hulse mistaken on that?

7              MR. LEE:  No, we did not white out the date and

8    then serve it with, we didn't do that, and that is

9    completely wrong.  I'm not sure where he is getting that

10   idea from.

11             MR. HULSE:  I'd be happy to offer to the Court the

12   copies of the original and the supplemental PFS

13   verifications, and it's obvious to the naked eye that these

14   are photocopies with the dates changed, and that includes

15   also the other three Bernstein Liebhard cases that are at

16   issue.

17             THE COURT:  Did I hear you -- I just want to make

18   sure that I heard you correctly, Mr. Lee.  You said you did

19   or did not?

20             MR. LEE:  We did not white out the dates and then

21   resubmit it.  Plaintiffs might have done it on their own,

22   but we did not.

23             THE COURT:  Do you disagree that the plaintiffs

24   maybe did it?  Mr. Hulse has a file on the podium, and I

25   don't know what's in it, but he's representing what you just

1   heard, that he has the original documents.

2          Okay, what about the *Swales* case?  That is 18 --

3   45, is that your's also?  No?

4          MR. HULSE:  *Swales* is Mr. Lee's case, Your Honor.

5          THE COURT:  Okay, Mr. Lee, is *Swales* your case?

6          MR. LEE:  Yes.  We served the PFS, according to

7   your Order dated August 16th, the PFS was served on

8   August 30th.  It was missing an information.  I believe it

9   was question 6, section 6, part 1, which asked, "Describe

10  any other further harm or consequences that you suffered as

11  a result."  That section was not answered, so I contacted

12  the plaintiff, my client, and then we served the PFS,

13  another amended PFS right away on September 4th.

14         THE COURT:  Mr. Hulse?

15         MR. HULSE:  They did.  They agreed with us that

16  the PFS was still deficient as of the Court's deadline of

17  August 31st.  They did serve a new PFS several days

18  afterwards, and it once again contains the same error around

19  verification.  It's the same verification, same signature

20  from the plaintiff with just the date changed.

21         THE COURT:  Okay, and there's no response to the

22  other harm part?  Is that the fundamental deficiency?

23         MR. HULSE:  I do believe that was cured by the

24  September 4th, the post-deadline PFS.

25         THE COURT:  And then what's the non-cured

1     deficiency?

2               MR. HULSE:  So it's the verification.

3               THE COURT:  Okay.  Mr. Lee, was there a

4     verification?

5               MR. LEE:  I believe verification was served.

6               THE COURT:  Let me just let Mr. Hulse flip through

7     the file here and see what he's got.

8               MR. HULSE:  Yes, it's the same for all of

9     Mr. Lee's cases.  A verification was served.  It is clear to

10    the naked eye that it's the same as the old verification,

11    and the date has been changed, and you can even see on this

12    one that part of the signature line has been whited out, so

13    somebody whited it out and put in a new date.

14              THE COURT:  All right.  And is that going to be

15    true for *Bresnock* also?

16              MR. HULSE:  Yes.

17              THE COURT:  Here's what we're going to do.

18    Mr. Lee, you disagree with the reading Mr. Hulse has of

19    these documents.  I'm not looking at the documents.  I won't

20    look at them until Mr. -- until you have a chance to do

21    whatever it is that you want to do about it, which may be

22    will be to contact Mr. Hulse and take a look at it or

23    something.  But if you have some disagreement with the

24    representation that Mr. Hulse is making, then just get that

25    in writing before the next status conference.  So within

 1      30 days, and we'll hold off on ruling on *Bresnock*, *Potter*

 2      and *Swales*.

 3                  UNKNOWN VOICE:  Your Honor?

 4                  THE COURT:  All right.  Is that Mr. Lee again?  Or

 5      is this somebody else?

 6                  UNKNOWN VOICE:  No, Your Honor.  This is someone

 7      else, Your Honor.  May I be heard?

 8                  THE COURT:  On *Bresnock*, *Potter* and *Swales*?

 9                  UNKNOWN VOICE:  No, Your Honor.  The phone was on

10      mute previously when you had *Brabham*, 18-262.

11                  THE COURT:  Hold on, let me find it.  And could we

12      have your name, please?

13                  MR. WALKER:  Yes, Your Honor.  This is Travis

14      Walker.

15                  THE COURT:  And you're a lawyer where?

16                  MR. WALKER:  I'm a lawyer in Florida with the law

17      office of Travis Walker.

18                  THE COURT:  And you're talking about one of your

19      cases which is *Brabham*, 18CV00262 that was listed in the

20      plaintiffs filing no response to the 15th motion to dismiss.

21      Yes, Mr. Walker.

22                  MR. WALKER:  Yes, Your Honor.  It came to our

23      attention when we heard the name, we were surprised because

24      it was our understanding that we had filed a response.  We

25      have the PFS in hand for the response.  It's my

1    understanding in speaking to the paralegal that one of the

2    two buttons on the portal was pressed but didn't get

3    processed.

4           We're just asking for an opportunity to file that

5    responsive PFS.  We have it in hand and, you know, we

6    apologize to the Court.  We weren't able to talk about this

7    previously, but we are prepared to file that PFS.

8           THE COURT:  All right.  Well, just file it then

9    within -- file it today.  File it by close of business

10   today, and we'll take a look at it.  So I will hold off on

11   ruling on *Brabham*.

12          MR. WALKER:  Thank you, Your Honor.

13          THE COURT:  All right.  Now that the phone line is

14   open, is there anyone else on *Johnson*, *Hanks*, *Lykes-Traver*,

15   *Meyers*, *Shoaf*, *Hughes*, *Brown*, *Stidham*, Wiggins?  All right.

16   What about -- I'm going to name some new cases now.  And let

17   me know if anyone on the phone wants to be heard on these.

18   And that would be *Weaver*, 17CV4754.

19          MR. ASSAAD:  That's our case, Your Honor.

20          THE COURT:  *Moore*, 17CV2901.

21          MR. ASSAAD:  Our case as well.

22          THE COURT:  And *Edwards*, 17CV4891?

23          MR. LEE:  Your Honor, that's my case.

24          THE COURT:  It sounds like Mr. Lee; is that right?

25          MR. LEE:  Yes.

1                    THE COURT:  *Johnston*, 17CV5270; *Billings* --

2          MR. LEE:  Yes.

3                    THE COURT:  Mr. Lee, was that you again?

4          MR. LEE:  Yes, Your Honor.  *Edwards*, *Johnston*,

5    *Billings* are our cases.

6                    THE COURT:  Okay.  And so that's *Billings*,

7    17-5277?

8          MR. LEE:  Yes, Your Honor.

9                    THE COURT:  *Collins*, 18CV1175?

10         MR. LEE:  That's mine too, Your Honor.  And

11   *Winegar*, I think that's 18-CV-0123 is mine too.

12                   THE COURT:  Okay, *Winegar*.  And, Mr. Lee, have you

13   communicated with counsel on the steering committee about

14   these?

15         MR. LEE:  Yes, Your Honor.  I believe I sent an

16   e-mail to one of the PSC members.

17                   THE COURT:  Okay, and who is it?  So you know who

18   is in court today.  Is there any one of those members that

19   you communicated with that you want to present your argument

20   in person?

21         MR. LEE:  I got to look into my e-mail, but I

22   think it's the Pritzker law firm.

23                   THE COURT:  Nobody in court is raising their hand

24   to say they were nominated.  So let's take a look at your

25   cases.  So you do not have *Weaver*, and you do not have

1    *Moore*, correct?

2              MR. LEE:  Correct.

3              THE COURT:  *Weaver* is dismissed.  That is 17-4754.

4    All right.  *Edwards*, 17-4891.

5              MR. HULSE:  Your Honor, *Edwards*, *Johnston*, and

6    *Billings* were not part of that August 31st deadline, but

7    they do exhibit the same issue with the signatures on

8    verifications where they appear to us to be obviously whited

9    out dates and signed.

10             And I just wanted to add that at our request,

11   plaintiffs' liaison counsel we know did bring this issue of

12   whiting out verification dates and resubmitting them with

13   new dates to the attention of all plaintiffs' counsel

14   earlier this year and indicated their agreement with us that

15   this is an unacceptable practice, and so that's why we stood

16   on this issue.  It's not new to anybody.  Mr. Lee and his

17   firm are aware of it.  Everybody is aware of it.

18             THE COURT:  Yes, Mr. Lee is just denying that

19   happened.

20             MR. HULSE:  I understand.

21             MR. LEE:  Your Honor, this was never raised in

22   their motion, and their motion was brought because of the

23   deficiency elicit in the PFS, which is now cured.

24             THE COURT:  All right.  But, Mr. Lee, let me just

25   ask you the more specific question that we discussed with

 1    respect to *Bresnock*, *Potter* and *Swales*, is it your position

 2    that Mr. Hulse is wrong in that these are not whited out and

 3    redated, resigned?

 4            MR. LEE:  No.  We -- our position is that we did

 5    not white it out.  Plaintiffs, my client, our client might

 6    have done it, but we did not.  We did not white it out and

 7    resubmit it.

 8            THE COURT:  And, Mr. Lee, is there an attorney

 9    from the plaintiffs' steering committee in court today who

10    you would entrust to take a look at the documents that

11    Mr. Hulse has with him and represent whether they do or do

12    not appear to be what defense counsel has represented?

13            MR. LEE:  Anybody from PSC, no.

14            THE COURT:  Any volunteers?  Ms. Zimmerman is

15    volunteering.

