EXHIBIT 39

Page 1

1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MINNESOTA
2    -------------------------------------------------
3    In Re:
4    Bair Hugger Forced Air Warming
     Products Liability Litigation
5
     This Document Relates To:
6
     All Actions                           MDL No.
7                                          15-2666 (JNE/FLM)
8    -------------------------------------------------
9
                    VIDEOTAPED DEPOSITION
10
                             OF
11
                    CHRISTOPHER NACHTSHEIM
12
                    Minneapolis, Minnesota
13
                  Tuesday, November 29, 2016
14
15   -------------------------------------------------
16
17
18
19
20
21
22
23
24   Reported by:
     Amy L. Larson, RPR
25   Job No. 113495

Page 326

NACHTSHEIM

the question.
    THE WITNESS: That would be the next best alternative.
BY MR. SACCHET:
Q. Why is that?
A. Here what we're doing with the -- with the randomized -- with a clinical trial is that we're going to actually put both -- both types of blankets in practice and we can look at -- look directly at infection rates that result from the two different conditions, and that's the -- that's the clinical study. If you're looking at -- if you want to know about infections, I think you're limited to looking at observational studies such as -- such as the one that we report on.
    We did -- we did experimental studies on bubbles, but we can't do experimental studies on infections without -- without resorting to a clinical trial of some kind.
    So I think that, yeah, I think you probably -- if you want to look at infections, I think you're -- I think you're

Page 327

NACHTSHEIM

probably limited to observational data.
Q. Isn't it true that a well-designed observational study can render results extremely similar to a properly conducted randomized trial --
    MS. GARCIA: Object --
BY MR. SACCHET:
Q. -- on the same subject matter?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I think that can happen, but I don't believe that the level of proof reaches the same -- I don't think that the proof reaches the same level of rigor. There's just always that chance in observational studies that -- I mean, I think there's a greater chance that something -- a confounding factor might be present, something you just hadn't thought of.
BY MR. SACCHET:
Q. But it is possible that if statistical significance is found based on observational data, that that significance may be replicated in a randomized control trial?

Page 328

NACHTSHEIM

A. Yes.
Q. So the observational data that is presented in the McGovern study is certainly valuable, is it not?
    MS. GARCIA: Object to the form of the question.
    THE WITNESS: I think it's valuable.
BY MR. SACCHET:
Q. That's why you published the observational data, correct?
A. Yes.
Q. You were previously asked about potentially confounding factors with respect to the observational data that was presented in the McGovern study, correct?
A. Correct.
Q. And some of those potentially confounding factors dealt with infection control measures, correct?
A. Correct.
Q. If we could turn to page 1540 of Exhibit 4, the McGovern study.
A. (Complies.)

Page 329

NACHTSHEIM

Q. I want to make sure that we are on the same page with respect to the change that occurred as to the antibiotic regime. Would you agree that an antibiotic called Gentamycin was applied during the forced-air warming period from July 1st, 2008, to the end of February 2009? It's about halfway down the paragraph.
A. I see it. From July 2008 to February 2009 a single dose of Gentamicin 4.5 was given at -- at induction.
Q. Whereas, a combination of Gentamycin and Teicoplanin -- and I'd be surprised if any of us know how to pronounce it, but that's how I'm going to say it -- was applied during the end of the forced-air warming period and throughout the entire conductive fabric warming period, which would namely be March 1st, 2009, until January 2011, correct?
    MS. GARCIA: Can you please point to where you're reading from?
    MR. SACCHET: So I am interpreting what's said in this paragraph and based on what's presented in Figure 7 so --
    MS. GARCIA: Okay. Then I'll

Page 330

1  NACHTSHEIM
2  object to the form of the question.
3      THE WITNESS: I -- I read this --
4      MR. SACCHET: I can walk through
5  it slower.
6      THE WITNESS: Well, I read this to
7  say that in March 2009 there was a change to
8  the combination of the two drugs you've
9  pronounced, and I don't believe there were
10 any changes until the end of the study.
11     MR. SACCHET: Okay.
12 BY MR. SACCHET:
13 Q. So -- so we're clear, there was a period in
14    which Gentamycin was applied to some
15    forced-air warming patients, and then the
16    antibiotic changed to a combination of
17    Gentamycin and Teicoplanin that applied to
18    some forced-air warming patients and all of
19    the conductive fabric warming patients,
20    correct?
21 A. Correct.
22 Q. Assuming the change in antibiotic did not
23    affect infection rates between warming
24    devices, would you still consider the
25    antibiotic a confounding variable?

