```
 1                    UNITED STATES DISTRICT COURT

 2                       DISTRICT OF MINNESOTA

 3     ------------------------------------------------------------
                                    )
 4                                  )
          In Re: Bair Hugger Forced Air   )   File No. 15-MD-2666
 5        Warming Devices Products    )   (JNE/FLN)
          Liability Litigation        )
 6                                  )   January 24, 2019
                                    )   Minneapolis, Minnesota
 7                                  )   Courtroom 9E
                                    )   10:00 a.m.
 8                                  )
                                    )
 9     ------------------------------------------------------------

10

               THE HONORABLE DAVID T. SCHULTZ
11             UNITED STATES MAGISTRATE JUDGE

12                     (MOTIONS HEARING)

13     APPEARANCES

14     FOR THE PLAINTIFFS:
                                    MESHBESHER & SPENCE
15                                  Genevieve M. Zimmerman
                                    1616 Park Avenue
16                                  Minneapolis, MN  55404

17     FOR THE DEFENDANTS 3M:
                                    BLACKWELL BURKE P.A.
18                                  Mary Young
                                    431 South Seventh Street
19                                  Suite 2500
                                    Minneapolis, MN  55415
20
       Court Reporter:              MARIA V. WEINBECK, RMR-FCRR
21                                  1005 U.S. Courthouse
                                    300 South Fourth Street
22                                  Minneapolis, Minnesota 55415

23
               Proceedings recorded by mechanical stenography;
24     transcript produced by computer.

25              *     *     *     *     *     *
```

```
 1                     P R O C E E D I N G S

 2                       (10:02 a.m.)

 3               THE COURT:  Good morning, everyone.  Please be

 4      seated.

 5               All right.  Good morning.  We're on the record in

 6      the matter of In Re Bair Hugger Forced Air Warming Devices

 7      Products Liability Litigation, MDL number 15-2666.  Counsel

 8      for the plaintiff, if you would note your appearance for the

 9      record, please.

10               MS. ZIMMERMAN:  Good morning, Your Honor.

11      Genevieve Zimmerman for the plaintiffs.

12               THE COURT:  Good morning, Ms. Zimmerman.  And for

13      the defendant?

14               MS. YOUNG:  Good morning, Your Honor.  Mary Young

15      for the defendant.

16               THE COURT:  Good morning, Ms. Young.  All right.

17      I have read everything that's been submitted.  I'm familiar

18      with the issues so just keep that in mind.  Before we start,

19      I just want to let you both know not related to this motion,

20      obviously, I have a draft of the completed categorization

21      order that I will hope to circulate if not today then

22      tomorrow for further comments by everyone, so just a

23      housekeeping matter.

24               Okay, Ms. Zimmerman, if you want to proceed.

25               MS. ZIMMERMAN:  Thank you, Your Honor.
```

1          Good morning, and may it please the Court.  We're

2     here today on Plaintiffs' Motion to Compel Supplemental

3     Discovery Responses pursuant to Rule 26(e).  And as the

4     Court is aware, Rule 26 requires that parties who have made

5     disclosures have to supplement those disclosures to the

6     extent that they learned that they are either incomplete or

7     incorrect, if that information has not been made available

8     or known to the other party during the course of discovery.

9     And that's not particularly controversial.

10          Frequently, we're in front of this Court even on

11     this case about plaintiffs' obligations with respect to

12     updating plaintiff fact sheets, for example.  Certainly, as

13     we approach trials, there are additional medical records and

14     other kind of details that are learned about in a particular

15     case but that obligation is not unilateral.  It is not only

16     upon the plaintiffs to provide supplemental discovery

17     responses to the extent that plaintiffs learn that there are

18     either incompletions or inaccuracies in the productions that

19     have been made up to the point with respect to previous

20     discovery answers.

21          And to set the stage just a little bit, and this

22     is one of the reasons that the motion that we filed with the

23     Court includes a great many documents that the Court may or

24     may not have had a chance to read.  I appreciate it's a

25     voluminous submission, but as a reminder about what this is,

1    we are not here in a single event case where there would

2    still be a duty to supplement on both sides.

3           But we are here, of course, with respect to an MDL

4    that involves right now over 5,000 cases.  And the

5    defendants make a number of points during their responsive

6    motion opposing or responsive papers opposing this motion

7    saying, of course, general causation discovery was

8    bifurcated and that that closed back in 2017, just about two

9    years ago.  But as of March of 2017 there were only 1580

10   cases in this MDL and right now, of course, there are more

11   than 5,000.  The plaintiffs that have filed their cases

12   since the time of the general causation discovery cut-off

13   did not consent to an abrogation of the Federal Rules of

14   Civil Procedure.

15          And so the other thing I think that is

16   particularly important as we talk about kind of what is

17   happening in this case is really to think about what's going

18   to happen later today.  Today the defendants are going to

19   bring a motion for reconsideration of Daubert on general

20   causation based on new information, and yet at the same time

21   they walk into this Court, and they say that they don't have

22   a duty to supplement discovery.  That cannot be the rule.

23   That's not the way the Federal Rules operate.  That is not

24   the way it ought to operate.

25          But I will say that over the course of the past

1    several years, it's clear that the defendants will not, will

2    not supplement their discovery productions voluntarily

3    because they think that this Court is not going to make

4    them.  That's ultimately what they think is going on here.

5            So we cite a number of cases in our papers, and I

6    will say that with respect to I mean, for example, excluding

7    and this is in the *Iweala v. Operational Tech Services* case,

8    which is out of the District of Columbia in 2010.  The Court

9    there properly finds that excluding documents from

10   production that are created after the close of discovery

11   from a duty to supplement would encourage parties to wait

12   until after discovery has closed to create documents

13   containing potentially damaging information.

14           That's a policy that we don't want to encourage,

15   and it's particularly important for a lot of different folks

16   that may or may not have cases pending that are going to be

17   governed by Minnesota law.  And we've had choice of law

18   briefing on a couple of different cases, but there are a

19   number of different plaintiffs here who have claims that we

20   believe are going to be governed by Minnesota law.

21           Now, why does that matter?  Well, under Minnesota

22   law and, specifically, the case is, I believe, *Stryker v.*

23   *Mack, Mack v. Stryker Corporation,* I'm sorry.  It's 748 F.3d

24   845.  That's out of the Eighth Circuit in 2014.  And the

25   Eighth Circuit notes that defendants have a duty to test and

1    investigate their products based upon the foreseeable risk

2    of harm to potential users in the light of current medical

3    knowledge and discoveries.  Further, the Eighth Circuit says

4    manufacturers are held to the skill of an expert in the

5    field that their products enter, and they are obligated to

6    keep informed of medical knowledge and discoveries in that

7    field.

8            Why does that matter?  Well, Judge, it matters

9    because we know that competitors, and I would point the

10   Court to document, and I will say that I don't think that

11   this was actually an exhibit, but I'm happy to provide a

12   copy to the Court, Bates document number 3MBH00932516.  It's

13   a document from a competitor from 1993.  The competitor is

14   Gaymar Industries, and it's important because they use their

15   forced air warming technology in connection with the Bair

16   Hugger blanket.  And what do they say under caution?  They

17   say convective air flow can cause airborne contamination to

18   open wounds if they're not covered.  This has been a

19   warnings case.  Now that information has not been presented

20   to a trier of fact yet, but it is a warnings case.

