# EXHIBIT 18

1

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF MINNESOTA
 3   -------------------------------------------------------
 4                              )
                                )
 5   Louis Gareis and Lillian   )VOLUME I
     Gareis,                    )
 6        Plaintiff,            )File No. 16-CV-4187
     v.                        )   (JNE/FLN)
 7                              )
     3M Company and Arizant     ) May 15, 2018
 8   Healthcare, Inc.,          ) Minneapolis, Minnesota
                                ) Courtroom 12W
 9        Defendant.            ) 9:03 a.m.
                                )
10   -------------------------------------------------------
11        BEFORE THE HONORABLE JOAN N. ERICKSEN
             UNITED STATES DISTRICT COURT JUDGE
12
             (JURY TRIAL - VOLUME 1)
13
     APPEARANCES
14
     FOR THE PLAINTIFFS:
15                 MESHBESHER & SPENCE
                   Genevieve M. Zimmerman
16                 1616 Park Avenue
                   Minneapolis, MN  55404
17
                   CIRESI CONLIN
18                 Michael Ciresi
                   Jan Conlin
19                 225 South 6th Street
                   Suite 4600
20                 Minneapolis, MN
21                 KASTER LYNCH FARRAR & BALL, LLP
                   Kyle Farrar
22                 1010 Lamar, Suite 1600
                   Houston, TX  77002
23
                   KENNEDY HODGES, LLP
24                 Gabriel Assaad
                   4409 Montrose Blvd
25                 Suite 200
                   Houston, TX 77006
```

2

```
 1   FOR THE DEFENDANTS 3M:      BLACKWELL BURKE P.A.
 2                 Jerry Blackwell
                   Ben Hulse
 3                 Mary Young
                   Corey Gordon
 4                 Peter Goss
                   431 South Seventh Street
 5                 Suite 2500
                   Minneapolis, MN  55415
 6
                   MITCHELL WILLIAMS
 7                 Lyn Pruitt
                   425 West Capitol Avenue
 8                 Suite 1800
                   Little Rock, AR  72201
 9
10   COURT REPORTERS:   MARIA V. WEINBECK, RMR-FCRR
                        RENEE ROGGE, RMR, CRR
11                 1005 U.S. Courthouse
                   300 South Fourth Street
12                 Minneapolis, Minnesota 55415
13
14
                   Proceedings recorded by mechanical
15   stenography; transcript produced by computer.
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              P R O C E E D I N G S
 2                 (9:03 a.m.)
 3                 (Jury in.)
 4        THE COURT:  Good morning, everybody.  Go ahead and
 5   be seated.  Members of the jury, you can sit now wherever
 6   you went.  I was so firm yesterday about how you had to sit
 7   in a particular seat, and we no longer care.  I understand
 8   that some judges make jurors sit in the same seat all
 9   through trial, but I think what if you want to change?
10   Please be seated everybody.  What if you want to change or
11   what if you decide you can't hear or see or you get sick of
12   your neighbor or anything like that.  So from now on, you
13   have that limited amount, you have that limited amount of
14   freedom.
15        And as I told you yesterday, we're going to start
16   with the opening statements of the lawyers.  Remember that
17   the opening statements have the purpose of previewing for
18   you what the lawyers think the evidence is going to be.  The
19   statements themselves are not evidence.  Let me just ask the
20   lawyers if they're ready.  Ms. Zimmerman, are you ready?
21        MS. ZIMMERMAN:  Yes, Your Honor.
22        THE COURT:  And over here, Mr. Blackwell?
23        MR. BLACKWELL:  Yes, Your Honor.
24        THE COURT:  And the plaintiff being the party with
25   the burden goes first.  Ms. Zimmerman, we are ready to hear
```

4

```
 1   from you.
 2        MS. ZIMMERMAN:  Thank you, Your Honor.
 3
 4        OPENING STATEMENT BY MS. ZIMMERMAN
 5        May it please the Court, counsel, Mr. And Mrs.
 6   Gareis's, and Ladies and Gentlemen of the Jury:
 7        My name is Genevieve Zimmerman, and I'm one of the
 8   plaintiff's lawyers who gets to represent these fine folks.
 9   And as the Judge has instructed you, I get to provide you a
10   little bit of a road map about what we expect the evidence
11   is going to show during this trial.
12        A couple of signs that I would suggest will help
13   guide your receipt of this evidence.  Listen carefully for
14   risk and utility.  The risk of using the Bair Hugger in an
15   orthopedic surgery.  Listen to hear if you have presented to
16   you any evidence about utility, benefit of using the Bair
17   Hugger in orthopedic surgery.
18        So what is the Bair Hugger?  You've been waiting
19   all day yesterday and now today to hear a little bit more
20   about it.  The Bair Hugger is a patient warming device.
21   There is actually one of them right here.  This is the
22   exact -- not the exact model that was used in Mr. Gareis's
23   surgery.  It's a Model 505.  One like this was used in
24   Mr. Gareis's surgery.
25        I'm going to turn it on.  And hot air is blowing
```

173

1   periprosthetic joint infections, correct?
2           MR. BLACKWELL:  Objection, Your Honor, Rule 402.
3           THE COURT:  Sustained.
4   BY MR. CIRESI:
5   Q.  Well, you evaluated, did you not, the risk of using the
6   Bair Hugger for prosthetic joint surgery?
7   A.  Well, I certainly participated in a number of hazard
8   analyses over the years.
9   Q.  And you would agree that the Bair Hugger should not
10  increase the particle count over the surgical site?
11  A.  I'm not sure what you, as part of a hazard analysis or?
12  Q.  In this actual operation for periprosthetic joint
13  surgery, should it increase particulate count over the
14  surgical site in its intended use?
15  A.  Well, I think the hazard that we would look at would be
16  the risk of infection not the number of particles.
17  Q.  Well, you understand that very small number of particles
18  could cause an infection?
19  A.  Depending on size, yes.
20  Q.  Okay.  Now, then all I want to know is is it part of its
21  intended use that it should increase the number of particles
22  over the surgical site?  Is that one of its intended
23  purposes?
24  A.  No.
25  Q.  It shouldn't do that, should it?

174

1   A.  Well, it's not part of its intended use.
2   Q.  And it should not do it, isn't that right?
3   A.  Well, we certainly want to minimize that.
4   Q.  So it's okay if a few show up over the site; is that
5   right?
6   A.  Well, again, the risk of that is a question that we
7   would evaluate.
8   Q.  But is it okay if a few show up over the site as a
9   result of its use?
10  A.  Well, it depends on whether a small number has an effect
11  on an outcome like infection.
12  Q.  Well, you knot it does based on the literature, don't
13  you?
14  A.  Again, that is not a settled question.  The relationship
15  between particulates and bacteria is not well-established.
16  Q.  So you don't know whether it's one or two or a hundred?
17  A.  Well, nor does anyone else.
18  Q.  But you do know that there's a substantial body of
19  scientific people who believe that a very small number
20  including Mr. Hansen can cause a joint infection?  You know
21  that, don't you?
22  A.  Yes, I believe that people do believe that a small
23  number of bacteria or particles can cause an infection, yes.
24  Q.  So I'm back to where I was, and that is is it okay then
25  if the normal operation of this device deposits small

175

1   numbers -- allows or deposits a small number of particles
2   over the surgical site, is that okay?
3   A.  Only if there's a risk of increasing the infection rate.
4   Q.  Well, you know that it could increase -- it could cause
5   infection if that got into the surgical site, correct?
6   A.  It's possible.
7   Q.  So how many bacteria should it allow to get there?
8   Where is the cutoff if you're going to use this device in
9   orthopedic surgery?
10  A.  Well, again, I don't think that would be the standard by
11  which it's judged.  We'd want to look at the outcomes
12  associated with its use, not necessarily particles of
13  bacteria, since no one knows what the threshold is.
14  Q.  And that study has never been conducted by 3M, has it?
15  A.  Well, we've looked at -- we've looked at the use of
16  forced air warming in a variety of surgical settings to look
17  at the reduction of risk in infections.
18  Q.  Sir, has the study ever been conducted by 3M to see how
19  many particles should be allowed to go through this tube
20  into this blanket putting out air, disrupting the airflow
21  and possibly depositing over the surgical site, has that
22  study ever been conducted by 3M?
23          MR. BLACKWELL:  Objection, Your Honor, 402 and
24  701.
25          THE COURT:  Well, if you're able to answer that

176

1   question, go ahead and do so.
2           THE WITNESS:  Well, there were a lot of parts.
3   I'm not sure which --
4           MR. CIRESI:  That's fair.
5   BY MR. CIRESI:
6   Q.  Have you ever done or --
7           THE COURT:  Make sure that you remember to use the
8   microphone, Mr. Ciresi.
9   BY MR. CIRESI:
10  Q.  Have you ever, and by "you" I mean the company, ever
11  conducted a study to determine how many particles over the
12  surgical site would result in a prosthetic joint infection?
13  A.  No.
14  Q.  But it's my understanding that your testimony is that
15  you know that a certain number of particles are going to get
16  over the surgical site?
17          THE COURT:  Okay, I think we've covered this.
18  Let's go on to something else.
19  BY MR. CIRESI:
20  Q.  Would you agree with me that there was no reason to
21  increase particle loads over the surgical site from a safety
22  standpoint?
23  A.  I can't think of a reason why that would be beneficial.
24  Q.  In fact, it would be unreasonable to do that, wouldn't
25  it?

177

1   A.  Well, intentionally, yes.
2   Q.  Because that would create potentially an unsafe
3   condition, correct?
4   A.  Potentially.
5   Q.  And if a small number of bacteria can cause an infection
6   in a prosthetic joint replacement, that could cause
7   catastrophic injury, can't it?
8   A.  It could.
9   Q.  Now, you would agree that every study shows that the
10  Bair Hugger increases the absolute count of particles over
11  the sterile field; correct?
12  A.  As far as I know, in absolute numbers the particulate
13  count goes up in a trivial amount, yes.
14  Q.  And there's no internal studies that you're aware of to
15  refute that, correct?
16  A.  That they're refuted?
17  Q.  That would refute that?
18  A.  None that I'm aware of.
19  Q.  Okay.  And did you participate in a Schlieren imaging
20  study at 3M?
21  A.  Well, I have been present for a number of Schlieren
22  activities.  I'm not sure they were studies, but I have,
23  yes.
24  Q.  Okay.  And you were present at one that was done in 2010
25  or '11, correct?

178

1   A.  It's possible.  I would have to look at any if we made a
2   report or.
3   Q.  Do you recall being asked about this in your deposition,
4   sir?
5   A.  Yes, I recall being asked about Schlieren Photography.
6   Q.  Okay.  And there are images that you get off of
7   Schlieren Photography, correct?
8   A.  Yes.
9   Q.  And the purpose of a Schlieren is to look at the effect
10  of the temperature various blankets would have on the
11  airflow in a laminar airflow setting.  That was the purpose
12  of the study or test, I should say.
13  A.  Well, I think that might have been one of the purposes,
14  yes.
15  Q.  And that was an experimental study, correct, or test?
16  A.  I'm not sure exactly what you mean by an experimental
17  test.
18  Q.  Well, it didn't replicate an actual operating room, did
19  it?
20  A.  No, no.
21  Q.  It was a test, fixture, correct?
22  A.  That's right, in a laboratory.
23  Q.  And in the one that you participated in, the imaging
24  showed an effect on the unidirectional airflow by the Bair
25  Hugger blanket, didn't it?

179

1   A.  Again, I would have to see the results of that study to
2   comment on it.  That was some time ago.
3   Q.  All right.  Could you go to your deposition, sir?
4   A.  And where is that?
5   Q.  It should be right there.
6       MR. CIRESI:  May I approach, Your Honor?
7       THE COURT:  You may.  Give it to the witness,
8   please.
9       MR. CIRESI:  I have one for, Your Honor.
10      THE COURT:  Okay.  Patrick, would you take it?
11  BY MR. CIRESI:
12  Q.  Could you go to page 170, 171, sir?  And just to refresh
13  your recollection, starting at the bottom of 170, line 18,
14  over to 171, line 3.  Then I'll ask you a question.  Are you
15  looking at the March 7th deposition, sir?
16  A.  This one is from yes, March 7th, yes, got it.
17  Q.  Have you read it?
18  A.  So there's a mention of Schlieren imaging there, yes.
19  Q.  And the question was, question at line 18, 170:
20      "You would agree with me there was an effect on
21  the imaging is what I'm thinking about that I've seen that
22  was produced, there was an effect on the unidirectional
23  airflow by the Bair Hugger blanket?"
24  A.  I'm sorry, where was that again?
25  Q.  Page 170, line 18.

180

1   A.  Are you talking about the number on the page or the
2   number on the deposition pages?
3   Q.  Deposition page 170, sir.
4   A.  So mine starts with page 18, oh, okay, got it.  I see it
5   now.
6   Q.  Deposition page 170, line 18 on the deposition page.
7   Are you there, sir?
8   A.  I'm there.
9   Q.  Okay.
10      "Question:  You would agree with me that there was
11  an effect on the imaging if it's the one I'm thinking about
12  that I've seen that was produced.  There was an effect on
13  the unidirectional airflow by the Bair Hugger blanket?
14      Answer:  In the test fixture that we put up, yes.
15      Question:  There was an effect on the
16  unidirectional airflow, correct?
17      Answer:  Yes."
18      Did you give those answers at that time?
19  A.  Yes.
20  Q.  Then you recall that study, sir?
21  A.  Yes, I recall that activity, yes.
22      THE COURT:  Just hold on one second.
23      THE WITNESS:  Page 170, yes, line 18.
24      THE COURT:  Mr. Ciresi, would you approach,
25  please?

181

1      MR. CIRESI: Pardon me, Your Honor?
2      THE COURT: Would you approach, please?
3      (Sidebar conference.)
4      THE COURT: This is -- it's not going to say that
5  at all.
6      MR. CIRESI: Oh, my god, it's the March 7th. I'm
7  sorry, yeah.
8           (IN OPEN COURT)
9  BY MR. CIRESI:
10  Q. So you gave those answers to that question, correct,
11  sir?
12  A. Yes, those are my answers, yes.
13  Q. Now, in evaluating the risk benefit of the Bair Hugger,
14  to your knowledge up through 2011, were any studies done to
15  determine if the Bair Hugger caused surgical site
16  infections?
17  A. Well, there were a number of --
18  Q. I'm asking if the company, sir.
19  A. If the company had done any to --
20  Q. Yes?
21  A. Internal microbiology studies? Is that what you're
22  asking? I want to make sure I answer your question.
23  Q. Any testing to determine if the Bair Hugger causes
24  surgical site infection?
25  A. Well, we had commissioned studies to look at the effect

182

1  of the use of the Bair Hugger in surgeries to see if they
2  increased the risk of surgical infections, yes.
3  Q. So your answer is yes, it has?
4  A. Yes.
5  Q. Could you go to the same deposition, page 183?
6      MR. BLACKWELL: Page what?
7      MR. CIRESI: 183.
8      THE WITNESS: Yes, I'm there.
9  BY MR. CIRESI:
10  Q. Okay, 183, did you give the following answer to the
11  following question at line 4?
12      "Question: Okay, with respect to the Bair Hugger
13  Patient Warming System causing surgical site infection, was
14  there any internal testing done by the company 3M, Arizant
15  or Augustine Biomedical with respect to that?
16      Answer: And what was the outcome?
17      Question: Surgical site infection.
18      Answer: No."
19      Did you give those answers on that date?
20  A. I did give those answers.
21      MR. CIRESI: Thank you. I have no further
22  questions.
23      THE COURT: Okay. Mr. Blackwell, any questions?
24      MR. BLACKWELL: I'll be very brief, Your Honor.
25      THE COURT: Okay.

183

1           DIRECT EXAMINATION
2  BY MR. BLACKWELL:
3  Q. Good afternoon, Mr. Van Duren.
4  A. Good afternoon.
5  Q. We're back to discussing particles and bacteria again.
6  For the ladies and gentlemen of the jury, are particles and
7  bacteria the same thing?
8  A. No.
9  Q. Why not?
10  A. Bacteria have a certain size that's generally bigger
11  than many of the particles that in the operating rooms, so
12  particles, many particles that are in the air are not big
13  enough to have bacteria on them.
14  Q. Do particles in of and by themselves cause surgical site
15  infections, just particles?
16  A. No, bacteria cause infections.
17  Q. And would all particles necessarily contain bacteria
18  just because they're in the room?
19  A. No, many of them don't contain any bacteria.
20  Q. Is there a certain size particle capable of even housing
21  or containing a bacteria?
22  A. Yes. It generally has to be, generally has to be above
23  two microns to have bacteria on it.
24  Q. A particle has to be above two microns to have bacteria
25  on it?

184

1  A. Yes.
2  Q. Do you have any basis or foundation to know what size
3  particles were in the operating room as pertains to
4  Mr. Gareis?
5  A. No, I don't.
6  Q. You had a lot of discussion about core temperatures,
7  35.5 degrees or celsius or less, do you remember that
8  discussion?
9  A. Yes.
10  Q. Do you have any basis or foundation to know what was the
11  core body temperature of Mr. Gareis?
12  A. No, I have not reviewed any records of that case.
13      MR. BLACKWELL: Your Honor, we're going to ask
14  Mr. Van Duren to come back in our case, so we'll stop there.
15      THE COURT: All right. You are free to step down.
16      MR. CIRESI: Your Honor, I have a couple
17  questions.
18      THE COURT: Do you have anything just based on
19  what the couple questions we just heard?
20      MR. CIRESI: Yes.
21      THE COURT: Very briefly, Mr. Ciresi. You may
22  proceed.
23           RECROSS EXAMINATION
24  BY MR. CIRESI:
25  Q. Particles I want to talk to you about just a second.

242

```
 1              UNITED STATES DISTRICT COURT

 2                 DISTRICT OF MINNESOTA

 3   -------------------------------------------------------
                                    )
 4                                  )
     Louis Gareis and Lillian       )    VOLUME II
 5   Gareis,                        )
                    Plaintiff,      )    File No. 16-CV-4187
 6         v.                       )    (JNE/FLN)
                                    )
 7   3M Company and Arizant         )    May 16, 2018
     Healthcare, Inc.,              )    Minneapolis, Minnesota
 8                                  )    Courtroom 12W
                    Defendant.      )    9:11 a.m.
 9                                  )
                                    )
10   -------------------------------------------------------

11        BEFORE THE HONORABLE JOAN N. ERICKSEN
             UNITED STATES DISTRICT COURT JUDGE
12
               (JURY TRIAL - VOLUME II)
13
     APPEARANCES
14
     FOR THE PLAINTIFFS:
15                           MESHBESHER & SPENCE
                             Genevieve M. Zimmerman
16                           1616 Park Avenue
                             Minneapolis, MN  55404
17
                             CIRESI CONLIN
18                           Michael Ciresi
                             Jan Conlin
19                           225 South 6th Street
                             Suite 4600
20                           Minneapolis, MN

21                           KASTER LYNCH FARRAR & BALL, LLP
                             Kyle Farrar
22                           1010 Lamar, Suite 1600
                             Houston, TX  77002
23
                             KENNEDY HODGES, LLP
24                           Gabriel Assaad
                             4409 Montrose Blvd
25                           Suite 2000
                             Houston, TX 77006

             MARIA V. WEINBECK, RMR-FCRR
                  (612) 664-5109
```

243

```
 1
     FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
 2                             Jerry Blackwell
                               Ben Hulse
 3                             Mary Young
                               Corey Gordon
 4                             Peter Goss
                               431 South Seventh Street
 5                             Suite 2500
                               Minneapolis, MN  55415
 6
                               MITCHELL WILLIAMS
 7                             Lyn Pruitt
                               425 West Capitol Avenue
 8                             Suite 1800
                               Little Rock, AR  72201
 9
10   COURT REPORTERS:         MARIA V. WEINBECK, RMR-FCRR
                              DEBRA BEAUVAIS, RPR, CRR
11                            1005 U.S. Courthouse
                              300 South Fourth Street
12                            Minneapolis, Minnesota 55415

13

14
                Proceedings recorded by mechanical
15   stenography; transcript produced by computer.

16
17
18
19
20
21
22
23
24
25
             MARIA V. WEINBECK, RMR-FCRR
                  (612) 664-5109
```

244

```
 1        P R O C E E D I N G S

 2            (9:11 a.m.)

 3    (In open court with the jury present)

 4       THE COURT:  Good morning.  Please be seated

 5   everybody.  Welcome back.

 6       Please be seated.  And, Ms. Conlin, we are in the

 7   middle of Dr. Presnal's middle or somewhere.

 8       MS. CONLIN:  Yep, we're going to recall to the

 9   stand by way of video deposition Dr. Presnal.  Your Honor,

10   we played part of it yesterday.  We're picking up at

11   page 27, line 1.

12       THE COURT:  Thank you.

13   (Video deposition of Dr. Bradley Presnal played as follows)

14   Q.  Now, unfortunately, Mr. Gareis developed an infection

15   after this, correct?

16   A.  Yes.

17   Q.  Do you know what type of infection it was?

18   A.  Let me see if I can find it here.  So when I saw him in

19   August of 2011, he came back in with some pain so he did

20   a --

21   Q.  What page are you on, sir?  There should be a number

22   down at the bottom there?

23   A.  25,000.  So I had actually seen him before that because

24   he came back in said his hip was starting to bother him.

25   That was July of 2011, and he came back in because his hip

             MARIA V. WEINBECK, RMR-FCRR
                  (612) 664-5109
```

245

```
 1   had done well initially but then started having some pain

 2   and so we sent him in for some blood work, a CRP,

 3   C-reactive protein and a sedimentation rate.

 4   Q.  What does that tell you?

 5   A.  So those are inflammatory markers, generally if they're

 6   elevated, if both are elevated that can be a sign of

 7   infection so that's when we use two because one alone may

 8   not be very indicative of an infection.  I was trying to see

 9   if we had those results.  I have in my note both the CRP and

10   sed rate were elevated which can be an indication of

11   infection, and so we did an aspiration.  We drew fluid off

12   his hip to check for infection.  It came back with a

13   coag-negative staph.

