# EXHIBIT 33

1   DR. KUMAR BELANI CONFIDENTIAL
2      UNITED STATES DISTRICT COURT
3         DISTRICT OF MINNESOTA
4   --------------------------------
    In re Bair Hugger Forced Air Warming
5   Products Liability Litigation
6                         MDL NO. 15-2666
                            (JNE/FLN)
7
8
    This Document Relates To:
9   All Actions
10  ----------------------------------
11            ***CONFIDENTIAL***
12        VIDEOTAPED DEPOSITION OF
13           DR. KUMAR BELANI
14           September 7, 2016
15               9:11 a.m.
16
17
18  Being held at: Children's Rehabilitation Center
19                 426 Church Street SE
20                 Minneapolis, MN
21
22
23
24  Reported by: Mari A. Skalicky
25  Job No. 112500

Page 106

DR. KUMAR BELANI CONFIDENTIAL
Q. Did Paul McGovern say anything in particular at those meetings that you remember?
A. No.
Q. What questions did you have of Mark Albrecht once he approached you about this?
A. Not -- I don't think I had very many questions.
Q. You just said, "We'd be interested in doing some research"?
A. No, I mean, I said the idea makes sense, so let's do it.
Q. Do you still have Exhibit 4 in front of you?
A. Yep. Yes.
Q. If you will turn to page 410, kind of one-third down, first full paragraph. I'm four sentences -- I'm four lines down. It says, "Thus, we are unsure of the exact degree of ventilation disruption that might occur in a working OR during orthopedic surgery." I read that correctly. Right?

Page 107

DR. KUMAR BELANI CONFIDENTIAL
A. Where is that?
Q. Do you sort of see -- look at the first paragraph.
A. Okay.
    MR. DUNDER: Right there (indicating).
A. Okay. Yeah.
BY MS. LEWIS:
Q. Did I read that correctly?
A. Yeah.
Q. And this was a study in which you were looking to see whether bubbles would move over the surgical field. Correct?
A. Correct.
Q. And one of the conclusions reached was, "We are unsure of the exact degree of ventilation disruption that might occur in a working OR during orthopedic surgery." Correct?
A. That's in the discussion, yeah.
Q. Right.
A. Not in the results.
Q. Did you author that particular sentence?
A. Don't remember.

Page 108

DR. KUMAR BELANI CONFIDENTIAL
Q. What's your understanding of the factual basis for that statement?
A. Whatever is there is what's there.
Q. What's your understanding of the factual basis for why -- why that's a part of the discussion in the study?
A. Well, it's --
    MS. CONLIN: Objection as to form.
A. It's pretty clear what the statement says.
BY MS. LEWIS:
Q. This was a lab exercise. Correct?
A. That's correct.
Q. Simulated?
A. That's correct. That's what --
Q. Test --
A. The editorial also says that.
Q. There, "No clinical correlation can be reached from this study." Correct?
    MS. CONLIN: Objection as to form.
A. That part, I can't tell you for sure because it was a simulated study.
BY MS. LEWIS:
Q. Okay. One of the researchers -- reviewers -- I'm sorry. Not researchers.

Page 109

DR. KUMAR BELANI CONFIDENTIAL
One of the reviewers of this study, one of the comments was that no clinical correlation could be reached. Correct?
A. We didn't do a clinical correlation.
Q. And so no clinical correlation can be reached from this study? That's what my question is. Is that right?
    MS. CONLIN: Same objection.
A. We didn't -- we didn't do a clinical correlation, so I cannot tell you whether it can be reached or not reached.
BY MS. LEWIS:
Q. And it was a simulated study; therefore, not real world, what would happen in a real orthopedic OR, doing an actual orthopedic surgery. Correct?
    MS. CONLIN: Same objection.
A. It's like a flight simulator. When you try to go through a flight simulator, it's as close as we can get, so it's the same thing.
BY MS. LEWIS:
Q. But it was not like what would happen in a actual orthopedic OR. Is that right?

Page 110

DR. KUMAR BELANI CONFIDENTIAL
1
2  A. It's --
3     MS. CONLIN: Asked and answered.
4  A. It's the same thing; if -- when you have a
5     flight simulator, and when you have a real
6     life situation, hopefully the simulator
7     would try to mimic the real life.
8  BY MS. LEWIS:
9  Q. For example, the orth -- number one,
10    there'd be an orthopedic surgeon in the
11    room. Correct?
12 A. That's what we've said. In the next
13    statement, I think it says that. Right?
14 Q. So in your simulated test, you did not
15    have an orthopedic surgeon present.
16    Correct?
17 A. We should have had, and that might have
18    actually made it worse. We might have had
19    more bubbles going to the surgical field.
20 Q. My question is, you did not have an
21    orthopedic surgeon present. Correct?
22 A. That's correct, but like I said --
23 Q. The anesthesia person --
24    MS. CONLIN: I don't think the
25    witness was done with his answer.

