# EXHIBIT 43

Page 1

1        UNITED STATES DISTRICT COURT
2           DISTRICT OF MINNESOTA
3
4  In re Bair Hugger Forced Air    )  MDL No. 15-2666
   Warming Products Liability      )         (JNE/FLN)
5  Litigation,                     )  VOLUME I
                                   )  PAGES 1-210
6
7
8
9
10
11
12
13    VIDEOTAPED DEPOSITION OF JONATHAN SAMET, M.D.
14             LOS ANGELES, CALIFORNIA
15              TUESDAY, JULY 11, 2017
16
17
18
19
20
21
22
23
24  Job No. 124786
25  DORIEN SAITO, CSR 12568, CLR

```
                                                Page 162
 1   about the surveillance time in Wansbeck, I thought it
 2   started in October '08.  I just -- which is why I had
 3   wondered with that -- somewhere in 2008 with the lower
 4   rates earlier in the year.
 5        But in any case, I mean, yes, there's some
 6   variation in this moving average.
 7     Q   And from a statistical standpoint, you're --
 8   you think that the proper way to analyze these data is
 9   to just say "Well, we'll just" -- "we're just going to
10   compare the overall average of a twenty-month period
11   that goes up and down and up to a seven-month period"?
12     A   No.  Let me say --
13        MS. CONLIN:  Well, objection -- objection
14   as to form in terms of the time.
15        THE WITNESS:  Sorry.  Forgive me.  Just
16   restate the question for me.
17        MR. GORDON:  Well, I don't think it was
18   accurate.  So, Jan, if you want to enlighten me as
19   to where I -- I misspoke I would be happy to --
20        MS. CONLIN:  Well, I --
21        MR. GORDON:  -- be educated.
22        MS. CONLIN:  -- I can't tell from -- I
23   don't want to have a speaking objection, but I
24   think --
25        MR. GORDON:  I'm inviting you.
```

```
                                                Page 163
 1        MS. CONLIN:  All right.  The -- this
 2   chart starts on September 1st, 2007, which we
 3   think the record is pretty clear.  And it's an
 4   inaccurate -- inaccurate data set for that.  So
 5   that -- that was the issue, but I didn't want
 6   to --
 7        MR. GORDON:  Okay.  No.  I'm glad you --
 8   and that's fine.  Let's -- I will clarify --
 9   clarify my question then.  I wasn't -- that wasn't
10   what I was intending to ask.
11     Q   I'm talking about the twenty-month period
12   that is depicted in Professor Holford's Figure 2 as
13   the Bair Hugger study period.  There's a red line
14   across that corresponds to the study time period
15   reflected in the McGovern paper.  And that's a
16   seven-month period that is identified here as the
17   HotDog study.  Those are -- are the two periods I was
18   referring to.
19        And you've got twenty months of -- of data in
20   the Bair Hugger study that go to a low, as you say,
21   of, it looks like, less than 1 percent to a high of 4
22   or 5 percent during that twenty months.  And then
23   you've got -- and that's being compared to the average
24   of seven months of data from McGovern -- or from the
25   HotDog period.
```

```
                                                Page 164
 1        Do you think from an epidemiological
 2   standpoint that averaging data with that kind of
 3   variability over twenty months and comparing it to a
 4   seven-month period is sound epidemiological
 5   methodology?
 6     A   Well, yeah, let me comment from a different
 7   perspective.  I've done a lot of time series analyses.
 8        This data set is simply too small to do any
 9   sort of formal analysis.  It's small.  It's -- I'll
10   use the word "noisy."  And probably the best way to
11   get a stable signal is to average the data that is at
12   hand.
13     Q   When you have a small and noisy series,
14   doesn't that impact the -- the weight that you can
15   give to any conclusions from it?
16     A   Well, again, as I said, the best way to try
17   to understand what the signal is, is to average all
18   the data you have and -- and use it all.
19     Q   You're saying the best way under adverse --
20   the -- the less than ideal circumstances of having a
21   small and noisy data set?
22     A   I'm simply referring to the data at hand in
23   this -- in this picture.
24     Q   In your professional work, either your
25   teaching or if you do health organization bodies like
```

```
                                                Page 165
 1   that, would you recommend a change in practice based
 2   upon a single observational study that has this
 3   limited data set and is this noisy?
 4        MS. CONLIN:  Objection as to form, it
 5   misstates his report.
 6        THE WITNESS:  Yeah.  Again, my
 7   conclusions as I've -- the conclusion of my report
 8   is not based solely on the McGovern data set.
 9   There's extensive review of other materials.
10   BY MR. GORDON:
11     Q   Yeah, and we're going to -- and I -- and I am
12   confining my questions to McGovern.
13        So if -- if you take had the McGovern paper
14   out of your consideration, are you saying that your --
15   your opinion would remain the same, that the Bair
16   Hugger is a substantial cause of surgical site
17   infections, substantial to -- or to periprosthetic
18   infections?
19        MS. CONLIN:  It calls for speculation.
20        THE WITNESS:  I -- I -- the only comment
21   I could make is that there's now a second study,
22   the Augustine report, with another -- an est- --
23   another estimate of the risks of this too.  That's
24   I think what I can say at this point.
25        ///
```

