# EXHIBIT 44

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

## Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - -

In Re:
Bair Hugger Forced Air Warming
Products Liability Litigation

This Document Relates To:
All Actions    MDL No. 15-2666 (JNE/FLM)

- - - - - - - - - - - - - - - - -

DEPOSITION OF JONATHAN BORAK
VOLUME I, PAGES 1 - 251
JULY 20, 2017

(The following is the deposition of JONATHAN BORAK, taken pursuant to Notice of Taking Deposition, via videotape, at the Marriott Hartford Downtown, 200 Columbus Boulevard, Hartford, Connecticut, commencing at approximately 8:09 o'clock a.m., July 20, 2017.)

## Page 2

APPEARANCES:

On Behalf of the Plaintiffs:
Jan M. Conlin
CIRESI CONLIN L.L.P.
225 South 6th Street, Suite 4600
Minneapolis, Minnesota 55402

On Behalf of Defendants:

Corey L. Gordon
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, Minnesota 55415

ALSO APPEARING:
Ronald M. Huber, Videotechnician

## Page 3

INDEX

| EXHIBITS | DESCRIPTION | PAGE MARKED |
|---|---|---|
| Ex 1 | Expert report of Jonathan Borak | 7 |
| 2 | Borak curriculum vitae | 8 |
| 3 | Jonathan Borak & Company website download | 39 |
| 4 | Article, Mortality Disparities in Appalachia, by Borak, et al | 46 |
| 5 | E-mail sent September 06, 2002 | 54 |
| 6 | Exhibit B to Borak's expert report | 61 |
| 7 | Kurz deposition excerpt, January 12, 2017 | 76 |
| 8 | E-mail, 3M00580475 | 90 |
| 9 | 510(k) Summary of Safety & Effectiveness, January 10, 1996, 3MBH00047382-3 | 94 |
| 10 | E-mail string, 3MBH00024633-4 | 113 |
| 11 | E-mail string, 3MBH00544754-5 | 119 |
| 12 | E-mail string, 3MBH00132501-2 | 124 |
| 13 | E-mail string, 3MBH00130429-32 | 126 |
| 14 | E-mail string, 3MBH01330587-92 | 128 |
| 15 | Article, Return to theatre following total hip and knee | |

## Page 4

| | | |
|---|---|---|
| | replacement, before and after the introduction of rivaroxaban, by Jensen, et al | 145 |
| 16 | Article in Health Devices, Force-Air Warming and Surgical Site Infections | 154 |
| 17 | Article, Wound Complications Following Rivaroxaban Administration, by Jameson, et al | 154 |
| 18 | Reed deposition transcript, December 4, 2016 | 161 |
| 19 | Article, Chlorhexidine-Alcohol versus Povidone-Iodine for Surgical-Site Antisepsis, by Darouiche, et al | 170 |
| 20 | Article, Preventing Surgical-Site Infections in Nasal Carriers of Staphylococcus aureus, by Bode, et al | 175 |
| 21 | Article, Effects of preoperative warming on the incidence of wound infection after clean surgery: A randomised controlled trial, by Melling, et al | 190 |
| 22 | Article, Prophylactic antibiotics | |

1 (Pages 1 to 4)

Page 65

1  correct?
2  A. It was my opinion that the man's cigarette
3  smoking and long history that predated the World Trade
4  Center explained his complaints.
5  Q. Okay. And what was your -- subject matter
6  of your testimony in Cabot Corporation?
7  A. I -- I already alluded to that. That had to
8  do with the adjudication in terms of the insurance
9  coverage for -- between two companies.
10 Q. And what was the particular chemical of
11 concern?
12 A. The issue had to do with if one could get
13 coal miner's pneumoconiosis in the absence of silica.
14 Q. And in that case you concluded that the --
15 that he can't; correct?
16    (Discussion off the stenographic record.)
17 A. Yes. My conclusion was that the absence of
18 silica, that -- no, let me turn it the other way --
19 that the presence of silica contributed to the
20 formation of pneumoconiosis.
21 Q. Okay. And how about in the final case,
22 Secretary of Labor (MSHA) versus Klondex Midas, which
23 side were you on in this case?
24 A. I -- I was involved with Klondex Midas, and
25 the case concerned whether medical causes of loss of

