1
2

                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA

3       ------------------------------------------------------------
                                    )
        In Re:  Bair Hugger Forced Air  )  File No. 15-MD-2666
4       Warming Devices Products       )            (JNE/DTS)
        Liability Litigation           )
5                                      )
                                       )  Minneapolis, Minnesota
6                                      )  March 8, 2019
                                       )  Courtroom 9E
7                                      )  11:09 a.m.
                                       )
8                                      )
        ------------------------------------------------------------

9

10              **BEFORE THE HONORABLE DAVID T. SCHULTZ**
              **UNITED STATES DISTRICT COURT MAGISTRATE JUDGE**
                           **(MOTION HEARING)**

11

        APPEARANCES
12        For the Plaintiffs:        Meshbesher & Spence
                                     GENEVIEVE M. ZIMMERMAN, ESQ.
13                                   1616 Park Avenue
                                     Minneapolis, Minnesota 55404
14
                                     Levin, Papantonio
15                                   BEN GORDON, ESQ.
                                     316 S. Baylen Street
16                                   Suite 600
                                     Pensacola, Florida  32502
17
          For the Defendant:        Blackwell Burke P.A.
18                                   PETER J. GOSS, ESQ.
                                     CHARMAINE HARRIS, ESQ.
19                                   431 South Seventh Street
                                     Suite 2500
20                                   Minneapolis, Minnesota  55415

21        Court Reporter:           ERIN D. DROST, RMR-CRR
                                     Suite 146
22                                   316 North Robert Street
                                     St. Paul, Minnesota 55101
23

24          Proceedings recorded by mechanical stenography;
        transcript produced by computer.
25

**P R O C E E D I N G S**

**IN OPEN COURT**

1

2

3

4          THE COURT:  All right.  Good morning, everyone.

5    We're on the record in the Bair Hugger MDL.  I believe it is

6    Case No. 15-MDL-266.

7          THE LAW CLERK:  6.

8          THE COURT:  6.  2666.  Okay.

9          Counsel for the Plaintiff, if you would note your

10   appearance for the record, please.

11         MS. ZIMMERMAN:  Good morning, Your Honor,

12   Genevieve Zimmerman.

13         THE COURT:  Good morning.

14         MR. GORDON:  Good morning, Your Honor.  Ben Gordon

15   for Ms. Trombley.

16         THE COURT:  Good morning, Mr. Gordon,

17   Ms. Zimmerman.

18         MR. GOSS:  Good morning, Your Honor.  Peter Goss

19   for Defendants.

20         THE COURT:  Good morning, Mr. Goss.

21         MS. HARRIS:  Good morning.  Charmaine Harris for

22   the Defendants.

23         THE COURT:  I didn't hear your last name.

24         MS. HARRIS:  Charmaine Harris.

25         THE COURT:  Oh, good morning, Ms. Harris.  Okay.

```
 1              MS. HARRIS:  Good morning.

 2              THE COURT:  Well, I have read everything that was

 3    submitted, and I'm happy to hear whatever arguments we have,

 4    okay?

 5              MS. ZIMMERMAN:  Thank you, Your Honor.  And may it

 6    please the Court, Genevieve Zimmerman here on behalf of the

 7    MDL Plaintiffs.  We have had the opportunity to be in front

 8    of Your Honor and this court on a number of issues of late,

 9    but also with respect to motions to strike expert reports

10    and expert testimony obviously in the past six months or so.

11    Your Honor is aware the Defendants brought a motion to

12    strike expert reports the Plaintiffs had disclosed in the

13    Axline matter, though their motion to strike was also

14    captioned in the general MDL, and that's principally why we

15    followed suit here in this instance.

16              That motion practice was, I believe, September,

17    and we had an order from Judge Ericksen then affirming

18    Your Honor's decision to strike our expert reports, and that

19    was Document 1580, which was filed on November 6th of 2018.

20              Fast forward now, we have the Trombley matter.

21    Plaintiffs have disclosed two case-specific experts; one

22    from Dr. William Jarvis who is an infectious disease doctor,

23    and then, two, from Dr. Brown who is a nephrologist, and he

24    is really not speaking in any way to the Bair Hugger

25    specifically, but really to the kind of kidney damage and
```

1    issues that he believes Ms. Trombley has suffered as a

2    result of the infections that she had.

3         Shortly after disclosing those reports -- and

4    actually I'm thinking about timing, I know both of those

5    doctors have been deposed already -- Defendants then

6    disclosed six different case-specific expert reports in the

7    Trombley matter.  Most of those experts are experts that we

8    have dealt with throughout the course of this case in terms

9    of general causation and case-specific.  Many of them have

10   been here or upstairs, I guess, when we tried the Gareis

11   case.  So some of their -- their generalized opinions are

12   certainly something that we're well aware of.  The reason

13   for the motion to strike is that they have significantly

14   supplemented their opinions with respect to general

15   causation issues in our estimation, including what we would

16   call backfilling with citations and things like that that

17   were available at the time of their original report.

18        Additionally, as we detail in our motion papers, a

19   number of these expert reports we really don't believe are

20   truly rebuttal reports.  You know, by way of example, I

21   would turn the Court to, you know, Exhibit 1 in our

22   response, which is the report of Dr. Abraham, and he says

23   right, you know, in the first paragraph of his report, In

24   this report, I expand on the opinions I expressed in my

25   earlier reports.  There was no CFD engineer disclosed in

 1    Trombley, so anything that he's doing here is -- is not

 2    truly rebutting anything that was provided in Trombley;

 3    rather, it is supplementing with additional citations, many

 4    of which were available beforehand, and we think that that's

 5    improper rebuttal.

 6            THE COURT:  Is -- Let me stop you there for a

 7    second.  So obviously I haven't read the Gareis trial

 8    transcript, but your CFD expert, Elghobashi?

 9            MS. ZIMMERMAN:  Excellent.  Yes, Your Honor.

10            THE COURT:  Okay.  He testified in Gareis; right?

11            MS. ZIMMERMAN:  Absolutely, Your Honor.

12            THE COURT:  So -- And did he testify to both the

13    general -- his general causation opinions and then specific

14    to Gareis?

