1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
2

3     ------------------------------------------------------------
                                    )
      In re:  Bair Hugger Forced Air )  File No. 15-MD-2666
4     Warming Devices Products       )          (JNE/DTS)
      Liability Litigation           )
5                                    )
                                     )  Minneapolis, Minnesota
6                                    )  May 28, 2019
                                     )  11:30 a.m.
7                                    )
                                     )
8                                    )
      ------------------------------------------------------------
9

10          BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                    **(STATUS CONFERENCE)**
11

12    **APPEARANCES**
        **For the Plaintiffs:**        **MESHBESHER & SPENCE**
13                                      **GENEVIEVE ZIMMERMAN, ESQ.**
                                        1616 Park Ave.
14                                      Minneapolis, Minnesota 55404

15      **For the Defendants:**         **BLACKWELL BURKE, P.A.**
                                        **BEN HULSE, ESQ.**
16                                      **DEBORAH LEWIS, ESQ.**
                                        431 S. 7th St., #2500
17                                      Minneapolis, Minnesota 55415

18      Court Reporter:               DEBRA BEAUVAIS, RPR-CRR
                                      300 S. 4th St., #1005
19                                    Minneapolis, Minnesota 55415

20

21

22        Proceedings recorded by mechanical stenography;
      transcript produced by computer.

23

24

25

1          **P R O C E E D I N G S**

2              **IN OPEN COURT**

3              THE LAW CLERK:  All rise.

4              THE COURT:  Good morning.  Please be seated.

5              All right.  Good morning, everyone.  I guess we're

6      going to do these on the record.  We are on the record in

7      the Bair Hugger MDL, MDL No. 15-2666.  Counsel for the

8      plaintiff, if you would note your appearance for the record,

9      please.

10             MS. ZIMMERMAN:  Yes.  Good morning, Your Honor.

11     Genevieve Zimmerman for plaintiffs.

12             THE COURT:  Good morning, Ms. Zimmerman.

13             And for the defendants.

14             MS. LEWIS:  Good morning, Your Honor.  Deborah

15     Lewis for defendants.

16             THE COURT:  Ms. Lewis.

17             MR. HULSE:  Good morning, Your Honor.  Ben Hulse.

18             THE COURT:  Mr. Hulse.

19             All right.  So let me begin by saying I may have

20     misunderstood, but I was under the impression that the

21     parties wanted to have sort of regular discovery-related

22     kind of informal conferences, and so I thought we'd go ahead

23     and do that, but did I misunderstand?

24             MS. ZIMMERMAN:  No, Your Honor.  Certainly from

25     the plaintiffs' perspective we welcome the opportunity to

1    engage with the Court and try to continue to move the case

2    along, adjust things speedily.

3           MR. HULSE:  Your Honor, it's not something that

4    the defendants had asked for.  Our thought is it's something

5    that might be of greater utility once we have a

6    determination from Judge Ericksen.  It is good to check in

7    on bucketizing certainly, but also in terms of -- you know,

8    we did reach out to plaintiffs' counsel with some

9    bucketizing issues that we wanted to potentially resolve

10   before seeing you here today.  For whatever reason, we

11   didn't get a response.  And no other issues have been raised

12   today, other than those that the Court put on the agenda.

13          THE COURT:  Okay.  Well, let's start with my

14   agenda.  So on the plaintiffs' motion to strike their expert

15   reports, I'll just be up front with you.  The only reason we

16   wanted to do it is -- and we were a good ways down the line

17   toward having a ruling on it when Judge Ericksen issued her

18   order on the reconsideration, and I don't know how long that

19   process will take, but if it goes into September, whatever,

20   we'll be jammed up in terms of our administrative

21   requirements.  Our thought was it would be better, frankly,

22   to hold our order, to find out, because there seems to be at

23   least potential for overlap.

24          So our request was would you withdraw -- you can

25   refile it again tomorrow.  It just takes it off the

1       six-month clock, is what it does.

2               MS. ZIMMERMAN:  Absolutely, Your Honor.  In fact,

3       my office is filing a letter today that will withdraw the

4       motion at the Court's request.  If and when we get to a

5       point to rebring the motion, we'll do that.

6               THE COURT:  Yeah.  I've only asked one other party

7       to do this once and it made them extremely nervous, so they

8       refiled it the next day, which is fine.

9               MS. ZIMMERMAN:  We won't do that.

10              THE COURT:  Okay.

11              MS. ZIMMERMAN:  But we will at least note in our

12      letter that we reserve the right to do so as the Court has

13      observed is our opportunity.

14              THE COURT:  Okay.  Second thing, I guess, on my

15      agenda was if you, Ms. Zimmerman, would remind some of the

16      plaintiffs' counsel that we actually do want them to engage

17      the meet and confer process a little bit more fully than

18      they are.  It's like motions to seal; it's the last thing

19      you're all of a sudden remembering they have to do.  But

20      it's best that they meet and confer in advance of the motion

21      and have an actual meet and confer.

22              MS. ZIMMERMAN:  Just for my information, as I can

23      get the information out to other counsel, are they troubling

24      your chambers with questions or people are not filing the

25      meet and confer statements they should or --

1          THE COURT:  No.  No.  What's happened we've seen

2      on a couple of situations out-of-town counsel has maybe sent

3      an email at 9:00 a.m. saying we assume you don't want to go

4      along with us on this and then they file their motion at

5      10:00.  They need to do a little bit more than that.

6          MS. ZIMMERMAN:  Oh.  Certainly.  As that's been an

7      issue, I will reach out and remind people of that.

8          It has come to my attention a few times lately

9      after the fact that counsel from both Minneapolis and

10     elsewhere are calling your chambers with questions, and so

11     we're trying to streamline that and at least have one point

12     person so as to minimize traffic on your end.  So whatever

13     we can do to be helpful we're happy to do.

14         THE COURT:  Okay.  That would be great.  Thank

15     you.

16         Along those lines, having nothing to do

17     specifically with this case, but it came up in some other

18     matter:  Apparently, when you file a letter on ECF, you get

19     this practice tip or filing tip that says you don't do that

20     without calling for permission, and so we get a lot of calls

21     from people saying can I file a letter.  In fact, that's

22     neither the local rule nor my practice pointer.  That

23     message is generated by the AO out in D.C.  At one point, I

24     think I told you guys to do a certain thing, I don't

25     remember what it was, but just for your future edification,

1    if you file a letter, unless it's a letter requesting

2    reconsideration, you don't need permission to file it on

3    ECF, so you can blow through that stop sign.  Okay?

4            MS. ZIMMERMAN:  All right.

5            THE COURT:  All right.  So then the last thing on

6    my agenda, which is really your agenda -- and I brought

7    copies in case you don't have them -- is I wanted to go

8    through the categorization order and see what questions we

9    have and what we need to deal with.

