**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

In re Bair Hugger Forced Air Warming
Products Liability Litigation

MDL No. 2666 (JNE/FLN)

---

This Document Relates to **ALL ACTIONS**

---

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION
FOR LEAVE TO AMEND MASTER LONG FORM AND SHORT FORM
COMPLAINTS TO ADD CLAIM FOR PUNITIVE DAMAGES**

**(PUBLICLY FILED REDACTED VERSION)**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

DISCUSSION .......................................................................................................2

I.  AS A THRESHOLD MATTER, PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT FAILS TO ADDRESS CHOICE OF LAW .............2

II.  PLAINTIFFS FAIL TO PRESENT CLEAR AND CONVINCING EVIDENCE THAT 3M OR ARIZANT DELIBERATELY DISREGARDED A HIGH PROBABILITY OF INJURY TO PATIENTS ........................................................................................6

    A.  The Studies on Which Plaintiffs Rely All Expressly Disclaim Any Conclusion That The Bair Hugger System Causes Surgical Site Infections ....................................................................7

    B.  Unlike *Mirapex*, There Is No Evidence That Doctors Told Defendants That Their Patients Were Harmed by the Bair Hugger System.........................................................................15

    C.  There Has Been Extensive Safety Testing of the Bair Hugger System; Moreover, a "Failure to Test" Does Not Support Punitive Damages .......................................................17

    D.  Offering a System With a Well-Established Safety Record Cannot Be "Deliberate Disregard" for Patient Safety .........................20

III.  PLAINTIFFS CONSISTENTLY MISREPRESENT THE DOCUMENTS AND DEPOSITIONS THAT THEY HAVE PROVIDED TO THE COURT ...................................................23

    A.  3M Has Not "Admitted" That The Bair Hugger System Causes Deep Joint Infections.............................................24

    B.  Plaintiffs Have Presented No Evidence To Support Their Allegations of "Scare Tactics" and "Suppressing" Adverse Research ..................................................................26

CONCLUSION ....................................................................................................30

ADDENDUM .......................................................................................................32

# TABLE OF AUTHORITIES

**Cases**

*Ainsworth v. Century Supply Co.*,
  693 N.E.2d 510 (Ill. App. Ct. 1998) ........................................................................ 5

*Baufield v. Safelite Glass Corp.*,
  829 F. Supp. 285 (D. Minn. 1993) .......................................................................... 24

*Beniek v. Textron, Inc.*,
  479 N.W.2d 719 (Minn. App. 1992) ........................................................................ 22

*Berczyk v. Emerson Tool Co.*,
  291 F. Supp. 2d 1004 (D. Minn. 2003) .......................................................... 13, 23, 26

*Burke v. DJO, LLC*,
  No. 10-cv-2209, 2012 WL 383948 (D. Minn. Feb. 6, 2012) ................................... 3, 5

*DOE YZ v. Shattuck-St. Mary's School*,
  No. 15-1151, 2016 WL 5858641 (D. Minn. Oct. 5, 2016) ...................................... 24

*Gurule v. Ill. Mut. Life & Cas. Co.*,
  734 P.2d 85 (Ariz. 1987) ........................................................................................... 5

*Healey v. I-Flow, LLC*,
  853 F. Supp. 2d 868 (D. Minn. 2012) ............................................................... passim

*In re Baycol Prods. Litig.*,
  218 F.R.D. 197 (D. Minn. 2003) ............................................................................. 3, 4

*In re Levaquin Prods. Liab. Litig.*,
  700 F.3d 1161 (8th Cir. 2012) ................................................................................. 11

*In re Levaquin Prods. Liab. Litig.*,
  MDL No. 08-1943, 2010 WL 7852346 (D. Minn. Nov. 9, 2010) ................................ 4, 11, 16

*In re Mirapex Prods. Liab. Litig.*,
  No. 07-MD-1836, 2007 WL 9636345 (D. Minn. Nov. 27, 2007) ............................ 1, 3, 15, 16

*In re Preempro Prods. Liab. Litig.*,
  586 F.3d 547 (8th Cir. 2009) ................................................................................. 6, 12

*Mack v. Stryker Corp.*,
  No. 10-2993, 2012 WL 12896248 (D. Minn. Feb. 28, 2012) ............................... 17, 20

*Target Corp. v. LCH Pavement Consultants, LLC*,
  960 F. Supp. 2d 999 (D. Minn. 2013) ................................................................. 2, 11

*Ulrich v. City of Crosby*,
  848 F. Supp. 861 (D. Minn. 1994) ........................................................................ 2

**Statutes**

Minn. Stat. § 549.191 ........................................................................ 3, 12, 14, 15
Minn. Stat. § 549 ....................................................................................6, 24, 26

**Other References**

Federal Judicial Center, *Reference Manual on Scientific Evidence* 336 (2d ed. 2000) ................ 14

## INTRODUCTION

Plaintiffs' motion for leave to amend their Master Long Form and Short Form Complaints to add claims for punitive damages must be denied.  This is not a close call. No court in this District has ever allowed a plaintiff to allege punitive damages based on evidence anything like the evidence before this Court.  Plaintiffs have failed to come forward with clear and convincing evidence that either Arizant or 3M deliberately disregarded a high probability of injury to Plaintiffs.

As demonstrated by the evidence (and lack of evidence) submitted by Plaintiffs in support of their motion, no scientific study – ***including those studies relied upon by Plaintiffs and their experts*** – has ever concluded that the 3M Bair Hugger™ patient warming system causes surgical site infections.  There has never been an FDA recall of the Bair Hugger system related to infection (or otherwise), and no FDA safety communication, warning letter, or other enforcement action related to an infection. Despite the fact that over 200 million surgeries have been conducted using the Bair Hugger system over more than 25 years, ***not one doctor*** has ever reported to 3M or Arizant that the Bair Hugger system caused his or her patient to develop a surgical site infection.  If such a report had ever been made, the Court can be sure that it would have featured prominently in Plaintiffs' motion. Reports from doctors of their patients being injured by the defendants' products were the key evidence relied upon by the court in granting leave to plead punitive damages in *In re Mirapex Prods. Liab. Litig.*, No. 07-MD-1836 (JMR/FLN), 2007 WL 9636345 (D. Minn. Nov. 27, 2007).

Defendants appreciate that the Court generally will not consider Defendants' rebuttal evidence in deciding whether Plaintiffs have made their *prima face* case. But the question before the Court is not whether Plaintiffs' *allegations* or their *characterization* of the evidence is clear and convincing proof of Defendants' deliberate disregard for Plaintiffs' safety. The question is whether, when peeling away Plaintiffs' spin, the evidence they have submitted satisfies Plaintiffs' burden. *See Target Corp. v. LCH Pavement Consultants, LLC*, 960 F. Supp. 2d 999 (D. Minn. 2013) ("[T]he Court must carefully scrutinize the evidence presented by the moving party to make sure that it amounts to a prima facie showing that the substantive requirements for punitive damages have been met."); *Ulrich v. City of Crosby,* 848 F. Supp. 861, 866 (D. Minn. 1994) ("[W]hen presented with a Motion for leave to assert a punitive damage claim, the function of the Court is to do more than 'rubber stamp' the allegations in the Motion papers."). The evidence Plaintiffs have submitted – including the studies they rely upon, the out-of-context lines from individual emails they cite, and the snippets of witness testimony they quote – falls far short of clear and convincing evidence of punishable misconduct by Arizant or 3M.

## DISCUSSION

I. **AS A THRESHOLD MATTER, PLAINTIFFS' MOTION SHOULD BE DENIED BECAUSE IT FAILS TO ADDRESS CHOICE OF LAW.**

Before getting to the evidence, the Court must confront a threshold, fundamental legal defect with Plaintiffs' motion. Plaintiffs' motion applies Minnesota's substantive punitive damages standard to the claims of ***all*** plaintiffs in the MDL, even though

2

Minnesota law does not apply to *any* of them.  The handful of Minnesota plaintiffs presently in the MDL will, in due course, be dismissed because diversity jurisdiction is lacking.  The claims of those plaintiffs who remain will be governed by the law of the state of each plaintiff's residence at the time of the alleged injury.  *See Mirapex*, 2007 WL 9636345, at *4.

