## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Bair Hugger Forced Air Warming Devices Products Liability Litigation | MDL No. 15-2666 (JNE/DTS) |
| This Document Relates To: ALL ACTIONS | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION TO DISQUALIFY JUDGE ERICKSEN AND MAGISTRATE JUDGE SCHULTZ (REDACTED FOR PUBLIC FILING)

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... ii

INTRODUCTION ............................................................................................... 1

LEGAL STANDARD .......................................................................................... 4

ARGUMENT ...................................................................................................... 6

    I.  Judge Schultz should be disqualified under 28 U.S.C. § 455(a) and (b) ................. 6

      A.  Judge Schultz knew he had a financial interest in 3M during this MDL .......... 6

      B.  Judge Schultz appears biased even if he is not actually biased ....................... 13

    II.  Judge Ericksen should be disqualified under 28 U.S.C. § 455(a) ......................... 16

      A.  Judge Ericksen's pattern of conduct and rulings raises an inference of bias ... 17

      B.  Judge Ericksen's reconsideration decision itself raises an inference of bias ... 22

      C.  Judge Ericksen's hiring of a secret "law clerk" raises an inference of bias ..... 27

      D.  The totality of Judge Ericksen's misconduct raises an inference of bias ........ 32

    III. Plaintiffs' motion is timely under 28 U.S.C. § 455(a) and (b) .............................. 33

CONCLUSION ................................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**

*Am. Textile Mfrs. Institute, Inc. v. The Ltd., Inc.*,
190 F.3d 729 (6th Cir. 1999) ..................................................... 35

*Bishop v. Albertson's, Inc.*,
806 F.Supp. 897 (E.D. Wash. 1992) ........................................... 27

*Bridges v. California*,
314 U.S. 252 (1941) .................................................................... 1

*Chase Manhattan Bank v. Affiliated FM Ins. Co.*,
343 F.3d 120 (2d Cir. 2003) ................................................. 15, 36

*Cobell v. Kempthorne*,
455 F.3d 317 (D.C. Cir. 2006) ................................................... 22

*Driscoll v. Metlife Ins.*,
2021 WL 5323962 (S.D. Cal. Oct. 19, 2021) .................... 9, 14, 15

*Dyas v. Lockhart*,
705 F.2d 993 (8th Cir. 1983) ............................................... 15, 17

*E.A. Renfroe & Co. v. Rigsby*,
2008 WL 11375428 (N.D. Ala. Jan. 4, 2008) ..................... 13, 14

*Eclipse Grp., LLP v. Target Corp.*,
2023 WL 1453155 (S.D. Cal. Feb. 1, 2023) ............................ 15

*Edgar v. K.L.*,
93 F.3d 256 (7th Cir. 1996) ......................................... 32, 33, 35

*ExxonMobil Oil Corp. v. TIG Ins. Co.*,
44 F.4th 163 (2d Cir. 2022) ................................................... 7, 9

*Fredonia Broad. Corp. v. RCA Corp.*,
569 F.2d 251 (5th Cir. 1978) ................................................... 30

*Gareis v. 3M Co.*,
9 F.4th 812 (8th Cir. 2021) .............................................. 20, 21

*Gordon v. Reliant Energy, Inc.*,
141 F.Supp.2d 1041 (S.D. Cal. 2001) ....................................... 12

*Gregorich v. Lund*,
    54 F.3d 410 (7th Cir. 1995) ....................................................................... 27

*H & R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*,
    546 F.3d 937 (8th Cir. 2008) ....................................................................... 6

*Hall v. Small Bus. Admin.*,
    695 F.2d 175 (5th Cir. 1983) ......................................................... 27, 28, 35

*In re Aetna UCR Litig.*,
    2013 WL 1622160 (D.N.J. Apr. 15, 2013) ............................................. 11, 12

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
    9 F.4th 768 (8th Cir. 2021) ............................................................... *passim*

*In re Hatcher*,
    150 F.3d 631 (7th Cir. 1998) ..................................................................... 15

*In re Kensington Int'l Ltd.*,
    368 F.3d 289 (3d Cir. 2004)............................................................... *passim*

*In re Mar. & Ne. Pipeline, L.L.C.*,
    349 F.Supp.2d 175 (D. Mass 2004) .......................................................... 6, 11

*In re Martinez-Catala*,
    129 F.3d 213 (1st Cir. 1997) ................................................................. 16, 33

*In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*,
    601 F.Supp.2d 1120 (D. Minn. 2009) ......................................................... 35

*In re RFC & Rescap Liquidating Tr. Litig.*,
    2016 WL 7177706 (D. Minn. Dec. 8, 2016)................................................... 6

*In re Sch. Asbestos Litig.*,
    977 F.2d 764 (3d Cir. 1992)................................................................ *passim*

*In re Yehud-Monosson USA, Inc.*,
    472 B.R. 795 (D. Minn. 2012) .................................................................. 16

*Johnson v. Mead Johnson & Co.*,
    2013 WL 716816 (D. Minn. Feb. 27, 2013) ................................................ 30

*Johnson v. Mead Johnson & Co.*,
    754 F.3d 557 (8th Cir. 2014) ............................................................... 30, 31

*Lewis v. Curtis*,
    671 F.2d 779 (3d Cir. 1982)....................................................................... 1

*Liljeberg v. Health Servs. Acquisition Corp.*,
796 F.2d 796 (5th Cir. 1986) .................................................................................. 15

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) .................................................................................... *passim*

*Limeco, Inc. v. Div. of Lime*,
571 F.Supp. 710 (N.D. Miss. 1983) .................................................................. 35

*Liteky v. United States*,
510 U.S. 540 (1994) ............................................................................... 5, 13, 16

*Little Rock Sch. Dist. v. Ark. State Bd. of Educ.*,
902 F.2d 1289 (8th Cir. 1990) ............................................................................ 6

*Mathis v. Huff & Puff Trucking, Inc.*,
787 F.3d 1297 (10th Cir. 2015) ........................................................................ 27

*Microsoft Corp. v. United States*,
530 U.S. 1301 (2000) ............................................................................... 4, 5, 33

*Moran v. Clarke*,
296 F.3d 638 (8th Cir. 2002) ..................................................................... *passim*

*O'Bannon v. Union Pac. R.R. Co.*,
169 F.3d 1088 (8th Cir. 1999) .......................................................................... 28

*Obduskey v. Wells Fargo*,
2023 WL 1831128 (10th Cir. Feb. 9, 2023) .................................................... 7, 9

*Parker v. Connors Steel Co.*,
855 F.2d 1510 (11th Cir. 1988) .............................................................. 17, 28, 35

*Petitta v. 3M Co.*,
999 F.3d 534 (8th Cir. 2021) ......................................................................... 21, 22

*Planned Parenthood of Se. Pa. v. Casey*,
812 F.Supp. 541 (E.D. Pa. 1993) ..................................................................... 36

*Potashnick v. Port City Constr. Co.*,
609 F.2d 1101 (5th Cir. 1980) ...................................................................... 1, 2, 15

*Roberts v. Wal-Mart La., L.L.C.*,
54 F.4th 852 (5th Cir. 2022) ........................................................................... 7, 9

*Sentis Grp. Inc., v. Shell Oil Co.*,
559 F.3d 888 (8th Cir. 2009) ..................................................................... *passim*

*Shell Oil Co. v. United States*,
   672 F.3d 1283 (Fed. Cir. 2012) ..................................................................... 6

*Smothers v. Rowley Masonic Assisted Living Cmty., LLC*,
   2023 WL 2618682 (8th Cir. Mar. 23, 2023) ................................................ 26

*Sw. Bell Tel. Co. v. F.C.C.*,
   153 F.3d 520 (8th Cir. 1998) ................................................................. 10, 35

*Tramonte v. Chrysler Corp.*,
   136 F.3d 1025 (5th Cir. 1998) .................................................................... 12

*Tumey v. Mycroft AI, Inc.*,
   27 F.4th 657 (8th Cir. 2022) .............................................................. *passim*

*United States v. Bobo*,
   323 F.Supp.2d 1238 (N.D. Ala. 2004) .......................................................... 1

*United States v. Borrero*,
   2009 WL 2005221 (D. Minn. July 8, 2009) ..................................... 5, 14, 33

*United States v. Brocato*,
   4 F.4th 296 (5th Cir. 2021) ........................................................................ 36

*United States v. Herrera-Valdez*,
   826 F.3d 912 (7th Cir. 2016) ...................................................................... 14

*United States v. Holland*,
   519 F.3d 909 (9th Cir. 2008) ...................................................................... 16

*United States v. Miell*,
   2018 WL 974843 (N.D. Iowa Apr. 8, 2008) ................................................ 13

*United States v. Ritter*,
   540 F.2d 459 (10th Cir. 1976) .......................................................... 16, 17, 33

*United States v. Sibla*,
   624 F.2d 864 (9th Cir. 1980) ...................................................................... 34

*United States v. Singer*,
   575 F.Supp. 63 (D. Minn. 1983) ......................................................... *passim*

*United States v. Tucker*,
   78 F.3d 1313 (8th Cir. 1996) .............................................................. *passim*

*United States v. United Health Grp., Inc.*,
   2019 WL 2353124 (C.D. Cal. May 31, 2019) ............................................. 12

*Vaska v. State*,
  955 P.2d 943 (Alaska 1988)......................................................................... 28

*Veneklase v. City of Fargo*,
  236 F.3d 899 (8th Cir. 2000) ...................................................................... 10

*Webbe v. McGhie Land Title Co.*,
  549 F.2d 1358 (10th Cir. 1971) .................................................................. 27

*Willis v. Brandt*,
  2012 WL 6644240 (D. Minn. Dec. 20, 2012)...................................... 5, 14, 33

## Statutes

28 U.S.C. § 144 ................................................................................................ 33

28 U.S.C. § 455 ......................................................................................... *passim*

28 U.S.C. § 455(a) ..................................................................................... *passim*

28 U.S.C. § 455(b) ........................................................................................ 5, 34

28 U.S.C. § 455(b)(4) ................................................................................. *passim*

28 U.S.C. § 455(c) ........................................................................................ 5, 10

28 U.S.C. § 455(d)(4) ................................................................................ 6, 9, 10

28 U.S.C. § 455(f) ...................................................................................... 11, 12

## Other Authorities

1 William Blackstone, Commentaries ................................................................ 1

Charles G. Geyh, Fed. Jud. Ctr., *Judicial Disqualification: An Analysis of Federal
  Law* (3d ed. 2018) ....................................................................................... 2

