## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

In re BAIR HUGGER FORCED AIR
WARMING DEVICES PRODUCTS
LIABILITY LITIGATION

This Document Relates to:
ALL ACTIONS

MDL No. 15-2666 (JNE/DTS)

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY
## JUDGE ERICKSEN AND MAGISTRATE JUDGE SCHULTZ

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

ARGUMENT ....................................................................................................... 5

I.      Legal Standard................................................................................ 5

II.     THE COURT SHOULD DENY PLAINTIFFS' MOTION TO
DISQUALIFY Judge Schultz.......................................................... 6

      A.     Judge Schultz Has No Present Financial Interest in 3M
Requiring Recusal Under Section 455(b), Timely Divested
His Interest, and Has Devoted Substantial Judicial Time to
this Matter. ....................................................................... 6

            1.     Judge Schultz Appropriately Disclosed His Past 3M
Stock Ownership. .................................................. 7

            2.     Recusal Is Not Required under Section 455(b)...................... 8

      B.     Disqualification Also Is Not Warranted Under Section 455(a). ..... 11

      C.     Judge Schultz's Marriage to Fairview's General Counsel Also
Does Not Warrant Disqualification................................................ 13

      D.     Plaintiffs' Motion to Disqualify Judge Schultz Is Also
Untimely.......................................................................... 16

            1.     Plaintiffs' Stock Ownership Challenge Is Untimely........... 17

            2.     Plaintiffs' Challenge Based on Judge Schultz's
Marriage Is Untimely. .......................................... 18

            3.     Plaintiffs Were Improperly Lying in Wait to See If
Rulings on Substitution Motions Would Go Their
Way. ..................................................................... 21

III.    THE COURT SHOULD DENY PLAINTIFFS' MOTION TO
DISQUALIFY THE COURT........................................................... 21

      A.     Plaintiffs' Wish to Relitigate Prior Rulings Does Not Justify
Disqualification. ............................................................... 22

            1.     Isolated comments............................................................. 22

            2.     Pretrial rulings................................................................... 25

             3.     *Gareis* trial rulings. ........................................................ 25

            4.     *Lexecon* waivers. ........................................................... 26

            5.     Ruling on discovery concerning air-free devices................. 26

i

# TABLE OF CONTENTS
### (continued)

Page

6. Amendment of pleadings to include punitive damages. ...... 27

7. Summary judgment on failure-to-warn claim. ..................... 28

8. *Petitta* injunction. ................................................................. 29

B. Plaintiffs' Continued Fixation on the Reconsideration Decision Offers Is No Grounds for Disqualification. .................... 31

C. Plaintiffs' Assertion that the Court Was Unduly Influenced by Fred Morris Borders on Insulting.................................................... 34

D. The Totality of the Court's Conduct Does Not Justify Disqualification. .............................................................................. 39

E. Plaintiffs' Motion Is Also Untimely as to the Court. ..................... 39

CONCLUSION ................................................................................................. 41

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*3M Innovative Props. Co. v. InFocus Corp.*,
No. 04-CV-0009, 2005 WL 361494 (D. Minn. Feb. 9, 2005) .................................... 35

*In re Aetna Cas. & Sur. Co.*,
919 F.2d 1136 (6th Cir. 1990) .................................................................................... 15

*Ahlberg v. Chrysler Corp.*,
481 F.3d 630 (8th Cir. 2007) ................................................................................ 27, 32

*Apple v. Jewish Hosp. & Med Ctr.*,
829 F.3d 326 (2d Cir. 1987)........................................................................................ 20

*In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*,
9 F.4th 768 (8th Cir. 2021) ...............................................................................27, 31, 32

*In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*,
999 F.3d 534 (8th Cir. May 28, 2021) ................................................................... 29, 30

*Bair v. Callahan*,
664 F.3d 1225 (8th Cir. 2012) .................................................................................... 25

*Central Telephone Co. of Virginia v. Sprint Communications Co. of
Virginia, Inc.*,
715 F.3d 501 (4th Cir. 2013) .................................................................................. 9, 10

*Centripetal Networks, Inc. v. Cisco Systems, Inc.*,
38 F.4th 1025 (Fed. Cir. 2022) ................................................................................... 10

*Chevron Corp. v. Donziger*,
783 F .Supp. 2d 713 (S.D.N.Y. 2011)......................................................................... 20

*Datagate, Inc. v. Hewlett Packard Co.*,
941 F.2d 864 (9th Cir. 1991) ..................................................................................... 21

*In re Digital Music Antitr. Litig.*,
No. 06-MD-1780, 2007 WL 632762 (S.D.N.Y. Feb. 27, 2007)................................. 19

*Findling v. Group Health Plan, Inc. & Fairview Health Servs.*,
979 N.W.2d 234 (Minn. Ct. App. 2022)...................................................................... 20

*Fletcher v. Conoco Pipe Line Co.*,
323 F.3d 661 (8th Cir. 2003) ....................................................... 5

*Friedman v. U.S.*,
374 F.3d 363 (8th Cir. 1967) ....................................................... 8

*Gareis v. 3M Co.*,
9 F.4th 812 (8th Cir. 2021) ............................................. 26, 28, 29

*Garrett v. Ohio State Univ.*,
60 F.4th 359 (6th Cir. 2023), *cert docketed sub nom. Ohio State Univ. v.*
*Gonzales* (Mar. 16, 2023) ........................................................... 5

*Hall v. Small Bus. Admin.*,
695 F.2d 175 (5th Cir. 1983) ..................................................... 35

*Huff v. Standard Life Ins. Co.*,
643 F. Supp. 705 (S.D. Fla. 1986) ............................................. 19

*Johnson v. Mead Johnson & Co.*,
754 F.3d 557 (8th Cir. 2014) ..................................................... 37

*In re Kan. Pub. Emps. Ret. Sys.*,
85 F.3d 1353 (8th Cir. 1996) ....................... 4, 16, 17, 19, 30, 40

*In re Kensington Int'l Ltd.*,
368 F.3d 289 (3d Cir. 2004) ................................................. 37, 38

*Kidder, Peabody & Co. v. Maxus Energy Corp.*,
925 F.2d 556 (2d Cir. 1991) ..................................................... 11

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) .............................................................. 8, 12

*Liteky v. United States*,
510 U.S. 540 (1994) ...................................................... 22, 24, 25

*Mangini v. United States*,
314 F.3d 1158 (9th Cir. 2003) ................................................... 15

*In re Medtronic, Inc. Sprint Fidelis Leads Prod. Liab. Litig.*,
601 F. Supp. 2d 1120 (D. Minn. 2009) ....................................... 21

*Neal v. Wilson*,
112 F.3d 351 (8th Cir. 1997) ..................................................... 21

*O'Bannon v. Union Pac. R.R. Co.*,
169 F.3d 1088 (8th Cir. 1999) .................................................................. 35

*Oglala Sioux Tribe v. Homestake Mining Co.*,
722 F.2d 1407 (8th Cir. 1983) .................................................................. 16

*Perkins v. Spivey*,
911 F.2d 22 (8th Cir. 1990) .............................................................. 12, 13

*In re School Asbestos Litigation*,
977 F.2d 764 (3d Cir. 1992), *as amended* (Oct. 8, 1992) ........................... 39

*Sentis Group, Inc. v. Shell Oil Co.*,
559 F.3d 888 (8th Cir. 2009) .................................................................. 30

*Shell Oil Co. v. United States*,
672 F.3d 1283 (Fed. Cir. 2012).................................................................. 11

*Silver State Intell. Techs., Inc. v. Google, Inc.*,
No. 214-CV-00662-RCJ-VCF, 2014 WL 5017874 (D. Nev. Oct. 6,
2014) ........................................................................................................ 15

*Sine v. Local No. 992 Int'l B'hood of Teamsters*,
882 F.2d 913 (4th Cir. 1989) .................................................................. 16

*Smothers v. Rowley Masonic Assisted Living Community, LLC*,
63 F.4th 721, 2023 WL 2618682 (8th Cir. 2023) ....................................... 32

*In re Steward*,
828 F.3d 672 (8th Cir. 2016) .................................................................. 20

*Tumey v. Mycroft AI, Inc.*,
27 F.4th 657 (8th Cir. 2022) .................................................................. 32

*Union Carbide Corp. v. U.S. Cutting Serv.*,
782 F.2d 710 (7th Cir. 1986) .................................................................. 11

*In re United States*,
572 F.3d 301 (7th Cir. 2009) ..................................................................... 5

*United States v. Ciavarella*,
716 F.3d 705 (3d Cir. 2013)........................................................................ 6

*United States v. Daley*,
564 F. 2d 645 (2nd Cir. 1977)................................................................... 19

*United States v. Farkas*,
 149 F. Supp. 3d 685 (E.D. Va. 2016) ................................................................... 16, 21

*United States v. Int'l B'Hood of Teamsters*,
 814 F. Supp. 1165 (S.D.N.Y. 1993).......................................................................... 21

*United States v. Pappert*,
 1 F. App'x 767 (10th Cir. 2001) ............................................................................... 11

*United States v. Queen*,
 433 F.3d 1076 (8th Cir. 2006) ................................................................................. 40

*United States v. Rubashkin*,
 655 F.3d 849 (8th Cir. 2011) ................................................................................... 16

*USX Corp. v. TIECO, Inc.*,
 929 F. Supp. 1460 (N.D. Ala. 1996).......................................................................... 15

*In re Yehud-Monosson USA, Inc.*,
 472 B.R. 868 (D. Minn. 2012) (Ericksen, J.)........................................................ 12, 20

## Rules and Statutes

28 U.S.C. § 455 .................................................................................................. passim

28 U.S.C. § 2106 ....................................................................................................... 40

Fed. R. Civ. P. 54(b)................................................................................................. 33

Minn. Stat. § 549.20.1 .............................................................................................. 28

Mo. Rev. Stat. § 510.263.8 (2018) ........................................................................... 28

Pub. L. No. 112–105, 126 Stat. 291, 298 (2012)........................................................ 10

## INTRODUCTION

Plaintiffs offer nothing but conspiracy theories and insinuations that fail to genuinely call into question the fairness of either this Court or the magistrate judge. The Court should deny Plaintiffs' transparently tactical motion.

