UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| In re Bair Hugger Forced Air Warming Devices Products Liability Litigation | MDL No. 15-2666 (JNE/DTS) |
| This Document Relates To: ALL ACTIONS | |

### PLAINTIFFS' OBJECTIONS TO THE RULING OF THE MAGISTRATE JUDGE ON PLAINTIFFS MOTION FOR DISQUALIFICATION

Pursuant to Local Rule 72.2(a)(3), Plaintiffs respectfully file this objection to the June 13, 2023 ruling (Doc. 2300) regarding Plaintiffs' motion seeking disqualification. The ruling was clearly erroneous and contrary to law, and therefore Plaintiffs respectfully file this Objection to the Order pursuant to Local Rule 72.2(a)(3).

Reasonable-minded claimants in this MDL may harbor doubts about judicial bias. In the Order Plaintiffs object to here, Magistrate Schultz seems to acknowledge this possibility, stating "[t]hus, the undersigned's failure to divest or disqualify *may have been* the result of simple oversight, rather than a deliberate dishonesty" (emphasis added). Accordingly, because one reasonable conclusion from the known facts is a distrust in the neutrality of the Court, Plaintiffs object to the Order denying disqualification.

### FACTS

The Order confirms relevant facts. Magistrate Judge Schultz was assigned to this MDL on July 20, 2018. At the time, he owned stock in 3M, but he says he was not "consciously" aware of that fact. (Dkt. No. 2300, p. 3). "[T]he relevant period for purpose

of this issue was from July 20, 2018 to July 30, 2020." (*Id.*). Due to his stock ownership, 28 U.S.C. § 455(b)(4) required him to either immediately recuse or divest of all 3M stock. Judge Schultz did neither. He admits he repeatedly certified his ownership in 3M stock and yet disobeyed 28 U.S.C.§ 455(b)(4).

It was not until "December 22, 2021" that he disclosed his ownership of 3M stock. (*Id.,* p. 4). However, at that time, he claimed he was ignorant of his financial interest in 3M during the pendency of the MDL and made no reference to the annual financial disclosure forms which should have been part of any reasonable inquiry into what was owned, when, and what was disclosed, and when.

Before bringing the Motion in April 2023, Plaintiffs' counsel obtained Annual Financial Disclosure Reports through 2020. The disclosure reports contain certifications from Judge Schultz confirming knowledge of 3M holdings at the time of his appointment to the MDL in 2018 and for two full years of the MDL. Despite these facts, and despite acknowledging his wife aided 3M in litigation testing in this case, Judge Schultz denied Plaintiffs' Motion. Because a reasonable person could conclude the Court lacks impartiality given these facts, Plaintiffs object to the Order.

## LEGAL STANDARD

Within fourteen days after being served with a copy of a magistrate's order, a party may serve and file objections to the order. LR 72.2(a)(3). The district judge "must consider timely objections and modify or set aside any part of the order that is clearly erroneous or is contrary to law." LR 72.2(a)(3); see also 28 U.S.C. 636(b)(1). This objection is filed within fourteen days.

# ARGUMENT

## I.     Refusing Disqualification Undermines the Federal Judiciary

Public trust in the judiciary has been in decline, but the issue burst to forefront when a "*Wall Street Journal* investigation found that 152 federal judges around the nation have violated U.S. law and judicial ethics by overseeing 1,076 court cases involving companies in which they or their family owned stock." (Siconolfi, Michael, *et al*., *Dozens of Federal Judges Had Financial Conflicts: What You Need to Know*, The Wall Street Journal, April, 27, 2022).[1] The sheer number of judges involved was staggering given there are only 870 total federal judges. The ensuing fallout resulted in a serious injury to the public's perception of the courts and caused immediate action by Congress.

