| | |
|---|---|
| In re: BAIR HUGGER FORCED AIR WARMING DEVICES PRODUCTS LIABILITY LITIGATION | MDL No. 15-2666 (JNE/DTS) MEMORANDUM **(FILED UNDER SEAL)** |

This Document Relates to All Actions

Plaintiffs filed a Motion to Disqualify Judge Ericksen and Magistrate Judge Schultz.[1]  They also moved for reassignment of their motion to disqualify.  Plaintiffs claimed that the undersigned's "pattern of conduct and rulings," "reconsideration decision," "hiring of a secret 'law clerk,'" and "totality of . . . misconduct" raise an inference of bias.  None of the cited decisions or statements constitutes grounds to disqualify.  The law clerk was not a secret, and nothing about the law clerk calls for the Court to recuse.  There was no misconduct.  Insofar as they relate to the undersigned, the Court denies Plaintiffs' motions.

## I.      Background

"In December 2015, the Judicial Panel on Multidistrict Litigation created and centralized the *In re Bair Hugger Forced Air Warming Devices Products Liability Litigation* ('MDL') in the District of Minnesota ('MDL court') for coordinated pretrial proceedings."  *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768, 773 (8th Cir. 2021), *cert. denied*, 142 S. Ct. 2731 (2022).  The Panel assigned

---

[1]      Michael V. Ciresi, Ciresi Conlin L.L.P.; Genevieve M. Zimmerman, Meshbesher & Spence Ltd.; Ben W. Gordon, Levin Papantonio, P.A.; David J. Szerlag, Pritzker Hageman, P.A.; Gabriel Assaad, McDonald Worley; and Kyle W. Farrar, Farrar & Ball, LLP, signed the memorandum in support of Plaintiffs' motion to disqualify the undersigned.

the MDL to the undersigned. Magistrate Judge Franklin Noel was assigned to the MDL until his retirement. Magistrate Judge David Schultz was subsequently assigned to it.

In December 2017, the Court denied Defendants' Motion to Exclude Plaintiffs' General Causation Medical Experts and Motion for Summary Judgment With Respect to General Causation. Five months later, the Court presided over the first bellwether trial, *Gareis v. 3M Co.*, Case No. 16-cv-4187.[2] The jury returned a verdict in Defendants' favor.

In August 2018, Defendants "request[ed] permission to file a motion for reconsideration of the Court's denial of Defendants' general causation *Daubert* and summary judgment motions." Plaintiffs opposed the request. In November 2018, the Court granted Defendants' request for permission to file a motion for reconsideration.[3] Several months later, the Court heard Defendants' motion for reconsideration. In July 2019, the Court granted the motion and entered summary judgment in Defendants' favor.

---

[2] "On May 30, 2017, pursuant to Pretrial Order No. 19, the Court selected eight bellwether cases from the parties' proposed cases and then each party exercised one strike to finalize the six cases in the 'Final Bellwether Trial Pool.' On June 16, 2017, the Court determined the order of these six bellwether trials, listing *Gareis* as last. Because the first five cases never made it to trial, *Gareis* became the first bellwether to go to trial. On March 13, 2018, the Court repopulated the bellwether pool and the parties selected an additional twelve potential bellwethers ('the Bellwethers Second') per Pretrial Order No. 24." Mem. 3 n.1, July 31, 2019, ECF No. 2064.

[3] "Prior to granting Defendants' request to file a motion for reconsideration, the Court had directed the two joint nominees in the Bellwethers Second—*Hives* and *Axline*—to prepare for trial. *Axline* was set to be tried on December 3, 2018. But by November 15, 2018, *Hives* had been dismissed and Plaintiffs' counsel had indicated that they intended to dismiss the remaining claims in *Axline*." Mem. 5, July 31, 2019, ECF No. 2064.

Plaintiffs appealed.  In August 2021, the United States Court of Appeals for the Eighth

Circuit reversed in part and affirmed in part:

> We reverse in full the exclusion of Plaintiffs' general-
> causation medical experts and reverse in part the exclusion of
> their engineering expert.  We reverse the grant of summary
> judgment in favor of 3M.  We affirm the discovery order that
> Plaintiffs challenge.  We affirm the MDL court's decision to
> seal the filings Plaintiffs seek to have unsealed.

*In re Bair Hugger*, 9 F.4th at 773.  The Eighth Circuit issued the mandate in November

2021.

At a status conference before the magistrate judge in December 2021, Plaintiffs

stated that they "expect to bring a motion to recuse."  In January 2022, the parties filed a

joint status report in which they requested a status conference.  The Court held the

request for a status conference in abeyance and ordered the parties to participate in

mediation.  A status conference took place before the magistrate judge in June 2022.  The

Court received letters from the parties in late 2022 and held status conferences in

chambers with lead counsel in February and March 2023.  After the March 2023 status

conference, the Court ordered the parties to participate in mediation.  A few weeks later,

and one day after the Court affirmed the magistrate judge's denial of a plaintiff's motion

for substitution under Fed. R. Civ. P. 25(a)(1),[4] Plaintiffs moved to disqualify the

undersigned and moved for reassignment of their motion to disqualify.

---

[4]     *Zotto v. 3M Co.*, Case No. 18-cv-1764, slip op. at 1-5 (D. Minn. Apr. 10, 2023).

## II.    Motion for Reassignment

Plaintiffs moved for reassignment of their motion to disqualify "to a random, disinterested judge."  Defendants took "no position on whether to decide or reassign the decision on Plaintiffs' Motion to Disqualify."  They did assert that "reassignment is rare and disfavored."

"[T]he judge presiding over a case is in the best position to appreciate the implications of those matters alleged in a recusal motion."  *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d 1353, 1358 (8th Cir. 1996) (quoting *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1312 (2d Cir. 1988)).  Accordingly, the issue of "whether disqualification is required in a particular case is committed to the sound discretion of the district judge." *Id.*; *see Akins v. Knight*, 863 F.3d 1084, 1086 (8th Cir. 2017) (per curiam) ("Our court as well as others have routinely affirmed recusal decisions rendered by the judge against whom the motion is directed."); *Moran v. Clarke*, 296 F.3d 638, 649 (8th Cir. 2002) (en banc) ("[R]ather than remand to a different judge, we remand this question to the district court with the suggestion that it revisit and more thoroughly consider and respond to Moran's recusal request.").  The Court denies Plaintiffs' motion for reassignment of their motion to disqualify.

## III.    Motion to Disqualify

Plaintiffs moved to disqualify the undersigned under 28 U.S.C. § 455(a), which states: "Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Defendants opposed Plaintiffs' motion to disqualify.

"The test for determining whether a judge's impartiality might reasonably be questioned is an objective one." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 861 (8th Cir. 1995). "The test for recusal is 'whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all of the relevant facts of a case.'" *United States v. Aldridge*, 561 F.3d 759, 764 (8th Cir. 2009) (quoting *Moran*, 296 F.3d at 648); *see, e.g.*, *Burton v. Nilkanth Pizza, Inc.*, 20 F.4th 428, 434 (8th Cir. 2021); *Scenic Holding, LLC v. New Bd. of Trustees of Tabernacle Missionary Baptist Church, Inc.*, 506 F.3d 656, 662 (8th Cir. 2007). "A party introducing a motion to recuse carries a heavy burden of proof; a judge is presumed to be impartial and the party seeking disqualification bears the substantial burden of proving otherwise." *Johnson v. Steele*, 999 F.3d 584, 587 (8th Cir. 2021) (quoting *United States v. Delorme*, 964 F.3d 678, 681 (8th Cir. 2020)).

"In the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns." *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d at 1360 (quoting *In re Cargill, Inc.*, 66 F.3d 1256, 1262-63 (1st Cir. 1995)). "[M]otions to recuse should not 'be viewed as an additional arrow in the quiver of advocates in the face of [anticipated] adverse rulings.'" *Id.* (second alteration in original) (quoting *TV Commc'ns Network, Inc. v. ESPN, Inc.*, 767 F. Supp. 1077, 1081 (D. Colo. 1991)). "The recusal statute does not provide a vehicle for parties to shop among judges." *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist. No. 1*, 839 F.2d 1296, 1302 (8th Cir. 1988).

### A.    Timeliness

The parties disputed whether Plaintiffs' motion to disqualify is timely.  Plaintiffs
asserted that § 455 "does not mention motion practice, much less any time constraints for
filing such a motion."  "Even if a timeliness requirement were to apply," they argued, "it
would apply only to section 455(b) motions, not section 455(a) motions."  Plaintiffs'
assertion that a motion under § 455(a) is not subject to a timeliness requirement is
incorrect:  "[O]ur circuit has consistently required timely action as to § 455 in general,
i.e., as to both (a) and (b)." *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d at 1360; *see United
States v. Rubashkin*, 655 F.3d 849, 858 (8th Cir. 2011); *Sentis Grp., Inc. v. Shell Oil Co.*,
559 F.3d 888, 904 (8th Cir. 2009); *Fletcher v. Conoco Pipe Line Co.*, 323 F.3d 661, 664
(8th Cir. 2003).

"Timeliness requires a party to raise a claim 'at the earliest possible moment after
obtaining knowledge of facts demonstrating the basis for such a claim.'" *Fletcher*, 323
F.3d at 664 (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir.
1987)).  "A party is required to bring its recusal motion promptly to avoid the risk that the
party might hold its application as an option in the event the trial court rules against it."
*Tri-State Fin., LLC v. Lovald*, 525 F.3d 649, 653 (8th Cir. 2008).