16            MS. ZIMMERMAN:  In all candor, the difficulty, I

17    think at least from my perspective, not as a handwriting

18    expert to the extent that this is somebody printing their

19    name and signing it, we all kind of print and sign our name,

20    and they're regularly going to look pretty similar.  And I

21    think that to the extent that there's any dispute, perhaps

22    we can try and get Mr. Lee to have brand new copies

23    executed.

24            THE COURT:  Well, that's not going to work because

25    that is an issue that we've been through before, so the

1       question is whether what was submitted qualifies?

2             Okay.  Mr. Lee, just for your comfort, we've got

3       all four lawyers pouring over these documents right now.

4             MR. LEE:  Your Honor, I just want to note on the

5       record that defendants never put this issue in their motion.

6             MR. HULSE:  That's not accurate, Your Honor.

7             THE COURT:  All right.  But we're not talking

8       about that is more of a legal procedural matter.  Right now

9       we're focusing on the factual dispute.

10            MS. ZIMMERMAN:  Your Honor, based on our review, I

11      mean he's an Officer of the Court, and he's represented

12      that's not what happened.  There's not anything that I can

13      see --

14            THE COURT:  Just to interrupt you.  That's not

15      exactly what he's representing.  He's representing that the

16      plaintiffs may have done it.  He doesn't know.  So he's

17      representing that he didn't do it himself, but he's not

18      representing that it did not happen.

19            MS. ZIMMERMAN:  Okay.

20            THE COURT:  In fact, he specifically said the

21      plaintiffs may have done it themselves.

22            MS. ZIMMERMAN:  Okay.  Based on my review and,

23      again, I'm not an expert on handwriting.  I don't see that

24      it's so obviously whited out.  I mean, I think that the

25      signatures and the printing are similar.  I don't see any

```
 1    white-out marks, you know, but --
 2              THE COURT:  Well, I guess there's no option but to
 3    take a look at it.  Ms. Zimmerman and Mr. Hulse, would you
 4    hand up one?
 5              (Voice of operator on phone.)
 6              THE COURT:  I don't know what that was.  Mr. Lee,
 7    are you still there?
 8              MR. LEE:  Yes, Your Honor.
 9              THE COURT:  All right.  Let's take one.
10              MR. HULSE:  I may need to organize it a little
11    bit.
12              MS. ZIMMERMAN:  And I didn't look at those yet.
13              THE COURT:  So someone on the phone put us on
14    hold, and we're getting the notices that our call is
15    important to them.  So as a result of that, I'm going to,
16    while I look at these documents, I'm going to put the
17    telephone calls on mute.
18              What we have here is all of them, right?
19              MR. HULSE:  Your Honor, I just passed up two.  I
20    can pass up the rest too.
21              THE COURT:  Oh, I see.  Okay, so *Potter* and
22    *Swales*.  All right.  Well, *Potter*, is an -- I don't know if
23    it's white out or whatever it is, but I find that the dates
24    are clearly different.  So this is not a person who is
25    routinized in their handwriting that there does not appear
```

1    that the style differences don't appear on different dates.

2    And the printed name and the signature line not only for

3    Ms. Potter but also for Mr. Potter are completely and

4    totally identical.  And even if in theory you can have one

5    person whose signature and printing was so routinized that

6    even the uptick of the pen remained the same, it's not

7    believable that that would happen with two people.  So

8    *Potter* is dismissed.

9         *Swales*, let's look at Swales.  Counsel, why are

10   there three copies?  So we've got three copies of

11   August 29th and three or four, no, no, we have four copies

12   of the August 29th.  One was in the wrong paper clip.  Is

13   there any reason why you have multiple copies of these?

14        MR. HULSE:  Multiple copies for the other parties,

15   right.

16        THE COURT:  All right.  So, Mr. Hulse, on *Swales*,

17   do you have any original s?  These are both photocopies and

18   especially the August 31st one is a little bit faint.

19        MR. HULSE:  They're the PDFs that were submitted

20   to us by plaintiffs' counsel, so we don't have an original

21   signature.  There in *Swales*, I would note the date, it's the

22   second line I believe actually, you can see the signature

23   line has been whited.

24        THE COURT:  Are you talking about the line itself?

25        MR. HULSE:  The line itself.

1            THE COURT:  Oh, I see.  Maybe, yeah, and that

2    might be a little bit true on the first line also.  Between

3    the A and the L, and between L and the S.  Also, under --

4    well, back in the August 29th one, you've got that same on

5    the first line, the same I don't know if partial apparent

6    obliteration of the line to the right of the S.  So I'm not

7    so persuaded by that whiting out of the line business

8    because strange things seem to be happening with the line on

9    both.  So I'm not going to -- I think it's -- I guess on

10   *Swales*, I can't really tell.

11            MS. ZIMMERMAN:  I just received an e-mail from

12   Mr. Lee.  He's trying to -- he's on mute because somebody

13   put us on hold, but he asked that he be given the

14   opportunity to provide copies of all the signatures that

15   have been submitted thus far in the *Potter* matter.  And I

16   tried to reply to see how many that might be, but he

17   certainly thinks that that would be an important issue for

18   the Court.

19            THE COURT:  Okay.  *Potter* is dismissed.  *Swales*,

20   I'm not comfortable making a decision on what I've got on

21   *Swales*.  So if you've got something else on *Swales* or

22   anybody else does, I guess I could take that.  But the

23   interesting thing about the *Swales* is that the signatures

24   and the printed are absolutely identical.  You hold them up

25   to the light, they are a hundred percent identical, so that

1        is a strong indicator that it is a cut and paste.

2                The thing that struck me, this seems to be the

3        signature of quite an old person, and the dates, she starts

4        her dates exactly the same distance from the left side of

5        the line both times and that's an indication of the sort of

6        routinization that was missing in the *Potter* case.  So I

7        mean maybe, yeah, it's not completely the same because the

8        dash between the 31 and the 2018 is obviously really

9        different from the dash between the 29 and the 2018, but I

10       can see how somebody would do that differently.  But the

11       distance from the left is something that you, you know, I

12       don't know.  Anyway.  I can't make the finding on *Swales*.

13               MR. HULSE:  Your Honor, I also have passed up the

14       *Bresnock* case, which I think, at least personally, I think

15       looks pretty clear-cut.

16               THE COURT:  And I'm going to look at *Bresnock*

17       right now.  It's almost like Bresnock never put the date on

18       the September 4th one.  The handwriting of September 4th is

19       completely different than the handwriting of the

20       August 24th.

21               MR. HULSE:  Your Honor, another possibility about

22       what may happen sometimes, Your Honor, is that --

23               THE COURT:  Wait a minute.  Wait a minute here.

24       The 9-4-18 on *Bresnock* is identical to the 9-4-18 on *Potter.*

25       Wait a minute.  Wait a minute.

1              The 9-4-18 on *Bresnock* is not anything like it

2     appears not to have been made by the same person who did the

3     date August 24, '18 on *Bresnock*.  The August one appears to

4     be the same or similar handwriting to the signature of

5     *Bresnock*, loopy, and what's the right word?  Kind of not --

6     not the handwriting of a mechanical engineer.

7              The 9-4-18 is a more pinched, precise writing, but

8     what's really concerning the Court right now, really

9     concerning, is now I am comparing the 9-4-18 on *Bresnock*

10    with the 9-4-18 on *Potter*, and let's say the eight,

11    obviously, the ink mark is heavier.  This person starts

12    their 8's strongly on the right, gets lighter as the loop is

13    completed.

14             Mr. Lee, any explanation for this September 4, '18

15    similarity between *Potter* and *Bresnock*?  You're off mute.

16    All right.  Hearing nothing.  And that's not trend *Swales*,

17    which is yet another reason why *Swales* seems different from

18    *Potter* and *Bresnock*.  All right.  *Potter* and *Bresnock* are

19    dismissed.

20             We can go on and on about the similarities between

21    the 9-14-18 on *Bresnock* and *Potter*.  The dash lines between

22    the dates go the same distance below the line.  You know,

23    you don't have to know the first thing about handwriting to

24    see that those are probably made by the same person.  All

25    right.

1            All right.  I'm handing back the *Bresnock*, *Potter*,

2     and *Swales* papers.  So just to be clear, the motions denied

3     on *Swales* based on what we have.  If there's something else,

4     bring it to our attention, but the white-out argument is

5     rejected on *Swales*.

6            MR. HULSE:  Understood.

7            THE COURT:  And it sounds like we are asked to

8     conduct this same factual inquiry with respect to *Edwards*?

9            MR. HULSE:  That's correct, Your Honor.  There are

10    three more cases.  Looking at my file here, I don't see that

11    I have copies of both verifications with me, so I would

12    offer, Your Honor, if the Court is willing, then I would

13    simply submit those later today for review.

14            THE COURT:  Do you have the September -- what's

15    the second date?  I just wonder if they have that same

16    September 4th.

17            MR. HULSE:  Actually, I just don't know, Your

18    Honor.

19            THE COURT:  All right.

20            MR. HULSE:  We do think there's a pattern and

21    practice with this particular firm of this occurring, but,

22    again, if Your Honor is willing, we'll submit the other

23    three for the Court's review.

24            THE COURT:  And that's just *Johnston, Billings*,

25    and *Edwards*?

 1          MR. HULSE:  Correct, Your Honor.

 2          THE COURT:  Okay.  So that's fine.  Mr. Lee also

 3     represents *Collins*, 18-1175?