Page 331

1  NACHTSHEIM
2      MS. GARCIA: Object to the form of
3  the question.
4      THE WITNESS: I'm going to assume
5  that it has -- the change had no effect?
6  BY MR. SACCHET:
7  Q. Yeah, assume that the antibiotic had no
8     effect on the infection rate. Would it still
9     be a confounding variable?
10     MS. GARCIA: Object to the form of
11 the question.
12     THE WITNESS: I don't think it
13 would be -- I don't think it would be
14 considered a confounding variable. I'm
15 trying to think of how else it might have an
16 impact, if it's not having an effect. I
17 guess it -- no, I don't think it would be,
18 yeah.
19 BY MR. SACCHET:
20 Q. One way that we could control for the -- let
21    me strike that.
22     In order to determine whether the
23 antibiotic had an effect on infection rates,
24 we could control for the warming device --
25 A. Yes.

Page 332

1  NACHTSHEIM
2  Q. -- and evaluate whether infection rates
3     between the changed antibiotic stayed the
4     same or went up or down --
5  A. Correct.
6  Q. -- with that control device, correct?
7  A. (Nods head.)
8      MS. GARCIA: I'm going to object
9  to the form of the question.
10 BY MR. SACCHET:
11 Q. Did you understand it?
12 A. Yes.
13 Q. If infection rates between the two groups
14    were similar, that would tend to show that
15    the antibiotic was not a confounding factor?
16 A. Correct.
17     MS. GARCIA: Object to the form of
18 the question.
19 BY MR. SACCHET:
20 Q. Assume that Mr. Albrecht, who you previously
21    mentioned was an expert in statistics and you
22    had full confidence in his ability to analyze
23    data presented in this article, informed you
24    that he found a 2.8 percent infection rate in
25    those who received Gentamycin, a single drug,

Page 333

1  NACHTSHEIM
2  but 3.1 percent of patients who received the
3  combination of antibiotics, but also
4  forced-air warming patients, with a nearly
5  identical infection rate, would you determine
6  that the antibiotic was a confounding factor?
7      MS. GARCIA: Object to the form of
8  the question.
9      THE WITNESS: That would be strong
10 evidence that it was not a confounding
11 factor.
12     MR. SACCHET: Let's mark this.
13     (Whereupon, Exhibit 27 was
14     marked for identification.)
15 BY MR. SACCHET:
16 Q. So just to be clear, if we look at this table
17    that's presented here, we can see in the
18    first line it presents antibiotic protocol 1
19    versus 2 for FAW, does it not?
20 A. It does.
21 Q. Assume that protocol 1 is the singular
22    antibiotic, i.e. Gentamycin, and that
23    protocol 2 is the combination of Gentamycin
24    and Teicoplanin.
25 A. Uh-huh. Yes.

Page 334

1  NACHTSHEIM
2  Q. In this particular analysis, forced-air
3     warming is held constant, correct?
4  A. Correct.
5  Q. And for forced air, protocol 1, the percent
6     of patients developing infection was 2.8?
7  A. Correct.
8  Q. And for forced air, protocol 2, involving
9     patients who received both Gentamycin and
10    Teicoplanin, the infection rate was 3.1,
11    correct?
12 A. Correct.
13 Q. And the p-value was 0.839, correct?
14 A. That's what's reported here.
15 Q. That's what's reported here. We could
16    conclude, based on this data set of these
17    numbers, that when the patient-warming device
18    is held constant, that the change in
19    antibiotic had no effect on infection rates,
20    correct?
21        MS. GARCIA: Object to the form of
22    the question.
23        THE WITNESS: Assuming there's
24    sufficient power in those sample sizes,
25    although they look fairly large to me, yes.