21           Likewise, the actual product that was manufactured

22   by Augustine Medical, there's a, if the Court has seen it,

23   there's a disposable blanket and there's essentially like a

24   cardboard fitting as between the hose and the cardboard

25   blanket.  In the early 1990's, Augustine Medical says right

1    on this and, again, this is Bates number 3MBH00500237.  And

2    it says, "Do not use the 200 series warming units in the OR.

3    Thermal injury and airborne contamination may result."

4         Likewise, we know from evidence introduced and

5    part of the motion today, a competitor in the forced air

6    warming industry right now, Stryker, they developed and

7    market the Mistral, they warn about airborne contamination.

8    All of that matters because there is an obligation to do

9    testing and to provide warnings to the doctors and the

10   ultimate users, the patients as well, but these documents

11   have not been produced to us.  And up to this point, the

12   defendants continue to deny that this is knowledge that they

13   have.

14        We know from the Bair Paws document that is the

15   subject of much litigation and, unfortunately, is still

16   under seal by this Court, the defendants have acknowledged

17   at least as of 2005 and 2007 and 2009 that the use of Bair

18   Hugger can be contraindicated, contraindicated, in

19   orthopedic surgery because it increases particles, because

20   it increases the risk of nosocomial infection and

21   transmission of pathogens in a hospital.  These are all

22   important admissions.

23        And from the plaintiffs' perspective, what Gaymar

24   knows, what Stryker knows, what Augustine knew in the early

25   1990's is absolutely relevant to what warnings are provided

1    on the device here today in 2019.  And because these issues
2    about warning continue to be hard fought in this litigation
3    and defendants continue to say, well, we didn't know about
4    this, it's not a reasonable warning, but they're not
5    supplementing with what they're doing.  They either did the
6    testing and haven't produced it or they didn't do the
7    testing and then they need to stipulate that the testing has
8    never been done.
9         THE COURT:  Let me interrupt you for a second.
10   You're not arguing, I don't think, that documents that would
11   be responsive to what you're saying that existed prior to
12   March of 2017 weren't produced.  I mean that's not your
13   motion, correct?  You're saying anything that they've either
14   created or come into possession of from March 2017 forward.
15        MS. ZIMMERMAN:  Yes, Your Honor, as in pretty much
16   any case, a plaintiff kind of plays a legal claim of
17   Battleship, if you know the game I play with my kids.  I
18   don't know what to ask for from the defendants.  And so to
19   the extent that there may be documents that weren't produced
20   during the course of general discovery, I mean I can say
21   that in the Pinnacle litigation, which is down in front of
22   Judge Kincaid in Texas, that involves a hip that has not
23   been on the market anywhere near as long as the Bair Hugger
24   product has, but they have produced a hundred million pages
25   of documents.

1              The Bair Hugger product has been on the market

2       since 1987, when the Twins won the World Series the first

3       time around, and we have 230,000 documents produced in this

4       case, just a little over two million pages.  So was their

5       production robust and complete at the time of 2017?  As

6       officers of the court, I'm going to leave it to them to make

7       that representation.

8              But what I do know and what is uncontroverted is

9       since 2017, they have sponsored studies.  We cite the Court

10      to the Rio study.  That is a pilot study that's underway in

11      the UK right now.  It came up at Reed's deposition, which

12      was, I think, December of 2017.  He talked about the study

13      being undergone.  And, of course, Reed, as far as we know,

14      is going to be the real basis for their motion for

15      reconsideration that comes in later today.  They're

16      sponsoring the guy.  He's one of the main authors of the

17      McGovern study.  We know that they're having ongoing

18      conversations.

19             The defendant's opposition papers don't contest

20      the fact that there are in fact responsive documents that

21      have been created since the close of discovery.  They simply

22      say we don't have to supplement.  But that's not been the

23      rule.

24             I mean back in, and I want to say it's, and I have

25      a case about this because I was looking at it late last

1       night.  There's a case in Minnesota because it used to be, I

2       think it's *Carlson Companies v. Sperry*, but in the early

3       '70's, it used to be that discovery was essentially what did

4       the defendant know as of the time you filed your lawsuit?

5       And the District of Minnesota in 1973 said that's not the

6       rule really.  It should be everything that you know not

7       just, you know, discovery cut off the day that the plaintiff

8       files the lawsuit but going forward.  That's certainly not

9       the rule now.

10              There's a duty to supplement discovery.  And we

11      have, and I brought if the Court would like to look at it,

12      although, I assume not.  And, again, I apologize, by the

13      way, about the Court's practice pointers about wanting to

14      know exactly what discovery responses we are bringing

15      motions to compel on.  I've got them all here if you would

16      like to look.

17              But by way of brief example, you know, post-market

18      surveillance.  The plaintiffs have requested, you know, all

19      documents relating to any articles that are published in

20      medical journals regarding the safety or efficacy of the

21      Bair Hugger, any documents reflecting meetings or conference

22      calls about these kinds of articles.  That's in some of our

23      post-market surveillance.  There's regulatory requests that

24      were responsive and we talk about this with respect to the

25      FDA letter.  So we had document requests outstanding in

1    2016.  We know from what was produced after the general

2    causation hearing and after that process closed, we got a

3    small production of what was provided to the FDA.  It was

4    not complete.  We know it's not complete because we got

5    additional documents in preparation for the Gareis trial

6    last April that show a little bit more about what was

7    provided to the FDA.

8             Suffice it to say it was not complete and did not

9    include a single internal document that admits that every

10   single study internal and otherwise admit that particles are

11   increased over the sterile field whenever the Bair Hugger is

12   turned to warm and that they have no evidence to refute

13   that.

14            There's nothing provided to the FDA in those

15   documents that say, hey, 3M does not contest the fact that

16   the inside of these machines is filthy.  They are prone to

17   growing bacteria.  They don't tell the FDA that.  The entire

18   volume of documents that we got, and I believe it's 143

19   documents from Susan Danielson's file.  They're all about

20   Dr. Augustine.

21            And, again, in the responsive papers, defendants,

22   you know, they suggest that we're allies with Dr. Augustine.

23   Obviously, Dr. Augustine's shadow casts long in this case.

24   And, unfortunately, it has been a distraction for everybody.

25   And we have said a number of different occasions as we

1    brought various motions that we wish that Dr. Augustine

2    would be excused entirely from the MDL, and that if there is

3    truly a product disparagement or some sort of business tort

4    case, the defendants believe that Augustine is doing

5    something they shouldn't, they should sue him.  They should

6    bring him to court or they should stop talking about it.

7    But what they can't say, what they can't continue to say is

8    that Augustine is actually behind everything here and that

9    the plaintiffs are in fact allied with him.