14   Q.  What kind of organism is that?

15   A.  So it's kind of a slow growing organism.  It typically

16   doesn't make people very ill.  You know, high fevers, night

17   sweats, things like that.  Generally, just creates pain at

18   some point.  It's a hard one to diagnose sometimes because

19   it's hard to grow in the lab.  Sometimes you can get, you

20   know, inconsistent cultures with it.  And sometimes the only

21   thing it causes is pain.  People don't have any other

22   symptom you would expect with an infection.

23   Q.  Was his symptomology consistent with that type of

24   infection?

25   A.  I think so where he comes in, he's not feeling bad, just

             MARIA V. WEINBECK, RMR-FCRR
                  (612) 664-5109
```

362

1   A.   Well, that's an area of debate, but decades of --
2   research dating back decades have even said as many as one
3   bacteria.  But it's just probably several.
4   Q.   Okay.
5   A.   Just a few.
6   Q.   Just a few?
7   A.   Just a few.  But very respective researchers have said
8   one.
9   Q.   You used the term "ultra-clean."  Can you define what
10  that means.
11  A.   When you package an implant, it is truly sterile.  It's
12  packaged in a factory in a clean room where there's no
13  bacteria, and that's sterile.  That's the true definition of
14  sterility, where there's no viable organism.  A bacteria is
15  an organism.  And when you take that component out of the
16  package to put it into the patient, it's now in the air.
17          Unfortunately, even though this looks clean in
18  here, the room and air looks clean -- you can't see clouds
19  or smoke -- there is all this microscopic stuff going on in
20  the air right now.  And it will then no longer then be 100
21  percent sterile.  It's going to be ultra-clean.  That is it
22  might have bacteria on it.  It might not have bacteria on.
23  Any time there is a chance it might have bacteria on it,
24  then it's what we call ultra-clean.
25          We try to make the -- we try to make the room as

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

363

1   sterile as we can, but we never can get to a one hundred
2   percent sterility.  The good news is we know that if we keep
3   that level of bacteria down to a certain amount, then the
4   chance of you not having infections is really low.
5          THE COURT:  Meaning you have an infection?
6          THE WITNESS:  Chance of you having an infection,
7   yes, Your Honor.  It's really low if you can keep that down.
8   So you have to control the environment and make it an
9   ultra-clean environment.
10          It's one of the reason why when I open these
11  components, I only open them the minute I need them.  So I
12  believe I'm actually putting a sterile component in because
13  I'm not letting the environment see this component for very
14  long.  So that's one way I control the environment, is just
15  open it when I need it.  Everybody on my team knows that,
16  and that's standard of care.
17  BY MR. FARRAR:
18  Q.   Are there, those components, are they -- tell me how
19  they are packaged.
20  A.   They're packaged many different ways, but they are often
21  three layers.  So there is a package within a package within
22  a package.  And the exact mechanics of how the factory does
23  it, I'm not an expert in that, but it's done in a clean room
24  basically where it's free of bacteria and organisms.
25  Q.   If there are bacteria organisms above the open incision,

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

364

1   can they attach to the prosthesis?
2   A.   Surely.  One thing to think about is every room has
3   bacteria, skin cells.  Humans shed up to 10 to the 9th.  I
4   think that's about 100 billion skin cells a day.  So it's an
5   amazing number that humans shed of their skin.
6          Skin cells also have bacteria.  There's also
7   particles that have bacteria on them.  And there is lint and
8   dust that have bacteria on it.  This is all floating in the
9   air right in here.  It's kind of gross to think about.  But
10  there's plenty of studies that date back many decades and
11  even recently -- one I saw in 2012, a study that showed that
12  the floors are full of skin, and dust, and bacteria.  What
13  happens is it's in the air and then it settles on the floor.
14  And that happens when people walk into a room.
15          So I imagine this room is cleaned every day, and
16  most rooms in public-use buildings are cleaned every day.
17  And if we were to study this room before all of us came in
18  here, we would find a whole lot less microbiological load in
19  here, meaning a lot less skin cells, a lot less bacteria, a
20  lot less dust, particles.  A lot of its on the floor.  Some
21  of it's floating in the air -- a lot of it's floating in the
22  air.  But when we all came in here -- no offense taken, Your
23  Honor, including Your Honor --
24          THE COURT:  Leave me out of this.
25          THE WITNESS:  Okay, I will.  And me, the officers

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

365

1   of the court, y'all, the spectators, we just brought in
2   trillions of stuff into this room.  It's really gross to
3   think about, but that's what we did.  And all of that has
4   potential bacteria.
5          You can't make an operating room a clean room.
6   Maybe one day in the future, space, in 2200 or 2300 or
7   something like that we might have a clean room we can
8   operate in, and that will be a happy day.  Right now we
9   can't do that.
10          So as soon as all of us walk into the room and we
11  bring in all of our stuff, we have to have a way to protect
12  the patient.  That's what ultra-clean is all about, is
13  trying to protect the patient from having all the stuff --
14  bacteria, skin cells, particles, lint, dust -- that just is
15  naturally on you and falls off you get into the wound.  The
16  way we do that is through a lot of different mechanisms.  I
17  don't know if you want me to go into it.
18  BY MR. FARRAR:
19  Q.   No, I do.  I want to talk about what you as an
20  orthopedic surgeon -- what orthopedic surgeons in general do
21  to protect the patients from surgeries.  I want to start
22  with the ventilation system if we would.
23          If you could put up 1606.
24          So, Doctor, I'm showing -- this is, obviously, not
25  to model Mr. Gareis' operating room, sort of a generic

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

366

1  operating room, but I want to talk about the ventilation.
2  Describe to me what unidirectional flow is and how it
3  protects the patient from infection risks.
4  A.  This is what I'm talking about.  When we walk into a
5  room, we bring a bunch of our stuff with us.  What I tell my
6  team every day and they say, Yeah, Doc, we know, bacteria is
7  your number one enemy.  Well, it is.  It's my number one
8  enemy because it's my patient's number one enemy.
9        The way we do it is create a unidirectional --
10  protect the patient is create a force field that you can
11  see -- can I draw on this?
12  Q.  Yep.
13  A.  This is -- up here are the diffusion panels where air is
14  being -- clean air is being pushed through into the
15  operating room.  And it pushes those falling skin cells, and
16  lint, and dust, and everything that we don't like on our
17  patients down and out, so away.  It's basically creating
18  this force field that the patient is in, and all that stuff
19  is being exhausted to the returns or the exhaust fans in the
20  room.
21        So clean air coming down.  How we get that clean
22  air?  We do it through filtered air.  We have a filter that
23  is often a HEPA filter and close to one hundred percent
24  filtration -- never one hundred percent because we're
25  humans; I think it's 99.97 percent filtering out at a

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

367

1  certain size of particle.  And not just that filter, that
2  filter will be right here before the diffusion panels, but
3  there's another one downstream from it and then another one
4  often downstream from that.  Sometimes an ultraviolet light
5  is thrown into the mix where it's also killing bacteria.  So
6  you have filter, ultraviolet light, filter, filter, air
7  coming into the operating room.  We're doing the best
8  humanly possible.  It's not the best we will have one day,
9  but it's the best right now.
10  Q.  The ultraviolet light, does it eradicate particles or
11  bacteria?
12  A.  The ultraviolet light will kill bacteria on particles.
13  Q.  So the bacteria are riding on the particles?
14  A.  That's right.
15  Q.  I'm sorry, I didn't mean to interrupt you.
16  A.  So it's pushed down, and then that's called
17  unidirectional flow.  And then it's pushed out the exhaust
18  fans.
19        And I think it's very important, that dates back
20  to Sir John Charnley.  He was knighted for his work in
21  orthopedic surgery.  He's an amazing man.  He's a man that
22  most orthopedic surgeons revere because he came up with this
23  (indicating).  He invented it.  But he also began the work,
24  early work, on unidirectional airflow and protecting
25  patients.  And subsequent studies over the last several

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

368

1  decades have shown it to be very important in protecting the
2  patient.
3        MR. FARRAR:  Your Honor, can I pull over the board
4  and draw on it?
5        THE COURT:  Well, sure.  Go ahead.
6        MR. FARRAR:  We'll do it at the lunch break.
7        THE COURT:  It's finding a location that doesn't
8  block everybody's view that's a challenge.
9        MR. FARRAR:  We'll do it at break and we'll figure
10  it out.  It will be easier.
11  BY MR. FARRAR:
12  Q.  You talked about force field -- sort of a force field.
13  I think that's also known as a sterile field.  Is that
14  right?
15  A.  Yes, sir.
16  Q.  That's kind of the professional term for it?
17  A.  Yes, sir.
18  Q.  All right.  Tell me where the sterile field, if you can
19  draw on this -- I'll clear out what you've got -- tell me
20  where the sterile field is.
21  A.  Okay.  So this is the operating room table (indicating).
22  That's ground zero.  That's where the patient is.  And I
23  like to say it's all about the patient, nothing else.
24  Everything we do is about the patient.  So we want to
25  protect the patient.  That's ground zero, the sterile field.

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

369

1  Anything below this is not sterile, is not ultra-clean.
2        And often you'll have tables that are used in the
3  operating room, and those are in the sterile field as well.
4  This table is out of the sterile field, but you can think of
5  that gray zone as the sterile field.  If this table were in
6  here, there would be a surgery tech standing next to it, and
7  it would be covered with sterile drapes that they go to
8  school to learn how to do.  That's the biggest part of their
9  training, is learning how to sterilely drape tables and
10  sterilely drape patients.  They spend a lot of time going
11  over that.  They're very good at it.  Very proud of the
12  surgery techs I work with.  They do a fantastic job
13  protecting our patients.
14  Q.  I put up another slide that shows the red below the
15  operating room table.  Would you consider that area sterile
16  or is it not sterile?
17  A.  I think that's a pretty good pictorial of what's not
18  sterile.  Basically, the reason why surgeons have their
19  hands up you see in TV -- they don't necessarily have them
20  up like this, but --
21  Q.  That's for the shows, right?
22  A.  Yeah.  But he can be down here about waist level.
23  Anything between waist or table level is not sterile.  It's
24  where it's a danger zone.
25  Q.  Are surgeons careful not to have anything that's below

DEBRA BEAUVAIS, RPR, CRR
(612) 664-5102

501

```
 1          UNITED STATES DISTRICT COURT
 2          DISTRICT OF MINNESOTA
 3   ---------------------------------------------
                                    )
 4                                  )
     Louis Gareis and Lillian       )VOLUME III
 5   Gareis,                        )
              Plaintiff,            )File No. 16-CV-4187
 6       v.                         )  (JNE/FLN)
                                    )
 7   3M Company and Arizant         )  May 17, 2018
     Healthcare, Inc.,             )  Minneapolis, Minnesota
 8                                  )  Courtroom 12W
              Defendant.            )  12:20 p.m.
 9                                  )
                                    )
10   ---------------------------------------------
11        BEFORE THE HONORABLE JOAN N. ERICKSEN
          UNITED STATES DISTRICT COURT JUDGE
12
          (JURY TRIAL - VOLUME III)
13
     APPEARANCES
14
     FOR THE PLAINTIFFS:
15                       MESHBESHER & SPENCE
                         Genevieve M. Zimmerman
16                       1616 Park Avenue
                         Minneapolis, MN  55404
17
                         CIRESI CONLIN
18                       Michael Ciresi
                         Jan Conlin
19                       225 South 6th Street
                         Suite 4600
20                       Minneapolis, MN
21                       KASTER LYNCH FARRAR & BALL, LLP
                         Kyle Farrar
22                       1010 Lamar, Suite 1600
                         Houston, TX  77002
23
                         KENNEDY HODGES, LLP
24                       Gabriel Assaad
                         4409 Montrose Blvd
25                       Suite 200
                         Houston, TX 77006
```

502

```
 1
 2   FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
                         Jerry Blackwell
 3                       Ben Hulse
                         Mary Young
 4                       Corey Gordon
                         Peter Goss
 5                       431 South Seventh Street
                         Suite 2500
 6                       Minneapolis, MN 55415
 7                       MITCHELL WILLIAMS
                         Lyn Pruitt
 8                       425 West Capitol Avenue
                         Suite 1800
 9                       Little Rock, AR  72201
10   COURT REPORTERS:         MARIA V. WEINBECK, RMR-FCRR
                         RENEE ROGGE, RMR, CRR
11                       1005 U.S. Courthouse
                         300 South Fourth Street
12                       Minneapolis, Minnesota 55415
13
14
               Proceedings recorded by mechanical
15   stenography; transcript produced by computer.
16
17
18
19
20
21
22
23
24
25
```

503

```
 1               P R O C E E D I N G S
 2                    (12:17 p.m.)
 3          (In open court with jury.)
 4       THE COURT:  Welcome back, everybody.  Please be
 5   seated.  And we'll have Dr. Stonnington back on the witness
 6   stand.  You're still under oath from yesterday.
 7       THE WITNESS:  Yes, Your Honor.
 8       THE COURT:  And, Mr. Farrar, whenever you're
 9   ready.
10          REDIRECT EXAMINATION
11   BY MR. FARRAR:
12   Q.  Doctor, welcome back.  I have a few questions just
13   followups.  We're going to be pretty short.  I want to talk
14   to you about some of the other equipment that Ms. Pruitt
15   talked to you about yesterday that's in the operating room.
16   And if we're going to pull up the operating room, if you
17   would do that, 1606.  This is just a kind of a mock --
18   demonstrative.
19          But she talked about an anesthesia machine.  If
20   you just kind of point to where an anesthesia machine would
21   be located.
22   A.  It would be at either end of the table depending on
23   what's the head or the -- you can use the table, the table
24   has either got a head and a foot side, but you can actually
25   switch them around.  We sometimes do for certain different
```

504