Page 111

DR. KUMAR BELANI CONFIDENTIAL
1
2  BY MS. LEWIS:
3  Q. The anesthesia person was standing still.
4     Correct?
5  A. Correct.
6  Q. In a real life orthopedic surgery, the
7     anesthesia person has to move around from
8     time to time. Correct?
9  A. As required, yeah.
10 Q. And --
11 A. Usually not, but usually they're on the
12    head end.
13 Q. During an orthopedic surgery, you're going
14    to have one or two scrub technicians
15    present. Correct?
16 A. Scrub nurse, yeah.
17 Q. You're going to have one, as you mentioned
18    earlier, assistant, probably, with the
19    orthopedic surgeon. Correct?
20 A. That's correct.
21 Q. You're going to have a circulating nurse
22    in the room. Correct?
23 A. Correct.
24 Q. You may have lab personnel come in and out
25    of the room. Correct?

Page 112

DR. KUMAR BELANI CONFIDENTIAL
1
2  A. Usually not.
3  Q. If they need to come in, they're going to
4     come into the room?
5     MS. CONLIN: Calls for speculation.
6  BY MS. LEWIS:
7  Q. Is that right?
8  A. If they need to come in, yeah, they will
9     come in.
10 Q. If a CRNA or another anesthesiologist
11    needs to come and take your place, that
12    person has to come in the room. Correct?
13 A. We try to minimize that.
14 Q. If they need to come in --
15 A. Yeah.
16 Q. -- to take your place, they've got to do
17    that.
18 A. They could --
19 Q. Right?
20 A. -- yeah. Because these are clean
21    surgeries, we have signs outside the door,
22    minimum traffic.
23 Q. And if they have to come in, they do so.
24    Right?
25 A. They do so, yeah.

Page 113

DR. KUMAR BELANI CONFIDENTIAL
1
2  Q. If the circulating nurse needs to go get
3     another supply, she's going to come in and
4     out of the room. Correct?
5  A. Usually not, but if they have to, they
6     have to.
7  Q. If the scrub tech needs an additional set
8     of sponges on the table, the circulating
9     nurse has to come put them on the table.
10    Correct?
11 A. Yeah. See, the thing is these are clean
12    surgeries, and we try to minimize traffic
13    and movement as much as possible except
14    for what the surgeon is doing, and as
15    required to make the surgery go safely.
16    But in-and-out flow, we try to minimize
17    that.
18 Q. And if the circulating nurse needs to put
19    additional sponges on the table --
20 A. They usually --
21 Q. -- for use, then she'll -- she'll --
22    she'll have to do that. Correct?
23 A. They try to keep all the things needed.
24    Because these are routine surgeries, they
25    know exactly what's needed, so everything

Page 114

1    DR. KUMAR BELANI CONFIDENTIAL
2    is available on the table, and they do
3    what's needed.  To leave the table and go
4    look for something else doesn't happen.
5  Q. The circulating nurse doesn't leave the
6    table.  I'm saying if she needs to go get
7    some extra sponges.
8  A. Usually not, because this is routine
9    surgery.
10 Q. And if she needs to, she'll have to go do
11   that.  Right?
12 A. Rarely.
13     MS. CONLIN:  Asked and answered.
14 BY MS. LEWIS:
15 Q. I understand.  But you haven't answered
16   the question.  Does she have to do that?
17 A. If anything needs to be done, it will be
18   done.
19 Q. Correct.
20 A. So they will go.
21 Q. So, in other words, there is movement
22   within the room --
23 A. Yeah.
24 Q. -- during the orthopedic surgery.
25   Correct?