Page 166

BY MR. GORDON:
Q   Okay. But what I want to understand is when you came to the opinion that you offered to the court on March 30, as I read the report, it -- the McGovern study is a critical element in how you arrived at your conclusions. But if I'm -- in fact, that's how I read it. That doesn't really matter.
A   Yeah. That's --
Q   My question to you, because you keep talking about it -- it's is just part of the data. If you didn't have the Mc --
   If you hadn't had the McGovern paper at all, would you have, based on all the other stuff that you're talking about, arrived at the same conclusion on March 30?
A   The McGovern paper is, at the time I wrote my report, the sole paper in the peer reviewed literature offering an estimate of the risk of deep joint infection associated with the Bair Hugger device.
Q   So if you hadn't had the McGovern paper, you would not have reached the conclusions that you reached --
   MS. CONLIN:  It calls for speculation.
BY MR. GORDON:
Q   -- on March 30; right?

Page 167

   MS. CONLIN:  It calls for speculation.
   THE WITNESS:  I -- I could only -- I could only say that there would not have been anybody to -- absent the McGovern paper, to quantify the magnitude of this.
BY MR. GORDON:
Q   Okay. But you would have still opined that there was a risk, just you couldn't quantify it?
A   I just can't answer that question.
Q   Well, let's approach it from a different standpoint. You've mentioned now several times that the McGovern paper was not the only evidence or data upon which you based your conclusion.
   Tell me what the other body of -- of data is that contributed to your opinion.
A   Well, let me take out my report --
Q   Sure.
A   -- and -- and comment on that. I think the sections lay out the different lines of evidence that were considered and perhaps --
   Critically the idea is laid out in Figure 3 on page 21.
Q   Okay. So table -- that table lists four sentences; right?
A   No. I said Figure 3 on page 21.

Page 168

Q   Oh, Figure 3. I'm looking at page 3.
   I'm sorry. What page?
A   21.
Q   Okay. Okay. So you -- this is, you say, "Mechanisms by Which the Bair Hugger Increases Risk for Joint Infection"; is that right?
A   That's the title.
Q   And you have the first two arrows. One goes to disturbed unit or directional flow. The other goes to microbial contamination of a surgical field. Right?
A   Correct.
Q   Let's talk about the bottom, microbial contamination of a surgical field.
   What do you mean by "microbial contamination"?
A   Microorganisms.
Q   Okay. And what data did you review that -- well, strike that.
   Am -- am I correct in inferring from your depiction here in Figure 3 that you believe there are some evidence that the Bair Hugger device results in increased microbial contamination of a surgical field?
A   Well, it is shown that -- the -- the literature cited shows that -- and -- and also the

Page 169

computational fluid dynamics of modeling that there's increased flow of particles across the surgical field.
   I believe at least one study -- maybe it's Moretti [phonetic] -- shows increased numbers of microorganisms associated with the Bair Hugger operating and then also the disruption of directional flow. So those contribute to increased risk of infection, which is what I've laid out here in Figure 3.
Q   You -- you referenced computational fluid dynamics.
   I take it you are referring to the computational fluid dynamics analysis that was done under contract to Dr. Al Garbashi [phonetic] at the request of plaintiffs in this case?
A   That's correct.
Q   I noticed --
   MR. GORDON:  Let me show you an exhibit I'm up to 13. Let me show you Exhibit 13.
   (The aforementioned document was
   marked Exhibit 13 for
   identification by the reporter.)
BY MR. GORDON:
Q   I noticed in your reference materials you cited to an unpublished document by Memarzadeh.