Page 66

1  consciousness had been addressed and considered by a
2  coroner and others.
3  Q. And what did you opine in that case?
4  A. I agreed with statements from the coroner
5  that she had not looked for such causes and could not
6  render such an opinion.
7  Q. Now you talk in your expert report about
8  sufficient component causation; correct?
9  A. Yes. I think I spoke to it in the context
10 of Dr. Samet's report.
11 Q. Right. And you'd agree with me that it's a
12 well accepted methodology in epidemiological studies;
13 correct?
14 A. I accept the concept.
15 Q. Yeah. And in fact it was first espoused by
16 Dr. Rothman; correct?
17 A. I looked at it in Dr. Rothman's writings as
18 a result of Dr. Samet citing that, yes.
19 Q. And you'd agree with me Dr. Rothman is one
20 of the leading minds in epidemiology.
21 A. I think Dr. Rothman is a leading mind in
22 epidemiology.
23 Q. So you don't take issue with Dr. Samet's
24 methodology, just his conclusions; correct?
25    MR. GORDON: Object to the form of the

Page 67

1  question.
2  A. I -- I don't object to his use of the
3  sufficient component cause model. I raise concerns at
4  the end of this section of my report and we could
5  address that specifically. Now it's not only the
6  conclusion, there was something in the method that I
7  had a problem with.
8  Q. Okay. But the sufficient component
9  causation methodology is well established and accepted
10 amongst epidemiologists.
11 A. I -- I think probably. I -- I don't --
12    I'm not objecting to that.
13 Q. Okay. And in fact you went through the same
14 framework in connection with responding to Dr. Samet's
15 report; correct?
16 A. Well I probably would have done that to be
17 responsive to Dr. Samet. I don't know if I would have
18 done it otherwise.
19 Q. Okay. But you did in fact use the same
20 framework. You didn't employ a different framework --
21 A. No. No.
22 Q. -- in connection with responding; correct?
23 A. Yes, that's correct I think.
24 Q. Okay. Would you agree with me that when
25 you're looking at epidemiology, that drawing causal

Page 68

1  inferences after finding association requires
2  judgment?
3  A. Judgment is part of the requirements, yes.
4  Q. Okay. Would you agree with me that although
5  the drawing of causal inferences is informed by
6  scientific expertise, it is not a determination that
7  is made using an objective or algorith -- algorithmic
8  methodology?
9  A. It is not necessarily.
10 Q. What do you mean by "it is not necessarily."
11 A. Well read me back your question and I'll
12 answer your second question. You asked me do I agree
13 that it is not, and I -- my answer was it was not
14 necessarily.
15 Q. Okay. Would you agree, quote, "Although the
16 drawing of a causal in" -- strike that. Let me start
17 over.
18    Would you agree with me, quote, "Although
19 the drawing of causal inferences is informed by
20 scientific expertise, it is not a determination that
21 is made using an objective or algorithmic
22 methodology," end quote?
23 A. Yes. It is not necessarily based upon such
24 an algorithmic approach.
25 Q. Would you agree with me that, quote,

17 (Pages 65 to 68)

Page 69

1 "Deciding whether associations are causal is not a
2 matter of statistics but a matter of good scientific
3 judgment and the questions that should be asked with
4 respect to the data offered?"
5     A. In principle. But there are some terms in
6 that sentence which are difficult to define, such as
7 "good." "Good judgment" I think was the word.
8     Q. Good scientific judgment.
9     A. Good scientific judgment. I don't know
10 quite what that means. But I can understand the
11 sentence.
12     Q. Well would you agree with me that The
13 Reference Guide on Statistics authored by Drs. Kay and
14 Friedman is an authoritative work?
15     A. It's a reference that I refer to.
16     Q. Okay. And you rely on it; right?
17     A. I do.
18     Q. And you don't take issue with what Drs. Kay
19 and Friedman have written in connection with The
20 Reference Guide on Statistics. In fact, you've relied
21 on it; correct?
22     A. That's correct.
23     Q. I'd like to direct your attention, sir, to
24 paragraph -- or page three of your expert report in
25 this case, Borak Exhibit No. 1. Do you have that in