15            MS. ZIMMERMAN:  Yes, yes, Your Honor, he did.

16            THE COURT:  So here's my -- here's my concern.

17    I'll be upfront with you about Abraham.  I think it's the

18    report about which I have the greatest concern to be honest

19    with you.  It seems like there's a whole bunch of -- it may

20    not be CFD, but airflow general causation-type background

21    that seems new to me.

22            MS. ZIMMERMAN:  We agree, Your Honor.

23            THE COURT:  I thought you might.

24            MS. ZIMMERMAN:  Well, and, you know, I think that

25    at the end of the day, the -- the timeline of the expert

1    reports here is kind of actually interesting.  So

2    Dr. Abraham, in his various depositions, has testified that

3    the CFD that he did, he completed in 2015.  It was before

4    Science Day in this case.  It was before he ever knew about

5    who Dr. Elghobashi was, so the work that he did was really

6    truly not rebuttal ever.  It was his own study.  And we can

7    take issue with that; but, you know, one of the issues that

8    has percolated up through these briefs is, you know, what's

9    rebuttal, what's sur-rebuttal, what's permissible, you know,

10   and I understand that all of that is important.  But in

11   terms of who had what documents and who was really

12   responding, I guess, to different kind of experts, it's

13   actually true that what Abraham did was not actually a

14   response to Elghobashi, because that wasn't produced until

15   the end of March of '17.  Now they are both doing kind of

16   their own studies, I guess, and really that's what the fact

17   finder is for, to figure out, you know, which -- which

18   version holds water.

19          But in terms of whether or not Abraham was really

20   a rebuttal -- I mean, and I know that some of the briefing

21   presented to this Court has said, look, Plaintiffs have had

22   his CFD forever because there happened to be some YouTube

23   videos.  It's true that there are some YouTube videos of

24   what Abraham claims he did.  We did not, however, have a

25   copy of his report or any of his CFD until the time that

1   expert reports were made, which, from Defendant's

2   perspective, I believe was June of 2017; so while Elghobashi

3   did his study and he did use many of the same inputs that

4   Abraham did based on information available on this YouTube

5   video, it's not as if we had his written report beforehand.

6   And that's kind of getting into the weeds, I guess, on

7   issues that have been before the Court about rebuttal or

8   sur-rebuttal and whether or not Dr. Nathan Bushnell was

9   properly disclosed and that sort of thing.

10          But really focussing on what Abraham has disclosed

11   with respect to Trombley, this isn't -- I mean, there was no

12   CFD that was done in the Trombley OR by Dr. Elghobashi.

13   He's done two; one on the Model 750, and then he did another

14   CFD on the Model 505.  And really the principal difference

15   is that while both of them show a statistically significant

16   number of squames reaching the sterile field in less than a

17   minute, they are slightly different because the airflow

18   essentially is stronger in one model than the other, which

19   is what he had opined on when he did his first CFD.

20          But then in an abundance of caution, and

21   particularly knowing that the Gareis Bair Hugger model was a

22   505, Dr. Elghobashi went back and actually did do the

23   computational fluid dynamics on the 505 to say, yes, while I

24   said I thought it would -- the same thing would happen, now

25   I have done the study and I can show you exactly what does

1   happen with the 505.  But he has not done anything for

2   Trombley, and much like 3M has not done, you know,

3   individual OR simulations for HCMC or, you know, Fairview

4   Ridges or United Hospital across -- you know, across the

5   river close to my house.  They did do some CFD in the past,

6   but they did one; and based on a model, then they go out and

7   they market it as safe for use for everybody.

8           That's kind of frankly what's happened with

9   Elghobashi.  He's done CFDs on a model OR, and the only

10  thing that's different in each one are the models of the

11  Bair Hugger.  There's a 750 and there's a 505.  And

12  Defendants did have the opportunity at trial in Gareis to

13  cross-examine him and say, Well, isn't it true that the

14  actual OR dimensions in the Gareis case were a little

15  different than the ones that you modeled in your CFD?  And

16  he acknowledged, yeah, they are a little different.  And his

17  testimony at trial was, in my expert opinion, if -- you

18  know, that he modeled a best case scenario OR, an OR that

19  was, you know, technically very modern; and that if the Bair

20  Hugger is impacting airflow in that modern OR, it's only

21  going to be -- the effect of the Bair Hugger will only be

22  worse in substandard operating rooms, and that's essentially

23  what came out in Gareis.

24          So with respect to Dr. Abraham's report in

25  Trombley, we just think that it is -- it's completely

1  improper and not rebuttal, and we think that it ought to be

2  stricken.

3  THE COURT: Here's -- Let me ask you this, so

4  here's -- and maybe we do need to get further into the

5  weeds, but here's -- here's what is troubling, I guess,

6  about Abraham. A lot of his report -- Let me back up. I

7  generally understand the notion that if you are going to

8  opine on, you know, a specific plaintiff's case, you -- you

9  obviously can't just do it in a vacuum. You have to say,

10  Hey, here's why this thing is important, and I get that.

11  And I understand, and that's -- and that's going to

12  necessarily sweep in what you could call general causation,

13  because you have to have context for this. What's a little

14  bit troubling, and I'm sure Mr. Goss or Ms. Harris are

15  champing at the bit to get up and talk about this, but if

16  you look at Abraham's opinion, I don't know, the first

17  whatever many pages are about airflow, if you will, fluid

18  dynamics, generally. There are photos of what happens when

19  somebody walks. There are photos, you know, around a

20  doorway. There are all sorts of sort of general causation

21  things that say, you know, this is what happens in an

22  operating room. And I understand -- I'm sorry. I know this

23  is a long-winded question. I understand that they can say

24  and all these things were present or not present, as the

25  case may be, in Ms. Trombley's operating theater, but it's

1    kind of like a lot of these things are present in every

2    operating room.  And so that's where I'm struggling, because

3    if Dr. Abraham didn't disclose these before or there's not

4    an expert who didn't disclose these things before, why isn't

5    that new and general causation?