10           The most important thing, from my perspective, was

11   just this last form on getting you to agree what the

12   disagreement is about the statute of limitations.  This last

13   form, it would apply to those states where the defendant

14   believes there is no discovery rule, but the plaintiffs say

15   that there is either a discovery rule or something akin to

16   it.  And I just want to have a list of those so that we can

17   track them.  But, you know, you don't have to -- I don't see

18   that as a lot of -- you know, that there's a lot of meeting

19   and conferring to do on this.  You agree to disagree and

20   reflect that on the document.  So that was my only comment.

21           Mr. Hulse, you submitted a bunch of questions.  Do

22   you want to go down your list or how do you want to do it?

23           MR. HULSE:  And I defer to Ms. Lewis on our

24   bucketizing point.

25           MS. LEWIS:  Your Honor, before I start going

1    through the list of things we wanted clarified, can I just

2    confirm on the record the particular states that will go on

3    your list, because we added -- defendants added a state to

4    the statute-of-limitations list and that was the State of

5    Michigan.

6             So, just briefly, there are 12 states:  Alabama,

7    Delaware, Idaho, Kansas, Maine, Michigan, Nebraska, New

8    York, North Carolina, North Dakota, South Dakota, and

9    Virginia.  And these were the states that were submitted to

10   the Court when we sent that list of limitations information.

11   So I just wanted to make sure that on the list Michigan was

12   stated in the record and will be a part of that list.

13            Also, with respect to this same chart, this is not

14   an issue that I put on the list of clarification, but if I

15   may bring it up.  Your chart has, at least for the discovery

16   rule:  Does the state have a discovery rule?  The question

17   with the parties in the data that we previously submitted

18   was -- there were, I think, three states where both parties

19   agreed there was no discovery rule, and we'll reflect that

20   data in the chart.  But it seems like the hang-up had to do

21   with those states in which plaintiffs cited a case that was

22   based on a toxic tort-type matter -- asbestos, benzene --

23   and we're wondering if this could be clarified or tweaked

24   somewhat so that maybe the question could be:  Does the

25   state have a discovery rule for non-toxic tort cases?

1              THE COURT:  Yeah, I understand your point.  You

2       would say in those -- the defense would say in those

3       circumstances no.  The plaintiffs are answering a slightly

4       different question, I think, which is we believe that those

5       cases relating it to toxic torts apply or should apply to

6       this kind of case.

7              So I guess what we need to accomplish, I think, is

8       some clarity in that.  Maybe we should add a column for a

9       comment or something for each side.  If I use a simple chart

10      and you answer it one way and they answer a different

11      question the other way, we'll end up confounding ourselves.

12             MS. LEWIS:  Correct.  The cases that plaintiffs

13      cited to us that is in the chart that we submitted to the

14      Court, those are the cases on which plaintiffs rely.  And

15      all those cases are either asbestos or benzene or some toxic

16      tort case, except for one case in New York which was an

17      AIDS/HIV.  Some of the states it's actually within the

18      statute itself.

19             So we agree that there should be some way to

20      clarify is there any authority that plaintiffs have for a

21      non-toxic tort case, because for all those states that are

22      listed if all they could find are asbestos-type toxic tort

23      cases, then that's where the discovery rule would not apply

24      in this case, because Bair Hugger with an infection is

25      nowhere near a toxic tort-type case.

1      THE COURT:  I understand what you're saying.  I

2 think what we're trying to get to is -- I don't want to

3 short the argument -- if the plaintiffs say, yeah, we admit

4 that this precedent is only related to toxic tort, but we

5 want the right to argue that it would be by logic applying

6 here, I think they have the right to do that.

7      So I think the most we can accomplish with the

8 chart is sort of laying out the battle lines.  Then we have,

9 long time down the road maybe, a question of whether those

10 disputes about whether there's a discovery rule or not,

11 maybe those get resolved on a statewide basis.

12      So if the plaintiffs say no, Alabama does have a

13 discovery rule, the defendants say no, it could be that

14 there is some efficient way of resolving that issue sort of

15 statewide so that it either applies a discovery rule or it

16 doesn't to all of those cases.

17      So how do you think -- I should hear from

18 Ms. Zimmerman as well, but how do you want to modify this so

19 that we can track it and understand?  Your argument is a

20 fair one; there's a discovery rule, but not for these kind

21 of cases.  They'll say otherwise.  But how do you want to

22 track it?

23      MS. LEWIS:  I don't know if we continue to do

24 separate submissions as we've done before.  If that's the

25 case, we've already submitted that data in which plaintiffs

1  on their column put the cases in which they relied on.  And

2  in defendants' column we've cited either the statute or the

3  cases that said there is no discovery rule and the exception

4  to the no-discovery rule is in toxic tort-type cases.

5          So I'm thinking that if we just answered simple

6  yes or no, there's not going to be an agreement.

7          THE COURT:  Right.

8          MS. LEWIS:  It seems like the only solution is to

9  continue separate submissions.

10          THE COURT:  Well, and I'm not intending that

11  you're going to agree on this chart.  So, for example, let's

12  just fill in the first line:  State is Alabama.  Statute of

13  limitations period is two years let's say.  Does the state

14  have a discovery rule?  Plaintiffs would put a "P" in the

15  "yes" column.  Defendants would put a "D" in the "no"

16  column.

17          So I wasn't intending that you guys are going to

18  agree on this.  Maybe I'm overthinking this.  Maybe what we

19  ought to do is -- I have the information from you.  I can

20  fill this out and circulate it to the parties and you can

21  just say, yeah, this reflects what our state of the

22  knowledge is.

23          MS. LEWIS:  We'd be happy to do that if that would

24  be okay with Your Honor, for plaintiff to put a "P" in the

25  column in which they say yes or no.

1      THE COURT:  And then let's make a -- we'll add a

2  seventh column for comments so that we understand where the

3  dispute lies.

4      MR. HULSE:  Maybe we should agree to just be

5  limited in the comments, too, so that it doesn't turn into a

6  take-home essay and then each side can put a sentence either

7  way, just so we can remember what the dispute was about.

8      THE COURT:  Right.  That's all we're trying to do,

9  is get a placeholder here.  Can you all do that?

10      MS. ZIMMERMAN:  Yes, I think we can, Your Honor.

11  I appreciate the Court's observation that we could do

12  something as simple as putting a "P" or "D" into the columns

13  instead of a check mark.  I think that's probably

14  accomplishing what we're trying to do here.

15      It was our understanding from our last meeting

16  that the kind of full briefing, to the extent we ever get to

17  that, is going to be down the road a ways.  Certainly I'm

18  sure defendants would not concede that they have submitted

19  all the arguments they intend to make to Your Honor, and

20  likewise we would certainly expect that it would be more

21  robust briefing.  To the extent that the purpose of this

22  exercise is just to understand more about the universe of

23  cases -- where they come from, what we think may be

24  happening -- I certainly think we can do that with the chart

25  you prepared.