The amendment procedure of Minn. Stat. § 549.191 is procedural and applies to all plaintiffs in this MDL.  *See Burke v. DJO, LLC*, No. 10-cv-2209 (JRT/TNL), 2012 WL 383948, at *3 (D. Minn. Feb. 6, 2012) ("Procedurally, courts of this District apply Minn. § 549.191 in diversity cases to deter forum shopping.").  But the legal standard for recovering punitive damages is substantive and requires a choice-of-law analysis.  *Id.*; *see also Healey v. I-Flow,* LLC, 853 F. Supp. 2d 868, 874 (D. Minn. 2012) ("[I]f the applicable punitive damages law does not allow punitive damages for the type of claim at issue, then of course the plaintiff could not meet section 549.191 requirements because the moving party could not make out a prima facie showing of entitlement to punitive damages.").  As Judge Keyes once said, "a plaintiff in a diversity case does not get to simply choose the punitive damages law that will apply in the case."  *Healey*, 853 F. Supp. 2d at 874.

*Mirapex* is instructive.  There, Judge Noel conducted the necessary choice-of-law analysis and concluded that "the law of the state of the plaintiff's residence should apply because the injury occurred in that state."  *Mirapex*, 2007 WL 9636345, at *4.  Citing *In re Baycol Prods. Litig.*, 218 F.R.D. 197, 215 (D. Minn. 2003), he observed that state punitive damages laws "vary significantly in that the procedures for alleging and

3

awarding them are considerably different." *Id.* Therefore, "[a]pplying the punitive damages law of one state to plaintiffs from multiple states where individual state laws differ so significantly would not promote the maintenance of interstate order or a coherent legal system." *Id.* Judge Noel's analysis should apply here as well.

Plaintiffs ignore Judge Noel's discussion of the choice-of-law issue, relying instead on a mangling of *Levaquin* to reach their conclusion that Minnesota law applies to all plaintiffs in this MDL. Plaintiffs assert that, in *Levaquin*, Judge Tunheim concluded that Minnesota's conflict of law analysis "would dictate the application of Minnesota law to the issue of punitive damages in this [multidistrict litigation]." Pl. Mem. 2. The bracketed text is a giveaway. Judge Tunheim's actual words were that Minnesota's conflict of law analysis "would dictate the application of Minnesota law to the issue of punitive damages *in this case*." *In re Levaquin Prods. Liab. Litig.*, MDL No. 08-1943 (JRT), 2010 WL 7852346, at *10 (D. Minn. Nov. 9, 2010) (emphasis added). Judge Tunheim was ruling on the motion for leave to amend by a single individual (a man named John Schedin) who *lived in Minnesota*, rather than a motion brought on behalf of all plaintiffs in the MDL. The defendants argued for application of the law of New Jersey, the state where Levaquin was manufactured. Judge Tunheim disagreed, and applied the punitive damages law of the plaintiff's home state. Judge Tunheim's application of Minnesota law to the punitive damages claim of a Minnesota resident is therefore consistent with Judge Noel's conclusion in *Mirapex* that the law of each plaintiff's state of residence is controlling.

Plaintiffs have made no attempt to demonstrate, as they must, that they are entitled to punitive damages under the law of the 49 other states and the District of Columbia. For example, Arizona requires proof by clear and convincing evidence that the defendant's conduct was "motivated by spite, actual malice, or intent to defraud." *Gurule v. Ill. Mut. Life & Cas. Co.*, 734 P.2d 85, 87 (Ariz. 1987). While Illinois does not require clear and convincing evidence, it still requires proof of "fraud, actual malice, deliberate violence or oppression or when the defendant acts willfully or with such gross negligence as to indicate a wanton disregard for the rights of others or for conduct involving some element of outrage similar to that found in a crime." *Ainsworth v. Century Supply Co.*, 693 N.E.2d 510, 515 (Ill. App. Ct. 1998) (internal quotation omitted). Massachusetts does not permit punitive damages at all in medical device cases. *See Burke*, 2012 WL 383948, at *5 (denying plaintiff's motion for leave to amend to add punitive damages claim in pain pump lawsuit after concluding that Massachusetts law applied).

Because Plaintiffs have not applied the correct substantive standard for recovery of punitive damages for any of the cases properly in the MDL, their motion for leave to amend should be denied with respect to all Plaintiffs in the MDL.[1]

---

[1] Space does not permit a full analysis here of the substantive punitive damages standards of the other 49 states and the District of Columbia. If the Court permits Plaintiffs to re-file their motion with a showing of how their evidence satisfies the law of other jurisdictions, Defendants respectfully request to respond on a state-by-state basis.

## II.  PLAINTIFFS FAIL TO PRESENT CLEAR AND CONVINCING EVIDENCE THAT 3M OR ARIZANT DELIBERATELY DISREGARDED A HIGH PROBABILITY OF INJURY TO PATIENTS.

Even if they are correct that Minnesota substantive law provides the standard for punitive damages,[2] Plaintiffs fall far short of that standard.  Plaintiffs have failed to come forward with clear and convincing evidence that the Bair Hugger system presents a high probability of injury to patients, much less that 3M or Arizant deliberately disregarded that high probability.  *See* Minn. Stat. § 549.20.  More than 30 depositions have now been taken, and millions of pages of internal documents from Defendants have been produced, but Plaintiffs are right where they started at the outset of this litigation. They lack scientific support for their allegations that the Bair Hugger system causes surgical site infections, and they cannot dispute that the Bair Hugger system remains the standard of care for millions of patients every year.  Plaintiffs' invective and misrepresentation of the evidence should not be allowed to obscure these basic facts.  *See In re Preempro Prods. Liab. Litig.*, 586 F.3d 547, 572 (8th Cir. 2009) (affirming judgment as a matter of law for Upjohn with respect to punitive damages, despite its violation of federal drug marketing regulations, because "there is no dispute that prescribing [Upjohn's product] along with estrogen had become the standard of care in hormone replacement theory").

---

[2] Defendants do not dispute that Minnesota law applies to those plaintiffs who have filed complaints in Ramsey County and who allege that they were injured in Minnesota.

**A. The Studies On Which Plaintiffs Rely All Expressly Disclaim Any Conclusion That The Bair Hugger System Causes Surgical Site Infections.**

Most of Plaintiffs' recitation of their "evidence" is irrelevant to the Court's analysis. What matters is whether Plaintiffs have submitted clear and convincing evidence that the Bair Hugger system actually causes surgical site infections, and that Arizant and 3M deliberately disregarded that evidence at the time of Plaintiffs' surgeries.

Ultimately, Plaintiffs' position rests on eight studies published between 2009 and 2013. (Pl. Mem. 24-28.) Not one of these studies actually concludes that the Bair Hugger system causes surgical site infections. To the contrary, each article *expressly disclaims* such a conclusion:

| Publication | Language Disclaiming Conclusion that Bair Hugger Warming Blanket Increases Risk |
|---|---|
| Albrecht M et al. Forced-air warming: a source of airborne contamination in the operating room? *Orthopedic Rev.* 2009; 1(2):e28 (PX29[3]) | "[T]he present study **did not evaluate the link between forced air warming and surgical site infection rates** …" |
| Albrecht M et al. Forced-air warming blowers: An evaluation of filtration adequacy and airborne contamination emissions in the operating room. *Am J Infect Control* 2010; 39:321-28 (PX30) | "[O]ur findings **do not establish a direct link** between forced air warming and increased surgical site infection rates …" |
| McGovern PD et al. Forced-air warming and ultra-clean ventilation do not mix. *J Bone & Joint Surg-Br.* 2011; 93-B(1 l):1537-44 (PX33) | "This study **does not establish a causal basis** for this association [the patient warming device and the risks of surgical site infections in the study]." |
| Legg A et al. Do forced air patient-warming devices disrupt unidirectional | "Because of the nature of our experiment **we are unable to conclude that the use of the** |

---

[3] "PX" refers to exhibits submitted in support of Plaintiffs' Motion. "DX" refers to exhibits submitted by Defendants.