Code of Judicial Conduct, Canon 3A(3) ........................................................ 19

Code of Judicial Conduct, Canon 3A(4)(c)..................................................... 32

Code of Judicial Conduct, Canon 3C(3)(c)(i) .................................................. 9

Rob Griffin, *3M insider stock sale: Chief legal officer offloads $700k MMM stock as
  company battles earplug lawsuits by veterans*, Capital (Nov. 8, 2022) ...................... 13

James V. Grimaldi, Coulter Jones & Joe Palazzolo, *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J. (Sept. 28, 2021) ............................................................................ 7

Coulter Jones, James V. Grimaldi & Joe Palazzolo, *How the Journal Found Judges' Violations of Law on Conflicts*, Wall St. J. (Sept. 28, 2021) ........................................ 7

Chief Justice John G. Roberts, Jr., *2021 Year-End Report on the Federal Judiciary* (Dec. 31, 2021) ........................................................................ 2, 10

A. Rubin, Fed. Jud. Ctr., *Law Clerk Handbook: A Handbook for Law Clerks to Federal Judges* (1st ed. 1977) ........................................................ 28

Davida Williams, *State of the District with Chief Judge Patrick J. Schiltz*, Bar Talk, Mar. 2023 ............................................................................ 1

Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3546 (3d ed.) .................................. 6, 10, 11

Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3550 (3d ed.) .................................. 33

# INTRODUCTION

*"Our Constitution created an independent federal judiciary in order to ensure that judicial decisions would be impartial and made only upon the law."*[1]

That statement is just as poignant today as it was when then-Judge Murphy—an "oracle of the law," to use Blackstone's vivid phrase—said it four decades ago.[2] In his recent State of the District address, Chief Judge Schiltz reiterated that "judicial independence" is not just an important issue; it is "the *most* important issue" now facing the District of Minnesota.[3] Indeed, "the protection of the integrity and dignity of the judicial process from any hint or appearance of bias is the palladium of our judicial system." *Potashnick v. Port City Constr. Co.*, 609 F.2d 1101, 1111 (5th Cir. 1980).

"[A]n impartial judiciary has been basic to our conception of freedom ever since Magna Carta," *Bridges v. California*, 314 U.S. 252, 282 (1941) (Frankfurter, J., dissenting), and it remains "the sine qua non of the American legal system," *Lewis v. Curtis*, 671 F.2d 779, 789 (3d Cir. 1982). Particularly in today's divisive climate, when "many Americans [are] disillusioned with government," *United States v. Bobo*, 323 F.Supp.2d 1238, 1242 (N.D. Ala. 2004), it is more important than ever to uphold the "strong tradition in our country of assuring not only a fair and impartial judicial forum, but also the appearance of fairness and impartiality," *Singer*, 575 F.Supp. at 68.

---

[1] *United States v. Singer*, 575 F.Supp. 63, 68 (D. Minn. 1983) (Murphy, J.).

[2] 1 William Blackstone, Commentaries *69.

[3] Davida Williams, *State of the District with Chief Judge Patrick J. Schiltz*, Bar Talk, Mar. 2023, at 2 (emphasis added).

1

Recognizing society's "need for an unimpeachable judicial system in which the public has unwavering confidence," Congress codified these lofty maxims in a federal statute. *See Potashnick*, 609 F.2d at 1111. Under 28 U.S.C. § 455, "[i]t is not enough that judges *be* impartial; the public must *perceive* them to be so."[4] To that end, "judges must be scrupulously attentive to both the letter and spirit" of the recusal statute, as Chief Justice Roberts made "crystal clear" in his recent Year-End Report on the Federal Judiciary.[5] Judges are "duty-bound to strive for 100% compliance" with the statute, Chief Justice Roberts proclaimed, "because public trust is essential, not incidental, to [the judiciary's] function."[6] Whenever a judge's impartiality is in doubt, "the appropriate remedy is to disqualify that judge."[7] Otherwise, judges run "the risk of undermining the public's confidence in the judicial process." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988).

This case exemplifies how this Court's dealings, in public courtrooms and in private chambers, can erode the public's trust in the judiciary. Under Judge Ericksen's tutelage, this MDL—one of the largest mass torts in history—has veered along a troubling and highly unusual path. Her antipathy toward Plaintiffs' counsel, present from the start,

---

[4] Charles G. Geyh, Fed. Jud. Ctr., *Judicial Disqualification: An Analysis of Federal Law* 1 (3d ed. 2018).

[5] Chief Justice John G. Roberts, Jr., *2021 Year-End Report on the Federal Judiciary* 3-4 (Dec. 31, 2021), https://bit.ly/3ZlZRc1.

[6] *See* Roberts, *supra* note 5, at 3.

[7] *See* Geyh, *supra* note 4, at 1.

immediately gave way to a pattern of rulings that hamstrung Plaintiffs at every stage. Judge Ericksen's undisclosed retention of a retired, unlicensed defense attorney as her "law clerk" illuminates her lack of impartiality. Armed with an individual who had devoted his career to defending corporate giants like 3M in products-liability cases like this one, Judge Ericksen reversed Plaintiffs' only major win in this long and storied litigation. In one fell swoop, she tossed out Plaintiffs' world-renowned experts and terminated nearly 5,000 cases. The Eighth Circuit revived all those meritorious claims, unanimously reversing Judge Ericksen's "clear error of judgment" and abuse of discretion.[8] Nevertheless, nearly two years later, Plaintiffs' claims continue to languish as Judge Ericksen has still not held a public status conference. Not to mention, the District still considers this massive MDL "closed," curiously citing the date of Judge Ericksen's ill-fated reconsideration ruling.[9]

Magistrate Judge Schultz's actions have also established clear grounds for disqualification. On the heels of the Wall Street Journal's ground-breaking article reporting that hundreds of judges had violated federal law by presiding over cases involving companies in which they owned stock, Judge Schultz belatedly disclosed that he was guilty of the same offense. Judge Schultz earned dividends from his stock ownership in Defendant 3M while presiding over this MDL. Newly discovered Annual Financial Disclosures establish that he had full knowledge of his financial interest in 3M at the time of his

---

[8] *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 785, 787-88 (8th Cir. 2021).

[9] *See* PX1 (D. Minn., *MDL Cases*) ("Bair Hugger – 15-md-02666 (JNE/DTS) (***Closed 7/31/2019***)") (emphasis in original).

appointment to the MDL and for several years thereafter. Whether intentional or not, Judge Schultz's failure to timely disclose his holdings mandates his disqualification. His nondisclosure is contrary to the plain language of the disqualification statute itself.

Any ordinary person would at the very least question the neutrality of Judge Ericksen and Magistrate Judge Schultz. With equal parts hesitation and respect for this District, Plaintiffs therefore move to disqualify them. Thousands of human lives hang in the balance, and all Plaintiffs have lost hope that they will ever obtain a fair trial in this District. Duty-bound, the undersigned have no choice but to do what is right: defend their clients' constitutional right to an independent judiciary and maintain the public's trust in our District.

## LEGAL STANDARD

Title 28 U.S.C. § 455 sets forth the criteria for disqualification of federal judges. "Th[e] statute is divided into two subsections, both of which are relevant to the present situation." *See Microsoft Corp. v. United States*, 530 U.S. 1301, 1301 (2000).

Section 455(a) states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). The statute was amended in 1974 to include this new restriction, "broaden[ing] the grounds for judicial disqualification," *Liljeberg*, 486 U.S. at 858 n.7, with this "liberal standard," *Singer*, 575 F.Supp. at 68. "Congress sought to eradicate not only actual [impropriety], but also the appearance of impropriety in the federal judiciary." *Moran v. Clarke*, 296 F.3d 638, 648 (8th Cir. 2002) (en banc). It did so

because the "appearance of impartiality is virtually as important as the fact of impartiality." *Singer*, 575 F.Supp. at 67.

Under section 455(a), the "inquiry is an objective one," *Microsoft*, 530 U.S. at 1302, considering the perspective of an "average person on the street," *United States v. Borrero*, 2009 WL 2005221, at *1 (D. Minn. July 8, 2009) (Ericksen, J.). As this Court put it, section 455(a) "requires disqualification if a reasonable person who knew the circumstances would question the judge's impartiality, even though no actual bias or prejudice has been shown." *Willis v. Brandt*, 2012 WL 6644240, at *1 (D. Minn. Dec. 20, 2012) (Ericksen, J.). Even in "questionable" cases, judges must "err on the side of caution" and disqualify themselves. *E.g.*, *Singer*, 575 F.Supp. at 68. That is especially true in "high profile" cases like this one. *E.g.*, *United States v. Tucker*, 78 F.3d 1313, 1325 (8th Cir. 1996).

In contrast to section 455(a)'s "catchall recusal provision," *Liteky v. United States*, 510 U.S. 540, 548 (1994), section 455(b) "lists specific instances in which disqualification is required," *Microsoft*, 530 U.S. at 1301-02. Section 455(b)(4) mandates disqualification where the judge "knows that he … or his spouse … has a financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). A judge cannot remain willfully ignorant; he must "inform himself about his personal and fiduciary financial interests, and make a reasonable effort to inform himself about the personal [and] financial interests of his spouse." 28 U.S.C. § 455(c). Where a judge violates any one of these restrictions or merely appears biased, the judge must immediately "disqualify himself." 28 U.S.C. § 455(a), (b).

## ARGUMENT

### I.    Judge Schultz should be disqualified under 28 U.S.C. § 455(a) and (b).

Magistrate Judge Schultz's violations of section 455(a) and (b) demand his disqualification. Judge Schultz violated section 455(b)(4) by knowingly holding 3M stock while presiding over this MDL. This newly discovered evidence—at a bare minimum—creates an appearance of bias under section 455(a) requiring Judge Schultz's disqualification.