Plaintiffs have threatened a disqualification motion since the December 2021 status conference, apparently hoping that threat would influence the Court and lead to more favorable rulings. At that conference (the first after the Eighth Circuit's remand decision), Plaintiffs' co-lead counsel announced: "We expect to bring a motion to recuse." Dkt. No. 2164, 12/17/21 Tr., at 18:16–18. When Judge Schultz asked if Plaintiffs intended to seek to disqualify him, the Court, or both, Plaintiffs' counsel mysteriously responded: "I don't know that we've defined it." *Id.* at 18:20–21.

Rather than balking, Judge Schultz encouraged Plaintiffs' counsel not to "feel squeamish about" raising such a motion, and that any motion would be "heard and attended to and whatever the result is the result is." *Id.* at 19:11–14. He recognized that Plaintiffs might move to disqualify him, stating that "whether it's [the Court] and me or not [the Court] or not me or not either of us, whatever, we can at least try to move [the case] along" in the interim. *Id.* at 21:24–22:1. Yet Plaintiffs failed to offer any basis for disqualification.

Judge Schultz had convened the December 2021 conference in part to make his own disclosure. He told the parties' counsel that he had unknowingly owned 3M stock during part of his pre-appeal tenure in the MDL, but had divested that stock, and invited the parties to take whatever action they deemed appropriate. Following his disclosure, Plaintiffs' co-lead counsel offered no reaction.

For over a year, and despite their threat, Plaintiffs filed no motion and said nothing more about it. As is now clear, they were waiting to see what decisions the Court and Judge Schultz made, whether mediation would succeed, and what would occur in certain state court cases they were pursuing. The court-ordered mediation concluded without a settlement in August 2022. Last fall, the parties tried a case of Plaintiffs' choosing in Missouri state court, *O'Haver*. The Missouri court allowed Plaintiffs to argue issues and present evidence they complain they were barred from presenting in the *Gareis* bellwether trial in 2018. Plaintiffs asked the jury for at least a billion dollars in punitive damages. The result was the same as in the one MDL bellwether case to make it to trial: a complete defense verdict in a couple of hours.

On February 10, 2023, the Court held an in-chambers conference with the parties' co-lead counsel. At this in-chambers conference, Plaintiffs' Co-Lead Counsel indicated for the first time in over a year that Plaintiffs were still contemplating filing a disqualification motion, but only mentioned a motion against the Court. They indicated for the first time that the basis was the Court's hiring of retired Minneapolis lawyer Fred Morris as a short-term law clerk, and claimed that Mr. Morris worked on the Court's summary judgment decision in 2019. But after the conference, once again, no motion was filed.

At the same time, various plaintiffs' counsel were filing substitution motions on behalf of some clients who had died during the previous several years, and Judge Schultz granted many of them. On February 24, for the first time since the appeal, Judge Schultz denied a substitution motion in a case called *Zotto*. The facts were different from prior motions. Judge Schultz found the deceased plaintiff's counsel inexcusably delayed in filing

2

his motion, having waited for years after the plaintiff's death and having failed to maintain contact with the plaintiff. The plaintiff's counsel in *Zotto* was David Hodges, the lawyer hired by fraud convict and 3M competitor Dr. Scott Augustine to develop products liability litigation against 3M. Mr. Hodges is by far the largest filer of cases in this MDL.

According to the declaration filed by Plaintiffs' Co-Lead Counsel, the same day Judge Schultz denied the substitution motion in *Zotto* (February 24, 2023), they downloaded Judge Schultz's financial disclosures—presumably from www.uscourts.gov , where they have long been publicly available. Dkt No. 2280, Zimmerman Decl. ¶ 7. But still, Plaintiffs did not file their disqualification motion, and made no mention of it (at least in 3M's presence) at a March 17 chambers conference. Then, on April 10, 2024, the Court overruled Hodges' objection to the denial of his substitution motion in *Zotto*, making clear that the Court would continue to enforce Pretrial Order No. 23 as it is written, with significant implications for the docket. Plaintiffs filed their disqualification motion the next day. These dates can hardly be a coincidence, and confirm that Plaintiffs have done just what the Eighth Circuit and other appellate courts have consistently warned against: raising the prospect of disqualification, but then lying in wait to see whether the district court would rule for or against them.

Plaintiffs' motivation comes through in their lengthy list of complaints about rulings over the long stretch of these proceedings. Juries, agreeing with the Food & Drug Administration and the vast majority of medical experts outside the courtroom, have now rejected Plaintiffs' theories not only in the MDL, but in state court as well. If Plaintiffs' motion is granted, they will have successfully and inappropriately used disqualification "as

an additional arrow in the quiver of advocates in the face of adverse rulings." *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1360 (8th Cir. 1996) (internal quotation omitted) ("*In re KPERS*").

In an attempt to justify their tactical move, Plaintiffs have cobbled together several specious arguments, infused with invective and rampant speculation. Their theories are:

- Judge Schultz could not have been honest when, in December 2021, he disclosed, *voluntarily*, that his money manager had bought and sold shares in 3M unbeknownst to Judge Schultz—and then invited Plaintiffs to take what action they deemed necessary (and for nearly 18 months they did nothing).

- Judge Schultz's wife, a lawyer at M Health Fairview, helped make an operating room available to 3M experts in 2015, *before the MDL came into being*, and therefore Plaintiffs say she is a lawyer and a material witness *in this* proceeding—even though Plaintiffs have known of her extraordinarily brief, tangential role since February 2017 and, for more than five years, never identified her as a witness in any discovery pleading.

- The Court ruled against Plaintiffs a significant number of times, and made a few jokes in the course of years of litigation, and therefore it is too biased to continue to oversee an MDL it has overseen for over seven years.

- The Court's summary judgment opinion in 2019 was ("on information and belief") secretly influenced by a retired private practice lawyer (the "man behind the curtain," in Plaintiff's melodramatic phrasing)—even though the

4

Court, a widely respected jurist[1] with decades of judging experience, is perfectly capable of making its own decisions.

As discussed below, none of this provides any legitimate basis for disqualification of either the Court or Judge Schultz under 28 U.S.C. § 455. It is specious and dishonest. Their motion should be denied.

## **ARGUMENT**

## I.    **LEGAL STANDARD.**

3M of course agrees that it is critical for a judge to be impartial.  That said, a party bringing a motion to disqualify faces a heavy burden: a "judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664 (8th Cir. 2003) (internal quotation omitted). A judge must "exercise care in determining whether recusal is necessary, especially when proceedings are already underway" because a "change of umpire mid-contest may require a great deal of work to be redone . . . and [may also] facilitate judge shopping." *In re United States*, 572 F.3d 301, 308 (7th Cir. 2009) (quotation omitted, first alteration original). Section 455 "does not require the judge to accept as true the allegations made by the party seeking recusal." *Garrett v. Ohio State Univ.*, 60 F.4th 359, 368 (6th Cir. 2023), *cert docketed sub nom. Ohio State Univ. v. Gonzales* (Mar. 16, 2023).

---

[1]   The Chief Justice recently designated Judge Ericksen to serve on the Foreign Intelligence Surveillance Court. As the District of Minnesota said in a public statement, the appointment is a "testament to her skill as a jurist and the high regard with which she is held nationwide." The appointment belies the absurd notion the Court could be improperly influenced by a law clerk.

Although recusal is mandatory if Section 455(b) is satisfied, "under § 455(a), discretion is confided in the district judge in the first instance to determine whether to disqualify h[er]self because the judge presiding over a case is in the best position to appreciate the implication of those matters alleged in a recusal motion, particularly when the district court has presided over (1) an extraordinarily complex litigation (ii) involving a multitude of parties (iii) for an extended period of time." *United States v. Ciavarella*, 716 F.3d 705, 702 (3d Cir. 2013) (quotation omitted).

## II.   THE COURT SHOULD DENY PLAINTIFFS' MOTION TO DISQUALIFY JUDGE SCHULTZ.

### A.   Judge Schultz Has No Present Financial Interest in 3M Requiring Recusal Under Section 455(b), Timely Divested His Interest, and Has Devoted Substantial Judicial Time to this Matter.

Judge Schultz handled the issue of his past financial interest in 3M as he should have. He promptly disclosed it to the parties' lead counsel upon becoming aware of it and disclosed it on the public docket, then took steps to ensure it would not occur again. He then invited the parties to take whatever action they deemed appropriate. Section 455(b) does not apply to *past* stock ownership, and even if it did, these circumstances fit squarely in Section 455(f)'s safe harbor, given Judge Schultz's divestiture and the fact he has devoted substantial judicial time to the Bair Hugger MDL. No reasonable person would question Judge Schultz's impartiality under the circumstances, notwithstanding Plaintiffs' inflammatory and unsupported accusations that Judge Schultz is being dishonest about his knowledge. Disqualification, therefore is not required under Section 455(a).