Not only did the *Wall Street Journal* refocus public attention on this issue, recent controversies involving Supreme Court Justices have stirred debate. In April 2023, Justice Thomas received sharp criticism due to undisclosed gifts, tuition payments, and real estate transactions with controversial billionaire conservative political donor Harlan Crow. (*See* Kaplan, Joshua, *et al*., *Clarence Thomas and the Billionaire*, ProPublica, April 6, 2023).

Days ago, another controversy broke when a second *ProPublica* investigation revealed Justice Alito had accepted luxury travel from Paul Singer, a billionaire investor who has appeared before the court at least 10 times, though he was never a named party or included in any disclosure statements. (Elliot, Justin, *et al*., *Justice Samuel Alito Took*

---

[1] As Congress noted, the *Wall Street Journal* report was "surely a major undercount: The Journal's work focused on district and appellate court judges, and excluded magistrate and bankruptcy judges; their work focused mainly on individual stock holdings." *See* https://www.congress.gov/congressional-report/117th-congress/house-report/199/1

*Luxury Fishing Vacation With GOP Billionaire Who Later Had Cases Before the Court*, ProPublica, June 20, 2023). Justice Alito never recused.

After receiving inquiries from *ProPublica*, Justice Alito explained his failure to recuse "would not cause a reasonable and unbiased person to doubt my ability to decide the matters in question impartially." (Alito, Samuel, *Justice Samuel Alito: ProPublica Misleads Its Readers*, The Wall Street Journal. June 20, 2023). Alito stated, "I was not aware and had no good reason to be aware" of the potential conflict. *Id.* The same is not true here. Judge Schultz was aware of his conflict, as evidenced in three certifications.

As Justice Alito noted, the operative question is not whether a reasonable person would necessarily conclude a judge ***is*** biased or acting in bad faith, but whether a reasonable member of the community "would **doubt** that the Justice could fairly discharge his or her duties." *Id.,* quoting Statement on Ethics Principles and Practices appended to letter from the Chief Justice to Senator Durbin, April 25, 2023 (emphasis added).

Instead of seeking to eliminate doubt, this Order confirms doubt is reasonable. Like a litigant facing summary judgment, the Order relies on raising a fact question. On one hand, there are multiple certifications confirming actual knowledge of ownership of 3M stock, and on the other hand, there are Magistrate Schultz's assurances that his certifications should be disregarded. Which of the assurances is the public to credit? Which to ignore?

The moment Magistrate Schultz admitted he failed to comply with the law, as he freely admits he did, a taint attached to his involvement in this MDL. As Representative Hank Johnson (D-GA), Chairman of the House Judiciary Committee's Subcommittee on

4

the Courts, Intellectual Property, and the Internet said during a hearing on this issue, "The damage has been done. Federal judges did not follow the law. We do not know whether any judge specifically acted to benefit his or her ownership interests, but the appearance of impropriety has already tainted their judgments." Chairman Hank Johnson, Jr, *Hearing on Judicial Ethics and Transparency: The Limits of Existing Statutes and Rules,* Subcommittee on Courts, Intellectual Property, and the Internet, October 26, 2021.[2] Similarly, in this situation, by not following the law and presiding over a case in which he held a confirmed financial interest, damage is done. As Chairman Johnson emphasized, "[n]otwithstanding any actual undue influence," the fact a judge "appear[s] as if they **might** have acted with their pecuniary interests in mind is enough to shake the public's confidence in the United States judiciary." *Id.* (emphasis added).

II. **Magistrate Schultz Misapplied 455(a).**

    A. **Subjective knowledge is irrelevant.**

"Scienter is not an element of a violation of § 455(a)." *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 859 (1988). "A careful reading of the respective subsections makes clear that Congress intended to require knowledge under subsection (b)(4) and not to require knowledge under subsection (a)." *Id.* For this reason, "[t]he judge's lack of knowledge of a disqualifying circumstance…does not eliminate the risk that 'his impartiality might reasonably be questioned' by other persons." *Id.* "[P]romot[ing] public confidence in the integrity of the judicial process … does not depend upon whether or not

---

[2] Available at https://hankjohnson.house.gov/media-center/speeches/judicial-ethics-and-transparency-limits-existing-statutes-and-rules (Last visited June 25, 2023).