Plaintiffs maintained that "[t]imeliness concerns are . . . inapt here because any
delay is due to both judges' 'inexcusable failure' to disclose their conflicts, let alone
recuse themselves based on those conflicts."  As to the undersigned, Plaintiffs asserted
that "Judge Ericksen never disclosed that she hired a retired defense lawyer as her 'law
clerk.'"  But there was no "failure to disclose" the law clerk's hiring.  The Court is not

obligated to notify Plaintiffs of its hiring decisions. No party is entitled to introductions

to Court staff. And no party is entitled to know the identity of a law clerk assigned to

work on a particular case. The matters that a law clerk works on are confidential. A law

clerk may not disclose them. *See Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 3, Code of

Conduct for Judicial Employees, Canon 3D(3) ("A judicial employee should never

disclose any confidential information received in the course of official duties except as

required in the performance of such duties. A former judicial employee should observe

the same restriction on disclosure of confidential information that applies to a current

judicial employee, except as modified by the appointing authority."); *Guide to Judiciary

Policy*, Vol. 2, Pt. B, Ch. 2, Published Advisory Opinions, Advisory Opinion No. 109

("The assignment of a law clerk to a particular case is rarely revealed by any court,

whether appellate, district, or bankruptcy."); Fed. Jud. Ctr., *Maintaining the Public Trust:

Ethics for Federal Judicial Law Clerks* 27 (2019 rev. 4th ed.) ("The matters that [a law

clerk] worked on are confidential and may not be disclosed . . . ."). Moreover, there was

no "failure to disclose" the law clerk's hiring because the names of the undersigned's law

clerks in 2019, including the one whose retention is cited by Plaintiffs as "rais[ing] an

inference of bias," were disclosed on the Court's public website. *The Honorable Joan N.

Ericksen*, United States District Court, District of Minnesota, https://web.archive.org

/web/20190515224105/http://www.mnd.uscourts.gov/Judges/ericksen.shtml. Thus, the

information was available to Plaintiffs and to the public at large at the time of the law

clerk's hiring, and it has remained publicly available ever since.

Plaintiffs claimed that their "justification for disqualification is more than compelling" such that timeliness concerns should be set aside.  *See Edgar v. K.L.*, 93 F.3d 256, 257 (7th Cir. 1996) (per curiam).  To support their motion to disqualify, Plaintiffs cited the undersigned's "pattern of conduct and rulings," "reconsideration decision," retention of the law clerk in 2019, and "totality of . . . misconduct."  Plaintiffs have not demonstrated that the untimeliness of their motion, which is based on events that took place before they appealed the grant of summary judgment to Defendants, should be disregarded.  *See Tri-State Fin.*, 525 F.3d at 653.

Finally, Plaintiffs claimed that their motion to disqualify "was not fully ripe until now."  They asserted that they could not have moved to disqualify the undersigned "any earlier."  Plaintiffs reasoned that "the Court lacked jurisdiction over the litigation" during the appeal; that,"[w]hen the Court finally regained [jurisdiction]," they "disclosed their intent to disqualify Judge Ericksen"; that "she 'referr[ed] the case to mediation' and held the MDL in 'abeyance'"; and that, "[a]s a result, 'it was not clearly foreseeable that this Court would be further involved in this case' until weeks ago when both sides sought to resume litigation."  Notwithstanding Plaintiffs' reasoning, the Court's further involvement in the MDL was clearly foreseeable in August 2021, when the Eighth Circuit reversed the grant of summary judgment to Defendants.  And the Court's further involvement in the MDL manifested itself upon the Eighth Circuit's issuance of the mandate in November 2021.  *See Carlson v. Hyundai Motor Co.*, 222 F.3d 1044, 1045 (8th Cir. 2000) ("Issuance of the mandate formally marks the end of appellate jurisdiction.  Jurisdiction returns to the tribunal to which the mandate is directed, for such

proceedings as may be appropriate . . . ." (quoting *Johnson v. Bechtel Assocs. Pro. Corp.*, 801 F.2d 412, 415 (D.C. Cir. 1986))).

One month after the mandate issued, a status conference took place before the magistrate judge. During a discussion with Plaintiffs about the possibility of additional bellwether trials, Plaintiffs questioned whether the undersigned, having taken senior status while their appeal was pending before the Eighth Circuit, would "want[] to take these cases and try the cases":

> THE COURT: . . . . I suppose the other -- to the extent that a bellwether process, if you want to call it that, is still beneficial, I suppose Judge Ericksen could identify some of her cases, the ones that are here, for that -- set those on for trial.
>
> MS. ZIMMERMAN: Absolutely correct. I mean, I'm sure that there are a number of potential options in terms of trying cases --
>
> THE COURT: Okay.
>
> MS. ZIMMERMAN: -- and sort of all of that is sort of in the mix. I do know that the Court has -- or that Judge Ericksen took senior status. We weren't sure if she was still wanting to take these cases and try the cases. I mean, I just don't know. I know that as a general matter in the District of Minnesota that senior judges don't handle MDLs, or that's my understanding. I could be wrong about that.
>
> But what's going on or what is to come, I guess, it could be a remand process that we're sort of at if we're not going to do additional discovery or perhaps we're looking at all sorts of additional discovery and another -- I mean, this case was transferred here in 2015. So we could be looking at another, you know, four or five years of litigation.
>
> MR. HULSE: Your Honor, may I suggest? It seems like what we're trying -- what's happening here is trying to make this litigation as unappealing for the Court as possible, but --

THE COURT: That's okay.

Later in the status conference, the magistrate judge asked the parties to submit case

management plans, and Plaintiffs stated that they planned to file a motion to recuse:

> THE COURT: Okay. Ms. Zimmerman, I mean, do you think it's a worthwhile exercise to have you each go back and sort of put together your own view of what should happen?
>
> MS. ZIMMERMAN: I'm going to say something candidly with the Court. We expect to bring a motion to recuse.
>
> THE COURT: Oh, okay. Me or Ericksen or both?
>
> MS. ZIMMERMAN: I don't know that we've defined it. I guess we thought Judge Ericksen, and not --
>
> THE COURT: No. That's --
>
> MS. ZIMMERMAN: There's certain cases, I guess, that just after a certain amount of history, there's just going to be a concern and maybe -- it's not a comment on Her Honor's ability to handle cases, she handles a lot of complicated cases, but this one has got some history now and we've got clients to represent.
>
> So I expect that that is going to come and it's a part of -- our, sort of, inquiry today was interested in if the Court intends to continue moving forward. So I guess that's --
>
> THE COURT: Yeah.
>
> MS. ZIMMERMAN: -- an awkward thing to have to say to the Court, but that's what we expect to do.
>
> THE COURT: So always a hard topic to raise, I recognize that, and you shouldn't feel squeamish about --
>
> MS. ZIMMERMAN: Too late.
>
> THE COURT: -- how you say it or how you raise it. As far as I know, Judge Ericksen is intending to continue on the case. Obviously if the plaintiffs bring a motion, it will be heard and attended to and whatever the result is the result is.

> What I think would still be useful, even while that
> motion is in process or before it's even filed, whichever --
> however it plays out, I think it would be good to sort of send
> the parties back to their own corners to develop what they
> think is an appropriate case management plan going forward
> and we'll take it from there.

Instead of filing a motion to disqualify, Plaintiffs participated in the litigation. Approximately one month after the status conference, the parties filed a Joint Status Update and Proposed Agenda for Requested Conference in which they expressed their "belie[f] that the first step toward establishing a case management plan to govern future proceedings will be a status conference with the Court." They sought "regularly-scheduled monthly status conferences"; asked for the reactivation of the "District of Minnesota's Bair Hugger MDL website"; identified "issues related to administration and Pre-Trial Orders"; disclosed the number of cases in the MDL; gave updates on "four state court cases" and a "Canadian putative class action"; disclosed their positions regarding discovery and bellwether trials;[5] indicated they "plan to review any motions that were fully briefed but not ruled upon, meet and confer on possible resolution, and then identify for the Court any issues that remain"; and disclosed Defendants' intention to file a petition for a writ of certiorari.

In early February 2022, the Court held the request for a status conference in abeyance and ordered the parties to participate in mediation. Neither side objected to the

---

[5] Regarding bellwether trials, Plaintiffs stated: "Plaintiffs are open to discussing with the Court and 3M. At this time, Plaintiffs suggest the Court and the parties work together to design a plan for the remand of waves of cases for case specific discovery and trial in the various transferee courts."

referral to mediation or to the Court's selection of a mediator. Notwithstanding the fact that the mediation took place during the COVID-19 pandemic, the Court presumes that Plaintiffs participated in the mediation fully and in good faith; they made no requests of the Court during that time.

After learning that mediation efforts had failed, the undersigned held status conferences with lead counsel in February and March 2023. At the March conference, the parties agreed on the selection of a new mediator. They also agreed that the new mediator would have the additional freedom, not available to the first mediator, to communicate with the Court about how to employ the resources of the Court to facilitate resolution of the parties' dispute effectively and efficiently. A few weeks after that conference, Plaintiffs filed their motion to disqualify the undersigned and the magistrate judge. The motion arrived in the wake of at least 16 months of direct and indirect rumblings from Plaintiffs about their intention to file a recusal motion.

The timeliness requirement for filing recusal motions helps ensure that parties do not hold a motion in their back pocket for use in case the normal processes of litigation do not go according to their plan. *See Tri-State Fin.*, 525 F.3d at 653; *In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d at 1360. Plaintiffs' motion to disqualify is untimely.

It is also meritless.

**B.    Pattern of Conduct and Rulings**

Plaintiffs maintained that the undersigned's "pattern of conduct and rulings raises an inference of bias." In *Liteky v. United States*, 510 U.S. 540 (1994), the Supreme Court

stated that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion":

> In and of themselves (*i.e.*, apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required (as discussed below) when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal.