 4          MR. HULSE:  That's correct, Your Honor.  This is a

 5     different --

 6          THE COURT:  That's a different issue.

 7          MR. HULSE:  It's like *Weaver*.

 8          THE COURT:  Okay.  Does anybody want to be heard

 9     on *Collins*?

10          (No response)

11          THE COURT:  *Collins* is dismissed.  *Winegar*,

12     18-CV-1283?

13          MR. HULSE:  That's also Mr. Lee's case, and it's

14     the same issue as *Collins*.

15          THE COURT:  Right.  Anybody want to say anything

16     about the *Winegar* case right now?

17          (No response)

18          THE COURT:  Okay, *Winegar* is dismissed.  And the

19     phones are back on mute because that "please hold" is still

20     going on.  Moore, 17-CV-2901.

21          MR. HULSE:  *Moore* is a case that's confusing to

22     us.  Plaintiffs' counsel indicates that the plaintiff has

23     passed away, but at this point, no suggestion of death

24     substitution motion has been filed, and we've been unable to

25     locate any kind of obituary or death record for this

1    individual.  That doesn't mean they haven't passed away, but

2    it just seemed to us at this point that there is not any

3    kind of proof of that, and so that's why we left it in the

4    motion.

5         THE COURT:  And unlike the suggestion of death

6    cases, there was never a PFS even filed.

7         MR. HULSE:  Correct, Your Honor.

8         MR. ASSAAD:  That's my case, Your Honor.

9         THE COURT:  Oh, it's your case.  Okay, I was just

10   going to go back on the phone, and now I recall, Mr. Assaad,

11   that this is your case.  So was there ever a PFS filed?

12        MR. ASSAAD:  I don't believe so, Your Honor.  The

13   issue is we heard or my office heard that the person passed

14   away, but we can't confirm it as well, so I want to file a

15   suggestion of death until I can confirm the death.

16        THE COURT:  Okay.  Well, then it's dismissed for

17   lack of PFS, and the person either is alive or dead, but

18   their case is no longer ongoing.  Okay.

19        Let me, so we have a procedure that we talked

20   about for *Edwards* and *Johnston* and *Billings*.  *Collins* is

21   dismissed.  *Winegar* is dismissed.  *Johnston*, *Hanks*,

22   *Lykes-Traver*, *Meyers*, *Shoaf*, *Hughes*, *Brown*, *Stidham* and

23   *Wiggins* are dismissed.  And Mr. Walker may submit something

24   by the end of the day today on *Brabham*.

25        All right.  Well, let's turn then to the

1    suggestion of death cases.  The pretrial order number 23 and

2    the Federal Rules of Civil Procedure 25 cases.

3            MS. ZIMMERMAN:  Your Honor, one piece of

4    housekeeping on the last set of motions, if we may just

5    request that the exhibits that have been provided in Court

6    today be made a Court exhibit.

7            THE COURT:  Oh, good point.  Okay, so now I've

8    given them back.  So now you and Mr. Hulse make them joint

9    exhibits, and I'll receive them, and that way you can make

10    sure that the things that come in are the right ones that we

11    looked at.

12            MS. ZIMMERMAN:  Thank you.

13            THE COURT:  They'll be joint Exhibit 1 for the

14    October 18, 2018, hearing.  And they'll be all three.

15    They'll include *Swales*, right?

16            MR. HULSE:  Understood, Your Honor.

17            THE COURT:  Okay.  Are we ready to talk about

18    *Lister*, which is 17-4336.

19            MR. HULSE:  Yes, Your Honor.  This is a case that

20    the substitution motion was due more than three months ago.

21    It hasn't been filed.  Plaintiffs' counsel indicate there is

22    no contact with the heirs, so under PTO23 and Rule 25, this

23    case should be dismissed with prejudice.

24            THE COURT:  Anybody want to say anything to the

25    contrary?  And the phone lines are open.  And no one in

1    court.

2         *Lister*, 17-CV-4336 is dismissed by operation.

3    Well, not by operation.  It's dismissed under Rule 25 of the

4    Federal Rules of Civil Procedure.

5         16-CV-2631, *Rich v. 3M*.  Let's talk first about

6    Mr. Rich and then we can turn to the consortium claim.  So

7    we had a timely suggestion of death on April 3rd.  Death

8    occurred January 6th.  Mr. Hulse?

9         MR. HULSE:  That's correct, and then so the

10   substitution motion was due more than three months ago.  It

11   wasn't filed.  The plaintiffs' actually filed a motion to

12   dismiss the entire case.  They just asked that it be without

13   prejudice, and our request that Mr. Rich's claim be

14   dismissed with prejudice under Rule 25 and PTO23.

15        THE COURT:  Anybody want to say anything about

16   that?  All right.  That's dismissed with prejudice.  That's

17   *Rich* and, again, 2631, 16-2631.

18        What about the loss of consortium claim?  It

19   strikes me that if in fact under Missouri law the consortium

20   claim can't proceed independently, that really would be a

21   12(b)(6), Rule 12 basis for dismissal, right?

22        MR. HULSE:  That's right, Your Honor.  I mean I

23   think what makes it easier is that plaintiffs themselves

24   have moved to dismiss their own case.

25        THE COURT:  Okay.  Well, but they moved to dismiss

1        it without prejudice.

2                MR. HULSE:  Without prejudice, you're right.  And,

3        Your Honor, we would have no issue I suppose with the

4        consortium claim being dismissed without prejudice.  I don't

5        think it's going to make a difference at the end of the day,

6        which would be to simply --

7                THE COURT:  Rule 12 is normally without prejudice,

8        but there's no way -- does anybody think that Missouri law,

9        and I know that New Jersey was first cited along with it,

10       but I think we are under Missouri law for this case.

11               If it's derivative, there's no point having it be

12       without prejudice because without his claim, there is no her

13       claim.  Okay.  So that case is dismissed in its entirety,

14       which is to say both plaintiffs.

15               All right.  *Richey*, 17-CV-5323.

16               MR. HULSE:  So this is a case where the suggestion

17       of death was filed late, and now there's another deadline

18       missed, which is the substitution deadline.  No substitution

19       has been filed.  It was due earlier this month.

20               There has been no showing of impossibility of

21       compliance with the PTO23 deadline on suggestions of death.

22       No good cause shown for missing the substitution deadline,

23       so we ask that this case be dismissed with prejudice.

24               MR. ASSAAD:  Your Honor?

25               THE COURT:  Mr. Assaad.

1            MR. ASSAAD:  Before I talk about this case, the

2      plaintiffs have filed a Motion to Amend, PTO Rule 23 on the

3      suggestion of death I'd like to be heard on at this point

4      because I think a lot of the arguments I make there will

5      also apply to a couple of the cases that --

6            THE COURT:  Well, even if you win that, it's not

7      going to be retroactive.  So what do you have to say about

8      *Richey*?

9            MR. ASSAAD:  Well, in the *Richey* case, we missed

10     the deadline because we weren't aware of the death until

11     July 3rd.  Once we found out about the death on July 3rd, we

12     filed it.  There is no -- it's very hard for the plaintiff

13     to discover deaths of clients.  We don't call our clients to

14     ask them, "are you still alive?"

15           THE COURT:  Okay, that is an argument that you're

16     going to want to make in the more broad context.  Here's

17     what I'm going to do on *Richey*.  It's not really what you're

18     talking about, but I'm going to deny the defendant's motion

19     not having to do with anything you are talking about.

20           But it struck me reading through the materials

21     that Mr. Assaad, you've been given the wrong information

22     about the death date, and that's something different from

23     just not knowing or not knowing the date, not knowing the

24     person's dead.  So you got caught by a three-day difference

25     for filing the suggestion of death.

1          So it's not technically all right under the order,

2     but because you were operating not just in the dark, but you

3     thought you had the right information.  You didn't have the

4     right information, so the motion is denied, and I give you

5     30 days to file a proper substitution motion.  So 30 days

6     from today, I'll get a substitution motion in.  And if

7     that's not in, then *Richey* will be dismissed with prejudice,

8     but that's what we're going to do on that one.

9          MR. ASSAAD:  Thank you, Your Honor.

10          THE COURT:  *Bellande*, and 16-CV-2700.

11          MR. HULSE:  The much briefed *Bellande*, Your Honor,

12     this is a case where the Court gave plaintiffs' counsel a

13     week to demonstrate that compliance with Court's Order with

14     PTO23.  That deadline was impossible, as the plaintiffs had

15     represented.

16          What they indicated in their supplemental

17     submission is that they made a phone call to the *Bellande*

18     household in January of this year.  It went unanswered.

19     They didn't then followup again until April.  They learned

20     that Mr. Bellande was dead and then two month later, they

21     filed a suggestion of death.

22          Our view is that doesn't demonstrate

23     impossibility.  If you don't reach somebody by phone, that's

24     a pretty good indication that you should try them again,

25     certainly not wait three months and then wait another two

1    months to file the suggestion of death.  So we don't believe

2    the Court's criterion has been met.

3              THE COURT:  Okay.  Mr. Assaad, do you want to come

4    up to the podium and speak?

5              MR. ASSAAD:  Yes, Your Honor.

6              THE COURT:  Or do you want to stay where you are?

7    It's up to you.

8              MR. ASSAAD:  And I'll try to be brief, Your Honor.

9    But as we can see, there are numerous motions being filed

10   under PTO23 regarding the 90-day limit for suggestion of

11   death.  And let's be clear, the 90-day limit is a court

12   imposed 90-day.  It's nowhere in the Federal Rules of Civil

13   Procedure.

14             THE COURT:  I'm talking right now about the

15   *Bellande* case.