Page 335

1  NACHTSHEIM
2  BY MR. SACCHET:
3  Q. The patient population for forced-air
4     protocol 1 was 389 patients, correct?
5  A. Correct.
6  Q. And the patient population for those
7     receiving the combination was 678, correct?
8  A. Correct.
9  Q. Those are fairly large patient populations,
10    correct?
11 A. Correct.
12        MS. GARCIA: Object to the form of
13    the question.
14 BY MR. SACCHET:
15 Q. Another way to determine whether the
16    antibiotic was a confounding variable would
17    be to control the antibiotic, but evaluate
18    different infection rates between different
19    forced-air -- or different warming devices,
20    correct?
21 A. Yes.
22        MS. GARCIA: Object to the form of
23    that question also.
24 BY MR. SACCHET:
25 Q. And if the infection rates were still higher

Page 336

1  NACHTSHEIM
2     among those who received forced-air warming
3     compared to those who received conductive
4     fabric warming, that would tend to show the
5     antibiotic did not substantially affect
6     infection rates, correct?
7  A. Correct.
8         MS. GARCIA: Object to the form of
9     the question.
10 BY MR. SACCHET:
11 Q. And if that's true, the change in antibiotic
12    would also not be a confounding factor,
13    correct?
14 A. Correct.
15        MS. GARCIA: Object to the form of
16    the question.
17 BY MR. SACCHET:
18 Q. If I could --
19        MR. SACCHET: Could I ask your
20    basis for the objection?
21        MS. GARCIA: I'm sorry?
22        MR. SACCHET: Could I ask your
23    basis for the objection on form?
24        MS. GARCIA: Yes. You keep using
25    the word, "determine," and you keep using the

Page 337

1  NACHTSHEIM
2     word, "show," and you keep using the word,
3     "establish," and I'm objecting to the form of
4     the question based on those terms.
5         MR. SACCHET: That's not going to
6     pass muster in the court.
7  BY MR. SACCHET:
8  Q. As to the hypothetical I just presented, if
9     you could turn your attention to the second
10    line of the table.
11        MS. GARCIA: I'm sorry, to just be
12    complete with my form objection, it's also an
13    incomplete hypothetical.
14        MR. SACCHET: Fair enough.
15 BY MR. SACCHET:
16 Q. Antibiotic protocol 2 involved a combination
17    have Gentamycin and Teicoplanin, correct?
18        MS. GARCIA: Object to
19    foundation --
20 BY MR. SACCHET:
21 Q. -- for the sake of --
22 A. Yes.
23        MS. GARCIA: Excuse me. Object to
24    foundation for that.
25 BY MR. SACCHET:

```
                                                Page 338
 1                    NACHTSHEIM
 2   Q.  And the data here shows that 3.1 percent of
 3       patients who received forced-air warming in
 4       the combination antibiotic developed joint
 5       infections, correct?
 6   A.  Correct.
 7   Q.  Whereas, .9 percent of patients who received
 8       conductive fabric warming and the combination
 9       of antibiotics developed joint infections,
10       correct?
11   A.  Correct.
12   Q.  By holding the antibiotic constant and
13       discontinuing the use of forced-air warming,
14       that resulted in a 71 percent decrease in
15       joint infections, did it not?
16           MS. GARCIA:  Object to the form of
17       the question.
18           THE WITNESS:  Yes, it did.
19   BY MR. SACCHET:
20   Q.  That essentially matches the 73 percent
21       decrease in infections that was noted in the
22       McGovern article itself, does it not?
23   A.  Correct.
24           MS. GARCIA:  Object to the form of
25       the question.
```

```
                                                Page 339
 1                    NACHTSHEIM
 2   BY MR. SACCHET:
 3   Q.  And based on the p-value of .0008, which is
 4       far less than .05, you would determine that
 5       difference to be statistically significant,
 6       would you not?
 7   A.  I would.
 8   Q.  So whether we control for the device or
 9       control for the antibiotic, based on this
10       data set in Exhibit 27, would you determine
11       that the antibiotic was not a confounding
12       factor?
13           MS. GARCIA:  Object to the form of
14       the question, it's a lack of foundation, it's
15       an incomplete hypothetical.
16           THE WITNESS:  This data certainly
17       supports that hypothesis.
18   BY MR. SACCHET:
19   Q.  And if it were not a confounding factor,
20       would there be any reason to deselect
21       patients from the population of 1,437
22       accounted for in the McGovern study in order
23       to exclude those who received a single
24       antibiotic?
25   A.  No.
```

```
                                                Page 340
 1                    NACHTSHEIM
 2           MS. GARCIA:  Object to the form of
 3       the question.
 4   BY MR. SACCHET:
 5   Q.  And if we were to do that and reduce the
 6       population, let's say, from the 1,473, or 37,
 7       I've forgotten which number it is, down to a
 8       number of let's say 500 patients, there could
 9       be concern about the powering of that
10       population?
11   A.  There could.  There could be.
12   Q.  Another confounding factor that was discussed
13       this afternoon was a change in the
14       thromboprophylaxis protocol, correct?
15   A.  Yes.  Can -- can you just remind me where
16       that --
17   Q.  Yeah, if we could turn to page 1540.
18   A.  (Complies.)
19   Q.  If you look at the bottom of the first full
20       paragraph in the left-hand column, it states
21       the thromboprophylaxis regimen from
22       July 2008 to the end of July 2009 was
23       Tinzaparin.
24   A.  Uh-huh.
25   Q.  Then it says from August 2009 to February
```

```
                                                Page 341
 1                    NACHTSHEIM
 2       2010, Rivaroxaban, which I'll represent is
 3       otherwise known as Xarelto, was provided from
 4       day one, but in February 2010 to the end of
 5       this study, patients were reverted to
 6       Tinzaparin, correct?
 7   A.  Yes.
 8   Q.  Assuming the change in the prophylaxis did
 9       not affect infection rates during the time of
10       this study, i.e., Exhibit 4, would you still
11       consider it a confounding variable?
12   A.  No.
13           MS. GARCIA:  Object to the form of
14       the question.
15           (Whereupon, Exhibit 28 was
16       marked for identification.)
17           MS. GARCIA:  What number are we
18   on?
19           MR. SACCHET:  Twenty-eight, I
20   believe.
21           THE COURT REPORTER:  Correct.
22           MS. GARCIA:  Thank you.
23   BY MR. SACCHET:
24   Q.  Have you seen this document before,
25       Professor?
```