10              Defendants, in their responsive papers, make much

11   about independent researchers in the UK that's only

12   partially funded by 3M doing this Rio study.  Of course,

13   every other time that we're in front of the Court, if

14   there's somebody such as Augustine or someone else, the

15   plaintiffs having done a CFD analysis, then the allegation

16   is that the funding taints the entire results.  They

17   acknowledge that this Rio pilot study is something that they

18   fund.  It's my understanding that the funding has not been

19   continued, but they acknowledge that these are prominent and

20   important researchers.

21              THE COURT:  Let me ask you so, obviously, you

22   know, some of that information is quite obviously in the

23   public record or you have access to it.  What is it that you

24   -- how would you describe other than generally just

25   supplement, what is it you would describe as what you're

1    really looking for?  And you can use as an example, and I

2    don't mean it as an exclusive, but as an example the Rio

3    study, what is it you're seeking?

4            MS. ZIMMERMAN:  Well, so, for example, from the

5    Rio study, to the extent that there are any preliminary

6    results, we're limited to what is available on the Internet

7    at this point because Dr. Reed's deposition was, you know,

8    almost two years ago now.  We knew that it was underway.  We

9    knew that it was funded by 3M.  We know that it's looking

10   specifically at this question about the impact of infection

11   with forced air warming devices.

12           What I can see on the Internet is that they

13   expected results to be released sometime around December of

14   2018, so in the last month.  Nothing has been updated yet,

15   and I'm not really surprised about that.  It's holidays and

16   all that.  But it's a strange reason to suggest that 3M is

17   paying money supportive of this kind of a study, and they're

18   not getting any kind of preliminary results.  And

19   particularly because it is our understanding that 3M has

20   declined to fund the remainder of the study after the pilot

21   is completed.  I don't know why that is, but we believe that

22   there are documents that reflect 3M's thinking on that.

23           And, for example, we have some documents cited in

24   our motion papers.  3M has been very involved in trying to

25   keep various organizations by, for example, ECRI.  The

1    internal documents say let's make sure that ECRI doesn't do

2    their own study here.  We want them to rely on us instead.

3            We know from the Sessler Olson study, that that

4    was actually a study that was conducted by 3M executives

5    over in the Netherlands.  They found a couple of people to

6    put their name on it.  3M wrote the entire thing.  They got

7    permission from Sessler to edit away because he was not

8    sophisticated in the statistics.

9            So what we want to know with respect to Rio, with

10   respect to ICOS is what is 3M's involvement in this?

11   Because the documents that we do have show that they have

12   had their hands deep in the science, deep involved in

13   stopping studies from being published in terms of getting

14   studies that were on the way to being published, edited,

15   changing results with respect to the Netherlands study.

16   There were different portions that 3M had removed from

17   tables.  I want to know that.  Plaintiffs are entitled to

18   that.  That's what the discovery requests that we have

19   served require or request.  And because there is a duty to

20   supplement and because we know that these things are out

21   there, we request that 3M be ordered to do that supplement

22   as plaintiffs would be required to do.

23           THE COURT:  Okay.  Let's assume for a second that

24   the Rio study comes out tomorrow, and it's highly critical

25   and very favorable on the science to the plaintiffs, how

1    would that get into evidence given that it's 2019?

2           MS. ZIMMERMAN:  Well, that's a good question, Your

3    Honor.  I suspect that depending on what kind of production

4    is made, there may well be -- and, I guess, to take a step

5    back.  I think the defendants really mischaracterized

6    plaintiffs' motion here as a motion to reopen all the

7    general discovery.  I think that's really what Your Honor's

8    question goes to.  That's not what we've asked for.

9           What we've asked for is that they supplement the

10   discovery responses that they provided thus far.  It may

11   well be, depending on what kind of additional documents or

12   supplements are provided, that we bring a motion for leave

13   or a motion to amend the scheduling order to allow us to

14   conduct additional discovery.  But plaintiffs have not

15   requested a redo of general causation, a reopening of

16   discovery in any way in this case.

17          And so if Rio comes out and it turns out that it

18   is helpful to one side or the other, I suspect that the

19   Court is going to hear about it either in the form of a

20   motion or an exhibit to the motion for reconsideration or a

21   motion for leave to conduct additional discovery.  I will

22   say that depending on what the motion looks like later this

23   afternoon, I anticipate that there is going to be a motion

24   to reopen discovery at least in some respect anyways because

25   to the extent that there is new information, plaintiffs'

1    experts must be entitled to consider that and respond to it,

2    if we are going to be looking at Daubert and general

3    causation for 5,000 claimants.

4            To the extent that the defendant's position may

5    well be they get to use new information but we don't get to

6    respond, I don't think that that position finds any kind of

7    grounding in the rules, but I guess we'll find out what

8    their motion looks like later.

9            I will say that there is a number of different

10   documents, and again, this is going to the issue about what

11   other competitors know about, what other device companies

12   know about because that duty of an expert is imposed on 3M.

13   The heater-cooler units, and I don't know that Your Honor

14   has heard a lot about the heater-cooler units.  It's a

15   different kind of a medical device that's used in an

16   operating room, typically, in cardiac surgery.  It both

17   heats and cools the patient when they're on bypass.

18           The reason it's relevant to this case, our

19   infectious disease doctor, Dr. Jarvis, said that

20   mechanistically the problem that they discovered with the

21   heater-coolers is the same problem that he sees with the

22   Bair Hugger and that is two-fold:

23           One, the device has become essentially a reservoir

24   of bacteria.  That's uncontested in this case with respect

25   to Bair Hugger.  Their 30(b)(6) witness says, yeah, we don't

1    dispute that.  These things get full of bugs, full of germs.

2    They don't tell anybody about that, but that's a problem.

3            The second part, and the reason that ultimately

4    lead to 12 different articles; and, ultimately, a recall of

5    multiple different kinds of heater-cooler units is that the

6    exhaust air from those heater-cooler units that sit in the

7    operating room was blowing essentially over these water

8    units where the bacteria was held and aerosolizing causing

9    the bacteria to get into the air and ultimately into the

10   surgical site.

11           Now, in the heater-cooler units because it was

12   such a strange and rare bacteria, it was a mycobacterium

13   chimaera, but they did a number of different studies and

14   they found to a DNA level that it was in fact the same kind

15   of bacteria that got from this unit in the hospital in the

16   OR into the patient's heart in two different instances.

17   And, ultimately, through a number of different studies, many

18   of which mimic the studies that have done by the plaintiffs'

19   experts in this case, they showed that is exactly what

20   happened.  It led to recalls of a couple of them.  And the

21   heater-cooler units now according to the CDC and FDA, they

22   are recalled, and they have warnings to make sure that they

23   do not disturb laminar air flow.

24           And I can show -- so this is the label of the

25   bottom of the one of the heater-cooler units.  In order to

1    avoid disturbances in the laminar flow area of the operating

2    room, make sure that the heater-cooler unit is placed in

3    such a way that the exhaust flow is not directed toward the

4    operating field.

5         The reason that that matters is that they figured

6    out through all these studies that these inanimate objects

7    that have previously been considered essentially inert and

8    not posing a risk to the patient, they hold bacteria, they

9    blow bacteria, and it causes risk to the patient.  Same

10   exact thing here.