```
 1   types of operations, so anesthesia can be received from
 2   either side.
 3   Q.  Does the anesthesia machine blow air from the unsterile
 4   field on the patient?
 5   A.  No, it doesn't.  In fact, the back of the anesthesia
 6   machine is where the air comes out of, and it's typically in
 7   every OR I've been in it's aimed away from the sterile field
 8   and that it's going towards the returns the exhaust fans
 9   where the air goes out.
10   Q.  She asked you about electrocautery machine, is that also
11   called a Bovie?
12   A.  Yes, sir.
13   Q.  What is a Bovie and where is it?
14   A.  A bovie is basically a hot knife.  And it's --
15       THE COURT:  How do you spell Bovie?  Like a Bovie
16   knife?
17       THE WITNESS:  It's b-o-v-i-e.
18       THE COURT:  Oh, Bovie, not a boning.
19   A.  Yeah, it's not a bowie knife or however you want to say
20   it.  It's not a Texas knife, I guess.  It's a various thin
21   pointed device that it heats up, and you can basically cut
22   tissues and cauterize bleeding while you're going down, but
23   you don't use it the whole way down either.  I use a
24   combination.  I use a lot of dissection with my fingers.
25   Q.  When you say "dissection," what do you mean?
```

Gareis vs. 3M                                                                                    May 17, 2018 - Volume III

509

1  **Q.** The nurse anesthetist took a break, is that unusual in
2  your practice?
3  **A.** That's very common.  That's usual.  In fact, it's a
4  running joke among surgeons that we make fun of them
5  anesthesia folks because they always have to have a lunch
6  break, and they always have to have bathroom breaks and
7  that's what they do.  And, you know, they're working all
8  day.  At least after I get done with a case, I can go sit
9  down in the lounge, but they actually, they got to keep
10  getting patients back, so they rightfully deserve to have
11  the breaks, but we make fun of them for that.
12         But that's what they do.  So when they need to go
13  to the bathroom, they get relieved.  When they need to go to
14  the lunch, they get relieved, and that's standard care
15  across America.
16  **Q.** Is there anything unusual about it?
17  **A.** There's nothing unusual about it.
18  **Q.** There was questions regarding a rep from the
19  manufacturer of the prosthesis in the room?
20  **A.** Correct.
21  **Q.** Do you typically have reps in the room when you're doing
22  hip replacement surgery?
23  **A.** For joint replacements every case.
24  **Q.** Why?
25  **A.** The representative knows all the vital points about the

510

1  prosthesis, so when you're putting this in, they know where
2  the boxes are that contain the components that are a few
3  millimeters different.  They can answer questions about
4  factory specifications that may or may not be right on the
5  -- might not be available to the surgeon right there other
6  than through the representative.  They make sure that the
7  prosthesis is the correct box is being chosen to open for
8  the surgery.
9         They, in my practice, they will come into my
10  clinic, and they will look at the x-rays of the patients I'm
11  about to operate.  They'll make measurements and go over the
12  case, and we'll come up with a plan for the next day.
13  They're actually a really vital part of the joint
14  replacement care, and so that is typical for them to be in
15  the room.
16  **Q.** Would you consider it part of the standard of care?
17  **A.** It is definitely part of the standard of care.
18  **Q.** So the number of folks in Mr. Gareis's surgery, is that
19  consistent with the number of people that are in and out of
20  the surgeries that you do?
21  **A.** That is, yes, that's typical.  And we're not at a point
22  in medicine where we're sitting, going to have, you know,
23  maybe one day, you know, maybe we'll be this space ship
24  society where we're going to have surgeons sitting in
25  control rooms with joy sticks.  We're going to have robots,

511

1  everything is sterile, and no human is going in and out.
2  But right now the best we have is what you just described,
3  and we have to work with that.  And so that's why we create
4  an OR to diminish the effects of that.  And just because
5  it's like that, it's not a license to make it worse.
6  **Q.** When you say you create an OR to combat the effects,
7  what are you talking about?
8  **A.** Going back to Sir John Charnley, who was united over his
9  work on this, creating unidirectional airflow that protects
10  the patient via this force field of getting the particles,
11  the skin cells that are floating, the dust that is floating
12  getting away from the patient and out to the return vents.
13  And that's one of the reasons, that's the main reason we
14  have that because we have to have human activity in the
15  operating room.  I have to be able to move my arms to do a
16  surgery.  I have to have a scrub nurse who can go from table
17  to handing me an instrument.  I have to have a circulator
18  who can go get things that are necessary.  It's --
19  the anesthesiologists have to take breaks.  Those are all
20  the things that are standard of care, but it's not a license
21  to make things worse.
22  **Q.** You were asked a question about whether the patient's
23  skin is a major source of bacteria.  And you wanted to give
24  an explanation, and you didn't get a chance to, but you do
25  now, so I want to let you explain what you wanted to say

512

1  about that to the jury, please.
2  **A.** So the skin is a major source of bacteria.  And as far
3  as it being a significant source, it's a significant source
4  from the standpoint that there's not just the skin cells on
5  your skin.  We deal with the skin cells on your skin with
6  the prep.  It's the skin cells like I talked about in this
7  room.  It's the skin cells in the air, it's the skin cells
8  on the floor.  Those are in addition to the skin cells that
9  are on your skin.  It's what makes it significant is we have
10  to figure out how to control the skin cells that are not
11  controllable.  And those are the -- and the best we can do
12  to make them controllable is through unidirectional air.  We
13  control the skin cells on the skin through our prep and we
14  try our best to control the skin cells through this
15  unidirectional air through this force field which takes
16  those cells, those particulates, that dust and pushes it out
17  through the return vents and protects the patient, and so
18  that's what I meant.  Those skin cells carry bacteria.  A
19  significant percentage of them carry bacteria.
20  **Q.** The prosthesis, can you hold that up?  How does a
21  bacteria get from wherever it is on a skin cell onto that
22  prosthesis during a surgery?
23  **A.** If you didn't have that force field protection from the
24  unidirectional air, the skin cells can actually come up from
25  the floor in the air and do that (witness indicates.)

513

1  **Q.** Is that called airborne contamination?

2  **A.** That's airborne contamination, and that is through

3  decades of research, that is the source of intraoperative

4  infections.

5  **Q.** Can bacteria, do they have -- this is maybe a silly

6  question, but do they have legs? Can they walk or jump?

7  **A.** They have to have a vector, and the vector is something

8  that carries it to them. And it's the air, it's the air

9  carrying it to them. So you have to have a way to control

10  the air, to control those skin cells from getting on to the

11  prosthesis and that's what we do. We control it through the

12  unidirectional air.

13  **Q.** So if you're putting in a prosthesis like that into

14  someone like Mr. Gareis, is it possible for bacteria that's

15  on his skin while you're putting it in to jump on to the

16  prosthesis?

17  **A.** Jump on it by itself?

18  **Q.** Right.

19  **A.** No, it's not. It needs something to bring it there.

20  And what's interesting is when you prep a patient's skin,

21  the Darouiche study from 2010 the New England Journal of

22  Medicine, a significant study, it showed that when you prep

23  a patient's skin with the best we have, which right now is

24  in my opinion ChloraPrep, which I use, that showed a

25  decrease infection rate at the skin level. It didn't show a

514

1  decrease infection rate at the deep joint. So it shows that

2  it's the air infecting the deep joint. It's not the skin

3  because if it had been the skin, that study would have shown

4  an increased infection rate of deep joints, and it didn't.

5  **Q.** So airborne contamination is what infects people for

6  deep joint infections?

7  **A.** Airborne contamination dating back decades, decades of

8  research.

9       MR. FARRAR: Your Honor, may I approach?

10       THE COURT: You may.

11  BY MR. FARRAR:

12  **Q.** The international consensus we talked about yesterday

13  from both I asked you some questions and Ms. Pruitt asked

14  you some questions about it, and this is the group of four

15  hundred or so that get together every couple of years and

16  discuss the best practices to prevent deep joint infections,

17  correct?

18  **A.** Yes, sir.

19  **Q.** And I think I asked you this, but you find it

20  authoritative and relied on it for opinions in this case,

21  right?

22  **A.** I did.

23       MR. FARRAR: I'm going to ask questions on this,

24  do you have any objection?

25       MS. PRUITT: No. It's not that I don't want to.

515

1  BY MR. FARRAR:

2  **Q.** I want to, it's sort of a thick book, but I'm going to

3  turn your attention if you would on the bottom to page 115.

4  **A.** I think I found it this time.

5       MS. PRUITT: Which number is that?

6       MR. FARRAR: It's question 2 on page 115.

7       MS. PRUITT: Where is the page?

8       THE WITNESS: Oh, I see it.

9  BY MR. FARRAR:

10  **Q.** Do you see where I'm looking, do you see question 2?

11  **A.** I do.

12  **Q.** All right. What's question 2 say?

13  **A.** "Do numbers of bacteria in the operating room

14  environment correlate directly with the probability of SSI?

15  Surgical site infection.

16  **Q.** And can you read what the consensus --

17       REPORTER: I'm sorry.

18  **A.** SSI means surgery site infection.

19  **Q.** And if you would read what the consensus is?

20  **A.** "We recognize that airborne particulate bacteria are a

21  major source of contamination in the OR environment and that

22  bacteria shed by personnel are the predominant source of

23  these particles. The focus of our" -- do you want me to

24  keep going?

25  **Q.** No, I really want to ask you about the justification and

516

1  it says, "air is a potential source of contamination in the

2  OR," and this is the part that I wanted to focus on.

3  **A.** Okay.

4  **Q.** "Studies have demonstrated that the number of airborne

5  bacteria around the wound is correlated to the incident of

6  periprosthetic joint infection." Can you tell the ladies

7  and gentlemen of the jury what that means?

8  **A.** So it's the airborne bacteria that is correlated with

9  the infection in the joint. It's airborne bacteria that is

10  affecting the deep joint. It's not the skin. It's not the

11  skin on the patient's skin. It's the airborne bacteria that

12  are floating on skin or particles or dust that are then

13  making their way into the wound and infecting that joint.

14  **Q.** I want to shift gears. You were asked some questions

15  about Mr. Gareis having a prior total hip replacement on his

16  other hip, and he had two other in his revision surgeries.

17  And the questions were something about him using the Bair

18  Hugger and not getting the infections in those, and I want

19  to ask you is that significant to you as an orthopedic

20  surgeon that he used the Bair Hugger in other instances and

21  did not get an infection?

22  **A.** It is. To answer your question, that's not significant

23  to me.

24  **Q.** Why not?

25  **A.** Because like I said, the operating room is not a robotic

597

1 **Q.** Well, actually, that raises a good point I would like
2 to clarify for the Ladies and Gentlemen of the Jury. You
3 were here when Dr. Presnal's deposition was played,
4 correct?
5 **A.** Yes.
6 **Q.** And do you recall him talking about the fact that
7 looking at the stain of the bug he couldn't tell where it
8 came from?
9 **A.** Correct.
10 **Q.** Okay. What did that mean to you?
11 **A.** Well, if you look at this plate or if you looked at a
12 stain, what's called a Gram stain that stains these bugs so
13 you can see them under a microscope, it doesn't tell you
14 anything about where they came from. Unless I told you
15 where I cultured them from, you would have no idea where
16 they were even at.
17 **Q.** But that's a different issue than when you were finding
18 out when you were inoculated with the bug, correct?
19 **A.** Correct.
20 **Q.** And that's the investigation that you did?
21 **A.** Correct.
22 **Q.** Okay. If we could direct your attention to
23 Plaintiffs' demonstrative Exhibit 1607, slide 30, which we
24 would offer for demonstrative purposes.
25 What are we looking at here, Dr. Jarvis?

599

1 exchange genetic material among themselves. So compared to
2 an organism such as the coagulase positive or
3 Staphylococcus aureus that I showed you, that would tend to
4 grow much faster. It has enzymes in it that allow it to
5 burrow through tissue much more rapidly. So you are going
6 to have more clinical signs and symptoms with a Staph
7 aureus infection than you would have with a Staphylococcus
8 epidermis infection.
9 **Q.** Okay. I would like to direct your attention to
10 Plaintiffs' Trial Exhibit 1607, slide 35, which we would
11 offer for demonstrative purposes.
12 And you've mentioned biofilm. Can you describe
13 this visual for the Ladies and Gentlemen of the Jury in
14 connection with the creation of biofilm and how it can
15 smolder for a long time before exhibiting itself?
16 **A.** Sure. So on this slide, if you thought of that gray
17 almost like table as an implant, the organism in 1 is
18 landing on it; and when they land on it, they attach
19 themselves and then they produce what's called an
20 exopolysaccharide or biofilm or, as Dr. Stonnington said,
21 slime that covers themselves and, as he mentioned, that
22 coverage or biofilm or slime helps to protect them. It's a
23 defense mechanism for the organism. The organism is saying
24 I want to live here, I want to grow and proliferate here,
25 which we as humans don't want it to do, but it wants to do,

598

1 **A.** So this is just showing you that once you have this
2 Staphylococcus, you could do a Gram stain and see that it's
3 a Gram-positive, so it will be a purple-looking bug under a
4 microscope. Then you do this very simple test in the test
5 tube called a coagulase test. And if it's coagulase
6 positive, that means it's Staphylococcus aureus. If it's
7 coagulase negative, and we have heard coagulase negative
8 Staphylococci, it puts it into that category. And of all
9 of the coagulase negative Staphylococci, Staphylococcus
10 epidermidis is the most common one.
11 **Q.** Okay. And we've heard a lot of testimony about the
12 fact that it's a common bug on your skin; is that right?
13 **A.** Correct.
14 **Q.** Is it a common bug deep down in your hip where an
15 implant is?
16 **A.** No. That would be sterile.
17 **Q.** Okay. And so by what mechanism could a Staph epi bug
18 end up on an implant?
19 **A.** The primary mechanism would be airborne.
20 **Q.** And there was also some testimony about the fact that
21 this is a slow-growing bug. Do you agree with that
22 assessment?
23 **A.** Well, everything is relative, but if it's in a biofilm,
24 one of the advantages that the organism has when it's in a
25 biofilm is they can down regulate their growth, they can

600

1 so it has developed mechanisms to help it do that.
2 One of the ways is to put this shield or
3 fortress, as Dr. Stonnington talked about, through this
4 slime or biofilm that then prevents the blood and our
5 immune system cells from getting to it or the antibiotics
6 in our blood getting to it or you need very high levels of
7 antibiotic to try to drive it in. As you can see, they
8 gradually produce in no. 2 a little bit of slime and then
9 in no. 3 it's even more; and within that slime, they are
10 exchanging genetic, basically talking to one another. It's
11 a community. They're talking to one another. They're
12 growing. If they feel like they're growing too fast, they
13 can send a signal to one another and say let's slow down
14 here.
15 So they gradually grow to larger numbers, and
16 then at some point they break through the slime and can get
17 into the other tissue or get into the bloodstream.
18 **Q.** Okay. I would like to switch gears now, Dr. Jarvis,
19 and talk to you about the methodology that you employed in
20 arriving at the conclusions and your opinions that we're
21 going to be talking about. Okay?
22 **A.** Okay.
23 **Q.** Did you review a number of journal articles and medical
24 studies?
25 **A.** Everything I could find.

601

1  **Q.** Okay. How arduous was that undertaking?

2  **A.** Well, it took a lot of time because I tried to review

3  as much of the literature as I could find, both in terms of

4  normothermia, risk factors for prosthetic joint infection,

5  the impact of particles, correlation between particles and

6  bugs or colony-forming units, virtually everything I could

7  try to find on the subject.

8  **Q.** Okay. And did you also review a number of expert

9  reports both by the plaintiffs as well as the defense

10  experts?

11  **A.** Correct. Yes.

12  **Q.** Okay. And did you review deposition testimony and

13  documents that were exchanged between the parties in the

14  case?

15  **A.** Yes.

16  **Q.** Okay. So describe the methodology that you did in

17  arriving at your conclusions here.

18  **A.** Well, first was reading Mr. Gareis's medical records,

19  and then was looking at all of the peer-reviewed published

20  literature that I could find that addressed the subject in

21  evaluating those papers, and then looking at expert reports

22  and depositions to see do they substantiate, conflict with

23  what's in the literature, and then reaching an opinion

24  balancing all of that.

25  **Q.** Okay. Now, you mentioned before that you had seen --

602

1  or have you seen scientific literature relating to whether

2  airborne contamination can cause prosthetic joint

3  infections like the one that Mr. Gareis suffered from?

4  **A.** Yes.

5  **Q.** Okay. Is that something that is well recognized?

6  **A.** Absolutely.

7  **Q.** Okay. I would like to direct your attention,

8  Dr. Jarvis, to Plaintiffs' Exhibit 795. And that was the

9  reference we talked about before, correct, Doctor?

10  **A.** Correct.

11  **Q.** And I think you read the last sentence about that the

12  results obtained through that study by far found that the

13  greater part of bacterial wound contamination in operations

14  for joint replacement is derived from air; is that correct?

15  **A.** Correct.

16  **Q.** And did that weigh on your opinion?

17  **A.** Yes.

18  **Q.** Okay. I would like to direct your attention as well to

19  Plaintiffs' Exhibit 530. And what's the title of

20  Plaintiffs' Exhibit 530?

21  **A.** Association of Airborne Microorganisms in the Operating

22  Room With Implant Infections: A Randomized Controlled

23  Trial.

24  **Q.** And where was this published?

25  **A.** In Infection Control and Hospital Epidemiology.

603

1  **Q.** Okay. And what's the date of this?

2  **A.** January 2017.

3  **Q.** Okay. Do you consider the Infection Control and

4  Hospital Epidemiology journal to be authoritative?

5  **A.** Yes.

6  **Q.** And is it something that folks like yourself would rely

7  upon in connection with their work?

8  **A.** Yes. This is the one I mentioned that I was the editor

9  of.

10  **Q.** Okay. And did you rely on this article in forming your

11  opinions in this case?

12  **A.** Yes.

13      MS. CONLIN: Okay. We would offer Plaintiffs'

14  Exhibit 530 under 803(18).

15      THE COURT: You may proceed.

16      MS. CONLIN: Thank you, Your Honor.

17  BY MS. CONLIN:

18  **Q.** If you could just describe what they were attempting to

19  do in this study, Dr. Jarvis?

20  **A.** Well, this is the study that I mentioned to you by

21  Darouiche from the VA in Houston where he randomized

22  patients to two different arms. One was -- I mentioned

23  vacuum cleaner. I probably carried that analogy a little

24  bit too far. It looks like the end of a vacuum cleaner,

25  kind of like that (indicating), but it's actually not

604

1  sucking. It's blowing HEPA-filtered air. So HEPA

2  filtration, which is what operating rooms have as usually

3  one of the last filters before it comes into the operating

4  room, they filter out 99.97, so almost 100 percent of

5  particles that are 0.3 microns or bigger.

6      Now, to give you a sense of 0.3 microns, if I

7  took a hair off of any one of you and just held it up, it's

8  less than 40 microns. And we're talking about .3 microns.

9  So it gets very small particles and anything bigger than

10  that and stops it from getting into the room.

11      In this study they used a device that they put

12  right next to the incision that looks a little bit like the

13  end of a vacuum cleaner, and it blew this HEPA-filtered air

14  over the incision. So it's similar to the air coming down,

15  the laminar flow or unidirectional airflow, where the air

16  is coming down, having basically a protective shield to

17  blow particles away from the operative field. This is

18  blowing it across the incision during the time they're

19  doing the surgery.

20      So the question these authors were asking was, if

21  we make the area right around the incision really, really,

22  really super clean, what impact is it?

23  **Q.** Okay. And if I can stop you there, if you can look at

24  the first page of this Darouiche study, Dr. Jarvis, on the

25  left-hand side, the very last sentence starting with

625

1 room table and what does it do to those, and it gives us a
2 visual of what it's doing to those.
3 **Q.** Okay. Did you also review the report or the McGovern
4 study?
5 **A.** Yes.
6 **Q.** Okay. And we're going to talk about that a little bit.
7 You understand that Dr. Samet is coming next week on that,
8 but I just want you to briefly touch upon why you thought
9 that study was important to the opinions that you're
10 reaching here.
11      So if I could direct your attention to
12 Plaintiffs' Trial Exhibit 93.
13      MR. COREY GORDON: Your Honor, we want to note
14 our objections under 402 and 403 and MIL 1.
15      THE COURT: You may proceed.
16      MS. CONLIN: Thank you.
17 BY MS. CONLIN:
18 **Q.** Do you have it, Doctor.
19 **A.** Yes, ma'am.
20 **Q.** This is known as the McGovern study; is that right?
21 **A.** Correct.
22 **Q.** And it was published in the Journal of Bone and Joint
23 Surgery, correct?
24 **A.** Yes.
25 **Q.** Okay. And it was authored by Dr. McGovern from the UK,

626

1 correct?
2 **A.** Correct.
3 **Q.** And then there were also some individuals from
4 Minnesota, including Mr. Albrecht and Dr. Belani and
5 Dr. Nachtsheim, correct?
6 **A.** Correct.
7 **Q.** Okay. And was this a study that was comparing
8 surgical -- I'm sorry -- deep joint infections or PJIs or
9 DJIs, you consider those interchangeable, right?
10 **A.** Correct.
11 **Q.** Comparing the infection rate when a Bair Hugger was
12 used versus a different warming modality; is that right?
13 **A.** That was one part of the study, yes.
14 **Q.** Okay. And I would like to direct your attention to the
15 discussion which is on page 5.
16 **A.** Okay.
17 **Q.** And if you could just read the first sentence and what
18 impact, if any, that sentence had to you in connection with
19 your conclusions in this case?
20 **A.** "Forced air warming was found to have a significant and
21 disruptive impact on the clean airflow patterns over the
22 surgical site compared to conductive fabric warming which
23 had no detectable effect."
24 **Q.** Okay. And did the McGovern authors also look at
25 whether you got more infections if you used the Bair Hugger

627

1 versus some other way of warming?
2 **A.** Yes.
3 **Q.** Okay. And what did those authors find?
4 **A.** That the risk of an infection was increased by a factor
5 of 3.8 over the other warming system. Odds ratio was 3.8.
6 **Q.** What is -- Dr. Samet is going to talk about this next
7 week, but the way I think about it from a lay person
8 standpoint, does that mean you have a 380 --
9      THE COURT: Use the microphone.
10      MS. CONLIN: Sorry, Your Honor. Sorry.
11 BY MS. CONLIN:
12 **Q.** -- 380 increase or times increased risk, or how would
13 you describe an odds risk ratio of 3.8 to those of us who
14 are not epidemiologists?
15 **A.** You have a 380 times greater risk of having an
16 infection.
17 **Q.** And if I could direct your attention to page 7 of
18 Plaintiffs' Exhibit 93.
19 **A.** Okay.
20 **Q.** And I would like you to look at the first full
21 paragraph there after they talk about this 3.8 increased
22 risk, and it says, "This study does not establish a causal
23 basis for this association."
24      What does that mean?
25 **A.** Well, I think they realize that, you know, it's not a

628

1 huge number of patients, and it's very difficult in most
2 studies to show a causal relationship.
3 **Q.** Okay. Is that language that you see often?
4 **A.** Very often, yes.
5 **Q.** Okay. And what does it mean that there is an
6 association versus causal basis?
7 **A.** Well, association means that they've obviously found a
8 statistical association and that what they can't say is it
9 is the only cause.
10 **Q.** Okay. And so is it -- and was this a randomized
11 control trial?
12 **A.** No.
13 **Q.** It was an observational study?
14 **A.** Correct.
15 **Q.** And what import does that difference have to someone
16 such as yourself?
17 **A.** Well, theoretically randomized control trial, as we
18 mentioned, that controls for confounding variables is, can
19 be the best type of study. That's not to say that some
20 randomized control trials aren't faulty as well, but
21 observational studies tend to be, tend to suffer more from
22 the, that confounding variables issue and that unless you
23 collect an enormous amount of data so you can kind of --
24 and have a large number of patients so you can analyze all
25 those little tiny cells, you can't necessarily control for

629

1 all those different confounding variables.

2        So they're not as powerful a study, but they, to

3 me before/after studies, as well as case control and cohort

4 studies that are less powerful than a randomized control

5 trial, but most of the time in epidemiology what you find

6 is, if you find it in a well designed observational case

7 control or cohort study and you subsequently do a huge

8 randomized control study, you find the same thing.

9 Q. So we have kind of put together a bunch of pieces of

10 the puzzle, and I would kind of like to summarize it before

11 we get to Mr. Gareis.

12        Have you had a demonstrative prepared that would

13 aid the Ladies and Gentlemen of the Jury in understanding

14 how you put these pieces together?

15 A. Yes.

16        MS. CONLIN:  Your Honor, we would offer for

17 demonstrative purposes 1607, slide 16.

18        THE COURT:  Has it been amended since yesterday?

19        MS. CONLIN:  It has, Your Honor.

20        THE COURT:  Okay.

21        MR. COREY GORDON:  13?

22        MS. CONLIN:  16.

23        MR. COREY GORDON:  I apologize.  No objection,

24 Your Honor.

25

630

1 BY MS. CONLIN:

2 Q. So explain, we have kind of gone through all these

3 different pieces.  Explain sort of how these all wrap up in

4 connection with your opinion that the use of a Bair Hugger

5 increases the likelihood that you're going to get a PJI?

6 A. I think what we find in clinical medicine is, advances

7 are made kind of a step at a time, and we know the first

8 one.  Bacteria cause infection.  Micro organism cause

9 infection.  If you don't have the micro organism, you're

10 not going to get an infection, period.

11        We also know now from a variety of both human

12 studies and animal studies that a smaller inoculum of

13 bacteria will cause an implant infection or a prosthetic

14 joint infection or a PJI, compared to trying to

15 experimentally cause an infection with bugs without an

16 implant takes thousands, if not tens or hundreds of

17 thousands, more organisms.

18        We know, Darouiche study shows it eloquently,

19 that airborne contamination can cause a PJI.  We know the

20 environment of use of any device is very important.  If I

21 have a device that produces 50 percent infection rates, but

22 this is the operating room, and I have it outside the

23 operating room, who cares?

24        If I bring it into the operating room, you're

25 going to care.  We know multiple studies have shown that

631

1 the Bair Hugger increases particles over the surgical

2 field.  We know that increased particles causes increased

3 bacteria.  Stocks just showed the combination, correlation

4 between the two, and that increased bacteria causes

5 increased risk for a prosthetic joint infection.

6        So we have a variety of studies that answer each

7 one of these questions, and when you put them all together,

8 you get a picture similar to what Dr. Elghobashi has shown

9 with his CFD model that illustrates why the Bair Hugger

10 will increase the risk of prosthetic joint infections.

11 Q. Okay.  Now, you were here during opening, and you heard

12 Mr. Blackwell say that the Bair Hugger was safe because of

13 studies, correct?

14 A. Correct.

15 Q. I think he said the most studied forced air warming

16 device in the history of the planet.  Do you recall that?

17 A. Yes.

18 Q. Okay.  Have you looked at the studies that 3M has

19 relied upon for its position that the Bair Hugger is safe?

20 A. Yes.

21 Q. Okay.  I would like to direct your attention to

22 Plaintiffs' Trial Exhibit 1, the Zink study.

23 A. Yes.

24 Q. And is that one of the studies that 3M has relied upon?

25 A. Yes.

632

1 Q. Can you describe for the Ladies and Gentlemen of the

2 Jury what this study was about?

3 A. This study involved eight healthy volunteers.

4 Q. Let me stop you right there.  There was only eight

5 volunteers in the Zink study?

6 A. Yes, eight volunteers, 20 to 25 years of age.  Not

7 exactly our age, Mr. Gareis, and they then took them into

8 an operating room and had them lay on a table.  And then

9 they used a lower body warming device.

10        So Mr. Gareis's was an upper body.  They're using

11 a lower body.  They placed a sterile drape, and then they

12 did testing during two hours when it was off and two hours

13 when it was on using culture plates that they set on their

14 abdomen.

15 Q. And what was the date of the study?

16 A. The date of the --

17 Q. Or the date of the publication?

18 A. This is from 1993.

19 Q. Okay.

20        THE COURT:  That was leading.

21        MS. CONLIN:  It was, Your Honor.  I apologize.

22 BY MS. CONLIN:

23 Q. Do you know what the date of the study was, Dr. Jarvis?

24 A. Yeah.  I'm trying to see if there was a month, but it's

25 1993.

654

```
 1          UNITED STATES DISTRICT COURT
 2            DISTRICT OF MINNESOTA
 3   ------------------------------------------------
                                  )
 4                                )
     Louis Gareis and Lillian     )VOLUME IV
 5   Gareis,                       )
              Plaintiff,           )File No. 16-CV-4187
 6   v.                            )  (JNE/FLN)
                                   )
 7   3M Company and Arizant        )  May 18, 2018
     Healthcare, Inc.,             )  Minneapolis, Minnesota
 8                                 )  Courtroom 12W
              Defendant.           )  9:04 a.m.
 9                                 )
10   ------------------------------------------------
11        BEFORE THE HONORABLE JOAN N. ERICKSEN
           UNITED STATES DISTRICT COURT JUDGE
12
            (JURY TRIAL - VOLUME IV)
13
     APPEARANCES
14
     FOR THE PLAINTIFFS:
15                    MESHBESHER & SPENCE
                      Genevieve M. Zimmerman
16                    1616 Park Avenue
                      Minneapolis, MN  55404
17
                      CIRESI CONLIN
18                    Michael Ciresi
                      Jan Conlin
19                    225 South 6th Street
                      Suite 4600
20                    Minneapolis, MN
21                    KASTER LYNCH FARRAR & BALL, LLP
                      Kyle Farrar
22                    1010 Lamar, Suite 1600
                      Houston, TX  77002
23
                      KENNEDY HODGES, LLP
24                    Gabriel Assaad
                      4409 Montrose Blvd
25                    Suite 200
                      Houston, TX 77006
```

655