Page 115

1    DR. KUMAR BELANI CONFIDENTIAL
2  A. Yeah.
3  Q. And that didn't happen in the testing --
4  A. It was not --
5  Q. -- that you did.  Correct?
6  A. That was not what we intended to do --
7  Q. And it wasn't --
8  A. -- so that's why we didn't do it.
9  Q. And that's not a part of the testing that
10   you did.  Correct?
11 A. Correct.
12 Q. In a normal -- during a normal procedure,
13   the surgical lights would be on.  Correct?
14 A. Correct.
15 Q. And they were turned off in part of your
16   test.  Correct?
17 A. For a few seconds, yeah.
18 Q. During a real orthopedic surgery, the
19   anesthesia monitor is going to be turned
20   on.  Correct?
21 A. Correct.
22 Q. And that machine is going to generate
23   heat, or do you know?
24 A. It should, yeah.
25 Q. The electric cautery is going to be used

Page 116

1    DR. KUMAR BELANI CONFIDENTIAL
2    during an orthopedic surgery.  Correct?
3  A. As needed.
4  Q. And that wasn't used and on during your
5    test.
6  A. Mm-hmm.
7  Q. Correct?
8  A. Correct.
9  Q. The anesthesia monitors were not on during
10   your test.  Correct?
11 A. Monitors?  I'm not -- I don't remember.
12 Q. Let's go back to page -- the same page, at
13   the beginning of that first paragraph it's
14   noted, "It is worth mentioning, however,
15   that the observed disruption was dependent
16   on our exact setup (arrangement of
17   draping, lights, and personnel), which did
18   not include the presence of instrument
19   trays and a working surgical team."  Did I
20   read that correctly?
21 A. Correct.
22 Q. So that's saying that if there was a
23   different setup, then what you would have
24   observed -- what you would have observed
25   would have been different.  Correct?

Page 117

1    DR. KUMAR BELANI CONFIDENTIAL
2  A. May have.  May have been.
3      MS. CONLIN:  Objection to form.
4  BY MS. LEWIS:
5  Q. May have been?
6  A. May have been, yeah.
7  Q. In other words, if the surgical light was
8    in a different place than where you had
9    it, then you may have seen a different
10   ventilation pattern.  Correct?
11 A. May have.
12 Q. If the anesthesia person had been moving
13   instead of motionless, you may have seen a
14   different ventilation pattern.  Correct?
15 A. May have.
16 Q. If a surgeon had been present next to the
17   operating table, you would have seen a
18   different ventilation pattern.  Right?
19 A. May have.
20 Q. If the lights had stayed on instead of
21   being turned off, you may have seen a
22   different ventilation pattern.  Right?
23 A. Unlikely, because we just turned it off
24   for the picture, which is a few seconds.
25 Q. If the drape had been put on a different

Page 218

1 DR. KUMAR BELANI CONFIDENTIAL
2 A. This is -- Exhibit 13 carries my
3 biography, CV.
4 Q. Okay. And I understand that this was
5 updated for the purposes of your testimony
6 here today?
7 A. Yeah.
8 Q. And, in fact, it lists, amongst other
9 things, your various positions at the
10 university, as well as your current
11 memberships and offices and professional
12 organizations. Correct?
13 A. Correct.
14 Q. And it also lists, if we could take a look
15 Dr. Belani, at page 6 of Exhibit 11; it's
16 got some publications. The first group is
17 entitled "peer-reviewed publications." Do
18 you see that?
19 A. Correct.
20 Q. And you have some 91 peer-reviewed
21 publications. Is that correct, Doctor?
22 A. Correct.
23 Q. And then you've got in your CV,
24 nonpeer-reviewed publications. Do you see
25 that, sir?

Page 219

1 DR. KUMAR BELANI CONFIDENTIAL
2 A. Correct.
3 Q. And you've got approximately 52 of those
4 listed on your CV, Exhibit 11?
5 A. Correct.
6 Q. Okay. What is the difference between a
7 peer-reviewed publication and
8 nonpeer-reviewed publication?
9 A. Peer-reviewed means it goes to a group
10 of -- of reviewers who are experts in the
11 field that I don't have any relationship
12 with, and they suggest whether the article
13 is worthwhile publishing or not.
14 Q. Okay.
15 A. And they also give some edits and send it
16 back with some queries.
17    Nonpeer-reviewed is where, like this
18 one that I'm doing, "Practical Reviews in
19 Anesthesiology," it's something that I
20 edit, and I get articles from -- like,
21 from different anesthesiologists in the
22 field, and then we put it together and
23 send it out.
24    And then I also review some of the
25 current literature, and it's not reviewed

Page 220

1 DR. KUMAR BELANI CONFIDENTIAL
2 by other people, but sent out for -- as --
3 as an expert opinion.
4 Q. Okay. And with respect to Belani --
5 Dr. Belani Deposition Exhibits 4, 5, and
6 6, the ones with whom you were -- or you
7 were discussing with counsel for 3M, are
8 those peer-reviewed or nonpeer-reviewed
9 publications?
10 A. Peer-reviewed.
11 Q. Okay. And -- and they are listed, in
12 fact, on your CV under peer-reviewed
13 publications. Correct?
14 A. Correct.
15 Q. And so did those three publications
16 undergo the process that you've described?
17 A. Correct.
18 Q. Okay. Do you try, Dr. Belani, to uphold
19 yourself to a high scientific and medical
20 standard?
21 A. I do.
22 Q. Okay. And do you stand behind the
23 protocols and work which resulted in
24 Belani Deposition Exhibits 4, 5, and 6?
25    MS. LEWIS: Objection to form.