Page 170

1     And I want to know, first of all, Is
2  Exhibit 13 that document to which you were referring?
3     MS. CONLIN:  I'm sorry.  What's the
4  question?
5  BY MR. GORDON:
6     Q   Exhibit 13.  And take a look at your report
7  there.  On the reference list is a reference to
8  some -- to some unpublished something from Memarzadeh.
9  It's your Reference Number 51.
10     MS. CONLIN:  He's just asking you if
11  that -- the reference on there --
12     THE WITNESS:  Well, I assume so.  I'm
13  just trying to read from the reference document.
14  BY MR. GORDON:
15     Q   This is -- is Exhibit 13 what you listed as
16  Number 51 on your materials considered?
17     A   Appears to be the case, yes.
18     Q   So this is something you had --
19     Exhibit 13 is something you had available
20  before you wrote your report; right?
21     A   Yes.
22     Q   And if you turn to page 10 of Exhibit 13 --
23     (Witness turning to page.)
24  BY MR. GORDON:
25     Q   -- it says (reading):

Page 171

1     "This investigation validates
2  the results and conclusions drawn
3  by Moretti and others that the
4  forced-air warming technology does
5  not in and of itself result in
6  increased risk of surgical wound
7  infection.
8     "However, this investigation
9  further indicates that if the
10  operating room ventilation system
11  is designed properly, the
12  contaminating particles from staph
13  around the patient will not impinge
14  on the surgical wound due to
15  thermal plume dynamics."
16     So that -- you read that before you
17  rendered your opinion?
18     A   (No audible response.)
19     Q   And -- and we can go through this.
20     But what this is, is a computational fluid
21  dynamics study; right?
22     A   Yes.
23     Q   And staying on page 10, you see that under
24  the conflict of interest statement, it says
25  "undeclared"?

Page 172

1     A   I see that, yes.
2     Q   The CFD, the computational fluid dynamics,
3  that -- that you referenced in your report -- or that
4  you actually discussed in your report by
5  Dr. Al Garbashi, if that were a published paper, you
6  would -- you would agree he'd have to declare a
7  conflict of interest if that was -- he did that -- he
8  was paid by the plaintiff's counsel to do that for
9  this litigation?
10     A   He would have cleared his finances.
11     Q   Well, don't you think that would be -- would
12  constitute a conflict of interest?
13     A   I -- I think that surmises that funding
14  source influences the outcome of this computational
15  fluid dynamic model.
16     Q   Well, okay.  Page -- page 10 on the
17  Memarzadeh thing identifies the funding sources of the
18  National Institutes of Health; right?
19     A   (No audible response.)
20     Q   You have to say yes or no.
21     A   It does, yes.
22     Q   Okay.  But -- so -- and I guess I've seen
23  this a lot where there's a conflict of interest
24  statement and a funding source statement.
25     Is that -- are -- are you saying that there's

Page 173

1  view there -- if you declare your funding source,
2  that's -- you don't have to declare any conflict of
3  interest?
4     MS. CONLIN:  It misstates his testimony.
5     THE WITNESS:  No, I didn't say that.
6  BY MR. GORDON:
7     Q   Okay.  In fact, I -- the opposite is true.
8     Wouldn't you -- wouldn't you agree that it's
9  customary to declare funding sources and to identify
10  any conflicts of interest?
11     A   Any potential conflicts of interest, right.
12     Q   Do you think being an expert witness hired to
13  testify on behalf of one side in civil litigation in
14  and of itself is a conflict of interest -- a potential
15  conflict of interest that would be -- that would
16  ordinarily be declared?
17     A   Well, I -- I think it's clear that the report
18  was done for the plaintiffs.
19     Q   You're talking about Dr. Al Garbashi?
20     A   Yeah, Dr. Al Garbashi.
21     Q   I -- for the record, my -- my point is, if it
22  had been a -- a paper for use beyond this litigation,
23  it would -- you would agree it should probably have a
24  conflict of interest disclosure that it was originally
25  prepared for litigation?

Page 211

1        UNITED STATES DISTRICT COURT
2           DISTRICT OF MINNESOTA
3
4  In re Bair Hugger Forced Air    )  MDL No. 15-2666
   Warming Products Liability      )         (JNE/FLN)
5  Litigation,                     )  VOLUME II
                                   )  PAGES 211-324
6
7
8
9
10
11
12
13     VIDEOTAPED DEPOSITION OF JONATHAN SAMET, M.D.
14              LOS ANGELES, CALIFORNIA
15              TUESDAY, AUGUST 8, 2017
16
17
18
19
20
21
22
23
24  JOB NO. 128394
25  DORIEN SAITO, CSR 12568, CLR

Page 220

1  is, Have you reviewed any materials since we last met
2  on July 11?
3    A  I've refreshed my memory concerning materials
4  that I have looked at in the past. But with regard to
5  absolute new materials, no.
6    Q  Okay. So you didn't do any additional
7  research in between July and --
8    A  No, I did not.
9    Q  -- now?
10   A  No.
11   Q  And you weren't -- you weren't given any
12 additional published materials?
13   A  No. I simply reviewed materials I had on
14 hand.
15   Q  I'm sorry? Did --
16   A  I reviewed materials I already had on hand.
17   Q  Okay.
18      MR. GORDON: And -- and we discussed this
19 a little bit last time. But some of the materials
20 that you listed on your Exhibit C, if I recall
21 correctly, of your report, which we marked as
22 Samet Exhibit 1. I'll give you a copy of it again
23 just to refresh your recollection.
24 ///
25 ///

Page 221

1      (The aforementioned document was
2       previously marked Exhibit 1 for
3       identification by the reporter.)
4  BY MR. GORDON:
5    Q  But some of those materials were ones that --
6  well, strike that.
7       All of the materials on Exhibit C in your
8  report were materials that you had available to you
9  prior to when you rendered your decision -- your --
10 your opinion on March 30; correct?
11   A  That's right. And then there was the
12 additional report by Augustine that was --
13   Q  Okay. And there -- you know, I don't -- I
14 don't want to spend a lot of time plowing old ground.
15      But in addition to that Augustine publication,
16 you, I think, testified that you had read the expert
17 reports of Holford, Wenzel, Borak. And I --
18   A  That --
19   Q  And I can't remember -- I apologize.
20   A  Right. I'm not sure I can remember.
21      I -- I will add, actually, have read the --
22 now the deposition of both Drs. Holford and Borak
23 which were, I think, obtained in the interim between
24 last month and -- and the -- that -- completion of the
25 deposition today.

Page 222

1    Q  Okay. And other than the depositions of
2  Dr. Holford and Dr. Borak, have you read any other
3  deposition --
4    A  No.
5    Q  -- since July 11?
6       Okay. And I can't remember.
7       Had you -- do you recall if you had read the
8  expert opinion of Dr. Michael Mont?
9    A  Offhand, I don't remember, no.
10   Q  Okay. And, again, I don't want to replow old
11 ground. But just -- I want to -- and -- and just so
12 the record is clear. We talked about it before.
13      MR. GORDON: I want to mark somewhere --
14 I'm showing you Exhibit 20.
15      (The aforementioned document was marked
16       Exhibit 20 for identification by the
17       reporter.)
18 BY MR. GORDON:
19   Q  And ask you if this is the Augustine paper
20 that you said you reviewed.
21   A  That's correct.
22   Q  And you had reviewed that initially sometime
23 in between the time you rendered your original opinion
24 in this case and when you were deposed on July 11;
25 correct?

Page 223

1    A  That's -- that's right. My understanding is
2  the paper was published in -- in the interim following
3  the preparation of my expert report.
4    Q  And since July 11, you've -- you've gone back
5  and rereviewed this paper; is that right?
6    A  Well, I've -- I've refamiliarized myself with
7  this and other materials.
8    Q  Did you review any other materials in
9  connection with the -- Exhibit 20?
10   A  Other materials specifically, no.
11   Q  Okay. And nothing about any of the hospitals
12 that were involved or any testimony of Dr. Augustine or
13 anything like that?
14   A  No, I have not.
15   Q  Okay. We'll -- we'll come back to that.
16      You -- and -- and correct me if I'm wrong.
17 But you have not -- it was not listed on your
18 Exhibit C, the deposition of Dr. Augustine.
19      So as of March 30, you had not read
20 Dr. Augustine's deposition?
21   A  Not -- not that I recall, no.
22   Q  Have you -- and have you read it subsequently?
23   A  No.
24   Q  Okay. All right. I want to step back and --
25 we'll pull back about 50,000 feet and just talk about

Page 224

1  the -- the scientific process that -- that you have
2  employed in -- in this case.
3       You -- as epidemiologist, you follow certain
4  objective approaches to the -- the materials that you
5  deal with; right? That was a poor --  that was a poor
6  question.
7       There -- there's -- there's a -- there's a --
8  there is a methodology that you, as an epidemiologist,
9  follow in order to arrive at conclusions or opinions
10 about causal relationships; is that correct?
11    A  Well, I guess I would say that my review of
12 the materials reflects not only my training in
13 epidemiologist, but in medicine, my broader
14 understanding of the -- the lung, of air, of movement
15 of particles in air, things that I've worked on in my
16 research.
17      So, yes, I -- I interpret the epidemiological
18 evidence, but I try and put it in the broader context
19 of biology, clinical path, and physiology, and so on.
20    Q  And -- and I -- and I was asking kind of a big
21 picture question.
22      That's generally how you approach issues of
23 epidemiology and -- and -- and health-related outcomes;
24 right?
25    A  Yeah.

Page 225

1    Q  You just don't look at an epidemiological
2  study. You try to look at other lines of evidence;
3  right?
4    A  Right. I guess I would -- if you'll excuse
5  me, I would probably rephrase things and say that I
6  approach questions that are relevant to public health,
7  population health, and that epidemiology is one of the
8  research methodologies used to generate evidence that
9  is relevant to public health.
10   Q  In the past, you have been critical of those
11 who contend that epidemiological studies are prone to
12 generating false positives; is that correct?
13   A  I've been involved in some statements
14 concerning -- I would say sort of general comments
15 about epidemiology and the validity of results and how
16 they may be subject to any number of problems,
17 including, quote, "false positives."
18      MR. GORDON: Let me show you what's been
19 marked as Exhibit 21 just to kind of tee this --
20 tee this up, and we'll plow through it.
21      The aforementioned document was marked
22      Exhibit 21 for identification by the
23      reporter.)
24 BY MR. GORDON:
25   Q  This is -- this is a paper -- let's say a

Page 226

1  commentary that you co-authored in 200- --
2       MS. CONLIN:  -9.
3  BY MR. GORDON:
4    Q   -- -9; is that right? 200- -- yeah, 2009.
5    A  Correct.
6    Q  Okay. And this was something that you and
7  your -- and all -- and the other authors wrote in
8  response to a publication that was simplistic -- and I
9  realize I'm being very simplistic. This was
10 essentially taking the position that observations by
11 the epidemiological studies are fraught with false
12 positives.
13   A  This was written in response to several --
14 several papers that posed this sort of too strong
15 generalization in the view of the author -- co-authors
16 and myself that there's a generic problem with false
17 positives, correct.
18   Q  And you -- and correct me if I'm wrong. But
19 you -- part of your opinion is based on your conclusion
20 that the McGovern paper does not represent a false
21 positive; is that correct?
22   A  Well, the McGovern paper is certainly part of
23 the evidence that I considered. And to the extent
24 that the P value is less than .05, that's a helpful
25 indication that the results are not arrived by chance

Page 227

1  alone.
2       And then of course since the McGovern paper,
3  there's been a second report that essentially
4  corroborates the -- the findings in other hospitals.
5    Q  You're talking about Exhibit -- the Augustine
6  publication?
7    A  Yes, I am. Yes.
8    Q  So -- and -- and I -- so specifically my
9  question with McGovern is, Your opinion is predicated
10 in -- at least in part on the -- your determination
11 that the McGovern findings were not -- do not represent
12 false pos- -- a false positive --
13   A  That's --
14   Q   -- is that correct?
15   A  That's correct, essentially.
16   Q  And you -- have you similarly concluded that
17 the Augustine publication is not based on a false -- or
18 does -- is -- is not a false positive?
19   A  Well, again, yes. And with two papers that
20 corroborate each other, I think the likelihood that
21 both are, quote, "false positives" diminishes.
22      And there's -- you know with -- P value is an
23 assessment of the role of chance. There are other
24 ways to generate false positives. But with two papers
25 with quite -- quite similar findings, I think the