Page 70

1 front of you?
2     A. I do.
3     Q. Okay. And I'd like to direct your attention
4 to Roman No. II, "The Samet Report." In 11a you talk
5 about this notion that there is sufficient evidence
6 that warming surgical patients to prevent hypothermia
7 and maintain normothermia reduces the rates of SSI;
8 correct?
9     A. Correct.
10     Q. And you cite to the CDC's guideline as one
11 of your references; correct?
12     A. Yes.
13     Q. And the World Health Organization; correct?
14     A. Yes.
15     Q. Okay. Did you investigate what -- what
16 information either the CDC or WHO had in connection
17 with their suggestion and determination that warming
18 is important?
19     A. Well I -- I've read the documents and I've
20 looked at some of the references. Is that an answer
21 to your question?
22     Q. Okay. And you say in the next paragraph,
23 "In addition, published findings from two random
24 control trials document that use of Bair Hugger to
25 maintain intraoperative normothermia reduced the risk

Page 71

1 of SSI."
2     A. Yes, I said that.
3     Q. Okay. I take it that you think the CDC in
4 terms of --
5     You know, let me strike that and ask it a
6 different way.
7     You relied on the CDC guidelines here in
8 connection with your report; correct?
9     A. I -- I cited it, yes.
10     Q. Okay. And you relied on it.
11     A. Well I relied upon it as an example of a
12 statement from a well-regarded organization, yes.
13     Q. Okay. And you agree the CDC is well-
14 regarded; correct?
15     A. Generally, yes.
16     Q. Okay. In connection with your work over the
17 course of your career, your emphasis has been on
18 exposure to environmental toxins as opposed to
19 infectious agents; correct?
20     A. For the most part.
21     Q. Have you ever opined in a case that involved
22 not an environmental toxin but an infectious agent?
23     A. Years ago, when I ran a trauma center, I was
24 involved in litigation that involved malpractice kinds
25 of issues, clinical malpractice issues, and I can

Page 72

1 remember in that context there were questions that
2 arose regarding infections. But that would have been
3 some time ago.
4     Q. Well you were a participant. It was part
5 of --
6     I mean you were involved in that case as a
7 result of your work; correct?
8     A. No, no. I was an expert in that context.
9     Q. When was that?
10     A. Oh, it --
11     There were more than one, and it would have
12 been before 1990 because before -- in 1990 I
13 essentially separated myself from my emergency
14 practice, and during the time between 1980 and 1990,
15 approximately, I was involved in a fairly large number
16 of litigation questions, often only from the
17 standpoint of looking at medical records and saying
18 whether I thought there was or was not some kind of a
19 problem, and in that context, some of those involved
20 infectious diseases.
21     Q. Have you ever been retained, litigation or
22 non-litigation, to provide an epidemiological opinion
23 that relates to an infectious organism?
24     A. I did some work several years ago at the
25 interface of epidemiology and occupational medicine

18 (Pages 69 to 72)

Page 145

1  for infection than Xarelto.
2      A.  I understand that tinza -- tinzap --
3  trinzaparin -- I don't know how to say it, but I
4  believe it's trinzaparin -- I believe that it is
5  associated with less wound bleeding postoperatively.
6      Q.  We'll just go there.  Hold on.
7          (Exhibit 15 was marked for
8          identification.)
9          THE WITNESS:  Thank you.
10 BY MS. CONLIN:
11     Q.  I've handed you what's been marked as Borak
12 Deposition Exhibit 15, which is an article entitled
13 "Return to the surgery following total hip and knee
14 replacement, before and after the introduction of
15 rivaroxaban."  Do you see that?
16     A.  I do.
17     Q.  And the rivaroxaban is Xarelto; correct?
18     A.  I believe so.
19     Q.  Okay.  And is this the study that you're
20 referencing?
21     A.  I believe it is.  I've looked at it in a
22 different format, so it's --
23         It was a pdf, printed in a different format,
24 but I think it's correct.
25     Q.  Okay.  Do you see the third author listed

Page 146

1  there?
2      A.  Is it Partington?
3      Q.  No, that would be the -- well do you see --
4          I guess it would be the fourth then.  Do you
5  see the fourth author there?
6      A.  Dr. Reed.
7      Q.  Okay.  Are you aware that Dr. Reed testified
8  that this study showed no --
9          Well strike it.  Let me ask it a different
10 way.
11         Are you aware that Dr. Reed testified that
12 this study eliminates Xarelto as a confounder for
13 infection risks in knee and hip surgeries?
14         MR. GORDON:  Object to the form of the
15 question.
16     A.  I'm --
17         I don't remember that he said that, but I
18 think it's wrong.
19     Q.  Okay.  So you don't remember reading it, but
20 if he said it, he's wrong.
21     A.  I believe it does not eliminate it.  Yes,
22 that's correct.
23     Q.  Okay.  And he's somebody who has
24 investigated this issue.  You're somebody who has read
25 some articles.  Correct?

Page 147

1          MR. GORDON:  Object to the form of the
2  question.
3      Q.  You haven't done an investigation beyond
4  what you -- what you've read; correct?
5      A.  I have not directly studied the use of
6  Xarox -- Xarelto.
7      Q.  Okay.  What investigation did you do other
8  than read the couple of articles that are cited in
9  your report?
10     A.  Well I've read a lot of articles.  Only
11 those cited are the ones I specifically was relying
12 upon.  I don't want to diminish the effort that was
13 put into it, but I read the literature.
14     Q.  Okay.  With respect to this issue of Xarelto
15 being a potential confounder --
16     A.  Yes.
17     Q.  -- for the risk of infection in knee and hip
18 surgeries, what other articles do you have in mind
19 other than those that you cited in your report?
20     A.  I think at the moment those are the ones
21 specifically that I would name.
22     Q.  And to the extent that Dr. Reed, an author
23 of this study, said that this study proves that
24 Xarelto is not a confounder in knee and hip surgery,
25 you would disagree with him.

Page 148

1      A.  Did he say that here?
2      Q.  He said it in his deposition.  I'm
3  representing that to you.
4      A.  I -- I don't think that this study
5  eliminates rivaroxaban as a confounder in the McGowan
6  study.
7      Q.  Okay.  Based on what is my question.
8      A.  Based on the fact that there was a
9  significant increase -- there was a large increase, I
10 think 2.5-to-one increase in infection rates, and I
11 think this study under-ascertained cases because it
12 only had a 30-day followup.
13     Q.  Well so you relied on it but you didn't rely
14 on it?
15     A.  No, no, no, no, no.  I didn't rely upon it.
16 I said I think it did not prove that it was not a
17 confounder.  Moreover, a confounder -- whether
18 something is or is not a confounder is not dependent
19 on whether it is, on a univariate level, statistically
20 significantly associated with the outcome or whether
21 it significantly influences the relationship that it
22 confounds.
23     Q.  It has to have an association.
24     A.  That's a start but not a finish.
25         MS. CONLIN:  Okay.  So why don't you pull

37 (Pages 145 to 148)

Page 149

1  out, Mr. Stirewalt, what was marked yesterday as
2  Exhibit 19, because I think that is probably the pdf
3  that he's used to seeing in connection with this
4  study.
5      A.  Maybe that one.
6          (Holford Exhibit 19 handed to the witness.)
7      Q.  I've handed you what's previously been
8  marked as Holford Exhibit 19, which is, I believe, the
9  same study in a different format.  Is this the format
10 that you're used to seeing this study?
11     A.  Yes, that's correct.
12     Q.  Okay.  And did you understand this study to
13 be breaking down wound complications such as surgical
14 wound infections versus deep joint infections?
15         MR. GORDON:  Object to the form of the
16 question.
17     A.  You're asking me whether it specifically
18 differentiated different kinds of wound infections?
19     Q.  Deep joint versus a superficial wound
20 infection or the like.  Did you have that in mind when
21 you reviewed this?
22     A.  I don't recall having that particular
23 question in mind, --
24     Q.  Okay.
25     A.  -- but I will -- would again if you'd like

Page 150

1  me to.
2      Q.  Did you have it in mind when you rendered
3  your opinions in this case on June 2nd?
4      A.  Whether --
5          The differentiation between the types of
6  wound infections?
7      Q.  Correct.
8      A.  I -- I'm sorry, and I'm just backing up.  Is
9  that raised in this document?  It would help me to
10 reconstruct and answer your question.
11     Q.  Well I'm just asking if you had it in mind
12 when you --
13     A.  I'm sure I had it somewhere in mind, but I
14 don't remember whether it was relevant, that question,
15 to this article.
16     Q.  Okay.  Why don't you take a look at
17 intern -- page 523, which is the third page of this
18 study, under "Results," and I'd like to direct your
19 attention down to the third paragraph starting with
20 "Of those patients who returned to theatre,
21 microbiology results showed that five of the nine
22 (55.5 percent) in group 1 had a deep infection,
23 compared with 14 of 22 (63.6 percent) in group 2."
24     A.  Okay.
25     Q.  And it's got a p-value of .7, do you see

Page 151

1  that?
2      A.  I'm sorry, let me try and read it more
3  clearly.  I'm not seeing it well enough in this print.
4          Yes.  Okay, I see that.
5      Q.  Okay.  And do you see the p-value of .7?
6      A.  .7 had to do with the probability that there
7  was a difference in the rate of deep versus
8  superficial infections.
9      Q.  My question is:  Do you see the p-value of
10 .7?
11     A.  Yes, I see it.
12     Q.  Is that statistically significant?
13     A.  No.
14     Q.  Okay.  Then it says, "The overall rate of
15 deep infection in group 1 was 1 percent (95) compared
16 with 2.5 percent in group 2," p-value of .102, do you
17 see that?
18     A.  I do.
19     Q.  Is that statistically significant?
20     A.  It is not.
21     Q.  Did you take that into account in connection
22 with your conclusions in this case that Xarelto is a
23 confounding factor for risk of infection?
24         MR. GORDON:  Object to the form of the
25 question.

Page 152

1      A.  It's discussed in paragraph 42 and following
2  in my report.
3      Q.  My question is a little different.  Did you
4  take that into account in connection with your
5  conclusions in this case?
6      A.  And I'm showing you, yes, I took it into
7  account --
8      Q.  Okay.
9      A.  -- in paragraphs 42 and following in my
10 report.
11     Q.  I think I asked you this before, but in
12 connection -- you didn't --
13         You didn't actually look at the mathematical
14 work Professor Holford did in reanalyzing the McGovern
15 data with Jensen; correct?
16         MR. GORDON:  Objection.
17     A.  Yes, I did not.
18     Q.  Okay.  And to the extent that he used either
19 data from Albrecht Exhibit 10 or McGovern Exhibit 16,
20 you would be deferring to him as to the
21 appropriateness of that; correct?
22     A.  Yes, I would.
23     Q.  Now I'd like to talk to you a little bit
24 about the Hawthorne effect and -- which is contained
25 on page 16 of your report.  Wouldn't --

Page 153

1  Well first of all, wouldn't the Hawthorne
2  effect exist in any observational study?
3     A.  I think it depends upon whether the subjects
4  are aware of the observation and how intensively the
5  observation impacts the daily life of those
6  individuals.
7     Q.  Well do you know whether any of the
8  participants in the Reed and McGovern study were
9  involved, that there was a study going on?
10     A.  I -- I understand from the statements that
11  were made in the citation which I cited -- "citation
12  which I cited" sounds like a redundancy -- there was
13  an award given to Northumbria, and in the context of
14  that they cited the efforts that had gone into it.
15  There's also description of the change in the
16  sensibility that was engendered as described by
17  Gillson and Lowdon or something, and my understanding
18  is that there was a full-court press to try to change
19  the behavior of the people, which included changing
20  clothes and changing the manner in which the clothes
21  were stored and changing shoes, and a variety of other
22  things were done, and I think that everybody there was
23  very aware that there was a problem with infections.
24     Q.  My question was a little different.
25     A.  Okay.  I'm sorry.

Page 154

1     Q.  My question was:  Do you believe that any of
2  the participants' employees understood or were aware
3  that there was going to be an observational study
4  conducted and published regarding infections in knee
5  and hip arthroplasty?
6     A.  I -- I have --
7     MR. GORDON:  Object to the form of the
8  question.
9     A.  I have no idea if anybody at the time knew
10  because the study was post hoc.
11     (Discussion off the stenographic record.)
12     (Exhibit 16 was marked for
13     identification.)
14     THE WITNESS:  Thank you.
15  BY MS. CONLIN:
16     Q.  I have handed you, sir, what's been marked
17  as Borak Deposition Exhibit 16, which is -- not what I
18  wanted to give you.  Hold on.  You can set that aside,
19  I'll get back to that.
20     (Exhibit 17 was marked for
21     identification.)
22  BY MS. CONLIN:
23     Q.  I have handed you, sir, what's been marked
24  as Borak Deposition Exhibit 17, --
25     A.  Yes.

Page 155

1     Q.  -- which is the Jameson study entitled
2  "Wound Complications Following Rivaroxaban
3  Administration."  This is one of the documents that
4  you referenced and opined on in your report; correct?
5     A.  That's correct.
6     Q.  Okay.  In connection with your review, did
7  you have in mind a difference or -- between a deep
8  joint infection and a superficial or deep tissue
9  infection?
10     A.  I don't think it was defined clearly in this
11  paper, and so I don't think that I made a decision.
12  But --
13     Q.  Okay.  Would it be important in connection
14  with making decisions that a change to Xarelto
15  postoperatively as an antithrombotic prophylaxis
16  increases the risk of a deep joint infection?
17     A.  I'm sorry, repeat that.
18     Q.  Sure.  Would it be important in connection
19  with making decisions in this case that a change in
20  Xarelto postoperatively -- postoperatively as an
21  antithrombotic prophylaxis increases the risk of a
22  deep joint infection as opposed to another kind of
23  wound infection?
24     A.  Would it matter to me?  Yes, I would
25  consider that.  I --

Page 156

1     Would you point to what you are talking
2  about in the paper so I understand the context of your
3  question?
4     Q.  Well I'm just under --
5     I'm trying to understand your opinion, sir,
6  when you say that the change in -- from rivar -- or
7  from trinzaparin to Xarelto creates an increased risk
8  of a deep joint infection, that you had paid attention
9  in the papers that you were citing as to differences
10  between, for example, a superficial wound or a deep
11  wound infection and a deep joint infection.
12     A.  I'm sorry, I -- I cited this paper for a
13  different reason, not to suggest what you are asking.
14  I cited it because Dr. Samet had cited it, and Dr.
15  Samet had cited it as evidence that it did not create
16  a difference.
17     Q.  My question was:  When you opine that a
18  change from trinzaparin to Xarelto creates an
19  increased risk of deep joint infection, did you pay
20  attention in the papers that you were citing as to the
21  differences between, for example, superficial wound or
22  deep wound or a deep joint infection?
23     A.  Let me answer, yes, I was aware of the
24  difference.
25     Q.  Do you think that you can extrapolate from

Page 197

1  something else?
2      A.  That is the one that has been used almost
3  universally, so I -- I am reasonably certain that I --
4  I would have expected that.  And I thought I knew
5  that, but at the moment sitting here I can't point to
6  a place where I found that specific detail.
7      Q.  And you again, in connection with this MSSA
8  screening, rely on statements by Dr. Reed; correct?
9      A.  Well I pointed to Dr. Reed's statement.
10     Q.  Well you relied on it; correct?
11     A.  Yes.
12     Q.  Okay.
13     A.  Oh, okay.  There.  Okay.  So it is Dr. Reed
14  who literally there said, "After MSSA screening, a
15  decolonization was introduced," and I took for granted
16  that that was referring to this time in this study of
17  concern that we have with McGovern.
18     Q.  Okay.  Did you do any analysis as to whether
19  MSSA infections went up after MSSA screening and
20  decolonization was implemented in January 2010?
21     A.  I understand from conversations -- I did not
22  look at the raw data -- that there were none reported
23  after the introduction of that process.
24     Q.  So you would disagree that there was an
25  uptick in infections after MSSA screening was

Page 198

1  implemented?
2      A.  I thought that there were no MSSA
3  infections.
4          (Exhibit 24 was marked for
5          identification.)
6  BY MS. CONLIN:
7      Q.  I've handed you, sir, what's been marked as
8  Borak Deposition Exhibit 24, which is a document
9  entitled "Surveillance of surgical site infections in
10 NHS hospitals in England."  Do you see that?
11     A.  I do.
12     Q.  Okay.  And is this something you've seen
13 before?
14     A.  I have seen documents that look like this.
15 I don't know if this is the one I saw.
16     Q.  Okay.  If we can direct your attention to
17 page 30, --
18     A.  Yes.
19     Q.  -- Figure 11, "Trends in micro-organisms
20 reported as causing inpatient SSIs, proportions with
21 lower and upper 95 percent confidence, all surgical
22 categories, NHS hospitals, England."  Do you see that?
23     A.  I do.
24     Q.  Okay.  Now you'll see the dotted green line
25 is MSSA infections; correct?

Page 199

1       MR. GORDON:  Dotted green or blue?
2       MS. CONLIN:  Well whatever.  It's the one
3  dotted line with the circle.
4       Q.  Do you see that?
5       A.  Yes.
6       MS. CONLIN:  Okay.  And yeah, it does look
7  blue, Mr. Gordon.  Thank you.  We'll refer to it as
8  the dotted blue line.
9       Q.  You'll see that there's a reference point
10 there of September 2008.
11         Right here.
12      A.  Yes.
13      Q.  Okay.  And then if you look, based on this
14 graph, MSSA infections went down between September
15 2008 and October 2009; correct?
16      A.  It seems to be.
17      Q.  Okay.  And then after October 2009 to
18 November 2011, you'll see there's an uptick; correct?
19      A.  I do see that.
20      Q.  Okay.  Is that something that you
21 investigated in connection with your view that the
22 MSSA screening renders the McGov -- is a confounder to
23 the McGovern report?
24         MR. GORDON:  Object to the form of the
25 question.

Page 200

1       A.  I would not have looked at this since this
2  is a composite of all of the hospitals in England -- I
3  think it is all of them -- and it is all forms of
4  surgery, and so I'm not quite sure what one could have
5  drawn from this or what it would have told me other
6  than the fact that there was heterogeneity in the
7  operating room procedures in the NHS hospitals.
8       Q.  Do you know which hospitals were included in
9  this?
10      A.  I'm happy to look at the beginning.
11      Q.  Well you just said it includes all the
12 hospitals.  I'm wondering if you know that or you're
13 just assuming that.
14      A.  I am assuming it based upon what I saw in a
15 quick look at the document, but I'm happy to look
16 further.  "Since July 2008 hospitals were required" --
17      I mean I'm happy to take time to look for
18 the number, but --
19      Q.  No.  I -- I was just curious, when you said
20 that it included more hospitals than the three at
21 issue in McGovern, whether you knew that or you were
22 just speculating.
23      A.  Oh, no, no, no, I'm not speculating, but I
24 don't know what the number is.
25      Q.  Okay.

50 (Pages 197 to 200)

Page 201

1  A. This is a composite of the NHS system. We
2  are looking at, in McGovern, one hospital.
3  Q. Okay. But you --
4     Your view is that because the MSSA data on
5  that chart we just looked at isn't specific to deep
6  joint infections, it wouldn't be a fair comparison; is
7  that right?
8  A. No. It wouldn't be a fair comparison
9  because it's looking at, I believe, most if not all of
10 the NHS hospitals in England. I don't know about
11 their implementation of procedures and protocols. I
12 believe I saw something here about a lack of
13 consistency in the applications of protocols. I think
14 there are a variety of other considerations. So I
15 wouldn't use this to inform my thinking about
16 Northumbria.
17 Q. And one of the reasons that you just stated
18 that you didn't think it would be a fair comparison is
19 because it's including other surgeries, not just deep
20 joint infections; correct?
21 A. Yes.
22 Q. Other types of infections.
23 A. Yes.
24 Q. And you don't think it would be fair to
25 extrapolate from one type of infection in one part of

Page 202

1  the body to a deep joint infection even if it's MSSA;
2  correct?
3  A. I -- I -- I --
4     Yes. I think this would raise the question
5  whether this added or altered my thinking, and I
6  referred ultimately to a comment which came literally
7  from Dr. Reed who said that "In the fight against
8  PJI" -- prosthetic joint infections -- "after MSSA
9  screening and decolonization was introduced, one NHS
10 joint replacement unit, the MSSA infection was reduced
11 from .84 to .26." I believe that is speaking about
12 Wansbeck, though in looking at the document I couldn't
13 tell which of the three hospitals it was, but I
14 presume it is because it's where there was the data.
15    MS. CONLIN: Move to strike as non-
16 responsive.
17    Can you read my question back?
18    (Record read by the court reporter.)
19 A. I -- I have difficulty extrapolating from
20 this document. I might also have --
21 Q. I didn't ask you that. I asked you a
22 straight-up question.
23    MS. CONLIN: Could you read it back again.
24    (Record read by the court reporter.)
25 A. It might not be fair.

Page 203

1     (Exhibit 25 was marked for
2     identification.)
3  BY MS. CONLIN:
4  Q. I've handed you, sir, what's been marked as
5  Borak Exhibit 25, which I think is your reference --
6  A. I think it's number 30.
7  Q. -- your reference number 30; correct?
8  A. I believe that's correct.
9  Q. Thank you. Okay. And this was one of the
10 things that you relied on to suggest that
11 decolonization with a topical antibiotic, mupirocin,
12 has been shown to significantly reduce risk of post-
13 surgical infections, including hip and knee
14 replacements; correct?
15 A. Yes.
16 Q. Okay. I'd like to direct your attention to
17 the third paragraph of this article.
18 A. After the introduction or in the abstract?
19 Q. Internal page 2385. Got a chart at the top.
20 A. Third page. I thought you said paragraph.
21 Okay.
22 Q. In the paragraph about "Of the 19
23 studies..."
24 A. "Of the 19 studies..." Yes.
25 Q. On the right-hand side, midway down, it

Page 204

1  says, "The majority of studies detected S. aureus
2  colonization using cultures, most SSIs were defined by
3  CDC criteria, the majority of studies did not
4  differentiate between superfer -- superficial versus
5  deep infections, and most of the patients who
6  underwent decolonization were positive for S. aureus
7  on nasal screens." Do you see that?
8  A. I do.
9  Q. In connection with your discussion of MSSA
10 screening, you bundled infections regardless of
11 whether they were deep joint infections; correct?
12    MR. GORDON: Object to the form of the
13 question.
14 A. I cited a paper which I think may have
15 bundled it.
16 Q. In -- in support of your belief that the
17 implementation of MSSA screening and decolonization is
18 a confounding factor in McGovern; correct?
19 A. Yes. Correct.
20    (Exhibit 26 was marked for
21    identification.)
22    THE WITNESS: Thank you.
23 BY MS. CONLIN:
24 Q. I've handed you what's been marked as Borak
25 Exhibit 26, which is a JAMA survey entitled "Centers

51 (Pages 201 to 204)