6          MS. ZIMMERMAN:  Exactly, Your Honor.  I mean --

7    And I think part of it is that, you know, I assume everybody

8    has talked to various members of the jury in Gareis, and

9    they -- we both, I think, understand the import of various

10   pieces of testimony, particularly doors opening, which was

11   not in Dr. Abraham's first report, but was absolutely

12   something the jurors latched onto.  And so from our

13   perspective, it was known and knowable.  It goes to general

14   causation.  It wasn't in his first report, and he shouldn't

15   be able to put it in here now and say, Oh, this is all

16   Trombley specific.  Because as Your Honor notes, a great

17   deal of the report that's disclosed in Trombley really is

18   very general.  Certainly I understand that there needs to be

19   some context provided, but -- but this is more than just

20   context.

21          You know, additionally, while he has some -- you

22   know, he has a number of pictures of -- you know, towards

23   the back of the report of the operating room as it exists

24   now, the operating room that Trombley was in, everybody

25   knows that it's not -- there's no kind of foundation that

1      that's what the operating room looked like on the day of the

2      Trombley surgery in 2015, I think it was.  So, you know, and

3      maybe that's -- you know, maybe that's going to be part of a

4      motion in limine or some other, you know, kind of motion

5      down the road if Dr. Abraham is permitted to go forward, or

6      maybe there's an objection on just foundation because

7      there's no foundation to say that this is actually, you

8      know, a correct and true depiction of the operating room as

9      it existed at the time of the surgery.  But I guess that is

10     kind of a small piece of the broader issue that we have.

11     And he's disclosed a 36-page report when there was no CFD

12     expert provided in the Trombley matter.

13             And so we really think that, you know,

14     particularly with respect to Dr. Abraham, and you can see

15     from the citations in terms of, you know, the years for the

16     various reports, a great number of these citations were

17     available certainly well before his general causation report

18     was due.  I mean the very first one he cites to, Whyte, is

19     from 1974, '76.

20             THE COURT:  Hang on, Ms. Zimmerman.  I think you

21     might be going a little fast.

22             MS. ZIMMERMAN:  I'm sorry.  I apologize.  I have a

23     habit of doing that.

24             So, yes, so we think that that -- that Abraham's

25     report, just in its entirety, is not appropriate rebuttal,

1    and it's an attempt to backfill his general causation

2    opinion.

3          And before I turn, I guess, to the other reports

4    in this, I would point the Court back to kind of the way --

5    I mean, I know that this is -- we have an MDL, so there's

6    5,000-some cases as the Court certainly is aware, and then

7    we have the Trombley case that's getting ready to be tried.

8    And I think that in various different motions that have been

9    brought, that the Defendants have attempted to kind of

10   recast the idea or the general understanding in courts

11   across the country about what is general causation and what

12   is specific causation, and how does bifurcating discovery in

13   an MDL impact expert reports down the road in cases that

14   actually go to trial.

15         So we -- we provided some citations to the

16   Reference Manual on Scientific Evidence and the Manual for

17   Complex Litigation.  General causation is typically

18   understood to be essentially do the Plaintiffs have some

19   admissible evidence to support the claims that they are

20   making.  And it's not generally understood to be this is the

21   universe of all evidence that the Plaintiffs have, but just

22   if Plaintiffs can't even get past this hurdle, we ought to

23   stop this MDL right now.  Stop the bleeding.  If they want

24   to go on appeal, they can do it, but let's not bother Judge

25   Schultz and Judge Ericksen once a month and have everybody

1    bring in all these motions for years and years if the

2    Plaintiffs can't even clear that basic hurdle.  And we got

3    past that.  We certainly -- I mean, the Court made the

4    appropriate decision and said, there is sufficient evidence

5    here.  And that's not the full universe of evidence that we

6    know.  You know, if and when we have the ability to bring

7    folks, particularly corporate folks from 3M to the witness

8    stand and ask them about some additional documents, I'm

9    confident there's going to be more evidence that makes it

10   much stronger, the Plaintiffs' claims, and the expert

11   opinions that we've disclosed go to that as well.

12          But what Defendants have really attempted to do in

13   their Motion to Strike in August or September, when we were

14   here on the Plaintiffs' experts, is to say, Look, you --

15   that's all the more you got.  You're stuck with the expert

16   reports that you disclosed on March 31st of 2017, and,

17   essentially, this MDL is frozen in time at that point.  And

18   that's not what the Reference Manual on Scientific Evidence

19   or the Manual for Complex Litigation contemplates.  That's

20   not typically the way an MDL is done.

21          So one thing, I think the Court has evidence and

22   interest in being practically minded, I think it may be

23   helpful to kind of sit down and talk about how are we going

24   to, from an administrative standpoint, look at each of the

25   obligations that are going to be made on these 5,000 cases

1     if we're going to trial on each one.  If someone files a

2     case tomorrow, are they limited to what was known or

3     knowable on March 31st of 2017?  I don't think that that's

4     typically what the rules contemplate, and so I think that

5     there may -- there may be an opportunity here for the

6     parties and the Court to work together in a collaborative

7     way so that we don't have this ongoing motion practice

8     about, well, they're out, but then you should be out, and

9     that sort of thing.

10            THE COURT:  That -- that point is well taken.  Is

11    your view -- It seems to me there are three things that are

12    going on here.  No. 1 -- well, the easy one, in my view, is

13    research, peer-reviewed articles, things that -- that are

14    published after an expert issues their report.  That seems

15    like proper supplementation to me.

16            MS. ZIMMERMAN:  We agree, Your Honor.

17            THE COURT:  The second thing is what about those

18    pieces of literature that support a previously issued

19    opinion that were available at the time but nobody's

20    perfect, you find them after the fact?

21            MS. ZIMMERMAN:  Right.

22            THE COURT:  What's your view of that?  Is that

23    out?

24            MS. ZIMMERMAN:  I think it's difficult,

25    Your Honor, because while on the one hand, you know, you are

1    right, no one is perfect, but we are afforded the

2    opportunity to explore -- both sides are afforded the

3    opportunity to explore the basis for an expert's opinions.

4              THE COURT:  Right.

5              MS. ZIMMERMAN:  And if experts are permitted to --

6    I mean, we can turn to Dr. Mont's report.  It is a monster,

7    and it is full of new citations, the vast majority of which

8    were certainly known or knowable.  I don't think -- You

9    know, even having deposed this guy a couple of times, I

10   don't think I could do it in seven hours; but I do need to

11   have that opportunity.  And that's what the rules afford to

12   the Plaintiffs here is to really understand what the basis

13   are of the opinions so that we can -- we can know that and

14   we can use it to potentially cross-examine and impeach him

15   at the time of trial, and also just to make sure that he's

16   qualified to be offering the opinions that he's offering,

17   because as we note in our -- in our report -- or in our

18   motion to the Court, again, we disclose two experts, an

19   infectious disease doctor and a nephrologist.  They've -- In

20   the general causation phase, they had an infectious disease

21   doctor, Dr. Wenzel.  They promised to the jury he was going

22   to show up.  He never did.  He's not had a report issued

23   since.

24              And so now Dr. Mont, who is an orthopod, and the

25   new anesthesiologist, who of course has got a top-to-bottom

1    new opinion on general causation and case-specific issues,

2    and their epidemiologist are essentially trying to cover the

3    waterfront with attacking Dr. Jarvis, our infectious

4    disease -- yeah, our infectious disease doctor.  I mean,

5    given that these folks have previously, under oath,

6    disclaimed expertise in infectious disease, you know, query

7    whether they really have the capacity or foundation to serve

8    as experts that rebut Dr. Jarvis, and that's, I guess, part

9    of the question that we've raised with the motion here.

10                   THE COURT:  Right.

11                   MS. ZIMMERMAN:  I mean, they can bring, I guess,

12   the experts that they want to bring.

13                   THE COURT:  Yeah, and I think their -- you are

14   really arguing, in part, a *Daubert* issue I think, or you are

15   suggesting that, which is not before me.

16                   MS. ZIMMERMAN:  Yeah.

17                   THE COURT:  But here's where I think you may find

18   that I'm not in agreement necessarily with the Plaintiffs'

19   position.  Two things; one, I don't think their experts -- I

20   don't think you get to -- I'm phrasing it this way, but I

21   don't think you get to decide what their -- what experts

22   there are; right?  So if you only put up a damages expert,

23   but you still go forward with the theory, obviously, of

24   liability, I think they still get to bring in experts to

25   address your theory of liability, even if -- so it's not tit

1    for tat --

2              MS. ZIMMERMAN:  Tit for tat, yeah.

3              THE COURT:  -- on who the experts are.  The second

4    thing, and I think this really gets to Dr. Mont, on the one

5    hand you are right, he's giving very generalized opinions

6    on, for example, diabetes, but, you know, the risk factors

7    for infection are specific to individuals, and so there

8    that -- that doesn't seem to be crossing the line to me, but

9    I think you think it does.

10             MS. ZIMMERMAN:  Well, I do think it does,

11   Your Honor, respectfully, and I would point, in terms of an

12   example, to the exclusion of Dr. Yadin David.  So when we

13   did a general causation report for him, and, in retrospect,

14   I'm not sure honestly that we needed one, because if we're

15   talking about what the Bair Hugger is generally capable of,

16   that probably isn't the stage of the case where we have to

17   prove there were reasonable alternative designs then.  But

18   he did offer a number of reasonable alternative designs in

19   his initial report.  And then when we offered a supplement

20   on that, evidencing, I think, seven or eight additional

21   reasonable alternative designs, all of which were known to

22   the Defendants at the time, the idea was, well, those were

23   known or knowable at the time he issued his March 17th

24   report, and so it should have been in there, and the

25   Defendants are in some ways disadvantaged by the fact that

1    there's new general causation kind of reasonable alternative

2    design opinions there.  Fast forward now to your question

3    about diabetes and Dr. Mont.  If Dr. Mont thought that

4    diabetes was a risk factor that predisposed patient

5    population generally, isn't that really something that

6    belonged also in his general causation report?

7             THE COURT:  It exposes every potential -- It

8    exposes the patient population that has diabetes.

9             MS. ZIMMERMAN:  Correct, Your Honor.

10             THE COURT:  And I guess the question is, is that a

11    distinction with or without a difference?

12             MS. ZIMMERMAN:  From the Plaintiffs' perspective,

13    it's a distinction with a meaningful difference, because we

14    would have had an opportunity to really delve into what

15    Dr. Mont's opinions are about the role that diabetes may

16    play in predisposing someone to infection.  And now perhaps

17    we have the opportunity to ask him that in the Trombley

18    matter, but just as Dr. David was not permitted to say, Oh,

19    there's also -- you know, it wasn't just the one reasonable

20    alternative design that I pointed to, it was all these other

21    ones, you know, we -- we think that they're really, you

22    know, similar -- similar issues before the Court and with

23    respect to the -- the properness, I guess, of a disclosure

24    and whether something is general causation or case-specific.

25             And then turning also to the anesthesiologist, I

1    think it's Dr. Dutton, it's certainly not Plaintiffs'

2    position that each set of -- and I think I've represented

3    this to the Court before -- that each party is going to be

4    forever limited to those experts that were disclosed in the

5    general causation phase or that we used in Gareis, because

6    at this point, it's looking like we have a lot of cases and

7    potentially a lot of trials to have; however, we certainly

8    would need to depose Dr. Dutton on issues including both

9    general causation and specific causation, because I can't

10   impeach him with the deposition testimony or the trial

11   testimony from Dr. Hannenberg, because they probably have

12   different opinions.

13            And so I guess then the next question the

14   Plaintiffs have are, well, could we -- if, for example, I

15   get a new expert that's going to opine on a reasonable

16   alternative design, do I get a new report top to bottom, put

17   all of the stuff in that the Court wouldn't let me put in

18   with respect to the Axline case and Dr. David?  I mean, I

19   don't want to forecast problems for the Court, but there's a

20   couple cooking -- a couple are cooking down the road, you

21   know, and so I guess those are some of the issues that are

22   certainly percolating from the Plaintiffs' perspective, and

23   we think that it really does impact, you know, the ability

24   to try the Trombley case in a fair manner, and it's going to

25   impact the rest of the MDL, what ultimately gets decided

1    about -- about disclosures and limitations on those.

2         THE COURT:  Okay.

3         MS. ZIMMERMAN:  I think you -- you generally

4    understand, and I'm happy to answer any questions that you

5    have or forecast additional issues for the Court.  You've

6    had enough this morning it sounds like.

7         THE COURT:  Please don't.  Well, let me just tell

8    you where I -- where I am in terms of I -- how I think I'll

9    approach this whole issue.  I think that there's broad,

10   though not precise agreement between the parties, even on

11   what the general principles are here about what's proper and

12   not proper; maybe not.  But I plan to look very carefully at

13   each and every report and try and make a determination about

14   whether it's -- you know, is it specific to the case or

15   appropriate context, or is it really kind of a do-over.

16        MS. ZIMMERMAN:  Right.

17        THE COURT:  And that's what I think you're asking

18   me to do, and that's what I think I probably have to do.

19        MS. ZIMMERMAN:  Yeah, I'm sorry to put that burden

20   on the Court, but that is what we're asking.

21        THE COURT:  Yeah.

22        MS. ZIMMERMAN:  And I think I kind of envision

23   it like a -- I mean, I don't know if it would be helpful to

24   the Court the way we do before a trial when we sit down and

25   rule on objections in depositions or something.  We're happy

1    to assist in any way we can, but we do think that that --

2              THE COURT:  No, you've highlighted everything, and

3    that does assist the Court, but, okay.

4              MS. ZIMMERMAN:  And I'll obviously stand by to

5    answer any questions the Court may have.

6              THE COURT:  One other that's going to sound

7    frankly very picky, but some of the highlighting you've

8    given me is in different colors.  I am assuming that the

9    color of the highlighting is not of significance to the

10   argument; correct?

11             MS. ZIMMERMAN:  Yeah, not significant enough to

12   trouble Your Honor with it.

13             THE COURT:  Okay.  All right.  Thank you.

14             MS. ZIMMERMAN:  Thank you.

15             THE COURT:  Mr. Goss?  Ms. Harris?

16             MR. GOSS:  Thank you, Your Honor.  May it please

17   the Court.  So I'm here to tell you that you don't have to

18   do it.  You don't have to rewrite our experts' reports.

19             THE COURT:  You know I like him better now; right?

20             MR. GOSS:  You don't have to do it, and here's the

21   reason why.  So -- And there's been a lot of replowing of

22   old ground and talk of recasting and foreshadowing, but I

23   really want to focus on what's in front of the Court right

24   now.  And really the -- the key precedent to this motion is

25   the Court's prior motion on the David and Bushnell --

1    Plaintiffs' -- actually, Defendants' prior motion on the

2    David and Bushnell reports.  And what the Court ordered in

3    that case was not that general cause discovery is forever

4    set in stone, that these expert reports are forever set in

5    stone, that you can never cite an article in future reports

6    that you already cited somewhere else, or that you can't

7    bring in any new articles.  What the Court ruled, and Judge

8    Ericksen affirmed, is that you can't bring in an expert who

9    has major new opinions previously undisclosed.  So we were

10   confronting --

11            THE COURT:  On general causation?

12            MR. GOSS:  On general causation, right, and that's

13   an important distinction, because the reports that we

14   challenged previously really were not case-specific.  They

15   weren't specific to Nancy Axline's case.  David titled his a

16   supplemental expert report, and he raised these seven new

17   alternatives that he wanted to talk about.  And -- and

18   that's an important distinction because, as the Court

19   recognized at the time, we no longer had the opportunity to

20   get discovery from the manufacturers about -- about those

21   devices, and the feasibility of turning one of those things

22   into the Bair Hugger or vice versa, and that's really what

23   was going to be the issue to be tried.

24            So Dr. Jarvis issued a case-specific report in

25   Axline, and he talked a lot about general things.  He talked

1    about the McGovern study.  He talked about the CFD.  He

2    talked about Stocks and Darouiche.  But we took that to be

3    his analysis of those sources in the context of Ms. Axline's

4    case.  He also brought in a new article, and we didn't

5    challenge that report because it was a case-specific report.

6    We challenged the two that were not case-specific.  There

7    was David, which was, by its own terms, a supplement, and

8    there was Bushnell, which was -- everybody agreed was a

9    sur-rebuttal to Dr. Abraham.

10             So -- so I think, you know, there's --

11   Ms. Zimmerman talked about recasting specific versus general

12   causation discovery.  I don't think this order did that.  I

13   think what this order did was it said, here's a guy with

14   seven new opinions on a major issue that the trier is going

15   to have to decide, and we're on the eve of trial, so we're

16   not going to do that.  So that's the -- the scope issue.

17             THE COURT:  Let me stop you for a second.

18             MR. GOSS:  Sure.

19             THE COURT:  I think Ms. Zimmerman said that -- or

20   maybe I merely viewed it this way -- that when you compare

21   Dr. David to Dr. Mont, they are almost like they are on a

22   spectrum.  David comes in and says, Here are seven

23   additional alternative designs.  Dr. Mont says, Geez,

24   there's a number of risk factors.  She has these.  And those

25   are not entirely dissimilar, although I understand that

1    Dr. Mont's discussion of, for example, diabetes may not

2    apply and wouldn't be applied to Ms. Axline.

3              MR. GOSS:  Right.

4              THE COURT:  So here's the question, are those on a

5    spectrum?  Is there a line between them?  And is there a

6    disclosed general causation expert on your side of the case

7    that talked about all the risk factors for infection?

8              MR. GOSS:  The answer to the last question is --

9    is yes.

10             THE COURT:  And who is that?

11             MR. GOSS:  And so it was Dr. Mont, but also

12   Dr. Wenzel, and we didn't promise the jury that he would

13   come to trial.  Plaintiffs did.  But that's neither here nor

14   there.  Dr. Wenzel, Dr. Borak, and I couldn't point you to

15   the chapter and verse exactly, but I know diabetes came up,

16   so it's not a new issue.

17             THE COURT:  Okay.

18             MR. GOSS:  And the difference, it's a difference

19   in kind and not in degree.  Because the difference is

20   Dr. Mont is issuing a case-specific opinion about

21   Ms. Trombley who has diabetes.  He can't do a specific

22   causation analysis without addressing her diabetes.

23   Dr. Jarvis, in his case-specific report for Ms. Trombley,

24   addresses her diabetes, and he says, I ruled it out.

25             So -- Which that also gets to this question of

1    what's rebuttal and what isn't.  And we've been over this a

2    few times, but really what the rule says is what's rebuttal

3    and what's initial depends on the burden of proof, which

4    party has the burden of proof.  So it doesn't depend on

5    timing, and it doesn't depend on, oh, is this person

6    responding point for point to this person.  It depends on

7    the burden of proof.

8            And so what all of our experts are doing in their

9    Trombley case-specific reports is responding to things that

10   Dr. Jarvis says.  He talks about CFD.  He talks about the

11   heating, ventilation and air conditioning.  Now, he may or

12   may not have expertise in those things, but clearly he

13   intends to talk about them.  And unless Plaintiffs are going

14   to say, We're not going to show the CFD, we're not going to

15   talk about it, we have to be able to rebut it with -- with

16   Dr. Abraham.  And so what he is doing is -- is rebutting

17   Dr. Jarvis.

18           And -- and if the Court would like to hear, I can

19   kind of elaborate on Dr. Abraham's exuberant additions of

20   literature and why -- why that happened, why he's doing

21   that.

22           THE COURT:  I would.  Do you understand why --

23   what I -- Do you understand why I said what I said at the

24   beginning of this, that I was perhaps most troubled by

25   Dr. Abraham's report?

 1              MR. GOSS:  I do, Your Honor.  I do.

 2              THE COURT:  Okay.

 3              MR. GOSS:  Because he added a lot of citations,

 4      but here's the reason why.  When he testified at the Gareis

 5      trial, he wanted to talk about something that was in his

 6      rebuttal report where he said that the opening and closing

 7      of doors has a substantial effect on airflow in the

 8      operating room, okay.  And he was starting to testify about

 9      that, and then he wanted to talk about a study that was

10      cited in Dr. Elghobashi's initial report, but it wasn't

11      cited in Dr. Abraham's report.  And it's the Saarinen study,

12      a study out of Finland that actually did a CFD analysis

13      backed by a smoke experiment to show the movement of air

14      when a mannequin moves through a door and into a room, okay.

15      And Plaintiffs objected.  They said Rule 26, Your Honor, he

16      doesn't get to talk about that because it wasn't in his

17      report.  It was in Dr. Elghobashi's, but it wasn't in his,

18      so he doesn't get to talk about that.

19              And there was a lengthy sidebar.  I have the trial

20      transcript from that discussion.  But Dr. Abraham could see

21      that there was a chance he wasn't going to be able to talk

22      about this issue that was actually pretty significant to his

23      analysis of Mr. Gareis' -- specific causation in

24      Mr. Gareis's case, so -- and then ultimately the Plaintiffs

25      based -- one of their arguments for a new trial in Gareis

1   was that -- that his testimony about the Saarinen article

2   was allowed, and Plaintiffs said that that's -- it was a

3   violation of Rule 26, and -- and that it was prejudicial.

4           And so what the -- I have it here somewhere.  What

5   the Court ultimately ordered on the -- denied the motion for

6   a new trial, and on page 9 of the order, this is Document

7   No. 519, the Court said, Dr. Abraham's report did opine on

8   the phenomenon behind the Saarinen study, and she quotes his

9   initial report on that.  She notes that the admission of the

10  evidence was not prejudicial to Plaintiffs because the

11  meaning of the Saarinen study was painfully clear to

12  everybody that if you open a door, you can feel the wind,

13  it's going to have an impact on the airflow.  Okay.  So she

14  denies the motion for a new trial.

15          But this was a serious enough issue for Plaintiffs

16  to raise it in a lengthy sidebar during his testimony and to

17  base a request for a new trial in Gareis on it.  So he felt

18  compelled to come back and say, All right, you are saying I

19  didn't disclose enough.  Now I'm going to disclose a number

20  of articles that are going to address this point; so really

21  Plaintiffs, to some degree, invited the supplementation.

22          Now is he going to talk about each of these

23  studies at trial?  No, he's not.  Ultimately he just needs

24  to be able to show the evidence -- the scientific evidence

25  that opening and closing doors in a surgery like

1    Ms. Trombley's would -- would make a huge difference in

2    airflow and would make any air coming out of the Bair

3    flow -- Bair Hugger essentially irrelevant.

4            THE COURT:  Let me ask you this, do you have

5    accessible to you Dr. Abraham's report in this case?

6            MR. GOSS:  Yes, I do.

7            THE COURT:  So let's look at -- let's look at

8    page 18 of the report.  There's a bunch of pictures there in

9    green light -- or green-lighted conditions showing they are

10   stills from a video, I guess.

11           MR. GOSS:  Yeah.

12           THE COURT:  Flow visualization of recirculation

13   area under different shaped luminaries or luminaires.

14           MR. GOSS:  Oh.

15           THE COURT:  I would call those lights, but in any

16   event.

17           MR. GOSS:  Let's see, 18 -- Are you sure it's 18?

18           THE COURT:  Maybe not.  No, it's 5.  I'm sorry.  I

19   have -- I have it on a thing that also --

20           MR. GOSS:  Okay.

21           THE COURT:  -- gives me different numbers.

22           So --

23           MR. GOSS:  Yes, I see it.

24           THE COURT:  -- did Dr. Abraham, in his initial

25   report, talk about the effect of essentially lamps in the

1    operating room on circulation?

2            MR. GOSS:  Yes.

3            THE COURT:  And were these -- and now we're

4    getting really kind of nitty-gritty on this.  Were these

5    photos or this video discussed before?

6            MR. GOSS:  No.

7            THE COURT:  Okay.

8            MR. GOSS:  Not this article.

9            THE COURT:  So here's their point, I think, and

10   the reason I have concern or I'm not certain what to do

11   about Dr. Abraham is it seems like all of this stuff is not

12   case-specific but rather general and could have been

13   disclosed before, and so how isn't that just the same as, I

14   believe it was -- who was it other than Dr. David?

15           MS. ZIMMERMAN:  Yadin David or Nathan Bushnell.

16           THE COURT:  Yeah, why isn't this just like Nathan

17   Bushnell?

18           MR. GOSS:  Because it's not a sur-rebuttal for one

19   thing, and that's why Bushnell was excluded.

20           THE COURT:  It's a supplementation in your view?

21           MR. GOSS:  Well, it is.  It -- it's -- Well, what

22   it is is it's a further discussion of why lights matter.

23   There were surgical lights in Ms. Trombley's surgery.  They

24   were moved during the surgery.  And essentially what -- the

25   way I see Plaintiffs' argument, it's kind of like, well, you

```
1    know, you cited cases in support of your motions in the MDL,

2    so now when you bring motions in in Trombley, you won't be

3    able to cite those cases again.  Really, citing literature

4    is kind of like citing cases.  You don't boil the ocean the

5    first time you do it.  You may go back and you find

6    additional things that further support your point, but

7    really what I want to make clear is that this -- he ties

8    this to his analysis of Ms. Trombley's case of what would

9    have or could have happened in her OR.  So this is not --

10   this is not a report that we intend to submit as an MDL

11   report.

12             THE COURT:  Right.

13             MR. GOSS:  This is a case-specific report.  And

14   he's really again responding to Dr. Jarvis who says, yeah,

15   lights don't cause infections, cabinets don't cause

16   infections, nothing causes infections except the Bair Hugger

17   in terms of what was in that room, and this is Dr. Abraham,

18   again, elaborating on that in the context of her case; and,

19   again, with a view toward, he had this experience where he

20   almost didn't get to testify about certain things because

21   there was an argument about whether he had adequately

22   disclosed them.

23             THE COURT:  Got you.  Okay.

24             MR. GOSS:  Okay.

25             THE COURT:  Anything further, Mr. Goss, that we
```

1    should talk about?

2                MR. GOSS:  I will take a quick look at my notes,

3    but...

4                Oh, the only other thing I would say, Your Honor,

5    and this kind of goes to the lack of prejudice, so the *Aviva*

6    *Sports* case is kind of on point.  This is from 2011.  It's

7    829 F.Supp.2d 802 at page -- let's see -- I have the head

8    notes -- oh, 820 to 821.

9                THE COURT:  Okay.

10                MR. GOSS:  So there's -- This is in the context of

11    a summary judgment motion where the party resisting the

12    motion brought in new expert reports to respond to the

13    arguments made in favor of summary judgment, and there was a

14    motion to strike those -- those reports.  And what Judge

15    Ericksen said here is -- is that the other side argues that

16    these declarations are new opinions which were submitted

17    outside the discovery deadline.  The Court does not find

18    that these declarations contain new opinions, they contain

19    no new material information and present no opinions that

20    were not provided during discovery.  So, you know, that

21    supports the idea that it's okay to provide additional

22    support as long as you aren't opening up a new front on the

23    battlefield.

24                The other thing that I would --

25                THE COURT:  That's your point about Dr. David?

```
 1              MR. GOSS:  Yeah -- yes, sir.

 2              THE COURT:  Okay.

 3              MR. GOSS:  And the other thing I want to say is

 4    this isn't a situation where these reports, you know, come

 5    out and there's no opportunity to do any discovery about

 6    them.  We've offered depositions for each one of these

 7    experts.  Two -- two of them have been accepted.

 8    Dr. Abraham, we don't have an accepted date for him yet.

 9              THE COURT:  Okay.

10              MR. GOSS:  But there's an opportunity to explore

11    these things and decide how much they matter or don't

12    matter, so that -- that's my last point on it, Your Honor.

13              THE COURT:  Okay.  Thank you.

14              Yeah, go ahead, Ms. Zimmerman.

15              MS. ZIMMERMAN:  Thank you, Your Honor.  I want to

16    start kind of with this discovery piece at the end, because

17    I think one thing we've missed a few times, and this is --

18    I'll take this on myself with respect to Yadin David,

19    discovery on general causation issues concluded the day that

20    we provided our reports, so the notion that any reasonable

21    alternative design that was identified by Yadin David that

22    they would have had the opportunity to do discovery on it,

23    that's just false.  I mean, discovery was closed that day.

24    So I appreciate that that's kind of touching back on this --

25    the order and the dispute we had in the fall, but it's not
```

1     actually that they would have had the opportunity to do

2     discovery on these third-party witnesses or companies that

3     had other products, and, by the way, they were known very

4     well to the Defendants.  Mr. Goss referred to Dr. Jarvis'

5     report -- the case-specific reports he's done in Gareis and

6     Axline and now in Trombley, and you are right, and he's

7     right, they definitely -- he cites back to McGovern, but

8     that was cited in his general causation report.  And so they

9     have had, you know, multiple depositions now to explore his

10    opinions with respect to how McGovern, you know, addresses

11    the general causation piece, and then get into what they

12    really think about the case-specific opinions that he's

13    offering.

14          Abraham is a different boat altogether.  Mr. Goss

15    makes the argument that Dr. Abraham was nearly excluded from

16    providing testimony.  Yeah, that's right.  It wasn't in his

17    report, despite the fact that apparently Dr. Abraham thought

18    that this was so specific and critical to his analysis, so

19    specific and critical, but it wasn't cited anywhere in his

20    report; so, yeah, we -- we made a motion, and we did have a

21    sidebar that said he shouldn't be allowed to use this --

22    this report and this video that he had never talked about.

23    And we still think that was error, and I appreciate that --

24    you know, that that's an issue before the Eighth Circuit at

25    this point.  But the Plaintiffs are entitled to know what

1     the Defendants' experts are going to testify about at trial,

2     and we are entitled to explore the basis for that so we can

3     bring appropriate motions and figure out both at the *Daubert*

4     stage, if necessary, or motions in limine, or, you know,

5     during trial objections about foundation, and that's

6     absolutely something we're entitled to do.

7           So I really do think that, you know, as we compare

8     kind of Mont and Yadin David, you know, if you look at their

9     general causation reports, you know, Mont then -- you know,

10    what should he have in there if he's going to opine on risk

11    factors that may predispose someone to an infection.

12    Shouldn't he have a generalized discussion, I guess, if

13    there are risk factors out there?  Opioids is new in

14    Trombley.  He hadn't talked about opioids before.  Diabetes,

15    I mean, that's not exactly some sort of rare condition.

16    There's a tremendous number of people in the population that

17    suffer from diabetes.  We think that any opinions about

18    diabetes and the role that may play in general causation

19    ought to have been disclosed back then, and that attempts to

20    put in 10 or 15 or 20 new articles on each of these things,

21    that that's not timely, and it shouldn't be permitted.  So I

22    appreciate the Court's time today, and obviously happy to

23    answer any questions you may have.

24          THE COURT:  So now I hear your argument a little

25    bit differently, but maybe in addition to what I said

1    earlier, you are saying, in a sense, that Dr. Mont is like

2    Dr. David because Dr. Mont is saying there are risk factors,

3    and here they are as they apply to Ms. Trombley?

4              MS. ZIMMERMAN:  Yes.

5              THE COURT:  And then he identifies risk factors

6    that weren't disclosed, at least according to your argument

7    before; right?

8              MS. ZIMMERMAN:  Yes, Your Honor.

9              THE COURT:  And so Dr. David said, there are

10   reasonable alternative designs.

11             MS. ZIMMERMAN:  There's a couple.

12             THE COURT:  And here's a couple, and now I want to

13   tell you --

14             MS. ZIMMERMAN:  Yeah.

15             THE COURT:  -- there's seven other ones?

16             MS. ZIMMERMAN:  Yep.

17             THE COURT:  Okay.  Okay.  This case is set for

18   trial May --

19             MS. ZIMMERMAN:  May 13th, I believe.

20             THE COURT:  May 13th?

21             MS. ZIMMERMAN:  Yes.  And Your Honor had given us

22   through, I think -- anticipating -- I don't know if you are

23   able to rule from the bench today, but that we will have I

24   think until the 21st to complete depositions on this.

25             THE COURT:  Of this month?

 1            MS. ZIMMERMAN:  Of this month, like two weeks.

 2            THE COURT:  Yeisch (phonetic).

 3            MS. ZIMMERMAN:  Abraham is at least local.  I

 4    can't speak to his schedule, but he is here.  He's at

 5    St. Thomas, so he's a little bit closer, and I don't know

 6    that we're going to take the depositions of all these folks,

 7    but it depends on --

 8            THE COURT:  Right.  Here's what I would say --

 9    Shoot.  To the extent that we don't get the order out as

10    quickly as we did in the -- in the other motion in Axline,

11    if I allow, right, you gotta have the opportunity to depose

12    them.  And I know that that's not always a great solution

13    because, of course, you've got that thing called trial

14    coming up; but to the extent that it helps, rest assured

15    that if -- if we get the motion out, and it's the 20th, and

16    we say, yeah, Dr. Mont is in, you don't have to depose him

17    the next day.  We'll figure that out.

18            MS. ZIMMERMAN:  Thank you, Your Honor.

19            THE COURT:  Okay.

20            MS. ZIMMERMAN:  And it's not our expectation that

21    Dr. Mont obviously would be excluded completely.

22            THE COURT:  Right.

23            MS. ZIMMERMAN:  But, you know --

24            THE COURT:  But what opinions or what he can say,

25    understood.

 1                    MS. ZIMMERMAN:  Yeah.

 2                    THE COURT:  Okay.

 3                    Yep, Mr. Goss.

 4                    MR. GOSS:  So a date has been accepted for

 5        Dr. Mont's deposition.

 6                    THE COURT:  Okay.

 7                    MR. GOSS:  Obviously we can meet and confer if

 8        that needs to change, but I think it's the 21st -- --

 9                    MS. ZIMMERMAN:  I think that's right.

10                    MR. GOSS:  -- is the date that's been accepted.

11        And then the only other thing I want to just be -- make sure

12        I'm clear on is Dr. Jarvis says in his report, I ruled out

13        diabetes.

14                    THE COURT:  Right.

15                    MR. GOSS:  So Dr. Mont has to be able to respond

16        to that in some fashion.

17                    THE COURT:  Understood.  Okay.  Anything further

18        we need to talk about today?

19                    MR. GOSS:  I wasn't prepared to talk about

20        anything else, Your Honor.

21                    MS. ZIMMERMAN:  I don't think so.  Thanks.

22                    THE COURT:  All right.  What I would say in

23        general, I think following up on Ms. Zimmerman's point, is

24        it -- it might make some sense for the parties to confer on

25        some kind of general ground rules.  Yes, you can cite to

```
 1     reports issued at this time or something like that.  It

 2     certainly would be a productive discussion in my view.

 3               MS. ZIMMERMAN:  We're happy to do that,

 4     Your Honor.

 5               MR. GOSS:  Yeah, sure.

 6               THE COURT:  Okay.  Okay.  Thank you.  Court is in

 7     recess.

 8               MR. GOSS:  Thank you, Your Honor.

 9               THE LAW CLERK:  All rise.

10        (Court adjourned at 12:02 p.m.)

11                         *      *      *

12

13

14          I, Erin D. Drost, certify that the foregoing is a

15     correct transcript from the record of proceedings in the

16     above-entitled matter.

17

18               Certified by:  s/ Erin D. Drost

19                              Erin D. Drost, RMR-CRR

20

21

22

23

24

25
```