1          THE COURT:  Okay.  And I think if there are --

2    defendants mentioned that there are three states where the

3    parties are in agreement, and if that's the case, then we

4    revert back to what we had previously tried to categorize.

5    In those cases where there is clearly no discovery rule, use

6    the prior categorization.  And I guess I had forgotten that

7    there were three states where the parties agreed on that.

8          MS. LEWIS:  Very good.  With respect to --

9          THE COURT:  By the way, can you make sure your

10   microphone is on.

11         MS. LEWIS:  It is, but I will speak louder.

12         THE COURT:  Debra is not complaining, so I think

13   we're probably okay.

14         MS. LEWIS:  Let me ask this question before I get

15   off of the discovery rule:  For those three states where the

16   parties agree, after we fill out this chart, shall we go

17   ahead and start the timetable or the time ticking for when

18   we submit to plaintiffs and plaintiffs respond back?

19         THE COURT:  Yes.

20         MS. LEWIS:  Okay.  For the fraudulent concealment,

21   which was an issue at the last hearing, your chart says,

22   "Does the state recognize fraudulent concealment?"  And we

23   gave our position last time, Your Honor, on how we just

24   thought that was not sufficient information maybe.  We had

25   another maybe suggestion to the Court either to have another

1    column or something to maybe point out an essential element

2    or two.  For example, for any state that recognizes the

3    doctrine of fraudulent concealment if reliance is a

4    requirement to establish, could we maybe have a column that

5    says:  Is reliance an element that must be established?

6           THE COURT:  I'm going to answer that by not

7    answering it.  Remind me in the three states that don't have

8    a discovery rule was there an allegation of fraudulent

9    concealment?  In other words, is that a doctrine that's

10   recognized in those three states?

11          MS. LEWIS:  I believe so.

12          MS. ZIMMERMAN:  Yeah.

13          MR. HULSE:  I would say Alabama -- you know, we

14   had our briefing in the 12(c) motion, which led to the

15   dismissal.

16          THE COURT:  Right.

17          MR. HULSE:  And that was a state where there's no

18   discovery rule.  Plaintiffs argued fraudulent concealment.

19   We came back and argued that under Alabama law the plaintiff

20   actually has to rely on an affirmative misrepresentation by

21   the defendant.

22          THE COURT:  Right.

23          MR. HULSE:  And that's the element that under the

24   pleadings couldn't be met.  So that's why Ms. Lewis is

25   bringing this up, is it's a fighting issue we see in

1     fraudulent concealment, is whether there is that reliance

2     element required.

3              THE COURT:  Right.  Yeah, I remember now.

4              MS. LEWIS:  We're just wondering if we could have

5     an extra column that says:  Is reliance an element to be

6     established?  And you could say yes or no.

7              THE COURT:  Let me ask you this:  I remember

8     reading *Partlow*.  Is there from the defense perspective some

9     additional fighting issues beyond reliance in that

10    circumstance?  In other words, what this is now reminding me

11    is that I think I had given up the idea that we could

12    efficiently categorize the cases in such a way to dispose of

13    some and definitively rule some in on the basis of the

14    statute of limitations.  And this is reminding me that even

15    in those states where there wasn't a discovery rule there

16    was still a fraudulent concealment issue.

17             MR. HULSE:  Right.

18             THE COURT:  Okay.

19             MR. HULSE:  What we're trying to do maybe is see

20    if we can salvage at least a little bit of a path for a

21    subset of cases toward potential disposition and cases that

22    would, basically, have the same -- they are either Alabama

23    cases or cases that had a similar legal regime to Alabama.

24    It would identify those cases or for motion practice allow

25    *Partlow*.  But if we're not looking to accomplish any of that

1    statute of limitations as you proposed, that's a different

2    issue.

3              THE COURT:  I think -- go ahead, Ms. Zimmerman.

4              MS. ZIMMERMAN:  The problem, first of all, I think

5    the Court knows, respectfully, we think *Partlow* was decided

6    wrongly.

7              THE COURT:  Right.

8              MS. ZIMMERMAN:  Additionally, with *Partlow* we had

9    depositions of the treaters, of people from the hospital

10   about what they had heard from 3M.  So to the extent that

11   3M's argument is plaintiffs must establish reliance, it is

12   not something that we are going to be able to dispose of all

13   Alabama cases on without discovery.

14             So I understand respectfully that they want to

15   bounce all of Alabama.  We can't do that without the

16   discovery that these people are entitled to take, which they

17   are presently estopped from taking.

18             MR. HULSE:  Well, *Partlow* was decided on a motion

19   for judgment on the pleadings.  It wasn't based on the

20   discovery record.  So it's certainly true we had discovery

21   at that point.

22             MS. LEWIS:  But we also have information, Your

23   Honor, from the plaintiff fact sheets that would answer that

24   question.

25             THE COURT:  Okay.  Well, here's what I think we

1    should do:  I am certainly not going to decide today that

2    there's any of these cases that can be disposed of without

3    individualized briefing or discovery.  I'm not going to

4    decide that.

5           I think if you want to -- my knowledge of

6    fraudulent concealment doctrine is spotty.  If there are a

7    standard list of elements -- reliance, something,

8    something -- I am fine with you defining on this chart what

9    elements are required in that particular state.  But don't

10   get your hopes up that somehow this is going to allow for

11   statewide dismissals or category dismissals, because I think

12   it's likely to be pretty plaintiff specific.  But

13   information will help us, I think.

14           MS. ZIMMERMAN:  And so then would it be -- if we

15   add the column for comments that Ms. Lewis requested, are we

16   going to be then limited -- Mr. Hulse requested it be a

17   limited submission.  Right?  We're going to do a sentence or

18   two about reliance?

19           MS. LEWIS:  I mean, we can just --

20           THE COURT:  I don't actually want you to argue

21   whether there's reliance or not in an individual case.  You

22   can identify the elements -- reliance, you know, material

23   omission, whatever the --

24           MS. LEWIS:  Affirmative act.

25           THE COURT:  -- plain vanilla elements are.

1            MR. HULSE:  Reliance and affirmative

2      misrepresentation, those are the two we would include.

3            THE COURT:  Right.  Okay.  And, you know, there

4      again make the columns -- if you want to revise this chart,

5      that's fine.  I think we have to -- what I had tried to do

6      with these columns were have both a "yes" and a "no" so that

7      if the parties agree on it, it's a check mark.  I don't

8      think I communicated this particularly well, so I'm sorry.

9      If the parties disagree, you put "plaintiff" or "defendant"

10     in your column so that we can see where the fighting issues

11     are.

12            MS. LEWIS:  Sure.

13            THE COURT:  So is that sufficient guidance,

14     Ms. Lewis, or not?

15            MS. LEWIS:  On that chart, yes, sir.

16            THE COURT:  Pardon me?

17            MS. LEWIS:  For the chart, yes.

18            THE COURT:  Okay.  So will you then -- let's do it

19     this way:  You revise this particular chart but circulate it

20     to the plaintiffs and to the Court.  No funny stuff.  All

21     right?

22            MS. LEWIS:  Not at all, Your Honor.

23            THE COURT:  All right.  Does that take care of the

24     statute of limitations?

25            MS. LEWIS:  Let's see.  I believe so.  I'm looking

1      down the list of items we submitted to the Court Friday for

2      clarification, and I think that answers Question 5, which

3      was -- no, I'm sorry -- yeah, it does, which had to do with

4      -- I think it answers maybe 5 and 6, which 6 was for the

5      chart how the parties are to submit the information.

6              And the due date will be -- will it be 30 days

7      from the last order?  So that would be June 17th?

8              THE COURT:  Well, let's get the form -- 30 days

9      from the finalization of the form of the chart.

10             MS. LEWIS:  Okay.  Very good.

11             MS. ZIMMERMAN:  I'm happy to jump ahead and report

12     that we circulated, essentially, a master spreadsheet for

13     folks to fill out across the country on all these cases

14     quite awhile back.  And I think at this point there are at

15     least 40 firms that have submitted even the proof of use and

16     statute stuff.  And it comprises several thousand cases so

17     far.  And my information from this morning is that bucket

18     one is looking to be somewhere around 55, 60 cases.  That's

19     the non-use one.  And, as the Court expected, the rest of

20     them are falling into the other categories.  Obviously, not

21     everybody has completed the task yet, but folks have been

22     submitting their information to Ms. Lewis and to myself, and

23     I think that we should be able to get all of the information

24     in in a timely manner.  Hopefully, we can continue to press

25     forward on this.

 1          THE COURT:  Okay.  That's great.  My intention

 2    with respect to the things that weren't affected by the most

 3    recent changes is that we keep that deadline.  But, again, I

 4    recognize I introduced an ambiguity on that.

 5          MS. ZIMMERMAN:  I think we can work with that.  I

 6    think counsel will be -- so just to give the Court a little

 7    background on how we've been doing this, we provided a

 8    spreadsheet to everybody and some basic instructions and

 9    Your Honor's order.  And just as everybody has filled out

10    plaintiff fact sheets across the country for their

11    individual plaintiffs, they have filled out their own

12    spreadsheets.  Ms. Lewis and counsel for defendants, they

13    would prefer that there be one uniform submission, I gather

14    prepared by myself or plaintiffs' lead counsel, but they

15    have been getting individual spreadsheets from everybody as

16    they get individual fact sheets from everybody.

17          I know a number of people on kind of my side of

18    the view would think that it's reasonable that one at a time

19    these spreadsheets come in.  I'm happy to work with defense

20    counsel to prepare a single spreadsheet so that we can all

21    be operating from the same kind of playbook as it was,

22    because I think that that's going to be more helpful for

23    both parties and the Court as we look at this.

24          THE COURT:  I do agree with that.

25          MS. ZIMMERMAN:  But I do think that we should have

1    most of the information hopefully pretty quickly.  We have

2    not suggested to people they have extra time.  We thought

3    that might persuade them to get their information in

4    promptly.

5              We will provide a response on the statute of

6    repose.  I believe that was due tomorrow.  We will exchange

7    that information with you by then.  And then we'll finish up

8    the statute-of-limitations information on those buckets

9    hopefully in the next couple of weeks.

10             MR. HULSE:  And, Your Honor, from our perspective,

11   if some additional time I think for the plaintiffs if

12   they're going to collate this information from the various

13   firms that we would be fine with it.  That's been our key

14   concern, is we're getting, you know, hundreds of different

15   spreadsheets on different days.  Some seems consistent with

16   the order.  Others there are quality control issues with.

17   We would look to plaintiffs' counsel to gather them, ensure

18   that they're compliant with the Court's order, and then get

19   them to us uniformly.  I think that's going to save us a lot

20   of time versus having to piece through hundreds of different

21   spreadsheets.

22             MS. ZIMMERMAN:  So the one piece to that that I

23   guess from the lead counsel's position is that we are not in

24   a position to verify everybody's -- I mean, I can gather

25   them.  They are sending me copies of their proof-of-use

1     documents and what's in a spreadsheet, but, frankly, the

2     idea of going through 5,500 cases and checking to see if

3     their math is right, that's too big of a project.

4             MS. LEWIS:  And we're not asking plaintiffs to

5     verify certainly, but we just want to be able to look at a

6     chart to say here are all the possible cases so that we can

7     say which ones are missing.

8             THE COURT:  Right.

9             MS. LEWIS:  Which ones have not submitted any

10    information.  So we were hoping maybe just a chart that

11    lists all the plaintiffs' names in alpha order.

12            MS. ZIMMERMAN:  You can sort them any way you

13    want.

14            MR. HULSE:  We understand what they're offering

15    here, this would come together in the three spreadsheets.

16    The reason we raise this is not ever expecting leadership

17    that they would verify, go down into the medical records and

18    so forth.  But, for example, there are some firms that are

19    confused between two and three, buckets two and three.  This

20    stuff is bound to happen.  It would probably save time if

21    they catch it, rather than us engaging in meet and confers

22    with --

23            MS. LEWIS:  140 some firms.  147 law firms.

24            MR. HULSE:  Right.

25            THE COURT:  Okay.  I'm not hearing a violent

1    disagreement between you.  I agree, first of all, there is

2    no sense in which the Court is expecting the plaintiffs or

3    the leadership to verify the information.

4            MS. ZIMMERMAN:  We appreciate that.

5            THE COURT:  Yeah.  But I do think it probably

6    falls on your shoulders to collate the information into a

7    proper form.

8            MS. ZIMMERMAN:  Yep.  Happy to do that.  What we

9    did is really one spreadsheet with multiple tabs.  So each

10   firm has all of their cases and there's a bucket one, and a

11   bucket two, and a bucket three.  And it may well be that

12   people have not filled it out the way we suggested, but

13   we'll work on getting that.

14           THE COURT:  Will they be sortable so that it can

15   be -- like alphabetical?

16           MS. ZIMMERMAN:  Yeah.  Absolutely.  You should be

17   able to sort by -- we've even asked that they do the latency

18   and injury stuff at the front-end, because if they are going

19   through all their files at once, maybe not a big deal if

20   somebody represents four plaintiffs.  There are some firms

21   that represent a thousand, so it's a bigger project.

22           THE COURT:  Right.  That's a big deal, yeah.

23           MS. ZIMMERMAN:  But, yeah, we're happy to help

24   coordinate that.

25           MR. HULSE:  I do think we need to make sure we're

1    -- I think we're in agreement, but that we're in agreement

2    on the same thing.  What plaintiffs have done -- and this is

3    good to a degree -- is created a template that they have

4    then sent out to the 100 plus plaintiffs' firms.  However,

5    they have been sending us individual sets of spreadsheets.

6    That is for us what we think is not working and why this has

7    gone a bit off the rails.

8            What we're looking for is, again, for the

9    plaintiffs to collate that information into a single set of

10   spreadsheets that will cover as best as possible the

11   entirety of the MDL.

12           THE COURT:  Right.  I think they're going to do

13   that.  Yeah.  But I also hear them saying we've sent you

14   those so that you can see where things are going.

15           MS. ZIMMERMAN:  Right.  Right now you have a

16   jumpstart.  At least 39 of the firms have sent the

17   information to you.  And if you want to read it, you can

18   read it.  If you don't want to read it --

19           MR. HULSE:  And it is helpful to us to the degree

20   we can see what some of the recurring issues are.

21           THE COURT:  Right.

22           MR. HULSE:  But we just want to be clear that it's

23   not plaintiffs' expectation that the clock -- our 60-day

24   clock is running from each of those individual emails that

25   we're getting from plaintiffs' counsel, that our 60-day

```
1    clock is going to run from receipt of the collated

2    spreadsheet.

3              THE COURT:  Right.  And, look, I put some

4    aggressive deadlines in here.  I recognize that you're

5    herding a lot of cats and a few other animals as well.  But,

6    yes, your time period runs from when the plaintiff completes

7    their side of it.  Just as theirs runs from when you

8    complete your side of it.

9              MS. LEWIS:  Right.

10             THE COURT:  And so but what I'm hearing from --

11   and this is more a matter of just curiosity than anything --

12   so far we're looking at about two percent of the cases fall

13   into that category of don't have any information on product

14   ID?

15             MS. ZIMMERMAN:  That's the information I have this

16   morning.  So it's certainly possible somebody will come in

17   with a huge batch of cases and they will say I never had any

18   proof, but so far what we're seeing is it's really a very

19   small number of people.

20             I'm glad to see that there are cases ending up in

21   that because it means that people are reading the

22   instructions.  And I'm answering a lot of emails and telling

23   people, look, if you don't have proof, you better put it in

24   bucket one.

25             THE COURT:  Right.
```

1          MS. ZIMMERMAN:  But it is certainly a very small

2     minority, which is what we expected to see.

3          THE COURT:  Okay.  Well, that's interesting.

4     Thank you.

5          All right.  Next.

6          MS. LEWIS:  Your Honor, with respect to what we

7     are receiving, we are starting to look at what we're

8     getting, and we did have a question for plaintiffs' counsel;

9     we didn't hear back from them.  But their instructions, I

10    believe, to plaintiffs' counsel was to put dates of Bair

11    Hugger exposure.  Your order says "relevant surgery."  We

12    understand "relevant surgery" to mean the index surgery.  So

13    we just wanted clarification on what does date of Bair

14    Hugger exposure mean.

15         THE COURT:  Well, I would assume the same thing,

16    yeah, index surgeries.

17         MS. LEWIS:  We just wanted a clarification on it

18    so that when we go through there, we can use that date to

19    compare to our information.

20         THE COURT:  Right.  Okay.  Well, and that may be,

21    frankly, a better way of phrasing it, frankly.

22         MS. LEWIS:  Well, actually, if plaintiffs have

23    sometimes -- if they rely on the revision surgery, then that

24    would not be accurate, and that would be something different

25    from what you were expecting.

1           THE COURT:  Right.

2           MS. LEWIS:  And that's why we wanted clarity that

3    that date should be the index surgery and not just any date

4    of Bair Hugger exposure because, again, some of the patient

5    plaintiffs may have multiple surgeries.

6           THE COURT:  Yeah.  I think --

7           MS. LEWIS:  So that clears up --

8           MS. ZIMMERMAN:  We understood it to be the time

9    that they would have been exposed to Bair Hugger that would

10   cause a problem.  I suspect a lot of these people ended up

11   with Bair Hugger on them again during the revision surgery.

12          MS. LEWIS:  They may have.  But if they're

13   alleging that it's the first surgery, that's the date we

14   wanted.

15          THE COURT:  It's the operative -- bad word -- it's

16   the triggering exposure.

17          MR. HULSE:  The reason we were wondering if there

18   was full clarity on the plaintiffs' side is that we've been

19   getting submissions where the proof of Bair Hugger use is in

20   the revision surgery.  So the PFS has told us that it's the

21   original surgery, the index surgery, where the Bair Hugger

22   was used and they got the infection.  But then when we get

23   proof of Bair Hugger use, it's for some later surgery.  So

24   that's why we wondered if there was full clarity among all

25   plaintiffs' counsel on this.

 1          THE COURT:  Well, that issue will sort of kind of

 2     come out in the process of when you respond to some of their

 3     categorization, I think that will make that clear.

 4          MR. HULSE:  Yep.  We agree.

 5          MS. ZIMMERMAN:  We agree.

 6          THE COURT:  Okay.  Next.

 7          MS. LEWIS:  One other issue with respect to -- so

 8     it's number five on the list that we submitted to the Court

 9     on Friday, and this has to do with your new buckets; three,

10     four, and five.

11          THE COURT:  Correct.

12          MS. LEWIS:  Is this just still to be for the

13     states that are already at issue that will go on your chart

14     or all 50 states?

15          THE COURT:  I want to double-check this, but my

16     recollection was, yeah, this was intended to be -- sorry --

17     all 50.

18          MS. LEWIS:  All 50?

19          THE COURT:  Yeah.  So that once we sort of

20     realized that there was nothing much that could be done or

21     that it would be difficult to do anything with the statute

22     of limitations the thought was, well, we can find out how

23     far out the cases are.  Some are real close, some are sort

24     of in the mid range, and some are way beyond that.  And that

25     may or may not be relevant at some point either to dismissal

1     or settlement or whatever.  So it was all 50.

2              MS. LEWIS:  All right.  Shall we have a meet and

3     confer or maybe submit a list to plaintiffs, which we can

4     do, for statute of limitations for all 50 states?  Because

5     so far we've only met and conferred on the 12 that were

6     previously.  So what we could do is create a chart for all

7     50, submit it to plaintiffs, get their agreement that this

8     is what the statute says so that we would at least agree on

9     what the relevant limitations period is?

10             THE COURT:  I would hope that would be possible,

11    yes.

12             MS. ZIMMERMAN:  I'm happy to meet and confer with

13    you on anything.  I guess I was thinking the 12 states you

14    were talking about were really limited to the statute of

15    repose issue.

16             MS. LEWIS:  No.  There are 13 statute of repose

17    states.  We have talked about repose, and then there are 12

18    --

19             THE COURT:  And then there are 12 statute of

20    limitations states where they believe there is no discovery

21    rule.

22             MS. LEWIS:  Or discovery of injury, which we are

23    seeing is pretty close to the end dates of surgery.  So

24    these are the 12 states that I've read off in the record.

25             What I'm saying is if now buckets three, four, and

1    five are to be for all 50 states -- I mean, we can do that,

2    but I don't want there to be a subsequent issue afterwards,

3    after we do all that work, where plaintiffs disagree on the

4    limitation period.  So I'm thinking maybe just on the

5    front-end we can generate a list for all 50 states, use

6    limitations period, get plaintiffs to confirm yes, those

7    dates are correct, you know, for whatever state, for Texas,

8    if it's two years.

9         THE COURT:  Yeah, and that's one where I would

10   hope, naively, that the parties can agree on what the

11   statute of limitations is.  But I'm already presupposing

12   you're going to disagree on -- or you agree that there's a

13   discovery rule so we know it's going to be fact-specific

14   inquiry such that there's no point trying to sort the cases

15   other than just sort of this very gross close, mid range,

16   far away.

17        MS. LEWIS:  This list I'm proposing would be just

18   to make sure that everybody agrees on the limitations period

19   so that we can go ahead and start our process for buckets

20   three, four, and five.

21        THE COURT:  Right.  Right.  I, for one, cannot

22   possibly anticipate every issue that you guys will raise.  I

23   won't be able to do it.  I would like to think that what the

24   statute of limitations period is is going to be by and large

25   not disputed, but I guess we'll see.

1          MS. ZIMMERMAN:  I think that's right.  I mean,

2     we're lawyers so, of course, we flyspeck your language and

3     we parse it.

4          THE COURT:  Right.  We reserve the right to

5     disagree.

6          MS. ZIMMERMAN:  We do.  This has come up a couple

7     of times.  I would suggest that it may be useful to us to

8     have -- I hate to add another column at the end of the

9     comments, but just say did someone file and ask for

10     Minnesota law, because that matters for purposes of

11     choice-of-law issues.  It's going to be down the road that

12     we end up briefing it, but there may be -- so, like,

13     *Partlow*, for example, she filed it here.  She said that

14     Minnesota law should apply.  I appreciate she lost that

15     issue, but she's different than maybe an Alabama person and

16     said Alabama law should apply right out of the gate.  It may

17     just be a helpful piece of information if the plaintiff puts

18     in an asterisk or something to say which state they filed

19     the case in or which state they claimed on their short form.

20          MS. LEWIS:  That would be down the road in

21     plaintiffs' response to buckets three, four, and five if

22     there's --

23          THE COURT:  I think that's right, that it's

24     probably something that gets added by the plaintiffs.

25          MS. ZIMMERMAN:  We would be happy to do so.

1          MS. LEWIS:  Okay.  So with respect to -- I'm sorry

2     I'm jumping around here, Your Honor -- for plaintiffs'

3     product ID buckets, we didn't really talk about how much

4     time we are okay with for plaintiffs to pull together and

5     collate all the data.

6          Ms. Zimmerman, how much time do you think you

7     might need, how much extra time?

8          MS. ZIMMERMAN:  So we used the -- I mean, we

9     instructed everybody that they needed to get their stuff in

10     really, frankly, by the end of this week; I guess by

11     tomorrow.  I don't know that we'll have all of that.  They

12     have all seen the order come out since, the May 17th order,

13     saying we're resetting the deadlines.  We have a lot of

14     people saying does that mean it's 60 days from then.  We've

15     said continue to operate like it's due tomorrow.

16          THE COURT:  Right.

17          MS. ZIMMERMAN:  I think probably what we ought to

18     do is say that it needs to be due by, say, June 17th.  We'll

19     be in a position to report to the Court then at the June

20     20th status conference, which I think is still presently

21     scheduled, about where we're at, that we've at least handed

22     off -- you guys will have the information for a couple of

23     days.

24          MS. LEWIS:  So by June 17th you will have the

25     coalesced three charts?

1          MS. ZIMMERMAN:  We should.

2          MS. LEWIS:  Fine.

3          THE COURT:  Okay.  Yeah, that makes sense to me.

4   I think that's good.

5          MS. LEWIS:  Okay.

6          THE COURT:  What else?  So in answer to the reset

7   of the clock, the short answer is it only reset the

8   statute-of-limitations statute -- it's really just the

9   statute of limitations, but it can be the statute of repose

10   as well, but not everything else.

11          MS. ZIMMERMAN:  We can get the statute of repose.

12   That's a much shorter thing.  There were 65, 80 cases that

13   they challenged, so it's not as big of a project.

14          THE COURT:  Okay.  Good.

15          MS. LEWIS:  Your Honor, one other point of

16   clarification at least let me get into the record, and that

17   is in your May 17th order for repose you still listed

18   states, but the parties had agreed that two states should be

19   removed.

20          THE COURT:  Right.

21          MS. LEWIS:  Kentucky and Oregon.

22          THE COURT:  Yep.

23          MS. LEWIS:  And I believe the parties agreed, at

24   least in theory, Connecticut, Kansas, and Wisconsin should

25   be included.

1            THE COURT:  Yeah, I think that's -- and I should
2    have caught that update, but that should be updated.
3            MS. LEWIS:  Okay.  And I don't know if we can
4    figure this out today, but the last --
5            THE COURT:  Number 8?
6            MS. LEWIS:  -- item number 8 on what do we do if
7    we don't get any response, maybe now that plaintiffs have
8    until June 17th that might fix some of the issues.  But for
9    maybe plaintiffs' firms that don't respond at all by June
10   17th what do we do with those cases?
11           THE COURT:  It's a fair question.  I'm not going
12   to decide that today.  I think we'll cross that bridge if we
13   get to it.  But I think -- Ms. Zimmerman, I think the thing
14   that the plaintiffs' counsel need to hear is that they are
15   playing with fire.
16           MS. ZIMMERMAN:  Oh, absolutely.  I mean, I assume
17   we can do a show cause order or something like that at the
18   appropriate time.
19           But if you want to work with me and get me a list
20   of people you think haven't gotten the information you
21   need -- I mean, you should have the stuff by the 17th, but
22   --
23           But I don't think we need to decide it today.
24           THE COURT:  I think that would be good.
25   Obviously, that's something that clearly I'll have to confer

1     with Judge Ericksen about, as well.  But let's tee that up.

2            If by the time June 20th rolls around there are

3     some stragglers out there, maybe submit ahead of time some

4     joint agenda and let me know what's out there.

5            MS. ZIMMERMAN:  Sure.  We should.  So we have --

6     the hearing on the motion for reconsideration has now been

7     reset.  It's June 12th, I think, in the morning.

8            THE COURT:  Okay.  Yeah.  I was going to ask about

9     that.  So it's been fully briefed.  The questions have been

10    responded to?

11           MS. ZIMMERMAN:  Yes.

12           THE COURT:  Okay.

13           MS. ZIMMERMAN:  And I think we provided copies of

14    our response papers to our chambers, too.

15           THE COURT:  You did I know.

16           Did you?

17           MR. HULSE:  We have not.  Would you like us to?

18           THE COURT:  Oh, heck, I might even read it.  I'm

19    interested, yeah.  So, yes, that would be great.

20           MR. HULSE:  We will do that.

21           THE COURT:  Has Judge Ericksen, I doubt it, but

22    has she indicated anything about when she thinks she will

23    get an order out on that motion?

24           MS. ZIMMERMAN:  Not to plaintiffs, Your Honor.

25           MR. HULSE:  Nor us.

1          THE COURT:  I assumed that the answer was the same

2     to both.

3          MR. HULSE:  There is no special line of

4     communication with Judge Ericksen.

5          THE COURT:  All right.  Well, good.

6          Anything else that we should be talking about

7     today?

8          MR. HULSE:  I think that covered what we submitted

9     on Friday.

10          MS. LEWIS:  I think that's it.

11          MS. ZIMMERMAN:  From the plaintiffs' perspective

12     it might be useful if we -- obviously, we have the hearing

13     on the 12th of June with Judge Ericksen and then the status

14     conference on the 20th of June, and perhaps it would be

15     helpful to submit an agenda of discovery items and whether

16     we do it in a formal status conference or something slightly

17     less formal kind of like this to talk about where we might

18     be headed for this case.  Obviously, I don't know how long

19     Judge Ericksen is going to need to make the decision on the

20     motion for reconsideration.  It's my best guess that the

21     couple of cases that are headed to the Eighth Circuit right

22     now are likely not going to be argued until September.

23     Briefing won't be fully submitted, I think, until next week.

24          So just that we're all in a position to kind of

25     get off the blocks, if we're getting off the blocks, quickly

```
 1    one thing that we would suggest is a discovery conference

 2    with an agenda we propose together, kind of mindful of the

 3    CLE that Your Honor provided in December.  Maybe, maybe we

 4    could get on the calendar for Your Honor to hear a couple of

 5    cases.  I know that sometimes the Article III judges their

 6    calendars get filled up a lot faster.  So if we could get

 7    going again this fall with trial, I'm glad to do that with

 8    Judge Ericksen or happy to consent to a trial before Your

 9    Honor.  We would consent to a couple of two-week long trials

10    and do it on the clock and get moving.  But we're eager to

11    try a case.

12              THE COURT:  Okay.  You'll have to discuss that

13    with the defendants.

14              As far as the discovery issues go, I think it

15    would be smart to submit something in advance of June 20th

16    as well.  So any discovery stuff that we can deal with, that

17    would be wise.

18              I know we have been holding onto or not deciding,

19    right, substitutions -- the suggestions of death and

20    substitutions because I believe some of the cases have

21    outstanding motions to dismiss as well.  And, honestly, I

22    don't know -- we've been holding them here on the thought

23    that if we were to do something like grant the substitution

24    and Judge Ericksen were to dismiss the case, that would seem

25    awkward.  So we've been holding onto them, and I think we're
```

1    going to continue to hold onto them until we know what's

2    going to go on upstairs.

3            Is that right, Austin?

4            THE LAW CLERK:  The reverse is the more awkward

5    situation.  Right?

6            THE COURT:  Yeah, where we deny the substitution

7    and --

8            MR. HULSE:  And that makes sense to us, Your

9    Honor.

10           The one thing that has popped up that I'm sure

11   you've seen is there is one firm that has been filing

12   motions for leave to file suggestions of death.  And we've

13   had a debate with them about it.  Our point of view is it's

14   completely unnecessary to do.  But what they're looking for

15   the Court to do is grant leave to file suggestions of death

16   as a sort of a determination of their compliance with

17   Pretrial Order No. 23.  That would sort of, in our view,

18   short-circuit the whole motion-to-dismiss regime that Judge

19   Ericksen has put in place.  So there are probably four or

20   five of these out there at this point.

21           So what we keep advising them is just file your

22   suggestion of death and if we think -- and if it's not

23   timely, we'll move to dismiss.  There is no reason that Your

24   Honor should have to be ruling on these.  And it's really

25   just in one firm, but it's created now this steady stream of

1   briefing on a side issue.

2          So what we would love -- and maybe a bit of an

3   advisory opinion if possible -- is for the Court to advise

4   that this is not necessary.  If a plaintiff wants to file a

5   suggestion of death, they should go ahead and file a

6   suggestion of death, and then whether that affects them

7   under PTO 23 is dealt with under the motion-to-dismiss

8   process that's laid out in PTO 23.

9          THE COURT:  I have not tripped to this issue.  You

10  have.

11         THE LAW CLERK:  It was discussed.

12         THE COURT:  Okay.  Which firm, if I might ask?

13         MR. HULSE:  Kennedy Hodges.

14         THE COURT:  Okay.  I haven't looked at it, but it

15  strikes me as there is no good reason to file a request to

16  file a suggestion of death.

17         MS. ZIMMERMAN:  I didn't even know it was

18  happening, so -- they're required to bring a notice of

19  suggestion of death upon record, and I believe Judge

20  Ericksen's order is it's pretty quickly after the death,

21  sometimes --

22         THE COURT:  Like 60 days, right?

23         THE LAW CLERK:  Ninety.

24         MR. HULSE:  And so these are cases where

25  they're --

1          THE COURT:  Out of time.

2          MR. HULSE:  We notified them that their client is

3    dead.

4          THE COURT:  Right.

5          MR. HULSE:  They then go -- instead of just doing

6    what every other firm does, which is just simply file a

7    suggestion of death at that point, they file a motion for

8    leave to file a suggestion-of-death notice -- or not notice,

9    before your Honor.  And so we just don't think that's

10   necessary for them to do.

11         THE COURT:  Well, it's just another way of getting

12   the dismissal heard and accepting the burden of proof on

13   their shoulders.  Why would they do that?

14         MR. HULSE:  Right.  Yeah, I think they're looking

15   for Your Honor to rule on these, rather than Judge Ericksen.

16         THE COURT:  Oh, okay.

17         MS. ZIMMERMAN:  Well, respectfully, I take

18   exception to that.  I think it's not reasonable to assume

19   that there's some sort of effort to get out from one judge

20   and in front of another, because any decision you make is

21   going to go up to the other judge as well.

22         MR. HULSE:  I purely meant on a procedural basis.

23         THE COURT:  Right.  Here's what we should do, I

24   think, with those:  Ms. Zimmerman, why don't you tell the

25   folks at Kennedy Hodges that they should just file

1    suggestions of death.

2            MS. ZIMMERMAN:  I will.

3            THE COURT:  And give them a special dispensation.

4    On the ones that they've already filed a request to file a

5    suggestion of death, if they file it by the end of next

6    week, which I believe is June 7th, then it will relate back

7    to the filing of the request to file a suggestion of death.

8            MS. ZIMMERMAN:  Okay.

9            THE COURT:  Make sense?

10           MR. HULSE:  It does.

11           MS. ZIMMERMAN:  It does.  I know that there is

12   also a case -- there's a Langdon Emison firm in Missouri --

13   they have a case that was filed in state court naming a

14   number of sales reps.  3M removed it.  The motion for -- and

15   then the plaintiff briefed a remand.  It was not decided

16   quickly enough.  3M, essentially, tagged the case to the

17   JPML.  JPML said, Hey, you know, if the federal district

18   court in Kansas or Missouri, I'm not sure which it is,

19   wanted the case or wanted to remand it, they could have done

20   it already.  I think that the whole thing happened in about

21   three weeks.  So we're sending it to the MDL here.  The

22   Langdon Emison firm thinks it's an improper removal and they

23   want to have it remanded.  There is a motion that has either

24   been briefed and filed or it's on the verge of being briefed

25   and filed.

1          I've encouraged them to try to time any kind of

2     hearings with the scheduled status conferences hoping that

3     that would be of assistance to the Court.  If you have a

4     different approach you prefer, either you or Judge Ericksen,

5     we would be happy to facilitate communication.

6          THE COURT:  So they're going to file this motion

7     in this district, I assume?

8          MS. ZIMMERMAN:  Correct, Your Honor.  So,

9     essentially, yeah, they were in state court, a number of the

10    sales representatives.  I believe a hospital was also named

11    in part because of some of the discovery answers that

12    they've received in the MDL.  3M removed it and at the same

13    time noticed the JPML that this case should be part of the

14    MDL in Minnesota, so please transfer it.  The JPML did in

15    fact do that, and it all took place in less than a month or

16    so.

17         So they have a motion to remand pending in

18    whatever the federal court is in Missouri, and they are now

19    going to bring it here.  I assume you'd prefer it on the

20    same days you already have scheduled for Bair Hugger

21    matters, but if you don't care --

22         THE COURT:  Here's what I would say:  Different

23    Article III judges seem to have a different approach to

24    questions of remand.  Some of them seem to view them as

25    dispositive, others don't, or they refer them anyway.

1            So I would file it and request a hearing date in

2     the ordinary course or request your hearing date and then

3     file it, however that's typically done --

4            MS. ZIMMERMAN:  Right.

5            THE COURT:  -- assuming Judge Ericksen will hear

6     it.  But then she may or may not refer it to me or she may

7     deem that it's non-dispositive.

8            MS. ZIMMERMAN:  Okay.

9            THE COURT:  And then if that's the case, then that

10    will be made obvious to the firm and then we can work out a

11    hearing date.

12           I'm all for doing these things efficiently.  So if

13    we can do it at June 20th or whenever, that's fine with me,

14    if it's mine to hear.

15           MR. HULSE:  And just to move that along a little

16    bit, so I actually spoke to plaintiffs' counsel, Langdon

17    Emison, on Friday to advise them of exactly that.  I said I

18    wasn't sure Judge Ericksen considered it dispositive or

19    non-dispositive.  My experience is that the courtroom

20    deputies usually know and would be able to advise her in

21    terms of scheduling a hearing.

22           THE COURT:  Yeah.  Yep.  Nope, that's all good.

23           Anything else?

24           MS. LEWIS:  Your Honor, yes.

25           THE COURT:  Yep.  Go ahead.

1           MS. LEWIS:  Sorry.  Each week we get filings, you

2      know, from Bair Hugger.  Each week 50 percent or more are

3      barred by limitation based on the data that we have from the

4      pleadings.  Because of that we're going to have on a rolling

5      basis cases that need to be added now to the

6      statute-of-limitations charts, maybe even the

7      statutes-of-repose charts.

8           THE COURT:  Right.

9           MS. LEWIS:  We are thinking that maybe we will do

10     this on a quarterly basis.  And we don't rely on the

11     pleading.  We rely on the PFS since that's the document

12     under oath for those dates.

13          So just to alert the Court that unless the Court

14     advises us otherwise, we were planning maybe every quarter

15     take a look to see what additional cases need to be placed

16     on the requisite bucket spreadsheets and submit those to

17     plaintiffs.

18          THE COURT:  In the ordinary course when do you get

19     the plaintiff fact sheets relative to when you get the case?

20          MS. LEWIS:  Ninety days.

21          THE COURT:  So it would be about a six-month lag

22     is what you're proposing?

23          MS. LEWIS:  Right.

24          THE COURT:  I think that's fine.  Yeah, do it in

25     the quarter -- now you can live in the administrative AO

1    hell that we judges live in.

2          If it is filed, do it in the first full quarter

3    after you get the PFS.

4          MS. LEWIS:  Right.

5          THE COURT:  Okay?  Make sense?

6          MS. LEWIS:  Yes.

7          THE COURT:  Okay.  Good, now you can track your

8    own six-month rules.

9          All right.  Anything else?  And I think that also

10   -- here's what I would say would be prudent for the

11   plaintiffs on product ID as cases come in, resolve that

12   bucketizing as soon as possible as well, but in no event

13   later than the same sort of full quarter after the PFS.

14         MS. ZIMMERMAN:  Right.  Absolutely.

15         THE COURT:  Okay.  Then I think we're done.

16         Thank you for your accommodation today.  It turned

17   out to have been unnecessary.  I was here at 11:00.  But I

18   appreciate the flexibility.

19         MR. HULSE:  And thank the Court for accommodation

20   on setting today as the hearing date versus the original

21   deadline.  We appreciate having that little bit of extra --

22   the original hearing date, which came close after our

23   briefing deadline.  So we appreciate that.

24         MS. ZIMMERMAN:  It's been a year this month.

25         THE COURT:  I aim to be user-friendly.  All right.

1     Thanks, everyone.  We're in recess.

2               THE LAW CLERK:  All rise.

3               (Court adjourned at 12:39 p.m.)

4                         *     *     *

5          I, Debra Beauvais, certify that the foregoing is a

6     correct transcript from the record of proceedings in the

7     above-entitled matter.

8               Certified by:   *s/Debra Beauvais*
                                Debra Beauvais, RPR-CRR
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25