| downward airflow? *J Bone & Joint Surg-Br.* 2012; 94-B:254-6 (PX34) [4] | **forced air warming device … would actually lead to an increased risk of surgical site infection**." |
| --- | --- |
| Dasari KR et al. Effect of forced air warming on the performance of operating theatre laminar flow ventilation. *Anaesthesia* 2012; 67:244-49 (PX35) | "Another limitation of our study is that **the definitive effects of this excess heat on clinical outcomes is presently unknown.**" |
| Legg A et al. Forced-air patient warming blankets disrupt unidirectional airflow. *Bone Joint J.* 2013 Mar; 95-B(3):407-10 (PX36) | "**This study does not show that forced-air warming increases the risk of infection** …" |
| Reed M et al. Forced-air warming design: evaluation of intake filtration, internal microbial buildup, and airborne-contamination emissions. AANA J. 2013 Aug; 81(4):275-80 (PX38) | "Last, we did not track hospital infections, **nor did we study the association between FAW [forced-air warming] contamination generation/emission and hospital infection rates** …" |
| Belani K et al. Patient warming excess heat: The effects on orthopedic operating room ventilation performance. *Anesthesia &Analgesia* 2012 (prepublication on-line) 2013; 117(2):406-411 (PX37) | "Thus, we are **unsure of the exact degree of ventilation disruption that might occur** in a working OR during orthopedic surgery… **future research is warranted** to characterize the clinical conditions under which forced air warming excess heat results in ventilation disruption during surgery." |

This is not rebuttal evidence; this is Plaintiffs' own evidence. Given these clear

disclaimers, these studies are not clear and convincing evidence of either a high

probability of injury, or Defendants' deliberate disregard of a high probability of injury.[5]

---

[4] Plaintiffs falsely assert that Defendants "attempted to coerce" the *Journal of Bone & Joint Surgery* to retract the 2012 Legg study. (Pl. Mem. 42.) They offer no evidence to support their defamatory allegation. Indeed, Plaintiffs fail to present any evidence that Defendants ever even contacted Legg, his co-authors, or the editor.

[5] The studies are also methodologically flawed and tainted by the influence of Augustine. But Defendants recognize that their criticisms of the studies cannot be considered in this

Even fraud convict and 3M competitor Scott Augustine, who sponsored these studies and (as the Court now knows) fostered this litigation, has conceded that there is no scientific proof that the Bair Hugger warming blanket actually causes surgical site infections.   In an archived version of Augustine's "Frequently Asked Questions" webpage advertising the HotDog, Augustine admits:

> Is Augustine claiming that forced-air warming causes infections? **Of course not** . . . . **To prove "cause" in a scientific sense would require a massive controlled, blinded study. No such study has been done** . . . **and may not even be possible**.[6]

### 1. Independent Reviewers Have Looked at the Studies Plaintiffs Cite and Rejected the Leap Plaintiffs Attempt to Make.

Respected independent reviewers of the scientific literature have refused to make the leap that Plaintiffs are attempting to make.  An independent review of the scientific literature by Sikka and Prielipp in the *Journal of Bone & Joint Surgery* in 2014 concluded that "the literature appears to indicate that forced air warming can impact laminar flow under certain very specific conditions, but any actual clinical impact on surgical site infections must be considered unproven at this time."[7]  Another independent review published by the Association of periOperative Registered Nurses (AORN) in 2013

---

context.  Defendants will address these in their forthcoming *Daubert* motions to exclude the testimony of Samet, Jarvis, and Plaintiffs' other experts.

[6] HotDog Patient Warming, Augustine Temperature Management, "Refund Guarantee," previously available at http://www.hotdog-usa.com/guarantee.php (July 12, 2012) (emphasis added) (DX1).

[7] Sikka RS, et al.  Forced Air Warming Devices in Orthopaedics: A Focused Review of the Literature.  *Journal of Bone & Joint Surgery* 96.24 (2014): e200 (DX2).

concluded: "Our review uncovered no conclusive evidence that the use of forced-air warmers increases the risk of SSI . . . . The evidence also does not support the concern that use of a forced-air warmer may cause an increase in bacteria near or on the patient or cause unwanted airflow disturbances. These findings confirm the AORN recommendations that forced-air warming is an effective way to prevent unplanned perioperative hypothermia."[8]

Also, in 2013, the ECRI Institute, a widely respected nonprofit organization that advises more than 5,000 healthcare organizations, reviewed over 180 studies, including the same studies cited by Plaintiffs. ECRI concluded: "we do not believe that the currently available evidence justifies discontinuing the use of FAW [forced air warming] during surgery."[9] ECRI further noted that a lawsuit had been filed that year alleging that a patient sustained a periprosthetic infection while undergoing hip replacement surgery as a result of contaminants being deposited in the surgical site by a 3M Bair Hugger system (the *Walton* case filed by Kennedy Hodges): "We have reviewed the plaintiff's petition. It does not present any new information that would alter the conclusions we have drawn in this article based on our review of the published literature."[10]

---

[8] Kellam MD, et al. Forced-air warming devices and the risk of surgical site infections. *AORN Journal* 98.4 (2013): 353-69 (DX3).

[9] Forced-Air Warming and Surgical Site Infections: Our Review Finds Insufficient Evidence to Support Changes in Current Practice. ECRI Institute, Guidance Article (April 2013): 122-25 (DX4.)

[10] Plaintiffs cite an email where 3M employee Gary Hansen (who Plaintiffs erroneously refer to, like every other 3M employee, as an "executive") recommended counseling ECRI against doing its own testing. Plaintiffs do not cite any evidence that ECRI had

Plaintiffs do not identify any scientific study or testing that was available to Defendants but not available to these independent reviewers. Nor do Plaintiffs present any evidence that these reviews were improperly influenced by 3M or suffered from "purposeful flaws and weaknesses." *Levaquin*, 2010 WL 7852346, at *4 (plaintiffs presented evidence that Aventis successfully influenced regulators by sponsoring a study with "purposeful flaws and weaknesses").[11]

Thus, the Court can only find that Plaintiffs have met their burden if it also concludes that Sikka and Prielipp, AORN, and ECRI deliberately disregarded the safety of patients. There is no comparison here to *Preempro*, where the district court noted

---

any interest in doing testing or that 3M took any action to "prevent" ECRI from testing.

[11] Plaintiffs rely heavily on *Levaquin*, even though the Eighth Circuit later disagreed with Judge Tunheim's analysis, holding on post-trial appeal that plaintiffs lacked clear and convincing evidence to support punitive damages. *In re Levaquin Prods. Liab. Litig.*, 700 F.3d 1161, 1169-70 (8th Cir. 2012) (reversing defendant's denial of motion for judgment as a matter of law on punitive damages); *see also Target*, 960 F. Supp. 2d at 1010 (noting that the standard the court applies in evaluating a motion for leave to amend to seek punitive damages is the same standard used to review a motion for judgment as a matter of law). Notably, the Eighth Circuit disagreed the conclusion that the defendant's sponsorship of a study with "purposeful flaws and weaknesses" was a viable basis for punitive damages. *Levaquin*, 700 F.3d at 1169 ("Regardless of OMJP's alleged actions relating to the Ingenix study, we cannot characterize OMJP as hiding information it openly published.")

In any event, the evidence presented by Plaintiffs here contrasts starkly with *Levaquin*. The studies plaintiffs relied upon in *Levaquin* were powerful enough to cause European regulators to act. Judge Tunheim noted that "several European regulatory authorities decided to take corrective action" based on a series of studies associating levofloxacin use with higher rates of tendon disorders. *Levaquin*, 2010 WL 7852346, at *2. For example, France required a "Dear Doctor" letter and a label change to warn of the risk of tendon disorders. *Id.* Here, there is no dispute that there has never been an FDA recall of the Bair Hugger system related to infection (or otherwise), no FDA safety communication, warning letter, or other enforcement action related to an infection.

evidence that the defendant attempted to convey that there was no definitive link between [Preempro] and breast cancer when such evidence in fact existed.  (Pl. Mem. 43-44, quoting *Preempro*, 586 F.3d at 572.)  3M and Arizant's public statements that there is no scientific proof that the Bair Hugger system causes surgical site infections simply reiterate the conclusions of independent reviewers and the authors of the same studies upon which Plaintiffs themselves rely.

> ## 2. The Arguments in Plaintiffs' Inadmissible Expert Reports Are Not Proof that Deliberately Disregarded Scientific Proof that the Bair Hugger System Causes Surgical Site Infections.

Attempting to compensate for their lack of scientific evidence of causation, Plaintiffs have submitted reports from two hired experts, Drs. Samet and Jarvis.  Samet and Jarvis provide causation opinions that Scott Augustine and the authors of the eight Augustine-sponsored studies all declined to reach, and that were found not to be scientifically supported by the independent reviewers at the *Journal of Bone & Joint Surgery*, AORN, and ECRI.

The Court cannot consider Samet's and Jarvis's reports in determining whether Plaintiffs have met the requirements of Minn. Stat. § 549.191 (which, as explained *supra*, applies regardless of choice of law).  As Judge Keyes concluded in refusing to consider plaintiffs' expert reports in *Healey*, an expert report that is not in the form of a sworn affidavit does not satisfy Minn. Stat. § 549.191's requirement that a motion for leave to amend to allege punitive damages be accompanied by affidavits showing the factual basis for the claim.  *Healey*, 853 F. Supp. 2d at 881.  That the expert reports are attached to the declaration of Plaintiffs' counsel does not make them proper under Minn. Stat. § 549.191.

12

Even if they were procedurally proper, Samet and Jarvis's reports suffer from the same fundamental defect that the plaintiffs' expert reports suffered from in *Healey*. Like Dr. Trippel in *Healey*, Samet and Jarvis did not conduct their own studies, but instead relied upon the same eight studies that Plaintiffs have cited – all of which ***disclaim*** the conclusion that the Bair Hugger system causes surgical site infections. *Healey*, 853 F. Supp. 2d at 881-82 (Trippel's review of the medical literature was not clear and convincing evidence). For the purposes of a motion to amend to allege punitive damages, an expert's opinion cannot spin straw into gold – it cannot satisfy the "clear and convincing" standard when the underlying scientific literature does not satisfy that standard. *See Berczyk v. Emerson Tool Co.*, 291 F. Supp. 2d 1004, 1015-16 (D. Minn. 2003) (expert report submitted in support of punitive damages was "predicated on many of the same documents that we found to be an inadequate basis on which to establish a claim of deliberate disregard"). Here, several highly reputable independent reviewers of the same literature have concluded that the scientific evidence does not support the conclusion that the Bair Hugger system causes surgical site infections.

The problem is well illustrated by Samet's conclusions that the McGovern 2011 study demonstrates an "elevated 3.8 risk ratio" and therefore "the Bair Hugger device would constitute a substantial contributing cause" of infections." (PX E at 16.) Mark Albrecht, a co-author of the study (and longtime employee of Augustine), testified that the study does not demonstrate causation. The study looked at infection rates at a hospital in the United Kingdom during a period when the Bair Hugger system was in use versus a period when Augustine's HotDog was in use. There was a period of time when

13

different antibiotics and anti-thromboembolism drugs were being used with the two groups of patients. For the periods of time where the same drug regimen was in place, Albrecht agreed that the difference in infection rates for the Bair Hugger system and HotDog "would not be significantly different." (DX5, Albrecht Dep. at 200:9-20.) Even if one does not control for the difference in drug regime, Albrecht agreed, the study shows at most "association," not causation. (*Id.* at 280:16-281:11.) Association is, of course, not equivalent to causation. *See* Federal Judicial Center, *Reference Manual on Scientific Evidence* 336 (2d ed. 2000) ("[I]t should be emphasized that *an association is not equivalent to causation*" (emphasis in original).).

When asked about claims that the McGovern study proves causation, Albrecht rejected those claims: "This is one of those things where we can step close to the line, and we do have important information to present that clinicians should be aware of, but we also have to be careful that we do not state claims regarding proof of infection reduction. Unfortunately, Scott [Augustine] likes to say that he's convinced of such a relationship, even though I tell him it is unsupported and I do not agree. Well, that is the difference between research and marketing." (DX5, Albrecht Dep. at 343:8-345:9.)

Apparently, this is also the difference between research and litigation.

Separately, Plaintiffs also rely upon "testing" in a laboratory clean room by one of their retained experts, Michael Buck, and a computer model created by another of their retained experts, Said Elghobashi. (Pl. Mem. 8-10.) Buck and Elghobashi's work in 2017 is irrelevant to the Court's analysis. Neither is admissible evidence for the purpose of Minn. Stat. § 549.191. Nor is their work in 2017 "evidence" that Defendants could

14

have deliberately disregarded at the time of any of Plaintiffs' surgeries.  Plaintiffs do not and cannot cite any case finding that work performed by Plaintiffs' experts *after* plaintiffs' alleged injuries occurred can be used to prove Plaintiffs' *prima facie* case under Minn. Stat. § 549.191.[12]

### B.  Unlike *Mirapex,* There Is No Evidence That Doctors Told Defendants That Their Patients Were Harmed by the Bair Hugger System.

Judge Noel's decision to grant leave to seek punitive damges in *Mirapex* turned on evidence that the defendants ignored or suppressed evidence that emerged from either clinical trials or reports from doctors that use of Mirapex caused compulsive behavior. There is no such evidence here.

In *Mirapex*, the plaintiffs presented evidence that defendant BIPI told the FDA in 1990 that animals treated with Mirapex exhibited "stereotypic climbing and compulsive gnawing" and noted that use might "cause and/or exacerbate pre-existing states of confusion, hallucinations, or mental disturbances."  2007 WL 9636345, at *6.  BIPI also told the FDA that Mirapex would "reinforce[e] behavior that . . . seeks pleasure."  *Id.*  In the course of clinical trials conducted over between 1994 and 2000, 12 patients reported increased libido, sometimes to the point of hypersexuality, or other compulsive behavior. *Id.* at *6-7.  In 2004, BIPI's corporate parent issued a Clinical Expert Statement that

---

[12] Defendants also submit that Plaintiffs' experts are unlikely to survive *Daubert* challenges. To the extent this Court is inclined to consider Plaintiffs' expert reports, or to find somehow that Plaintiffs have met their burden to seek punitive damages, it should defer decision on this motion until it has considered and ruled upon Defendants' *Daubert* challenges.  The courts' decisions on allowing punitive damages amendments in *Levaquin* and *Mirapex* came at a far later stage, after bellwethers had been selected and *Daubert* motions had been resolved.

concluded the data "strongly suggest a pharmacodynamics effect of pramipexole on pathological gambling." *Id.* At *7. BIPI publicly denied a causal link despite its corporate parent's contrary conclusion, and did not disclose its corporate parent's conclusion to the FDA. *Id.* At *8.

As to defendant Upjohn, the plaintiffs presented evidence that Upjohn was aware of the reports of compulsive behavior in the clinical trials conducted in 1993-95 and 1997 to 2005. *Id.* At *9-10. They presented additional evidence that Upjohn told the FDA that Mirapex was a dopamine agonist, and that dopamine agonists cause compulsive behavior in animals. *Id.* As to defendant Pfizer, the *Mirapex* plaintiffs presented evidence that Pfizer learned in 2003 that three doctors who were prescribing Mirapex reported that their patients develop gambling addictions. Pfizer shared the cases with its public relations consultant but did not report what it had learned to the FDA.[13] *Id.* At *10.

There is no similar evidence here. No doctor or healthcare provider has ever reported to Arizant or 3M that the Bair Hugger system caused one of their patients to develop a surgical site infection. The filing of the *Walton* suit by Kennedy Hodges in March 2013 was the first time either Defendant received a report of any kind (and it was only a lawyer's allegation) that the Bair Hugger system had caused someone's surgical site infection. Unlike in *Mirapex*, there is no evidence that Arizant or 3M failed to report

---

[13] *Levaquin* involved similar evidence. There, the plaintiffs presented evidence that, by 1998, the defendants knew of 15 cases of tendon disorders associated with levoflaxin use. 2010 WL 7852346, at *2.

patient injuries to the FDA.  Neither 3M nor Arizant has ever concluded – in public or in private – that use of the Bair Hugger system causes surgical site infections.

The facts here are like those in *Healey*, where Judge Keyes denied the motion for leave to allege punitive damages.  In *Healey*, as here, the plaintiff submitted no evidence that a physician ever informed the defendant that the defendant's medical device had caused his injury.  853 F. Supp. 2d at 877-81.  This litigation is likewise similar to *Mack v. Stryker Corp.*, No. 10-2993 (PAM/JJG), 2012 WL 12896248 (D. Minn. Feb. 28, 2012).  There, Judge Graham denied leave to amend where there were no reports from doctors of injuries caused by use of Stryker's device prior to the plaintiff's surgery.  *Id.* at *4-5.

### C. There Has Been Extensive Safety Testing of the Bair Hugger System; Moreover, a "Failure to Test" Does Not Support Punitive Damages.

Plaintiffs argue that Arizant and 3M "failed to validate the safety of the Bair Hugger system" before the Bair Hugger system was used in Plaintiffs' surgeries.  (Pl. Mem. 5.)  Plaintiffs' own evidence proves this allegation is false.  Indeed, Plaintiffs spend several pages of their brief quibbling with several scientific studies focused on the safety of the Bair Hugger system that precede the use of Bair Hugger systems in all, or nearly all, of Plaintiffs' surgeries.  (Pl. Mem. 30-32.)

First, Plaintiffs concede that in 1993, *Anesthesia & Analgesia* published a study by Zink et al. entitled "Convective warming therapy does not increase the risk of wound contamination in the operating room," which concluded exactly what the title says.[14]

---

[14] Zink R. et al., "Convective warming therapy does not increase the risk of wound contamination in the operating room."  *Anesthesia & Analgesia* 76.1 (1993):50-53

Plaintiffs concede that the study involved Bair Hugger systems.  This study was published many years before the use of the Bair Hugger system in the surgery of any of the plaintiffs in the MDL.

Second, Plaintiffs concede that in 2003, *Critical Care* published a study in which the authors took bacterial cultures at the start and finish of surgery with the use of a Bair Hugger system.[15]  The study concluded that "there was no increase in air contamination associated with the Bair Hugger patient warming system."  No surgical site infections occurred in any patient.[16]  More than 99 percent of the cases in the MDL involve surgeries that occurred after the publication of the *Critical Care* study.

Third, Plaintiffs concede that in 2009, the *Journal of Hospital Infection* published a study by Moretti et al. in which the authors took cultures with and without the use of the Bair Hugger system.[17]  The authors concluded:  "Statistical analysis of the results demonstrated that the Bair Hugger system does not pose a real risk for nosocomial infections, whereas it does offer the advantage of preventing the potentially severe consequences of hypothermia during major orthopaedic surgery."[18]  No surgical site

---

(DX6).

[15] Huang J.K.C. et al., "The Bair Hugger patient warming system in prolonged vascular surgery: an infection risk?" *Critical Care* 7.3 (2003): R13-R16  (DX7).

[16] *See* discussion of Huang in ECRI (2013) at 123 (DX6).

[17] *See* discussion of Moretti at *id*.

[18] Moretti, B., et al., Active warning systems to maintain perioperative normothermia in hip replacement surgery: a therapeutic aid or vector of infection, *Journal of Hospital Infection* 73 (2009):73:58-63 (DX8).

infections occurred in any patient in the study. Ninety percent of the cases in the MDL involve surgeries that occurred after publication of this study.

These are just the three studies acknowledged by Plaintiffs. There are many others supporting the safety of the Bair Hugger system that predate all or most of Plaintiffs' surgeries. As early as 1991, Hall and Teenier reported to conference of the New York State Society of Anesthesiologists on their findings that Bair Hugger system use "does not increase the risk of surgical wound infection," noting that "[t]here were no detectable differences in contamination rates" and that none of the study patients experienced a post-operative wound infection.[19] In 1994, *Anesthesiology* published a study finding no bacterial growth when the Bair Hugger system was used.[20] Plaintiffs also ignore a study published in the *Lancet* in 2011, which looked at surgical site infection rates in a total of 421 patients who underwent breast, varicose vein, or hernia surgeries. The study compared the Bair Hugger system to a noncontact normothermic wound therapy that was not intended to maintain a patient's body temperature. The surgical site infection rate

---

[19] Hall AC and Teenier T. Bair Hugger Warmer Does Not Increase Microbial Contamination in the Operating Room. PGA poster presentation (1991) (DX9).

[20] Dirkes WE and Minton WA. Convection warming in the operating room: Evaluation of bacterial spread with three filtration levels. *Anesthesiology* 81.3A (1994): A562 (DX10). Similarly, in 1997, Avidan et al. placed Bair Hugger system warming blankets over agar plates, and when air was blown over the plates for 30 minutes at 43 degrees Celsius, the agar plates grew no bacterial organisms. Avidan MS et al., Convection warmers: not just hot air. *Anaesthesia* (1997): 1073-76 (DX11). More recently, another published study compared the impact of the Bair Hugger system to the Augustine HotDog on bacterial parameters in the operating room, and concluded that the type of patient warming system had no significant influence on bacterial counts. Oguz R. et al., Airborne bacterial contamination during orthopedic surgery: A randomized controlled pilot trial. *Journal of Clinical Anesthesia* 38 (2017): 160-164 (DX12).

was not significantly different between the warming systems, but was significantly lower in warmed patients versus nonwarmed.[21]  Almost three quarters of the cases in the MDL involve surgeries that occurred after the publication of the *Lancet* study.

Even if Plaintiffs were correct that the Bair Hugger system never went through safety testing prior to their surgeries (and they obviously are not correct, based on their own evidence), that would provide no support for their motion.  The Bair Hugger system is a 510(k) device cleared by the FDA.  As Judge Keyes concluded in *Healey*, a medical device manufacturer's failure to conduct safety and effectiveness testing of a 510(k) device, when the FDA has not required it, is not *prima facie* evidence to support punitive damages.  *Healey*, 853 F. Supp. 2d at 879; *see also Mack.*, 2012 WL 12896248, at *4 (denying motion for leave to seek punitive damages; Stryker's failure to conduct safety testing of its pain pump was not clear and convincing evidence because 21 C.F.R. § 807.92 did not require safety and effectiveness testing of the device).

### D. Offering a System With a Well-Established Safety Record Cannot Be "Deliberate Disregard" for Patient Safety.

Finally, while this Court does not consider "rebuttal" evidence in evaluating Plaintiffs' motion, it should nonetheless consider the Bair Hugger system's undisputed legacy of helping patients in determining whether Plaintiffs have met their burden.  Since it went to market more than 25 years ago, the Bair Hugger system has warmed more than 200 million surgical patients in hospitals around the world.  Preventing hypothermia in anesthetized patients during surgeries is recognized as important by virtually all relevant

---

[21] *See* discussion of Melling in DX6, ECRI (2013) at 123-24 (DX6).

anesthesia and patient care organizations, including the American Society of Anesthesiologists (ASA). Indeed, just last week, the Centers for Disease Control and Prevention issued new guidelines for prevention of surgical site infections, and recommended that during surgery, "normothermia should be maintained in all patients."[22] Several of these organizations specifically call for the use of forced-air warming devices, including the Bair Hugger system, to warm patients.

It is now well established in the scientific literature that maintaining normal body temperature during surgery brings a host of benefits, including reducing the risks of infections, reducing surgical bleeding, reducing post-operative heart attacks, and improving surgical outcomes.[23] The 2014 review of the scientific literature in *The Journal of Bone & Joint Surgery* concluded that "[f]orced air warming devices such as the Bair Hugger (3M Healthcare, St. Paul, Minnesota) maintain or increase core temperature in patients during the perioperative period, with benefits that include reduced surgical wound infections, maintenance of normal coagulation, and faster discharge from the post-anesthesia care unit (PACU)."[24]

The safety and efficacy of Bair Hugger warming blankets has been confirmed time and time again over more than 25 years. As noted above, there never has been, over

---

[22] "Centers for Disease Control and Prevention Guideline for the Prevention of Surgical Site Infection, 2017," http://jamanetwork.com/journals/jamasurgery/fullarticle/2623725.

[23] Association for Professionals in Infection Control and Epidemiology, Guide to the Elimination of Surgical Site Infections (2010) (DX13); Sessler D., Non-pharmacologic Prevention of Surgical Wound Infection. *Anesthesiol Clin.* 24.2 (2006): 279-97 (DX14).

[24] Sikka RS (DX2); *see also* Kellam MD (DX3).

those many years, a single report of infection connected with the Bair Hugger system from any patient's healthcare provider.  If that track record of safety satisfies the legal standard of clear and convincing evidence of a deliberate disregard for a high probability of injury to patients, then the legal standard has no true meaning.

Plaintiffs spend much of their brief that Arizant and 3M should have followed through on internal discussions about incorporating a higher efficiency filter an antimicrobial coating or the blower hose.  (Pl. Mem. 15-23.)  Plaintiffs fail to present evidence that these discussions were based on acknowledgment of some danger to patients – as opposed to what they actually were, which was a response to misinformation spread by a competitor.  But even so, evidence that a defendant explored ways to prevent dangers associated its product does not satisfy Minnesota's punitive damages standard. *Beniek v. Textron, Inc.*, 479 N.W.2d 719, 721-23 (Minn. App. 1992) (affirming trial court's grant of directed verdict on punitive damages where plaintiff presented evidence that defendant considered adding additional safety features for its chain saws – including patenting one of those features –but did not follow through).

In sum, the evidence submitted by Plaintiffs, as well as the undisputed track record of the Bair Hugger system, falls far short of clear and convincing evidence that either Arizant or 3M deliberately disregarded a high probability of injury to Plaintiffs prior to their surgeries.  Plaintiffs' own evidence confirms that there was no scientific study before their surgeries – and there is none today either – that concludes that the Bair Hugger system causes surgical site infections.

## III. PLAINTIFFS CONSISTENTLY MISREPRESENT THE DOCUMENTS AND DEPOSITIONS THAT THEY HAVE PROVIDED TO THE COURT.

The remainder of Defendants' brief addresses Plaintiffs' other factual contentions in support of their motion. These remaining contentions are irrelevant to the determinative question of whether Defendants deliberately disregarded a high probability of injury to Plaintiffs at the time of their surgeries. But even if these contentions were relevant, they still would not satisfy Plaintiffs' burden.

Over and over, Plaintiffs assert that documents say things they don't actually say, and that witnesses testified to things to which they did not testify. *See Berczyk*, 291 F. Supp. 2d at 1012 n. 7 (denying leave to seek punitive damages where "[t]he degree of deviation, between the Affiant's summarization of the referenced documents, and the content of the documents, is frequently considerable."). Over and over, Plaintiffs make dramatic assertions based on a line or two from a single email or a single sentence from deposition testimony, obscuring the context of the document or testimony. *See id.*, 291 F. Supp. 2d at 1012 ("The Plaintiffs' exhibits are a hodge-podge of largely disconnected documents which, like snapshots of different scenes, foreclose any responsible attempt to see the whole."). And while they transparently attempt to label every Arizant or 3M employee as an "executive," in nearly all cases Plaintiffs fail to present evidence that each of the individuals whose email and documents they quote[25] was either "employed in

---

[25] *See, e.g.*, emails and documents submitted as PX10, PX12, PX14, PX15, PX18, PX19, PX26, PX27, PX28, PX41, PX44, PX45, PX47, PX48, PX49, PX51, PX52, PX53, PX54, PX55, PX57, PX59-67, PX69, PX71, PX72, PX73, PX75, PX76, PX77.

a managerial capacity with authority to establish policy and make planning level decisions" for 3M or Arizant or that a person with such authority "ratified or approved" the statements.  Minn. Stat. § 549.20, subd. 2(c), (d).  The Court cannot consider employee statements as evidence to support Plaintiffs' *prima facie* showing unless they satisfy the statutory managerial authority test.  *See Baufield v. Safelite Glass Corp.*, 829 F. Supp. 285, 286 (D. Minn. 1993) (granting judgment as a matter of law to defendant as to plaintiff's claim for punitive damages where plaintiff failed to satisfy the statute's managerial authority test); *DOE YZ v. Shattuck-St. Mary's School*, No. 15-1151 ADM/SER, 2016 WL 5858641, at *22 (D. Minn. Oct. 5, 2016) (denying leave to amend to allege punitive damages:  "While [knowledge of nonmanagerial employees] is imputable to [the corporation] for negligence purposes, it is not imputable to [the corporation] for assessing punitive liability.").

Defendants address two of Plaintiffs' most inflammatory assertions here (that 3M has admitted that the Bair Hugger causes surgical site infections, and that 3M "willfully suppressed" potentially harmful testing) and demonstrate that there is no evidence to support either assertion.  The Addendum following this brief addresses three dozen other examples of Plaintiffs' mischaracterization of the evidence.

## A. 3M Has Not "Admitted" That The Bair Hugger System Causes Deep Joint Infections.

Plaintiffs assert that 3M's Rule 30(b)(6) designee, Albert Van Duren, "duly recognized" that (in Plaintiffs' counsel's words) "the Bair Hugger device causally increases risk for deep joint infection."  (Pl. Mem. 29.)  That would be a bombshell if that

24

were actually Van Duren's testimony – and an extremely surprising one given the absence of any scientific study reaching that same conclusion.  But of course it was *not* Van Duren's testimony.  Here is Plaintiffs' questioning of Van Duren on the document that Plaintiffs cite at page 29 of their brief:

> Q. And the first paragraph reads:
>
>> There is no evidence that forced-air warming, FAW, increases risk of surgical site infections, SSIs, and considerable evidence that it does not, most recently from the United States National Institute of Health.
>
> And then you write a comment, and you write -- that's your comment, correct, on the right?
>
> A.  It is.
>
> Q.  Okay.  So it's:  Actually there is evidence that FAW use increases risk.  This evidence was the motivation for Dr. Memarzadeh's work.
>
> A.  Yes.
>
> Q.  So is there evidence that FAW use increases risk?
>
> A.  ***Well, this is -- this was an editing comment that I had made rather careless. What I should have said was that there was suspicion that forced-air warming increases risk; not that there's evidence***.  ***There's -- there clearly was suspicion that this was true, which was the motivation for all of the studies in the first place***.

(DX 15, Van Duren 30(b)(6) Dep. at 204:3-205:3 (emphasis added).)  Van Duren went on to explain that this "suspicion" was the reason that Dr. Moretti conducted his study. *Id.* at 205:6-19.  As discussed above, Moretti's study ultimately concluded that the "suspicion" was not borne out:  that the Bair Hugger system "does not pose a real risk for nosocomial infections, whereas it does offer the advantage of preventing the potentially

severe consequences of hypothermia during major orthopaedic surgery." (DX8, Moretti et al. at 62.) A careless edit in a single document – an edit readily clarified by its author in his deposition – cannot possibly be clear and convincing evidence to support punitive damages. *See Berczyk*, 291 F. Supp. 2d at 1013 ("Of course, we are mindful that, with snippets from one document, when appended to another, some apparitions seem vaguely visible, but we must be presented, here, not with nebulous shadows, but with a requisite showing undergirded by clear and convincing evidence.").[26]

## B. Plaintiffs Have Presented No Evidence To Support Their Allegations of "Scare Tactics" and "Suppressing Adverse Research."

Plaintiffs repeatedly allege that Arizant and 3M employed "scare-tactics to convince scientists not to publish adverse research." (Pl. Mem. 36.) Their "evidence" to support this extraordinary allegation is beyond "anemic" – in fact, it is nonexistent.

First, in a section entitled "Defendants Willfully Suppressed Potential Harmful Testing," Plaintiffs assert that an Arizant marketing employee instructed other employees to "poke holes" in an unfavorable article in the *Operating Theatre Journal*. (Pl. Mem. 41.) But wait – what unfavorable article would that be? Plaintiffs never otherwise cite an article in the *Operating Theatre Journal*. Plaintiffs must have hoped that the Court would never look at their exhibit, because it makes clear that "unfavorable information" published in the *Operating Theatre Journal* was a ***paid advertisement by Scott Augustine***. (PX71 at 3MBH00002793.) Plaintiffs would have this Court nonetheless

---

[26] Nor have Plaintiffs demonstrated that when Van Duren made these edits he was a managerial agent under Minn. Stat. § 549.20.

26

believe that "poking holes" in a competitor's advertisement is clear and convincing evidence that the Defendants "willfully suppressed potentially harmful testing."

Second, in another purportedly damning piece of evidence, Plaintiffs describe an Arizant employee urging colleagues to make "a vigorous challenge" to findings by physicians at Stanford Medical School (findings, incidentally, that are not important enough for Plaintiffs to ever describe them or submit them to the Court). The email Plaintiffs cite suggests how this challenge might be made – by posing such questions to the researchers as, "Did the sampling include adequate controls?" "Why do the authors believe that bacteria within the hose, if present, would be transported to the patient? The mode of transmission for most bacteria is direct touch, not airborne." "Why do the authors believe that bacteria entrained in the airstream, if present, pose a risk to patients? Other papers, including Avidan, support the safety of BH when used with a blanket." (PX71 at 3MBH00024680.) This is the stuff of scientific debate and exchange, not proof of "willfully suppress[ing] potentially harmful testing."

Third, Plaintiffs charge 3M with "attempt[ing] to coerce the editor of the *Journal of Bone & Joint Surgery* to extract an adverse study about the Bair Hugger." (Pl. Mem. 42.) Their sole support for this allegation is an internal email attaching a draft letter to the editor. Buehler writes his colleagues about the draft: "I think you should speak with [then-3M employee] Gary [Hansen] about how a scientist would write such a letter. Also, we should think about it from the point of view of the editor and come up with compelling reasons why not retracting this would cause him pain." (PX73 at 3MBH0125823.) Plaintiffs offer no evidence that the letter to the editor was ever

27

finalized or sent or that there were any acts whatsoever to "coerce" the editor, much less that any article was retracted.

Fourth, Plaintiffs claim that 3M used its influence to kill unfavorable "research" that was to be published in *OR Manager*. (Pl. Mem. 42.) Their sole support for this is an internal email from Gary Hansen in 2010 describing a conversation with Dr. Daniel Sessler of the Cleveland Clinic. Hansen writes: "I spoke to Dan a moment ago. First, the OR Manager article will not be published. Dan spoke to the editor and apprised her of the paper's numerous flaws. It's dead." (PX57 at 3MBH00051040.) Plaintiffs offer no evidence to counter Dr. Sessler's viewpoint that the article proposed for publication in *OR Manager* suffered from numerous flaws. They offer no evidence that Dr. Sessler did anything other than communicate his honest scientific viewpoint. And they offer no evidence that the editor of *OR Manager* was coerced or intimidated, or that Dr. Sessler used "scare tactics" in the discussion. Indeed, Plaintiffs do not even describe what this article was even about, and present no evidence that it reported on "harmful testing."

Fifth, Plaintiffs assert that following its acquisition of Arizant, 3M "prevented additional testing" by withdrawing the Bair Hugger system from a bundled infection study being performed in the United Kingdom in 2010. Plaintiffs contend that 3M withdrew from the UK study because it was afraid of what the results might show. The single email they cite provides no support for that contention. The email discussed 3M's objection that the study was using Augustine's HotDog device "interchangeably with the Bair Hugger and Bair Paws products" and would not ultimately identify any distinction between the effectiveness of the HotDog and the Bair Hugger system. (PX75 at

3MBH00042660.)   Plaintiffs offer no evidence that 3M's objection was invalid or pretextual, much less that its true fear was an adverse result.   Nor do Plaintiffs present any evidence that 3M's objection resulted in the UK study being "suppressed."

Sixth, Plaintiffs assert that Arizant "steered" an organization called ACEP (which Plaintiffs mistakenly refer to as "CEDAR") from testing the safety of the Bair Hugger system. (Pl. Mem. 43.) There is no evidence that ACEP had any plans, intentions, or capability to test the safety of the Bair Hugger system.  All Plaintiffs offer in support is a draft response to a 2008 inquiry to Arizant from ACEP concerning a proposed "buyers' guide" for use by National Health Service purchasers in the United Kingdom.   The template asks for a ranking of the importance of "conduct[ing] a physical test of the device to measure an important parameter which will differentiate between more effective devices and less effective devices."   It does not ask about safety testing. The drafter of the response ranks this item behind others in importance because (the drafter wrote), it is "[n]ot necessary.  It is difficult to perform such tests validly; tests have already been published."   (PX76 at 3MBH00108247).  There is no evidence presented that this draft was finalized in this form or that it was submitted, much less that it "steered" ACEP or anyone else away from testing the safety of the Bair Hugger system.

Finally, Plaintiffs allege that 3M stopped ECRI or "steered it away" from conducting its own testing of the safety of the Bair Hugger system.  The sole document Plaintiffs cite (PX77), is not evidence that ECRI ever contemplated doing its own testing, much less that 3M did anything to prevent it.  In this purely internal email (which is not a communication to ECRI), then-3M employee Gary Hansen makes the case that ECRI

should not attempt to "duplicate a difficult test that has already been done well, repeatedly, elsewhere."  If ECRI does say that it wishes to conduct testing, he suggests proposing to ECRI that it "conduct a test on only the media (m10 and m20) using the same methodology that we use."  Plaintiffs offer no evidence that 3M proceeded to make either proposal to ECRI.

This, in total, is the evidence that Plaintiffs argue should cause this Court to find they have made a *prima facie* case that Defendants "willfully suppressed potentially harmful evidence."  (Pl. Mem. 41.)  All Plaintiffs have proved is their willingness to distort and overplay innocuous documents and testimony.

## CONCLUSION

Plaintiffs' motion for leave to amend their Master Long Form and Short Form Complaints to add a claim for punitive damages should be denied.  As a threshold matter, their brief fails to address the substantive law of any state other than Minnesota. Plaintiffs' motion should be denied on that basis with respect to all plaintiffs whose claims are properly in the MDL.  If the Court nonetheless concurs with Plaintiffs that Minnesota substantive law applies to all Plaintiffs' claims, it should deny Plaintiffs' motion because they have failed utterly to make out the necessary *prima facie* case.  Put simply, they have not presented clear and convincing evidence that either Defendant acted with deliberate disregard of a high probability of injury to Plaintiffs.

Dated:  May 11, 2017

Respectfully submitted,

*s/Jerry W. Blackwell*

Jerry W. Blackwell
MN Atty ID No. 0186867
Benjamin W. Hulse
MN Atty ID No. 0390952
Mary S. Young
MN Atty ID No. 0392781
**Attorneys for Defendants 3M Company
and Arizant Healthcare Inc.**
BLACKWELL BURKE P.A.
431 South Seventh Street, Suite 2500
Minneapolis, MN  55415
T: (612) 343-3200  F:  (612) 343-3205
blackwell@blackwellburke.com
bhulse@blackwellburke.com
myoung@blackwellburke.com

Bridget M. Ahmann
MN Atty ID No. 016611x
**Attorney for Defendants 3M Company
and Arizant Healthcare Inc.**
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
T: (612) 766-7000  F: (612) 766-1600
bridget.ahmann@faegrebd.com

31

**Addendum:  Plaintiffs' Own Evidence Does Not Support Their Assertions**

| Plaintiffs' Assertion | What the Evidence Actually Shows |
|---|---|
| (Pl. Mem. 6) | That is not what Maharaj testified. <br><br> (PX6, Maharaj Dep. at 97:20-22).  Maharaj further testified that the Bair Hugger system "had been well vetted in the clinical field by independent researchers." (DX21, Maharaj Dep. at 162:17-16; *id* at. 96:4-17 ("I don't recall the names of the studies, but Scott Augustine, who was also on the 750 team, had -- had them studied or they'd been studied by independent researchers."). |
| (Pl. Mem. 6) | That is not what Van Duren testified. <br><br> (PX5 at 51:9-16.) <br><br> (DX16, DX17.) |
| (Pl. Mem. 6) | Plaintiffs' evidence does not support their assertion. Plaintiffs rely upon the Proceedings of the International Consensus Meeting on Periprosthetic Joint Infection. The meeting was held in 2013 – 20 years *after* the development of the Model 500 series.  (PX4.) <br><br> The attendees *did not* make a consensus statement supporting a "well-established link between particles and infections." Question 2 asked about a correlation between the *number of bacteria* in the operating room and the probability of surgical site infections.  (*Id.* at 115-16.)  Particles are not the same as bacteria. <br><br> The attendees did, however, make a strong consensus statement that "no studies have shown an increase in SSI [surgical site infections]" related to the use of forced air warming devices.  (DX18, further excerpts from Proceedings.)  No surprise:  Plaintiffs omit this |



| | statement from their submission. |
| --- | --- |
| ▮▮▮▮ (p. 6) ▮▮▮▮ (Pl. Mem. 6) | Plaintiffs' assertion is false. ▮▮▮▮ (PX6 at 59:8-10.) ▮▮▮▮ (PX7 at 117:12-22.) As Plaintiffs concede, many studies have looked at the issue that have been published between 1993 and the present.  (Pl. Mem. 30-32.) |
| ▮▮▮▮ (Pl. Mem. 11) | ▮▮▮▮ (PX2 at 3MBH00047383.) |
| ▮▮▮▮ (Pl. Mem. 12) | ▮▮▮▮ (DX20, ▮▮▮▮ MERV 14 is the same level of filtration used in general surgery operating rooms.  (DX19, ASHRAE, HVAC Design Manual for Hospitals and Clinics (2d ed.) at 30.)  The U.S. EPA states that a MERV 14 filter is appropriate for controlling "all bacteria" in general surgery.  (DX21 at 11.) |
| ▮▮▮▮ (Pl. Mem. 12-13.) | This is false. ▮▮▮▮ (PX49.) |

| | |
|---|---|
|  (Pl. Mem. 14) | False. When the FDA's misstatement was brought to 3M's attention in this litigation, 3M issued a corrective letter to the FDA.  (DX30, 3M 2016 letter to FDA.)<br><br>(PX13 at 3MBH00048083.)<br><br>David Westlin, former regulatory director at Arizant, testified that he never noticed the reference to HEPA in the FDA's report.  (DX22 at 136:5-7.)  Former Arizant CEO Maharaj also testified that no one from Arizant ever represented to the FDA during the inspection that the Model 505 warming unit had a 0.2 micron HEPA filter. (DX23, Maharaj Depo at 144:4-145:3.) |
| The Bernards study "found contaminated particles in the interior of a Bair Hugger containing pathogens that were isolated to the same strain of bacteria responsible for the outbreak." (Pl. Mem. 15) | Plaintiffs omit incredibly important information from their summary.  Bernards found *A. baumanii* bacteria in two places:  inside a ventilator, which likely exposed patients to the bacteria while supporting their breathing, and inside the *filters* of certain Bair Hugger units.  (PX17 at 1003.)  If *A. baumanii* were already present in an operating room, one would expect to find it caught in the Bair Hugger filter, because the Bair Hugger would have been the only device in the operating room that filters air besides the HVAC system itself. |
| Other articles and customer reports found the same. (Pl. Mem. 15) | The author of the minimally detailed hearsay email in PX18 did not identify the location in the Bair Hugger warming unit where the *acinetobacter* was found.<br><br>Gjolaj found bacteria in 3 Bair Hugger filters and the distal ends of 12 Bair Hugger hoses.  Neither finding is meaningful.  (PX19.)  This shows only that the Bair |

34

| | |
|---|---|
| | Hugger system trapped bacteria that were *already* in the operating room.  Gjolaj did not report any infections in connection with their investigation. |
| (Pl. Mem. 15-16) | Van Duren's advice was correct, and Plaintiffs have no evidence to refute it.  There is no evidence that the use of the Bair Hugger system increases infection risk when used and maintained properly. |
| (Pl. Mem. 16) | Plaintiffs have presented no evidence that any of the discussed actions would have had any impact on the Bair Hugger system's alleged risk.  *See Beniek*, 479 N.W.2d at 721-23. |
| (Pl. Mem. 17) | *See Beniek*, 479 N.W.2d at 721-23. |
| (Pl. Mem. 17) | |
| (Pl. Mem. 18) | |



| | |
|---|---|
| (Pl. Mem. 18) | (PX24 at 3MBH01617180 (emphasis added).) |
| (Pl. Mem. 19) | (PX25 at 205:15-21.) |
| (Pl. Mem. 19) | (PX26 at 3MBH00542396.) |
| (Pl. Mem. 19-22) | Tan, a former 3M lab employee, testified that the "ideation" project was "just white space" – in other words, brainstorming.  (DX25, Tan Dep. at 107:15.)  When plaintiffs' counsel urged, "But these are ideas that are feasible; right?"  Tan replied "No, not all."  (*Id.* at 107:17-21.)  *See Beniek*, 479 N.W.2d at 721-23 (contemplation of adding product features does not support punitive damages). |

| | |
|---|---|
| ███████████████<br>███████████████<br>███████████████<br>███████████████<br>████████████.<br>(Pl. Mem. 23) | Plaintiffs know this is not the reason the project was discontinued. Former 3M lab employee Tan testified that the specific item under consideration for reducing the cost of the filters was a change in the filter frame material. The contemplated cost reduction had nothing to do with the efficiency of the filter. (DX25, Tan Dep. at 98:11-99:5.) |
| ███████████████<br>███████████████<br>███████████████<br>███████████████<br>(Pl. Mem. 23) | This is pure speculation. There are no studies showing that any bacteria found inside the Bair Hugger warming unit and hose ever makes it out of the blanket. Meanwhile, numerous studies, including those cited by Plaintiffs at pages 30-32 of their brief, have found no increased bacteria in air released from the Bair Hugger. |
| Wood (2014) recommended use of alternative patient warming devices.<br>(Pl. Mem. 28) | This is highly misleading. The Wood paper, which was a review of other papers rather than independent research, nonetheless concludes: "FAW does contaminate ultra-clean air ventilation; however, there appears to be no definite link to an increased risk of SSI based on current research." (PX39 at 1.) |
| Zink (1993) detected bacterial contamination despite use of the M10 filter and no surgeons, staff, equipment, or flow obstructions in the room.<br>(Pl. Mem. 30) | Plaintiffs omit Zink's finding of *more* bacterial colonies in the control group (the group that did not receive Bair Hugger warming) than the study group (the group that did receive Bair Hugger warming). (DX6 at 51-52.) Plaintiffs' expert Jarvis also neglects to include this in his report. Zink concluded there was no significant difference in the number of bacterial colonies between the two study periods. |
| The company never publicized the limitations of the studies it relied on to its customers.<br>(Pl. Mem. 32) | The "limitations" noted by Plaintiffs are acknowledged by the authors themselves in the text of their articles. Punitive damages hardly can be premised upon limitations of studies that were disclosed by the authors themselves. *See Levaquin*, 700 F.3d at 1169. |
| ███████████████<br>███████████████<br>███████████████<br>███████████████<br>(Pl. Mem. 32) | ████████ PX5 at 258:5-18. ███████████<br>███████████████████<br>████████ The discussion immediately before this question and answer concerned only three studies: Legg, McGovern, and Sessler. (DX15, Van Duren Dep. at |

37

| | |
|---|---|
| | 257:7-258:10.) ███████████ |
| ███ (Pl. Mem. 32) | ███████████ |
| ███ (Pl. Mem. 33) | ███ The only study relied upon by Plaintiffs that had been published at that time (Albrecht 2009) "did not evaluate the link between forced air warming and surgical site infection rates." (PX29.) |
| ███ (Pl. Mem. 33) | This is false.  Plaintiffs' argument is with German DIN standards, not with Defendants.  The testing was done by Hybeta, an expert in the German DIN standard for certifying laminar flow systems.  All testing was done according to the German DIN standard, which was the purpose of the experiments.  (DX26, Hansen Dep. at 198:6-10; 226:23-227:10.) ███████████ (PX48 at 3MBH00001560 (" ███████ ).) |
| ███████ | Beyond false insinuations, Plaintiffs cite no evidence of impropriety with how the data was presented.  As Dr. Sessler, who was involved in the study, explained, "When you do multicenter studies, it's absolutely routine and normal for the results to differ in the various centers.  You -- you expect that just by random motion. |

38

| (Pl. Mem. 34) | And it's also true that the centers are truly different; they have different operating rooms, different anesthesia, different protocols, so you expect real differences among sites in a multicenter study.  But you do a multicenter study to enhance generalizability.  You take all the results you have and you put them together and you present the average because that best characterizes what you know, and that's what we did here."  (DX27, Sessler Dep. at 65:18-66:4.) |
|---|---|
| (p. 35)  | |
| (Pl. Mem. 37) | , similar studies had already been conducted several times in the past, and none showed any increase in the presence of bacteria at the surgical site.  These include (as discussed above) Zink (1993), Huang (2003), Moretti (2009), and several others. (Pl. Mem. 32.) |
| (Pl. Mem. 37) | |
| " (Pl. Mem. 38) | |



| | |
|---|---|
| (Pl. Mem. 40) | Jana Stender, who sent PX69, was a marketing employee, not an "executive." As Stender explained, this portion of the document reflected a brainstorming exercise to think about future actions of Augustine, who had not (and still has not) conducted a credible study on forced air warming and contamination. (DX28, Stender Dep. at 177:16-180:14.) |
| (Pl. Mem. 41) | Plaintiffs misrepresent Bergstrom's testimony. Bergstrom disagreed that he was instructed to draft talking points to "discredit" studies. He explained that the purpose was to provide sales representatives with responses to address misinformation in the marketplace generated by Augustine. (PX32; DX29, Bergstrom Dep. at 66:3-20; 68:5-73:2; 96:21-98:1.)<br><br>Bergstrom explained: "I believe the goal of the marketing department was to review those papers, as we would any paper, examine the strengths and weaknesses and then provide the responses that our -- our sales force could use." (PX32, Bergstrom Dep. at 67:21-25.) |
| (Pl. Mem. 42) | Plaintiffs' allegation is false. 3M marketing employee (not an "executive") Troy Bergstrom explained that the Response Communication Plan was "an initial brainstorm" and collection of possible tactics. Many of the possible tactics, including the one highlighting Leaper's connection with Augustine, were never implemented. (DX29, Bergstrom Dep. at 163:3-16.) *See Baufield*, 829 F. Supp. at 286-87 (no punitive damages without proof of "intention of the principal to adopt or approve the act" of the employee"). Plaintiffs offer no evidence to the contrary. |