#### A.  Judge Schultz knew he had a financial interest in 3M during this MDL.

Section 455(b)(4) mandates disqualification where the judge "knows that he … or his spouse … has a financial interest in the subject matter in controversy or in a party to the proceeding." 28 U.S.C. § 455(b)(4). Disqualification in this context is not optional; it is "automatic." *Little Rock Sch. Dist. v. Ark. State Bd. of Educ.*, 902 F.2d 1289, 1290 (8th Cir. 1990); *see, e.g.*, Wright & Miller, *Fed. Prac. & Proc. Juris.* § 3546 (3d ed.) (judge "must recuse" if he or she has "*any* financial interest … in a party"). "It is well-established that the ownership of stock constitutes a financial interest." *E.g.*, *Shell Oil Co. v. United States*, 672 F.3d 1283, 1289 (Fed. Cir. 2012) (citing 28 U.S.C. § 455(d)(4)).

This bright-line rule leaves "no room for discretion." Wright & Miller, § 3546. Judges who have discovered such conflicts therefore recused themselves "at once." *In re Mar. & Ne. Pipeline, L.L.C.*, 349 F.Supp.2d 175, 178 (D. Mass 2004); *see, e.g.*, *H & R Block, Inc. v. Am. Int'l Specialty Lines Ins. Co.*, 546 F.3d 937, 938 n.1 (8th Cir. 2008) (judge "recused from the case when he inherited stock in one of the parties"); *In re RFC &*

6

*Rescap Liquidating Tr. Litig.*, 2016 WL 7177706, at *2 (D. Minn. Dec. 8, 2016) (similar "mid-litigation" recusal in "consolidated action").

In fact, droves of judges recused themselves in the wake of the Wall Street Journal's ground-breaking 2021 article reporting that "[m]ore than 130 federal judges ha[d] violated U.S. law and judicial ethics by overseeing court cases involving companies in which they or their family owned stock." *See ExxonMobil Oil Corp. v. TIG Ins. Co.*, 44 F.4th 163, 171 (2d Cir. 2022) (quoting James V. Grimaldi, Coulter Jones & Joe Palazzolo, *131 Federal Judges Broke the Law by Hearing Cases Where They Had a Financial Interest*, Wall St. J., Sept. 28, 2021); *see, e.g.*, *Roberts v. Wal-Mart La., L.L.C.*, 54 F.4th 852, 853-54 (5th Cir. 2022); *Obduskey v. Wells Fargo*, 2023 WL 1831128, at *4 (10th Cir. Feb. 9, 2023).[10]

Although the Wall Street Journal article presumably prompted Judge Schultz to finally reveal that he had owned "72 shares of 3M stock" while overseeing this MDL, he refused to recuse, unlike other judges. *Compare* Dkt. 2161 at 1-2, *with, e.g.*, *ExxonMobil Oil Corp.*, 44 F.3d at 170-71 ("Although [the judge] reported that his stock ownership did not affect his decisions in the case, he recognized that such ownership would have required his recusal."). Instead, Judge Schultz issued an order on December 22, 2021, sidestepping recusal because he apparently first "became aware of his (very) modest past ownership interest in 3M" in November 2021, after he divested. Dkt. 2161 at 1. But documents show otherwise.

---

[10] The article was limited to district judges, so it did not name Magistrate Judge Schultz. *See* Coulter Jones, James V. Grimaldi & Joe Palazzolo, *How the Journal Found Judges' Violations of Law on Conflicts*, Wall St. J. (Sept. 28, 2021), http://bit.ly/3JXPW6M.

Newly discovered Annual Financial Disclosure Reports confirm Judge Schultz had full knowledge of his interest in 3M at the time of his appointment to the MDL in 2018 and for two full years of the MDL before he finally divested.

| FINANCIAL DISCLOSURE REPORT<br>Page 12 of 34 | Name of Person Reporting<br>Schultz, David T. | | Date of Report<br>08/08/2018 |
|---|---|---|---|

**VII. INVESTMENTS and TRUSTS** — *income, value, transactions (Includes those of spouse and dependent children; see pp. 34-60 of filing instructions.)*

☐   NONE *(No reportable income, assets, or transactions.)*

| A.<br>Description of Assets<br>(including trust assets)<br><br>Place "(X)" after each asset<br>exempt from prior disclosure | B.<br>Income during<br>reporting period | | C.<br>Gross value at end<br>of reporting period | | D.<br>Transactions during reporting period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1)<br>Amount<br>Code 1<br>(A-H) | (2)<br>Type (e.g.,<br>div., rent,<br>or int.) | (1)<br>Value<br>Code 2<br>(J-P) | (2)<br>Value<br>Method<br>Code 3<br>(Q-W) | (1)<br>Type (e.g.,<br>buy, sell,<br>redemption) | (2)<br>Date<br>mm/dd/yy | (3)<br>Value<br>Code 2<br>(J-P) | (4)<br>Gain<br>Code 1<br>(A-H) | (5)<br>Identity of<br>buyer/seller<br>(if private<br>transaction) |
| 136.  3M CO (MMM) | A | Dividend | J | T | Buy<br>(add'l) | 09/14/17 | J | | |
| 232.  3M CO (MMM) | A | Dividend | J | T | | | | | |
| 391.  3M CO (MMM) | A | Dividend | J | T | | | | | |

PX2 (2017-Disclosure-1, 12, 17, 27) (reporting 3M stock ownership, purchase, and dividends on August 8, 2018); PX3 (2018-Disclosure-10, 15, 26) (dividends); PX4 (2019-Disclosure-10, 14, 23) (dividends).

Judge Schultz's signature "certify[ing]" his "knowledge" of his financial interest in 3M was "accurate, true, and complete," *e.g.*, PX2 (2017-Disclosure-34), confirms he was "subjectively aware" of that conflict during the MDL, *cf.* Dkt. 2161 at 1.

## IX. CERTIFICATION.

I certify that all information given above (including information pertaining to my spouse and minor or dependent children, if any) is accurate, true, and complete to the best of my knowledge and belief, and that any information not reported was withheld because it met applicable statutory provisions permitting non-disclosure.

I further certify that earned income from outside employment and honoraria and the acceptance of gifts which have been reported are in compliance with the provisions of 5 U.S.C. app. § 501 et. seq., 5 U.S.C. § 7353, and Judicial Conference regulations.

Signature: **s/ David T. Schultz**

*E.g.*, PX2 (2017-Disclosure-34); PX3 (2018-Disclosure-37); PX4 (2019-Disclosure-31).[11]

Given Judge Schultz's knowledge of his financial interest in 3M before and during this MDL, he "should have recused himself from this matter upon its assignment to him." *See, e.g.*, *ExxonMobil Oil Corp.*, 44 F.4th at 171. His repeated failure to do so was a plain "violation of § 455(b)(4)." *See Liljeberg*, 486 U.S. at 867.[12] And his stated ignorance of this conflict is "inexcusable" given the impact of his omission on Plaintiffs and the public. *See id.* at 866; *Roberts*, 54 F.4th at 854 ("the public's faith in the judicial system" is "undermined" where a judge holds stock in a party but fails to recuse).

---

[11] The statutory exception for "mutual or common investment funds" did not apply to Judge Schultz's "financial interest" in 3M. *See* 28 U.S.C. § 455(d)(4)(i); *see, e.g.*, PX5 (Thrivent, *Traditional IRA vs. Roth IRA*) ("[A]n IRA is not a mutual fund."). Judge Schultz's disclosure of his stock ownership is telling. *See* Dkt. 2161; Code of Judicial Conduct, Canon 3C(3)(c)(i) (defining "financial interest" in same manner as § 455(d)(4)(i)); *cf., e.g.*, PX4 (2019-Disclosure-29) (identifying "Maslon Cash Balance Pension Plan" as sole account over which Judge Schultz exercised "no control" pursuant to section 455(d)(4)).

[12] *See, e.g.*, *Obduskey*, 2023 WL 1831128, at *6 ("[The judge] violated § 455 by failing to initially recuse from this case, in light of the fact that [he] or his wife owned Wells Fargo stock while he was presiding over the case."); *Roberts*, 54 F.4th at 854 (similar); *Driscoll v. Metlife Ins.*, 2021 WL 5323962, at *1 (S.D. Cal. Oct. 19, 2021) ("Although [the judge] eventually recused herself in response to [the] motion, that she did not do so *sua sponte* as soon as she discovered the disqualifying conflict was a violation of section 455(b)(4).").

9

Judge Schultz "remain[ed] under a duty to stay informed of any personal or fiduciary financial interest [he] may have" had in the litigation, "notwithstanding [its] size and complexity." *See Liljeberg*, 486 U.S. at 862 n.9 (citing 28 U.S.C. § 455(c)). Independent of his section 455(b)(4) violation, then, Judge Schultz "separate[ly] violat[ed]" section 455(c) by "fail[ing] to stay informed of his fiduciary interest," as Chief Justice Roberts instructed him. *See Liljeberg*, 486 U.S. at 867-68; *Sw. Bell Tel. Co. v. F.C.C.*, 153 F.3d 520, 521 (8th Cir. 1998) ("[I]t is the fundamental ethical duty of every judge to police his or her own disqualification status."); Roberts, *supra* note 5, at 3-4.

Judge Schultz's prior reasoning does not save him under section 455 or the Canons. *See* Dkt. 2161 at 1-2; *Liljeberg*, 486 U.S. at 858 n.7 (Congress amended section 455 "to conform with the recently adopted ABA Code of Judicial Conduct"); *Veneklase v. City of Fargo*, 236 F.3d 899, 901 (8th Cir. 2000).

Judge Schultz's description of his stock ownership as "(very) modest" is of no moment. *Cf.* Dkt. 2161 at 1.[13] Section 455(d)(4) defines a "financial interest" as "ownership of a legal or equitable interest, *however small*." 28 U.S.C. § 455(d)(4) (emphasis added); Wright & Miller, § 3546; *see* Roberts, *supra* note 5, at 3. The Canons echo that expansive definition, as Judge Schultz himself recognized. *See* Dkt. 2161 at 2 ("Canon 3C(3)(c) defines a 'financial interest' as 'ownership of a legal or equitable interest, however small.'"). Ergo, "no matter how insubstantial [his] financial interest and regardless of

---

[13] To most Americans, Judge Schultz's stock ownership was anything but "modest." *See, e.g.*, PX2 (2017-Disclosure-12) (characterizing stock purchase as worth up to $15,000).

whether or not [his] interest actually creates an appearance of impropriety," disqualification is required. *See, e.g.*, *Liljeberg*, 486 U.S. at 859 n.8.

Equally unavailing are Judge Schultz's non-sequiturs that he did not "approve" the 3M stock purchase, that he lacked "subjective[] aware[ness]" of the purchase, and that he "divested" his interest after presiding over this litigation for two years. *Cf.* Dkt. 2161 at 1. Under the disqualification statute, all that matters is whether Judge Schultz knew he had a "financial interest" in 3M during this MDL. *See* 28 U.S.C. § 455(b)(4). And his signed and certified financial disclosure forms confirm that he did.

Section 455(f) allows judges to cure conflicts in certain circumstances, to be sure. *See* 28 U.S.C. § 455(f). But "curative divestment" only counts when it immediately follows discovery of the conflict; it was never meant to be invoked retroactively to avoid recusal. *See, e.g.*, *In re Aetna UCR Litig.*, 2013 WL 1622160, at *4-5 (D.N.J. Apr. 15, 2013). Here, however, Judge Schultz did not divest when he first reported this conflict in 2018. Quite the opposite: he continued to report 3M dividends throughout the MDL. *E.g.*, PX3 (2018-Disclosure-10, 15, 26). Section 455(f) does not excuse such violations. Even if it did, Plaintiffs would still seek disqualification. *See, e.g.*, *In re Mar. & Ne. Pipeline, L.L.C.*, 349 F.Supp.2d at 179 ("[S]ection 455(f) prudentially ought to be reserved for those situations where all parties desire continued judicial action by the same judicial officer.").

In addition, Judge Schultz cannot satisfy the savings clause's plain language because he did not devote "substantial judicial time" to this MDL. *See* 28 U.S.C. § 455(f); *see also* Wright & Miller, § 3546 ("[T]he concept of 'substantial judicial time,' … [depends] on the amount of activity undertaken by the court, rather than mere passage of

time."). From July 2018 (when he was appointed) to July 2019 (when the MDL was closed), Judge Schultz handed down only 14 rulings. *See* Dkt. 2161-1. Compared to his predecessor, Judge Schultz's "involvement in the action was, to put it plainly, minimal." *See In re Aetna*, 2013 WL 1622160, at *1, 4.[14] After all, Judge Schultz could not have substantially impacted the MDL while it was on appeal and then held in "abeyance" as the parties "pursue[d] mediation." *See id.* (finding "basic housekeeping" during mediation constituted "minimal" involvement); Dkt. 2169. Because "it can hardly be said that Judge [Schultz] devoted 'substantial judicial time' to the [MDL]," section 455(f) is "unavailable" to him. *See, e.g.*, *Tramonte v. Chrysler Corp.*, 136 F.3d 1025, 1031-32 (5th Cir. 1998).[15]

Judge Schultz also cannot seek shelter under section 455(f)'s safe harbor because his financial interest in 3M could have been "substantially affected by the outcome" of this massive MDL. *See* 28 U.S.C. § 455(f). Properly understood, the inquiry considers "not the size of the interest, but the size of the impact on the interest." *United States v. United Health Grp., Inc.*, 2019 WL 2353124, at *1 (C.D. Cal. May 31, 2019). Outcomes of high-profile MDLs like this one—the eighth largest mass tort in the country—significantly impact

---

[14] *Compare* Dkt. 2161-1 (collecting Judge Schultz's rulings), *with, e.g.*, Dkts. 19, 57, 107, 109, 112, 121, 122, 144, 148, 160, 167, 179, 211, 231, 243, 249, 250, 265, 282, 290, 293, 306, 392, 498, 501, 574, 576, 585, 589, 621, 629, 645, 682, 709, 852, 854, 858, 987, 988, 990, 991, 1015, 1016, 1027, 1059, 1067, 1096, 1097, 1099, 1168, 1174, 1178, 1182, 1196, 1245, 1247, 1310, 1322, 1374.

[15] *See also, e.g.*, *In re Aetna*, 2013 WL 1622160, at *5; *Gordon v. Reliant Energy, Inc.*, 141 F.Supp.2d 1041, 1045 (S.D. Cal. 2001).

financial investments in the defendant-companies.[16] Because this MDL surely "affect[ed] the price of [his 3M stock] by even a penny," Judge Schultz's divestment of his shares does not save him from disqualification. *See id.*

Either way, Judge Schultz's dilatory divestment "give[s] rise to an appearance of impropriety." *See id.*; *see, e.g.*, *United States v. Miell*, 2018 WL 974843, at *3 (N.D. Iowa Apr. 8, 2008). Most troubling is Judge Schultz's representation to Plaintiffs and the public that he lacked knowledge of his conflict until November 2021. *See* Dkt. 2161 at 1. Clearly, an average person on the street would expect a federal judge to review his Annual Financial Disclosures as part of his investigation into his own financial holdings following the Wall Street Journal exposé. *See E.A. Renfroe & Co.*, 2008 WL 11375428, at *4 ("A federal judge is very likely to be aware of such [a financial] interest, partly because … the Ethics in Government Act requires that judges file an annual Financial Disclosure Report detailing their stockholdings and other investments."). Regardless, Judge Schultz's certification of those disclosures establishes his knowledge of the conflict. Disqualification follows.

### B. Judge Schultz appears biased even if he is not actually biased.

Even if Judge Schultz could evade section 455(b)(4) by claiming he lacked knowledge of his 3M stock, he cannot escape section 455(a)'s "catchall recusal provision." *See Liteky*, 510 U.S. at 548. That "liberal standard," *Singer*, 575 F.Supp. at 68, "requires disqualification if a reasonable person who knew the circumstances would question [Judge

---

[16] 3M's stock price plummeted 30% last year due to its mounting liability in a similar products-liability MDL. *See* Rob Griffin, *3M insider stock sale: Chief legal officer offloads $700k MMM stock as company battles earplug lawsuits by veterans*, Capital (Nov. 8, 2022), http://bit.ly/3U1m3Hm.

Schultz's] impartiality, even though no actual bias or prejudice has been shown," *see Willis*, 2012 WL 6644240, at *1 (Ericksen, J.). Actual bias is not dispositive of Judge Schultz's disqualification because "observers outside of the judicial process are less inclined to credit [his] impartiality and mental discipline than the judiciary itself will be." *See, e.g.*, *United States v. Herrera-Valdez*, 826 F.3d 912, 918-19 (7th Cir. 2016).

Whether Judge Schultz truly lacked knowledge about his financial conflict while presiding over this MDL "is open to speculation, and it is precisely that speculation that causes the perception of bias [by an average person on the street] which is prohibited under § 455(a)." *See, e.g.*, *Herrera-Valdez*, 826 F.3d at 919; *cf. Borrero*, 2009 WL 2005221, at *1 (Ericksen, J.). "Scienter is not an element of a violation of § 455(a)," so Judge Schultz's belated knowledge of his financial interest in 3M "does not eliminate the risk that his impartiality might reasonably be questioned." *See Liljeberg*, 486 U.S. at 859. Thus, even if Judge Schultz first discovered his section 455(b)(4) violation after he "divested of all 3M stock," Dkt. 2161 at 1, disqualification is still inescapable under section 455(a), *see, e.g.*, *E.A. Renfroe & Co. v. Rigsby*, 2008 WL 11375428, at *4 (N.D. Ala. Jan. 4, 2008); *Driscoll*, 2021 WL 5323962, at *1.

At a minimum, to "rectify" his "oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary," Judge Schultz should have recused "when he finally realized that [he] had an interest in the litigation." *See Liljeberg*, 486 U.S. at 861; *see, e.g.*, *In re Sch. Asbestos Litig.*, 977 F.2d 764, 784 (3d Cir. 1992) ("[A judge] can and should disqualify himself or herself retroactively upon discovery of the facts that led to the current appearance of partiality."). Indeed, assuming his "failure to disqualify

14

himself was the product of a temporary lapse of memory," despite his self-certified disclosure of 3M stock ownership and dividends during this MDL, "it was nevertheless a plain violation of the terms of the statute." *See Liljeberg*, 486 U.S. at 861-62 (citing 28 U.S.C. § 455(a)).[17] Not only that, Judge Schultz's refusal to recuse after so "many publicly reported instances of federal judges presiding over cases in violation of § 455 create[d] a particular risk of undermining public opinion in the judicial process," even if he "was not actually aware of [his] disqualifying interest." *E.g.*, *Driscoll*, 2021 WL 5323962, at *1-2; *Eclipse Grp., LLP v. Target Corp.*, 2023 WL 1453155, at *3-4 (S.D. Cal. Feb. 1, 2023).

Accordingly, in the extraordinary event that section 455(b)(4) does not mandate Judge Schultz's disqualification—it does—disqualification would still further "the purpose behind [section 455(a)] of assuring the appearance of impartiality." *See Dyas v. Lockhart*, 705 F.2d 993, 997-98 (8th Cir. 1983); *see, e.g.*, *Potashnick*, 609 F.2d at 1111-12; *In re Hatcher*, 150 F.3d 631, 633 (7th Cir. 1998) ("Notwithstanding our complete confidence in [the judge's] integrity and impartiality, however, we conclude that the circumstances of this case required him to recuse himself under § 455(a) because of the significant risk of an appearance of impropriety.").

---

[17] *See, e.g.*, *Liljeberg v. Health Servs. Acquisition Corp.*, 796 F.2d 796, 802-03 (5th Cir. 1986) (disqualifying judge under section 455(a) despite lack of knowledge under 455(b)(4)), *aff'd*, 486 U.S. 847 (1988); *Chase Manhattan Bank v. Affiliated FM Ins. Co.*, 343 F.3d 120, 130 (2d Cir. 2003) ("[T]he district judge's stated ignorance … cannot overcome the objective appearance of a conflict of interest requiring disqualification under Section 455(a)."); *Driscoll*, 2021 WL 5323962, at *1 (similar).

## II.     Judge Ericksen should be disqualified under 28 U.S.C. § 455(a).

Section 455(a) also requires removal of Judge Ericksen. Compared to section 455(b), "the language of [s]ection 455(a) allows a greater flexibility in determining whether disqualification is warranted in [this] particular situation[]." *United States v. Ritter*, 540 F.2d 459, 462 (10th Cir. 1976). The framework is "fact-driven" and "turn[s] on [the] subtleties" of Plaintiffs' motion. *E.g.*, *United States v. Holland*, 519 F.3d 909, 913-14 (9th Cir. 2008).

Extrajudicial bias is the hallmark of section 455(a) disqualification, but it is not a desideratum. "The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a *necessary* condition for bias or prejudice recusal." *Liteky*, 510 U.S. at 554. Disqualification "may be necessary based solely on events transpiring in current court proceedings." *Sentis Grp. Inc., v. Shell Oil Co.*, 559 F.3d 888, 904 (8th Cir. 2009). This Court recognizes that well-settled rule. *E.g.*, *In re Yehud-Monosson USA, Inc.*, 472 B.R. 795, 878 (D. Minn. 2012) (Ericksen, J.) (citing *Liteky*, 510 U.S. at 555).

Whether a judge appears to be biased is not a piecemeal analysis. Multiple events standing alone may not require disqualification, but "[t]he cumulative effect of a judge's individual actions, comments and past associations could raise some question about impartiality." *In re Martinez-Catala*, 129 F.3d 213, 221 (1st Cir. 1997). Because "the whole is sometimes greater than the sum of its parts," *id.*, section 455(a) disqualification depends on the "total facts," *Ritter*, 540 F.2d at 464. Disqualification is required where the totality of "unusual circumstances" would impact "public perception of a fair and impartial judicial

16

system." *Singer*, 575 F.Supp. at 68; *see In re Sch. Asbestos Litig.*, 977 F.2d at 782; *Ritter*, 540 F.2d at 464; *Parker v. Connors Steel Co.*, 855 F.2d 1510, 1524-25 (11th Cir. 1988).

Here, the totality of circumstances requires Judge Ericksen's removal. Her pattern of flawed rulings and fractious relationship with Plaintiffs' counsel "reflect a sufficiently high degree of antagonism" to warrant disqualification. *See, e.g.*, *Sentis*, 559 F.3d at 904. To boot, Judge Ericksen's undisclosed retention of a retired senior products-liability defense attorney to serve as her temporary "law clerk," but who actually functioned as her *ex parte* industry advisor when she gutted the MDL, irreparably tainted her appearance of impartiality. The Eighth Circuit's unanimous ruling that she "committed a clear error of judgment" in jettisoning one of America's largest MDLs, combined with all her other concerning conduct throughout the MDL, creates at least an *inference* of bias. *In re Bair Hugger*, 9 F.4th at 785, 787-88; *see, e.g.*, *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 668 (8th Cir. 2022).

## A. Judge Ericksen's pattern of conduct and rulings raises an inference of bias.

Under section 455(a), "a fractious relationship between the district court and [a party's] attorneys" may signal "potential impropriety." *Moran*, 296 F.3d at 649. An appearance of impropriety may also arise from a "judge's course or pattern of rulings" during the litigation. *Id*. Although "the judge's course of conduct" and "pattern of rulings" may each independently support disqualification, *id.*, their combination mandates that outcome in this litigation, *see, e.g.*, *Sentis*, 559 F.3d at 904-05; *Dyas*, 705 F.2d at 997.

*Sentis* is instructive. There, plaintiffs had moved to disqualify the district court under section 455(a) given the court's intent to grant defendant's motion to dismiss as a

17

sanction for plaintiffs' discovery abuses. *Sentis*, 559 F.3d at 891. After the district court refused to recuse and then dismissed the case as forecasted, plaintiffs appealed. *Id.* at 897-98. The Eighth Circuit "reverse[d] as to the recusal issue" and "remand[ed] for reassignment and reconsideration of the motion for sanctions." *Id.* at 891. Even though plaintiffs had alleged "no extrajudicial source indicating an appearance of impartiality," the panel concluded "[t]he proceedings leading up to and including the sanctions hearing," together with "the ultimate order of dismissal, reflect[ed] a sufficiently high degree of antagonism to require reassignment." *Id.* at 904. In addition to "distrust[ing]" plaintiffs "early in the litigation," the district court had "mischaracteriz[ed]" discovery orders and denied plaintiffs "an opportunity for discovery." *Id.* at 905. Viewing the district court's rulings "in context," alongside its "salty" commentary to counsel, the panel held that a "reasonable man" would likely "harbor doubts about the judge's impartiality." *Id.*

So too here. A reasonable person would harbor grave doubts about Judge Ericksen's impartiality because—in Judge Schultz's own words—she has "battered and bruised" Plaintiffs during this MDL. PX6 (4/26/19-Tr.-34:18-19). Besides holding herself out as "the mean judge," PX7 (11/15/18-Tr.-29:5-6), and insulting Plaintiffs' counsel several times,[18] Judge Ericksen rarely—if ever—sided with Plaintiffs during this long-running

---

[18] Canvassing all examples is well-nigh impossible, as many occurred off the record. Zimmerman Decl. ¶ 3. But one exemplar of Judge Ericksen's "distrust" of Plaintiffs' counsel occurred "early in the litigation" and without "provo[cation]." *Cf. Sentis*, 559 F.3d at 891, 905. During the multi-day *Daubert* hearing in 2017, Judge Ericksen sardonically insulted Plaintiffs' counsel. *See* PX8 (10/25/17-Tr.-237:4-10) ("[Plaintiffs' counsel]: … I have copies of the decs that we presented yesterday that we would be happy to give the Court. I conferred with my friends on the other side, and they have copies as well. THE

litigation. Her adverse rulings infected even the most quotidian issues. To name just a few: Judge Ericksen refused to amend the deadline for Plaintiffs to file suggestions of death despite the "impossibility" of complying with that deadline, Dkt. 1614 at 1-3; she never required 3M to produce a Defendant Fact Sheet—a drastic departure from any modern MDL—despite requiring Plaintiffs to produce thousands of individual fact sheets, Zimmerman Decl. ¶¶ 9-10; and she dismissed multiple cases based on her speculation that Plaintiffs' signatures were supposedly plagiarized, PX9 (10/18/18-Tr.-23:22-28:25).

Her rulings also distorted the sole bellwether trial, slanting it so far in 3M's favor as to "rob[] the verdict of any value as a bellwether."[19] Over the two-week trial, Judge Ericksen permitted Plaintiff to admit a grand total of 15 documents, but not a single 3M internal document except a product manual. *See Gareis*, Dkt. 467 (citing P-1337). She sustained 3M's objection to every internal memo or email, *e.g.*, PX10 (5/15/18-Tr.-112:8-13), including 3M's fatal admission that ██████████████████████████████ ██████, PX11 (3MBH00834874). According to Judge Ericksen, 3M's knowledge of its own device's defects was irrelevant to whether Bair Hugger was defectively designed. *See Gareis*, Dkt. 304; *cf. Gareis*, Dkt. 245 at 3-6; *Gareis*, Dkt. 297 at 41:1-49:16. Unable to

---

COURT: *No one is admitting to being your friend*.") (emphasis added). This comment followed Judge Ericksen's transparent remark revealing her animus toward that attorney and Plaintiffs in general. *See id.* at 236:8-10 ("If I had a heart and if I had feelings, I would have felt bad for cutting you off."). Even if those statements do not require disqualification, Judge Ericksen still violated the Judicial Canons. *See* Code of Judicial Conduct, Canon 3A(3) ("A judge should be patient, dignified, respectful, and courteous to litigants.").

[19] *Cf., e.g.*, 3M's Brief at 41, *Adkins v. 3M Co.*, No. 22-12812 (11th Cir. Nov. 21, 2022).

shore up her paradoxical reasoning, the Eighth Circuit avoided it altogether. *See Gareis v. 3M Co.*, 9 F.4th 812, 816-17 (8th Cir. 2021) (harmless error).[20]

As word traveled about Judge Ericksen's pattern of rulings up to and following the *Gareis* trial, Plaintiffs from all over the nation retracted their *Lexecon* waivers. Dkt. 1379 at 2. But consistent with her prior rulings assailing Plaintiffs, Judge Ericksen rejected those retractions. *See id.* at 5. Instead of allowing Plaintiffs to try their cases in more neutral forums, Judge Ericksen forced them to suffer through her erroneous rulings. *See id.*

And that they did, as Judge Ericksen ruled against Plaintiffs on *every* significant issue. In global discovery, for example, she ruled that air-free conductive warming devices were not safer alternative designs to forced-air convective warming devices. Dkt. 304 at 3-4. She made this ruling without considering individual state laws, much less conducting a 50-state survey or affording Plaintiffs any discovery into this fact-bound question. *See id.* at 5-6. Although the Eighth Circuit affirmed because Plaintiffs "had other reasonable-alternative-design evidence available to them," the panel made no effort to endorse Judge Ericksen's anomalistic holding that "this discovery was irrelevant across the entire MDL." *See In re Bair Hugger*, 9 F.4th at 790; *Gareis*, 9 F.4th at 816-17 (harmless error).

Following that skewed ruling, Judge Ericksen denied bellwether Plaintiffs' motion to amend the Master Complaint to add a claim for punitive damages. Dkt. 984 at 1. Plaintiffs' run-of-the-mill request was "futile," said Judge Ericksen, because Plaintiffs had

---

[20] Judge Ericksen's other rulings at trial were also far from even-handed. Examples abound. *Compare, e.g.*, PX12 (5/16/18-Tr.-488:5-16) (examples of 3M publishing studies), *with, e.g.*, PX12 (5/16/18-Tr.-400:1-401:4) ("No, you may not put it on the screen.").

not shown 3M knew Bair Hugger could cause infection. *Id.* at 1, 3-4. In so ruling, Judge Ericksen not only rejected studies from 3M's files directly linking Bair Hugger to infection, *cf. id.* at 4 n.2, but she disregarded data in 3M's possession demonstrating Bair Hugger increases infections by 380%, *cf. id.* at 4 n.3. Unsurprisingly, a judge outside this District decisively overruled 3M's motion for directed verdict on punitive damages, proving Plaintiffs' motion to allege punitive damages was anything but futile. *See* PX13 (*O'Haver*-Trial-Tr.- 1493:10-1494:1, 1600:6-1604:24, 2303:2-2304:6).

Undeterred, Judge Ericksen ignored the same evidence on summary judgment when tersely dismissing Plaintiff's failure-to-warn claim. *See Gareis*, Dkt. 111 at 3; *Gareis*, Dkt. 113 at 3. Citing nothing, she declared that "the available scientific or medical data would not have alerted a reasonable medical-device manufacturer that the Bair Hugger could cause a prosthetic-joint infection." *Gareis*, Dkt. 113 at 3. Yet again, 3M's own documents proved ███████████████████████████████████████████, PX14 (3MBH00001336), ██████████████████████████, PX11 (3MBH00834874). Yet again, peer-reviewed literature put 3M on notice of a significant association between Bair Hugger and infection, *see Gareis*, Dkt. 65 at 5 n.5, 19, 48 (citing, *e.g.*, PX11; PX14). And yet again, the Eighth Circuit could not rubber-stamp Judge Ericksen's rogue reasoning. *See Gareis*, 9 F.4th at 818-19 (harmless error).

Nor could the Eighth Circuit find any justification for Judge Ericksen's peculiar order permanently enjoining a Plaintiff from litigating his Bair Hugger claims outside the MDL. *See Petitta v. 3M Co.*, 999 F.3d 534, 536 (8th Cir. 2021). The decision is remarkable not only for its reversal of Judge Ericksen's meretricious attempt to block a plaintiff from

21

litigating outside her courtroom, but also for the taint of bias it reveals; the suspicious timing of her injunction did not go unnoticed by the panel. *See id.* at 537 ("The Texas court heard arguments on Petitta's motion for summary judgment on August 7, 2019. Later *that same day*, the MDL court granted 3M's motion for an injunction.") (emphasis added).

Ultimately, Plaintiffs' *only* major win throughout this protracted litigation was Judge Ericksen's initial *Daubert* ruling denying 3M's motion to exclude Plaintiffs' general-causation experts. Dkt. 1024 at 30. But that sole victory evaporated, of course, when Judge Ericksen radically reversed herself and poured out all 5,000 cases 18 months later, despite the absence of any new scientific evidence. *See* Dkt. 2065 at 1-2; *see also In re Bair Hugger*, 9 F.4th at 776-90 (reversing reconsideration decision for abuse of discretion).

Given Judge Ericksen's pattern of conduct and rulings in the MDL, there can be no doubt that a reasonable person would "harbor doubts about [her] impartiality." *See Sentis*, 559 F.3d at 905. As in *Sentis*, Judge Ericksen "manifested" her "distrust" of Plaintiffs "early in the litigation" and she "mischaracterize[ed]" the record on too many occasions. *See id.* At bottom, "[t]he proceedings leading up to and including the [reconsideration] hearing, … and the ultimate order of dismissal [of the MDL], reflect a sufficiently high degree of antagonism to require reassignment." *See id.* at 904-05; *see, e.g.*, *Moran*, 296 F.3d at 649; *Cobell v. Kempthorne*, 455 F.3d 317, 333-35 (D.C. Cir. 2006).

**B.  Judge Ericksen's reconsideration decision itself raises an inference of bias.**

Even ignoring Judge Ericksen's disparaging remarks and repeated rulings against Plaintiffs, the reconsideration proceeding alone supports her disqualification under section 455(a). In fact, a recent Eighth Circuit decision requires it.

22

In *Tumey*, the plaintiff moved for a temporary restraining order enjoining defendant Mycroft from engaging in cyber-attacks. 27 F.4th at 661-62. At the hearing, the district court granted Tumey's request to convert the motion to a preliminary injunction. *Id.* at 662. The court did so over Mycroft's objection that it had not yet conducted discovery on the injunction. *Id.* Nevertheless, the court heard testimony from both parties, including from Tumey's business partner who admitted that he had found no evidence linking the attacks to Mycroft. *Id.* at 662-63. Despite the paucity of incriminating evidence, the district court granted the injunction and refused to stay it pending appeal. *Id.* at 663-64.

Mycroft appealed, seeking not only vacatur of the injunction but also reassignment to a different judge. *Id.* at 664, 668. Finding no evidence to support the injunction, the Eighth Circuit vacated it. *Id.* at 667-68. Regarding reassignment, the panel considered under 28 U.S.C. § 2106 "whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts"—the same standard governing section 455(a) disqualification. *See id.* Though both parties had engaged in "frustrating conduct," "an objective review of the record demonstrate[d] a degree of antagonism against Mycroft that [was] higher than that being applied against Tumey." *Id.* at 668. Beyond transforming Tumey's motion from a temporary restraining order to a preliminary injunction, the district court "fanned the flames" by "restricting Mycroft's access to evidence" and granting the injunction despite the dearth of evidence incriminating Mycroft. *Id.* "Because a reasonable person" aware of the proceeding "would harbor doubts about the [district court's] impartiality," the panel ordered reassignment on remand. *Id.*

23

If the injunction proceeding in *Tumey* independently required reassignment, the reconsideration proceeding in this MDL does too, *a fortiori*. Just like in *Tumey*, where the district court allowed Tumey to "transform his motion for a temporary restraining order to a preliminary injunction" without supporting evidence, *see* 27 F.4th at 666-68, Judge Ericksen granted 3M leave to move for reconsideration of her general-causation rulings without any legal or factual support, *see* Dkt. 1428. Although Plaintiffs' world-class general-causation experts relied on *hundreds* of scientific sources to support their well-established opinion that Bair Hugger can cause deep-joint infection, *see, e.g.*, Dkt. 1429 at 1, 3M predicated its motion for leave on *one* new study by Jeans that supposedly created a sea change in the scientific evidence, *see* Dkt. 1428 at 2. But that irrelevant study did not test Bair Hugger, nor analyze deep-joint infections; it merely analyzed the impact of one potential confounding variable on infections in general. *See* Dkt. 1787 at 35-43. Even 3M's epidemiologist confessed that Jeans did not confound Plaintiffs' evidence. *Id.* Despite no new evidence, Judge Ericksen greenlighted 3M's plea to unravel the MDL. *See* Dkt. 1608.

Also like in *Tumey*, where the district court "fanned the flames" by "restricting Mycroft's access to evidence," *see* 27 F.4th at 668, Plaintiffs were barred from conducting discovery on the supposedly "new evidence" supporting 3M's motion for reconsideration, Dkt. 1781. For instance, Plaintiffs sought leave to depose one or more authors of the Jeans study—the heart of 3M's misguided motion. Dkt. 1747 at 1-2. Plaintiffs' prompt request was summarily denied. Dkt. 1781. Plaintiffs also sought leave for their experts to "review and respond to the [Jeans study], given [3M's] reliance on the same [study] in moving to exclude their expert opinions." Dkt. 1747 at 2. Plaintiffs' prompt request was summarily

denied. Dkt. 1781. Finally, Plaintiffs sought an extension of time to respond to 3M's motion given its potentially dispositive impact on all 5,000 cases in the MDL. *See* Dkt. 1747 at 2. Yet again Plaintiffs' prompt request was summarily denied, even though Judge Ericksen had not scheduled oral argument. *See* Dkt. 1781; *cf.* Dkt. 1921.

After Judge Ericksen forced Plaintiffs to defend themselves with their hands tied behind their backs, Dkt. 1786, she *sua sponte* ordered a "homework assignment" on three new "issues," *see* Dkt. 1905. Though 3M had cabined its motion to *general* causation, Judge Ericksen's "issues" confusingly and unjustifiably expanded the inquiry to target *specific* causation. *See* Dkt. 1905. One issue, for example, instructed Plaintiffs to identify a methodology to support their claim that "Bair Hugger [is] the most probable cause of infection," *id.* at 1-2, even though Plaintiffs were required to prove only that Bair Hugger is *a* cause of infection, Dkt. 1914 at 4-5. Despite the very limited scope of 3M's reconsideration motion, Judge Ericksen erroneously conflated the elementary concepts of general and specific causation. Compounding the problem, none of these newly fabricated concerns about specific causation was raised in 3M's motion, clouding Judge Ericksen's newfound curiosity with suspicion. *See* Dkt. 1719.

What's more, just as the district court in *Tumey* enjoined Mycroft despite the absence of incriminating evidence against it, *see* 27 F.4th at 666-67, Judge Ericksen poured out Plaintiffs' experts on reconsideration despite no new evidence dooming their opinions, *see* Dkt. 2064. She did so without addressing objections in Plaintiffs' brief, *see* Dkt. 1787, not to mention those raised at oral argument, *see* Dkts. 1980, 2111. She even ignored 3M's confession that ███████████████████████████████████████████████ PX14

(3MBH00001336). Instead, Judge Ericksen gutted Plaintiffs' experts based on points 3M never raised, blindsiding Plaintiffs without due process. *See, e.g.*, Dkt. 2064 at 37-38.

Finally, the Eighth Circuit vacated Judge Ericksen's decision, just like in *Tumey*. *See* 27 F.4th at 668. But in stark contrast to *Tumey* where the court merely erred, Judge Ericksen not only "abused [her] discretion," she "committed a *clear error* of judgment." *In re Bair Hugger*, 9 F.4th at 783, 785, 787-88 (emphasis added).[21] The unanimous panel found that Judge Ericksen had fabricated an "illusory" analytical gap between the scientific evidence and Plaintiffs' experts' opinions. *Id.* at 785. The panel even called out her bias, declaring that Judge Ericksen had "take[n] a side on an issue that is currently the focus of extensive scientific research and debate." *See id.* at 789; *see also id.* at 785 (noting "significant support" for Plaintiffs' theory that Bair Hugger can cause infection).

Following remand, Judge Ericksen has continued to let Plaintiffs' infections fester. To this day—nearly two years since she regained jurisdiction and almost four years since the reconsideration hearing—Judge Ericksen has still not held a public status conference. *See* Dkt. 2271 ("Courtroom: Judge's Chambers"); Dkt. 2268 (same). In fact, she recently rejected the parties' joint request for a status conference and instead held the MDL in "abeyance." *See* Dkt. 2169. Even the District's website continues to list this massive MDL as "closed," referencing the date of Judge Ericksen's defunct reconsideration decision.[22]

---

[21] Last month, the Eighth Circuit reiterated that Judge Ericksen's reconsideration decision was a "*gross* abuse of discretion resulting in *fundamental unfairness*." *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 2023 WL 2618682, at *2 (8th Cir. Mar. 23, 2023) (emphasis added) (citing *In re Bair Hugger*, 9 F.4th at 790).

[22] *See* PX1 (D. Minn., *MDL Cases*).

Against this disturbing backdrop, no reasonable person could seriously dispute that "the record demonstrates a degree of antagonism against [Plaintiffs] that is higher than that being applied against [3M]." *See Tumey*, 27 F.4th at 668. The reconsideration proceedings alone prove Judge Ericksen exhibited "a sufficiently high degree of antagonism" against Plaintiffs to warrant her disqualification. *See id.*; *see, e.g.*, *Webbe v. McGhie Land Title Co.*, 549 F.2d 1358, 1361 (10th Cir. 1971) ("[T]here is not a reasonable likelihood that the trial judge in the instant case, having now been reversed for granting summary judgment, could later preside over the trial of this matter in a fair and impartial manner.").

**C. Judge Ericksen's hiring of a secret "law clerk" raises an inference of bias.**

Lest any doubt somehow remain, Judge Ericksen's secret retention of Mr. Morris—a retired senior defense lawyer—as her so-called "temporary law clerk" during the reconsideration proceeding proves "this is a rare case in which the history, proceedings, and [reconsideration] order [itself] reflect a sufficiently high degree of antagonism" to mandate disqualification. *See Tumey*, 27 F.4th at 668. In hindsight, the shroud of secrecy surrounding Mr. Morris is unsurprising because revealing the man behind the curtain of the reconsideration decision would have all but exposed Judge Ericksen's bias.

Law clerks are "extension[s]" of their judges. *Bishop v. Albertson's, Inc.*, 806 F.Supp. 897, 899 (E.D. Wash. 1992). Judge Learned Hand called them "puny judges." *Gregorich v. Lund*, 54 F.3d 410, 417 n.6 (7th Cir. 1995). Because law clerks are not merely "errand runners," *Hall v. Small Bus. Admin.*, 695 F.2d 175, 179 (5th Cir. 1983), their "actual or potential [bias] may be imputed to the judge," *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th Cir. 2015). Thus, "[i]f reasonable people could conclude

that [a law clerk] either was biased or appeared biased, then reasonable people could also question [the judge's] impartiality." *E.g.*, *Vaska v. State*, 955 P.2d 943, 946 (Alaska 1988).

*Hall* proves the point. There, Judge Rubin[23] of the Fifth Circuit held that a magistrate judge should have recused himself under section 455(a) because his law clerk was initially a member of a class action pending before the court and the clerk accepted employment with class counsel before judgment had been entered. *Hall*, 695 F.2d at 176-77. "Whether or not the law clerk actually affected the magistrate's decision," ruled Judge Rubin, "her continuing participation with the magistrate in a case in which her future employers were counsel gave rise to an appearance of partiality." *Id.* at 179; *see O'Bannon v. Union Pac. R.R. Co.*, 169 F.3d 1088, 1092 (8th Cir. 1999) (citing *Hall* with approval); *see, e.g.*, *Parker*, 855 F.2d at 1524 (clerk bias "might cast doubt in the public's mind on [the judge's] ability to remain impartial and at a minimum these facts raise the appearance of impropriety").

The same teaching applies to judicial advisors. Consider *In re Kensington*, another consolidated litigation where creditors in asbestos-related bankruptcy cases moved to disqualify the presiding judge based on his "association with certain consulting [a]dvisors." *In re Kensington Int'l Ltd.*, 368 F.3d 289, 293 (3d Cir. 2004). The judge had appointed these advisors, "all of whom had prior experience with asbestos or mass tort litigation either as state court judges, private practitioners, or academics," to help him "manage [the] complex litigation." *Id.* at 297. The advisors "were not law clerks *per se*," but "they were in some respects the substantial equivalent of law clerks." *Id.* at 307. One "drafted legal

---

[23] Judge Rubin authored the seminal treatise on law clerks. *See* A. Rubin, Fed. Jud. Ctr., *Law Clerk Handbook: A Handbook for Law Clerks to Federal Judges* (1st ed. 1977).

opinions"; others "held a special position of trust and influence" as the judge "depended on them to educate him on all the relevant issues." *Id.* Given the "irrebuttable presumption that a judge is 'tainted' and must be disqualified where … he surrounds himself with individuals who may not be truly disinterested," the Third Circuit held that a reasonable person would believe the advisors' conflicts had "tainted" the judge. *Id.* at 308-09.

Such conflicts are particularly problematic "[i]n high profile cases" where the outcome "will in some way affect millions of people." *In re Sch. Asbestos Litig.*, 977 F.2d at 782. When judges expose themselves to industry conflicts during multi-district litigation, "suspicious minds might question" whether their views were irreversibly tainted. *Id.* Thus, even if an MDL judge does not actually harbor bias that would require removal under section 455(b), section 455(a) demands disqualification if "a reasonable person might perceive bias to exist" or "suspect a taint" from the judge's contacts. *See id.* at 781-83.

Judge Ericksen's surreptitious retention of a seasoned products-liability defense lawyer who masqueraded as her "law clerk" when she discarded this MDL "tainted" any appearance of impartiality she had left in this MDL. *See id.* at 776, 783. Unlike other clerks who met the parties and attended hearings, Judge Ericksen never unveiled Mr. Morris—not in open court, not in chambers, not even by email. *Cf., e.g.*, PX15 (2/18/16-Tr.-3:10-11) (introducing clerk to parties); PX16 (6/15/17-Tr.-10:15-11:6) (same); PX17 (10/24/17-Tr.-3:3-5) (same). Indeed, despite transforming into a "law clerk" two months before the full-day reconsideration hearing and then shedding that temporary position after completing his sole mission to dispose of this litigation, *see* Zimmerman Decl. ¶¶ 4-5, Mr.

Morris never dared to appear at that hearing, *cf.* Dkt. 1968. He lurked only in the shadows of chambers—for one obvious reason: Mr. Morris was no law clerk at all.

Unlike "fledgling lawyer[s]" fresh out of law school who seek out clerkships to hone their amateur research and writing skills, *Fredonia Broad. Corp. v. RCA Corp.*, 569 F.2d 251, 255 (5th Cir. 1978), Mr. Morris was a *retired* lawyer.[24] And not just any lawyer who perplexingly left behind the luxuries of retirement to clerk in his early 70s; he was the former Chair of Products Liability Defense at Leonard Street and Deinard with nearly half a century of practice "representing *primarily corporate clients* in complex *product liability* … litigation."[25]

One of those litigations was *Johnson*, where Mr. Morris, on behalf of his corporate client, convinced Judge Ericksen to end that products-liability action for want of causation. *See Johnson v. Mead Johnson & Co.*, 2013 WL 716816 (D. Minn. Feb. 27, 2013) ("Frederick W. Morris … for Defendant."). The Eighth Circuit reversed Judge Ericksen for "abus[ing] [her] discretion in excluding [plaintiff's] experts," despite Mr. Morris's attempt to protect her. *See Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 558-59 (8th Cir. 2014) ("Frederick W. Morris … for Defendant-Appellee."). Nevertheless, Judge Ericksen hired Mr. Morris to help her yet again "abuse[] [her] discretion" in this litigation. *See In re Bair Hugger*, 9 F.4th at 773.

---

[24] PX18 (Morris-MARS-Profile).

[25] *See* PX19 (Morris-LinkedIn-Profile) (emphasis added); PX20 (Morris-Leonard-Street-Deinard-Profile); *see also* PX21 (Morris-Westlaw-Profile).

Within weeks of hiring Mr. Morris as her "law clerk," Judge Ericksen *sua sponte* ordered supplemental briefing on the three new "issues" discussed *supra*, Dkt. 1905, even though Plaintiffs had already responded to 3M's meritless motion for reconsideration, Dkt. 1786. As mentioned, 3M's motion for reconsideration was limited to general causation, but Judge Ericksen's "homework assignment" inquired about specific causation, just like in *Johnson*. All suspicion of Mr. Morris' impact on Judge Ericksen ended when she suddenly reversed herself and threw out the MDL, again conflating general and specific causation. *See* Dkt. 2064; *In re Bair Hugger*, 9 F.4th at 788. Worse, Judge Ericksen disregarded the Eighth Circuit's decision in *Johnson* reversing her for committing the same abuse of discretion—despite citing that decision when denying 3M's initial *Daubert* motion, Dkt. 1024 at 9, and repeated warnings that *Johnson* barred her from reversing herself on reconsideration.[26] Relying on Mr. Morris' expertise in defeating similar actions, Judge Ericksen invented never-before-disclosed problems to exclude the same experts who had used the same methods to offer the same opinions that she had already blessed earlier in this litigation. *See, e.g.*, Dkt. 2064 at 37-38.

---

[26] *See, e.g.*, PX22 (6/12/19-Tr.-48:14-18, 84:20-24).

Whether Mr. Morris was Judge Ericksen's quasi-law clerk or pseudo-judicial advisor is beside the point.[27] His background speaks for itself. Even Mr. Morris touts himself publicly as a hired gun for "corporate clients," despite concealing his short-lived stint as Judge Ericksen's aide. *See* PX19 (Morris-LinkedIn-Profile). Given the "irrebuttable presumption that a judge is 'tainted' and must be disqualified where … [she] surrounds [her]self with individuals who may not be truly disinterested," *see, e.g.*, *In re Kensington*, 368 F.3d at 308-09, Judge Ericksen's retention of this senior defense lawyer in the most "unusual of circumstances" mandates her disqualification, *see Singer*, 575 F.Supp. at 68.[28]

### D. The totality of Judge Ericksen's misconduct raises an inference of bias.

In sum, Judge Ericksen's antipathy toward Plaintiffs requires her disqualification. *See Moran*, 296 F.3d at 649. So does her pattern of flawed rulings, *see Sentis*, 559 F.3d at 904-05, and her covert retention of a retired senior defense lawyer to finish her final but failed mission to upend the MDL on reconsideration, *see Tumey*, 27 F.4th at 668.

---

[27] To the extent Mr. Morris acted as a judicial advisor rather than a temporary law clerk, Judge Ericksen's "*ex parte* meetings" with him violated section 455(a) and (b). *See, e.g.*, *Edgar v. K.L.*, 93 F.3d 256, 259-60 (7th Cir. 1996). Either way, Judge Ericksen ran headlong into the Judicial Canons: "A judge may… obtain the written advice of a disinterested expert on the law, but only after giving advance notice to the parties of the person to be consulted and the subject matter of the advice and affording the parties reasonable opportunity to object and respond to the notice and to the advice received." Code of Judicial Conduct, Canon 3A(4)(c).

[28] *See, e.g.*, *In re Sch. Asbestos Litig.*, 977 F.2d at 782 (reversing denial of disqualification because judge's advisors created "appearance of partiality that mandate[d] disqualification"); *Edgar*, 93 F.3d at 259-60 (granting disqualification because an observer would find "a panel of experts who had become partisans carries an unacceptable potential for compromising impartiality").

Even so, the question under section 455(a) is not whether *each* of those independent issues requires Judge Ericksen's disqualification. *See, e.g.*, *Microsoft*, 530 U.S. at 1302; *In re Martinez-Catala*, 129 F.3d at 221. The question is whether an "average person on the street" *might* question Judge Ericksen's neutrality based on *all* this concerning conduct, *see Singer*, 575 F.Supp. at 67-68; *Borrero*, 2009 WL 2005221, at *1 (Ericksen, J.), "even though no actual bias or prejudice has been shown," *Willis*, 2012 WL 6644240, at *1 (Ericksen, J.).

Given the "total facts" presented here, the answer to that question is a resounding "yes." *See, e.g.*, *Ritter*, 540 F.2d at 464; *Edgar*, 93 F.3d at 259-62; *In re Sch. Asbestos Litig.*, 977 F.2d at 782. It is the only possible answer even if this is a "questionable" case for disqualification—and it is not. *See, e.g.*, *Singer*, 575 F.Supp. at 68. If Judge Ericksen were allowed to continue overseeing this "high profile" MDL despite her potential bias, *see Tucker*, 78 F.3d at 1325, "the outcome of this massive, important, and widely followed case would be shrouded with suspicion" forever, *see In re Sch. Asbestos Litig.*, 977 F.2d at 784-85. This "cannot be permitted." *See In re Sch. Asbestos Litig.*, 977 F.2d at 782.[29]

## III.   Plaintiffs' motion is timely under 28 U.S.C. § 455(a) and (b).

Section 455, unlike other disqualification statutes, "sets forth no procedure for seeking recusal in the district court." *Tucker*, 78 F.3d at 1324; *see, e.g.*, Wright & Miller § 3550 ("Section 455 … is silent on procedure."); *cf.* 28 U.S.C. § 144. The statute does not

---

[29] Although a newly assigned judge would "face a gargantuan task" in getting up to speed on this MDL, Judge Ericksen no longer has a "duty to sit" under the statute. *See In re Sch. Asbestos Litig.*, 977 F.2d at 784. Also, "[a]s a practical matter, there is no shortage of other judges in [our District] to whom this [MDL] may be assigned." *Tucker*, 78 F.3d at 1325.

mention motion practice, much less any time constraints for filing such a motion. *See* 28 U.S.C. § 455. This makes good sense because section 455 "place[s] the obligation to identify the existence of th[e] grounds [for disqualification] upon the judge himself." *Tucker*, 78 F.3d at 1324 (quoting *Liteky*, 510 U.S. at 548); *see also United States v. Sibla*, 624 F.2d 864, 867-68 (9th Cir. 1980) ("[I]f the judge sitting on a case is aware of grounds for recusal under section 455, that judge has duty to recuse himself or herself.").

Even if a timeliness requirement were to apply, it would apply only to section 455(b) motions, not section 455(a) motions. *See Tucker*, 78 F.3d at 1324. Still, imposing such a bar under either section makes no sense here because Plaintiffs do not seek vacatur of the Court's orders. *Id.* Unlike in most section 455 cases, Plaintiffs simply seek reassignment.[30]

Timeliness concerns are also inapt here because any delay is due to both judges' "inexcusable failure" to disclose their conflicts, let alone recuse themselves based on those conflicts. *See Liljeberg*, 486 U.S. at 869; *see also Moran*, 296 F.3d at 649 ("We find particularly worrisome the district court's failure to disclose this conflict himself."). Judge Ericksen never disclosed that she hired a retired defense lawyer as her "law clerk," much less that his sole mission was to continue his life's work protecting corporate giants. *Cf., e.g.*, PX15 (2/18/16-Tr.-3:10-11). Judge Schultz, moreover, never revealed that he knowingly held 3M stock while overseeing the MDL. To the contrary, Judge Schultz created a false sense of security when he inexplicably disclaimed knowledge of his disqualifying conflict. *Compare* Dkt. 2161 at 1-2, *with, e.g.*, PX3 (2018-Disclosure-10, 15,

---

[30] Plaintiffs reserve the right to challenge the Court's orders in future proceedings.

26); *see Am. Textile Mfrs. Institute, Inc. v. The Ltd., Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) ("[L]itigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters.").

Unfortunately for Plaintiffs, both judges remained "silen[t]" about this disqualifying information, *see Liljeberg*, 486 U.S. at 866-67, violating their "fundamental ethical duty" to "police [their] own disqualification status," *Sw. Bell Tel. Co.*, 153 F.3d at 521. As in *Kensington* and *Hall*, then, Plaintiffs could not have moved for disqualification until they recently unearthed this information. *See In re Kensington*, 368 F.3d at 312-15 (reversing untimeliness finding because judge "never disclosed to the parties, either on or off the record, that [his advisors] were [conflicted]"); *Hall*, 695 F.2d at 179 ("[W]e need not be detained by the [timeliness] issue because counsel … did not know that the law clerk had accepted employment with the firm representing the plaintiff."). Because both judges here "improperly placed the burden" on Plaintiffs to uncover this "secret" information, Plaintiffs are not to blame for any delay. *See In re Kensington*, 368 F.3d at 313; *Parker*, 855 F.2d at 1525; *cf. In re Medtronic, Inc. Sprint Fidelis Leads Prods. Liab. Litig.*, 601 F.Supp.2d 1120, 1131 (D. Minn. 2009) ("[T]here is not now, nor has there ever been, any secret that my son is a shareholder at Fredrickson.").

Either way, "passage of time is not conclusive if the justification for disqualification is compelling." *Edgar*, 93 F.3d at 257. Given the "unique" grounds for disqualification and the "high profile" nature of this MDL, Plaintiffs' justification for disqualification is more than compelling. *See, e.g.*, *Limeco, Inc. v. Div. of Lime*, 571 F.Supp. 710, 710 (N.D. Miss.

35

1983) ("This delay … is nevertheless understandable in view of the unique ground assigned which of necessity required diligence as well as resourcefulness on the part of [movant's] counsel."); *see also Tucker*, 78 F.3d at 1325; *In re Sch. Asbestos Litig.*, 977 F.2d at 782.

Finally, this motion was not fully ripe until now. Plaintiffs did not discover Judge Schultz's financial disclosure forms until very recently. *See* Zimmerman Decl. ¶¶ 7-8.[31] Nor could Plaintiffs have moved on Judge Ericksen any earlier. After she disposed of this MDL, the Court lacked jurisdiction over the litigation. When the Court finally regained it, Plaintiffs disclosed their intent to disqualify Judge Ericksen, Dkt. 2164 at 18:16-22:2, but she "referr[ed] the case to mediation" and held the MDL in "abeyance," *see* Dkt. 2169 at 1; Dkt. 2272 at 1. As a result, "it was not clearly foreseeable that this Court would be further involved in this case" until weeks ago when both sides sought to resume litigation. *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 812 F.Supp. 541, 546 (E.D. Pa. 1993); *see also* Zimmerman Decl. ¶ 11. Even today, the MDL is still considered "closed."[32] Because Plaintiffs did "not file [the] [m]otion in haste or without careful consideration," they have satisfied any timeliness requirement. *See Sentis*, 559 F.3d at 904-06; *see, e.g.*, *United States v. Brocato*, 4 F.4th 296, 305 (5th Cir. 2021).

---

[31] To be clear, "lawyers do not routinely research judges' financial disclosure forms—the only information available on a particular judge's financial holdings." *Chase Manhattan Bank*, 343 F.3d at 130-31. Consistent with that observation, Judge Schultz's financial disclosure forms are not available through the United States Courts' database. *See* PX23 (U.S. Courts, *Judiciary Financial Disclosure Reports*). And his 2020 to 2022 financial disclosure forms are not available anywhere online. PX24 (Court Listener, *Financial Disclosures for J. David T. Schultz*).

[32] *See* PX1 (D. Minn, *MDL Cases*).

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion to disqualify Judge Ericksen and Magistrate Judge Schultz pursuant to section 455.

Dated: April 11, 2023

Respectfully submitted,

CIRESI CONLIN L.L.P.

/s/ Michael V. Ciresi
Michael V. Ciresi (MN #0016949)
Jan M. Conlin (MN #0192697)
Michael A. Sacchet (MN #0395817)
225 S. 6th St., Suite 4600
Minneapolis, MN 55402
Phone: (612) 361-8202

MESHBESHER & SPENCE LTD.

/s/ Genevieve M. Zimmerman
Genevieve M. Zimmerman (MN #330292)
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121

LEVIN PAPANTONIO, P.A.

/s/ Ben W. Gordon
Ben W. Gordon (Pro Hac Vice)
J. Michael Papantonio (Pro Hac Vice)
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Phone: (850) 435-7090

***Co-Lead Counsel for Plaintiffs***

PRITZKER HAGEMAN, P.A.

/s/ David J. Szerlag
David J. Szerlag (MN #034476X)

100 University Ave. SE
Minneapolis, MN 55414
Phone: (612) 338-0202

***Liaison Counsel for Plaintiffs***

MCDONALD WORLEY

/s/ Gabriel Assaad
Gabriel Assaad (Pro Hac Vice)
1770 St. James Place, Suite 100
Houston, TX 77056
Phone: (281) 623-1906

FARRAR & BALL, LLP

/s/ Kyle W. Farrar
Kyle W. Farrar (MN #0397942)
1117 Herkimer St.
Houston, TX 77008
Phone: (713) 221-8300

***Counsel for Plaintiffs***