### 1. Judge Schultz Appropriately Disclosed His Past 3M Stock Ownership.

In December 2021, Judge Schultz voluntarily disclosed his recently discovered past interest in 3M. Dkt. No. 2164, 12/17/21 Tr. at 23:2–24:19. He informed the parties that his money manager, without his "subjective knowledge, purchased some shares in 3M. Also without my knowledge, not too long after that, I think it was less than a year, sold the shares in 3M." *Id.* at 23:13–17. He further informed the parties that they would be receiving a disclosure from him that would tell the parties: when the shares were purchased, when they were sold, what was decided during that period, and what percentage of his portfolio those shares composed. *Id.* at 23:18–22. Judge Schultz also told the parties that he had directed his advisor "that they may not purchase any shares of 3M or any of its subsidiaries." *Id.* at 24:1–3. He stated that, upon receipt of the disclosure, and its subsequent unsealing, the parties "may all do whatever you see appropriate to do. Okay? But that is what's required by my rules, that I have to make the disclosure. And the advisory opinions say that in the middle of a case, the remedy is to divest. However, you all do with that information whatever it is you see fit." *Id.* at 24:4–12.

Judge Schultz then asked if there was anything else the parties wished to discuss before concluding the conference; neither party raised anything. *Id.* at 24:13–19. In his disclosure filed on the public docket, Judge Schultz stated that he "and his family never owned more than a total of 72 shares of 3M stock, which never accounted for more than 0.4% of the value of the aggregate assets under management . . . on these accounts." Dkt. No. 2161, Notice at 1.

Following the Eighth Circuit's ruling, Judge Schultz has been involved in: (1) two status conferences, *see, e.g.*, Dkt. Nos. 2164, 2254; and (2) ruled on dozens of motions for substitution of deceased plaintiffs in member cases, granting most. As noted above, the instant disqualification motion was filed only a day after the Court upheld Judge Schultz's denial of one such substitution motion, *see Zotto v. 3M Co.*, No. 18-CV-1764 (JNE/DTS), Dkt. No. 29 (D. Minn. Apr. 10, 2023) (affirming Dkt. No. 20 (Feb. 24, 2023), which denied a motion to substitute plaintiff). *See* Dkt. No. 2280 ¶¶ 7–8.

## 2. Recusal Is Not Required under Section 455(b).

Judge Schultz's past financial interest in 3M does not require disqualification, for three reasons.

***First***, recusal is required only when the judge "*know[s]* of his or her interest." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 859 (1988) (emphasis original). Judge Schultz has stated that he was not aware of his prior financial interest in 3M, because he did not manage his stock investments once he became a magistrate judge.

***Second***, Section 455(b)(4) only mandates recusal when a judge "*has* a financial interest" in a party before the Court—not when the judge previously *had* a financial interest in a party.[2] *See* 28 U.S.C. § 455(b)(4). Judge Schultz does not currently have a financial interest in a party to this litigation, so he need not recuse at this point.

---

[2] Were Section 455(b)(4) to require judges who at some point in time owned stock or another interest in a party before them to recuse, the purchase of a single share at any time could forever disqualify a judge from hearing a case involving that corporation. Congress cannot have intended such an absurd result. *See Friedman v. U.S.*, 374 F.3d 363, 367 (8th Cir. 1967) ("To construe statutes so as to avoid glaringly unjust results . . . is . . . a traditional and appropriate function of the courts.").

***Third***, under 28 U.S.C. § 455(f), if "substantial judicial time has been devoted to the matter" and the judge discovers "after the matter was assigned to him or her that [he or she] has a financial interest in a party," the judge need not recuse if he or she "divests . . . of the interest that provides the grounds for disqualification." 28 U.S.C. § 455(f). That is exactly what occurred here. Having ruled on many motions and attended and presided over numerous status conferences, oral arguments, and other proceedings in this case, Judge Schultz unquestionably has devoted "substantial judicial time" to this case. And at the time Judge Schultz recognized that he had, at one time, owned an interest in 3M, he was already divested of that interest. *See* Dkt. No. 2161 at 1–2; Dkt. No. 2164 at 23:2–24:19. He therefore had no need to recuse.

Case law provides additional support for application of Section 455(f) here. In *Central Telephone Co. of Virginia v. Sprint Communications Co. of Virginia, Inc.*, the judge discovered that he owned a financial interest in the plaintiff after presiding over extensive litigation including two bench trials (but before issuing his opinion on the second). 715 F.3d 501, 509–510 (4th Cir. 2013). The interests were held in a mutual fund managed by others, without the judge's input, at the time he was presiding over the case. *Id.* The judge immediately divested after discussion with the parties and later denied disqualification. *Id.* at 510. The Fourth Circuit held that the judge's denial of the disqualification motion was proper and that the belated discovery was not a basis for

disqualification, in part because the judge did not exercise control over the funds.[3] In *Centripetal Networks, Inc. v. Cisco Systems, Inc.*, the court concluded that prompt divestment upon discovery of a financial interest in a party is a sufficient remedy. 38 F.4th 1025 (Fed. Cir. 2022). While the case was pending (the judge had largely prepared a full draft of a bench trial opinion where "virtually every issue was decided" prior to his discovery of the conflict), the judge discovered that his wife owned stock in Cisco. *Id.* at 1028. Concerned that selling the stock would run afoul of insider trading rules, the judge placed the stock in a blind trust and denied recusal. *Id.* at 1029. The Federal Circuit concluded that the judge "was required to recuse under § 455(b)(4) absent divestiture under § 455(f)."[4] *Id.* at 1030. In considering the question, the court found it "telling" that Section 455(b)(4) used the present tense, which "suggests that selling or donating the stock is the only cure envisioned under § 455(f)." *Id.* at 1032.

Timely divestment of an ownership interest *is* sufficient to remedy a conflict that would otherwise mandate recusal—where "a judge discovers a financial interest and divests in accordance with § 455(f), disqualification under 455(b)(4) is no longer required."

---

[3]  Because the stock was held in a mutual fund, it was subject to Section 455(d)(4)(i)'s exception, but the case is nonetheless illustrative. *See Cent. Tel.*, 715 F.3d at 515–16.

[4]  Importantly, divestiture in such circumstances does *not* run afoul of insider trading rules or other similar concerns. *Centripetal Networks*, 38 F.4th at 1033 n.9 ("Selling stock to comply with ethical obligations is not insider trading, as was made clear in the Stop Trading on Congressional Knowledge Act of 2012 ('STOCK Act'), Pub. L. No. 112–105, 126 Stat. 291, 298 (2012). Although the STOCK Act provides that the insider trading restrictions of securities law apply to judicial employees . . . it states that nothing in the Act shall be construed to 'be in derogation of existing . . . ethical obligations governing . . . judicial officers.' *Id.* at 279–98. Here, the sale of the stock would have been done to comply with ethical obligations." (first alteration added)).

*Shell Oil Co. v. United States*, 672 F.3d 1283, 1290 (Fed. Cir. 2012); *see also United States v. Pappert*, 1 F. App'x 767, 769 (10th Cir. 2001) (holding that a judge's "prompt divestment prevented her from having to recuse" and that one a judge divests from the conflict that creates the stock, Section 455(b)(4) no longer applies); *Union Carbide Corp. v. U.S. Cutting Serv.*, 782 F.2d 710, 714 (7th Cir. 1986) ("Since the statute forbids only the knowing possession of a financial interest, since Judge Getzendanner relinquished control of the case as soon as she found out about the financial interest, and since she did not resume control until the financial interest was eliminated, at no time was she in literal violation of the statute."); *see also Kidder, Peabody & Co. v. Maxus Energy Corp.*, 925 F.2d 556, 561 (2d Cir. 1991) (holding that § 455(f) applied where the judge immediately disclosed and divested his stock and the parties had devoted nearly three years to litigation); *cf. Shell Oil Co.*, 672 F.3d at 1290 (holding that judge should have recused himself because his wife had not divested of the stock in question).

In sum, Judge Schultz disclosed the conflict when he became aware of it, at which time he was already divested of the interest, and he took steps to prevent the conflict from occurring again. Section 455(b)(4) does not mandate recusal here. And even if it did, Section 455(f) would still apply, and recusal is not required.

**B.    Disqualification Also Is Not Warranted Under Section 455(a).**

Section 455(a), like Section 455(b), does not support disqualification here either. No reasonable person, looking at the circumstances here, would question Judge Schultz's impartiality.

Certainly, Section 455(c) imposes a duty upon judges to reasonably investigate their financial interests. 28 U.S.C. § 455(c). Judge Schultz's disclosures, however, were lengthy (over 30 pages, containing 476 lines of assets *see, e.g.*, PX2), and Judge Schultz's belated disclosure apparently resulted from a simple oversight. The forthrightness with which he addressed the issue at the December 2021 status conference and his invitation to the parties to do "whatever it is you see fit" with the disclosure, *see* Dkt. No. 2164, 12/17/21 Tr., at 23:2–24:19, supports a strong inference of good faith on his part. Plaintiffs have identified no basis where such an oversight would require disqualification of a judge where Section 455(f) is otherwise applicable.

Instead, Plaintiffs argue that Judge Schultz is lying about whether he knew about his 3M stock ownership. Having accused him of lying, they then argue that the existence of this accusation means his impartiality might reasonably be questioned under Section 455(a). The Court should reject this sophistry, as it has elsewhere: "[a] party cannot force a judge to recuse him or herself merely by launching inflammatory personal attacks on the judge and then claiming that the attacks were so offensive that the judge must be biased." *In re Yehud-Monosson USA, Inc.*, 472 B.R. 868, 878 (D. Minn. 2012) (Ericksen, J.).[5]

Plaintiffs also have waived disqualification on these grounds. A party may waive disqualification under Section 455(a) after "full disclosure on the record." *Perkins v.*

---

[5]   To the extent Plaintiffs rely on *Liljeberg* to establish that "a temporary lapse of memory" can require recusal, it is entirely different from this situation. The judge in that case was a trustee at a university that was selling property and the property was the subject of a case before the judge. Section 455(f) was therefore not applicable. 486 U.S. at 850–52.

*Spivey*, 911 F.2d 22, 33 (8th Cir. 1990); *see* 28 U.S.C. § 455(e) ("Where the ground for disqualification arises only under [Section 455(a)], waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification."). "By electing to proceed and failing to seek [the judge's] recusal," a party waives a claim for recusal. *Perkins*, 911 F.2d at 33. Even after Judge Schultz invited them to file a disqualification motion if they felt it was appropriate, Plaintiffs waited 16 months to act—waiting, and watching, to see what Judge Schultz did on motions that mattered to them.

**C.     Judge Schultz's Marriage to Fairview's General Counsel Also Does Not Warrant Disqualification.**

Two out of three of Plaintiffs' Co-Lead Counsel signed onto a separate brief that Judge Schultz should be disqualified because his wife, Trudi Trsyla, is general counsel of M Health Fairview. Because Ms. Trysla had momentary logistical involvement in making an operating room available for use by 3M's experts in 2015, before the MDL was formed, Plaintiffs argue Ms. Trysla was "acting as a lawyer in the proceeding" and is "likely to be a material witness in the proceeding" under Section 455(b)(5)(ii) and (iv). Neither is true.

Ms. Trysla did not act as a lawyer and is not likely to be a material witness in this proceeding. Plaintiffs offer just one email and whole lot of speculation in support of their argument. That email shows that in October 2015, two months before the transfer order creating the MDL, and nearly three years before Judge Schultz's involvement in the litigation, Ms. Trysla helped facilitate 3M's use of an operating room at Fairview Southdale Hospital. PX26 [3MBH02272887]. There is no evidence that Ms. Trysla had any other involvement in the work done by 3M's employees and expert; she neither participated in

the actual testing nor was she present during the work at the operating room, as confirmed

by the 3M engineer who was present, Dr. Andrew Chen. PX31, Chen Dep. at 148:15–18

("Q. Okay. Do you know who Trudi Trysla is? A. No. Q. Have you ever met her? A. I

don't know who she is.").[6] 3M's expert, Dr. John Abraham, was also present and testified

to the individuals who were present—none of whom were Ms. Trysla:

> Q. Who was there with you?
>
> A. Attorneys, or maybe it was one attorney, I can't recall, from the
> initial law firm. There were I believe hired surgeons and nurses who
> replicated a surgery. An attorney from 3M, Janell. Two engineers
> from 3M. And Jennifer Wagner and Brian Plourde. And I think two
> lighting people.

PX28, Abraham MDL Dep. at 143:12–23. Indeed, there is no evidence that Ms. Trysla

knew anything more about the work of 3M's experts than is indicated in this single email

exchange. Such minimal "involvement" (and it is a stretch to call it even that) falls far

below the standard of recusal under Section 455(b)(5).

Plaintiffs offer no legal authority for their notion that Ms. Trysla became a lawyer

"in the proceeding" by facilitating use of an operating room—*before the MDL even existed*.

They offer no proof whatsoever that 3M sought legal advice from Ms. Trysla or that she

provided it. M Health Fairview has never filed an appearance in this litigation.

---

[6]   Plaintiffs once again complain that 3M has not produced the results of certain privileged
work performed by Dr. Chen, and try to tie this to their disqualification motion. But it
was Judge Noel (not Judge Schultz) who sustained 3M's privilege objection (a
conclusion also reached by the Missouri state court judge, whom they have not yet
sought to disqualify). *See* Dkt. No. 1196, Order at 3. Plaintiffs did not file an objection
to that order.

Plaintiffs' argument that Ms. Trysla is likely to be a "material witness" "in the proceeding" is also unfounded. 3M produced the email with Ms. Trysla's name to Plaintiffs over six years ago, in February 2017. Declaration of Benjamin W. Hulse ("Hulse Decl.) ¶ 4. Plaintiffs have not been shy about exploring the facts around this event. They deposed 3M's expert witness Dr. Abraham about the project at Fairview on July 20, 2017. Never since have Plaintiffs sought to depose Ms. Trysla in either federal or state court proceedings, despite deposing dozens of other witnesses. They have never listed her as a person with knowledge in initial disclosures or discovery responses. Nor has 3M. General fact discovery has been closed for more than five years. Plaintiffs' new contention that she is likely to be a material witness is tactical and self-serving.

This situation is easily distinguished from *Mangini v. United States,* 314 F.3d 1158, 1160-62 (9th Cir. 2003), and the other cases cited by Plaintiffs, where family members had direct financial interests in entities involved in the litigation. In *Mangini,* the judge's brother-in-law indisputably acted as a lawyer in the proceeding. On behalf of the plaintiff, he sent a letter to an expert witness enclosing an initial retainer fee and case information to assist the expert in evaluating the case. He also wrote a letter to the expert explaining he was attempting to obtain an extension on the deadline for expert reports and disclosures. *Id*. at 1160; *see also In re Aetna Cas. & Sur. Co.*, 919 F.2d 1136 (6th Cir. 1990) (holding that judge was required to recuse due to his daughter's participation as a lawyer in depositions which would remain in the record of the consolidated proceedings); *USX Corp. v. TIECO, Inc.*, 929 F. Supp. 1460 (N.D. Ala. 1996) (concluding that the judge was required to disqualify himself from deciding motion to disqualify his nephew's law firm); *Silver*

*State Intell. Techs., Inc. v. Google, Inc.,* No. 214-CV-00662-RCJ-VCF, 2014 WL 5017874, at *2 (D. Nev. Oct. 6, 2014) (concluding that questions as to impartiality can be harmlessly avoided by recusal or reassignment of the judge whose brother-in-law and nephew are listed as partners at the firm of Plaintiff's lead counsel).

By comparison, Ms. Trysla's extremely brief, tangential "involvement" as general counsel of a non-party in facilitating 3M's use of an operating room, which occurred before the MDL was formed, does not satisfy the statutory criteria to qualify as a lawyer or material witness "in the proceeding" and does not warrant Judge Schultz's disqualification.

### D.      Plaintiffs' Motion to Disqualify Judge Schultz Is Also Untimely.

A motion to disqualify "must be timely made," which requires a party "to raise a claim at the earliest possible moment after obtaining knowledge of the facts demonstrating the basis for such a claim." *United States v. Rubashkin*, 655 F.3d 849, 858 (8th Cir. 2011) (quotations omitted). The motion is too late when "the totality of the circumstances suggests that the movant rested on his or her laurels to 'gather evidence of a judge's possible bias' to see whether 'the proceedings went his way before using the information to seek recusal.'" *United States v. Farkas*, 149 F. Supp. 3d 685, 694 (E.D. Va. 2016) (quoting *Sine v. Local No. 992 Int'l B'hood of Teamsters*, 882 F.2d 913, 916 (4th Cir. 1989)).

The Eighth Circuit has unambiguously stated that the timeliness requirement applies to both Section 455(a) and Section 455(b). *Rubashkin*, 655 F.3d at 858 (quoting Section 455(a) and concluding that a recusal motion "must be timely made"); *In re KPERS*, 85 F.3d at 1360 (concluding that *Oglala Sioux Tribe v. Homestake Mining Co.*, 722 F.2d 1407 (8th

16

Cir. 1983), applied a timeliness requirement to recusal motions under both Section 455(a) and (b)). For the following reasons, Plaintiffs waited far too long to seek disqualification of Judge Schultz under both of their theories.

### 1. Plaintiffs' Stock Ownership Challenge Is Untimely.

Judge Schultz disclosed this past interest on December 2021, in court and in a disclosure filed on the docket. Dkt. No. 2161, Disclosure; Dkt. No. 2164, 12/17/21 Tr., at 23:2–24:19. In both, Judge Schultz made clear the fact that he had owned 3M stock in the past and that he was "completely divested of all 3M stock" nearly 18 months before he became aware of this interest. *Id.* at 1. Judge Schultz told the parties that they "may all do whatever [they] see appropriate to do [with the disclosure]," referencing the possibility of a disqualification motion. Dkt. No. 2164, 12/17/21 Tr., at 24:4–12. Plaintiffs did nothing for 16 months and continued to engage in motion practice concerning plaintiff substitutions during that time. *See In re KPERS*, 85 F.3d at 1361 ("KPERS engaged in full-blown discovery for the next ten months and gave no indication that it was concerned about Judge Bartlett's impartiality during that time.").

Plaintiffs protest that Judge Schultz "never revealed that he knowingly [*sic*] held 3M stock while overseeing the MDL" and that he "created a false sense of security when he inexplicably disclaimed knowledge of his disqualifying conflict." Mot. at 34. But Judge Schultz's disclosure listed all orders and rulings he issued, from his appointment through the date of divestment—including rulings during the period covered by the disclosures Plaintiffs cite to establish Judge Schultz's knowledge of his alleged knowing violation of Section 455. *Compare* Dkt. No. 2161-1, Rulings List at 1–2, *with* PX3, 2018 disclosure.

17

While Plaintiffs disingenuously claim that they only obtained Judge Schultz's financial disclosure statements in February 24, 2023, they could have downloaded them at any time from www.uscourts.gov or other online resources.[7] They simply chose not to until Judge Schultz ruled in a way they did not like.

### 2. Plaintiffs' Challenge Based on Judge Schultz's Marriage Is Untimely.

Plaintiffs' challenge to Judge Schultz based on his wife's minor, pre-MDL involvement in making an operating room available to 3M is also untimely.

Plaintiffs claim that "[it] was not until September 22, 2022, at the deposition of Dr. Andrew Chen . . . that Plaintiffs discovered Judge Schultz's wife's connection to this MDL." Zimmerman Dec. ¶ 6. But that statement is false. 3M produced the email with Ms. Trysla's name to Plaintiffs' Co-Lead Counsel on February 23, 2017, more than six years ago. Hulse Decl. ¶ 4.

Moreover, Judge Schultz's marriage to Ms. Trysla is no secret. Both are prominent, highly respected members of the Twin Cities legal community. Their marriage has been reported on by local media since at least 2012,[8] and those articles turn up in a Google search

---

[7] Judge Schultz's financial disclosures are also available online, without the need for registration, at https://www.courtlistener.com/person/9327/david-t-schultz/.

[8] *See, e.g.*, "The System Does Not Always Work: David Schultz Never Loses Sight of This in His Professional and Pro-Bono Work," *Minnesota Super Lawyers* (July 9, 2012), online at https://www.superlawyers.com/articles/minnesota/the-system-does-not-always-work/ (noting that Judge Schultz, then running for Ramsey County Attorney, was married to Trysla, "Trysla, an attorney with Fairview Health Services"); *see also* "Trial Lawyer David Schultz Joins Ramsey County Attorney Race," Pioneer

of her name. It is implausible that longstanding members of the Twin Cities legal community, including those who signed the disqualification motion and those who reviewed and approved it, did not know who she was. *See, e.g.*, *In re Digital Music Antitr. Litig.*, No. 06-MD-1780, 2007 WL 632762, at *9 (S.D.N.Y. Feb. 27, 2007) (concluding that "apparently it is not very difficult" to identify that judge's husband was a partner at a law firm that represented party to antitrust litigation); *accord In re KPERS,* at 85 F.3d 1363 n.8 (rejecting belated suggestion of partiality based on information "easily accessible" from Almanac of the Federal Judiciary); *United States v. Daley,* 564 F. 2d 645, 651 (2nd Cir. 1977) (recusal motion untimely where predicate facts were "a matter of public record [and] were at all times ascertainable by counsel"); *Huff v. Standard Life Ins. Co.*, 643 F. Supp. 705, 708 (S.D. Fla. 1986) (where basis for motion is "known, or knowable, with due diligence from public records or otherwise," delay in filing motion is basis for denial). Certainly, it would not have been difficult for them to find out. As the Eighth Circuit has noted, this Court need not take the other Co-Lead Counsel's purported ignorance at face value. *See, e.g.*, *In re KPERS*, 85 F.3d 1353, 1363 n.8 (8th Cir. 1996) ("[W]e question KPERS' assertion that its Kansas City attorneys did not know of Judge Bartlett's prior affiliation with Blackwell, a Kansas City firm, and in any event, the information was easily

---

Press, online at https://www.twincities.com/2009/06/04/trial-lawyer-david-schultz-joins-ramsey-county-attorney-race/ (referencing Judge Schultz's marriage to Trysla).

accessible."). Tellingly, the third of Plaintiffs' Co-Lead Counsel, Mike Ciresi (whose firm has sued Fairview in the past[9]) did not sign Plaintiffs' separate brief on Ms. Trysla.

Further undermining Plaintiffs' credibility is the fact that *they*—not 3M—raised Ms. Trysla's name at Dr. Chen's September 2022 deposition. PX31, Chen Dep. at 148:15–18. Plaintiffs' counsel came to the deposition with the Trysla email and ready with questions about her.

Even if Plaintiffs did not know about Ms. Trysla until Dr. Chen's deposition, they failed to bring this motion until more than six months later. That is still too long. *See, e.g.*, *In re Steward*, 828 F.3d 672, 682 (8th Cir. 2016) (affirming denial of motion to disqualify where party waited four months to bring motion to recuse); *Apple v. Jewish Hosp. & Med Ctr.*, 829 F.3d 326, 334 (2d Cir. 1987) (holding that Section 455 motion was untimely when party waited two months to bring it); *Yehud-Monosson, Inc.*, 472 B.R. at 879 (denying disqualification motion where party did not file its motion for recusal until more than two months after becoming aware of the basis for the motion); *Chevron Corp. v. Donziger*, 783 F .Supp. 2d 713, 721 (S.D.N.Y. 2011) (concluding that motion was untimely because "the LAP Representatives never moved to recuse the undersigned in those cases. Nor did they

---

[9]   *Findling v. Group Health Plan, Inc. & Fairview Health Servs.*, 979 N.W.2d 234 (Minn. Ct. App. 2022); see also DX1, *Findling* Docket from Hennepin County.

do so for nearly three months of litigation in this action. Instead, they waited until after this Court had ruled on the preliminary injunction and bifurcation motions in this case").[10]

### 3. Plaintiffs Were Improperly Lying in Wait to See If Rulings on Substitution Motions Would Go Their Way.

Plaintiffs "rested on [their] laurels to gather evidence" of Judge Schultz's bias and see whether "the proceedings went [their] way before using the information to seek recusal." *Farkas*, 149 F. Supp. 3d at 694. The timing of their motion tells the tale. They downloaded Judge Schultz's financial disclosures on February 24, 2023, the same day Judge Schultz denied a substitution motion filed by David Hodges, the attorney who has filed the most cases in the MDL. *Zotto v. 3M Co.*, No. 18-CV-1764 (JNE/DTS), Dkt. No. 20 (D. Minn. Feb. 24, 2023). They filed this disqualification motion one day after the Court overruled Hodges' objection. *Id.*, Dkt. No. 29 (Apr. 11, 2023.) The Eighth Circuit disapproves of litigants who wait to seek recusal until after a judge has "issued an unfavorable ruling." *In re Medtronic, Inc. Sprint Fidelis Leads Prod. Liab. Litig.*, 601 F. Supp. 2d 1120, 1132 (D. Minn. 2009) (quoting *Neal v. Wilson*, 112 F.3d 351, 357 n. 6 (8th Cir. 1997)). The Court should likewise deny this exercise in judge shopping.

## III. THE COURT SHOULD DENY PLAINTIFFS' MOTION TO DISQUALIFY THE COURT.

Plaintiffs' broadside against the Court fails to justify its disqualification. At root, Plaintiffs' motion is not much more than an attempt to trace adverse court rulings to

---

[10] *See also Datagate, Inc. v. Hewlett Packard Co.*, 941 F.2d 864, 871–72 (9th Cir. 1991) (six-week delay rendered motion untimely); *United States v. Int'l B'Hood of Teamsters*, 814 F. Supp. 1165, 1172 (S.D.N.Y. 1993) (two months).

implacable bias or other impropriety instead of the reasoned assessment of the facts and the law that the Court gave at every turn. The Court should reject Plaintiffs' strategically timed effort to disqualify it.

### A. Plaintiffs' Wish to Relitigate Prior Rulings Does Not Justify Disqualification.

The bulk of Plaintiffs' argument for disqualifying the Court comprises a catalog of grievances about certain statements and its decisions in this long-running litigation. Of course, without more, "remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (affirming district judge's denial of motion to recuse him). Judicial rulings, too, "almost never constitute a valid basis" for a § 455(a) motion. *Id.* Plaintiffs here make much of very little. None of the Court's comments or decisions that they cite come close to showing the "deep-seated favoritism or antagonism" that require disqualification. *Id.*

#### 1. Isolated comments.

The parties have appeared before the Court numerous times in the nearly eight years of this litigation, including for days-long summary judgment and *Daubert* motion hearings and a bellwether trial. From the understandably great volume of words that the Court has spoken during these appearances, Plaintiffs have cherrypicked a handful of remarks and pared them of context to, they hope, cast doubt on the Court's impartiality.

For example, Plaintiffs raise how the Court referred to itself as a "mean judge." Mot. at 26. The Court's statement was made to counsel for the plaintiff in a member case, *Owens v. 3M*, No. 18-cv-275, who had just stated during a status conference that his client would

22

dismiss the claims against 3M because the Bair Hugger system was not used during the relevant surgery. Dkt. No. 1065, 11/15/18 Tr., at 28:22-29:14. The Court proposed dismissing the case, which counsel could explain to his client as something the "mean judge" did. *See id.* This joking comment, made during the course of discussing several PFS-related dismissals, was obviously harmless and intended solely to move the conference along toward what was, by any measure, its inevitable conclusion. (The *Owens* case was dismissed a few days later. *Owens*, Dkt. No. 8.)

Plaintiffs next take issue with the Court's offhand remarks during the extended *Daubert* hearing held in 2017. Mot. at 26–27. During the second day of that hearing, the Court opened the proceedings by noting that Plaintiffs' counsel had not had a chance to finish his presentation the day before and that, "[i]f [she] had a heart and if [she] had feelings, [she] would have felt bad for cutting [him] off." Dkt. No. 1000, 10/25/17 Tr. at 236:1-237:1. The Court was, however, "happy to hear from [him]" again and asked how much time he would need. *Id.* Immediately afterward, the Court said in jest that "no one [would] admit[] to being" friends with Plaintiffs' counsel, referring to *3M's counsel*. *Id.* at 237:4-10 ("[Plaintiffs' counsel]: . . . I have copies of the decs that we presented yesterday that we would be happy to give the Court. I conferred with my friends on the other side, and they have copies as well. THE COURT: No one is admitting to being your friend."). The prevailing tenor of the whole exchange was humorous. Plaintiffs know perfectly well that the Court was trying to inject a bit of levity into a grueling three-day hearing. The Court is known for its wit, and any lawyer who has practiced in front of the Court

23

appreciates that it is not personal, nor evidence of bias. It is simply part of how the Court connects with lawyers appearing before it.[11]

Plaintiffs also point to Judge Schultz's remark in April 2019 that the Court had "battered and bruised" them, likely referencing rulings in the *Gareis* case that Plaintiffs did not like. Dkt. No. 1896, 4/26/19 Tr., at 34:18-19. It is a stretch to imply, based on these snippets, that Judge Schultz thought the Court had been unfair. Just moments earlier, Judge Schultz stated that "in [his] view, unequivocally, any Plaintiff can get a fair hearing and trial against 3M in the District of Minnesota." *Id.* at 34:7–10. Plaintiffs apparently think the only fair trial is those where they win. Not so.

In short, these stray statements do not approach the invective that counseled disqualification in other cases that Plaintiffs cite. And as a general matter, even significant criticism of a party or its counsel—which did not occur here—does not warrant disqualification. *See Liteky*, 510 U.S. at 55–56 ("*Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune."). Plaintiffs' grab bag of comments fails to reach the consistency or import that could support disqualification.

---

[11]  As the Court related in a 2021 interview, it has learned "the value of having a social conscience, a meaningful vocation, and a sense of humor." Jeya Paul, "Hon. Joan N. Ericksen," *Federal Lawyer* (Jan./Feb. 2021), https://www.fedbar.org/wp-content/uploads/2021/02/JudicialProfile-Ericksen.pdf.

### 2. Pretrial rulings.

Plaintiffs provide a laundry list of admittedly "quotidian" decisions by the Court that, they contend, evince her partiality. Mot. at 27. Those decisions were, like most everything else in this case, litigated thoroughly. To take one example, the Court's dismissal of certain cases due to discrepancies in certain Plaintiff Fact Sheets was based on more than sheer "speculation." *Cf. id.* The Court noted on the record, and with all parties' counsel's participation, that the Plaintiff Fact Sheets in question reflected the use of whiteout and re-dating. *See, e.g.*, Dkt No. 1570, 10/18/18 Tr., at 24:21-25:8. She further noted that the discrepancies comprised "an issue that we've been through before," so its resolution could not be delayed. *Id.* at 22:24–25:1. Plaintiffs offer nothing to distinguish this and other decisions from the usual course of ordinary judicial rulings that almost never serve as a basis for disqualification. *See Liteky*, 510 U.S. at 555.

### 3. *Gareis* trial rulings.

Plaintiffs also critique certain of the Court's decisions made in *Gareis*. Boiled down, they criticize the Court largely for not having consulted a scoreboard of sorts when it decided whether to admit or exclude evidence, *i.e.*, it should have admitted as many documents offered by Plaintiffs as it excluded. Mot. at 27. It goes without saying that evidentiary rulings should not be made this way. Substantively, Plaintiffs also provide nothing to show that the Court's rulings constituted a "clear and prejudicial abuse" of the "broad discretion" that district judges have over matters of evidence. *See Bair v. Callahan*,

664 F.3d 1225, 1228 (8th Cir. 2012). That the Court ruled against Plaintiffs based on the specific facts before it is not grounds for recusal.[12]

### 4. *Lexecon* waivers.

The next patch in Plaintiffs' quilt of alleged partiality is the Court's refusal to allow certain Plaintiffs to withdraw their *Lexecon* waivers. Again, the Court did not act out of animosity toward Plaintiffs. Instead, it applied the law concerning such waivers and concluded that they would, in this case, work unnecessary delay and surprise. Dkt. No. 1379 at 4. Coming as they did on the heels of the *Gareis* bellwether verdict, it is not surprising that the Court found the attempted withdrawals were motivated by purely tactical concerns, not good cause. *See id.* at 3–4.

### 5. **Ruling on discovery concerning air-free devices.**

Revisiting a third-party discovery dispute, Plaintiffs urge recusal based on the Court's affirmance of a report and recommendation by Judge Schultz, who found that Plaintiffs could not subpoena a nonparty manufacturer of a patient warming device that used a technology fundamentally different from the Bair Hugger system's (convective versus forced air). Dkt. No. 304. Given the lack of similarity, Judge Schultz, *at Plaintiffs' invitation to make a standalone relevance determination*, found that the requested nonparty discovery was not relevant. *See id.* at 3. In objecting to his report and recommendation,

---

[12] Even if the Court erred in excluding certain evidence on defective design, the Eighth Circuit concluded that it would not have changed the outcome of the trial given the jury's finding on causation. *Gareis v. 3M Co.*, 9 F.4th 812, 817 (8th Cir. 2021). The appellate court did not "avoid[ ]" the Court's decision, contrary to Plaintiffs' assertion. *Cf.* Mot. at 27-28.

Plaintiffs "largely rel[ied] on facts not before the magistrate judge" and "cite[d] no controlling case law" to show clear or legal error, which led the Court to overrule their objections. *Id.* at 4. Plaintiffs' missteps, not partiality, led to this result.[13]

### 6. Amendment of pleadings to include punitive damages.

Plaintiffs assert that the Court improperly denied leave to include a punitive damages claim in their Master Complaint when it ignored certain documents they offered, and they cite as proof another judge's decision to allow punitive damages to reach the jury in a Missouri state court action, applying a different standard. Mot. at 29. But the Court did consider the documents that Plaintiffs raised. The Court concluded, however, that they demonstrated only (at most) negligence on 3M's part, not the deliberate disregard necessary to allow a claim for punitive damages to move forward under Minnesota law (which, as Plaintiffs conceded, governed the issue). Dkt. No. 984 at 1. Plaintiffs did not include the denial of leave to seek punitive damages in their appeals in *Gareis* or *Amador*, though they could have. They did appeal the parallel denial of leave to seek punitive damages in the Minnesota state court litigation. The Minnesota Court of Appeals affirmed the denial. It is worth noting that the two juries to consider the evidence have concluded

---

[13]   In connection with this, Plaintiffs try, once more, to paint the Eighth Circuit as reluctant to examine the Court's reasoning. Mot. at 28. But the appellate court affirmed the discovery ruling at issue primarily because "Plaintiffs [did] not even argue[] on appeal, let alone show[], that the MDL court's discovery ruling resulted in fundamental unfairness to them." *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 790 (8th Cir. 2021) (citing *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 634 (8th Cir. 2007) ("[P]oints not meaningfully argued in an opening brief are waived.")).

that the evidence does not support a finding of liability, much less the conduct necessary to award punitive damages.

Finally, Plaintiffs' reference to the decision of the Missouri state court judge ignores not only the different legal requirements to pursue punitive damages under Minnesota and Missouri law, *compare* Minn. Stat. § 549.20.1, *with* Mo. Rev. Stat. § 510.263.8 (2018),[14] but also the reality that different judges may honestly reach different conclusions under different laws and, critically, different facts. The Court did not err, much less show partiality.

### 7.  Summary judgment on failure-to-warn claim.

The Eighth Circuit affirmed the Court's decision to grant 3M summary judgment on the failure-to-warn claim in *Gareis*, 9 F.4th at 818. Despite this, Plaintiffs criticize the Court's "rogue reasoning" and the fact that her summary judgment order "cit[ed] nothing," apparently an oblique way of saying that the Court ignored certain 3M-internal documents that Plaintiffs raised. Mot. at 29. The Court, though, noted that the parties' arguments were well-developed on the papers and at the hearing. Most pertinently, and contrary to Plaintiffs' assertion, the Court concluded that 3M had no duty to warn based on the documents that Plaintiffs raised because they were not the "scientific or medical data" needed to trigger that duty under governing South Carolina law. *Gareis v. 3M Co.*, No. 16-CV-4187 (JNE/DTS), Dkt. 113 at 3 (D. Minn. Apr. 17, 2018). Once more, the Court

---

[14]  In 2020, Missouri adopted a new section 510.261 that more closely resembles Minnesota Statutes section 549.20.1.

applied the law to the facts before it, as affirmed by the Eighth Circuit. The Court displayed no partiality.[15]

### 8. *Petitta* injunction.

Finally, Plaintiffs try to portray the Court as vindictive because it enjoined a one-time plaintiff, John Petitta, from litigating in Texas state court the claims that he agreed to dismiss "with prejudice" in the MDL. Mot. at 29–30. This order, in Plaintiffs' view, revealed only a "taint of bias" triggered by Petitta's daring to "litigate outside [the Court's] courtroom." *Id.* at 30. The appellate court was not so confounded, though. Its opinion vacating the injunction did not criticize the Court or express surprise. Rather, the Eighth Circuit devoted significant space to analyzing dispositive choice-of-law issues and the nuances of Texas law on *res judicata*. *See generally In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 999 F.3d 534, 539–41 (8th Cir. May 28, 2021)*.* As this shows, whether Petitta should have been enjoined under the Anti-Injunction Act's third exception was not a simple issue resolved by intemperate decision making, and it was not helped by Plaintiffs' failure to "point[] the Court to any contrary authority" that would have advanced their position. Dkt. No. 2074 at 6. The Eighth Circuit may have vacated the Court's order when it clarified the relevant legal standards, but it did not take the Court to task because it had no reason to.[16]

---

[15] Plaintiffs ignore that the *Gareis* jury rejected their (presumably fully expounded) theory of *causation*, an element critical to all of their claims. *Gareis*, 9 F.4th at 818.

[16] Plaintiffs also imply there was something sinister in the Court issuing its injunction order on the same day that the Texas state court heard summary judgment arguments.

Plaintiffs' efforts to compare the Court's rulings with those that have led to recusal in other cases fall far short. *Sentis Group, Inc. v. Shell Oil Co.* is instructive. 559 F.3d 888 (8th Cir. 2009). The Eighth Circuit summarized the events leading to its decision to remand the case to a different district judge:

> In the course of numerous in-person and telephone conferences and hearings, the court directed profanities at Plaintiffs or Plaintiffs' counsel over fifteen times. In addition, at the December 15 sanctions hearing, the court denied Plaintiffs a meaningful opportunity to respond following Defendants' lengthy presentation, and in doing so, misconstrued the language of its own discovery orders and dismissed Plaintiffs' attempt to explain those orders. The court adopted Defendants' characterization of the four discovery orders as all having required production of the same "Walls documents." This was the case even though the first three orders had temporal or qualitative limitations on the documents subject to the order, and the third order demanded only the production of one document. When Plaintiffs attempted to explain at the sanction hearing "that you have not ruled four times to give them those 58 documents," the district court cut off Plaintiffs and moved toward dismissal.

*Id.* at 904-05. The Court has done nothing like this. The Court has measured its statements, provided Plaintiffs meaningful opportunities to respond to every issue, and explained why the law, applied to the facts of this case, warranted its rulings. Plaintiffs may not like how this litigation has gone for them, but nothing they have identified rises to the level of antagonism or favoritism justifying recusal. *In re KPERS*, 85 F.3d at 1360.

---

Mot. at 30. The Eighth Circuit did not comment on this other than to lay out the sequence of events. *See* 999 F.3d at 536–37. Given that 3M's injunction motion was filed months before, the timing of the Court's order appears to have been the result of nothing more than regular judicial processes. Coincidences sometimes are no more than that.

## B.   Plaintiffs' Continued Fixation on the Reconsideration Decision Offers Is No Grounds for Disqualification.

Plaintiffs give special attention to the Court's reconsideration of general causation. Mot. at 30–35. In their telling, the Court inexplicably allowed 3M to seek reconsideration based on one "irrelevant" study by Jeans. *Id.* at 32. Without deliberation (in their view), the Court then barreled down a path toward reversing its earlier *Daubert* decision and granting 3M summary judgment. *Id.*

This makes sense only if you are unaware of what actually happened. By the time that the Court granted 3M leave to move for reconsideration, it had already observed and weighed the testimony of Plaintiffs' experts at the *Gareis* trial (something that its initial *Daubert* ruling had largely allowed to come in as Plaintiffs wished). Dkt. No. 1428 at 1 (3M's letter anticipating eventual appeal in *Gareis*). This fact, which Plaintiffs omit, explains in large part why the Court granted reconsideration. Dkt. No. 1608. Having seen Plaintiffs' experts in action and with the benefit of the new evidence that 3M identified, the Court reasonably granted a request for reconsideration. It took the opportunity that presented to request the parties' positions on issues that the *Gareis* trial highlighted, including whether Plaintiffs could specify a way for their experts to determine specific causation in *general* (not, as Plaintiffs' brief may suggest, *see* Mot. at 33, specific causation in a specific case).

What followed has been thoroughly litigated. Both parties briefed and argued the issues, with the Court ultimately siding with 3M and entering summary judgment. The Eighth Circuit partly reversed this decision on *Daubert* grounds. *In re Bair Hugger Forced*

*Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768 (8th Cir. 2021). The Eighth Circuit did not, however, charge the Court with any impropriety besides simply having reached a different legal conclusion about expert evidence. This is the "bias" that Plaintiffs—and only Plaintiffs—insist on seeing. *Cf. id.* at 785 (noting that McGovern and Belani studies "ameliorate[d]" the "gap" between simulated and real operating-room conditions, rendering the gap "at least partially illusory").[17]

Plaintiffs try to analogize the Court's decision to *Tumey v. Mycroft AI, Inc.*, but that case is easily distinguished. In that cyber-harassment case, the district judge failed to give the defendants a meaningful chance to oppose a preliminary injunction both by allowing its entry on virtually no notice and barring them from cross-examining witnesses. 27 F.4th 657, 668 (8th Cir. 2022). The district judge also admitted irrelevant testimony from one of the defendant's next-door neighbors, which had nothing to do with the core issue of whether the defendants were harassing the plaintiffs via the Internet. *Id.* at 660, 668. Worse, the district judge's preliminary injunction went far beyond the limited relief that the plaintiffs sought. *Id.* at 668. When the defendants challenged the injunction's scope on constitutional grounds, the district judge dismissed their request "without analysis." *Id.*

---

[17] Plaintiffs insist the Eighth Circuit "reiterated" the reconsideration decision was a "*gross abuse of discretion resulting in fundamental unfairness*" in *Smothers v. Rowley Masonic Assisted Living Community, LLC*, 63 F.4th 721, 726-27, 2023 WL 2618682, at *2 (8th Cir. 2023). Mem. at 34 n.21. The Eighth Circuit did no such thing. The part of *Smothers* Plaintiffs raise merely cited *Bair Hugger* for the standard to obtain reversal based on a lower court's resolution of a discovery issue, which was itself derived from *Ahlberg v. Chrysler Corp. See id.* (citing 481 F.3d 630, 637-38 (8th Cir. 2007)).

Here, in contrast, the Court has articulated the reasoning behind each of its decisions that Plaintiffs cite as a basis for its recusal. Neither has it denied Plaintiffs notice or access to evidence.[18] Plaintiffs' request for additional discovery in connection with the reconsideration motion came on February 11, 2019. Dkt. No. 1747. That was several months after 3M's August 14, 2018 request for leave to file the reconsideration motion, Dkt. 1428; the Court's granting 3M's request on November 20, 2018, Dkt. 1608; and the Court's issuance of a briefing schedule on December 20, 2018, Dkt. 1651.[19] Plaintiffs' request for more discovery came only after 3M had filed its opening brief and would have disrupted the proceedings even more. As pertinent to this motion, too, it was Judge Schultz, *not* the Court, who denied Plaintiffs' request. Dkt. No. 1781. Plaintiffs did not object to Judge Schultz's ruling, either. Equally misguided is the notion that the Court was partial for having granted reconsideration to the extent that it did. All decisions adjudicating fewer than all claims against all parties remain interlocutory until final judgment, Fed. R. Civ. P. 54(b), and, with the benefit of the *Gareis* bellwether, the Court appropriately determined

---

[18] To cite one example of the notice (and patience) the Court has afforded, it gave an additional week for a plaintiff to respond to 3M's motion to dismiss based on the late filing of a suggestion of death and substantive New Jersey law. This was despite the fact that the Plaintiff admitted receiving 3M's motion on time. Dkt. No. 1605, 11/15/18 Tr., at 21:7–16.

[19] The Court ordered that 3M's reconsideration motion was due January 24, 2019; Plaintiffs' response was due February 21; and 3M's reply was due March 14. Dkt. 1652.

to reconsider the admissibility of Plaintiffs' experts' testimony. Plaintiffs' assertion that these actions belied partiality is mistaken.[20]

### C. Plaintiffs' Assertion that the Court Was Unduly Influenced by Fred Morris Borders on Insulting.

In perhaps their most brazen gambit for disqualification, Plaintiffs all but accuse the Court of abdicating its judicial responsibilities to Fred Morris, a retired attorney Plaintiffs describe insultingly as the "man behind the curtain" or a "secret law clerk." Mot. at 35–40. Plaintiffs' theory requires believing that the Court was incapable of resolving the issues presented to it during this case, including issues surrounding the reconsideration motion. Plaintiffs provide no evidence that the Court—which has decades of experience at the trial and appellate levels—was so helpless as to need that sort of assistance. They can offer only supposition and unwarranted extrapolation.

Plaintiffs' "secret law clerk" theory relies on the assumption that Mr. Morris was in fact biased against them. As proof of that bias, though, Plaintiffs are left touting only Mr. Morris's time in practice representing corporate clients in product liability matters—though neither he nor his firm represented 3M. That is all. But Mr. Morris's *former* practice representing a general category of clients fails to show bias of any sort, and certainly not the type of bias that merits imputation to the Court and, by extension, its recusal. Plaintiffs cite no authority for expanding the reach of Section 455(a) in this way, nor is there any.

---

[20] Plaintiffs also attempt to tie the Court's reconsideration decision to its more recent choice to not schedule a status conference. It is not clear why a decision that affects both Plaintiffs and 3M equally proves partiality.

The Eighth Circuit has affirmed district judges' refusals to recuse in circumstances where their law clerks bore much closer relationships to the parties. For example, in *O'Bannon v. Union Pac. R.R. Co.*, the Eighth Circuit found no error in a challenged judge's decision to remain on the case even as one of his law clerks was the housemate of defense counsel. 169 F.3d 1088, 1091–92 (8th Cir. 1999). The court emphatically rejected the plaintiffs' argument for recusal because, even though disqualification motions always call for "reasoned judgment," they overlooked that "cases are decided by judges, not law clerks." *Id.*; *cf. Hall v. Small Bus. Admin.*, 695 F.2d 175 (5th Cir. 1983) (requiring magistrate judge's recusal when his clerk had once been a class member in the pending case; had earlier expressed her conviction that the plaintiffs were correct; and, before judgment was rendered, accepted employment with the plaintiff's counsel). Plaintiffs overlook the same bedrock principle here in demanding the Court's recusal based on Morris's tenuous connection with a certain type of client and legal specialty.

If speculation were to be entertained, then Mr. Morris might have been biased *against 3M*. Earlier in his career, Mr. Morris defended a client, InFocus, in a patent case that 3M commenced. *See, e.g.*, *3M Innovative Props. Co. v. InFocus Corp.*, No. 04-CV-0009 (JNE/JGL), 2005 WL 361494 (D. Minn. Feb. 9, 2005) (denying InFocus's motion to dismiss for lack of personal jurisdiction or, alternatively, change of venue). That litigation terminated with InFocus entering an agreed judgment that "bar[red] InFocus from contending in this action or any other proceeding that the products in suit and other products that [were] only colorably different [did] not infringe" the subject patent. *InFocus Corp.*, Dkt. 107 ¶ 13. Plaintiffs fail to mention Mr. Morris's past adversity to 3M, nor do

they explain how it should figure into their estimate of his alleged bias. What they do not conjure out of thin air they simply ignore.

Plaintiffs also oversimplify the timeline of events surrounding the reconsideration motion that they allege Mr. Morris steered in 3M's favor. While Plaintiffs allege that "within weeks of hiring Mr. Morris as its 'law clerk,' the Court *sua sponte* ordered supplemental briefing on the three new 'issues,'" they omit important context:

- August 14, 2018: 3M filed its letter request seeking leave to move for reconsideration on the prior denial of summary judgment and denial of *Daubert* motions on general causation. 3M's request was based on both the *Gareis* trial testimony and new publications, including the new International Consensus.

- August 15, 2018: Plaintiffs file their opposition to 3M's request.

- November 20, 2018: The Court issues an order finding compelling circumstances to reconsider its prior summary judgment and *Daubert* decisions and sets a briefing schedule.

- December 20, 2018: The Court cancels all status conferences through March 21, 2019.

- March 18, 2019: The Court cancels a status conference scheduled for March 21, 2019.

- March 20, 2019: The Court cancels another status conference scheduled in April 2019.

- April 24, 2019: The Court cancels another status conference scheduled in May 2019.

- May 6, 2019: Following filing of the parties' briefs, the Court requests supplemental briefing on (1) specific issues in the McGovern and Jeans studies, and (2) what methodology an expert can use to reliably rule out alternative causes and identify the Bair Hugger as the most probable cause of infection.

- June 12, 2019: The Court hears argument on 3M's motion.

Plaintiffs tie Mr. Morris to this sequence of events and the Court's grant of reconsideration only on "information and belief" that he was hired around April 2019, when the Court ordered supplemental briefing. Dkt. 2280 ¶ 4. There is nothing to show that Mr. Morris was the one who prompted that additional briefing, and there is even less to show that Mr. Morris did so out of bias against Plaintiffs. The sequence outlined above reflects that the Court had in all likelihood given serious, sustained thought to 3M's motion long before it (supposedly) hired Mr. Morris. In short, the only bias that could be imputed here is Plaintiffs' bias against the Court's reconsideration decision.

Plaintiffs make further untenable assertions about Mr. Morris and his role in this litigation. For instance, they say that the Court never "unveiled" Mr. Morris to the parties. Plaintiffs point to no such requirement and 3M is not aware of any. Plaintiffs also plunge deep into the realm of conspiracy by referring to Mr. Morris's work on *Johnson v. Mead Johnson & Co.*, where the Eighth Circuit reversed the Court's exclusion of certain expert testimony on garden-variety *Daubert* grounds. *See* 754 F.3d 557, 558-59 (8th Cir. 2014). Mr. Morris represented his client during this case; there is nothing that indicates he "attempt[ed] to protect" the Court. *Cf.* Mot. at 38.

Plaintiffs find no support in the authorities to which they try to analogize this case. For example, in *In re Kensington Int'l Ltd.*, the district judge granted quasi-judicial power to five individuals so they could, among other things, mediate disputes, hold case management conferences, consult with counsel, and, "without further notice," act as special masters to "hear any disputed matter and to make a report and recommendation to the Court." 368 F.3d 289, 297 (3d Cir. 2004). The district judge held numerous *ex parte*

meetings with these "advisors," at which "whatever issue [one] can think of" relevant to asbestos litigation was raised to "educate" the judge.[21] *Id.* at 298. At least two advisors named Hamlin and Gross, though, had structural conflicts of interest. *Id.* at 304. Hamlin was the legal representative of the present and future asbestos personal injury claimants in one of the subject bankruptcy matters before the district judge and Gross served as his local counsel. *Id.* Although they owed the court complete neutrality, Hamlin and Gross also had a fiduciary duty to advance their claimants' interests and to see that they received the greatest possible share of the bankruptcy estate. *Id.* Given this and their unique access to the district judge, the Third Circuit concluded that his recusal was necessary because Hamlin and Gross's conflicts of interest were imputable. *Id.* at 318. Mr. Morris, on the other hand, was in not in a role anywhere similar to the ones held by the *Kensington* advisors, nor, perhaps more importantly, is there evidence that he had an irredeemable conflict of interest of that sort that worried the Third Circuit. *Kensington* does not mandate the Court's recusal.

---

[21] Plaintiffs say that to the extent Mr. Morris acted in a similar advisory capacity, the Court violated §§ 455(a) *and* (b), along with the judicial canons, by meeting him *ex parte*. Pl. Mem. at 40. Even *Kensington* did not go so far. There, the Third Circuit's assessment of Hamlin and Gross's *ex parte* contacts with the district judge was driven by their structural conflicts of interest. *Kensington*, 368 F.3d at 312 ("If the structural conflict of interests gave Gross and Hamlin a motive to give Judge Wolin less-than-neutral advice, it was the *ex parte* meetings that gave them the opportunity."). Plaintiffs have failed to show that Mr. Morris had a similar conflict of interest.

Plaintiffs also suggest that Mr. Morris "conceal[ed]" his work for the Court because he has not updated his LinkedIn profile. The notion that a retired attorney has some sort of obligation to keep his LinkedIn profile updated is curious, to say the least; 3M observes that Mr. Morris's activity on PX19—where he has "liked" a post about a new golf course at the University of North Dakota—is consistent with what one would expect.

Neither does *In re School Asbestos Litigation*, another Third Circuit case. 977 F.2d 764 (3d Cir. 1992), *as amended* (Oct. 8, 1992). The "advisors" in that case were the executive committee of plaintiffs' counsel, *id.* at 779–80, and recusal was necessary because the district judge "attended a predominantly pro-plaintiff conference on a key merits issue; the conference was indirectly sponsored by the plaintiffs, largely with funding [from a settlement fund] that he himself had approved; and his expenses were largely defrayed by the conference sponsors with those same court-approved funds." *Id.* at 781–82. Moreover, he was, "in his own words," exposed to a "Hollywood-style 'pre-screening' of the plaintiffs' case: thirteen of the eighteen expert witnesses the plaintiffs were intending to call gave presentations very similar to what they expected to say at trial." *Id.* at 782.

Plaintiffs have alluded to nothing so egregious here. Mr. Morris's role in this litigation does not at all require the Court's disqualification.

### D.   The Totality of the Court's Conduct Does Not Justify Disqualification.

Plaintiffs repackage their many disagreements with the Court's decisions into a catchall argument that, taken in sum, its supervision of this case smacks of bias. Mot. at 40–41. But the whole is not greater than its parts. This all-encompassing argument fails for the simple reason that, as explained above, the Court at no point demonstrated partiality.

### E.   Plaintiffs' Motion Is Also Untimely as to the Court.

If Plaintiffs are to be believed, they have harbored serious doubts over the Court's impartiality at least since its grant of 3M's reconsideration motion on July 31, 2019. This would be a conservative estimate, as Plaintiffs cite conduct by the Court going back to April 2017 as the basis for disqualification. Mot. at 28 (discussing Dkt. 304). Regardless,

if taken at their word, there is little doubt that Plaintiffs have—for several years—doubted whether the Court could fairly preside over this litigation. That much can be gleaned from the fact that they first aired the possibility of seeking disqualification in December 2021. They have nonetheless sought to recuse only now, more than seven years after the formation of the MDL. That is too late. *See, e.g.*, *In re KPERS*, 85 F.3d at 1361 (holding that an 11-month delay in seeking recusal was untimely under § 455(a)); *see also id.* at 1360 (summarizing precedent that "impose[s] a timeliness requirement" on motions made under "both" § 455(a) and 455(b)).[22]

Even using the reinstatement of the MDL is charitable. If both the constituent parts and totality of the Court's conduct has been as biased as Plaintiffs allege, their first opportunity to seek its recusal passed long ago, after *Gareis*. *See, e.g.*, *Gareis*, 16-cv-4187, Dkt. No. 113, Amended Summ. J. Order (Aug. 17, 2018). This, by itself, requires that the instant motion be denied. *In re KPERS*, 85 F.3d at 1360 ("We hold that KPERS' petition for a writ of mandamus is untimely as to the Boatmen's and Blackwell matters, that it is interposed for suspect tactical and strategic reasons, and that it can and should be denied for these reasons alone.").

---

[22] Plaintiffs could have asked the Eighth Circuit to reassign the MDL on remand, *see* 28 U.S.C. § 2106, and they did not do so here. They could have sought disqualification even during the pendency of these appeals. A notice of appeal terminates a lower court's jurisdiction only over those aspects of a case that are the subject of the notice. *See, e.g.*, *United States v. Queen*, 433 F.3d 1076, 1077 (8th Cir. 2006).

## **CONCLUSION**

The arguments plaintiffs have cobbled together in their attempt to disqualify the Court and Judge Schultz are specious and fail to satisfy the criteria set by Section 455 and Eighth Circuit law. Plaintiffs' losses to date (including in a state court unaffected by this Court) are the result of pressing causation theories that have been roundly rejected by the medical community, not judicial bias. The Court should deny Plaintiffs' motion.

Dated: May 3, 2023                            Respectfully submitted,

*s/Benjamin W. Hulse*
Benjamin W. Hulse (MN #0390952)
Mary S. Young (MN #0392781)
Norton Rose Fulbright U.S. L.L.P.
60 South Sixth Street, Suite 3100
Minneapolis, MN 55402
Phone: (612) 321-2800
Email: ben.hulse@nortonrosefulbright.com
         mary.young@nortonrosfulbright.com

**Co-Lead Counsel for Defendants 3M Company and Arizant Healthcare Inc.**

41