5

the judge actually knew of facts creating an appearance of impropriety, so long as the public might reasonably believe that he or she knew." *Id.* at 860. Given the disclosures, there is no gray area here: he knew at least those facts to which he attested in writing.

Nor would claimed lack of subjective knowledge prevent disqualification. As the Supreme Court explained in *Liljeberg*:

> If it would appear to a reasonable person that a judge has knowledge of facts that would give him an interest in the litigation then an appearance of partiality is created even though no actual partiality exists because the judge does not recall the facts, because the judge actually has no interest in the case or because the judge is pure in heart and incorruptible. The judge's forgetfulness, however, is not the sort of objectively ascertainable fact that can avoid the appearance of partiality.

*Id.* at 860, citing *Hall v. Small Business Administration,* 695 F.2d 175, 179 (5th Cir. 1983). Here, a reasonable member of the public would expect a judge would have actual knowledge about a matter for which he certified his actual knowledge three times.

### B. Magistrate Schultz's belated 2021 disclosure does not inspire faith.

The Order suggests the benefit of the doubt is appropriate because of "[t]he forthright and prompt manner in which the Court addressed the issue support an inference of good faith, not bias." (Dkt. No. 2300, p. 9). But Judge Schulz's 2021 disclosure was not prompt. Indeed, the disclosure wasn't made until the Eighth Circuit commanded all judges review for undisclosed conflicts after the *Wall Street Journal* expose.

The disclosure also cannot be described as forthright. If the appropriate due diligence was performed when executing instructions from the Eighth Circuit, the certified records from 2018-2020 confirming knowledge of 3M stock would have been found.

6

Instead, the Magistrate said he lacked knowledge until sometime in late 2021. Further, a review of PACER filings confirms written disclosures of other financial conflicts were made in multiple cases pending before Magistrate Schutlz in November, 2021,[3] yet no disclosure was made in this case until December 2021 during a temporarily sealed status conference, followed shortly by a disclosure form. In the other cases recusal took place without request or following written notice to the parties and a status conference. Not so here.

In addition, the Order concludes the public should have no concern because he "has implemented a number of additional safeguards to prevent a recurrence of this issue." (Dkt. 2300, p. 14). Yet Magistrate Schultz's pattern of recusals after the *Wall Street Journal* investigation and Eighth Circuit order seem to suggest otherwise:

| Case | Filed | Recusal | Financial Interest Reflected on Disclosure Forms |
|---|---|---|---|
| *Sieber v. Johnson & Johnson et al.*, No. 0:21-cv-1297 | 5/28/2021 | 10/19/2021 | J&J stock |
| *City of Philadelphia v. Bank of Am.*, No. 0:22-mc-12 | 2/1/2022 | 2/7/2022 | Bank of America stock |
| *McHugh v. Bank of New York Mellon, Bank of Am., et al.,* No. 0:21-cv-2174 | 10/4/2021 | 2/14/2022 | Bank of America stock |
| *Armstrong v. JPMorgan Chase Bank,* No. 0:21-cv-548 | 2/25/2021 | 2/14/2022 | JPMorgan Chase stock |
| *Cambria Co. LLC v. Disney Worldwide Servs., Inc.*, No. 0:22-cv-459 | 2/18/2022 | 5/27/2022 | Disney stock |
| *Quast v. DePuy Orthopaedics, Inc.,* No. 0:22-cv-331 | 2/2/2022 | 12/9/2022 | J&J stock |

---

[3] See, e.g., *Carlson v BNSF*, 19-cv-1292 (Doc. 202 and 203).

| | | | |
|---|---|---|---|
| *Sprafka v. DePuy Orthopaedics, Inc.*, No. 0:21-cv-1785 | 8/4/2021 | 1/9/2023 | J&J stock |

In each of these cases, Magistrate Schultz recused himself under 455(a), and in many instances he did so long after the Eighth Circuit's order or his assignment to the case.

**C.    Judge Schultz had good reason to know of his conflict.**

Magistrate Schultz correctly admits he "should have known he owned 3M stock." (Dkt. No. 2300, p. 11). In his order, he admits he personally "reviewed and signed those reports." (*Id.*, p. 11). But Judge Schultz claims the reports are too complex, and as a result, he claims ignorance over his own financial affairs, despite certifying knowledge. But this oversells the complexity of the reports. For example, the 2018 report was only 34 pages long, and his 3M stock ownership was easily identifiable:

| FINANCIAL DISCLOSURE REPORT Page 12 of 34 | Name of Person Reporting: Schultz, David T. | | | | | | | Date of Report: 08/08/2018 |
|---|---|---|---|---|---|---|---|---|

**VII. INVESTMENTS and TRUSTS** — *income, value, transactions (Includes those of spouse and dependent children; see pp. 34-60 of filing instructions.)*

☐ NONE (*No reportable income, assets, or transactions.*)

| A. Description of Assets (including trust assets) Place "(X)" after each asset exempt from prior disclosure | B. Income during reporting period | | C. Gross value at end of reporting period | | D. Transactions during reporting period | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | (1) Amount Code 1 (A-H) | (2) Type (e.g., div., rent, or int.) | (1) Value Code 2 (J-P) | (2) Value Method Code 3 (Q-W) | (1) Type (e.g., buy, sell, redemption) | (2) Date mm/dd/yy | (3) Value Code 2 (J-P) | (4) Gain Code 1 (A-H) | (5) Identity of buyer/seller (if private transaction) |
| 136. 3M CO (MMM) | A | Dividend | J | T | Buy (add'l) | 09/14/17 | J | | |
| 232. 3M CO (MMM) | A | Dividend | J | T | | | | | |
| 391. 3M CO (MMM) | A | Dividend | J | T | | | | | |

Failing to identify the conflict and comply with the law in three consecutive years gives rise to reasonable questions about the court's impartiality.

In the Order declining to disqualify, Judge Schultz says he "makes no excuse for his failure to immediately recognize the issue." (Dkt. No. 2300, p. 11). But imagine an attorney was facing sanctions based on allegations she had impermissible contact with employees of the opposing party, in violation of Minnesota Rule of Professional Conduct 4.2. During the sanctions proceeding, the attorney represents to the Court she was at all times ignorant that the individuals she contacted were employed by the opposing party. However, the Court later learns – without the attorney ever disclosing it – the attorney had on three separate occasions signed certifications affirming a list of 400 individuals were employees of the opposing party. In response, the attorney again claims ignorance, despite the three separate certifications, on the basis it was a long list. With what level of healthy skepticism would the Court react? And with what level of skepticism would a reasonable member of the public *expect* the Court to react? Which representation from a judicial officer is appropriately reliable and which should be automatically disregarded?

### III.     Judge Schultz is not Entitled to the Safe Harbor in § 455(f).

§ 455(f) does not apply here because Magistrate Schultz did not devote "substantial judicial time" to this MDL. He presided over 15 motions which he described as inconsequential. Judge Schultz stated "[t]he only significant matter the Court ruled on was the motion to exclude certain expert evidence." (Dkt. No. 2300, p. 10). The only other tasks he described include an unspecified review of documents, consisting of "case-related filings and material," and that he spent "hours" preparing and appearing in a settlement

9

process. (*Id.,* p. 17). Discovery on issues of general causation, Daubert briefing, and the only trial were concluded prior to Magistrate Schultz's involvement. Between the time he was added to the case July 2018 through the summary judgment order entered on July 31, 2019, there were a handful of motions decided and "buckets" meetings in chambers, but the bulk of the action in the MDL was focused on the reconsideration motion heard and decided by the MDL Court.

This situation is similar to that faced by Judge Stanley Chesler of the District of New Jersey in an *Aetna* class action. *In re Aetna UCR Litig.,* CIV.A. 07-3541 SRC, 2013 WL 1622160, at *4 (D.N.J. Apr. 15, 2013). In *Aetna*, Judge Chesler could not claim the safe harbor because 1) he had not devoted substantial time to the case, under circumstances similar to these, and more importantly, 2) he did not know, but should have known, of the conflict upon assignment, again as here. Because Judge Chesler should have known of the conflict but did not divest upon assignment, he noted the § 455(f) safe harbor was unavailable.

Judge Chesler explained "[t]hough the case had been on the undersigned's docket for over a year-and-a-half before the realization that … the judge and his wife were putative class members, the undersigned's involvement in the action was, to put it plainly, minimal." The judge described his activities as "basic housekeeping," much akin to Judge Schultz's limited involvement. *Id.* But most importantly, Judge Chesler explained because he should have known of his conflict, divestment was only available upon assignment:

> Moreover, the timing of the undersigned's realization of his and his wife's financial interest in the litigation distinguishes the recusal question presented in this action from the

> exercises of curative divestment found appropriate by the judges in the *Literary Works* action and by the Committee on Codes of Conduct. As to the former, the Second Circuit judges opined that "curative divestment should generally be possible when recusal is mandatory under § 455(a) or (b) **if a reasonable person would not have known the circumstances warranting recusal prior to his divestment of the offending interest**." *Id.* at 142.

*Id.* (emphasis added); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 509 F.3d 136, 142 (2d Cir. 2007) (noting "a judge could not ameliorate circumstances warranting disqualification when he should have known of the 'disqualifying interest ... long before [its] subsequent discovery and [his attempted] divestiture.'").

Finally, the safe harbor is misapplied here. Indeed, some federal judges have observed "455(f) prudentially ought to be reserved for those situations where all parties desire continued judicial action by the same judicial officer." *In re Maritimes Northeast Pipeline, L.L.C.*, 349 F. Supp. 2d 175, 179 (D. Mass. 2004). The parties are not jointly requesting waiver of the conflict here. The appearance of bias mandates disqualification.

**IV.    Involvement of Judge Schutlz's Wife Magnifies the Appearance of Impropriety**

In addition to questions raised by 3M stock ownership, the situation is aggravated by the involvement of Ms. Trysla. The question is whether Ms. Trysla "performed work for a party." (Dkt. No. 2300, p. 18). Judge Schultz insists Ms. Trysla was not performing work. Rather, he claims her conduct simply involved receiving and sending emails, thereby facilitating a transaction between two parties. Yet that is 95% of what many lawyers do for "work" every single day. They facilitate interactions and arrange undertakings between entities. Nonetheless, Judge Schultz insists "all evidence in the record indicates Ms. Trysla

11

was acting in Fairview's [interest]—not 3M's." (*Id.,* p. 20). There is nothing in the record suggesting Fairview had an interest in the testing. Indeed, the notion that the General Counsel of a corporation as significant as Fairview would be involved in mundane issues akin to reserving a conference room is absurd. No reasonable member of the public would believe the GC of one of the largest corporations in Minnesota involves herself with requests about low-level facilities requests. A reasonable member of the public would react with understandable skepticism if told the judge's spouse assisted with litigation testing 3M claims must remain secret. Here she facilitated testing with consulting and litigation experts and third parties present, the results of which 3M asserts are immune from production because the documents are protected by the attorney work-product and attorney-client privilege. Again, any reasonable person armed with facts now known to the public would be reasonable in assuming if the results of such testing were consistent with 3Ms alleged defenses in this litigation, the privileges would long since have been waived. The fact 3M maintains privilege protects these documents tells any reasonable person what the results of the testing were. When placed in context with the remainder of this motion, it exacerbates reasonable public doubt of impartiality.

**V.    Judge Schultz Applies a Double Standard to a Reasonable Person's Doubts about Propriety.**

Judge Schultz noted in his order, "Thie [sic] present motion to disqualify the undersigned was filed approximately 17 months after that status conference and written disclosure." (Dkt. No. 2300, p. 5). Plaintiffs were troubled and surprised by the disclosure made during the impromptu December 2021 status conference. No information was ever

provided regarding prior written disclosures. Indeed, Judge Schultz never revealed that he knowingly held 3M stock while overseeing the MDL. Nor did he reveal the date or reason of divestiture. Plaintiffs discovered certain prior written disclosures confirming actual knowledge of the conflict in 2023.[4] Plaintiffs' counsel should never be required to discover that conflict.

"A contrary rule would presume that litigants and counsel cannot rely upon an unbiased judiciary, and that counsel... must investigate the impartiality of the judges before whom they appear. Such investigations, of course, would undermine public confidence in the judiciary and hinder, if not disrupt, the judicial process - all to the detriment of the fair administration of justice." *Porter v. Singletary*, 49 F.3d 1483, 1489 (11th Cir. 1995); *see also Am. Textile Mfrs. Inst., Inc. v. Limited, Inc.*, 190 F.3d 729, 742 (6th Cir. 1999) ("litigants (and, of course, their attorneys) should assume the impartiality of the presiding judge, rather than pore through the judge's private affairs and financial matters"). Timeliness concerns are inapt here due Judge Schultz's failure to disclose evidence which ran contrary to his assertion he lacked knowledge of 3M stock ownership. Plaintiffs could not have moved for disqualification prior to obtaining that information in 2023.[5]

---

[4] It is precisely because of the previously onerous and taboo nature of obtaining information about a judge's finances, and in direct response to the *Wall Street Journal's* reporting, that Congress passed the Courthouse Ethics and Transparency Act in 2022 to improve access to this data.

[5] Whether a reasonable member of the public might doubt the timing of the motion for disqualification, Judge Schultz believes mere "sequence and timing" is enough. But when it comes to potential public reactions to his own conduct, suspicions about sequence and timing seem insufficient to create reasonable doubts. This double-standard is irreconcilable.

## CONCLUSION

"The judiciary is built on a foundation of public trust: it doesn't have the power of the purse or the authority to enforce the laws that it interprets. Credibility is its currency. If that falls away, then the entire institution crumbles." (*See* Lerza, *supra*). Here, in one of the nation's largest and longest pending MDLs, Judge Schultz has been "called upon to rectify an oversight and to take the steps necessary to maintain public confidence in the impartiality of the judiciary." *Liljeberg*, 486 U.S. at 861.

Dated: June 27, 2023

Respectfully submitted,

MESHBESHER & SPENCE LTD.

/s/ Genevieve M. Zimmerman
Genevieve M. Zimmerman (MN #330292)
1616 Park Avenue South
Minneapolis, MN 55404
Phone: (612) 339-9121

LEVIN PAPANTONIO, P.A.

/s/ Ben W. Gordon
Ben W. Gordon (Pro Hac Vice)
316 S. Baylen Street, Suite 600
Pensacola, FL 32502-5996
Phone: (850) 435-7090

*Co-Lead Counsel for Plaintiffs*

MCDONALD WORLEY

/s/ Gabriel Assaad
Gabriel Assaad (Pro Hac Vice)
1770 St. James Place, Suite 100
Houston, TX 77056
Phone: (281) 623-1906

FARRAR & BALL, LLP

/s/ Kyle W. Farrar
Kyle W. Farrar (MN #0397942)
1117 Herkimer St.
Houston, TX 77008
Phone: (713) 221-8300

**Counsel for Plaintiffs**