510 U.S. at 555. The Supreme Court also stated that "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible":

> Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an extrajudicial source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible. An example of the latter (and perhaps of the former as well) is the statement that was alleged to have been made by the District Judge in *Berger v. United States*, a World War I espionage case against German–American defendants: "One must have a very judicial mind, indeed, not [to be] prejudiced against the German Americans" because their "hearts are reeking with disloyalty." *Not* establishing bias or partiality, however, are expressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.

*Id.* at 555-56 (alteration in original) (citations omitted); *see, e.g.*, *Oden v. Shane Smith Enters., Inc.*, 27 F.4th 631, 633 (8th Cir. 2022) ("But where a party seeks recusal based on 'in court conduct,' that party must show 'that the judge had a disposition so extreme as to display clear inability to render fair judgment.'" (quoting *United States v. Denton*, 434 F.3d 1104, 1111 (8th Cir. 2006))); *White v. Nat'l Football League*, 585 F.3d 1129, 1139-40 (8th Cir. 2009) ("To the extent that the district judge's statements were jocular and informal, we believe the average observer would see that as reflective of his down-to-earth approach to resolving the oft-contentious disputes brought to him by the parties."); *Sentis*, 559 F.3d at 904 ("Although, in general, reassignment should rest upon an appearance of bias or prejudice derived from an extrajudicial source, reassignment may be necessary based solely on events transpiring in current court proceedings or on a court's statements or rulings where 'they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.'" (quoting *Liteky*, 510 U.S. at 554)); *Moran*, 296 F.3d at 649 ("[T]he inquiry whether a reasonable person, knowing all the relevant facts, would discern potential impropriety certainly warrants consideration of a judge's course or pattern of rulings, and also of the judge's course of conduct."); *A.J.*, 56 F.3d at 862 ("A controversy between a trial judge and an attorney does not require disqualification of the judge in the absence of proof of bias or personal prejudice to the parties.").

Plaintiffs asserted that "*Sentis* is instructive." In that case, the district court dismissed the plaintiffs' claims with prejudice as a sanction for discovery and other abuses and denied the plaintiffs' motion to recuse. 559 F.3d at 891. The Eighth Circuit

"reverse[d] as to the recusal issue, vacate[d] the order of dismissal, and remand[ed] for reassignment and reconsideration of the motion for sanctions." *Id.* Regarding reassignment, the court of appeals observed that the district court directed profanities at the plaintiffs or their counsel during several conferences and hearings, misconstrued the district court's own orders, dismissed the plaintiffs' attempt to explain the orders, and denied the plaintiffs a meaningful opportunity to respond to the defendants' presentation at the sanctions hearing. *Id.* at 904-05. Nothing remotely comparable to *Sentis* took place in this case.

Plaintiffs claimed that a reasonable person would doubt the undersigned's impartiality "because—in Judge Schultz's own words—she has 'battered and bruised' Plaintiffs during this MDL"; because she held "herself out as 'the mean judge'" and "insult[ed] [their] counsel several times"; and because she "rarely—if ever—sided with Plaintiffs during this long-running litigation." Plaintiffs continued: "Her adverse rulings infected even the most quotidian issues." A litany of complaints about rulings over the course of the MDL followed.

## 1.    April 2019 Colloquy

At a status conference in April 2019, Magistrate Judge Schultz offered the following response to Plaintiffs' assertion that a judge on the Judicial Panel on Multidistrict Litigation asked whether it was possible for a plaintiff to receive a fair trial in Minnesota against 3M:

> Whatever generated that particular judge's question, I
> can tell you that in my view, unequivocally, any Plaintiff can

> get a fair hearing and trial against 3M in the District of
> Minnesota.
>
> To the extent that that -- that there is a perception that
> that might not be the case, you know, I -- I share the
> Plaintiffs' view that we should do what all is appropriate to
> make it clear that that is an uninformed opinion.
>
> That's not to say that Plaintiffs will always be pleased
> with every ruling they're going to get.
>
> Frankly, you've been battered and bruised over the
> course of the months that I've been involved in this. And to
> the extent that that's me, it's not because I dislike the
> Plaintiffs or their Counsel.

The Court reiterates Magistrate Judge Schultz's statement that any plaintiff can

expect to receive, and will receive, a fair trial against Defendants in the District of

Minnesota. Plaintiffs undoubtedly do not appreciate some of the decisions made over the

course of the MDL. Defendants undoubtedly do not appreciate others. The Court's

decisions are borne not out of bias, for or against, any party or any attorney, but of a

faithful effort to apply the law to the facts before it. *See* 28 U.S.C. § 453 (judicial oath).

The magistrate judge's characterization of the course of the litigation does not constitute

grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

### 2. November 2018 Colloquy

At a status conference in November 2018, a lawyer for a plaintiff agreed to

dismiss an action because the Bair Hugger was not used during his client's surgery: "We

did submit the [plaintiff fact sheet], but it does appear that it was not the Bair Hugger, so

we just want to confer with our client and get their permission to dismiss and then we

told [defense] counsel we'd be happy to dismiss it." The Court asked: "Would you rather

do that? Or I'll dismiss it right now." Defendants interjected: "And that would be our --"
The Court continued: "And then you can communicate to your client that the judge did it,
that the mean judge did it." The lawyer preferred to "have the client be aware of the
issue first and get them on board." The Court stated that the action would be dismissed in
a few days. The lawyer agreed that was sufficient time to contact the client.

Any reasonable listener to this exchange would understand that the Court was
offering to make that particular lawyer's job easier rather than harder by taking the blame
for a dismissal that indisputably had to be made. The Court proceeded in accordance
with the lawyer's stated preference to speak with his client before the dismissal was
entered. The attorneys who signed the recusal motion said nothing at the time or in the
4.5 years since about having been offended by the Court's comment, and they offer no
statement from the lawyer to whom the comment was made. Nothing about the Court's
conversation with the lawyer whose client was not exposed to the Bair Hugger constitutes
grounds to disqualify. *See id.*; *White*, 585 F.3d at 1139-40.

### 3. Insults

Plaintiffs claimed that the undersigned insulted their counsel several times. They
offered "one exemplar" in the memorandum in support of their motion to disqualify.[6]

---

[6]     Sweeping accusations appear in a declaration of one of Plaintiffs' attorneys.
These vague, unsupported allegations do not constitute grounds to disqualify. *See
Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (per curiam) (stating that "[r]umor,
speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual
matters" are "not ordinarily sufficient to require § 455(a) recusal"); *Holloway v. United
States*, 960 F.2d 1348, 1350 (8th Cir. 1992) ("Affidavits based on conclusions, opinions,
and rumors are an insufficient basis for recusal." (quoting *Davis v. Commissioner*, 734
F.2d 1302, 1303 (8th Cir. 1984) (per curiam))); *United States v. Faul*, 748 F.2d 1204,

Over three days in October 2017, the Court heard the parties' motions to exclude several experts and Defendants' motion for summary judgment. At the end of the first day, Plaintiffs asked whether the Court "want[ed] to hear anything about Dr. Borak." The Court responded, "We really can't right now." The Court continued: "But you'll be back tomorrow, and we'll consult and actually we'll give you a few minutes to talk about Dr. Borak in the morning, but we have to be in recess now." At the start of the second day, the Court stated: "Mr. Sacchet, we cut you off yesterday. Did you have any last thoughts that you wanted to clear up?" After Plaintiffs responded affirmatively, the Court stated: "I'd be happy to hear from you. If I had a heart and if I had feelings, I would have felt bad for cutting you off." Plaintiffs responded, "Don't worry." After requesting and receiving about ten minutes to discuss Dr. Borak, Plaintiffs stated: "I did have a housekeeping matter. I have copies of the decs that we presented yesterday that we would be happy to give the Court. I have conferred with my friends on the other side, and they have copies as well." The Court interjected, "No one is admitting to being your friend." Plaintiffs responded, "I would hope they would." After confirming that Defendants had "a similar dec," the Court asked Plaintiffs to submit the copies "a little bit later" because "we're over -- underwhelmed with space up here."

The transcript reveals a mild, light-hearted exchange in the midst of a tense, information-packed, 3-day hearing. The Court took Mr. Sacchet to be a person capable

1211 (8th Cir. 1984) ("The affidavits . . . do not raise a reasonable question as to the judge's impartiality under section 455. They contain conclusory allegations of bias or prejudice without sufficient factual support for the conclusions reached." (citation omitted)).

of distinguishing pleasantries from affronts. He seemed so at the time, and counsel who submitted the recusal motion do not assert that he mistook the exchange for a mortal insult, much less one that merited raising for the first time more than 5 years after the fact.[7] Nothing about the Court's interaction with Plaintiffs at the start of the second day of the hearing in October 2017 constitutes grounds to disqualify. *See Liteky*, 510 U.S. at 555-56; *White*, 585 F.3d at 1139-40.

### 4. Decisions

A recusal motion does not afford the moving party an opportunity to relitigate matters previously adjudicated. The "adverse rulings" that Plaintiffs identified were duly explained in orders or in open court. None evinces a degree of favoritism or antagonism, let alone "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. Although the Court is confident that the record speaks for itself, a thorough review of the record follows to address Plaintiffs' contentions regarding the Court's rulings.

### a. Deadline to File Suggestion of Death

Plaintiffs asserted that the undersigned "refused to amend the deadline for Plaintiffs to file suggestions of death despite the 'impossibility' of complying with that deadline." In the Order cited by Plaintiffs to support their assertion, the Court stated that

---

[7]     Defendants noted that the Court is "known for its wit." That may or may not be. To be clear, the Court did not intend this exchange to be laugh-out-loud funny. It was merely a small attempt to humanize a difficult process and possibly raise a smile from counsel before delving into the business of the day.

it excuses noncompliance with Pretrial Order #23, which sets a 90-day deadline to file a suggestion of death, when compliance is impossible:

> First, Plaintiffs argue that compliance with PTO 23 is sometimes impossible, particularly when a plaintiff relocates or experiences health issues that preclude contact with counsel. But the Court excuses noncompliance with PTO 23 when compliance is impossible. Indeed, the Court recently excused noncompliance when counsel for a plaintiff "detailed diligent and good faith efforts to comply with the deadlines in PTO 23 and Rule 25." The Court noted that "impossibility" and even "excusable neglect" will excuse noncompliance. It is thus unnecessary to eliminate the 90-day deadline to protect plaintiffs who cannot follow it.

Order 1-2, Dec. 4, 2018, ECF No. 1614 (citations omitted). Nothing in the Court's decision constitutes grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

### b. Defendant Fact Sheet

Plaintiffs stated that the undersigned "never required 3M to produce a Defendant Fact Sheet . . . despite requiring Plaintiffs to produce thousands of individual fact sheets." The Court responded to Plaintiffs' request for a defendant fact sheet in September 2016: "So you still have the ability to ask for that in discovery as we discussed a while ago." Nothing in the Court's decision constitutes grounds to disqualify. *See id.*

### c. Verification

Plaintiffs asserted that the undersigned "dismissed multiple cases based on her speculation that Plaintiffs' signatures were supposedly plagiarized." Plaintiffs' assertion relates to the dismissal of two actions, *Potter* and *Bresnock*. In those cases, the plaintiffs submitted verified fact sheets, which were dated in August 2018; Defendants identified deficiencies in the fact sheets; and the plaintiffs subsequently submitted verified fact

sheets dated September 4, 2018.  At a status conference on October 18, 2018, Defendants

asserted that the plaintiffs "served photocopie[d] verifications with the dates of the

original signatures whited out and new dates written in, which is not a proper practice."

Defendants maintained that "[i]t is clear to the naked eye that it's the same as the old

verification, and the date has been changed, and you can even see on this one that part of

the signature line has been whited out, so somebody whited it out and put in a new date."

The plaintiffs' attorney offered a qualified denial: "[O]ur position is that we did not white

it out.  Plaintiffs, my client, our client might have done it, but we did not.  We did not

white it out and resubmit it."

Regarding *Potter*, the Court observed that "the dates are clearly different" and that

"the printed name and the signature line not only for Ms. Potter but also for Mr. Potter

are completely and totally identical."  Regarding *Bresnock*, the Court observed marked

differences in the dates: "It's almost like Bresnock never put the date on the September

4th one.  The handwriting of September 4th is completely different than the handwriting

of the August 24th."  The Court also observed marked similarities in the September

verifications submitted in *Potter* and *Bresnock*:

> THE COURT: Wait a minute.  Wait a minute here.  The 9-4-
> 18 on *Bresnock* is identical to the 9-4-18 on *Potter*.  Wait a
> minute.  Wait a minute.
>
> The 9-4-18 on *Bresnock* is not anything like it appears
> not to have been made by the same person who did the date
> August 24, '18 on *Bresnock*.  The August one appears to be
> the same or similar handwriting to the signature of *Bresnock*,
> loopy, and what's the right word?  Kind of not -- not the
> handwriting of a mechanical engineer.

> The 9-4-18 is a more pinched, precise writing, but
> what's really concerning the Court right now, really
> concerning, is now I am comparing the 9-4-18 on *Bresnock*
> with the 9-4-18 on *Potter*, and let's say the eight, obviously,
> the ink mark is heavier. This person starts their 8's strongly
> on the right, gets lighter as the loop is completed.

The Court asked the plaintiffs' attorney to explain the similarity between the September

dates on the verifications in *Potter* and *Bresnock*. The attorney said nothing. The

dismissal of two actions in which the plaintiffs submitted improperly verified fact sheets

is hardly evidence of bias.[8]

---

[8]    Lest any doubt linger, the Court draws attention to a decision not mentioned by
Plaintiffs: the subsequent denial of Defendants' motion to dismiss other actions in which
the plaintiffs, who were represented by the same attorney who represented the plaintiffs
in *Potter* and *Bresnock*, allegedly "provided an improper re-dated photocopy of a prior
verification with the amended [fact sheet] submission." Recognizing a change in the
plaintiffs' representation and the submission of updated verification forms by the time
Defendants' motion was heard, the Court declined to dismiss the actions:

> [T]he Court denies Defendants' motion as to Plaintiffs
> Edwards, Johnston, and Billings, 17-cv-04891 (*Edwards v.
> 3M Co., et al.*), 17-cv-05270 (*Johnston v. 3M Co., et al.*), 17-
> cv-05277 (*Billings v. 3M Co., et al.*). In these cases,
> Defendants asserted that Plaintiffs had filed improper re-dated
> photocopies of previously submitted verifications. Defs.'
> Letter, MDL ECF No. 1563. The Court had given Plaintiffs
> thirty days to respond to this allegation. Order, MDL ECF
> No. 1564 at 5. Plaintiffs did not respond. But given that
> Plaintiffs are now represented by new counsel and Plaintiffs
> submitted updated verification forms, the Court declines to
> dismiss these cases at this time.

Order 5-6, Dec. 21, 2018, ECF No. 1653. At the status conference on December 20,
2018, the Court responded to Defendants' assertion that the updated verification forms in
*Edwards*, *Johnston*, and *Billings* came too late:

> Well, the problem is that that whiting out might have
> been done by the lawyers not with the firm anymore. And
> now if there are actual verifications, I don't want the plaintiffs

### d.     Bellwether Trial

Plaintiffs complained about evidentiary rulings at the *Gareis* bellwether trial. After a 2-week trial, the jury returned a verdict in Defendants' favor.  The jury found the Gareises did not prove that the Bair Hugger was unreasonably dangerous for its intended use and that a reasonable safer alternative design existed.  The jury also found the Gareises did not prove that Mr. Gareis's injury would not have occurred but for the use of the Bair Hugger.  Plaintiffs are understandably disappointed with the verdict.  But the Gareises appealed.  Rejecting their challenge to three evidentiary rulings and to the grant of summary judgment in Defendants' favor on the failure-to-warn claim, the Eighth Circuit affirmed.  *Gareis v. 3M Co.*, 9 F.4th 812, 815-19 (8th Cir. 2021).

Plaintiffs' recitation of evidentiary grievances from the *Gareis* trial does not advance their contention that recusal is appropriate.[9]  *See Liteky*, 510 U.S. at 555-56. Perhaps Plaintiffs are attempting to relitigate evidentiary rulings in the guise of a recusal motion in hopes of plowing judicial ground to enhance their chances for more favorable rulings in future bellwether trials.  Due explanation accompanied the Court's rulings and provided the Gareises ample opportunity to make their case on appeal.  Evidentiary

---

to suffer as a result of whatever that lawyer might have done.
I doubt very much that the clients did the whiting out.

[9]     Plaintiffs do not highlight all of the decisions made in the course of the 2-week trial, and they notably omit reference to those that favored the Gareises.  For example, Defendants were determined to let the jury know about Dr. Augustine's key role in pushing the litigation forward and his financial interest in seeing his new invention replace the Bair Hugger in the market.  Over Defendants' strenuous objection, the Court granted Plaintiffs' motion to exclude the evidence.

disputes in future bellwether trials, regardless of the court that tries them, will provide the parties ample opportunity to make appropriate arguments. A threat to file a recusal motion in the event of an unfavorable ruling would not be an appropriate argument or consideration for the deciding court.[10]

### e. Retraction of *Lexecon* Waiver

Plaintiffs complained that the Court rejected retractions of certain plaintiffs' *Lexecon* waivers. Plaintiffs stated that, "[a]s word traveled about Judge Ericksen's pattern of rulings up to and following the *Gareis* trial, Plaintiffs from all over the nation retracted their *Lexecon* waivers"; that, "consistent with her prior rulings assailing

---

[10] Plaintiffs, in a footnote, accused the Court of unfair rulings throughout the *Gareis* trial: "Judge Ericksen's other rulings at trial were also far from even-handed. Examples abound. *Compare, e.g.*, PX12 (5/16/18-Tr.-488:5-16) (examples of 3M publishing studies), *with, e.g.*, PX12 (5/16/18-Tr.-400:1-401:4) ('No, you may not put it on the screen.')." The transcript citations reveal Defendants' publication of studies to which no objection was made and the denial of the Gareises' attempt to publish a study considered under Fed. R. Evid. 803(18). The Court addressed the publication of studies at length with the parties:

> Is it one of those charts that came out of a study that was relied on by a previous witness and then we went through the whole business about statements not going up and I said okay, for use as illustrative purposes you can do that, but it's one thing to do that with the witness who's actually relying on it and talking about it because and then the foundation was laid that it's helpful for illustrative purpose for that witness, but now to use it as substantive evidence, if it was an 803.18 exhibit, it's not substantive evidence such that you can use it without laying a similar foundation with this witness, so if you tell me that it was admitted as substantive evidence and you're willing to stand by that, I will accept your representation of that. I'm just saying if it's not, then you have to take it down and do something else.

Plaintiffs, Judge Ericksen rejected those retractions"; and that, "[i]nstead of allowing Plaintiffs to try their cases in more neutral forums, Judge Ericksen forced them to suffer through her erroneous rulings."

The Court did conclude that "[t]he attempted retractions are invalid" because the plaintiffs "failed to provide good cause to retract their Lexecon waivers." Order 5, July 25, 2018, ECF No. 1379. Some plaintiffs "cite[d] no reason for the retraction of their Lexecon waivers." *Id.* at 3. The Court concluded that "[t]heir retractions are . . . invalid as unsupported by good cause." *Id.* Other plaintiffs "provide[d] identical reasons for retraction." *Id.* First, they cited "the Court's ruling in the *Gareis* matter choosing the law of a plaintiff's state of residence rather than Minnesota law as the substantive law to be applied to plaintiff's claims, amongst other rulings." Next, they claimed that the "waiver[s] [were] made without consideration." Third, the plaintiffs maintained that, although included in the bellwether pool, their cases have "not been selected as . . . trial pick[s] and no additional motion practice or discovery has occurred to move the case[s] forward." Finally, they asserted that "Defendants have never affirmatively waived *Lexecon*." The Court rejected the arguments:

> This is not enough. As to the first reason, Plaintiffs mention no grounds for reasonably expecting a contrary choice-of-law ruling, making it unclear why Plaintiffs believe that the choice-of-law ruling caused a "material difference" in the case. And it is unclear what "other rulings" caused a "material difference in the posture of the case." This uncertainty prevents the Court from finding good cause for retraction. Regardless, it is unlikely that a "material difference in the posture of the case" even amounts to "good cause" for retraction. If it did, any MDL party who disliked a court's rulings could simply issue a Lexecon retraction and

undo months of work performed in reliance on the Lexecon waiver. The prospect of these unilateral retractions would undermine the bellwether trial process.

Second, Plaintiffs cite no authority for their claim that a lack of consideration justifies retraction of a Lexecon waiver. At any rate, consideration clearly exists—Plaintiffs waived venue objections in exchange for moving to the front of the line to try their cases. Again, no good cause exists for retraction.

Third, Plaintiffs seem to argue that retraction would not unduly inconvenience the parties and the Court. This is wrong. The Bair Hugger MDL has progressed for the past few months in reliance on Plaintiffs' Lexecon waivers. Changing course now would waste the resources expended in advancing the current list of Bellwethers and would delay the more than 4,500 cases in this MDL by many months.

Fourth, Plaintiffs again cite no authority for their contention that Defendants' failure to file a Lexecon waiver justifies the retraction of Plaintiffs' Lexecon waivers. At the Status Conference on July 19, 2018, Defendants argued that it is unclear whether Defendants must file a Lexecon waiver given that Defendants reside in Minnesota, but if a Lexecon waiver is required, Defendants['] agreement to try the bellwether cases in Minnesota constitutes a Lexecon waiver. The Court agrees.

*Id.* at 3-4. The Court's rejection of certain plaintiffs' retractions of their *Lexecon* waivers does not constitute grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

### f.  Safer Alternative Designs

Plaintiffs maintained that the Court "ruled that air-free conductive warming devices were not safer alternative designs to forced-air convective warming devices"; that the Court did so "without considering individual state laws, much less conducting a 50-state survey or affording Plaintiffs any discovery into this fact-bound question"; and that the Eighth Circuit affirmed without making any effort to endorse the "anomalistic

holding that 'this discovery was irrelevant across the entire MDL.'"  In February 2017,

Plaintiffs moved "for an order overruling VitaHEAT Medical, LLC's relevancy objection

to the December 30, 2016 subpoena."  In an Order dated March 6, 2017, the magistrate

judge denied Plaintiffs' motion and sustained VitaHEAT's relevancy objection.

Plaintiffs objected to the magistrate judge's order.  The Court denied the objections and

affirmed the magistrate judge's order.  The Court stated that "Plaintiffs' arguments as to

factual error largely rely on facts not before the magistrate judge"; that "[t]he Court will

not consider new evidence that was not submitted to the magistrate judge for

consideration"; and that, "[e]ven if the Court were to consider this new evidence, it would

not find clear error because the testimony, read in full, does not say what Plaintiffs want

it to say."  In addition, Plaintiffs failed to demonstrate the magistrate judge erred as a

matter of law.  The Eighth Circuit found "no basis to reverse":

> We assume without deciding that, as Plaintiffs argue, the MDL court erroneously concluded that this discovery was irrelevant across the entire MDL because some states would (or might allow a jury to) recognize conductive patient-warming devices as reasonable alternative designs to convective patient-warming devices.  Even so, Plaintiffs have not even argued on appeal, let alone shown, that the MDL court's discovery ruling resulted in fundamental unfairness to them in trying their cases.
>
> Even if we considered the point, we would not find fundamental unfairness on this record.  Plaintiffs apparently had other reasonable-alternative-design evidence available to them, as is demonstrated by their recitation of studies suggesting that filter-related modifications to the Bair Hugger would make it safer.  In addition, Plaintiffs were permitted discovery regarding other convective warming devices for reasonable-alternative-design purposes.

*In re Bair Hugger*, 9 F.4th at 790 (citations omitted).  Nothing in the Court's decision constitutes grounds to disqualify.  *See Liteky*, 510 U.S. at 555-56.

### g.     Motion to Amend to Claim Punitive Damages

Characterizing it as a "run-of-the-mill request," Plaintiffs complained that the undersigned "denied bellwether Plaintiffs' motion to amend the Master Complaint to add a claim for punitive damages."  *But see Shank v. Carleton Coll.*, 329 F.R.D. 610, 615 n.4 (D. Minn. 2019) ("Motions to amend involving punitive damages and state substantive law are distinguishable from more run-of-the-mill motions to amend . . . .").  Plaintiffs maintained that the undersigned "rejected studies from 3M's files directly linking Bair Hugger to infection" and that the undersigned "disregarded data in 3M's possession demonstrating Bair Hugger increases infection by 380%."  They noted that a judge in Missouri state court "overruled 3M's motion for directed verdict on punitive damages, proving Plaintiffs' motion to allege punitive damages was anything but futile."

In this case, the magistrate judge "conclude[d], assuming all factual allegations raised by Plaintiffs to be true, that Plaintiffs' allegations for punitive damages are futile pursuant to Minnesota law.  Plaintiffs' motion to amend the Master Long Form and Short Form Complaints to allege punitive damages, must be denied."  Order 18, July 27, 2017, ECF No. 629.  The magistrate judge denied the motion to amend "as to the Bellwether Trial Pool cases" and ordered the parties to "to meet and confer and determine which states' punitive damage standards, if any, are likely in conflict with Minnesota's substantive punitive damages standard, and propose a procedure within thirty . . . days of this Order, by which the Court can determine whether Minnesota's choice of law rules

would require a different outcome with regard to Plaintiffs' motion to amend the

Complaint to allege punitive damages in any of the remaining cases consolidated in this

MDL." *Id.* at 19 (citation omitted). Plaintiffs objected. The Court overruled Plaintiffs'

objections and affirmed the magistrate judge's July 27 Order.

As to the "rejected studies" and "disregarded data," the Court stated:

> Plaintiffs cannot plausibly show deliberate disregard
> by alleging that Defendants read scientific publications that
> hedge about whether the device can infect patients. One
> publication states that, if the device vents near the surgical
> wound, bacteria could "conceivably settle" on that wound.
> Another notes that the bacteria-colonized filters it found had
> neither a record of nor a protocol for regular replacement.
> Another notes how device-driven convection would be
> washed out by thumbprint differences between surgical
> theaters. This one also says that, "Unfortunately," its study
> was neither randomized nor controlled for variables
> "identified elsewhere as important predictors for deep
> infection." And all expressly disclaim finding causation.

Mem. 4, Oct. 19, 2017, ECF No. 984 (footnotes omitted) (citations omitted). The Court's

denial of their motion does not constitute grounds to disqualify. *See Liteky*, 510 U.S. at

555-56.

The decision of the state judge in Missouri does not bear the weight Plaintiffs

place on it, and it does not advance Plaintiffs' position that recusal is appropriate.

Standards governing punitive damages vary from state to state. Accordingly, the ability

of similarly situated plaintiffs to seek punitive damages in different states might very well

differ. For instance, in the consolidated *Bair Hugger* litigation that proceeded in

Minnesota state court, the Minnesota Court of Appeals affirmed the denial of the

plaintiffs' motion to amend their complaint to add a claim for punitive damages. *In re*

*3M Bair Hugger Litig.*, 924 N.W.2d 16, 24 (Minn. Ct. App. 2019) ("The district court did not abuse its discretion in concluding that appellants had not presented the prima facie case requisite for a punitive-damages claim.").[11] And the jury in Missouri state court, which considered evidence that Plaintiffs maintain should have been introduced at the *Gareis* trial, returned a verdict in Defendants' favor in short order.

### h.      Failure to Warn

Plaintiffs maintained that the Court "ignored the same evidence on summary judgment when tersely dismissing Plaintiff's failure-to-warn claim." After stating that "[t]he parties' arguments were well-developed on the papers and at the [h]earing," the Court granted in part Defendants' motion for summary judgment in *Gareis*:

> The Court GRANTS IN PART Defendants' Motion for summary judgment, as to Defendants' lack of a duty to warn. As of the surgery that allegedly caused Gareis's prosthetic-joint infection, the available scientific or medical data would not have alerted a reasonable medical-device manufacturer that the Bair Hugger could cause a prosthetic-joint infection. Although Gareis cites documents that purportedly trigger a duty to warn, these documents are not scientific or medical data and so do not trigger a duty to warn.

Am. Order 3, Apr. 17, 2018, Case No. 16-cv-4187, ECF No. 113. The Eighth Circuit affirmed on an alternative ground:

---

[11]      The Minnesota Court of Appeals also affirmed the grant of summary judgment in the defendants' favor: "The district court's decisions to apply the *Frye-Mack* general-acceptance standard and exclude the testimony of appellants' experts and to grant respondent's motion for summary judgment as to general causation were without error . . . ." *In re 3M Bair Hugger Litig.*, 924 N.W.2d at 25. Minnesota is "a *Frye-Mack* state." *Id.* at 20; *see Goeb v. Tharaldson*, 615 N.W.2d 800, 814 (Minn. 2000) ("Having reviewed the cases and the commentary surrounding this issue, we reaffirm our adherence to the *Frye–Mack* standard and reject *Daubert*.").

The district court granted 3M summary judgment on the Gareises' failure-to-warn claim under both negligence and strict-liability theories because it concluded that 3M lacked sufficient actual or constructive knowledge at the time of Louis Gareis's surgery about the Bair Hugger's alleged dangers to have a duty to warn. Under South Carolina law, a product manufacturer such as 3M can be held liable for failing to warn of a product's dangers under either negligence or strict-liability theories if the manufacturer "know[s] or ha[s] reason to know the product is or is likely to be dangerous for its intended use." The Gareises argue that summary judgment on their failure-to-warn claim under both theories was erroneous because a genuine dispute of material fact remained as to whether 3M actually or constructively knew that the Bair Hugger was or was likely to be dangerous in orthopedic surgeries so as to trigger 3M's duty to warn.

We need not reach this question because an alternative ground exists to affirm. Under South Carolina law, a manufacturer or seller is liable under either theory for failing to warn only if the plaintiff shows "that he was injured by the product" in question. The question whether the Bair Hugger used in Louis Gareis's surgery caused his PJI was tried to the jury, which returned a special verdict finding that the Gareises failed to prove this point. As 3M points out in its opening brief and as discussed above, the jury heard extensive evidence supporting this finding. Its "verdict in favor of [3M] on the [causation issue] indicates the jury would not have found in favor" of the Gareises on their failure-to-warn claim even if the claim had survived summary judgment. Thus, the district court's grant of summary judgment on this claim, "even if wrong, did no harm." Accordingly, we affirm it.

*Gareis*, 9 F.4th at 818-19 (alterations in original) (footnote omitted) (citations omitted).

The Court's grant of summary judgment on the failure-to-warn claim does not constitute grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

### i. *Petitta* Injunction

Plaintiffs complained that the Court enjoined a plaintiff, John Petitta, from pursuing an action in state court after he stipulated to a dismissal with prejudice of his action in the multidistrict litigation. The Eighth Circuit reversed, *Petitta v. 3M Co.*, 999 F.3d 534 (8th Cir. 2021), in a decision characterized by Plaintiffs as "remarkable not only for its reversal of Judge Ericksen's meretricious attempt to block a plaintiff from litigating outside her courtroom, but also for the taint of bias it reveals; the suspicious timing of her injunction did not go unnoticed by the panel."[12]

---

[12] The court of appeals stated:

> On June 24, 2019, Petitta moved for summary judgment in Texas court on 3M's potential res judicata defense; on July 31, 2019, 3M cross-moved for summary judgment on the same basis. The Texas court heard arguments on Petitta's motion for summary judgment on August 7, 2019. Later that same day, the MDL court granted 3M's motion for an injunction, permanently enjoining Petitta from "relitigating in state court his claims against Defendants that were previously dismissed with prejudice from the MDL." Petitta now appeals.

*Petitta*, 999 F.3d at 537.

In this Court, Defendants filed their motion for a permanent injunction in early June 2019. In their supporting memorandum, Defendants stated:

> The Texas state court has not yet ruled on the *res judicata* issue. Under the Texas Rules of Civil Procedure, Defendants' only avenue for asserting *res judicata* is a motion for summary judgment (the Texas rules do not permit a motion for judgment on the pleadings based on *res judicata*), and discovery is still ongoing through at least late summer of this year – and likely longer, if Petitta's recently filed motion to extend the schedule is granted.

Notwithstanding Plaintiffs' contention that the Court sought to thwart plaintiffs from proceeding in state court, the Court actually *vacated* judgments erroneously entered in Defendants' favor and remanded actions in the MDL to state court. *O'Haver v. Anesthesia Assocs. of Kan. City, P.C.*, Case No. 19-cv-920, slip op. at 14 (D. Minn. Feb. 19, 2020); *Tye v. St. Luke's E. Anesthesia Servs., P.C.*, Case No. 19-cv-2089, slip op. at 13-14 (D. Minn. Feb. 19, 2020).

As to *Petitta*, the Court's issuance of the injunction was the product of nothing but a good faith attempt to discern the applicable law and to apply it to the facts before it. Before this Court, Defendants asserted that "Eighth Circuit law determines the res judicata effect of Petitta's stipulation of dismissal with prejudice." Petitta maintained that Minnesota law should apply: "Assuming this Court, sitting in diversity, would apply

---

Petitta responded in late June. Defendants filed their reply in mid-July. In their reply, Defendants stated that "Petitta has now filed a motion for summary judgment on *res judicata* in the Texas state court, but that motion is not fully briefed and has not been heard by the Texas state court." On July 31, the Court cancelled the hearing on Defendants' motion for a permanent injunction. The same day, the Court granted Defendants' motion for reconsideration and granted summary judgment in their favor. Seven days later, the Court granted Defendants' motion for a permanent injunction. The Court stated:

> Defendants have not yet raised the *res judicata* issue in the Texas state litigation. Under the Texas Rules of Civil Procedure, Defendants' only avenue for asserting *res judicata* is a motion for summary judgment, which is unlikely to be heard before the close of discovery. Because discovery in state court is ongoing for the foreseeable future and the state court's decisions regarding discovery would impact the MDL, the Court will address the *res judicata* issue at this time.

Order 2, Aug. 7, 2019, ECF No. 2074.

Minnesota law, 3M's formulaic application of preclusion based on a dismissal in favor of a then-pending state court action finds no support." The Court stated that "[t]he Supreme Court has held that the preclusive effect of a federal-court judgment, including a dismissal by a federal court sitting in diversity, is determined by federal common law"; summarized "the doctrine of *res judicata*, or claim preclusion," under federal law; and noted that "[t]he law is the same under Texas or Minnesota law." The Court distinguished the case relied on by Petitta on the ground that it addressed a dismissal based on a statute of limitations; noted that, "in other contexts, courts have treated dismissals with prejudice on non-substantive grounds as constituting final judgment for purposes of *res judicata*"; and concluded that the stipulation of dismissal with prejudice barred him from pursuing his claims in state court.

On appeal, Defendants "urge[d] [the Eighth Circuit] to apply the substantive approach to claim preclusion developed under federal common law." *Petitta*, 999 F.3d at 537. "Petitta encourage[d] [the court of appeals] to apply Minnesota's approach here." *Id.* at 538. The Eighth Circuit decided that Texas law applied and concluded that, under Texas law, "the stipulated dismissal in Petitta's MDL case is not a final judgment on the merits. As such, his claims in Texas state court are not precluded under Texas law." *Id.* at 539-41. The court of appeals "recognize[d] that some Texas cases suggest that a dismissal with prejudice is necessarily a final judgment on the merits, without consideration of the parties' motives in pursuing the dismissal." *Id.* at 540 n.4. The court of appeals continued: "these cases did not involve situations like the one here, where the parties agreed to a dismissal with prejudice without settling the dismissed case, and at

most they indicate that this is an unsettled area of Texas law. For the purposes of the relitigation exception, 'close cases have easy answers: The federal court should not issue an injunction, and the state court should decide the preclusion question.'" *Id.* at 541 n.4 (quoting *Smith v. Bayer Corp.*, 564 U.S. 299, 318 (2011)). The Court's decision to grant Defendants' motion for a permanent injunction in *Petitta* does not constitute grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

## C.    Reconsideration

Plaintiffs claimed that their "*only* major win throughout this protracted litigation was Judge Ericksen's initial *Daubert* ruling denying 3M's motion to exclude Plaintiffs' general-causation experts." "[T]hat sole victory evaporated," Plaintiffs remarked, "when Judge Ericksen radically reversed herself and poured out all 5,000 cases 18 months later, despite the absence of any new scientific evidence." According to Plaintiffs, "the reconsideration proceeding alone supports her disqualification under section 455(a)."

Plaintiffs relied heavily on *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657 (8th Cir. 2022). They claimed *Tumey* "requires" the undersigned's disqualification. In *Tumey*, the district court issued a preliminary injunction in favor of the plaintiffs, referred to collectively as "Tumey." 27 F.4th at 663-64. The defendants, referred to collectively as "Mycroft," appealed. *Id.* at 664. The court of appeals "doubt[ed] whether Mycroft was given sufficient notice and afforded a fair opportunity to defend against Tumey's allegations prior to the issuance of a preliminary injunction":

> The briefing focused on the request for a temporary
> restraining order. The proposed order submitted by Tumey
> was identified as a temporary restraining order. The district

court set the matter on for a hearing on the motion for a temporary restraining order. While the standard for analyzing a motion for a temporary restraining order is the same as a motion for a preliminary injunction, there is a material difference in the allowed duration, which is significant to the affected party.

Tumey provided an hour's notice that he sought to transform what had been understood by everyone as a request for a temporary restraining order to a preliminary injunction. While Mycroft had an opportunity to participate in an adversarial hearing in a sense that it was allowed to cross-examine Tumey's witnesses and present its own evidence, Mycroft's ability to mount a defense was hampered by the non-disclosure and concealment of evidence that Tumey allegedly had in his possession connecting Mycroft to the attacks and harassment. Not only had no discovery been exchanged but Mycroft was prevented by the court at the hearing from discovering the nature of evidence, if any, Tumey had to connect Mycroft to the behavior in question.

*Id.* at 665-66 (citation omitted). "Even if there was no procedural due process issue," the court of appeals concluded that "the district court committed a clear error of judgment when it issued a preliminary injunction based on a lack of evidence demonstrating Mycroft was responsible for the conduct at issue." *Id.* at 666. The Eighth Circuit discerned a high degree of antagonism against Mycroft:

After the district court allowed Tumey, over Mycroft's strenuous objection, to transform his motion for a temporary restraining order to a preliminary injunction on one hour's notice, the court further fanned the flames during the hearing by *sua sponte* restricting Mycroft's access to evidence, or lack thereof, connecting Mycroft to the unlawful conduct that took place. Again, over Mycroft's objection, the court allowed testimony about the disputes between neighbors in Hawaii when the relevance, if any, of this testimony to the current litigation is marginal and tangential. The preliminary injunction that was ultimately issued went beyond the intended use of maintaining the status quo until the claims

> can be resolved. When Mycroft sought reconsideration of the
> preliminary injunction, specifically raising claims regarding
> the breadth and restraint on speech and publication, the court
> dismissed, without analysis, Mycroft's constitutional claims.

*Id.* at 668. The Eighth Circuit "vacate[d] the preliminary injunction and remand[ed] with instructions to assign this case to a different judge." *Id.* at 668.

The reconsideration proceedings in this case are not at all comparable to *Tumey*. The Court denied Defendants' Motion to Exclude Plaintiffs' General Causation Medical Experts and Motion for Summary Judgment with respect to General Causation in December 2017. In May 2018, the Court presided over the bellwether trial in *Gareis*. In August 2018, Defendants "request[ed] permission to file a motion for reconsideration of the Court's denial of Defendants' general causation *Daubert* and summary judgment motions." Plaintiffs opposed the request. In November 2018, the Court granted Defendants' request for permission to file a motion for reconsideration and directed the parties to work together to establish a proposed briefing schedule. At a status conference in December 2018, the Court set a briefing schedule for Defendants' motion for reconsideration: (1) motion due by January 24, 2019; (2) response due by February 21, 2019; and (3) reply due by March 14, 2019. Plaintiffs indicated that they might file a motion for discovery:

> MS. ZIMMERMAN: Thank you, Your Honor. And from the
> plaintiffs' perspective, we've asked I guess to know if the
> motion is intended to be based on new evidence, and we don't
> have an answer to that question yet. But to the extent that it is
> new evidence, we'd like to know what the new evidence is so
> that we can address it properly, and I expect that there will
> likely be a motion to conduct discovery such that plaintiffs
> can respond to new evidence.

The Court responded: "We'll see what happens. We'll see what they submit." Defendants timely filed their motion for reconsideration. By letter dated February 11, 2019, Plaintiffs "request[ed] leave of Court to conduct additional discovery related to Defendants' motion for reconsideration" and sought an extension of time to respond to Defendants' motion. Defendants opposed Plaintiffs' request. The magistrate judge denied Plaintiffs' request for leave to conduct additional discovery; Plaintiffs did not object. They responded to Defendants' motion for reconsideration on the deadline previously set. Defendants timely filed their reply. In early May 2019, the Court solicited the parties' responses on three issues. The day after the parties responded, the Court scheduled Defendants' motion for reconsideration for a hearing in June 2019. The hearing lasted approximately four hours. At the hearing, a dispute arose about three studies offered by Plaintiffs. In late June, after supplemental briefing, the Court sustained in part and overruled in part Defendants' objections to the three studies offered by Plaintiffs. Approximately one month later, the Court granted Defendants' motion for reconsideration and entered summary judgment in favor of Defendants. A 49-page Memorandum explained the decision. Plaintiffs appealed.

On appeal, the Eighth Circuit acknowledged an "intriguing juxtaposition" of the discretionary standard of review and the liberal admission of expert testimony under Rule 702 of the Federal Rules of Evidence:[13]

> [W]e have recognized that the "liberal thrust" of Rule 702 regarding the admissibility of expert testimony creates "an

---

[13] Absent congressional action, amendments to Fed. R. Evid. 702 will take effect on December 1, 2023.

intriguing juxtaposition with our oft-repeated abuse-of-discretion standard of review." "While we adhere to this discretionary standard for review of the district court's Rule 702 gatekeeping decision, cases are legion that, correctly, under *Daubert*, call for the liberal admission of expert testimony."

*In re Bair Hugger*, 9 F.4th at 777 (citation omitted). The court of appeals acknowledged another "intriguing juxtaposition":

> When a district court excludes an expert's opinion for being fundamentally unsupported, yet another "intriguing juxtaposition" is evident in our case law. On the one hand, we have recognized that we owe "significant deference" to the district court's "determination that expert testimony is excessively speculative," and we "can reverse only if we are convinced that the District Court made a clear error of judgment on the basis of the record before it." On the other hand, we have stated numerous times that, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility."

*Id.* at 778 (alteration in original) (citations omitted). Ultimately, the court of appeals reversed the exclusion of Plaintiffs' general-causation medical experts and reversed in part the exclusion of their engineering expert. *Id.* at 778-90. Having "reverse[d] in relevant part the exclusion of those experts, [the Eighth Circuit] reverse[d] the grant of summary judgment." *Id.* at 790.

Plaintiffs claimed that the Court entered summary judgment in Defendants' favor "without addressing objections in Plaintiffs' brief" and without addressing "those raised at oral argument." Plaintiffs asserted that the Court "gutted Plaintiffs' experts on points 3M never raised, blindsiding Plaintiffs without due process." But Plaintiffs did not detail which objections were overlooked and which points were raised improperly.

Plaintiffs asserted that "the Eighth Circuit vacated Judge Ericksen's decision, just like in *Tumey*." They continued: "But in stark contrast to *Tumey* where the court merely erred, Judge Ericksen not only 'abused [her] discretion,' she 'committed a *clear error* of judgment.'"[14] *But see Tumey*, 27 F.4th at 666 ("[T]he district court committed a clear error of judgment when it issued a preliminary injunction based on a lack of evidence demonstrating Mycroft was responsible for the conduct at issue."); *id.* at 667 ("On this record, Tumey has failed to meet his burden and the district court committed a clear error of judgment in finding he did.").

Plaintiffs noted that an analytical gap identified by the Court was, in the words of the Eighth Circuit, "at least partially illusory." *In re Bair Hugger*, 9 F.4th at 785. The court of appeals observed that this Court's "analytical-gap determination constituted the primary justification for its decision to exclude Plaintiffs' general-causation medical experts" and that this Court "did briefly find as well that lack of general acceptance of the causal inferences made by the experts also supported excluding their testimony." *Id.* at 788. After reviewing statements of the medical and scientific community, the Eighth Circuit stated: "To exclude the experts' opinions here because their conclusions lacked general acceptance would be to take a side on an issue that is 'currently the focus of

---

14      "[A] court of appeals is to apply an abuse-of-discretion standard when it 'review[s] a trial court's decision to admit or exclude expert testimony.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). "A district court abuses its discretion 'when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when the court, in weighing all proper factors, commits a clear error of judgment.'" *Shipp v. Murphy*, 9 F.4th 694, 700-01 (8th Cir. 2021) (quoting *Kozlov v. Associated Wholesale Grocers, Inc.*, 818 F.3d 380, 393 (8th Cir. 2016)).

extensive scientific research and debate.'" *Id.* at 789 (quoting *Milward v. Acuity Specialty Prods. Grp., Inc.*, 639 F.3d 11, 22 (8th Cir. 2011)).

Plaintiffs erroneously asserted that, "[l]ast month, the Eighth Circuit reiterated that Judge Ericksen's reconsideration decision was a '*gross* abuse of discretion resulting in *fundamental unfairness*.' *Smothers v. Rowley Masonic Assisted Living Cmty., LLC*, 2023 WL 2618682, at *2 (8th Cir. Mar. 23, 2023) (emphasis added) (citing *In re Bair Hugger*, 9 F.4th at 790)." Actually, the court of appeals in *Smothers* simply quoted *In re Bair Hugger* for a standard of review:

> For reversal, Smothers must show that the district court committed a "gross abuse of discretion resulting in fundamental unfairness." *See In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 790 (8th Cir. 2021) (quoting *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 637–38 (8th Cir. 2007)). This she has not done.

*Smothers*, 63 F.4th 721, 727 (8th Cir. 2023). Furthermore, the quotation of *In re Bair Hugger* in *Smothers* comes from a passage in which the court of appeals found no fundamental unfairness in the Court's discovery ruling:

> "Appellate review of a trial court's determination concerning discovery matters is very narrow." "[W]e will only reverse upon a showing of a 'gross abuse of discretion resulting in fundamental unfairness in the trial of the case.'"
>
> We assume without deciding that, as Plaintiffs argue, the MDL court erroneously concluded that this discovery was irrelevant across the entire MDL because some states would (or might allow a jury to) recognize conductive patient-warming devices as reasonable alternative designs to convective patient-warming devices. Even so, *Plaintiffs have not even argued on appeal, let alone shown, that the MDL court's discovery ruling resulted in fundamental unfairness to them in trying their cases.*

> *Even if we considered the point, we would not find*
> *fundamental unfairness on this record.*

*In re Bair Hugger*, 9 F.4th at 790 (alteration in original) (emphasis added) (citations omitted).

"The question posed in motions for recusal under § 455(a) is not whether the trial judge committed errors, but whether these errors create a reasonable inference that the Court has lost its impartiality." *Little Rock Sch. Dist.*, 839 F.2d at 1302. The court of appeals recognized that "there are weaknesses in the factual basis for Plaintiffs' medical experts' general-causation opinions":

> On the one hand, they have epidemiological evidence
> reporting an association between Bair Hugger use and PJIs,
> but on the other hand they failed to grapple adequately with
> the shortcomings of that evidence. On the one hand, they
> have identified two plausible mechanisms explaining this
> association, but on the other hand there are weaknesses in the
> supports for both mechanisms.

*In re Bair Hugger*, 9 F.4th at 787-88. The Court's reconsideration decision does not constitute grounds to disqualify. *See Liteky*, 510 U.S. at 555-56.

Finally, Plaintiffs stated the undersigned has "continued to let Plaintiffs' infections fester" after the Eighth Circuit issued the mandate. They noted that no public status conference before the undersigned has taken place. After the mandate issued, the magistrate judge held status conferences, the Court held status conferences with lead counsel in chambers, and the Court ordered the parties to participate in mediation.

### D.     Law Clerk

Of the numerous law clerks this Court has employed during the pendency of the

MDL, Plaintiffs have zeroed in on one.  They mischaracterized him as a "secret" law

clerk, attacked him for adhering faithfully to the duty of confidentiality, and denigrated

his experience as disqualifying.  Plaintiffs asserted, without any factual basis, that the law

clerk was "the man behind the curtain of the reconsideration decision."

The law clerk in question was and is a retired attorney who enjoyed a long and

respected career.  Far from being a "secret," his employment as a law clerk was publicly

disclosed on the District of Minnesota's website.  *The Honorable Joan N. Ericksen*,

United States District Court, District of Minnesota, https://web.archive.org/web

/20190515224105/http://www.mnd.uscourts.gov/Judges/ericksen.shtml.  Again, the

information was available to Plaintiffs and to the public at large at the time of the law

clerk's hiring, and it has remained publicly available ever since.

One of Plaintiffs' grievances is that the law clerk was not physically present in the

courtroom during the reconsideration hearing ("never dared to appear at that hearing" and

"lurked only in the shadows of chambers" are the phrases Plaintiffs chose).[15]  But law

clerks do not formally "appear" in cases.  Certainly there is no requirement that they

present themselves in the courtroom to suggest that they are working on a particular case

---

[15]     Plaintiffs did not mention the Court's other law clerks in 2019, some of whom did attend the reconsideration hearing, perhaps because those law clerks would not serve Plaintiffs' "man behind the curtain" theory.  *Cf. O'Bannon v. Union Pac. R.R. Co.*, 169 F.3d 1088, 1091-92 (8th Cir. 1999) ("What plaintiffs' argument in the present case overlooks is that cases are decided by judges, not law clerks.").

or aspect of a case.  In fact, "[l]aw clerks owe judges complete confidentiality in case-related matters."  Fed. Jud. Ctr., *Law Clerk Handbook: A Handbook for Law Clerks to Federal Judges* 7 (4th ed. 2020).  They "should avoid making public comment on the merits of a pending or impending action," and they "should never disclose any confidential information received in the course of official duties except as required in the performance of such duties."  *Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 3, Code of Conduct for Judicial Employees, Canon 3D.  The matters that a law clerk works on are confidential; a law clerk may not disclose them.  *Guide to Judiciary Policy*, Vol. 2, Pt. B, Ch. 2, Published Advisory Opinions, Advisory Opinion No. 109 ("The assignment of a law clerk to a particular case is rarely revealed by any court, whether appellate, district, or bankruptcy."); Fed. Jud. Ctr., *Maintaining the Public Trust: Ethics for Federal Judicial Law Clerks* 27 (2019 rev. 4th ed.) ("The matters that [a law clerk] worked on are confidential and may not be disclosed . . . .").  A law clerk's duty of confidentiality is well known in the legal profession.  Plaintiffs' counsel must certainly be aware of it.  Plaintiffs' assertion that the law clerk's service was kept a secret is false.

Law clerks must also act impartially.  They (and other judicial employees) "should avoid conflicts of interest in the performance of official duties":

> A conflict of interest arises when a judicial employee knows that he or she (or the spouse, minor child residing in the judicial employee's household, or other close relative of the judicial employee) might be so personally or financially affected by a matter that a reasonable person with knowledge of the relevant facts would question the judicial employee's ability properly to perform official duties in an impartial manner.

*Guide to Judiciary Policy*, Vol. 2, Pt. A, Ch. 3, Code of Conduct for Judicial Employees, Canon 3F(1). Law clerks are subject to additional restrictions. *Id.*, Canon 3F(2)(a).[16] Plaintiffs alleged nothing that casts doubt on the fact that the law clerk bore allegiance only to the faithful application of the law.

---

[16] Canon 3F(2)(a) states:

> A staff attorney or law clerk should not perform any official duties in any matter with respect to which such staff attorney or law clerk knows that:

> (i) he or she has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

> (ii) he or she served as lawyer in the matter in controversy, or a lawyer with whom he or she previously practiced law had served (during such association) as a lawyer concerning the matter . . ., or he, she, or such lawyer has been a material witness;

> (iii) he or she, individually or as a fiduciary, or the spouse or minor child residing in his or her household, has a financial interest in the subject matter in controversy or in a party to the proceeding;

> (iv) he or she, a spouse, or a person related to either within the third degree of relationship . . ., or the spouse of such person (A) is a party to the proceeding, or an officer, director, or trustee of a party; (B) is acting as a lawyer in the proceeding; (C) has an interest that could be substantially affected by the outcome of the proceeding; or (D) is likely to be a material witness in the proceeding;

> (v) he or she has served in governmental employment and in such capacity participated as counsel, advisor, or material witness concerning the proceeding or has expressed an opinion concerning the merits of the particular case in controversy.

If a law clerk or other member of a judge's personal staff[17] has a conflict of

interest with regard to a particular case, the law clerk or staff member can be walled off

from it in chambers. *See Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1311 (10th

Cir. 2015) ("Of course, '[i]f a clerk has a possible conflict of interest, it is the clerk, not

the judge, who must be disqualified.'"); *O'Bannon*, 169 F.3d at 1091 ("A judge might

well instruct a law clerk not to work on a case in which one of the lawyers is a close

friend, housemate, or the like of the law clerk.  That would be a reasonable decision for a

judge to make, and, in fact, a judge might consider such a decision ethically obligatory.").

Had Plaintiffs pointed to a conflict of interest on the part of a particular clerk, the Court

could have undertaken an analysis of whether that clerk should have been walled off from

the MDL.  *See Mathis*, 78 F.3d at 1311 ("If a law clerk continues to work on the case in

which his or her impartiality might reasonably be questioned, however, the clerk's actual

or potential conflict may be imputed to the judge.").  But Plaintiffs pointed to no conflict

of interest.  *See In re Kensington Int'l Ltd.*, 368 F.3d 289, 303-04 (3d Cir. 2004) ("We

conclude that two of the Advisors . . . did, in fact, operate under a structural conflict of

interests at the same time that they served as Judge Wolin's Advisors.  This conflict arose

from the dual roles they played in the Five Asbestos Cases and the *G-I Holdings*

bankruptcy."); *Hall v. Small Bus. Admin.*, 695 F.2d 175, 176-77 (5th Cir. 1983)

("Because a magistrate's sole law clerk was initially a member of the plaintiff class in

---

[17]     Canon 3F(2)(b) addresses "[a] secretary to a judge, or a courtroom deputy or court reporter whose assignment with a particular judge is reasonably perceived as being comparable to a member of the judge's personal staff."

this suit, had before her employment with the magistrate expressed herself as convinced of the correctness of its contentions, and accepted employment with its counsel before judgment was rendered, we hold that the magistrate erred in refusing to disqualify himself.").

The law clerk, in his long, pre-retirement career, is not alleged to have represented Defendants in any matter, let alone one that relates to the Bair Hugger. Plaintiffs claimed no improper financial interest on the part of the law clerk. They claimed no improper personal relationships on the part of the law clerk. Plaintiffs alleged no violation of the Code of Conduct by the law clerk. The most Plaintiffs say is that he apparently represented more products liability defendants than plaintiffs in his prior career. (He also acted as a mediator.)

A practice in a particular area does not, in the American legal system, disqualify an attorney from acting as a neutral. Criminal defense attorneys become prosecutors; prosecutors become defense attorneys. Both become judges. It is this Court's observation that lawyers in civil cases, whether they represent plaintiffs or defendants, are more, rather than less, effective if they are able to appreciate the other side's point of view.

Plaintiffs ascribe a high degree of professional efficacy to the targeted law clerk. His professionalism belies Plaintiffs' groundless assertion that he clerked "to continue his life's work protecting corporate giants." The attacks on this lawyer are unfounded, unreasonable, and unfair. Experience is not disqualifying for public service. *See In re Kensington*, 368 F.3d at 305 ("We emphasize that it is the *conflict of interest* and not the

particular specialty of the neutral expert or advisor that concerns us. A judge may engage an expert or someone to assist him who has no conflict and is 'disinterested.'"). The Court's retention of the law clerk in 2019 does not constitute grounds to disqualify. *See Mathis*, 787 F.3d at 1311.

### E. Totality

Finally, Plaintiffs asserted that "[t]he totality of [the undersigned's] misconduct raises an inference of bias." Considered individually or collectively, nothing in Plaintiffs' motion to disqualify the undersigned constitutes grounds to disqualify. *See In re Kan. Pub. Emps. Ret. Sys.*, 85 F.3d at 1365 ("Finally, KPERS argues that all of these facts cumulatively create an appearance of a conflict of interest in violation of § 455(a). To the contrary, considering all of the facts and the procedural context of this case, including KPERS' delay and motivation, the big picture reveals to a reasonable person a complex case involving an inordinate number of pretrial motions, an underlying struggle between the parties to determine the choice of forum, a tactical move made by a party who fears a looming adverse decision, and an experienced district judge who is attempting to efficiently resolve the case.").

## IV. Conclusion

The Court denies Plaintiffs' Motion to Disqualify Judge Ericksen and Magistrate Judge Schultz [Docket No. 2273] insofar as it seeks the undersigned's disqualification. The Court denies Plaintiffs' Motion for Reassignment of Plaintiffs' Motion to Disqualify Judge Ericksen and Magistrate Judge Schultz [Docket No. 2285] insofar as it seeks

reassignment of Plaintiffs' motion to disqualify the undersigned.  The Court will issue a

separate order that is consistent with this Memorandum.

July 10, 2023

s/Joan N. Ericksen

JOAN N. ERICKSEN
United States District Judge