16             MR. ASSAAD:  I'm sorry.  I thought you wanted me

17   to talk.  It's the same thing, Your Honor.  It is --

18             THE COURT:  It's not exactly the same thing

19   because we've discussed *Bellande*, and I gave you time to

20   submit things.  So *Bellande*, I don't think it should be

21   impossible to address the *Bellande* case.

22             MR. ASSAAD:  I understand that.  We called the

23   client.  They did not pick up the phone.  Judicial notice

24   that people do not pick up phones.  We tried back a couple

25   months later.

```
 1              THE COURT:  Well, it was a couple of months.  It
 2    was quite a bit.  It was April.  So January -- wait a
 3    second.  Oh, I can't remember.  I had this all in my mind.
 4    It was, I thought the call, the initial call was --
 5              MR. ASSAAD:  January 26th.
 6              THE COURT:  And no call back until -- so three
 7    months.  Did you call back in April?
 8              MR. ASSAAD:  April 17, 2018, Your Honor.
 9              THE COURT:  Okay.
10              MR. ASSAAD:  Two months or three months in an MDL
11    case to call the client, which as you're aware, there's
12    5,000 cases.  We have many cases, Your Honor.  Nothing is
13    really happening on most of these cases.  We have no reason
14    to call the client.  We contact them with e-mails and
15    letters giving them updates every couple of months.  We only
16    contact a client if we're returning a phone call or calling
17    them to get some information.  Two months or three months
18    between calls is not irregular.
19              THE COURT:  You just keep saying "two or three
20    months."  Am I wrong about these dates?
21              MR. ASSAAD:  Three months, three months, Your
22    Honor, a little less than three months.  You know, less than
23    three months we find out after the first call that they
24    didn't pick up that the person was deceased, Your Honor.
25    My point is there is no intentional disregard of the Court's
```

1   Order here, Your Honor.  There's no reason that the

2   plaintiffs should be basically sanctioned for involuntary

3   dismissal based on not following a rule, which we think is

4   impossible to follow, and that's why we brought up the

5   Motion to Amend.

6        There's no other court in this country that has

7   ever dismissed a case on a failure to file a suggestion of

8   death under timely.  No court in this country.  The one case

9   that they cite to that has been posed an order of 30 or 60

10  days for suggestion of death, to me that was dicta because

11  if you go look at the cases, they never denied a suggestion

12  of death and even some of them were filed 900 or 900 days

13  after the death of the plaintiff in those cases.

14       THE COURT:  Is there not a loss of consortium

15  claim in *Bellande*?  So you had a live plaintiff the whole

16  time and, of course, under Rule 25, it doesn't have to be

17  counsel.  It can be somebody in the family who files the

18  notice of death, right?

19       MR. ASSAAD:  We're talking about the suggestion of

20  death.  And most of these people that we represent don't

21  understand the Rules of Civil Procedure that they have to

22  notify and file a suggestion of death when their loved one

23  or their father dies or their mother dies.

24       THE COURT:  Right.  But the impossibility argument

25  that you're talking about has less weight when the spouse is

1     alive and is also a plaintiff and would presumably have some

2     interest in -- knows for certain knows that there's a

3     lawsuit going on.

4              MR. ASSAAD:  Is it impossible?  Probably not.  Is

5     it unreasonably an undue burden on plaintiffs' counsel to

6     make sure that their clients are all living and have 90 days

7     to keep on contacting them if they don't pick up the phone?

8     When I call people, and they don't pick up the phone, I

9     don't assume they're dead, Your Honor.

10             And we should not have to assume on January 26,

11    2018, that when we left a message and we don't get a call

12    back, we tried back two and a half months later, that the

13    plaintiff is dead.  That is where the impossibility is to

14    put a burden on the plaintiffs' counsel to figure out that

15    within 90 days of the death of a plaintiff that the person

16    is dead and files a suggestion of death.

17             No court in this country has ever dismissed a case

18    on solely on the grounds of the suggestion of death not

19    being filed timely.  And in the *Novartis* case out of

20    Tennessee, which counsel has cited, every single one of the

21    suggestion of death and motions to substitute were granted

22    even when they're filed almost three years after the death

23    of the decedent.  Dismissing a case under Rule 25 or

24    basically dismissing it under PTO23 is a Rule 31 dismissal,

25    and the Eighth Circuit discourages, highly discourages

 1    dismissals that are not based on the merits.  And the fact

 2    that we were a little bit late or anyone is late in this

 3    case filing a suggestion of death, especially when there's

 4    no prejudice.  These cases are just sitting there --

 5             THE COURT:  All right.  Once again, please, not

 6    "these cases."  In the *Bellande* case, did you not wait more

 7    than two months even after?  So you call on January, you

 8    don't get an answer.  You don't call back until April.  You

 9    find out about the death.  You then wait two months, and so

10    to file the suggestion of death.

11             So even if it's, you know, you maintain that it

12    was impossible, even though you had a live plaintiff living

13    in the same house to know about the death, then is it your

14    position that because that deadline was impossible to meet,

15    that then it didn't matter when you file?  I mean the two

16    months of waiting after you found out is concerning.  I

17    don't understand how that, and you don't talk about that in

18    your *Bellande* papers, I don't think.

19             But the suggestion of death didn't get filed until

20    June 15 of 2018, so we've got two months that go by

21    following the belated learning of the death to file the

22    suggestion of death.

23             MR. ASSAAD:  I'm just trying to get the date of

24    our filing.

25             THE COURT:  Yes, just make sure that's right

1    because I think it's ECF number 6-16-CV-2700.

2         MR. ASSAAD:  We filed on June 15, 2018, Your

3    Honor.

4         THE COURT:  So two months after you finally

5    learned of the passing on April 17th.

6         MR. ASSAAD:  I understand that, Your Honor, and I

7    understand your position.  However, my argument is still

8    this dismissal will be a very harsh sanction for someone

9    that is injured without any prejudice at all to the defense

10   in this case.

11        This client is not a bellwether.  There's no other

12   issues with, I mean there's no hardship to the defendant in

13   this case.  And I think under any type of dismissal, at this

14   point in time, without any prejudice, it just would be

15   unfair, and I think would go against what the Eighth Circuit

16   would consider a harsh sanction for not, you know, not

17   filing something timely two months later, Your Honor.

18        THE COURT:  All right.  *Bellande* is dismissed.

19   The matter was previously discussed at a conference.  An

20   opportunity was given to show why it would have been

21   impossible.  The showing does not demonstrate impossibility.

22   There is the spouse.  There's the existence of PTO23, which

23   is a reason to set up a system to maintain sufficient

24   contact with clients to make sure that they're still alive.

25   The waiting after belated learning even of the death for two

 1    months to file is not reasonable.

 2         The existence of PTO23 is justifiable.  It is a

 3    mechanism that was discussed in great detail before it went

 4    into effect.  Before we had it, defendants were having to go

 5    through what plaintiffs were alive and which ones weren't.

 6    We had 20 or so motions filed by the defendant to dismiss

 7    because of death.

 8         And the tardy filings aren't necessarily, you

 9    know, it doesn't have to be a whole bad faith finding, but

10    there's been a clear Order.  I know that, Mr. Assaad, you've

11    opposed that Order for a long time, but it couldn't be more

12    clear that the Order is in effect, and it's there to make

13    sure that we know that some percentage of these five

14    thousand or so cases to try to keep track of how many of

15    those are cases that have a live plaintiff.  So the *Bellande*

16    case is dismissed.

17         We now have the broader question of whether PTO23

18    should be amended.  And, Mr. Assaad, I think you've made the

19    points in connection, you've made your argument.  Is there

20    anything else you want to say now generally in support of

21    your position that the 90-day deadline per suggestion of

22    death ought to be eliminated?

23         MR. ASSAAD:  Yes, Your Honor.  Rule 25 was amended

24    in 1963, and the advisory committee in the 1963 amendment

25    stated that it was intended the motion to be substituted to

1    be freely given, and it may be denied by the Court with the

2    exercise of sound discretion if made long after death and

3    circumstances arising rendering it unfair to allow

4    substitution.

5          This Court has imposed a deadline based on the

6    request by the defendants in which the plaintiffs did oppose

7    and that we were not allowed to brief on earlier.  It was

8    part of the joint agenda, and we never had the opportunity

9    to brief it.  And, therefore, we briefed it in our Motion to

10    Amend.

11          Now, what we do know is the Federal Rules of Civil

12    Procedure do require 90 days after the suggestion of death,

13    which can be extended by good cause under Rule 6B, and it

14    can be filed by any party.  It doesn't have to be the

15    plaintiff or the defendant.  Now, the Eighth Circuit has

16    said that the power of this Court to dismiss a cause of

17    action with prejudice is not unlimited.  Dismissal with

18    prejudice are drastic and extremely harsh sanctions.  And

19    this is *Bergstrom v. Frascone*, 744 F.3d 571.  A dismissal

20    not on the merits but failure to meet a deadline imposed by

21    the Court is a sanction, and sanctions must be proportionate

22    to a litigant's transgression.

23          The Eighth Circuit has stated that dismissal with

24    prejudice is proper only when there has been a clear record

25    of delay and contentious conduct by the plaintiff.  The

1    Eighth Circuit has also admonished that this sanction should

2    only be used when lesser sanctions prove futile.  Dismissing

3    these cases for the failure of filing a suggestion of death

4    is a sanction on the plaintiff that's not based on any type

5    of merits.

6          No court, as I said before, has ever enforced a

7    deadline to file the suggestion of death.  And defense cited

8    to the *Novartis* case, which is *In Re Aredia and Zometa*

9    *Products Liability litigation.*  They used that case when

10    they argued for the 30 day, when they wanted 30 days, and

11    then they cite it again in the opposition to the Motion to

12    Amend.

13          And from the get-go, the plaintiffs' position is

14    that's just not fair that we have to find out that we have

15    to call our clients in an MDL case when nothing is going on

16    in their case, they filled out the PFS.  We have nothing to

17    tell them.  Nothing has happened in this case in this Court

18    for, you know, since the trial.  Nothing significant that

19    the clients need to know about.  And we send them letters.

20    And, of course, that people do not call us, and they don't

21    answer phone calls, and they don't say we didn't get the

22    letter.

23          So I looked at the *Novartis* case that defendants

24    cited, and it is in the Order but that Order was never

25    enforced.  It was never enforced.  It was basically dicta.

1    And I created a spreadsheet that I would like to give to the

2    Court that has the case numbers, and I did 150 of the 300

3    suggestions of death, and all of them were granted.  All of

4    the motions to substitute were granted even after it was

5    filed after the 60-day deadline because dismissing --

6         THE COURT:  Just a second.  I haven't said I would

7    receive it yet.  I just want to know first what it is.

8         MR. ASSAAD:  It is a list of all the cases in

9    which a court, the Court in that case, the District Court in

10   Tennessee, which had the only order that the defendants

11   could fine imposing a deadline for the suggestion of death

12   of when the person died, when the suggestion of death was

13   filed.

14        THE COURT:  Okay, what's the Tennessee court?

15   What's the Tennessee case?

16        MR. ASSAAD:  It is *In Re Aredia and Zometa*

17   *Products Liability Litigation*.

18        THE COURT:  That is A-r-e-d-i-a.

19        MR. ASSAAD:  Yes, Your Honor.

20        THE COURT:  And Z-o-m-e-t-a.  So what did you do?

21   What is this?  You went through the docket in *Aredia*?

22        MR. ASSAAD:  Yes, I did.  And what I did was

23   60 days just is impossible for people to find out their

24   clients have died at 60 days.

25        THE COURT:  But that was 30 day.

1           MR. ASSAAD:  It was a 30 day, then it changed to

2     60, and I think they changed it later on, but the point is

3     that every single case that the suggestion of death was

4     filed after the deadline was still granted, and the motion

5     to substitute was granted.  And as far out as 921 days after

6     the death of the plaintiff, the Court still granted it

7     because it would be unfair and harsh and would go against

8     the clear law in the Eighth Circuit or any circuit because

9     there are many cases out there to dismiss a case when a case

10    has merit.

11          And that's why we believe the 90-day rule should

12    be changed to something more reasonable.  If they find out

13    that we knew about the death and failed to inform them in a

14    timely manner, that should be the appropriate standard.

15          However, to have set a hard standard to impose on

16    plaintiffs' counsel to determine when someone dies because

17    they might not have answered a phone call and not returned

18    our phone call, which I have a lot of friends that don't

19    return my phone call.  I don't assume that they're dead.

20    That's very harsh, and I think it goes against the great

21    weight of the law in the Eighth Circuit.

22          THE COURT:  Do you have a similar analysis of

23    *Wallace v. Novartis* in Pennsylvania?

24          MR. ASSAAD:  Yes, it was dismissed on Rule 25

25    based on the fact that, if I recall correctly in that case,

 1    the person that they said was the administrator on the

 2    motion to substitute was not really the administrator,

 3    wasn't legally the administrator or the personal

 4    representative of the case.  No case has been dismissed for

 5    failure to file a timely suggestion of death.  Many MDLs go

 6    on in this case, and most of these types of orders are not

 7    in those MDLs.

 8            Number one, there has to be a prejudice to the

 9    defendant.  Nothing is going on in these cases until maybe

10    when they get remanded, and I think the District of

11    Tennessee, one case they dismissed because part of the

12    remand order was you had to submit all of the certificates

13    of like the administrator certificates or whatever they're

14    called in each state to the defense counsel and they failed

15    to do it.  Not one case was dismissed for failure to file

16    suggestion of death because it is unreasonable.

17            These people are real people.  They have cases.

18    And the fact that no one knew that they died or someone

19    didn't contact them in an MDL is unfair, and it goes against

20    what the Eighth Circuit and every other circuit.  Even the

21    Third Circuit case, the *Brown* case, where the suggestion of

22    death -- interesting enough about all of these cases, Your

23    Honor, the knowledge of death, we can know the knowledge,

24    but the 90 day does not trigger until the suggestion of

25    death is filed.

1              THE COURT:  Rule 25.

2              MR. ASSAAD:  Your Honor?

3              THE COURT:  Rule 25 doesn't apply until --

4              MR. ASSAAD:  Yes, even if everyone knows the

5     person is dead.  In the Third Circuit, *Brown versus* -- I'm

6     sorry, I'll pull up the case.  This is a case in which --

7     well, the *McKenna* case, which I cited in my brief.

8              THE COURT:  What's the cite?

9              MR. ASSAAD:  *McKenna v. Pacific Rail*.

10             THE COURT:  So is that not the *Brown* case?

11             MR. ASSAAD:  No, 32 F.3d 820.  And this is a case

12    in which, this is a Third Circuit case in which all the

13    parties knew the person was dead.  On the day of trial,

14    there was no suggestion of death and no motion to

15    substitute, and the District Court dismissed the plaintiff.

16    And the Third Circuit reversed and basically said that until

17    the suggestion of death is filed, which it was very late.

18    It was the day before trial, but that is not grounds to

19    dismiss a meritorious claim.

20             And what 3M is doing here is using Rule 23 as a

21    sword to dismiss meritorious claims because of the failure

22    to file a suggestion of death, which no court in this

23    country has ever dismissed a case on, Your Honor.  And I

24    think there should be a new system that I would like to get

25    together with defense counsel and maybe propose something

1    more reasonable of maybe 30 days from the knowledge of death

2    by plaintiffs' counsel.

3            But to impose, I mean I might have clients that I

4    don't know have died, and there's no way I'm going to find

5    out.  There is no service out there, Westlaw or Lexis, that

6    you can plug in names and find out if a person is alive or

7    dead.  And when we talked about an earlier case that we

8    dismissed about under PTO-14 that both sides tried to find

9    out if the person is dead or not, we heard rumors, but no

10   one could conclude that someone was dead.  It's very hard to

11   do.

12           And we had these motions that just, I think, waste

13   the Court's time on issues that could be resolved later on,

14   and we don't have to sit here and argue did you know or not

15   know?  If we find out, we'll let the defense know.  We'll

16   file a suggestion of death.  If not, the plaintiffs should

17   not be -- their meritorious claims, these injured plaintiffs

18   should not be cases dismissed because I don't think the

19   sanction is proportionate to the failure to file suggestion

20   of death within 90 days.

21           THE COURT:  Okay.  Could you just briefly address

22   the utility of a procedure that sort of minimizes the

23   chances that an MDL is populated with deceased plaintiffs?

24   In terms of the defendants or anybody knowing what the

25   actual number of cases is?

 1            MR. ASSAAD:  Well, we're talking about a small

 2     handful here, Your Honor.  And I think the most important

 3     part of what the MDL process does is it sets up a system for

 4     discovery, and usually if these plaintiffs are dying during

 5     the plaintiff fact sheet process, usually those are

 6     discovered because there's communications with the plaintiff

 7     to get answers and discovery.  So most of these cases are

 8     coming up after the PFS is completed.

 9            And, realistically, Your Honor, it's not a single

10     event case.  Usually I'll have contact with my clients on a

11     single event case.  Cases that I have appeals on, you know,

12     I might not contact the client from the date of filing an

13     appeal to let them know that the appeal is being heard.

14     There's just nothing to talk to the client about.  We don't

15     call our clients.  No one calls their clients to make sure

16     they're alive.

17            THE COURT:  But just in terms of the willful

18     disobedience of the rule that you disagree with, PTO23, to

19     not make a, to not set up some system even if you don't call

20     them personally, to have some regular communication enough

21     to know that they're alive or dead, I mean how, like, what

22     have you done to comply with Rule 23?

23            MR. ASSAAD:  You know, we've sent out, we sent out

24     letters, we send out e-mails to update them about the case.

25     You know, we try to contact our clients, but if they don't

1    pick up the phone, we just can't assume they're dead.  If I

2    picked up the phone of every client --

3            THE COURT:  So we've got this order on the books,

4    so you call, there's no answer and then --

5            MR. ASSAAD:  Well, I don't think we need at this

6    point in time to even dismiss cases of --

7            THE COURT:  I'm just asking what you do and the

8    answer is?

9            MR. ASSAAD:  I have my office send letters.  If we

10   get a bounce-back or something like that, then I'm like,

11   hmm, you know, this is unreturnable.  Let me follow up.  But

12   sometimes, you know, they're living somewhere where they

13   don't bounce back the letters.  The letters don't come back

14   to us.

15           You know, it would be very inefficient to send

16   letters by Fed Ex to get them signed every time I send a

17   letter to my client.  I think that would be an unreasonable

18   burden on the plaintiffs to do.  But I think the real

19   solution here is just what's the harm of letting it go?  I

20   mean so instead of having 4900 cases, we have 4800 cases,

21   and a hundred people that are dead.  If these cases get

22   remanded or there's a resolution, it will be discovered at

23   that time.  It will be discovered at that time.

24           But at this point having these motions and arguing

25   these motions over an Order, which no court has ever

 1    followed, which we're dismissing cases, a meritorious case

 2    on the fact that we didn't file a suggestion of death within

 3    90 days, I don't think that abides by the Eighth Circuit or

 4    any circuit's law on dismissing cases under Rule 41.  And I

 5    do think it's reversible error, Your Honor, under Rule 41

 6    because --

 7           THE COURT:  All right.  Thank you, Mr. Assaad.

 8    Mr. Hulse?

 9           MR. HULSE:  Your Honors, just a couple of things I

10    want to say.  PTO23 is actually working very well.  We've

11    had very few cases that we've had to move to dismiss over

12    the last ten months because of noncompliance, a relatively

13    small subset of them are suggestion of death cases.  Every

14    day we see suggestions of death being filed.  We get

15    reach-outs from plaintiffs' counsel about substitution

16    motions to meet and confer.

17           So the process from our perspective has actually

18    worked quite well, and it's addressed what, from our

19    perspective, was a very serious problem that existed in the

20    MDL, which is that we had an ever growing number, dozens of

21    cases, and that's just what we knew about at the time, of

22    cases where plaintiffs had passed away and nothing had been

23    done.

24           And the reason that we're also surprised about the

25    position that's being taken here is it really is in

 1     everybody's interest to have a system that ensures that

 2     there is regular communication with plaintiffs' counsel,

 3     that deaths are identified, and action is taken.

 4          Many states, many states have very short statutes

 5     of limitation on survival actions, and you have to bring

 6     that survival action on behalf of the deceased plaintiff

 7     within a year.  If there's no contact being had, there's no

 8     discovery of the death, that year can easily lapse.  As it

 9     is, the process that PTO23 puts in place is a six-month

10     process.

11          So our viewpoint is it's working well.  The

12     relatively small number of motions that have had to be filed

13     and taken up by the Court is proof of it.  The very

14     significant number of timely suggestions of death that have

15     been filed is proof of it as well.

16          We don't see this as a widespread problem.  This

17     is just our perspective for plaintiffs' counsel in the MDL.

18     There are other firms that have, including the Brown and

19     Crouppen firm, which has about a quarter of the firms in the

20     MDL.  They've got over 1200 I think, at this point, that has

21     had from our perspective we've seen very little issue in

22     terms of getting suggestions of death on file.

23          Now, I don't know what they do, but it strikes us

24     that probably what's happening is that most plaintiffs'

25     counsel after PTO23 was adopted put into effect some kind of

1    system where they were informing their clients of the

2    obligations under PTO23.  They have information about next

3    of kin through the PFS process where next of kin have to be

4    identified and that there was real and good work being done

5    by many plaintiffs' counsel to ensure compliance, and it's

6    working.  And as a result, we are no longer put in the

7    position of constantly searching obituaries and social

8    security death records to figure out who is alive and who is

9    dead.

10           The one thing I would add the backdrop to PTO23 is

11   that we tried for months to reach an agreement with

12   plaintiffs' counsel on a system where they would be

13   monitoring for deaths and would disclose it to us, and we

14   were not and plaintiffs' liaison counsel simply was not able

15   to get meaningful participation by many of the plaintiffs'

16   firms, and that's why we came to the Court asking for a

17   Court Order.

18           The 90-day deadline is within the range.  In fact,

19   it's longer than some of the deadlines that have been

20   adopted by other courts.  *Aredia and Zometa* did go up to 60

21   days because 30 days, ultimately, the Court concluded that

22   that might be too short, that 60 days was the date, and

23   then, of course, we had the 60 day deadline in *Wallace v.*

24   *Novartis*.  This deadline is well within the Court's

25   authority under Rule 16 to set deadlines in the case.  It's

1    vital in the management of an MDL.

2            The argument that we should treat plaintiffs

3    differently.  We should treat the obligations of

4    communication differently in an MDL where we have five

5    thousand cases I think is exactly the wrong way of

6    approaching it.  The idea this is not a class action.  These

7    are not absent class members.  They are real plaintiffs.

8    They deserve to be in regular contact.  They have the rights

9    of their heirs need to be protected.  And everybody in here,

10   if we're going to talk about how we work through these five

11   thousand cases, we have to know who is alive, who is dead,

12   who the real plaintiffs are, and get substitutions done in a

13   timely manner.

14           So beyond that, unless Your Honors have questions,

15   we stand on our briefs.

16           THE COURT:  Okay.  Thank you, Mr. Hulse.

17           MR. HULSE:  Your Honor, just briefly, we did have

18   another PTO23 motion just with three cases that was noticed

19   for today.  I don't know if the Court is ready to hear it.

20           THE COURT:  Well, first, I was going to see if Mr.

21   Assaad had any response so.

22           MR. HULSE:  Oh, of course.

23           MR. ASSAAD:  Your Honor, I don't disagree that at

24   the end of the day we need to know what cases are in and

25   what cases are out.  I just disagree with the harshness of

1    the penalty by people that don't find out within 90 days

2    that their clients have passed away and not filed a

3    suggestion of death.

4         And a couple of things, the *Wallace* case is also

5    the same thing as the first MDL I discussed In Re Aredia and

6    Zometa.  It just was the case was all remanded, and it was

7    just tried in Pennsylvania.  That's why that came up.  It

8    was the same order.  It wasn't two different courts having

9    two different orders.  The only court that ever ordered the

10   90 days is that one court.

11        THE COURT:  It was 60 days.

12        MR. ASSAAD:  Or 60 days, I'm sorry.  And with

13   respect to the survival action, the SOL, that's not an issue

14   in this case.  These cases already have been filed, so

15   there's no SOL on a motion to substitute.  And, in fact, the

16   advisory committee says it could be filed long after the

17   person's death.  That's all I have, Your Honor.

18        THE COURT:  So with respect to Rule 25 says

19   90 days or a court dismiss.  PTO23, as we have seen, if

20   there is some representation of diligent efforts to reach a

21   client and, you know, an explanation for where you sent

22   this, we tried this, we did this, then that time is

23   extended.

24        I'll take a look at, Mr. Assaad, the new -- well,

25   the arguments that you've made here today, and I'll take a

1    look at the motion.

2             MR. ASSAAD:  Your Honor, I forgot to submit the

3    spreadsheet that I made.

4             THE COURT:  Yeah.

5             MR. ASSAAD:  It might be helpful.

6             THE COURT:  Well, it's your reading of the docket

7    sheet in a separate unrelated MDL for the purpose of showing

8    that this Court would be out of step with the Tennessee

9    court.

10            MR. ASSAAD:  No, it's to show that the Tennessee

11   court did not even follow their own Order, but they did and

12   understood that they're granting orders to substitute well

13   after the death.

14            THE COURT:  Yeah, it seems totally irrelevant, but

15   I'll receive it.

16            Okay.  Mr. Hulse, you had something you were about

17   to say.

18            MR. HULSE:  Your Honor, there was one more PTO23

19   motion with three cases that we had noticed for today.  We

20   can hold it over to next time, if the Court prefers.

21            THE COURT:  Wait a minute.  Let me just see here.

22            MR. HULSE:  The cases are *Williams*, *Kriner* and

23   *O'Conner*.

24            THE COURT:  Yes.  So I've read through, *Williams*

25   is kind of -- *Williams* is sort of a funny one, right?

```
 1              MR. HULSE:  Yes.

 2              THE COURT:  Let me hear from the plaintiffs on

 3     Williams, because that was a -- isn't that the one where

 4     there was this odd motion filed, but it was the wrong motion

 5     that was filed?

 6              MR. HULSE:  That's right, Your Honor.  So I can

 7     let them speak for themselves, Your Honor.  It's Mr. Walker.

 8              THE COURT:  Who has got Williams, 17-CV-264.

 9              MS. ZIMMERMAN:  Mr. Travis Walker, so he's on the

10     telephone.

11              THE COURT:  Oh, right, right.  Mr. Walker?

12              MR. WALKER:  Are you there?  Can you hear me, Your

13     Honor?

14              THE COURT:  Yes.

15              MR. WALKER:  Okay, perfect.  Just with a little

16     bit procedural background, in January of 2017, we filed a

17     Complaint.  On February 7 of 2018, Mr. Williams, Millard

18     Williams passed away.  On May 1 of 2018, we filed a notice

19     of death, so --

20              THE COURT:  Right, a timely notice of -- a timely

21     suggestion of death.

22              MR. WALKER:  Yes, Your Honor.  And so on May 7th,

23     we filed our motion to substitute, which was also timely.

24     On June 4th, 2018, Magistrate Judge Noel declined to enter

25     an Order.  We needed to do a meet and confer, and we agreed
```

1    with that.

2            And then on June 6th, our office was in contact

3    with Ted Hartman, opposing counsel, with the meet and

4    confer.  At that point, we determined that we needed,

5    pursuant to Arkansas law, we needed to do a probate action,

6    and we agreed with that.  As opposed to amending the motion,

7    which was already timely, the motion was withdrawn.

8            And then on July 23, 2018, our office e-mailed

9    Mr. Hartman again asking for additional time to conduct a

10   probate.  Our client is 74 years old.  She's had a stroke.

11   She is in rural Arkansas, so it's difficult for her to get

12   access to the courts.

13           THE COURT:  Right.

14           MR. WALKER:  So we received no response to that

15   July 23, 2018 e-mail.  On September 6th, we re-filed the

16   motion to substitute.  And on September 12th, the response

17   was received in opposition as the proper party was not the

18   executor and does not indicate that -- did not indicate the

19   previous, in their response, they said nothing that

20   obviously the previous motion had been timely.

21           So we filed a response for defendant's opposition

22   motion to substitute on October 11th.  Right now, the client

23   is completely in position to be -- she's got the letters of

24   administration.  She's now the executor of the estate.

25   She's completely in position to be the plaintiff, but for,

1    and we've been doing our due diligence.  We've been

2    constantly in contact trying to work the probate and

3    everything and act expeditiously and really there's no

4    material delay, you know.

5            And, you know, and as you heard dismissal with

6    prejudice, you know, is an extreme sanction, and we cited

7    that in our motion.  You know, and everything is in place

8    now.  You know, the plaintiffs have been properly pointed,

9    and so we've been constantly working the file over, and

10   we're just asking that the Court, you know, considering that

11   the notice of death was timely filed and the defendants were

12   well aware of what was going on, we asked for Ms. Williams

13   to be substituted.

14           THE COURT:  And when you filed on September 6th,

15   you accidentally filed the same thing that you had filed

16   before, correct?

17           MR. WALKER:  Correct, Your Honor.  We have made a

18   mistake.  We filed the same motion and then that's why we

19   filed the amended motion subsequently.

20           THE COURT:  Right.  I looked into this, and I feel

21   your pain.  I see that she was appointed on September 5th,

22   right?

23           MR. WALKER:  Yes.  So she was appointed on

24   September 5th, and we filed the motion to substitute on

25   September 6th.

1          THE COURT:  Right, and you filed the wrong thing,

2     but I, you know, so she's appointed on September 5th.

3     September 6th, you file something.  It's accidentally the

4     wrong thing, and she's all set to go now.  I accept that

5     what you meant to file the day after she was appointed was

6     something having to do with the fact that she just got

7     appointed.  So the motion to dismiss *Williams*, 17-264, is

8     denied.

9          MR. WALKER:  Thank you, Your Honor.

10         THE COURT:  All right.  The speaker is off now.

11    *Kriner*, 16-CV-169.

12         MR. HULSE:  In this case, plaintiffs' counsel

13    filed a letter indicating that they lost contact with

14    anybody, any heirs.  They didn't file an opposition.

15         THE COURT:  And *Kriner* is dismissed.  That once

16    again is 16-CV-169.  Dismissed.

17         *O'Conner,* 17-CV-1317.

18         MR. HULSE:  No opposition filed, Your Honor, and

19    there's been no demonstration of impossibility of

20    compliance.

21         THE COURT:  And *O'Conner* is dismissed.

22         MR. HULSE:  Thank you, Your Honor.

23         THE COURT:  Mr. Hulse, let me ask you, we've now

24    covered every plaintiff who is the subject of a motion today

25    from one of your motions, right?

1          MR. HULSE:  Yes, Your Honor.

2          THE COURT:  Okay.  Thank you for reminding me

3     about that three.  I forgot those three.

4          And we have heard about the Motion to Amend, 23.

5     We've got your 15th motion to dismiss for failure to comply

6     with PTO-14.

7          MR. HULSE:  Right, that was the PFS motion, Your

8     Honor.

9          THE COURT:  Okay, so we did that.  Those are the

10    same cases.  Okay.  We've done it.

11         So, that brings us to bellwethers, pretrial orders

12    and case schedule.  The first matter on the correct joint

13    agenda.

14         There was an objection to the Magistrate Judge's

15    R&R in *Axline*, and there has not yet been a response to

16    that, but because this is the end of October, I took a look

17    at the R&R and the objections anyway.  And I am persuaded

18    that the R&R is correct, and I will adopt that Report and

19    Recommendation.

20         There are two cases remaining in that pool for the

21    bellwether second, and those are *Ramirez* and *Henderson*.

22    Ms. Zimmerman, you're dismissing those; is that right?

23         MS. ZIMMERMAN:  That is not quite right, Your

24    Honor.

25         THE COURT:  Not quite right.  Okay, set me

1    straight.

2              MS. ZIMMERMAN:  So there are more than just two

3    cases left in that bellwether group, but the two that are

4    listed, *Ramirez* and *Henderson*.

5              THE COURT:  Oh, the two of them.

6              MS. ZIMMERMAN:  Two of them, exactly, that's

7    correct, Your Honor.  And I believe that counsel for both of

8    those cases I believe is Brown and Crouppen firm in

9    Missouri, and they have approached counsel for 3M with

10   respect to their intention to dismiss those cases *Ramirez*

11   and *Henderson*.

12             THE COURT:  But we still have more.

13             MS. ZIMMERMAN:  Yes.  And we have, I believe

14   *Partlow* is one that remains.  *Trombley* is another one that

15   remains.  *Arnold* I believe is another that remains.  And I

16   think it was *Axline*.

17             THE COURT:  I'm sorry, Jerry?

18             MR. BLACKWELL:  *Goodpaster*.

19             MS. ZIMMERMAN:  Oh, *Goodpaster* as well.  Thank

20   you, Mr. Blackwell.  So those are the remaining cases from

21   the second bellwether order.  And though there are some

22   other issues that are probably going to overlap given some

23   of the decisions from this Court.  I know, for example, Ohio

24   comes up again, so there's a number of different issues that

25   we may need to get the Court's input on.

 1                    THE COURT:  What do you think, Ms. Zimmerman,

 2     about the idea of supplementing the bellwether pool?

 3                    MS. ZIMMERMAN:  Your Honor, the plaintiffs'

 4     position is that it would be more useful to the Court and

 5     the parties that we would learn more if we really focused

 6     our attention on two issues, and those are really kind of

 7     addressing the post-trial motions in *Gareis*, so that we can

 8     get the evidentiary and other kind of issues sorted out by

 9     the Eighth Circuit.  And then perhaps meeting with Judge

10     Schultz with respect to the bucketizing idea that he

11     suggested.  I don't know if that's a real word, but it's a

12     word now.

13                    THE COURT:  It's going be on your tombstone.

14                    MAGISTRATE SCHULTZ:  I'm going to be bucketized.

15                    MS. ZIMMERMAN:  So just from our perspective, we

16     think that that would be the most productive use of the

17     Court's time and the parties' time.  There's a lot, I guess,

18     if we continue to try the same case, I don't know how much

19     we're going to learn from that, so that would be our

20     position that if we could focus on getting those post-trial

21     motions kind of figured out and see what the Eighth Circuit

22     has to say about them, and chat with the Judge when he's

23     available, we think that that would be the most efficient

24     use of everyone's time.

25                    THE COURT:  Would that still be your view if you

1    didn't get a stay?  If we just waited until the *Gareis*

2    post-trial motions, I could issue an order on those, but in

3    the absence of a stay, would you still think that we don't

4    need to address the bellwether pool right now?  Well, not

5    right now, but are you --

6                MS. ZIMMERMAN:  To repopulate it, whether there's

7    a stay or not?

8                THE COURT:  Right, right.

9                MS. ZIMMERMAN:  I think that some of these issues

10   that I just briefly forecasted, I mean I think of the four

11   remaining cases, we do have another Ohio case.  And so if

12   we're not going to be permitted to amend that Complaint to

13   conform to the Ohio Products Liability --

14               THE COURT:  So now we're down to three.

15               MS. ZIMMERMAN:  Yes, exactly.  I don't know enough

16   about each of those cases as I stand here, so I would be

17   happy to get additional information to provide to the Court

18   what might be gained from those, but I do think that we're

19   going to run into some of the same issues both with respect

20   to amending and choice of law and that sort of thing.

21               THE COURT:  All right.  Thank you.  One more

22   thing, do you have something on Judge Schultz's calendar?

23               MS. ZIMMERMAN:  We don't, but we'd be happy to

24   reach out and make sure that that happens.

25               MAGISTRATE SCHULTZ:  We can do that today.

 1                    THE COURT:  All right.  We're all together now.

 2                    MS. ZIMMERMAN:  Wonderful.  We will make that

 3      contact.

 4                    THE COURT:  Okay, that's great.  Thank you very

 5      much.  Mr. Blackwell?

 6                    MR. BLACKWELL:  Good morning, Your Honors.

 7                    THE COURT:  Good morning.

 8                    MR. BLACKWELL:  First, I wanted one to say that

 9      Ms. Pruitt couldn't be here today.  She had a family

10      vacation that was planned for this time, and I told her her

11      judgment was poor that she decided to be with her family,

12      but she didn't listen to me, Your Honor.

13                    THE COURT:  She didn't go on some meditation

14      retreat at least.

15                    MR. BLACKWELL:  She did not.  She said that's only

16      for strange people who do that on a vacation.

17                    We see good benefit in supplementing the

18      bellwether pool now, as is we spent a great deal of time

19      with respect to the various PTOs that have been put into

20      place and efforts leading toward the bellwether trials that

21      should teach us something.  And thus far, we have tried a

22      long latency case for plaintiff from South Carolina.  And

23      that within this bellwether pool and all the cases we've

24      seen, there ought to be much that can be gleaned and learned

25      from trying some additional cases.

1           THE COURT:  What do you think about the utility of

2      the Court travelling to a different jurisdiction, even one

3      where there hasn't been a *Lexecon* waiver to try a case?  It

4      seems like there are couple of cases that are really

5      sticking in people's craws.  I mean we can go try them in

6      those jurisdictions, I suppose.

7           MR. BLACKWELL:  I think short of even appearing

8      before another sort of population in some other part of the

9      country, there's much to be learned from the cases that are

10     right here before this Court with plaintiffs that have

11     different attributes, different latencies, different ages,

12     different bacteria that are at issue, et cetera.

13          And, obviously, should Your Honor go to some other

14     state to sit and to try a case, in the event, this is just

15     my projection into the future, if that doesn't resolve in

16     the way the plaintiffs will like, well, that wouldn't have

17     taught us anything either, and they will be looking to go to

18     somewhere else to try yet another one.

19          But the reason that it's, the fact is about a

20     quarter of the cases that have been filed in this MDL are

21     direct filed here in Minnesota anyway.  So I think there's a

22     great deal to be learned and to be had.  Having said that,

23     we got one trial out of the first round of bellwethers as

24     Your Honor knows, and here in the second pool of the

25     bellwethers, we're already down four.  And two of the ones

1    Your Honor just mentioned, *Ramirez* and *Henderson*, were two

2    of the three defense picks that were struck by the other

3    plaintiffs.  And those cases they proposed to dismiss at

4    this point when all we've done is collect medical records in

5    those cases, and those are now gone.  And mind you, Your

6    Honor, we did spend over $50,000 collecting medical records

7    in those cases, and it could have been evaluated earlier on

8    without us just wasting the money.

9         But this particular bellwether second pool of

10   cases is likely to substantially dry up too.  There will be

11   some statute of limitations issues in the four cases that

12   remain, and very soon we'll be short of having anything in

13   the second pool also.  I think it's always helpful for us to

14   have something in place so that we know what's going to

15   happen next in the event we set out to try the next case in

16   the MDL.

17        The bucketizing idea we like also for a number of

18   reasons, and it initially rose under the heading of

19   settlement discussions, but even beyond that, it's hard for

20   us to have a discussion about the docket generally until we

21   can first clean it up to some extent, get statute of

22   limitations stuff addressed, no product ID, that sort of,

23   well, junk that's in the docket.  It's a bloated docket.

24        The other thing that I think the bucketizing would

25   help us to do is to put the cases in different categories,

```
1    and that may give us some incites into what might be useful
2    cases to try from different buckets, whether it's here or
3    somewhere else.
4              THE COURT:  All right.  I'm speaking to you both
5    now, is what I am sensing makes sense is that we not do
6    anything about repopulating the bellwether pool until you
7    have a chance to have this meeting that you're going to set
8    up momentarily with the Magistrate Judge?
9              MR. BLACKWELL:  Yes.
10             MS. ZIMMERMAN:  Okay, Your Honor.
11             THE COURT:  Okay, makes sense?
12             MR. BLACKWELL:  Very good.
13             THE COURT:  Okay, good.  The motions to remand are
14   denied.  4,956 cases pending?
15             MS. ZIMMERMAN:  Slightly more than that, Your
16   Honor.  I'm told by the Pritzker firm that as of this
17   morning is 4,969 cases and that does back out those cases
18   that have been dismissed.  Although, it's not been updated
19   based on the Court's Orders this morning.
20             THE COURT:  Yeah, I saw on the daily activity
21   report that they're --
22             MS. ZIMMERMAN:  And one additional piece of
23   information that I asked Wendy Thayer to pull for me, and
24   thank you to her if she is on the phone, was information
25   about how many cases have been filed in the past 90 days.
```

1    And the reason I thought that might be useful to Your Honor

2    and talking with defense counsel, so there have been 216

3    cases that have been filed in the last 90 days.  That's

4    important because pretrial order number 14 really deals with

5    these kinds of issues that continue to come up with respect

6    to is there really a product ID issue, all of that, because

7    pretrial order 14, of course, sets forth how they can

8    challenge that.

9         For all but those 216 cases, they've already had

10   the opportunity to look through the plaintiff fact sheet and

11   to the extent that there are any kind of deficiencies,

12   including with respect to product ID, there would already be

13   a motion brought to this Court to have it dismissed.

14        So to the extent that there are ongoing

15   representations that there are problems with a bloated

16   docket where there's not really proof of product, that's not

17   reflected in the kind of motions that have been brought to

18   the Court.

19        So because in pretrial order 14, any plaintiff has

20   I think it's 90 days to file a fact sheet, and then based on

21   that Order, the defendants then have four weeks to challenge

22   with respect to any kind of core deficiencies, one of which

23   is proof of product.

24        So to the extent that we are through that kind of

25   time period, we do know that there haven't been motions on

1    the vast majority of the cases that are presently pending

2    before the Court.

3              THE COURT:  That's a bucketizing point.

4              MS. ZIMMERMAN:  That is a bucketizing point, yes,

5    Your Honor, but we hadn't had that data point before, so I

6    thought I would share that with the Court.

7              THE COURT:  The related State Court proceedings?

8              MS. ZIMMERMAN:  We do have --

9              THE COURT:  And there's an oral argument scheduled

10   in the Minnesota Court of Appeals in early November.

11             MS. ZIMMERMAN:  Yes, Your Honor, November 7th.

12   And then, of course, based on the Minnesota statute, we will

13   know one way or the other about that appeal on or before

14   February 7th.

15             THE COURT:  Because of the 90 day rule.

16             MS. ZIMMERMAN:  90 days, yes.

17             THE COURT:  And if I didn't say so before, the

18   stay of all bellwether work pending resolution of the *Gareis*

19   motions and the *Gareis* appeal, that motion is denied.

20             Let me ask my courtroom deputy if there's anything

21   else we need to cover?

22             (Off the record discussion between Court and

23   clerk.)

24             THE COURT:  I think we've covered everything.

25             MS. ZIMMERMAN:  I think we have too.

 1                    THE COURT:  Anybody else on the plaintiffs' table?

 2                    MS. CONLIN:  No, Your Honor.

 3                    MR. ASSAAD:  No, Your Honor.

 4                    THE COURT:  And, Mr. Blackwell, anything from your

 5      table?

 6                    MR. BLACKWELL:  One thing, Your Honor.

 7                    Again, just to clarify with respect to the

 8      bellwether second that we know what's going to wait

 9      bucketizing conference, which may be a series of meetings.

10      With respect to those four bellwethers, is it the Court's

11      wish that we hold off on working those up?

12                    THE COURT:  No, no, no.

13                    MR. BLACKWELL:  We can move forward?

14                    THE COURT:  Move forward on them.

15                    MR. BLACKWELL:  All right, so that's one.  Thank

16      you, Your Honor.

17                    The second is with respect to *Ramirez* and

18      *Henderson*, and we get they propose to dismiss those, but it

19      was just based on the basis of just the medical records

20      cases that were a year old, and we did have to spend over 50

21      grand collecting those records, and we think that's -- we

22      had a discussion with Your Honor before we came and asked

23      for costs, and I remember the words, "you know, Mr.

24      Blackwell, you have won," and I stopped talking and moved

25      on.  We may like to --

```
 1              THE COURT:  Not on this.

 2              MR. BLACKWELL:  Not on this, that's correct.  It

 3      was on some other issue.  And which I --

 4              THE COURT:  You're excessively broadening your

 5      words.

 6              MR. BLACKWELL:  I'm trying not to carry over, but

 7      we may want to kind of at least raise or be able to kind of

 8      brief the issue of costs incurred in a case that's a year

 9      old that is dismissed this late when we had to incur $50,000

10      in collecting medical records, when there was no other

11      discovery done other than collecting medical records, that

12      it was then dismissed.

13              THE COURT:  I think the plaintiffs are listening

14      to you.  I think they heard it.

15              MR. BLACKWELL:  I'm sorry, Your Honor?

16              THE COURT:  I think the plaintiffs heard what you

17      just said.

18              MR. BLACKWELL:  Right, right.  All right, I'll

19      leave it at that, Your Honor.  So we'll brief it, raise it,

20      and whether it be with presumably Your Honor or Judge

21      Schultz.

22              THE COURT:  Seems like it.

23              MR. BLACKWELL:  All right.  Thank you, Your

24      Honors.

25              THE COURT:  Okay.  What about the silent portion
```

1     of the defense table?  Anything?  No?

2                 MS. YOUNG:  No, Your Honor.

3                 MS. AHMANN:  No, Your Honor.

4                 THE COURT:  No, no, no.

5                 MR. BLACKWELL:  The longer we stay, about a

6     scheduling order with respect to the four bellwether second

7     cases, would Your Honor like for us to propose we did

8     propose something but I think we should revisit that and

9     perhaps confer with the plaintiffs.

10                THE COURT:  We've got an alternate trial date,

11    don't we?

12                MR. BLACKWELL:  Yes, for mid-May.

13                THE COURT:  And that's what you want to talk

14    about?

15                MR. BLACKWELL:  Yes, and putting the schedule in

16    place that works backward from there, Your Honor.

17                MS. ZIMMERMAN:  We're happy to confer.

18                THE COURT:  I think that's best.  I think I'd only

19    get in the way if I tried to do it right here right now

20    without the opportunity for you to discuss it and for you to

21    talk to the Magistrate Judge.

22                MR. BLACKWELL:  Yes.

23                THE COURT:  Okay.  We are in recess.  Thank you

24    very much.

25                     (Court adjourned at 11:38 a.m.)

1

2

3

4                                    *       *       *

5                            REPORTER'S CERTIFICATE

6

7            I, Maria V. Weinbeck, certify that the foregoing is

8     a correct transcript from the record of proceedings in the

9     above-entitled matter.

10

11                   Certified by:   *s/ Maria V. Weinbeck*

12                                   Maria V. Weinbeck, RMR-FCRR

13

14

15

16

17

18

19

20

21

22

23

24

25