Page 342

NACHTSHEIM

A. No, I have not.
Q. Was this document produced with the set of documents that you provided to 3M in response to the subpoena?
A. No.
Q. Does the bottom right-hand label of this document bear a Bates number of Nachtsheim --
A. It does.
Q. -- space 0000451?
A. It must have been attached to one of my e-mails. I -- I -- I don't remember seeing the document.
Q. Since you don't remember receiving or reading the document, let's go through it.
A. Okay.
Q. If you'd turn to the second page of text that bears the heading, "Introduction"; do you see that?
A. I do.
Q. Do you see the last paragraph at the bottom of that page?
A. "This multicenter study"?
Q. Correct. I'll read it out loud and you just confirm that we're on the same page. "This

Page 343

NACHTSHEIM

multicenter study based on prospectively collected national data aims to evaluate the surgically relevant complications of using either Rivaroxaban, or LMWH," which I'll represent means low molecular weight heparins, "as thromboprophylaxis, including wound complications, readmission and return to theater for deep infection, in addition to the incidents of major bleeds and EVT," correct?
A. Correct.
Q. Based on that statement, do you agree that at least two or three outcomes were measured, one being wound complications, another being return to theater for deep infection, and another being major bleeds?
A. I agree.
        MS. GARCIA: I object to lack of foundation.
BY MR. SACCHET:
Q. If you could turn to the next page under, "Methods," in the third paragraph it states, "The primary outcome measure was wound complications," parens, "Including hematoma,

Page 344

NACHTSHEIM

superficial wound infection and deep infection requiring return to theater, RTT, within 30 days of procedure"; do you see that?
A. I do.
Q. And you see the designation that RTT involves a deep infection requiring a return to theater, correct?
A. Correct.
Q. Which is one of the independent variables that was mentioned in the prior paragraph that we read, correct?
        MS. GARCIA: Object to the form of the question.
        THE WITNESS: Correct. I think dependent variables.
        MR. SACCHET: Okay. Noted.
BY MR. SACCHET:
Q. If we can now turn to the next page under, "Results," do you see that heading?
A. Yes, 456.
Q. It says, "During the study period, 2,762 patients received Rivaroxaban, and 10,361 received LMWH. Patient demographics are

Page 345

NACHTSHEIM

shown in table 1. There were significantly fewer wound complications in the LMWH group," parens, "2.81 percent versus 2.85 percent, OR equals .72, 95 percent confidence intervals between 0.58 to 0.90 with a p-value of .005. However, rates of RTT for infected wound washout were not significantly different." Do you see that?
A. I do.
Q. Assuming the truth of this study in what we just read, would you agree that Rivaroxaban, otherwise known as Xarelto, increased wound complications compared to low weight molecular heparins like Tinzaparin?
        MS. GARCIA: Object to the form of the question, to an incomplete hypothetical and to a lack of foundation for this witness to opine about the meaning of this article.
        THE WITNESS: It says there were significantly fewer wound complications in the LMH -- LMWH group. Is that what you're referring to?
BY MR. SACCHET:
Q. That's what I'm referring to. And the

Page 346

1  NACHTSHEIM
2  p-value was a statistically significant
3  value, correct?
4  A. Yes, correct.
5  Q. So there were fewer wound complications as a
6  result of the use of a low weight molecular
7  heparin --
8  A. Correct.
9  Q. -- compared to Rivaroxaban, correct?
10 A. Yeah, correct.
11       MS. GARCIA: Object to the form of
12 the question.
13 BY MR. SACCHET:
14 Q. However, the study notes that rates for RTT,
15 which we established to be a return to
16 theater for --
17 A. Uh-huh.
18 Q. -- infections, were not significantly
19 different; do you see that?
20 A. Correct. Yes, I do.
21 Q. Assuming the truth -- well, let me back up.
22       Would you also agree that the
23 McGovern study, Exhibit --
24       MS. GARCIA: Four.
25 BY MR. SACCHET:

Page 347

1  NACHTSHEIM
2  Q. -- 4, evaluated joint infections?
3  A. Yes.
4  Q. It did not evaluate wound complications, did
5  it?
6  A. Correct, it did not.
7  Q. Assuming the truth of this study, would you
8  ultimately agree that the change in protocol
9  from Tinzaparin, which is an LMWH, to
10 Xarelto, otherwise known as Rivaroxaban, and
11 then back to Tinzaparin, did not
12 significantly affect the infection rate?
13       MS. GARCIA: Object to the form of
14 the question, to lack of foundation, and it's
15 an incomplete hypothetical.
16       THE WITNESS: Assuming the study
17 was carefully done and generalizable, yes.
18 BY MR. SACCHET:
19 Q. And assuming the study was well done and
20 generalizable, would you agree that the
21 change in thromboprophylaxis noted in the
22 McGovern study, Exhibit 4, did not confound
23 the infection rates?
24       MS. GARCIA: Object to the form of
25 the question.

Page 348

1  NACHTSHEIM
2       THE WITNESS: Assuming -- yes.
3  BY MR. SACCHET:
4  Q. And would you also conclude that, assuming
5  the truth of this study, it would be improper
6  to deselect all of the patients who received
7  Xarelto, otherwise known as Rivaroxaban, from
8  the patient population if the
9  thromboprophylaxis was not a confounding
10 variable?
11       MS. GARCIA: Object to the form of
12 the question.
13       THE WITNESS: It doesn't seem
14 justified in -- on the basis of these
15 results.
16 BY MR. SACCHET:
17 Q. And, in fact, when the coauthors of the
18 McGovern study were in the process of
19 publication, are you aware that at numerous
20 times they sought to collect additional data
21 in support of the study?
22 A. I was not aware of that. I knew that -- I
23 knew that they sought to run this study out
24 in time.
25 Q. Are you aware that when Mr. Albrecht and

Page 349

1  NACHTSHEIM
2  Dr. Reed collected additional data that went
3  beyond January 2011 in the conductive fabric
4  warming population, that the data still
5  showed a significant decrease in infections
6  when conductive fabric warming was used?
7  A. I'm aware of that.
8  Q. Assuming that --
9        MS. GARCIA: Can we take a break
10 shortly?
11       MR. SACCHET: Yeah, give me two
12 minutes.
13 BY MR. SACCHET:
14 Q. Assuming that neither the antibiotic nor the
15 thromboprophylaxis protocol required control
16 because they were not confounding factors as
17 we discussed, you would be confident in the
18 results of the observational study presented
19 in the McGovern data?
20       MS. GARCIA: Object to the form of
21 the question.
22       THE WITNESS: I'm confident that
23 those weren't confounding factors, that those
24 studies are well done. It doesn't rule out
25 the potential for other confounding factors.