11        Now, Dr. Jarvis wasn't allowed to talk about that

12   at trial, but these are relevant facts.  And we know from

13   some of the documents that have been produced that 3M is

14   discussing the relevance of the heater-cooler units recalls

15   with respect to the forced air warming.  And when you add in

16   what we know that Augustine knew in 1987 and 1993, and when

17   they submitted their 510K to the FDA in 1996, that airborne

18   contamination is a risk with this product.

19        We know that the manufacturers of other devices

20   both in the forced air warming unit market and otherwise

21   warn about this kind of thing.  We know that 3M, well, their

22   predecessors used to warn about it, but when they put that

23   device into the operating room where patients are at a

24   greater risk, they took the warning off, and they still

25   don't explain why there's no warning today in January of

1    2019, even though their competitors warn about it.

2          So we know that there's additional discussion

3    going on.  And I would point the Court, again, to the ICOS.

4    So that's the International Consensus on Prevention of

5    Perioperative Infection I think is how it ultimately comes

6    out, but we call it the International Consensus or the ICOS.

7    3M is a platinum sponsor.

8          The first time the group got together was 2013.

9    They got together last summer again.  Their main expert on

10   orthopedic surgery is one of a handful of editors of the

11   entire paper.  Dr. Elgobashi's published report, our CFD

12   expert, is cited in this paper.

13          Now, the ICOS, again, they recognize the

14   theoretical risk posed by these products.  They say that

15   there are alternatives that can and should be used, but

16   they're not at this point.  They're saying they want more

17   study but until the more study is done, they're not

18   suggesting that everybody needs to stop using these.

19          We know that 3M is discussing it.  We know that

20   they're involved.  We know that their previous CMO, Michelle

21   Hulse Stevens, was at the first International Consensus, and

22   she came back and she said, hey, guys, this issue is

23   everywhere.  Orthopedic surgeons are super concerned about

24   particles in the operating room, and there is uniform

25   agreement that forced air warming units increase the number

1    of particles.

2            Now, of course, we know that because Al Van Duren,

3    their corporate 30(b)(6) witness, admitted as much.  Every

4    single study shows more particles when the Bair Hugger is

5    used.  So we know that they're talking about it.  We know

6    that these documents exist.  Defendants don't even deny that

7    they exist.  They're just saying that they don't have to

8    supplement and that's not what the law requires.

9            So we would request that the Court order that they

10   supplement their discovery responses as required by the

11   rules.  And I'll stand down for now pending questions from

12   the Court.

13           THE COURT:  Okay.  Thank you.

14           Ms. Young, before you begin, let me ask you a

15   couple of questions.  Number one, I had not, frankly, noted

16   the briefing date of the motion for reconsideration but

17   that's today, apparently.

18           MS. YOUNG:  Yes, Your Honor.

19           THE COURT:  And 3M will be moving to reconsider

20   general causation, correct?

21           MS. YOUNG:  Correct.

22           THE COURT:  Will 3M be submitting new documents or

23   testimony or disclosures by experts that have not been

24   previously produced to this Court?

25           MS. YOUNG:  No, Your Honor.

```
1              THE COURT:  Okay.

2              MS. YOUNG:  There is not, there is no -- we don't

3      have access to and we don't know of any preliminary results

4      from the Rio study, which Ms. Zimmerman is talking about.

5      We'll be referring to published literature, the

6      International Consensus statement from 2018, the gene

7      studies, but no testimonial evidence, affidavits, new

8      documents.

9              THE COURT:  Okay.  So I just want to make sure of

10     this.  Is there anything that you will be submitting in

11     support of that motion that has not been either previously

12     produced or publicly available?

13             MS. YOUNG:  No.

14             THE COURT:  Okay.  All right.  Go ahead.

15             MS. YOUNG:  Your Honor, just a very brief setting,

16     and I know Your Honor knows this from the extended hearing

17     we had in the Axline case on the motion to exclude

18     supplemental expert reports, but general causation discovery

19     in this case refers not just to the general causation

20     question of whether the Bair Hugger is capable of causing

21     infection, but also covered regulatory issues, it covered

22     voluminous documents that would go to 3M's knowledge,

23     conduct.  And so when we're talking about this general --

24             THE COURT:  It's really case-wide discovery or

25     omnibus discovery, if you will.
```

1            MS. YOUNG:  Right.  What we described as issues

2      that cross-cut across the cases in the MDL.  So that

3      discovery closed on March 20th of 2017.  And 3M had

4      responded at that point to 200 requests for production, 30

5      interrogatories, and with quite significant oversight by

6      Magistrate Judge Noel, we worked through an ESI protocol

7      that covered 26 custodians.  There was much debate about

8      whether that should be expanded.  Judge Noel ultimately

9      said, no, 26 was the right appropriate number here.

10           We ran search terms, we checked, we

11     double-checked, so this notion that there is this ongoing

12     duty to supplement that discovery.  And I see that

13     Ms. Zimmerman brought today some manila folders with

14     highlighted discovery requests, that has not ever been

15     presented to us in that fashion.  She named a couple.

16           But what plaintiffs are suggesting here is that we

17     have some ongoing duty to supplement those 200 RFPs through

18     some ESI process I assume because I don't know how else a

19     company like 3M would be able to come up with a responsive

20     set of information.  So I think that request is well beyond

21     what any duty to supplement that is contemplated in the

22     Federal Rules.

23           Rule 26E talks about the requirements to

24     supplement incomplete or inaccurate responses to material

25     issues.  I think we have two things that are in debate here.

1     One is when does that duty to supplement -- what does it

2     relate to material that was created at the time of your

3     original response and you later discover it and you produce

4     it because you know you need to to make your response either

5     accurate or complete, and that can happen if you perhaps had

6     a set of documents in an ESI review that were tagged for

7     further review, needed to be reviewed, inadvertently hadn't,

8     you go through them and you role out a supplemental

9     production.  I think that happens frequently.

10         Then the idea here and what Your Honor was talking

11    about with your question I believe is what has happened

12    since March of 2017 and today?  And is that really the

13    information that plaintiffs are seeking?  And if so, I think

14    that brings us to the next question of is it material?  Is

15    it relevant to the issues in this litigation?

16         So, I think with respect to what is required by

17    way of supplementation, we cited, and I apologize that we

18    got it to Your Honor by way of letter, and it wasn't in our

19    brief, but a string of cases that talks about the duty

20    relating to information that is not about information that

21    is gathered after, that we have to have some, the scheduling

22    orders discovery deadlines have to mean something,

23    especially in an MDL like this.  They were designed to

24    promote efficiency across the cases, and there simply can't

25    be some ongoing duty for 3M to go through 200 RFPs.

1           And, again, as to issues that are not in the case,

2       the reservoir of infection theory the Court has rejected

3       because there's no scientific support for that theory.  The

4       failure to warn claim was not allowed in the Gareis case, so

5       how 3M's internal discussions about a study are relevant and

6       admissible to the design defect question in these cases is

7       not a material issue.  And plaintiffs haven't articulated

8       why that would be the case.

9           And so, Your Honor, I also just want to say just

10      briefly about what we did do.  We not only produced that,

11      but there in the declarations submitted in the report, you

12      can see there were some supplemental productions.  And so

13      what we did was to the extent there were documents that were

14      missed the first time either because they needed a further

15      review, those were ruled out.

16          We also certainly understand our duty under

17      Rule 26(a)(1), on initial disclosures to supplement with any

18      material we intend to rely on, and I think that some of the

19      cases that plaintiff cited talk about, you know, to avoid

20      sandbagging, to be fair in litigation, that's exactly what

21      those supplements would be designed to do.  We're not going

22      to try to show up at trial with a document that we have

23      never produced.  And then we also had the FDA information.

24      Plaintiffs served a second set of discovery outside the

25      close of general cause discovery, and we negotiated with

1    them and said we understand you want these documents.  We

2    think you're entitled to them, and we negotiated that.

3            So I think the casting this as a request for

4    supplementation as opposed to reopening of general causation

5    discovery, I don't think that's a fair characterization

6    given the broadness of that and how it would essentially

7    completely nullify the general causation discovery deadline

8    and reopening that has been rejected at numerous times by

9    this Court.

10           We, of course -- plaintiffs say 3M admits we would

11   have information.  Of course, a company like 3M involved in

12   a 5,000 case MDL is going to have an active product line.

13   It's going to have documents that would fall within 200

14   RFPs.  We would never contend it didn't.

15           I think the question here is are we in violation

16   of Rule 26 for failing to supplement that?  And we contend

17   no, because there's absolutely no evidence that anything we

18   provided as of the general causation discovery deadline is

19   either incomplete or inaccurate in a material respect.  And

20   then the other question I think goes then more to the very

21   specific request that they're making and that's in which

22   fall into three categories.

23           We have, first, the Rio study.  As plaintiffs

24   point out, 3M committed to a partial funding of the first

25   phase of that.  We provided that funding.  We are not and do

1    not have access to any preliminary results.  We don't know

2    anything other than what's on the Internet about the Rio

3    study, and so plaintiffs' suggestion that what internal

4    folks at 3M might have said about that study, we don't see

5    how that is relevant to any of the issues in this case.

6         On the FDA letter, plaintiffs concede that we

7    produced the documents that were responsive.  There is, you

8    know, that letter was not ultimately admitted in trial, and

9    any more information or discussions 3M made have had about

10   that, I don't believe there's any ongoing duty to supplement

11   that.

12        Plaintiffs also make an absolutely erroneous

13   statement that 3M admitted during the Daubert hearings that

14   the letter was the result of a lobbying campaign.  That just

15   isn't true.  That's not what the transcript says.  We

16   provided information to FDA.  FDA took information from us

17   from other manufacturers of forced air warming devices, from

18   health care providers and that's right on the face of their

19   letter.  So the notion that they're still going after this

20   idea that somehow 3M manipulated the FDA and controlled that

21   letter is just an unproven premise that's been brought up

22   many times in litigation.

23        THE COURT:  Well, the letter was not allowed into

24   evidence, correct?

25        MS. YOUNG:  Correct.

1          THE COURT:  At the Gareis trial.  And I'm assuming

2     there wasn't any, maybe there was, evidence relating to

3     actions the FDA either took or didn't take other than the

4     510(k) clearance?

5          MS. YOUNG:  Actually, the Court was very

6     restrictive, and no FDA clearance came in -- the letter or

7     otherwise.

8          THE COURT:  Okay.

9          MS. YOUNG:  And then, Your Honor, we have the

10     International Consensus meeting.  So that is, Your Honor

11     knows they are the premier organization globally.  They have

12     800 delegates who are looking at evidence of issues.  One of

13     the things that they were asked to reconsider at their

14     second meeting was the question of whether there's any

15     evidence that forced air warming causes or contributes to

16     surgical site infections.  They responded with 93 percent

17     consensus, a strong consensus that there is no evidence of

18     that.

19          3M was a platinum sponsor.  There are 55 sponsors

20     to that meeting.  They're all listed in the first preamble

21     portion of that report.  Mike Reed, one of the authors who

22     Your Honor has heard about involved in some of the UK

23     research relating to the Bair Hugger was part of that

24     process, as was Dr. Mont.  These are the leading orthopedic

25     surgeons, microbiologists, people that understand

1    periprosthetic joint infections.  And so we have that

2    information.  We'll cite the publicly available information.

3            They also include their rationale, all the

4    evidence that they looked at, evidence that is available

5    to -- they certainly are aware of the Elghobashi published

6    article that plaintiffs cite to.  So how 3M's internal

7    communications about the fact that that group is meeting

8    have any relationship to this case, we don't think

9    plaintiffs have articulated that, and they can have equal

10   access to the publicly available information about the ICM.

11           And so, Your Honor, plaintiffs have not shown that

12   3M is in violation of Rule 26(e) across the board, and what

13   they're asking would be equivalent to reopening general

14   causation and taking away any finality that that bifurcation

15   order has had.

16           We also note, and it's in our papers, I won't

17   belabor this, but plaintiffs haven't done any

18   supplementation other than in the bellwether case specific,

19   and they were ordered to answer some specific discovery and

20   there are plaintiffs' firms that have never complied with

21   that either.

22           So it's our position, Your Honor, that they

23   haven't met what would be the requirement under Rule 26(e)

24   to show that our answers at the time they were made were

25   incomplete or inaccurate in a material respect, and they

1     also have not made any effort to show how good cause would

2     be shown to change what would otherwise be a Rule 16

3     scheduling order issue.

4              THE COURT:  Let me ask you a couple of other

5     questions.  And I don't know that this matters, but does 3M

6     or its lawyers have in place some system or some practice

7     such that documents that are created or obtained after

8     March 20th of 2017, if they undermine render inaccurate or

9     incomplete prior discovery responses get somehow flagged for

10    review?

11             MS. YOUNG:  You know, Your Honor, we certainly

12    have ongoing holds for litigation, but I think you're

13    talking about information that would have been previously

14    available or all of it?

15             THE COURT:  No, I'm specifically asking about,

16    well, first of all, let me say this about information that

17    was previously available as of the time of general causation

18    discovery.  I don't hear anything that says as of March 20

19    of 2017, other than as supplemented thereafter, that 3M's

20    production was incomplete.

21             MS. YOUNG:  Correct.

22             THE COURT:  And I'm assuming but I should ask you

23    as an officer of the court, do you have any information that

24    would suggest that that production for documents that

25    existed and were in 3M's possession or subject to its

1    control in March 20th of 2017, was somehow not produced?

2          MS. YOUNG:  I do not have information that there

3    were any inaccuracy in the information provided on that

4    date.

5          THE COURT:  Or incompleteness?

6          MS. YOUNG:  Or incompleteness.  We have the 26

7    custodians search terms, we've run and rerun, double-checked

8    against that and have rolled out supplements where

9    appropriate.

10         THE COURT:  Okay.  And as to documents that were

11   either created after March 20th of 2017 or came into the

12   possession or control of 3M after March 20th, 2017, and as I

13   say, I don't know if it's relevant, I should say germane to

14   this issue, but is there a process by which 3M or its

15   attorneys review that information or those documents?

16         MS. YOUNG:  In terms of a systematic process, Your

17   Honor, I'm only thinking that the way we would approach

18   discovery generally would be the ESI collection and

19   searching.  And so while folks are on hold, that hasn't all

20   been pulled into my understanding and run through search

21   terms.  Of course, we're in touch with key witnesses there,

22   and to the extent any of them were to say, look, what about

23   this?  I found this file next to my desk after we had spoken

24   so much about the Bair Hugger, we would absolutely be

25   tracking that and evaluating and making a production if that

1    were required.

2              I'm not trying to dodge your question, but it's a

3    little bit hard given the way that we ensure we're finding

4    information with the corporation, and so I could say on an

5    ad hoc basis given the people we're in touch with, we

6    absolutely would have them continuing to forward things to

7    us or bring things to our attention.

8              THE COURT:  Right.  Now, I think it's an easy call

9    in a sense to say that to the extent that you have documents

10   that have not been produced, that you intend to rely upon,

11   obviously, that will be an issue that the Court will have to

12   look at, you know, so that there is no -- clearly, 3M is not

13   going to put a document on its exhibit list.  Clearly, 3M is

14   not going to be allowed to put a document on its exhibit

15   list that it hasn't produced in discovery absent some highly

16   exceptional circumstances.

17             So I worry less about the issue of trial by ambush

18   than what I think is motivating the plaintiffs which is how

19   do we know that there aren't documents that would be helpful

20   to the plaintiffs that 3M isn't just concealing?  And I

21   think the answer to that is partially that Magistrate Judge

22   Noel supervised that process regarding custodians and search

23   terms up to March 20th of 2017.

24             But then the question mark I think they have is

25   and since then what?  How would they ever know that there's

1    information that is material that would show the prior

2    document request productions have been inaccurate or

3    incomplete?  That's what I think the nub of their issue is,

4    and I don't know that it necessarily matters, but can you

5    respond to that rather rambling question?

6         MS. YOUNG:  I think what I'm, so what I'm

7    struggling with a little bit is the idea that there's a

8    document that existed as of March 2017 that wasn't provided

9    and would be necessary to make a response wholly complete or

10   accurate or that there would be information created after

11   that that looking backward would somehow make the response

12   at that time inaccurate or incomplete?

13        THE COURT:  The latter.

14        MS. YOUNG:  And I think there what we're

15   struggling with that is we have 200 RFPs, 30 'rogs, and

16   absolutely no indication -- and the Court's significant

17   narrowing of the issues in this litigation.  So to suggest

18   that it's like a needle in the haystack.  I know

19   Ms. Zimmerman pointed out a single, a couple of the things

20   she pointed to also are issues that the Court has narrowed

21   and are not in the case, so the notion that we would even

22   know what it is we're looking for without some more specific

23   guidance here.

24        This request too was made, I mean to the extent

25   there was any meet and confers on it, it was the last

1    sentence of a number of letters that essentially said, and

2    we remind you, 3M, of your ongoing duty to supplement things

3    that are attained and/or generated after the close of fact

4    discovery.  I mean there has been no effort to actually

5    narrow in on, I think, what Your Honor is saying perhaps

6    there is, you know, some narrow subset, but the approach

7    here was approved by the Court, was designed to get us

8    through a very significant portion of the discovery in this

9    MDL.

10             THE COURT:  Okay.  Thank you, Ms. Young.

11             MS. YOUNG:  Thank you, Your Honor.

12             THE COURT:  Ms. Zimmerman?

13             MS. ZIMMERMAN:  Yes, Your Honor, if I could, I am

14   compelled to start with to the extent that defendants

15   continue to represent or argue that the issues in this

16   entire MDL have been narrowed because of what happened in

17   Gareis, that is just inaccurate.  And it's, frankly, a

18   misstatement of what Judge Ericksen said in the Axline Order

19   on the motion for a judgment as a matter of law.

20             She rejected expressly their argument that because

21   in Gareis certain consumer protection claims were out that

22   they were then out for Axline and every other case.  She

23   said expressly in her order that is not the case.

24             So there are asserted by 5,000 people failure to

25   warn claims, negligence claims, design defect claims, all

1    sorts of claims that have not been disposed of on an

2    MDL-wide basis.  So as a preliminary matter, those are live

3    claims.  We have discovery requests outstanding, the Federal

4    Rules require that they supplement.

5            Now to the extent that counsel has just

6    represented that Judge Noel has carefully supervised the

7    discovery in this process, that's just not accurate.  Judge

8    Noel was certainly involved in the beginning of the parties

9    kind of trying to work together with respect to these

10   requests for production of documents and that was in between

11   April and June of 2016.

12           We also had a stipulated order entered by the

13   Court with respect to ESI document collection and that sort

14   of thing.  And I have to check back, my memory is a little

15   fuzzy, but it was end of 2016, beginning of 2017, defendant

16   said, hey, I know that there's an order saying this is how I

17   have to collect it.  It's not working the way we agreed to

18   do it, and so we just want to do it the old-fashioned way.

19           And despite the fact that there was an agreement

20   and despite the fact that it was reduced to an order, the

21   defendants were not required to continue to collect

22   documents the way they agreed to do so, and the way the

23   Court ordered it.  Now, the Court ultimately blessed that,

24   but it is not true to say that Judge Noel supervised this

25   all the way through March of 2017.

1          You know, there's a bit of argument both in the

2     responsive briefing and otherwise about plaintiffs' ongoing

3     attempts to do reopening discovery and really what they're

4     alluding to in their footnote is plaintiffs' attempts to

5     serve subpoenas on Dr. Minkowitz, who is in Chicago.  He's

6     an editor of a paper or a journal where one of defendant's

7     experts claims to have submitted and had published a peer

8     review journal based on the deposition testimony that we

9     obtained after the close of discovery, and we couldn't bring

10    the motion until we got him to misrepresent and we believe

11    actually outright lie about the case, the status of his peer

12    review paper.  Once we had that representation under oath,

13    we served a subpoena and we sought the discovery.

14          There was a motion in front of Judge Noel.  Judge

15    Noel reduced to an Order a finding that Dr. Abraham's paper

16    was not subject to peer review.  Plaintiffs attempted to

17    impeach Dr. Abraham on the stand with that order.  It was

18    excluded.  The Order was excluded on hearsay grounds.  The

19    Order of Judge Noel was excluded on hearsay grounds.

20          So, plaintiffs, yes, we have tried to get that

21    discovery.  We think we're entitled to it.  We still think

22    we're entitled to it.  We haven't been able to impeach a

23    witness that was put on the stand with an Order of the

24    Court.  We think that that's outrageous.

25          Your Honor asked some questions about how do we

```
 1    know, and I made probably a terrible analogy with respect to

 2    the game of Battleship I play with my nine year old, but

 3    that is the nature of plaintiffs' work, right, and I

 4    understand that.  But what we do know with respect to

 5    defendants, the completeness of defendant's production as of

 6    March 20th of 2017, which Your Honor asked about, we know it

 7    wasn't complete at least with respect to communications with

 8    the FDA.

 9            And I would point Your Honor and counsel

10    specifically to the PowerPoint presentation that was

11    provided to the FDA by lobbyist counsel in DC.  The

12    PowerPoint presentation itself is dated March 2nd of 2017.

13    It was not produced to plaintiffs until advance of the

14    Gareis trial.  That appears at Bates range 3M BH02326976.

15    So we know it wasn't complete.  We know it wasn't complete.

16            And the other thing that matters about that is in

17    that PowerPoint, they detail a number of different concerns

18    that they're getting in.  They're getting complaints from

19    customers.  They're getting concerns from orthopedic

20    surgeons, and that's part of the basis for their Complaint

21    to the FDA, and they say, hey, please weigh in on this and

22    tell Augustine to stop making stuff up.  That's really the

23    basis of this.  There's no medical studies that are provided

24    to the FDA.  None of that is on the index of materials, no

25    internal documents, no depositions.  So --
```

1            THE COURT:  But a lot of what you seem to be

2     raising or asking me to do is somehow it all has the quality

3     of second guessing what's already been decided by either

4     Judge Noel or Judge Ericksen.  And in case it's not clear,

5     I'm not going to do that.

6            So maybe the best way to get at this is would you

7     describe for me what you're asking me to order 3M to do?

8            MS. ZIMMERMAN:  Sure, Your Honor.  We think that

9     at a minimum the three issues that have been crystalized as

10    much as we can in our papers and again today during

11    argument, is an order to supplement any documents that they

12    have internal or otherwise that fall within the previously

13    served discovery responses with respect to Rio, with respect

14    to ICOS, and with respect to the FDA.  And the reason all

15    that matters is that it all keeps coming back.

16           Sure, the FDA was mostly out of the Gareis trial.

17    Again, that doesn't mean that it's going to be out of

18    Trombley, if that's tried in May or whatever other trials

19    come down the line, whether in this Court or elsewhere

20    around the country.  So we're entitled to do that discovery.

21    We're entitled to get that discovery.

22           We know from the representations from counsel that

23    the FDA did get involved in this at the request of 3M.  We

24    know from some of the documents that have been produced.  We

25    don't know if they're complete.  We do know that it was a

1    lobbyist from in DC that directed a lot of those efforts on

2    3M's behalf.

3           Your Honor may be familiar from your experience in

4    private practice about the way the FDA normally works when

5    there is something like this; usually there's a public

6    meeting, usually there's a detailed list of every single

7    thing that was concerned, considered, usually there's

8    testimony and all these sorts of things.  None of that

9    happened here.

10          What we know after the close of discovery is that

11   there were documents generated prior to the close that were

12   not produced.  We know that they were not produced until

13   after our general causation and Daubert orders were

14   obtained.  I guess it was before we got the order but it was

15   after the arguments, after the briefing, then they produced

16   the documents at the beginning of November of 2017.

17          So we know the productions weren't complete in

18   March.  We know the documents existed then.  We know from

19   the PowerPoint they were getting complaints in from

20   customers.  They were getting questions from orthopedic

21   surgeons?  What did they do to respond?  All of that is

22   responsive to plaintiffs' requests.

23          So at a minimum we would ask for the Rio study and

24   any documents that talk about that, the ICOS studies, and

25   anything that demonstrates what 3M's involvement has been

1    with respect to the 2018 ICOS and their internal

2    discussions.  Sure, they're -- I'm sure that they're happy

3    to stipulate as Your Honor kind of questioned.  They're not

4    going to introduce into evidence a document they haven't

5    previously produced.  Those aren't the documents I want.  I

6    want the documents they don't want to give me, right?  I

7    mean I want the seven documents that I care about that I can

8    try my case in front of a jury and they're going to be

9    outraged.

10            I know some of those documents.  I've seen some of

11   those documents.  I've focused group some of those

12   documents.  I know juries are outraged by it.  The question

13   is how do we get what they know?  How do we get what we know

14   their competitors know and acknowledge?  This is a huge

15   product.  They make a ton of money.  We are in their back

16   yard begging that the rules be enforced.

17            One final note, and I grabbed the defendant's

18   answers and objections to the plaintiffs' second

19   interrogatories, and this is not before the Court, but it is

20   dated March 31st of 2017.  And I only want to put this up to

21   show that the defendants in fact also contemplated that they

22   were going to have to supplement.  So at the end of -- so

23   what do they say in one of the answers?  "Defendants will

24   respond further after the time required for expert witness

25   disclosures in accordance with Rule 26 and the Court's

1    operative scheduling order."  And this is, you know --

2              THE COURT:  Well, but that's appropriate.  It's a

3    contention interrogatory.

4              MS. ZIMMERMAN:  Yes, absolutely, absolutely.  But

5    they understood that there are ongoing duties to supplement

6    but they don't stop on March 31st or March 20th of 2017 as

7    they would suggest is the law.

8              THE COURT:  Well, I understand your point.  And

9    I'm not so sure that demonstrates it because I think that's

10   really getting at a different issue.  But, you know, there's

11   no question that there's a duty to supplement.  The question

12   is whether or not there is an obligation or they failed is

13   probably the better way to put it to meet that duty in this

14   case with respect to general causation.

15             So, okay, anything further Ms. Zimmerman?

16             MS. ZIMMERMAN:  I don't think so.

17             THE COURT:  Ms. Young, are you champing at the bit

18   to say anything else?

19             MS. YOUNG:  One very brief thing, Your Honor.

20             THE COURT:  Okay.

21             MS. YOUNG:  And that is just going back to the

22   idea that 3M has lobbied the FDA, the FDA was well aware of

23   this issue.  Scott Augustine and his attorney filed

24   anonymous MedWatch reports that parroted the complaints in

25   this cases by the hundreds, I believe.  So the idea that the

1   FDA wasn't aware of Scott Augustine's advertising, the

2   litigation, and everything that was going on is just not an

3   accurate statement.

4        THE COURT:  Okay.  Thank you.  All right.  It is

5   11 o'clock.  I'm going to take a recess and look at my

6   notes, look at a couple of things and then we'll come back.

7        It's been my practice, as you know, as you all

8   know, to try and rule on things of this nature quickly and

9   from the bench because I think it does the parties more

10  service that way than to perhaps take 30 days or whatever it

11  takes to get out a very, you know, lengthy and detailed

12  memorandum.

13       So I'm going to go look at this, and we'll be back

14  on the record in 15 minutes or 15 minutes after 11.  Okay?

15  All right.  Court is in recess.

16              (Short recess at 11:01 a.m.)

17              (In open court at 11:18 a.m.)

18       THE COURT:  Good morning.  Be seated.

19       All right.  We are back on the record in the Bair

20  Hugger MDL number 15-2666.  I am going to go ahead and rule

21  on the motion to compel supplementation on the record.  That

22  will be followed up with an Order that just says, "For the

23  reasons stated on the record," et cetera, et cetera, et

24  cetera.  So here is my ruling and rationale:

25       I am going to deny the motion to the extent that

CASE 0:15-md-02666-JNE-DTS  Document 1727  Filed 01/29/19  Page 42 of 47      42

1    it requests me to compel the defendants to undertake a

2    general supplementation of its responses to all of the

3    discovery in this case.  I am going to grant some specific

4    supplementation, which I will outline later.  But let me

5    just say my rationale for these rulings is as follows:

6            First of all, the discovery on general causation

7    by Court Order, Pretrial Order 17, which is docket number

8    175, was closed on March 20, 2017.  Since that date, the

9    defendant has provided supplementation to its discovery on

10   nine occasions.  The support for that is the Declaration of

11   Benjamin Hulse, paragraph 1, which is docket number 1715.

12           I will note that the plaintiff, according to

13   Mr. Hulse's declaration and I have no basis to think

14   otherwise, the plaintiff has not supplemented its discovery

15   responses since March 20, 2017, on the question of general

16   causation.  However, has provided additional or supplemental

17   information as to bellwether plaintiffs, quite obviously.

18           You know, the duty to supplement under Rule 26(e)

19   is clear and definite, but it's a limited duty.  And so that

20   duty under the express terms of the rule is simply to

21   supplement with, well, to supplement either a document

22   request or an interrogatory answer or a request for

23   admission, if the party learns that in some material respect

24   the disclosure or response is incomplete or incorrect, and

25   if the additional or corrective information is not otherwise

(612) 664-5109

1    been made known to the opposing party during the discovery

2    process or in writing.

3            And so that discovery duty to supplement is to

4    correct material inaccuracies or material incompleteness,

5    and I am aware of the cases that say it had to be materially

6    incomplete or inaccurate at the time that the discovery

7    response was made.  However, I believe the better rule is

8    that after acquired evidence that might call into question

9    the continuing accuracy or completeness of the discovery

10   response should also be subject to supplementation.

11           So on the question, I think, of what the defendant

12   calls the refresh or the generalized supplementation, that

13   is not, I am not familiar with anything that says that is

14   typically undertaken.  It is certainly not warranted in

15   light of the defendant's representations to this Court, and

16   there is no evidence before me that gives me any basis to

17   believe that as a general rule the defendant's discovery

18   responses are incomplete or inaccurate.  And I think

19   ordering it would not only be burdensome to the defendant,

20   it would in fact undermine the orderly process that has been

21   the subject of the Court's Pretrial Orders.  And it would

22   effectively nullify the Court's Pretrial Order 17 that had a

23   cutoff date.

24           So that result in my view is consistent with Judge

25   Ericksen's Pretrial Order.  It's consistent with Rule 26(e),

1    and the cases from this district including the case cited by

2    the defendant's *Promotional Marketing Insights*, which is

3    found at 212 Westlaw 13028115.

4            Turning to specific supplementation, let me -- I'm

5    going to make some general comments that are going to seem

6    inconsistent with what I've ultimately ruled.  I don't

7    believe there is any evidence before me that any of the

8    productions with respect to the three specific matters were

9    incomplete or inaccurate in any material way either at the

10   time made or even now.  But at the same time, I am mindful

11   that the plaintiff always suffers from a little bit of an

12   information deficit in that regard.

13           So the FDA communications prior to the August 2017

14   letter, the defendant's production was made after

15   August 30th of 2017, and the defendant certified that at the

16   time it was made it was complete, and the letter was

17   excluded from the Gareis trial even though I believe the

18   defendants had wanted to put it in.

19           That notwithstanding, and I am skeptical that any

20   of the discovery supplementation I'm about to order will

21   lead to the discovery of admissible evidence or will itself

22   be admissible but that's not for me to decide.

23           So I am going to order the defendants to

24   supplement their document production to include any further

25   communications with the FDA on the limited topic of the

1    August 30th, 2017, letter.  So that's as to the FDA.

2         As to the International Consensus, again, it

3    appears to me that this Consensus meeting is occurring post

4    cut-off of the discovery, and if the FDA letter isn't going

5    to come in, it's hard for me to envision how a report or

6    publication of the International Consensus would be admitted

7    at a subsequent trial.

8         That notwithstanding, I will order the defendants

9    to produce to the plaintiff any communication with the

10   International Consensus group from January 1, 2018, to the

11   present, and any internal discussion of the International

12   Consensus group that bears on the topic of whether the Bair

13   Hugger Forced Air Warming System is capable of causing any

14   of the infections which are alleged in this case.  So, in

15   other words, on the topic of the general causation.  And,

16   obviously, it goes without saying that it's by no means

17   clear that that will result in the production of any

18   documents.

19        The last item is the Rio pilot study.  Again, I

20   don't have evidence as to which document request this

21   particular request is related to, and I'm skeptical of its

22   ultimate admission or relevance.  Having said that, I am

23   going to order the defendant to produce the same materials

24   with respect to the Rio pilot study that I just ordered with

25   respect to the International Consensus, and that is to say

1   any communications with the pilot study group since the last

2   production of documents by 3M, and any internal documents

3   regarding the Rio pilot study that bear on the issue of

4   general causation.

5            All right.  Let me begin with Ms. Zimmerman, do

6   you have any questions or is there anything you wish to call

7   to my attention about that ruling?

8            MS. ZIMMERMAN:  Maybe one question, Your Honor.

9   When you order that the production of communications

10  essentially with the ICOS and/or the Rio pilot study, is

11  that intended to include essentially the authors or just --

12  honestly, I don't enough about these particular

13  organizations to know if they have a central clearing house.

14           THE COURT:  Nor do I.  My intention is not to

15  order communications with the authors per se except to the

16  extent that that communication is undertaken in their

17  capacity as a member of that group.

18           MS. ZIMMERMAN:  Okay.

19           THE COURT:  Does that make sense?

20           MS. ZIMMERMAN:  So if it's communication with the

21  person --

22           THE COURT:  On the topic --

23           MS. ZIMMERMAN:  On the topic of the ICOS.

24           THE COURT:  Yeah, or in their role as an ICS

25  member.

1          MS. ZIMMERMAN:  Okay.  I think that's the only

2     question I have.

3          THE COURT:  Okay.  Ms. Young, other than perhaps a

4     little bit of disappointment or consternation, do you have

5     anything that you feel I should hear from the perspective of

6     the defendants?

7          MS. YOUNG:  No, Your Honor.

8          THE COURT:  Okay.  Very well.  We will get an

9     Order out today or tomorrow at the latest that simply

10    embodies this without further discussion of the rationale.

11    That Order when it's issued will start the clock for an

12    appeal of that order to Judge Ericksen.  Okay?  All right.

13    Thank you both.  Court is in recess.

14               (Court adjourned at 11:31 a.m.)

15                    *     *     *

16                    REPORTER'S CERTIFICATE

17         I, Maria V. Weinbeck, certify that the foregoing is

18    a correct transcript from the record of proceedings in the

19    above-entitled matter.

20         Certified by:  *s/ Maria V. Weinbeck*

21                    Maria V. Weinbeck, RMR-FCRR

22

23

24

25