```
 1
     FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
 2                      Jerry Blackwell
                        Ben Hulse
 3                      Mary Young
                        Corey Gordon
 4                      Peter Goss
                        431 South Seventh Street
 5                      Suite 2500
                        Minneapolis, MN  55415
 6
                        MITCHELL WILLIAMS
 7                      Lyn Pruitt
                        425 West Capitol Avenue
 8                      Suite 1800
                        Little Rock, AR  72201
 9
10   COURT REPORTERS:   MARIA V. WEINBECK, RMR-FCRR
                        RENEE ROGGE, RMR, CRR
11                      DEBRA BEAUVAIS, RPR, CRR
                        1005 U.S. Courthouse
12                      300 South Fourth Street
                        Minneapolis, Minnesota 55415
13
14
15          Proceedings recorded by mechanical
     stenography; transcript produced by computer.
16
17
18
19
20
21
22
23
24
25
```

656

```
 1              P R O C E E D I N G S
 2                  (9:04 a.m.)
 3        THE COURT:  Dr. Jarvis, come on up.
 4        Good morning, everybody.  Please be seated.
 5   You're still under oath from yesterday.  You can go ahead
 6   and take the seat.
 7        And, Ms. Conlin, whenever you're ready.
 8        MS. CONLIN:  Yes, thank you, Your Honor.
 9             DIRECT EXAMINATION
10   BY MS. CONLIN:
11   Q.  Good morning, Dr. Jarvis.
12   A.  Good morning.
13   Q.  I want to just finish up on a couple points that we
14   we're dealing with yesterday.  I'd like to talk to you a
15   little bit more about the studies that have been cited in
16   this case.
17        I'd like to add a column for orthopedic
18   procedures, and so could I direct your attention to the Zinc
19   article first.  Do you know how many of those were
20   orthopedic procedures?
21   A.  Zero.
22   Q.  And how about in the Huang study?
23   A.  Zero.
24   Q.  How about Moretti?
25   A.  20.
```

657

```
 1   Q.  And how about Hall?
 2   A.  Zero.
 3   Q.  And in the interest of completeness, I'd like to add one
 4   other study, the Oguz study, if you could look in your book,
 5   sir, at Trial Exhibit 635.  And is this article entitled,
 6   "Airborne Bacterial Contamination during orthopedic surgery
 7   a randomized control trial?
 8   A.  Correct.
 9   Q.  What did they find in that trial with respect to whether
10   there was an increase in bacteria at the surgical site when
11   the Bair Hugger was used?
12   A.  Well, they did agar plates around the operating room,
13   and the one that was closest to the patient, wasn't really
14   real close, but the closest is table or plate 4 in the study
15   and that had an increase that almost reached statistical
16   significance.
17   Q.  And how many patients were in the Oguz study?
18   A.  There were a total of 80 patients that were randomized
19   to the forced air warming Bair Hugger versus an electric
20   blanket, and then they were divided into laminar flow and
21   non-laminar flow, but the bottom line is of these were all
22   minor orthopedic procedures so not implant procedures and
23   there was only one total knee.
24   Q.  How many patients total?
25   A.  In the forced air warming, 40.
```

762

1  Q.  Right.  But in terms of the number of particles in each
2  of those categories, it plummets logarithmically when you go
3  from 0.3 to 0.5 to 5, right?
4  A.  Well, it does decrease.  But if that 2.8 lands on your
5  prosthetic joint, that's important.  It doesn't take 10 of
6  the 4.
7  Q.  So is it your testimony that you're taking these studies
8  that didn't find any -- didn't look or at least didn't
9  report an increase in 10 micron particles as a result of the
10  Bair Hugger and you're just saying, well, that's okay, they
11  must have -- that must mean that 10 micron size particles
12  increase too; and, hey, there are these studies that say if
13  you have 10 micron particles or greater, there is a positive
14  correlation with bacteria; well, therefore, the Bair Hugger
15  increases bacteria?
16  A.  Well, there was a lot of questions in that one.  You
17  want to reword that?
18  Q.  You don't have a single study that demonstrates by any
19  methodology that the Bair Hugger increases particles over
20  the surgical site -- particles over the surgical site of
21  greater than 10 microns, right?
22  A.  Greater than 10 microns --
23  Q.  Equal to or greater than.
24  A.  Well, the Stocks study looks at greater or equal to 10
25  microns.

763

1  Q.  That's right.  You keep wanting to tell us that the
2  Stocks study is about the Bair Hugger.  It's not, right?
3          MS. CONLIN:  I would object as argumentative, Your
4  Honor.
5          MR. COREY GORDON:  I withdraw.
6          THE COURT:  Can you rephrase.
7          MR. COREY GORDON:  Yes.  Apologize, Your Honor.
8  BY MR. COREY GORDON:
9  Q.  The Stocks study does not have anything to do with the
10  Bair Hugger, doesn't it, Dr. Jarvis?
11  A.  Correct.
12  Q.  Is there any study -- there is no study that shows that
13  the Bair Hugger increases particles of 10 microns or greater
14  over the surgical site, right?
15  A.  Well, there's none that look specifically at that issue.
16  We have different pieces of the puzzle that are looked at in
17  various studies.
18  Q.  Okay.  And so you take those studies that show maybe
19  small particles -- you say, well, that's a piece of the
20  puzzle, must be moving bigger particles, too?  That's one of
21  your leaps, right?
22  A.  Well, and that's where Dr. Elghobashi in his model can
23  help fill in that gap, where studies haven't been done.
24  Q.  Okay.  And then you take like the Stocks study, and even
25  though the authors were specifically looking for particle

764

1  bacteria correlations and only concluded from their data
2  that 10 microns or greater correlated, you've concluded that
3  no, actually, there is a correlation with 5 micron and up?
4  A.  Well, are you telling me that in Table 2 where it says
5  the variable is 5 to 9.99 and the P value is 0.015 that I
6  should ignore that, that it's irrelevant, that they report
7  it and we don't want to look at some of the data?
8  Q.  You know, this whole thing about particle and bacteria
9  might be kind of confusing.  Why would anybody in an
10  operating room care about counting particles and seeing if
11  they measure up with bacteria?  Do you know?
12  A.  Well, I think there are probably several reasons why
13  they would want to do that.  One, which many of these
14  authors have pointed out in their introductions and the
15  discussion, is it would be very valuable during an
16  orthopedic implant procedure to be able to do a test during
17  the procedure that could be predictive of increased risks of
18  infection --
19  Q.  A real-time measurement?
20  A.  -- or trying to prevent that from happening.
21  Q.  That's because with the technology that's readily
22  available to hospitals, not expensive military equipment,
23  there is nothing that you can take into an operating room
24  and push a button and look at a read-out and say we've got X
25  number of bacteria, right?

765

1  A.  Right.  Turn that machine off or let's not do surgery
2  today, yeah.
3  Q.  But they're hand-held units, you go in and push a button
4  and it tells you the number of particles, right?
5  A.  Correct.
6  Q.  Doesn't tell you anything about whether the particles
7  you're counting are completely inert, maybe a little
8  bacteria or a lot of bacteria?  Tells nothing about
9  bacteria, right?
10  A.  Well, that's not true.  Stocks right here does.
11  Q.  But that's why Stocks and all these other researchers
12  have been trying to correlate that, because if they could
13  correlate, then OR personnel could be confident that if they
14  take a particle measurement and whatever they decide is
15  relevant, things are okay or say we better stop and see
16  what's going on?
17  A.  Absolutely, why we shouldn't ignore it.
18  Q.  But at least three researchers in papers that you read
19  published in peer-reviewed journals concluded that you just
20  can't correlate particles?
21  A.  And, as I said, those three papers if you look carefully
22  at them use different methodologies, and they don't do six
23  or seven or eight or ten particle sizes.  They do one or two
24  or at most three.  And, as a result, they are loading all
25  the small particles in with the bigger particles and

778

1   with the Bair Hugger turned on?
2   A.   It's interesting all thee of these studies basically put
3   the ager plates in the same place.  Except the one that was
4   on the abdomen, they were around the outside of the room and
5   then one somewhat proximate to the patient but not really
6   near the surgical site.
7   Q.   Well, Doctor, wouldn't you agree that when you are doing
8   surgery, you probably don't want to have agar plates right
9   in the way?
10  A.   Well, I don't know.  Darush put the particle counter
11  right next to the surgical incision in HEPA filtered air.
12  Q.   Let's talk about McGovern.
13  A.   And it is interesting, if you look at --
14  Q.   There's no question pending now.
15  A.   Don't want to look at the data?  Okay.
16  Q.   If you turn to P93.
17  A.   93?
18  Q.   P93.  It's McGovern.  You already talked a little bit
19  about this with the bubble part of it.  There was another
20  part of it.  After they did the bubble study, they took a
21  look at infection rates before and after and made some
22  changes at the hospital, right?
23  A.   Right.
24  Q.   Okay.  This would be what's called an time -- an
25  interrupted time series observational study?

779

1   A.   Definitely an observational study, yeah.
2   Q.   And one of the big problems with interrupted time series
3   is if you look at one period in time and another period in
4   time and try to just isolate out one thing when there's been
5   all sorts of changes on both sides, you can't really ascribe
6   any correlation or causation to any change in one number,
7   right?
8   A.   I don't think I would agree with that characterization.
9   Obviously a confounding variable is only important if it's a
10  confounding variable.  If it has nothing to do with the
11  price of tea in China, then obviously it doesn't matter if
12  it changed.  It has to be related to the event you are
13  looking for and, in this case, prosthetic joint infections.
14  Q.   In this case, the authors on page 0007 said this study
15  does not establish a causal basis for this association,
16  right?
17  A.   Correct.
18  Q.   Let's go on, though.  They say, Although the
19  demographics were similar between the patient groups in
20  items of risk factors for infections, the data are
21  observational and may be confounded by other infection
22  control measures instituted by the hospital.  For example,
23  changes were made to the antibiotic, thromboprophylaxis
24  protocols used during the study, although no infection
25  control changes were made after February 2010.

780

1           In addition, we were unable to consider all
2   factors that have been associated with SSI, as the details
3   of blood transfusion, obesity, incontinence, and fitness for
4   surgery which have been identified elsewhere as important
5   predictors for deep infection were not sufficiently dealt
6   in the medical record.  Did I read that correctly?
7   A.   Correct.
8   Q.   So that's really saying two things.  They were changing
9   other infection control practices during this time period,
10  right?
11  A.   Well, they said there were none after February 2010, so
12  not during the whole time period, no.
13  Q.   Okay.  And if you want to take the time, we can go
14  through it, but the Bair Hugger, the time period of the Bair
15  Hugger that they were looking at went from July 2008 to
16  March of 2010, so there were lots of changes going on before
17  the Bair Hugger -- during the Bair Hugger period?
18  A.   Well --
19  Q.   Stopped making changes --
20  A.   -- you're characterizing it as a lot.  I don't know
21  that's the case.  They haven't listed them.  They just say
22  that there were none after February 2010.  They don't say we
23  did four before 2010 or 10 or 20 or 1.
24  Q.   Dr. Jarvis, you know that they changed the
25  thromboprophylaxis back and forth, that's an anti-blood

781

1   clot, right?
2   A.   Right.  And the thromboprophylaxis is given after
3   surgery.
4   Q.   And they had some problems with it with increased return
5   to theater that they switched right back after only seven
6   months?
7   A.   And there have been studies showing no impact on
8   prosthetic joint infections too.
9   Q.   And there have been studies showing that it increases
10  deep joint infections, aren't there?
11  A.   Well, there were some randomized controlled trials
12  showing the opposite too.
13  Q.   But you just want to talk about the ones that support
14  the position that you are advocating here, right?
15  A.   No, I'm saying that they're both.
16  Q.   Okay.
17  A.   That the -- go ahead.
18  Q.   If you look at figure -- or Table 2, excuse me, the only
19  comparison that they did in terms of possible infection control
20  changes, even though they mentioned some as examples, is
21  they did a univariant analysis between the Bair Hugger and
22  when they switched over to a different warming device,
23  right?
24  A.   Correct.
25  Q.   They didn't do a multi varied analysis like you and your

782

1  colleagues did after you did the uni varied analysis in that
2  1990 study, right?
3  A.  Correct.
4  Q.  And there are a whole bunch of things that they didn't
5  even look at, they couldn't look at, because they didn't
6  have the data, and one of those was fitness for surgery,
7  right?
8  A.  How ever they evaluate that, yes.
9  Q.  That's ASA, right?  They do not -- they don't call it
10  that in England, but ASA is a measure of fitness for
11  surgery, right?
12  A.  Could be, yes.
13  Q.  And after you went through all of your univariant
14  analyses of all those factors that you carefully examined
15  and carefully culled out of the records and interviews and
16  examinations, you did the uni varied analyses of all those
17  factors, you found I think you said ten that might have been
18  contributors, then you did a uni -- a multi varied analysis
19  and you found that fitness for surgery as measured by the
20  ASA was significant difference in doctor X's client or
21  patient group than --
22  A.  Well, an ASA --
23  Q.  The --
24  A.  -- equal to or greater than three.
25          THE COURT REPORTER:  Could you say that again?

783

1          THE WITNESS:  An ASA equal to or greater than
2  three.
3  BY MR. COREY GORDON:
4  Q.  And if you turn to P860, this is the CDC guideline for
5  prevention of surgical site infection from 1999, right?
6  A.  Correct.
7  Q.  And you were the coordinator who pulled this together,
8  right?
9  A.  Correct.
10  Q.  And you are listed as the senior author, right?
11  A.  Correct.
12  Q.  And this was your -- your colleagues and the CDC's
13  attempt to give the best guidance to hospitals, physicians,
14  and others involved in medical care for reducing surgical
15  site infections, right?
16  A.  Correct.
17  Q.  And that includes periprosthetic deep joint infections,
18  right?
19  A.  It's not specific to that.
20  Q.  No.
21  A.  It's a general guideline, but it includes that.
22  Q.  But it's not just about superficial infections, is it?
23  A.  Oh no, absolutely not.
24  Q.  Okay.  If you turn to page 0008.  I'm sorry, 0007.
25  A.  Yes.

784

1  Q.  And the first full paragraph on the bottom of the
2  right-hand column, you wrote, For most SSIs, the source of
3  pathogens is the endogenous flora of the patient's skin,
4  mucous membranes, or hollow viscera.  Did I read that right?
5  A.  Correct.
6  Q.  And you go on to say, When mucus membranes or skin is
7  incised, the exposed tissues are at risk for contamination
8  with endogenous flora.  Did I read that right?
9  A.  Yes.
10  Q.  And you mentioned it yesterday, endogenous means what we
11  have on our bodies, in our bodies, it's our bacteria, right?
12  A.  Correct.
13  Q.  It's what the patient brings to the table?
14  A.  Correct.
15  Q.  Okay.  So in 1999, when you were working for the CDC and
16  you reviewed all the literature and did that CDC gold
17  standard and you were trying to give guidance to
18  practitioners who were actually on the firing line, you told
19  them that for most SSIs, the source of pathogens is the
20  endogenous flora, what the patient brings to the table?
21  A.  Right.  And that goes back to what we talked about
22  earlier, that if you look at all SSIs, remember those three
23  categories, two-thirds of SSIs are that top incisional
24  layer.
25  Q.  Yeah.

785

1  A.  So the endogenous flora is important for that, and that
2  is why it is the most common because the most common site
3  of infection is not deep organ space or prosthetic joint, it
4  is superficial incisional and that's where the patient's
5  skin is important.
6  Q.  And, Doctor, this has lots of references for each of the
7  assertions in it, doesn't it?
8  A.  Has lots of reference.
9  Q.  References, scientific research, literature, articles at
10  the back, footnotes?
11  A.  Oh, absolutely, yeah.
12  Q.  So for the statement that you make here when mucus
13  membranes where skin is incised, the exposed tissues are at
14  risk for contamination with endogenous flora, you list one
15  reference, right?
16  A.  Right.
17  Q.  And that would be reference number 58, right?
18  A.  Right.
19  Q.  Could you go to the reference list and just read for the
20  jury the title of that reference?
21  A.  58?
22  Q.  Yep.
23  A.  Roots of infection, a study of using tracer particles in
24  orthopedic operating room.  So it's looking at all SSIs, not
25  just prosthetic joint infections.

830

```
1                UNITED STATES DISTRICT COURT
2                   DISTRICT OF MINNESOTA
3      ---------------------------------------------------
                                        )
4                                       )
       Louis Gareis and Lillian        )VOLUME V
5      Gareis,                          )
              Plaintiff,                )File No. 16-CV-4187
6         v.                            )  (JNE/FLN)
                                        )
7      3M Company and Arizant           )  May 21, 2018
       Healthcare, Inc.,               )  Minneapolis, Minnesota
8                                       )  Courtroom 12W
              Defendant.                )  9:37 a.m.
9                                       )
10     ---------------------------------------------------
11          BEFORE THE HONORABLE JOAN N. ERICKSEN
              UNITED STATES DISTRICT COURT JUDGE
12
13             (JURY TRIAL - VOLUME V)

14     APPEARANCES

15     FOR THE PLAINTIFFS:
                       MESHBESHER & SPENCE
16                     Genevieve M. Zimmerman
                       1616 Park Avenue
17                     Minneapolis, MN  55404

18                     CIRESI CONLIN
                       Michael Ciresi
19                     Jan Conlin
                       225 South 6th Street
20                     Suite 4600
                       Minneapolis, MN
21                     KASTER LYNCH FARRAR & BALL, LLP
22                     Kyle Farrar
                       1010 Lamar, Suite 1600
23                     Houston, TX  77002

24                     KENNEDY HODGES, LLP
                       Gabriel Assaad
25                     4409 Montrose Blvd
                       Suite 200
                       Houston, TX 77006
```

831

```
1
2      FOR THE DEFENDANTS 3M:      BLACKWELL BURKE P.A.
                       Jerry Blackwell
3                      Ben Hulse
                       Mary Young
4                      Corey Gordon
                       Peter Goss
5                      431 South Seventh Street
                       Suite 2500
6                      Minneapolis, MN  55415

7                      MITCHELL WILLIAMS
                       Lyn Pruitt
8                      425 West Capitol Avenue
                       Suite 1800
9                      Little Rock, AR  72201

10     COURT REPORTERS:      MARIA V. WEINBECK, RMR-FCRR
                       STACI, HEICHERT, RDR, CRR, CRC
11                     1005 U.S. Courthouse
                       300 South Fourth Street
12                     Minneapolis, Minnesota 55415
13
14             Proceedings recorded by mechanical
15     stenography; transcript produced by computer.
16
17
18
19
20
21
22
23
24
25
```

832

```
1                    P R O C E E D I N G S
2                       9:37 a.m.
3          THE COURT:  Good morning, everybody.  Welcome back
4      and please be seated.
5          Ms. Zimmerman.  You may proceed.
6          MS. ZIMMERMAN:  Thank you, Your Honor.
7          May it please the Court, for our first witness
8      today the plaintiff's will call Dr. Said Elghobashi.
9             WITNESS DR. SAID ELGHOBASHI SWORN
10         THE COURT:  Please take the witness stand, and
11     once you're comfortable, state your full name, spelling your
12     last for the record.
13         THE WITNESS:  Said Elghobashi.
14         THE COURT:  And spell your last name for the
15     record.
16         THE WITNESS:  E like echo, l-g-h-o-b-a-s-h-i.
17                 DIRECT EXAMINATION
18     BY MS. ZIMMERMAN:
19     Q.  Good morning, Dr. Elghobashi.
20     A.  Good morning.
21     Q.  Could you take a moment to introduce yourself for the
22     ladies and gentlemen of the jury today?
23     A.  My name is Said Elghobashi.  And I'm a distinguished
24     professor at the University of California.
25     Q.  Thank you.
```

833

```
1      A.  In mechanical and aerospace engineering.
2      Q.  All right.  Dr. Elghobashi both and you I sometimes are
3      going to need to work on speaking into the microphone so the
4      court reporter can take down everything we're saying, okay?
5      A.  Sure.
6      Q.  I know you have a quiet voice sometimes.
7          Dr. Elghobashi, what is your current employment?
8      A.  University of California at Irvine.
9      Q.  And I'm going to direct you there's a binder of
10     materials in front of you.  Can you turn to Tab 704?
11     A.  I have to put my glasses on.
12     Q.  That's fine.
13     A.  Which number, please?
14     Q.  704.  Towards the front.
15     A.  I have it.
16     Q.  Do you see that?  And what do you see at Tab 704?  What
17     is that document?
18     A.  My CV.
19     Q.  All right.  And is a CV a fancy way of saying your
20     professional resume?
21     A.  Yes.
22     Q.  What is your educational background?
23     A.  I have a master's degree in 1971 from U.S.C.  That's the
24     University of Southern California.  I have a Ph.D. from
25     University of London Imperial College in 1974.  And I have a
```

874

1 average, N for Navier, S for Stokes, and that doesn't give
2 you eddy sizes or anything. It's just the simplest way to
3 do it. Most industries view that for noncritical flows.
4 Q. Is there -- what are the other two ways to do it?
5 A. So that would be the cheapest most crude way of doing
6 it. The highest end will be a direct American simulation.
7 That's like the gold standard. It has no approximation. It
8 gives you details in space and time of every eddy,
9 everything you want to know. And that's my part, my
10 research is for past 35 years in that. That's very
11 expensive and cannot do high RANS number flow because we do
12 not have bigger super computer here or in China. China has
13 the biggest but still cannot do that. So you cannot use DNS
14 for a flow of an airplane or a car. So it becomes just like
15 a microscope, it gives you details that you can use the
16 results of DNS to help RANS. And in the middle between
17 them, something called large-eddy simulation, and that's
18 what we did for this project. It is the only way to do the
19 turbulent flow in an operating room accurately and available
20 super computer can do it and that does not resolve the very
21 tiny scales because they cost so much money. Large eddies,
22 LES, large-eddy simulation, it can resolve the big eddies
23 but not the tiniest one because of the cost.
24 Q. So you first told the jury about RANS, right?
25 A. Yes, RANS. Right, yes, RANS.

875

1 Q. And more precise than that would be?
2 A. LES. And the highest one is called DNS, direct
3 numerical simulation.
4 Q. And LES is what you did here?
5 A. For this project because it's the only way possible.
6 You can do RANS, and I think some people in papers like in
7 NIH, they use HANS, which is, again, I consider it rubbish.
8 Q. RANS?
9 A. Yes, for this kind of flow, yes.
10 Q. And why is that?
11 A. You remember we talked about boundary condition, RANS
12 will fail miserably near the walls of the room, near the
13 faces of the surgeons, near the table. When you get closer
14 to the wall of anything, RANS fails.
15 Q. It doesn't have the same kind of precision?
16 A. Well, it just gives you results. Wall region close to
17 an object is very crucial for turbulent flow because that's
18 a high sheer stress.
19 Q. Sheer like in an airplane. In your work from your
20 published paper, do you know how much heat is generated by
21 the Bair Hugger?
22 A. I just read the manuscript. It shows the 3M report or
23 manual is one kilowatt amount of power so the temperature
24 would be 38, 41, 43.
25 Q. Okay. I'm going to direct your attention to 1337, which

876

1 is in the book right in front of you.
2 A. Yes.
3 Q. And if you turn to page 12 of that document. First of
4 all, what is that document, do you know?
5 A. Page 12?
6 Q. Yes.
7 A. Yes, it's specifications.
8 Q. Do you know what this document is on the first page?
9 A. 3M Bair Hugger Model 505.
10 Q. And what is it?
11 A. You mean --
12 Q. What is the title of the document, do you know?
13 A. Temperature management unit.
14 Q. Model 505. Is this the operator's manual?
15 A. Yes.
16 Q. What do you see on page 12? That was relevant to the
17 work you did here.
18 A. The last four lines, high 43 plus or minus 3C, medium 38
19 plus or minus 3C, low 32 plus or minus 3C, C means
20 centigrade.
21 Q. And is that the operating temperatures for the Bair
22 Hugger?
23 A. Right.
24 Q. And did you use this information in doing the work that
25 you did in this case?

877

1 A. Right.
2       MS. ZIMMERMAN: Plaintiffs are going to offer
3 1337.
4       MR. BLACKWELL: Your Honor, no objection to only
5 this provision.
6       MS. ZIMMERMAN: This page. Page 12 of 1337.
7       THE COURT: All right. Page 12 of 1337 is
8 received.
9       MR. BLACKWELL: Your Honor, the section labeled
10 temperature characteristics.
11       THE COURT: All right. The modification will be
12 made at the appropriate time.
13       MS. ZIMMERMAN: Okay. Permission to publish to
14 the jury.
15       THE COURT: Go ahead.
16 BY MS. ZIMMERMAN:
17 Q. There we go. Thank you. And is this the document that
18 you're looking at in front of you?
19 A. Correct.
20 Q. And does it outline the temperatures from the machine?
21 A. Yes.
22 Q. And which temperature did you use?
23 A. I think 41. I don't recall the exact figure but 41.
24 Q. And on the screen in front of you, does it show the
25 average temperatures at the end of the hose?

878

1  A.  Yes.
2  Q.  And that's 43 degrees Celsius; is that right?
3  A.  Correct.
4  Q.  And it also says the air temperatures reaching the
5  patient are approximately two degrees centigrade lower than
6  the listed temperatures; is that right?
7  A.  Correct.  We use 31 or 41.
8  Q.  41 degrees?
9  A.  Yes.
10  Q.  Do you know if that's the same temperature that 3M used
11  in doing their work on this matter?
12  A.  I didn't look at their work.  I didn't, yeah.
13  Q.  Now, you modelled some draping in your work?
14  A.  Correct.
15  Q.  And what import, if any, was the draping in the model
16  that you did?
17  A.  Okay.  Before we did the work, we went with counsel to a
18  surgery room in Santa Monica, California, orthopedic surgery
19  hospital, and we asked the nurse to set up the Bair Hugger
20  blanket, drape, as she usually does in an operating room.
21  And we took one of our colleague of the lawyer, she's a
22  lawyer, and we asked her to lie down on the operating table
23  covered with the Bair Hugger blanket, tied the things, and
24  covered the drape, and we asked the nurse to turn the Bair
25  Hugger on.  And we asked the lawyer on the bed whether

879

1  there's air coming toward her face, and she said, no,
2  because she has contact lenses and if the hot air is coming
3  to her eye, she would stop the thing.  So she said no air
4  coming up.  So we went around, there were other lawyers.  We
5  looked at the airflow and all the air was coming at the
6  edges of the drape.
7  Q.  All right.  Have you seen one of these before?
8  A.  Correct.
9  Q.  And what is this?
10  A.  It's a blanket that should be connected to the Bair
11  Hugger with a hose.
12  Q.  All right.  And when you went to the operation, the
13  operating room?
14  A.  Correct.
15  Q.  In Santa Monica?
16  A.  Yes.
17  Q.  Was there anything over this?
18  A.  Yes, it's the same thing, yes.
19  Q.  Was there anything placed on top of the blanket?
20  A.  The drape, it's a plastic drape.  The nurse put it on.
21  That's how they keep, yeah.
22  Q.  All right.  And were those part of the assumptions that
23  you made as you were --
24  A.  Right.  So from what we saw, we know the flow rate
25  coming from the blower, and we divided equally to the edge

880

1  of the drapes so uniformly coming to keep the mass flow rate
2  the same, yes.
3  Q.  Okay.  So have you been asked to evaluate the effect
4  that the Bair Hugger has on movement of particles in an
5  operating room?
6  A.  That was the main object of all the work, yes.
7  Q.  And are you prepared to explain to the ladies and
8  gentlemen of the jury what your work was with respect to the
9  Bair Hugger and the CFD you did?
10  A.  Okay.  So after --
11  Q.  Could I stop you for just one second?
12  A.  Yes.
13  Q.  Thank you.  Do you have an opinion that you hold to a
14  reasonable degree of engineering certainty about the effect
15  of the Bair Hugger machine on the disbursement of squame
16  size particles in an operating room?
17  A.  My opinion is based on our results.
18  Q.  All right.
19  A.  I had no opinion before because of Navier-Stokes you
20  cannot guess about it.  After we did the computations, I can
21  say now, that, yes, the Bair Hugger causes squames to arise
22  from the floor to higher elevation.
23  Q.  All right.  And does that include over the operating
24  room table?
25  A.  Correct.

881

1  Q.  And also to the surgical site?
2  A.  Say that again?
3  Q.  Does your model also show squames reaching the surgical
4  site?
5  A.  Yes.
6  Q.  So what did your LES model include in the operating
7  room?  Are there squames?
8  A.  Right.  So after we did the geometry as shown by 3M, we
9  said the boundary condition from the drape, and in order to
10  give 3M the best case scenario I mean in their favor, we put
11  the squames only on the floor, not anywhere in the room,
12  about one centimeter from the floor, so we put a layer
13  around the operating table with three million squames.
14       To give you an idea, each human being sheds 20
15  million squames per hour.  Think of that, that's a lot of
16  squames.  And if you have five people, they shed hundred
17  million squames per hour.  To follow these squames, all of
18  them with the correct way we do it would be very expensive.
19  So we put only three million on the floor, only three
20  million.  And if you look from the top you look on the
21  table, the operating table, the squames are taking a
22  U-shape, means one side of the bed, one side of the bed, and
23  one side near the Bair Hugger.  And we -- these are
24  stagnant, they're not moving, and we turn the blower on.  We
25  follow them.  Each one we follow, each individual squame,

882

1 there's an equation to describe the motion of each squame,
2 and we followed that. It will give you a trajectory where
3 each -- so I give them a color code. I give green, red, and
4 green, red then yellow just to see the turbulent mixing how
5 it will affect, so you can see I think there's a video that
6 shows some of them go from the green side to the yellow side
7 or red side and so on, to monitor them.
8 Q. Doctor, so the colors of the squame in your model, is
9 that just so that we can visualize?
10 A. Absolutely. It's only for visualization. The color has
11 no effect on anything. Only the size of the squame, and
12 it's mass and density.
13 Q. And so the super computer, what does it do with the
14 particle? I think you explained to the jury it calculates
15 where it moves?
16 A. Right. So in addition to what we do with Navier-Stokes
17 equation to tell you the velocity and the pressure and the
18 temperature each point in the operating room,
19 simultaneously, you saw the motion of each of the three
20 million squame to see where they go.
21 Q. So the computers are doing the Navier-Stokes equation
22 for each one of the three million squames?
23 A. No, Navier-Stokes only for fluid motion. If you have
24 the -- squames have the density like liquid water, so think
25 of them as very tiny rain drops. Navier-Stokes only

883

1 applies to a continuum fluid means the molecules 22 to the
2 10 in one centimeter cube. That's just one fluid.
3 Particles are foreign objects like oranges. They have their
4 own equation, which took 150 years to develop, so we solved
5 that equation individually to each squame.
6 Q. So you solved that equation for each one of the three
7 million squames?
8 A. We saw that every microsecond three million. That's why
9 you need a super computer. You can't do it on a laptop or
10 some other machine.
11 Q. How long did it take the super computer to this?
12 A. If the machine is running without interruption, it takes
13 about 10, 12 hours. It will take 200 years if you want to
14 do it in other machine.
15 Q. Okay.
16 A. Yeah.
17 Q. Which super computer did you use?
18 A. The one in University of Texas at Austin.
19 Q. All right. Can anybody use the --
20 A. No, no, in order to have access to these machines, you
21 have to write a proposal to a National Science Foundation to
22 tell them I would like to solve this problem. It will be a
23 peer reviewed by five people around the country, again,
24 confidentially, and when they see that your work deserves to
25 use a super computer, they will let you do that. Okay.

884

1 Q. And your work here in this case was done on the super
2 computer, right?
3 A. Correct, yes.
4 Q. Did you do a model with the Bair Hugger on and the Bair
5 Hugger off?
6 A. That is essential. In order in science to see the
7 effect of something, you have to show without and with, then
8 you see the difference.
9 Q. And what, if anything, did you learn from doing the CFD
10 LES with the Bair Hugger off?
11 A. With the Bair Hugger off, the airflow from the ceiling
12 scavenges everything in front of it, and the flow exits from
13 the floor, exit grilles near the floor.
14 Q. So did you see that the airflow was effective?
15 A. Yeah, we can follow, yeah, we can follow, yeah, uh-huh.
16 Q. Okay. Do you recall what mass flow rate you used in
17 solving these equations?
18 A. Mass flow rate from the ceiling or from the Bair Hugger?
19 There are two.
20 Q. From the Bair Hugger?
21 A. I don't recall. It is given somewhere in a table. We
22 use that from Bair Hugger, yes.
23 Q. Do you know if it was from a 3M document?
24 A. Yes. I recall I think we used a little bit lower than
25 what was written by few percent.

885

1 Q. Do you know if you used the same mass flow rate as 3M's
2 witness?
3 A. Again, if you're referring to the video of 3M, they had
4 a table that would probably use the same, yes.
5 Q. And did the LES CFD that you did on the Model 505
6 generate videos?
7 A. Correct.
8 Q. And is that something that this super computers
9 typically do when you do this kind of work?
10 A. Not typically, but you ask them to do it like after you,
11 after you do the simulation, you save certain parts in a
12 given time period, you store them, and then you run a video
13 generating code using your data. So the video is --
14 remember, when you have hundreds of millions of points in
15 the mesh, the mesh will have tens of million, hundreds of
16 million, you cannot read the results at each point. It's
17 impossible to read in time every microsecond of flow
18 changing, so the best way to visualize that is to create a
19 video to tell you how everything is moving, yes.
20 Q. And is that something that you do with some regularity
21 in your work?
22 A. Right, right. That's the way to do for DNS or LES
23 because the amount of data is huge, yes.
24 Q. All right. And do you know was the super computers that
25 you worked on or that you used for this, were they

890

1 Q. All right. What impact, if any, would there be if the
2 people were moving?
3 A. It would be much worse. I mean, I summarize first, all
4 the simulation we did, we did everything in the simulation
5 to provide the best case scenario for 3M, not for us. I
6 wanted the best case scenario. I wanted to see, put
7 everything on the floor, because in general, in a operating
8 room, the squames are everywhere. We could have put them
9 one meter high, two meter, we put them near the ceiling,
10 then they will drop, but we did not do that. We put, again,
11 best case scenario for 3M. So these came from the floor up
12 only if the Bair Hugger is on, yeah.
13 Q. Doctor, as you were preparing your work in this case,
14 did you review an article by Dr. Memarzadeh? Does that name
15 familiar?
16 A. A long time ago, just somebody told me there is a person
17 at NIH who did something and related. I looked at it and I
18 think he was using RANS, R-A-N-S, which, as I described
19 earlier, is the lowest level of simulation, means
20 untrustworthy for this load. You can use RANS for a garden
21 hose, that's okay, but you use it for this, that's bad, bad
22 idea.
23 Q. Doctor, do you remember what size particles
24 Dr. Memarzadeh --
25 A. Ten microns.

891

1 Q. The same size you used?
2 A. Yes.
3 Q. And he used the RANS model. Is that right?
4 A. Yes.
5 Q. Did Dr. Memarzadeh include a drape in his --
6 A. No.
7 Q. And what impact, if any, does that have on the results?
8 A. Well, we tried to put everything in the operating room
9 as I saw it by myself in the Santa Monica operating room.
10 That's how the nurse told us this is how we do orthopedic
11 surgery, so I followed that.
12 Q. Do you know, did Dr. Memarzadeh, did he conclude that
13 particles reached the surgical site as well?
14 A. I could not hear what you said.
15 Q. I'm sorry, I'm not speaking into the microphone.
16 A. Oh, okay. Okay.
17 Q. Let me direct you, the book in front of you, Plaintiffs'
18 Exhibit 1419, page 3.
19 A. Yes.
20 Q. And the first full paragraph, did you start out
21 discussing Dr. Memarzadeh's work?
22 A. Correct.
23 Q. Do you know how -- he used a RANS model. Is that right?
24 A. Correct.
25 Q. Do you know how many particles he modeled?

892

1 A. I don't remember, maybe 3,000. It could be written here
2 somewhere.
3 Q. 4,000 sound right?
4 A. 4,000, okay.
5 MR. BLACKWELL: Objection, Your Honor. Leading.
6 THE COURT: It is.
7 MS. ZIMMERMAN: All right.
8 BY MS. ZIMMERMAN:
9 Q. The fifth line down in the first full paragraph.
10 A. Okay. Yes.
11 Q. And I'm going to direct your attention about midway
12 through the paragraph.
13 A. Yeah.
14 Q. And your paper says, it's the sentence starts out they.
15 Do you see that?
16 A. Yeah, they, the first word in the sentence they, upper
17 case they.
18 Q. Could you read that to the ladies and gentlemen of the
19 jury?
20 A. They showed that roughly 2 percent to 5 percent of
21 particles reach the surgical site, and in italics, provided
22 they are originated very close, about 1.3 centimeter above
23 the site, yes.
24 Q. Okay. And your particles started where?
25 A. On the floor, yeah. We avoided anything, yeah.

893

1 Q. Did Dr. Memarzadeh's group use a drape?
2 A. I don't think so, no.
3 Q. Okay. And why -- why might a drape matter?
4 A. Again, go back to Santa Monica hospital, we had to do
5 the conditions in a operating room identical to what happens
6 in reality when you have a surgery, so I did not omit
7 anything, except some insignificant machines, computers and
8 things which are not really important.
9 Q. Okay. Tell me about that, Doctor. You -- have you seen
10 pictures of the operating room that was where Mr. Gareis's
11 surgery took place?
12 A. I think the during the deposition the counsel of 3M
13 showed me photographs of a operating room called Providence.
14 I don't know what it is. But he showed me the machines and
15 yes.
16 Q. Okay. And, in your model, did you include a patient?
17 A. Include a patient?
18 Q. Yes.
19 A. Yes.
20 Q. Did -- what about a surgical team?
21 A. We have four, four surgical team people.
22 Q. What other equipment did you use in your model?
23 A. Well, the Bair Hugger surgical masks, and that's it.
24 Q. There have been some questions to other witnesses about
25 other devices used in that operating room. Do you know what

894

1  a electrocautery device is?
2  A. Say it again, please.
3  Q. Yes. Do you know what a electrocautery device is?
4  A. Yes. Yes, I do.
5  Q. Okay. And is that used throughout the course of a
6  operation?
7  A. No, it's a intermittent device. You use it for a few
8  seconds to close a wound and that's it.
9  Q. And what import, if any, is the fact that the device is
10 used intermittently, what impact does that have on the
11 opinions that you have in this case?
12 A. Well, in our project, we are interested in fact of hot
13 air relieving the Bair Hugger and the drape on the motion of
14 squames in the room. And a machine like you just mentioned
15 had no effect or insignificant effect on that behavior.
16 Q. All right. Do you -- do you know how many watts, for
17 example, an electrocautery device generates?
18 A. I think about maybe 300-watt maybe or 300 to 500,
19 depends, yeah.
20 Q. Do you know about anesthesia, how many watts the
21 anesthesia machine emits?
22 A. Yeah, they're all about a hundred watts, much lower than
23 the hair dryer in your bathroom, much lower, and
24 intermittently used.
25 Q. And they are more or less watts than the Bair Hugger

895

1  machine?
2  A. They're all below the Bair Hugger machine, yes.
3  Q. You have another video I think from a different angle?
4  A. Yes.
5  Q. Can you explain to the ladies and gentlemen of the jury
6  what they're going to see in this video?
7  A. It's a close-up on the previous video to show when the
8  Bair Hugger is on, how the different color squames would
9  rise or where would they go, yes.
10 Q. How do you validate the work that you do? How is CFD
11 validated?
12 A. That's a good question. So if there is a simple flow,
13 you can run an experiment using noninvasive -- I'll go back
14 a little bit. If you want to provide measurement in a
15 turbulent flow, you cannot put your hand in it because that
16 would be invasive to the flow. You cannot do that.
17 Q. If you reached your hand in, it would interrupt the
18 results?
19 A. Yeah, putting whatever device was suggested by other
20 people, you cannot do that, so it has to be noninvasive,
21 means you have to use optical devices, laser beams. And you
22 can spend a long time to be trained of how to use it. You
23 have to at least a Ph.D., at least, and use these optical 3D
24 like PIV particle image velocimetry and you need access to
25 that operating room for two months, at least, and one month

896

1  to process the data. You need highly qualified people. And
2  this will be the nearest thing to an LES. Then you can go.
3  It costs minimum $2 million, in addition to having access to
4  operating room for two months. Nobody should enter in
5  because the optical equipment has to be set up. In the
6  absence of this, then you have to go back to your code and
7  see if it was validated in other flows, and that's we
8  did.
9  Q. Okay. So let me ask you, so did you do -- did you use a
10 PIV to validate your work here?
11 A. I did not. You need very specialized people. The best
12 person I know, there are two or three people in the company,
13 one at Caltech, one at Arizona, yeah, so you have to get
14 those people with their post docs and Ph.D. and pay them
15 quite a bit of money and in addition to buying
16 four-dimensional cameras and then you can do that.
17 Q. Okay. So you didn't do PIV here. Is your work still
18 validated?
19 A. Absolutely. Because that code was validated over
20 15 years, at least 15 years at Stanford University where the
21 code was created. And that goes through testing like
22 testing plain, simple flows, more difficult, until you do
23 something like the flow inside the shift engine combustor
24 for Pratt & Whitney or Rolls-Royce you do that. After you
25 do all this means you solve a energy equation and more and

897

1  other equations or chemistry, then you know your code is
2  fine, then you can use it for simpler flow like this one.
3  The operating rooms are much simpler flow than the flow
4  inside a combustion chamber of a jet engine that you fly
5  because that combustion chamber is very liquid filled, in
6  different sizes, and much higher temperature, 2,000 degrees
7  centigrade, and swirling, highly complex. If the code can
8  predict that to satisfaction of the manufacturer of the jet
9  engine, then when you go to an operating room, then you know
10 it's fine, yeah.
11 Q. So if the code has been validated for more complicated
12 problems --
13 A. Yes.
14 Q. -- it's also valid for --
15 A. Yes. Yes.
16 Q. -- less complicated problems?
17      MR. BLACKWELL: Objection, Your Honor.
18      THE WITNESS: Remember validation takes many
19 years. First you do very simple flow, LES and a pi flow,
20 then a channel flow, then a cavity flow. You can do, there
21 are many scenarios which I think I summarized in my year ago
22 to I think it was sent to the counsel of 3M. So validation,
23 it's published in peer-reviewed papers. Stanford have the
24 best group in the world. It's called Center for Turbulence
25 Research, the whole thing is called Center for Turbulence

946

1    A.  Okay.  The temperature of the -- for a steady state, the
2    temperature leaving the exit of the hose is the same as
3    leaving the holes after being around for a long time, not at
4    the beginning.  The beginning would be a difference between
5    this one and the exit of the hose and the exit of the air,
6    but if you ran it for how far, the temperature, at least
7    the -- the hole is very close to the end of that would be
8    the same, no difference.
9    Q.  And you were then looking to take the temperature, where
10   do you believe the air exited at the bottom of the drape
11   that you talked about?
12   A.  That's computed, not assumed.
13   Q.  All right.
14   A.  It's computed.
15   Q.  And so that would have been a different temperature from
16   the temperature at the end of the hose, right?
17   A.  Yes.  Yes.  And the report showed that.
18   Q.  Let's go back to our list.  In any event, you wanted to
19   know the air inflow rate to the Bair Hugger?
20   A.  Yes.
21   Q.  And the temperature of the air leaving the blanket?
22   A.  Correct.
23   Q.  And you wanted a drawing of the blanket and the
24   locations of the drape edges near the floor, true?
25   A.  Can I ask a question, are you showing me a table that I

947

1    created?  I don't know where the table, is this my table?
2    Q.  I don't know that it's your table, but I think these are
3    things that you thought were key and important measurements,
4    aren't they?
5    A.  Right.  That means I probably have asked somebody to
6    provide me at the beginning of the project I think.
7    Q.  But you did want a drawing of the blanket and the
8    locations of the drape edges near the floor.  You wanted
9    this last one too?
10   A.  Absolutely, yeah, yeah, yes.
11   Q.  And so my next question, which you may have anticipated,
12   is who would have supplied these measurements that you
13   wanted?
14   A.  So eventually we had to go to Santa Monica to do that.
15   That we -- the reason for going to Santa Monica Hospital is
16   to provide this information.  That what the main reason we
17   went to an operating room, yes.
18   Q.  Isn't it true that every single one of these key and
19   important measurements were provided by the plaintiffs'
20   lawyers?  Every one of them?  Isn't that true, sir?
21   A.  Okay, they gave me the drawing of the blanket from 3M,
22   and the temperature I got it from the hose from your manual,
23   and the airflow rate for the Bair Hugger, from the manual.
24   They may have given me the manual to look at this.  If you
25   want to say they gave it to me, that's fine.

948

1    Q.  No, no, I'm not trying to make up anything.
2    A.  All right.
3    Q.  Sir, if pull up defense 966.  Oh, I'm sorry.  And here,
4    sir, is where you say, the following data will be provided
5    by Gabriel.
6    A.  Right.
7    Q.  And Gabriel is Gabriel Assaad, isn't it?
8    A.  He's a gentleman sitting there, yes.
9    Q.  He's a gentleman too.
10   A.  Yes, yes.
11   Q.  Gabriel Assaad, and that's one of the plaintiff's
12   lawyers?
13   A.  Right.  And I know you're using terminology that I'm not
14   very familiar with, but yes, he is the gentleman sitting
15   there, yes.
16   Q.  Okay.  So if you look here what's on the screen, these
17   six items that I just had up on the chart also --
18   A.  Yes.
19   Q.  -- are the ones you expected --
20   A.  Yes.
21   Q.  -- to be provided to you by the plaintiffs' lawyers?
22   A.  You can see how careful I am, I needed all this at the
23   beginning of the project.  I wanted this information.  And
24   after that we had to go to Santa Monica to provide some of
25   the answers to these questions.

949

1    Q.  Dr. Elghobashi, once the lawyers who are suing 3M gave
2    you this information, isn't it true that you didn't do
3    anything yourself to independently verify that what you were
4    getting was accurate?  Is that true?
5    A.  Yes, as I said repeatedly, I went by myself to
6    Santa Monica Hospital, spent a day there with nurses to
7    measure everything.  So what you mean I did not prove, I
8    mean, I am the one who asked to go to hospital.  They took
9    them a long time to find a free hospital to interrupt.  I am
10   the one who requested that.
11   Q.  Well, let's take, for example, look at No. 2 on this
12   list, the dimensions and locations of the inlet and exit air
13   groups?
14   A.  Yes.
15   Q.  So you had the exit air grilles down at the floor, true?
16   A.  Right.
17   Q.  And you were expecting to get information about the exit
18   air grilles?
19   A.  Right.
20   Q.  From these lawyers, right?
21   A.  Right, yes.
22   Q.  Did you do anything to verify that the exit air grilles
23   were, in fact, at the bottom of the floor as apparently had
24   been represented to you?
25   A.  Sir --

950

1  Q.  Just yes or no, sir.
2  A.  I disagree.  Your question is not like that.  You're
3  saying that the dimension of the grille, the four grilles in
4  the floor taken from 3M geometry, the ten grilles in the
5  ceiling, these were taken from either from 3M geometry or
6  Rochester, when you go to a operating room, we visit all of
7  them, they have different grilles like the one you
8  mentioned, Providence, so you want me to simulate all
9  operating rooms in the world?
10  Q.  No, sir, I just want to know when you received
11  information from the lawyers when you did any homework or
12  research yourself to --
13  A.  A lot.
14  Q.  -- independently verify?
15  A.  I did a lot.
16  Q.  What did you do, for example, to --
17  A.  Looking at geometries and ventilation system of -- by
18  HVAC people.  There were journals.  I spent many, many hours
19  trying to get that, finally decided that all operating rooms
20  have different inlet, outlet, like the one in Providence, so
21  I took the best case scenario for 3M.  All the outlets on
22  the floor, that's the best case.  If you lose outlet, you
23  will have more squames out, trust me.
24  Q.  You were asking, sir, for the locations of inlet and
25  exit air grilles --

951

1  A.  Yes.
2  Q.  -- as pertained to Mr. Gareis in the hospital in this
3  case?  What did you do to verify that the information that
4  you got was accurate?
5  A.  Mr. Goss showed me the grille location in Providence
6  operating room, and I told him, and I repeat again, the
7  location of the grille on the wall at the higher elevations
8  of the floor increases, enhances the dispersion of squame
9  toward the table because that allowed the plume of the 505
10  to rise higher.  If the grille were down, air would --
11  incoming air would push the heated air down.  If you -- if
12  you put all the outlet grilles higher, you would have a much
13  worse operating room.
14  Q.  So I think I've gotten about the best answer I'm going
15  to get, so I'm going to move on and ask you another
16  question.
17  A.  Okay.  All right.  Good.
18  Q.  So you made the statement awhile ago when the other
19  lawyer was standing here that all the other machines in the
20  operating room had less watts than the Bair Hugger machine.
21  Who told you that?
22  A.  I looked in it the web about the different machines in a
23  operating room, including an anesthesia machine, the
24  cauterizing machine, the all of that, computer, for example,
25  the fan of any computer produce like ten watt or something,

952

1  very small, computers in operating room has nothing, all
2  other devices that use intermittently for few seconds or
3  minute will have no impact, in addition, any electric device
4  that generates heat with a fan will create its own plume.
5  If you have many plumes in the room, it will be the worst
6  case scenario for 3M, so I did not.  I wanted to have a pure
7  operating room that you not raise any issue about it, trust
8  me.
9  Q.  Do you recall what my question was, Dr. Elghobashi?
10  A.  I don't recall the question.
11  Q.  It's true, isn't it, that you're not able to tell me or
12  the jury or anyone what the make or model or any of the
13  details or specifics were for any piece of equipment that
14  was, in fact, in the operating room for Mr. Gareis on the
15  day of his surgery on November 9th, 2010, that's true, isn't
16  it?
17  A.  I totally agree with you.
18          MR. BLACKWELL:  I'm going to switch gears, Your
19  Honor.
20          THE COURT:  Actually, we'll take lunch break and
21  resume at 2 o'clock.
22      (1:07 p.m.)
23                   * * * * *
24
25

953

1              P R O C E E D I N G S
2                  (2:09 p.m.)
3          THE COURT:  Please be seated.  And Dr. Elghobashi,
4  you're still under oath from this morning.  And Mr.
5  Blackwell is going to resume his questioning, whenever he's
6  ready.  Are you ready?
7          THE WITNESS:  Yes.
8          THE COURT:  All right.
9  BY MR. BLACKWELL:
10  Q.  Good afternoon again, Dr. Elghobashi.
11  A.  Good afternoon.
12  Q.  I hope you had a nice lunch.
13  A.  Thank you.
14  Q.  I want to go back to the testing you did of the Santa
15  Monica that you talked to us a little bit about.
16  A.  Yes.
17  Q.  And I believe it's true that you had never before seen a
18  Bair Hugger set up in an operating room at the time of the
19  experimentation you did out in Santa Monica; is that right?
20  A.  Correct.
21  Q.  So is it true then that the persons who actually set up
22  that operating room and arranged the whole thing were,
23  again, these lawyers; is that right?
24  A.  Could you repeat the question again, please?
25  Q.  The persons who set up the visit to the operating room

958

1  Q.  So let's bring this back to the operating room number 4
2  at Providence Hospital Northeast in Columbia, South
3  Carolina, where the surgery took place on November 9, 2010.
4  Now, were you aware that there was an opportunity for
5  experts like yourself to come out to the actual operating
6  roo Mr. Gareis had been i to take your own measurements.
7  Did you know that?
8  A.  I will repeat what you told me, just to make sure I
9  understood.  You said I could have gone to whatever this
10  other hospital is and take measurements and I said earlier I
11  don't trust in taking measurements the way you propose so
12  why would I go to place to do something that is illogical to
13  me?  It doesn't make sense.
14  Q.  Let me ask my question again because I don't want to
15  argue with you.
16  A.  Okay.
17  Q.  I just want to know whether you were aware that there
18  was an opportunity for an expert like yourself to come out
19  to the hospital where the surgery took place and either take
20  measurements or have measurements taken.  Did you know that?
21  A.  I have not known that.
22  Q.  So to the extent there was a meeting set up for that
23  purpose, is it fair to say that you weren't invited to the
24  meeting as far as you know?
25  A.  I was not invited to a meeting in the Carolinas.

959

1  Q.  Now, when you were finally able to see the actual
2  photographs of operating room number 4, and you said
3  Mr. Goss showed them to you?
4  A.  Yes.
5  Q.  There is Mr. Goss?
6  A.  I met him in the morning.
7  Q.  And he showed them to you, and at the time he showed you
8  those photographs, didn't you ask the question how come
9  these photographs weren't shown to me before today.  Isn't
10  that what you asked?
11  A.  My memory is not very good, but if it was written that I
12  said that, then I trust you.  I cannot remember.  I mean I
13  have so many things.
14  Q.  I'm okay, I'll do trust to verify.  So if you could look
15  in your big binder we have up there.
16  A.  Oh.
17  Q.  And look your deposition for February 10th of 2018.
18  A.  Okay.  I have it.
19  Q.  And then go to page 226 and lines 22 through 25 on
20  page 226?
21  A.  I have -- I have page -- the page has four pages.  The
22  one page has four squares, right?
23  Q.  If you look at the square that has the 226 in the
24  corner.
25  A.  Okay, I have it.

960

1  Q.  Okay.  And lines 22 through 25.
2  A.  I do.
3  Q.  And do you see where the question is asked -- where you
4  ask --
5  A.  Yes.
6  Q.  -- how come they didn't show me these pictures before
7  today?
8  A.  Right.
9  Q.  What did your lawyer say?  Would you read that for the
10  ladies and gentlemen of the jury?
11  A.  Because they are irrelevant.
12  Q.  So when you asked how come you didn't see the pictures
13  before today, it was the same lawyers who are telling you
14  that the pictures that show the actual operating room are
15  irrelevant, that's what they said?
16  A.  That's what's written here, yes.
17  Q.  And that's what you heard?
18  A.  I don't remember but it's written, means I heard it,
19  yes.
20  Q.  So in any event, had Mr. Goss or 3M not shown you the
21  photographs of the operating room, for all you know you'd
22  never have seen them, right?
23  A.  Correct.
24  Q.  Now, going to another subject, Dr. Elghobashi.  The jury
25  has heard some references already that relate to the

961

1  movement of personnel and in out of the operating room and
2  the significance of that.  Do you understand that the
3  movement of personnel in and out of the operating room is an
4  important risk factor for surgical infections?  Do you know
5  one way or the other?
6  A.  I'm not a medical doctor.
7  Q.  Now, I think you told us before that none of the
8  personnel that you had depicted in your CFD move?
9  A.  Correct.
10  Q.  If the -- at least assume for purposes of my question
11  that the international consensus of orthopedic surgeons has
12  a statement, persons in the operating room are a major
13  source of bacterial load and shed bacterial particulates.
14  These particulates circulate through the operating room via
15  air currents.  Movements of personnel and objects, including
16  operating room equipment and opening and closing doors, can
17  generate significantly marked air currents and increase the
18  probability of bacteria being deposited in the surgical
19  site.  So I take it given your answer that you are not a
20  medical doctor, then you don't have any basis to disagree
21  with the international consensus of orthopedic surgeon on
22  the significance of the movement of personnel and object in
23  the operating room?
24  A.  I agree on parts of this that does not mention
25  infection.  If you open the door or let the people move, you

962

1    will enhance the spreading of squames. I'm not talking
2    about infection. So that's why I said all our computations
3    were done as the best case scenario for 3M not our side.
4    Q.   You keep repeating that. Are you --
5    A.   Yes, I do.
6    Q.   -- suggesting --
7    A.   I do, I do.
8    Q.   May I finish, please, sir? Are you suggesting to the
9    jury that you are being paid over $250,000 to help 3M, are
10   you trying to suggest that?
11   A.   The science, what the science I perform to prove to show
12   these results, I could have picked moving people easily. I
13   could have opened/closed the door and the squames would have
14   been risen at a much higher rate than what I did, so I did
15   the one -- you mentioned the money. Don't mention the
16   money. I don't care about the 250, that's just nothing.
17   Q.   You don't care, it's nothing?
18   A.   Absolutely nothing for because it's paid to students.
19   Q.   Dr. Elghobashi, if what the jury wants to get is an
20   accurate picture of the nature of squames or particles or
21   bacteria.
22   A.   Yes.
23   Q.   Taking into account all of the factors that may have
24   contributed to it in the operating room, we can agree that
25   your CFD does not depict that, true?

963

1    A.   I repeat again. If we allowed the people to move and
2    the doors to open and close, the Bair Hugger effect would
3    have been enhanced in spreading squames. So we did it such
4    that just to isolate the effect of the Bair Hugger, that's
5    how we do science.
6    Q.   With all due respect, sir, you're not answering my
7    question. If the jury wants to understand all of the
8    factors in the operating room that might affect the air
9    currents, the movement of squames or particles or bacteria,
10   your CFD does not encompass or include all of the factors
11   that would contribute to air movement occurrence in the
12   operating room. Is that true?
13        MS. ZIMMERMAN: Objection, Your Honor. Asked and
14   answered.
15        THE COURT: Overruled.
16   BY MR. BLACKWELL:
17   Q.   Is it true, sir?
18   A.   I answered my answer which is the correct answer for me.
19   I cannot answer any more. What do you want me to do?
20   Q.   I would like you to tell me if it's true or not true,
21   sir?
22   A.   Which is what is true and not, could you repeat that
23   again?
24   Q.   I will try one more time.
25   A.   Yes, please.

964

1    Q.   If the jury wants to understand all of the factors in
2    the operating room that would contribute to the movement or
3    air currents and/or the creation of squames or particles,
4    Mr. Gareis's operating room, your CFD does not take into
5    account all of the factors that would have contributed to
6    the movement of air currents in the operating room. That's
7    a true statement, isn't it?
8    A.   I disagree. And you want me to explain to you why, I
9    will do it. I disagree with that statement, yes, I do.
10   Q.   Well, let me ask you then this way. If you say you
11   disagree and you took into account all of the factors, isn't
12   it true that in no respect whatsoever did you attribute any
13   value to the fact that the doors to that operating room were
14   opened and closed at least six times during the surgery of
15   Mr. Gareis on November 9, 2010, you didn't factor in even
16   one of them, did you, sir?
17   A.   I did not account for any door closing or opening.
18   Q.   Thank you. You answered my question.
19   A.   Okay.
20   Q.   Isn't it true that to the extent there's other equipment
21   in the operating room that generates heat or blows air, you
22   included not a single one of them in your CFD. Isn't that
23   also true?
24   A.   It is true but irrelevant.
25   Q.   That may be your opinion. I'm just trying to understand

965

1    what you did and what you considered. Isn't it also true,
2    even though you said you were putting together the best case
3    for 3M, that the patient that you had modelled in your CFD
4    was a patient that had zero bacteria on his or her own body.
5    Isn't that true?
6    A.   Do you mean I made sure that our patient in the
7    simulation is not sick?
8    Q.   No, that's not what I meant.
9    A.   If you have bacteria on something means it's not right.
10   I did not -- I took a clean patient.
11   Q.   All right. So a clean patient, you meant a patient that
12   had no bacteria is what you took, true?
13   A.   We do not account for bacteria because they are much
14   smaller than the smallest turbine scale.
15   Q.   Sir, I'm trying to understand what you assumed. So when
16   you say that you took a patient that was cleaned or whatever
17   word you used, you presume to have a patient in your CFD
18   that contained no bacteria on his or her skin, that's a true
19   statement, isn't it?
20   A.   I disagree. The simulation does not account for
21   bacteria at all, whether patient or floor or medical stuff,
22   so there is no place to put bacteria in because bacteria is
23   much smaller than the particle, the squames.
24   Q.   All right. So fairness to your point, if there is no
25   bacteria taken into account, that means there would have

1562

```
 1              UNITED STATES DISTRICT COURT
 2              DISTRICT OF MINNESOTA
 3    -------------------------------------------------------
                                    )
 4                                  )
 5    Louis Gareis and Lillian      )VOLUME IX
      Gareis,                       )
 6             Plaintiff,           )File No. 16-CV-4187
      v.                            )  (JNE/FLN)
 7                                  )
      3M Company and Arizant        )  May 25, 2018
 8    Healthcare, Inc.,            )  Minneapolis, Minnesota
                                    )  Courtroom 12W
 9             Defendant.           )  9:32 a.m.
                                    )
10    -------------------------------------------------------
11            BEFORE THE HONORABLE JOAN N. ERICKSEN
              UNITED STATES DISTRICT COURT JUDGE
12
                  (JURY TRIAL - VOLUME IX)
13
      APPEARANCES
14
      FOR THE PLAINTIFFS:
15                              MESHBESHER & SPENCE
                                Genevieve M. Zimmerman
16                              1616 Park Avenue
                                Minneapolis, MN  55404
17
                                CIRESI CONLIN
18                              Michael Ciresi
                                Jan Conlin
19                              225 South 6th Street
                                Suite 4600
20                              Minneapolis, MN
21                              KASTER LYNCH FARRAR & BALL, LLP
                                Kyle Farrar
22                              1010 Lamar, Suite 1600
                                Houston, TX  77002
23
                                KENNEDY HODGES, LLP
24                              Gabriel Assaad
                                4409 Montrose Blvd
25                              Suite 200
                                Houston, TX 77006
```

1563

```
 1    FOR THE DEFENDANTS 3M:      BLACKWELL BURKE P.A.
 2                                Jerry Blackwell
                                  Ben Hulse
 3                                Mary Young
                                  Corey Gordon
 4                                Peter Goss
                                  431 South Seventh Street
 5                                Suite 2500
                                  Minneapolis, MN  55415
 6
                                  MITCHELL WILLIAMS
 7                                Lyn Pruitt
                                  425 West Capitol Avenue
 8                                Suite 1800
                                  Little Rock, AR  72201
 9
10    COURT REPORTERS:         MARIA V. WEINBECK, RMR-FCRR
11                             RENEE A. ROGGE, RMR-CRR
                               1005 U.S. Courthouse
12                             300 South Fourth Street
                               Minneapolis, Minnesota 55415
13
14
                 Proceedings recorded by mechanical
15    stenography; transcript produced by computer.
16
17
18
19
20
21
22
23
24
25
```

1564

```
 1
                      P R O C E E D I N G S
 2                        (9:32 a.m.)
 3         THE COURT:  Good morning.  Welcome back.  Please
 4    be seated.  Good morning.
 5         MR. GOSS:  Good morning, Your Honor.  Your Honor,
 6    defendants call Michael Keen as our next witness.
 7      (Witness sworn.)
 8         THE COURT:  Please take the witness stand, which
 9    is right there, and once you're comfortable, state your full
10    name, spelling your last for the record.
11         THE WITNESS:  Good morning.  My name is Michael
12    Keen.
13         THE COURT:  Spell your last.
14         THE WITNESS:  Oh, sorry.  K-E-E-N.
15              DIRECT EXAMINATION
16    BY MR. GOSS:
17    Q.  Good morning, Mr. Keen.  My name is Peter Goss.  I'm one
18    of the lawyers for 3M, and I'm going to have a few questions
19    for you this morning.  Mr. Keen, where are you from?
20    A.  I'm from Toronto, Ontario, Canada.
21    Q.  Okay.  And Brett, can we bring up slide number 1,
22    please?
23         Toronto, is that north or south of here?
24    A.  Ironically, it's actually southeast of here.
25    Q.  Okay.  Well, thanks for coming up from Canada.  Where do
```

1565

```
 1    you work, Mr. Keen?
 2    A.  I work at a group of hospitals in Toronto, St.
 3    Michael's, St. Joe's, and Providence Health Care.
 4    Q.  And over the course of your education, training, and
 5    experience, have you developed expertise in hospital
 6    engineering?
 7    A.  Yes, I have.
 8    Q.  And does that include heating, ventilation, and air
 9    conditioning, or what we might refer to as HVAC, in
10    hospitals and health care facilities?
11    A.  Yes, it does.
12    Q.  All right.  Brett, could you pull up slide 2, please?
13         I'd like to review your education briefly.  You
14    were an undergraduate at the University of Waterloo.  Is
15    that in Ontario, Canada?
16    A.  It is Ontario.
17    Q.  And you received a bachelor of science in mechanical
18    engineering.  Is that right?
19    A.  Bachelor of applied science in mechanical engineering,
20    yes.
21    Q.  Thank you.  And then you went on to pursue an MBA at
22    Queens University, also in Ontario; is that right?
23    A.  Yes, that's right.
24    Q.  Were you working during the time that you received your
25    MBA?
```

1578

1  Q.  Okay.  And what does the standard say?  You don't have
2  to read it, but just explain to the jury what the standard
3  says for the location of the diffusers.
4  A.  Okay.  The location of the diffusers that calls for in
5  the standard that they should be concentrated to provide
6  airflow over the patient and the surgical table which are
7  located in the center of the room.
8  Q.  Okay.  And then we've got -- that's part A.  And then
9  subpart B, could you go to the next slide, Brett?
10         Okay.  And then what does subpart B say about the
11  area over the operating table?
12  A.  It says that it references the fact that there are other
13  things other than the air vents in the ceiling such as the
14  operating room lights, articulating arms, gas columns that
15  might be in the ceiling sprinkler heads, and so it says that
16  over this primary diffuser array, so this section of vents
17  in the center of the room over the patient and the operating
18  table, that no more than 30 percent of that space should be
19  for these other things.  70 percent of that space should be
20  just for the air vents themselves.
21  Q.  Okay.  And Brett, can we go back to the previous slide,
22  please?
23         And does part A also specify an airflow velocity
24  for the diffusers over the table?
25  A.  Yes, it does.  It calls for an average velocity range of

1579

1  25 to 35 feet per minute.
2  Q.  And how would you characterize that velocity?
3  A.  I would say that's a very -- what we call a low
4  velocity.
5  Q.  Okay.  Now, did you prepare a report for your work in
6  this case?
7  A.  Yes, I did.
8  Q.  And in your report did you cite a drawing that relates
9  to the airflow patterns created by an ASHRAE 170 compliance
10  system?
11  A.  Yes, I did.
12  Q.  And would that aid your testimony to the jury this
13  morning?
14  A.  Yes, that would be a helpful illustration.
15  Q.  Okay.  Brett, can you please pull up 436-11, defendants?
16         Okay.  And is this the drawing you cited in your
17  report?
18  A.  Yes, it is.
19  Q.  Can you explain to the jury what this shows?
20  A.  Sure.  So you see in this drawing at the bottom of the
21  middle is the operating room table in the center of the
22  room.  Above that you'll notice the sort of four boxes in
23  the ceiling level, that's representing those supplier vents
24  I just talked about, and you can see here the concentration
25  of where it's over the space above the operating room table.

1580

1  And we call that space where the air vents are to be over
2  that table sort of the one foot around the perimeter of the
3  operating room table that it should occupy that 70 percent
4  of the ceiling space.  So here's it's a simplified view, you
5  can see it's -- they have the vents that are in the ceiling,
6  and the air there is being blown down towards the operating
7  room table and once it gets there, it's washed away to
8  sides.
9         You'll notice as well on the two sides here in the
10  corner, there are exhaust vents, so this is where the air
11  gets exhausted from the room, so effectively the airflow
12  pattern that we're trying to achieve is to have the air
13  supplied from the center of the room over the top of the
14  patient and the operating room table over the staff that are
15  there and washed away to the outsides and then exhausted
16  from the corners.
17  Q.  Now, I want to ask you what's shown on the sides, the
18  left and right sides of the drawing.  What are we seeing
19  there?
20  A.  So the air that comes in initially, the idea is to try
21  and achieve a unidirectional sort of flow downwards so that
22  air is going down into the room as opposed to mixing as soon
23  as it gets there.  Once it starts to hit things in the room,
24  the table, the patient, and it hits the floor, it starts to
25  go out to the sides and you can see where it starts to get a

1581

1  little turbulence on the sides there and starts to mix
2  around, that's what happens on the sides.
3  Q.  Okay.  Is there any way to prevent turbulence in the
4  operating room with an HVAC system?
5  A.  No, not completely.
6  Q.  Now, would it be accurate to describe this pattern of
7  airflow over the surgical table as a force field?
8  A.  No, I wouldn't call it a force field.
9  Q.  How would you characterize it?
10  A.  It's more like a waterfall coming down.
11  Q.  Okay.  Would it feel like a waterfall if you were to go
12  to Minnehaha Falls and stand under it?
13  A.  No, no, it's not that strong.  I mean, again, I
14  mentioned it's a low velocity of air so it's probably more
15  like a soft rain or drizzle that's coming down if I had used
16  the waterfall analogy, but it's a low velocity of air that's
17  wafting over.
18  Q.  So to give the jury a point of reference, let's say you
19  turn on a hair dryer, how would the velocity of air from the
20  ceiling compare to a typical hair dryer?
21  A.  So a hair dryer would classify as high velocity and
22  we've all felt the high velocity of a hair driver.  Here I
23  mentioned it's 25 to 35 feet per minute.  A hair dryer would
24  be like 30 times, probably close to a thousand feet per
25  minute as far as a velocity goes, like 30 times stronger

1638

1  blowing air over the patient.
2  Q.  Well, let's take a look at this is the anesthesia
3  machine?
4  A.  Yes, it is.
5  Q.  And you can see the operating table here, correct?
6  A.  Yes.
7  Q.  And the vents are pointing away from the patient,
8  correct?
9  A.  Yes.
10  Q.  So those would not be blowing air into the sterile
11  field, fair?
12  A.  I don't know if there's a fan included in there or not
13  or whether they're just passive vents.
14  Q.  Sure, they're not venting heat onto the sterile field,
15  how about that?
16  A.  The vents here are the in the opposite direction of the
17  surgical table.
18  Q.  And you know from your experience, that's the way these
19  machines are always set up, right?  The vents are always
20  away from the sterile field, right?
21  A.  No, I am not familiar with that.
22  Q.  You don't know one way or the other?
23  A.  No.
24  Q.  Okay.  And there was a computer screen, and obviously
25  the computer, you have to be able to be around the patient

1639

1  and see the computer so it's -- the screen is facing the
2  team, correct?
3  A.  Yes, it is.
4  Q.  So the vents, whether or not they're active or passive,
5  are on the back side of the computer, correct?
6  A.  On the -- on this monitor they're on the back side, yes.
7  Q.  So they're also not blowing air into the sterile field
8  or venting air in the sterile field, correct?
9  A.  If they are venting air, it is the back of the monitor.
10  Q.  What is that blue thing?
11  A.  I believe you pointed to the Bair Hugger unit
12  representation.
13  Q.  That's not the Bair Hugger that was used for
14  Mr. Gareis's operation though, right?
15  A.  This is a schematic, and I believe it looks like a
16  different model.
17  Q.  I'm just color and looking at the size, that's clearly
18  not the 505 Bair Hugger, right?
19  A.  Correct.
20  Q.  You didn't measure how high this diffuser -- or I'm
21  sorry, this return grille was, correct?
22  A.  Yes, we did.
23  Q.  You did?  Testify --
24  A.  We did an approximation measurement.
25  Q.  At the hospital in the operating room, you didn't take a

1640

1  measuring cord or stick and see how high it was?
2  A.  No, we did an eyeball measurement.
3  Q.  Eyeball measurement, okay.  And then from your eyeball
4  and approximations, that's how you made this?
5  A.  I did not make this schematic.
6  Q.  Do you know who did?
7  A.  No, I do not.
8  Q.  So you're relying on it but you didn't make it and you
9  didn't know who made it?
10  A.  No.
11  Q.  Do you have any idea of how accurate it is?
12  A.  I believe it's a fairly accurate representation of the
13  operating room, from a schematic sense.
14  Q.  Just based on your blind trust of somebody you don't
15  know?
16        MR. GOSS:  Objection, Your Honor.
17        THE COURT:  Sustained.
18  BY MR. FARRAR:
19  Q.  You talked a bit about laminar flow or unidirectional
20  flow, correct?
21  A.  Yes.
22  Q.  And I think you said it's not a protective field or
23  doesn't make a protective field or something like that; is
24  that right?
25  A.  The question was asked whether I determine it to be a

1641

1  force field, and I said no.
2  Q.  Would you look at your December 6, 2017, report.  I'm
3  sorry, that's the wrong report.  The June 2, 2017, report.
4  Page 23, subpart D is where I'm looking specifically.  Do
5  you say in D, the laminar flow characteristic in an
6  operating room is an important design feature to provide a
7  protective field from infiltration of possible
8  contamination.  You agree with that, correct?
9  A.  Yes.
10  Q.  All right.  So it's a protective field, just take issue
11  with force field?
12        THE COURT REPORTER:  I'm sorry?
13  BY MR. FARRAR:
14  Q.  You're okay with protective field, you just take issue
15  with force field?
16  A.  I think it's applied in different context, yes.
17  Q.  Okay.  Talk to you a little bit your inspection of the
18  OR.  ASHRAE requires two banks of filters for the air coming
19  into the OR, correct?
20  A.  Yes.
21  Q.  And you know that in OR No. 4 they actually had three
22  banks of filters, correct?
23  A.  Correct.
24  Q.  So it went above and beyond ASHRAE standards, correct?
25  A.  There was an additional filter bank, yes.

1642

1  Q.  And in fact, that additional filter bank was HEPA
2  filtration, correct?
3  A.  Yes, it was.
4  Q.  Which is basically the highest level of filtration we
5  can get, right?
6  A.  It is one of the better ones, yes.
7  Q.  And in fact, it stops 99.97 percent of any particles
8  .3 microns and larger.  You know that, right?
9  A.  Yes.
10  Q.  It also had a UV light between the two --- first two
11  filters, correct?
12  A.  I was told it had a UV light.  I'm not sure where it was
13  located.
14  Q.  Okay.  And you don't have any reason to believe it
15  didn't have a UV light?
16  A.  No, I do not.
17  Q.  That is also not something that's required by ASHRAE,
18  correct?
19  A.  That's correct.
20  Q.  So above and beyond making sure that the air coming in
21  is sterile, correct?
22  A.  The UV light was an extra beyond the standard -- extra
23  piece beyond the standard requirement.
24  Q.  It had -- well, did you calculate the number of air
25  changes per -- what's the ASHRAE standard is 20 air changes?

1643

1  A.  20 total air changes is the minimum requirement, yes.
2  Q.  Did you calculate what OR No. 4 had when you were there?
3  A.  Yes, I did.
4  Q.  What was it?
5  A.  I'm sorry, just to correct, I calculated by the design
6  drawings --
7  Q.  Sure.
8  A.  -- what they designed it to be, and I calculated that to
9  be I believe somewhere in the range of 26 to 28 air changes.
10  Q.  Yeah, I think you said 28.  So that's above -- either
11  way, above and beyond ASHRAE standards?
12  A.  It's over the minimum requirement of 20.
13  Q.  So above and beyond the ASHRAE standards?
14  A.  Yes.
15  Q.  Finally, Mr. Keen, I want to talk to you a little bit
16  about computational fluid dynamics.  You're not an expert in
17  that, right?
18  A.  No, I am not.
19  Q.  You've never done it?
20  A.  I have not done it.  I'm sorry, I've done some basic CFD
21  when I was in school.
22  Q.  You've never modelled anything using computational fluid
23  dynamics?
24  A.  I have in school, yes.
25  Q.  What?

1644

1  A.  It's was a long time ago, I don't recall, but I did take
2  a course and did some basic modelling.
3  Q.  Undergrad?
4  A.  Yes.
5  Q.  Okay.  You don't have like a Ph.D. or master's in --
6  A.  No, I do not.
7  Q.  Do you know what grid independence is?
8  A.  Repeat the question.
9  Q.  Grid independence, do you know what it is?
10  A.  No, I'm not familiar with that term.
11  Q.  Do you know what mesh independence is?
12  A.  No.
13  Q.  Have you ever used LES?
14  A.  I have not used LES.
15  Q.  Have you used RANS, R-A-N-S?
16  A.  I have not used RANS.
17  Q.  Do you have any opinion as to the quality between LES
18  and RANS?
19  A.  I don't have an opinion between them.
20  Q.  Do you know what the Navier-Stokes equation is?
21  A.  Yes, I do.
22  Q.  What is it?
23  A.  It's an equation used in computational fluid dynamics.
24  Q.  Do you know and can you write it out, do you know what
25  it is?

1645

1  A.  I couldn't do that by memory, no.
2  Q.  Can you solve it?
3  A.  I think we used it in school.  Again, I couldn't do that
4  today.
5  Q.  Do you know what Elghobashi map is?
6  A.  Sorry, can you repeat the question?
7  Q.  Do you know what the Elghobashi map is?
8  A.  No, I'm not familiar with the Elghobashi map.
9  Q.  You understand, don't you, Mr. Keen, that the setup that
10  Dr. Elghobashi used for his computational fluid dynamics was
11  not intended to mimic Mr. Gareis's operating room No. 4,
12  right?
13  A.  I don't know whether or not that was the intention.
14  Q.  You read his report, correct?
15  A.  Yes.
16  Q.  And you just testified about all kinds of things that
17  you disagree with or have complaints with.  Do you have an
18  understanding, sir, if it was meant to model Mr. Gareis's
19  operating room?
20  A.  No, I don't have that understanding.
21  Q.  You just don't know one way or the other?
22  A.  I don't know that it was intended to match that, no.
23  Q.  Okay.  So maybe that's the confusion then, Mr. Keen,
24  maybe you think it's supposed to model it and it's actually
25  not and that would take care of your criticisms, right?

1710

1  that you did?
2  A. That is correct.
3  Q. And that's what's available on YouTube?
4  A. That is correct.
5  Q. Would you tell the ladies and gentlemen of the jury what
6  exactly that video is referring to?
7  A. So that video refers to a calculation of airflow in
8  what's called a modelled operating room, so it was an
9  operating room with specific dimensions. There was a Bair
10  Hugger device in it. There was ventilation flow coming
11  downwards from the ceiling. There were no moving surgeons
12  or patient. There were no other equipment that would cause
13  any air motion or heat, so it was a very specific
14  calculation of airflow. And that video was intended to show
15  the patterns of airflow in that operating room, that
16  modelled operating room.
17  Q. So that modelled operating room that's based upon the
18  airflows from your calculations?
19  A. Correct.
20  Q. Now, do you recall what it is that Dr. Elghobashi took
21  away from your video on YouTube?
22  A. I believe he took the dimensions of the room, so the
23  height, width, and depth.
24  Q. So your video, your YouTube video, based upon your CFD,
25  does it or does it not purport to represent the dimensions

1711

1  of OR No. 4 that the jurors have heard a lot about?
2  A. It does not.
3  Q. And OR No. 4 is the operating room that we've been
4  discussing in this courtroom that relates to Mr. Gareis's
5  surgery?
6  A. That is correct.
7  Q. Was your CFD model, and we'll see it after a while, but
8  was it at all intended to capture the reality of
9  Mr. Gareis's surgery?
10  A. It was not.
11  Q. Was it designed to measure all of the forces that would
12  affect air movement in the operating room on November 9,
13  2010, at the time of Mr. Gareis's surgery?
14  A. No.
15  Q. Do you have an opinion, then, to a reasonable degree of
16  engineering scientific certainty as to whether
17  Mr. Elghobashi's use of the dimensions of the operating room
18  used in your video, your model, are sufficient to make
19  conclusions about Mr. Gareis's operating room in this case?
20  A. I mean, frankly, neither of the calculations correspond
21  to the operating room No. 4. They were both corresponded to
22  an entirely different operating room.
23  Q. And so if you had to answer the question does it
24  correspond yes or no, what does would say?
25  A. It does not correspond.

1712

1  Q. And the opinion that you've expressed, again, you hold
2  that opinion to a reasonable degree of scientific certainty?
3  A. Yes.
4  Q. So let's talk more specifically about the work you've
5  done, then, in this case. Would you tell the ladies and
6  gentlemen of the jury what work have you done?
7  A. I think I mentioned this earlier, I did a lot of reading
8  about what is known about operating room airflow and what
9  other people have done to study whether or not these types
10  of devices can influence airflow, so I've read a lot of
11  independent research. In addition, I carried out my own
12  research and project, and that involved two things. It
13  involved my own calculations and it also involved my own
14  experiments.
15  Q. So you read a lot of scientific literature?
16  A. Yes.
17  Q. Did you prepare your own model CFD?
18  A. Yes, I did.
19  Q. Did you conduct something called an airflow
20  visualization experiment?
21  A. Yes, I did.
22  Q. Briefly, can you tell the ladies and gentlemen of the
23  jury what is that? What's an airflow visualization
24  experiment?
25  A. Well, it's a real world experiment. So it's making an

1713

1  experiment -- the visualization means you're going to
2  visualize how the air flows in the operating room, so a
3  visualization experiment helps you track the airflow
4  patterns that are occurring that you otherwise wouldn't be
5  able to see with your eyes. So that visualization
6  experiment was an experiment to capture what happens in the
7  real world.
8  Q. So did you also review the expert reports of other
9  experts for the plaintiffs in the case?
10  A. Yes, I did.
11  Q. Have you reviewed the CFD videos and reports of
12  Dr. Elghobashi?
13  A. Yes, I have.
14  Q. Do you know whether or not Dr. Elghobashi reviewed your
15  report?
16  A. He did not.
17  Q. Have you formed any opinions about the Bair Hugger and
18  its effect on operating room airflow based on the work
19  you've done in this case?
20  A. Yes, I have.
21  Q. And do you hold those opinions to a reasonable degree of
22  scientific certainty?
23  A. Yes.
24  Q. Now, tell us, what's your opinion?
25  A. My opinion is the Bair Hugger device does not disrupt

1714

1   the downward airflow from the ceiling in an operating room.
2   Q.  Can you tell us what you base that opinion on?
3   A.  I base it on my own experiments in an actual operating
4   room with moving physicians and a patient.  I base that on
5   my review of the literature and what other people have done
6   and on my own calculations.
7   Q.  Now, I heard you say that you performed your own airflow
8   calculations.  Would you tell the ladies and gentlemen what
9   that means?
10  A.  You've heard -- we've heard a lot about CFD calculations
11  and how they're done.  Basically, if you want to calculate
12  the airflow, let's say in this room, you set up what's
13  called a grid, which are a bunch of points in the computer
14  world, not in fiscal objects but a bunch of points in the
15  computer world, and you calculate the airflow at each point.
16  And what that means is you calculate the velocity and the
17  air pressure at every single point.  And so if you calculate
18  enough points of velocity and pressure, you can stitch all
19  that stuff together like a puzzle, you put a puzzle together
20  and it tells the whole picture, so it's calculating airflow
21  at millions and millions of locations in a space.
22  Q.  So there are things, then, that the CFD can tell us and
23  things the CFD can't tell us?
24  A.  Correct.
25  Q.  In the context of the work you've done on this case, can

1715

1   a CFD tell us how the air moved in the operating room during
2   the surgery of Mr. Gareis eight years ago on November 9,
3   2010, precisely between the times of 12:11 p.m. and 2:55
4   p.m.?
5   A.  These CFD calculations cannot tell you that.
6   Q.  And why not?
7   A.  These calculations only tell you how the flow behaves
8   depending on your input.  So they can only account for the
9   inputs that you put into the model.  So if you wanted to
10  know and you wanted to calculate the airflow in this OR, you
11  would have to know where people stood, how they moved, you
12  would have to know what equipment was there, where was the
13  equipment mand you have to track all of that stuff for the
14  entire surgery.  And no one that I know of has that
15  information or could to a calculation with all of that
16  information.  You'd have to know, for example, did the doors
17  open, if they opened when, did someone walk through, and
18  that kind of information can't be put into a CFD
19  calculation.
20  Q.  And we'll talk about that more in just a moment, but
21  you're saying you essentially have to know and have all
22  these data points from moment to moment for that entire time
23  period?
24  A.  The entire operation.
25  Q.  And have you seen any data for any part of the

1716

1   operation?
2   A.  No.
3   Q.  Now, in your opinion, what might be useful about a CFD
4   in this case?
5   A.  Here's the thing about these fluid flow calculations and
6   the thing people have to keep in mind.  They are -- the
7   phrase we use in our field is they're never right but
8   they're sometimes useful.  They're useful to answer very,
9   very specific questions.
10         Okay.  So why did I do a CFD calculation?  I'll
11  tell you why.  I wanted to answer a very specific question.
12  My calculation was intended to answer this question.  If I
13  remove everything from the operating room, no heaters, no
14  anesthesia machine, no surgeons, no moving surgeons, no
15  opening doors, remove all that, and just let's see if the
16  Bair Hugger air can interrupt and disrupt the ceiling
17  ventilation downward airflow, a CFD can answer that because
18  I've removed everything else.
19  Q.  Well, what answer did you get to that?
20  A.  The answer that I got was the Bair Hugger itself cannot
21  interrupt the downward airflow from the vents.
22  Q.  So what is it that would make you do a CFD, a form of a
23  simulation, where you take practically everything out of the
24  operating room except the Bair Hugger, why would do you it
25  that way?

1717

1   A.  Simple.  Because the Bair Hugger's motion, the air
2   motion from the Bair Hugger, is dominated by other things.
3   A door open, a surgeon moves, those things are more
4   important.  If the Bair Hugger by itself isn't going to
5   disrupt the downward airflow, then it's going to be less
6   important when you add all of those other things, and so I
7   was looking at a worse case scenario.
8   Q.  So you were telling us a bit about a CFD model being no
9   better than the inputs that go into it.  Can you give us
10  some examples of inputs?
11  A.  Yes, I can.  So, for the question that I wanted to
12  answer, that very specific question, I needed to know things
13  like the dimensions of the room, where the operating table
14  was, I needed to know information about how the flow went
15  from the ceiling into the room, so that would be the inputs.
16  I needed to know how the Bair Hugger air emerged from the
17  blanket into the room, and I also needed to know some
18  information about how the air left the room, and that would
19  be the exit vents.  So for my calculation, those were the
20  critical things I needed.
21  Q.  So does it make any difference whether the exit vents
22  are powered or not?
23  A.  Yes, it does.
24  Q.  And it may be obvious, but how come?
25  A.  Well, powered vents have suction, there's a fan sucking

1789

```
 1         UNITED STATES DISTRICT COURT
 2            DISTRICT OF MINNESOTA
 3    ------------------------------------------
                                  )
 4                                )
      Louis Gareis and Lillian    )VOLUME X
 5    Gareis,                     )
              Plaintiff,          )File No. 16-CV-4187
 6       v.                       )   (JNE/FLN)
                                  )
 7    3M Company and Arizant      ) May 29, 2018
      Healthcare, Inc.,           ) Minneapolis, Minnesota
 8                                ) Courtroom 12W
              Defendant.          ) 9:07 a.m.
 9                                )
                                  )
10    ------------------------------------------
11      BEFORE THE HONORABLE JOAN N. ERICKSEN
         UNITED STATES DISTRICT COURT JUDGE
12
            (JURY TRIAL - VOLUME X)
13
      APPEARANCES
14
      FOR THE PLAINTIFFS:
15                     MESHBESHER & SPENCE
                       Genevieve M. Zimmerman
16                     1616 Park Avenue
                       Minneapolis, MN  55404
17
                       CIRESI CONLIN
18                     Michael Ciresi
                       Jan Conlin
19                     225 South 6th Street
                       Suite 4600
20                     Minneapolis, MN
21                     KASTER LYNCH FARRAR & BALL, LLP
                       Kyle Farrar
22                     1010 Lamar, Suite 1600
                       Houston, TX  77002
23
                       KENNEDY HODGES, LLP
24                     Gabriel Assaad
                       4409 Montrose Blvd
25                     Suite 200
                       Houston, TX 77006
```

1790

```
 1    FOR THE DEFENDANTS 3M:    BLACKWELL BURKE P.A.
 2                       Jerry Blackwell
                         Ben Hulse
 3                       Mary Young
                         Corey Gordon
 4                       Peter Goss
                         431 South Seventh Street
 5                       Suite 2500
                         Minneapolis, MN  55415
 6
                         MITCHELL WILLIAMS
 7                       Lyn Pruitt
                         425 West Capitol Avenue
 8                       Suite 1800
                         Little Rock, AR  72201
 9
10    COURT REPORTERS:       MARIA V. WEINBECK, RMR-FCRR
                         1005 U.S. Courthouse
11                       300 South Fourth Street
                         Minneapolis, Minnesota 55415
12
13
14         Proceedings recorded by mechanical
      stenography; transcript produced by computer.
15
16
17
18
19
20
21
22
23
24
25
```

1791

```
 1              P R O C E E D I N G S
 2                (9:07 a.m.)
 3         THE COURT:  Good morning.  Welcome back,
 4    everybody.  And please be seated.
 5         And Dr. Abraham, you can resume the witness stand.
 6    Good morning.  And you're still under oath from three days
 7    ago, last week.
 8         THE WITNESS:  Thank you.
 9         THE COURT:  Mr. Assaad.
10         MR. ASSAAD:  Thank you, Your Honor.  May I
11    approach the witness?
12         THE COURT:  You may proceed.  Yes.
13              CROSS EXAMINATION
14    BY MR. ASSAAD:
15    Q.  Good morning, Dr. Abraham.
16    A.  Good morning.
17    Q.  Did you have a nice long weekend?
18    A.  I did.  A little too much sun, biking with my kids, but
19    yeah, yeah, nice weekend.
20    Q.  I think it's I think it's one of the first time that I
21    thought it was hotter in Minnesota than it was in Houston.
22         And I don't think I introduced myself to the jury
23    last week.  My name is Gabriel Assaad, and I represent
24    Mr. and Mrs. Gareis.
25         Dr. Abraham, you agree with me that air can't pass
```

1792

```
 1    through the hospital drapes, the sterile drapes that are
 2    used during on orthopedic surgery, correct?
 3    A.  I've seen no evidence or I've heard no claim that they
 4    could, so I agree with you.
 5    Q.  Okay.  And you've actually seen pictures of an operating
 6    room and how the draping occurs, correct?
 7    A.  Yes.
 8    Q.  And I'd like to go to -- I just want to run through the
 9    setup so it will help us answer, like, when we go further
10    on, about a couple questions I have later on.  If we could
11    go to plaintiff's Exhibit 1521.
12         MR. BLACKWELL:  1615.
13         MR. ASSAAD:  I'm sorry, correct.
14    BY MR. ASSAAD:
15    Q.  1615.  Now, Doctor, you were here for Dr. Presnal's
16    testimony by deposition, correct, the orthopedic surgeon in
17    this case?
18    A.  Was that on Friday?
19    Q.  I believe you were here most of the week last week,
20    correct?
21    A.  I was here a good portion.  I don't know if it was most
22    of but a good portion.
23    Q.  And you were here for the testimony of Dr. Presnal, the
24    orthopedic surgeon, that he described how Mr. Gareis was
25    draped during the surgery?
```

1849

1  Q. "And you're running the streamline for 60 seconds in
2  that individual frame, correct?"  And, "That is correct.
3  I'm tracking the path of the flow over a 60-second time
4  period in that frame."  Correct?
5  A. Correct.
6  Q. Okay.  So just so the ladies and gentlemen of the jury
7  understand, you run the simulation, say, for the 505, for
8  5.07 seconds, correct, and you get a file?
9  A. Well, I mean that's partially correct.  You get -- what
10  I did, and I testified to this in my deposition, I ran and I
11  think I ran a RANS study to get the initial guess of the
12  solution, the initial solution.
13  Q. You used RANS?
14  A. Yes, I did.  And then what I began to do is to take
15  frames, like frames in a movie, and I think I took up to
16  3630 frames.
17  Q. Is that TRN files?
18  A. The frames are from the TRN files.
19  Q. Are they separate TRN files or it's off one TRN file?
20  A. Separate.
21  Q. So you're saying that you had 3,630 different TRN files?
22  A. Well, I testified to this in my deposition.
23  Q. I understand what you testified in your deposition, but
24  I'm saying today, you had 3,630 TRN files?
25  A. Yes.

1850

1  Q. And you deleted most of them?
2  A. No, no, no.  On page 250, I tell you, you ask, "Now, you
3  provided TR" --
4       MR. ASSAAD:  Wait.  He can't read off the
5  deposition, Your Honor.  If he wants --
6       THE COURT:  Didn't you ask him to?
7       MR. ASSAAD:  No, I did not.
8       THE COURT:  All right.  Give him a question.
9  BY MR. ASSAAD:
10  Q. You had 3,630 TRN files.  That's your testimony today?
11  A. My testimony is that I had up to 3,630.  That is my
12  testimony today.
13  Q. And you produced only one to the plaintiff, correct?
14  A. I disagree.  I said it on page 250.
15  Q. We'll move on.  We'll get to the deletion part in a
16  little bit.
17       You agree that time does not stand still, correct?
18  A. I agree time does not stand still.
19  Q. And when you create streamlines from a single time
20  frame, all the streamlines were based on a frozen frame;
21  correct?
22  A. I agree with you.
23  Q. Okay.  Now, now, real quick, and I don't want -- you
24  said I mislead the jury.  When you turn on the Bair Hugger,
25  it doesn't get to 43 degrees right away, correct?

1851

1  A. That is correct.
2  Q. Actually, to get the blanket to 43 degrees, it probably
3  takes five or six minutes, maybe even up to ten, correct?
4  A. I don't know how long it takes, but the heating up of
5  the Bair Hugger is not related to how I did my calculation,
6  but I don't know how long it takes.
7  Q. But it takes a few minutes, correct?
8  A. It may take a few minutes.
9  Q. And you've seen studies where just even to get up to
10  36 degrees when you turn the Bair Hugger on, it's about 3.2
11  minutes for the blanket?
12  A. I don't recall seeing any studies.
13  Q. Did you see any internal studies by 3M?
14  A. Yes.  I saw what I characterize as a tech data sheet,
15  but I don't recall the studies on the time it takes the Bair
16  Hugger to warm up.  It wouldn't have mattered to me because
17  I assumed the Bair Hugger was operating at full heat.
18  Q. Okay.  Now, you said you ran a RANS model to get the
19  initial conditions for your CFD analysis, correct?
20  A. That's what I recall.
21  Q. You did not produce that RANS file to the plaintiffs,
22  correct?
23  A. I did not.
24  Q. You never compared the Bair Hugger off to the Bair
25  Hugger on, correct?

1852

1  A. In this expert report I did not.
2  Q. Now, you've used ANCYS for many years, correct?
3  A. Yes.
4  Q. It's a commercial code.  It's a code for many people
5  could buy or get a license for?
6  A. Yes.
7  Q. University of St. Thomas has a license?
8  A. Correct.
9  Q. And it's user friendly for people that are engineers
10  that have that use CFD, correct?
11  A. I think my students would argue that it's not very user
12  friendly, but if you work on it for many years, it's user
13  friendly, yeah.
14  Q. Okay.  And like most computer programs or software that
15  we use, it notifies you when you have an error, correct?
16  A. Yes, it gives error warnings or just general warnings,
17  yes.
18  Q. It produces error messages, correct?
19  A. Yes.
20  Q. And your 505 CFD analysis had error messages, correct?
21  A. I think it had an error message.  I don't know if it had
22  more than one.
23  Q. Now, this is a file that you produced to us regarding
24  your 505 analysis, correct?
25  A. Correct.

1853

1  **Q.** And actually it says JP Abraham up here, correct?
2  **A.** Yes, it does.
3  **Q.** And it has the date 2017.
4  **A.** Yes, it does.
5  **Q.** And that's December 22, 2017, correct?
6  **A.** Correct.
7  **Q.** Now, if you turn to page --
8       THE COURT:  We'll take a morning recess.
9  15 minutes.
10     (Recess.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1854

1              **11:10 A.M.**
2
3       **(In open court with the Jury present.)**
4       THE COURT:  Be seated.  You may proceed.
5       MR. ASSAAD:  Thank you, Your Honor.
6  BY MR. ASSAAD:
7  **Q.** Where we left off we were discussing about error
8  messages that CFX produces or can produce while you run
9  your CFD code, correct?  Do you recall that?
10  **A.** Correct.
11  **Q.** Okay.  And you've actually received error messages in
12  the CFD model you did for the 505, correct?
13  **A.** Yes.
14  **Q.** And in fact you almost always receive error messages
15  when you do CFD modeling, correct?
16  **A.** Well, it's very common that you'll receive error
17  message or guidance messages from the software.  It's very
18  common.  I don't know if it's almost always, but very
19  common.
20  **Q.** Let's turn to your deposition on March 15th, 2018, page
21  152.
22  **A.** March 15th?
23  **Q.** Yes.  February 15th.  I'm sorry.  2018.
24  **A.** Could you give me the page number again?
25  **Q.** 152.

1855

1       "Question:  Have you ever received an error
2  message in any of the work you did on ANSIS?
3       "Answer:  I almost always receive error
4  messages."
5       Did I read that correctly?
6  **A.** Yes, and the next --
7  **Q.** Let's go to exhibit -- let's go to Exhibit 463.
8       MR. BLACKWELL:  Your Honor, may the witness
9  please finish his answer?
10      THE COURT:  Next question.
11  BY MR. ASSAAD:
12  **Q.** Exhibit 463, and you were looking at Exhibit 463 which
13  is a result file that you produced to the plaintiff
14  regarding your CFD analysis on the model 505, correct?
15  **A.** Yes.
16  **Q.** And if you turn to page 10 of Exhibit 463, you see an
17  error message has occurred in the subroutine interaction,
18  correct?
19  **A.** It's actually a warning message, but there is a message
20  the computer is giving in that subroutine.
21  **Q.** It actually says error, correct?
22  **A.** It does, but at the end it says warning, and it gives
23  the warning.
24  **Q.** And if you go to page 13 of the same exhibit, there is
25  another error message, correct?

1856

1  **A.** It is the same warning message that's given.
2  **Q.** Now, we can take down that exhibit.
3       Now, I asked you this before, but you agree with
4  me that you for each of the 505 and 705 models, you can
5  only provide me with one result file, correct?
6  **A.** I disagree.
7  **Q.** Let's go to page 234 of your deposition that was taken
8  in July of 2017.
9  **A.** Is your question by a certain date, or is your question
10  just overall how many results files?
11      MR. ASSAAD:  Your Honor, I would like to admit
12  Exhibit 463 in evidence, which is his result file that he
13  produced.
14      MR. BLACKWELL:  Objection, Your Honor.
15  Relevance.
16      MR. ASSAAD:  It's the result file of his own CFD
17  analysis.
18      THE COURT:  I'll reserve ruling.  The offer comes
19  out of the blue disconnected from any foundational
20  questions to the witness, so I will withhold ruling on
21  that.
22  BY MR. ASSAAD:
23  **Q.** Let's go to Exhibit 463 again, sir.  What is
24  Exhibit 463?
25  **A.** Exhibit 463 is called a log file.

1857

1  **Q.** And a log file is the results of a, of a time stamp,
2  correct?
3  **A.** No.
4  **Q.** What is the log file?
5  **A.** The log file gives you details about a calculation.
6  **Q.** So it gives you details about a calculation.  This was
7  created in your CFD analysis of the 505, correct?
8  **A.** I believe so.
9  **Q.** And this was done in -- this is routinely created in
10 the -- in any type of CFD analysis, correct?
11 **A.** I wouldn't say any type of CFD analysis, no.
12 **Q.** Well, it's created as a result of a CFX program in
13 performing your calculations on the model operating room
14 performed in this case, correct?
15 **A.** Okay.  Could you just ask that question again?
16 **Q.** This was created in response to your modeling of the
17 CFD -- of your CFD modeling of the operating room in your
18 505 analysis, correct?
19 **A.** Correct.
20 **Q.** And you have seen this document before, correct?
21 **A.** I don't know if I've seen this exact document.  I've
22 seen documents like this.
23 **Q.** You have no -- you agree that -- you've never seen this
24 document before?
25 **A.** There has been a lot of -- I probably have.  There has

1858

1  just been so many documents that, I mean I'm assuming I
2  have.
3  **Q.** This was created off your computer, correct?
4  **A.** Yes.  I can see, I can see that at the top, yes.  I
5  created this document.
6  **Q.** And you saw this at your depo, and it's marked Exhibit
7  Number 16, correct?
8  **A.** Yes.
9  **Q.** So your computer created this result file?
10 **A.** Yes.
11 **Q.** And you agree with me that if your computer created it,
12 it's an authentic copy of the results of your CFD 505 or
13 your logs of the 505 analysis, correct?
14 **A.** It is a, it is the log of the 505.
15         MR. ASSAAD:  Your Honor, I offer Exhibit 463 into
16 evidence.
17         MR. BLACKWELL:  No objection, Your Honor.
18         THE COURT:  463 is received.
19 BY MR. ASSAAD:
20 **Q.** Let's go back to where I left off regarding the files
21 that were produced to the plaintiff.  If you go to page 234
22 of the deposition of July of 2017, line 16.
23 **A.** I'm not quite there yet.  I'm there.
24 **Q.** "Question:  I only have one PRN file.  You understand
25 that, correct?

1859

1         "Answer:  Yes."
2         Did I read that correctly?
3  **A.** You read that correctly.
4  **Q.** And you essentially went and deleted any unimportant or
5  unessential files that you believed were unimportant or
6  unessential, correct?
7  **A.** I deleted things that were contained within the master
8  file and weren't needed.
9  **Q.** So you deleted files that you believed were not needed,
10 correct?
11 **A.** Correct.
12 **Q.** Now, with respect to the geometry that you used in your
13 CFD model for both the 1.2 second model, the 750, and the
14 507 second model, the 505, that geometry you did not
15 create, correct?
16 **A.** That is correct.
17 **Q.** You obtained that from 3M, correct?
18 **A.** Correct.
19 **Q.** Now the animation that you put up in, the video
20 animation that you showed to the jury, those were
21 streamlines, correct?
22 **A.** Yes.
23 **Q.** And you agree with me that particles do not follow the
24 path of streamlines, correct?
25 **A.** I would agree.  Particles do not necessarily follow the

1860

1  path of the streamlines.  Streamlines are the airflow
2  lines, and particles tend to fall out of the air, which is
3  why we have to dust frequently.  Those are particles that
4  land on surfaces, and that's an example of particles not
5  following the airflow.
6  **Q.** And you agree with me that you did not add any
7  particles to your CFD analysis, correct?
8  **A.** Well, no.  I disagree.  In my deposition I made this
9  clear.  I added particles that were air particles, so they
10 were neutrally buoyant.  I stated it in my deposition.
11 They were air particles, and I followed those.
12 **Q.** Can you go to page 176 of the July 2017 deposition,
13 line 24.
14         "Question:  So you agree with me you didn't add
15 particles to the flow, correct?
16         "Answer:  I did not."
17         Did I read that correctly?
18 **A.** You read it correctly, but the context you're missing.
19 **Q.** Do you agree with me that in your CFD operating room
20 you didn't even have the Bair Hugger blower in your model?
21 **A.** Can you explain what you mean by that?
22 **Q.** The blower, this thing, that sucks air in, you did not
23 have that in your model, correct?
24 **A.** I did not include that structure.
25 **Q.** And you'll agree with me that a Bair Hugger that sits

1861

1  on the floor is going to affect the flow around the
2  operating room table?
3  **A.** I think everything would have some effect on the flow.
4  **Q.** My question, listen to my question.  It's about the
5  Bair Hugger.  You agree with me that a Bair Hugger that
6  sucks 30 CFN, cubic feet of air, off the floor is going to
7  affect the airflow around the operating room table.  You
8  agree?
9  **A.** I agree everything would affect the airflow.
10 **Q.** You didn't model any doors opening or closing in the
11 operating room, correct?
12 **A.** I did not.
13 **Q.** You didn't model any people moving in the operating
14 room, correct?
15 **A.** Correct.
16 **Q.** You didn't put any other tables, like back tables where
17 the surgical instruments and the implant sit in the sterile
18 field, in your model, correct?
19       THE COURT:  Five more minutes, Mr. Assaad.
20       MR. ASSAAD:  Excuse me?
21       THE COURT:  You have five more minutes.
22       THE WITNESS:  That is incorrect.
23 BY MR. ASSAAD:
24 **Q.** You had no air going over the arms of the patient in
25 your model, correct?

1862

1  **A.** That is correct.  I had the air exit by the patient's
2  head and neck.
3  **Q.** And you agree with me that if there was a heat source
4  that you believed would affect your model that that would
5  need to be included in the model, correct?
6  **A.** If there is a heat source that affects the
7  specific question I'm trying to answer, and I talked about
8  that last week, then, yes, I would need to include it.
9  **Q.** And you didn't include a bovie, anesthesia machine or
10 personal computers in your model, correct?
11 **A.** I did not include -- well, I would say this:  I did not
12 include the heat from any of those devices.
13 **Q.** Now, you talked about your publication being peer
14 reviewed, correct, on Friday, correct?
15 **A.** Yes.
16 **Q.** You agree with me that a double blind review is where
17 the author and the reviewers do not know who each other
18 are?
19 **A.** I agree.
20 **Q.** And you agree with me that according to the
21 instructions of Numerical Heat Transfer where your paper
22 was published that it requires a double blind review?
23 **A.** No.  I think that's probably the instructions, but I
24 believe, and it's my practice, the editor has the
25 opportunity to handle the review themselves if they are an

1863

1  expert in the field.  In fact, that's what I do, and that's
2  what my colleagues who are editors do.  So I agree that
3  that may be the instructions for general papers, but I
4  don't -- I think it's the editor's prerogative.
5  **Q.** You understand that according to the publisher that the
6  editor is going to assess the suitability for the
7  publication of the paper, but it will then be double blind
8  peer reviewed by expert referees.  Isn't that what the Heat
9  Transfer Journal states?
10 **A.** It may or may not.
11 **Q.** Why don't you turn to page 456?  Doesn't it state on
12 the bottom paragraph under peer review that it is to be
13 double blind?
14 **A.** You did read it correctly.  What it states is, Once
15 your paper has been assessed for suitability by the editor,
16 it will then be double blind peer reviewed by expert
17 referees, and it's my experience and practice that if the
18 editor is an expert in that area, they often handle the
19 review themselves.
20 **Q.** What is required, what is stated here in the journal is
21 not what occurred with your paper that was published in, by
22 Dr. Minkowycz, the editor in chief, correct?
23 **A.** That's correct.
24 **Q.** And in fact, you communicated with Dr. Minkowycz about
25 your paper before you submitted it, correct?

1864

1  **A.** That is correct.
2  **Q.** Now, let's go into the -- you discussed about that
3  video we saw yesterday about the person walking through the
4  doorway, the Sarinen paper?
5  **A.** I recall that.
6  **Q.** You understand that that was an isolation room test,
7  correct?
8  **A.** Well, I think it was a positive pressure isolation
9  room.
10 **Q.** Do you believe there was ventilation in that study?
11 **A.** I would have to review the paper to see the
12 ventilation.
13 **Q.** Let's go to Exhibit 464, and because I only have a
14 couple minutes --
15       THE COURT:  That's based on your two hours.  If
16 you need more, let me know.
17 BY MR. ASSAAD:
18 **Q.** Are you at Exhibit 464, sir?
19 **A.** Yes, I am.
20 **Q.** Go to page 3, top paragraph, and you reviewed this
21 study before, correct?
22 **A.** Yes.
23 **Q.** You agree with me that the test case was a scenario
24 without ventilation?
25 **A.** Just let me review this to make sure.  Yes.