Page 221

1 DR. KUMAR BELANI CONFIDENTIAL
2 A. I do.
3 BY MS. CONLIN:
4 Q. Okay. Now, as part of the preparation for
5 you coming here today, you actually signed
6 a protective order in that -- in this
7 case. Is that correct? I think it's
8 Exhibit No. 3 in front of you.
9    MS. LEWIS: His signature is No. 2.
10 A. Is that the one where I'm supposed --
11    MS. LEWIS: Protective Order.
12 A. -- to keep quiet? Yeah.
13 BY MS. CONLIN:
14 Q. And is that your signature --
15 A. That's correct.
16 Q. -- on Belani Exhibit No. 2?
17 A. Correct.
18 Q. And you understand that, by signing that,
19 what -- if I show you things that are
20 otherwise confidential, you need to
21 maintain that confidentiality with respect
22 to those?
23 A. Okay. The only question I had was how
24 long? How long is that to be the case?
25 Q. Until -- well, we -- we could have a long

Page 222

DR. KUMAR BELANI CONFIDENTIAL
argument about that, but for the purposes of today, I don't think I'm going to show you anything too controversial, but I would like to take you through a few documents.
A. Okay.
Q. Now, if we can take a look first at Belani Deposition Exhibit No. 4, which is the peer-reviewed article of which you are the lead author, entitled, "Patient Warming Excess Heat, the Effects on Orthopedic Operating Room Ventilation Performance"? Do you see that?
A. Correct.
Q. And if we could take a look, Doctor, at the last page of this article, right before the disclosures?
A. Yes.
Q. Okay. You and your co-authors write, quote, "Therefore, it seems that future research is warranted to characterize the clinical conditions under which forced-air warming excess heat results in ventilation disruption during surgery." Do you see

Page 223

DR. KUMAR BELANI CONFIDENTIAL
that?
A. I do.
Q. Okay. Now, when this -- following the publication of Belani Exhibit No. 4, were you contacted by 3M at any point in time regarding perhaps further research that needed to be performed?
A. To date, they have not.
Q. Okay. They didn't contact you and say, "you know, Dr. Belani, we would like to fund a study where we actually have a simulation where the nurse goes to get additional sponges that she forgot in the other room"? Did they contact you about that?
A. No, they have not.
Q. Did they ever suggest to the U of M that they would fund further research in these areas that you indicated -- you and your co-authors indicated might be explored further clinically?
A. To my knowledge, no.
Q. Okay. And you know folks over at 3M. Correct, Doctor?

Page 224

DR. KUMAR BELANI CONFIDENTIAL
A. Oh, yeah. I just had an email with one of them yesterday. They're bringing a group of Chinese physicians to come and work and visit our operating rooms to see how we do things, so I was going to coordinate that visit for them.
Q. And --
A. I have many contacts with 3M.
Q. And as an example, you know Michelle Stevens well. Correct?
A. Right.
Q. And you've had -- and -- and can you describe your sort of relationship with Dr. Stevens?
A. It's Michelle Hulse. Is that the one?
Q. Yes.
A. She's an infectious disease specialist, and I -- I collaborated with her in getting a workshop conducted at one of the biggest hospitals in India to promote 3M infection control measures that can be used in the operating room.
Q. Has -- Dr. Hulse Stevens, has she ever talked to you about your studies and work

Page 225

DR. KUMAR BELANI CONFIDENTIAL
regarding the Bair Hugger that are reflected in Belani Exhibits 4, 5, and 6?
A. No, she has not.
Q. Were you aware, Doctor, that 3M did both internal critiques of your various studies as well as made comments about them publicly?
A. I'm not aware.
Q. Okay.
(Exhibit No. 14 was marked for identification by the Court Reporter.)
BY MS. CONLIN:
Q. I've handed you, Doctor, what Ms. Skalicky has marked as Belani Deposition Exhibit No. 12 --
MS. LEWIS: We've already got it.
A. 14.
BY MS. CONLIN:
Q. Oh, 13.
A. 14.
Q. 14. Thank you.
THE REPORTER: It should be 14.
A. Yeah, 14.
BY MS. CONLIN: